**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02075-WJM-GPG

SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,
and LINDSAY WINNINGER, an individual,

      Plaintiffs,

v.

VAIL CLINIC, INC. d/b/a VAIL HEALTH, a Colorado nonprofit corporation.

      Defendant.

---

### PLAINTIFFS' AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiffs Sports Rehab Consulting LLC ("Sports Rehab"), and Lindsay Winninger ("Winninger"), for their Amended Complaint against Defendant Vail Clinic, Inc. previously d/b/a "Vail Valley Medical Center" n/k/a "Vail Health" ("Vail Health"), by and through their attorneys, state and allege as follows:

### NATURE OF THE ACTION

1.    This is an action under § 2 of the Sherman Act, 15 U.S.C. § 2, to adjudicate Vail Health's liability for anticompetitive conduct and recover monetary damages to remedy Vail Health's past unlawful conduct.

2.    Vail Health, through its Howard Head Sports Medicine physical therapy unit ("Howard Head"), provides over 80% of the physical therapy services in the Vail Valley market and possesses monopoly power to raise prices and exclude competition. Vail Health has possessed that power for at least the past four years.

3.    There are high barriers to entry in the Vail Valley market, and one of the most important is the lack of physical therapists in the labor market, which Vail Health

controls through unlawful employment contracts.  Other barriers to entry are entrenched physician referral networks, extremely high-cost commercial real estate space, and Vail Health's lower-cost structure and economies of scale, among others.

4.      The most significant potential threats to Vail Health's monopoly power was the loss of The Steadman Clinic ("Steadman") as a referral source of patients to its Howard Head physical therapy unit and the entry of Steadman into the Vail Valley physical therapy market as a competitor.

5.      To protect its valuable monopoly, Vail Health attempted to secure and expand its monopoly by entering into a joint arrangement with Steadman and other orthopedic clinics to "lock up" its referral sources and keep Steadman from becoming a competitor.  That attempt to combine would have increased Vail Health's 80% market share and assured Vail Health's continued dominance in the Vail Valley market.

6.      To maintain its market dominance, Vail Health included a restrictive covenant in its long-term lease arrangement with Steadman prohibiting Steadman from providing physical therapy services from its space in the Vail Health medical building.

7.      Another significant potential threat to Vail Health's monopoly power was the entry of Sports Rehab into the Vail Valley physical therapy market.  To protect its monopoly against such a potential competitive threat, Vail Health engaged in a number of anticompetitive activities, including a broad-based campaign of defamatory and disparaging communications against Sports Rehab and its founder, Lindsay Winninger.

8.      The consequence of this exclusionary conduct is that Vail Health has directly interfered with and destroyed Winninger and Sports Rehab's business relationships in the Vail Valley.

9.      Collectively, Vail Health's attempt to combine to expand its monopoly, its unnecessarily restrictive contracts, and its exclusionary conduct have unreasonably restrained competition, and will continue to restrain competition (unless enjoined) in the market for physical therapy in the Vail Valley market.

## PARTIES

10.     Plaintiff Lindsay Winninger is a licensed physical therapist presently residing in Eagle County, Colorado and a principal member of Sports Rehab.

11.     Plaintiff Sports Rehab Consulting LLC is a Colorado limited liability company that, at times relevant to this action, maintained an office at the Four Seasons Hotel located at 1 Vail Road, Vail, Colorado 81657.  Due to the impact of the facts alleged in this Complaint, Winninger and Sports Rehab were forced to close the Vail office in September 2018 but continue to maintain an office located at 3909 Fox Street, Denver, Colorado 80216.

12.     Defendant Vail Health is a Colorado nonprofit community hospital with its principal office located at 181 West Meadow Drive, Suite 100, Vail, Colorado 81657.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the matter pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337, in that the exclusionary conduct alleged herein places unreasonable burdens on the free and uninterrupted flow of interstate commerce, as follows:

(a) The activities and conduct of Vail Health are within the flow of interstate commerce and affect that commerce because Vail Health's Howard Head physical therapy unit provides in excess of $20 million in physical therapy services to patients not only from the Vail Valley, but to patients who come to Vail Valley from throughout the United States and foreign countries. Vail Health is therefore engaged in interstate commerce.  Moreover, all or

3

most of Vail Health's physical therapy patients have been adversely affected by the anticompetitive activities and conduct of Vail Health in violation of § 2 of the Sherman Act that have resulted in supra-competitive prices, as hereinafter alleged.  Vail Health has therefore had an effect on interstate commerce that is decidedly adverse to consumers who are paying more than they otherwise would have in a competitive market.

(b) The physical therapy services provided by Vail Health, through its Howard Head unit, were at all times relevant to this action offered to and continue to be offered to and utilized by patients moving into and out of the Vail Valley, all or most of whom have been adversely affected by the anticompetitive activities and conduct of Vail Health in violation of § 2 of the Sherman Act, as hereinafter alleged.  Vail Health has therefore had an effect on interstate commerce that is decidedly adverse to consumers who are paying more than they otherwise would have in a competitive market.

(c) The physical therapy services provided by Vail Health, through its Howard Head unit, were in most instances paid for, or reimbursed by Medicare, Medicaid, health care insurers, health care plans, and third-party health care administrators (collectively, "insurers") who are located throughout the United States.  But two of many examples are United Health Care (Minnesota) and Anthem Blue Cross Blue Shield (ten states).

Vail Health was and is integral and indispensable to the administrative functions of accounting, invoicing, and collecting of patient medical expenses from interstate insurers arising out of the physical therapy services provided to interstate patients by Vail Health.  Vail Health is therefore engaged in interstate commerce.

The insurers were and continue to be adversely affected in the form of millions of dollars in higher medical claims resulting from the anticompetitive activities and conduct of Vail Health in violation of § 2 of the Sherman Act, as hereinafter alleged.  Vail Health, therefore, has had a negative effect on interstate commerce.

(d) The physical therapy services provided by Vail Health, through its Howard Head unit, were at all times relevant to this action performed by and and continue to be performed by physical therapists moving into and out of the Vail Valley, all or most of whom have been adversely affected by the anticompetitive restrictive employment covenants that illegally restrict their movement in the labor market.  Vail Health's activities and conduct with respect to these restrictive agreements are in violation of § 2 of the Sherman Act and have had a negative effect on interstate commerce.

(e) Over the time period at issue in this case, the negative effect of Vail Health's anticompetitive behavior exceeds $20 million.

14.     Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Vail Health was incorporated, maintains its principal place of business, and transacts business in this judicial district.  In addition, the acts giving rise to this action occurred in this judicial district.

## GENERAL ALLEGATIONS

15.     Many of the following factual allegations are supported by deposition testimony taken in the Eagle County action.  None of the depositions or testimony referred to in this Amended Complaint were designated as confidential under the terms of the Protective Order issued in that case, and therefore, Plaintiffs are not precluded in any way from relying on that testimony here.  Before filing this Amended Complaint, Plaintiffs specifically asked Vail Health to identify where any such confidentiality designation was made on the record or in accordance with the Protective Order.  Vail Health did not respond.

## WINNINGER AND SPORTS REHAB

16.     Winninger founded Sports Rehab in spring 2014 to assist athletes in reaching maximal potential after injury.  Sports Rehab provides a concierge-type physical therapy service that is not generally offered in Vail Valley.  Sports Rehab's physical therapists generally treat a patient for 1-2 hours and at any location requested by the patient.  Additionally, Sports Rehab does not use protocols but offers an individualized rehabilitation program suited to each patient's needs.

17.     Winninger has been a practicing physical therapist for over ten years.  She earned her Bachelor's degree in Exercise Science and completed her Master's degree in Physical Therapy at St. Louis University in St. Louis, Missouri.

5

18.     She is recognized as a leading sports physical therapist in the evaluation and treatment of hip and knee injuries.

19.     From January 2008 to May 2012, Winninger worked as a physical therapist for a company called Rehabilitation & Performance Center at Vail, LLC ("RPC-Vail"), which was owned and managed by John Atkins and Topper Hagerman.  RPC-Vail was engaged in a physical therapy practice and conducted its services under the trade name of Howard Head.  RPC-Vail operated the physical therapy clinic in the Vail Health medical center building in Vail, Colorado.

20.     Until Winninger departed for the U.S. Ski Team in 2012, Winninger was an employee of RPC-Vail and was never a Vail Health employee.

21.     In spring 2012, Winninger resigned from her position at RPC-Vail to become the head physical therapist for the U.S. Women's Ski Team.  She maintained that position from May 2012 to April 2014, during which time she was the Women's Alpine Team physical therapist for the 2014 Winter Olympic Games in Sochi.

22.     After the 2014 Olympics, Winninger became alpine skiing champion Lindsey Vonn's private, full-time physical therapist.  Vonn has credited Winninger with helping her come back after multiple injuries over the past six years.

23.     Winninger has treated and rehabbed athletes in the NFL, NHL, NBA, MLB, PGA, WTA, USSA, as well as collegiate and Olympic athletes in various sports.  She has treated many of her patients for well over five years.

24.     Sports Rehab opened the Vail location in December 2015 and was forced to close that location in about September 2018 because of the effects of Vail Health's anticompetitive conduct.  Sports Rehab presently has four physical therapists located in

Denver.   Each has a strong educational background, holding either Master's or Doctorate degrees.   Each also has a strong professional background working with prominent athletes, including the U.S. Olympic Sports Medicine team, the International Triathlon Union's Sports Development team, NBA, NFL, NHL, PGA, USSA, MLB, and multiple professional ballet companies.

25.     For many years, Winninger and other Sports Rehab physical therapists routinely worked with Steadman and other orthopedic clinics in the Vail Valley.   When Winninger returned to the Vail Valley on a full-time basis, it was anticipated that Steadman would constitute a significant portion of Winninger and Sports Rehab's physical therapy referrals.   That dramatically changed, however, because of Vail Health's anticompetitive conduct.

26.     Winninger had the highest reputation for excellence in physical therapy services for significant athletic and sport-related injuries.   She has been called "the best sports physical therapist in the country, if not the world," by a leading orthopedic surgeon in Vail.   Winninger has earned the respect and admiration of some of the country's other renown orthopedic surgeons and developed the highest of reputations among world-renown athletes.   Through Vail Health's anticompetitive conduct, Vail Health intentionally and purposefully endeavored to destroy Winninger and Sports Rehab's reputation to drive them out of the Vail Valley physical therapy market.

27.     In 2016, Steadman and the Steadman Philippon Research Institute ("SPRI") approached Winninger, seeking to engage her services to provide advice and consulting services specific to developing patient-centered and patient-specific programs for musculoskeletal health and sports injury prevention programs.   Winninger

was retained, at least in part, to revise a hip protocol for Managing Partner of Steadman, Dr. Philippon, and establish a rehabilitation outcomes data base for SPRI. She was also retained by Steadman to create a wellness program for its patients.

28.    By August 2016, Steadman and SPRI both entered into separate consulting services agreements with Winninger for these consulting services.  As alleged in this Complaint, Vail Health sought to destroy Winninger and Sports Rehab's relationship with Steadman and SPRI to drive Winninger and Sports Rehab out of the Vail Valley market, which Vail Health ultimately accomplished.

### VAIL HEALTH AND HOWARD HEAD SPORTS MEDICINE

29.    Vail Health is an independent nonprofit hospital, which is home to a physical therapy operation doing business under the trade name of Howard Head Sports Medicine ("Howard Head").  Steadman and SPRI are separately owned and operated entities that share operational facilities with Vail Health in Vail, Colorado.

30.    In 2012, Vail Health terminated the lease for the space in which RPC-Vail operated its physical therapy services in the Vail Health medical center and also terminated service contracts with RPC-Vail and RPC-Denver.  At or about the same time, Vail Health solicited virtually all of the physical therapists working for RPC-Vail and its corresponding physical therapy office in Denver ("RPC-Denver") to become physical therapists for Vail Health under the same Howard Head name.

31.    Vail Health offered physical therapists additional compensation and a bonus to leave RPC-Vail and RPC-Denver, but they were required to sign a nonsolicitation agreement if they were to continue working at the Howard Head facility that would now be run by Vail Health.  Most of the physical therapists in RPC-Vail

accepted the offer.  Through these actions, Vail Health eviscerated the physical therapy business of RPC-Vail and captured that business for itself.

32.    Today, Vail Health, through Howard Head, employs over 57 physical therapists in the Vail Valley geographic market, who provide physical therapy sessions at Howard Head's eight clinic locations in the Vail Valley.  Howard Head does not provide the personalized, at any location, and patient-specific programs like Winninger and Sports Rehab.  For example, Howard Head physical therapists are scheduled to see patients about every 40 minutes at one of the eight clinic locations in the Vail Valley and generally do not devote the same amount of time, or provide the same personalized, at-home services that Winninger and Sports Rehab offer.

## VAIL HEALTH ACHIEVED MONOPOLY POWER

33.    The history of Vail Health's Howard Head physical therapy unit demonstrates that it maintains remarkable market saturation.  But regardless of how that was acquired, Plaintiffs allege that Vail Health possesses and exercises monopoly power in the market for physical therapy services in the Vail Valley by engaging in conduct that excludes competition in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

## THE RELEVANT GEOGRAPHIC MARKET

34.    Plaintiff Sports Rehab currently maintains an office in Denver, Colorado, and from December 2015 to September 2018 maintained an office in Vail, Colorado. Sports Rehab was forced to close its Vail office due to the exclusionary conduct of Vail Health, alleged in this amended complaint.   Vail Health, through its Howard Head physical therapy unit, provides physical therapy services at the following Eagle County, Colorado offices:  Avon, Beaver Creek (seasonal), Eagle, Edwards (2 offices), Gypsum,

and Vail (2 offices).  Vail Health, through its Howard Head physical therapy unit, also provides physical therapy services in Breckenridge and Silverthorne (Summit County).

35.     Vail Health provides at least 80% of the physical therapy services in Eagle County, which Plaintiffs define for antitrust purposes as the relevant geographic market (hereinafter the "Vail Valley market"), which lies in the somewhat narrow Vail Valley stretching from East Vail to Gypsum, Colorado.  The Vail Valley market has the natural geographic features of Vail Pass (10,577 feet above sea level) on the East end, Glenwood Canyon on the West end, and mountains to the South and North.

36.     Plaintiffs do not include Vail Health's Breckenridge or Silverthorne offices to be part of the relevant geographic market for several practical reasons.  *First*, physical therapy patients residing on the West side of the summit of Vail Pass would be required to travel between 30 to 68 miles to reach Silverthorne and up to about 75 miles to reach Breckenridge if they were to seek alternative sources of physical therapy services.  The sheer distance, combined with the challenges of navigating Vail Pass or Glenwood Canyon during the roughly five-month winter or during inclement weather, are simply too difficult to render Silverthorne or Breckenridge to the East or Glenwood Springs to the West as viable providers of physical therapy services.

37.     *Second*, many of the physical therapy services at issue are provided within the first 1-3 weeks following a patient's surgery, and the overwhelming number of surgeries occurs in Vail Health's operating suites in Vail.  Many recovering surgery patients are unable or unwilling to make a 30+ mile trip over Vail Pass and 30+ mile trip back from Silverthorne or the 60 mile trek to Glenwood Springs to seek alternative

physical therapy treatment.   As a practical matter, therefore, Vail Valley is the only realistic definition for the relevant geographic market.

38.     *Third*, within the Vail Valley market there are few competitors of Vail Health that provide physical therapy services.   As of the date of this filing, Plaintiffs calculate there are 80 physical therapists in the Vail Valley market, of which 57 are employed by Vail Health.   On a head-count basis, therefore, Vail Health has in excess of a 71% market share.   The more appropriate market share calculation for purposes of antitrust analysis of relevant geographic market, however, is on a revenue basis. Because of the much higher rates charged by Vail Health physical therapy patients, Plaintiffs estimate that Vail Health's market share on a revenue basis exceeds 80% in the Vail Valley market.   As a result, patients in need of physical therapy are unable to quickly or easily turn to alternative providers either within or outside Vail Valley.   So if Vail Health controls 80% of the physical therapy revenue in the Vail Valley, as Plaintiffs allege, then Vail Valley is the relevant geographic market for purposes of this action.

39.     *Fourth*, as discussed below and incorporated herein, there are barriers to entry in the Vail Valley market that prevent new or additional providers of physical therapy services from entering the Vail Valley.   One of the most significant barriers is that Vail Health has the labor market for physical therapists "locked up" with non-compete and/or non-solicitation restrictions in employment agreements.   This means that over 70% of the physical therapy labor in the Vail Valley (by head-count) is controlled by Vail Health.   An entrant to the Vail Valley market seeking to compete for the excessive profits that Vail Health enjoys would be required to attract labor from outside the Valley.   The physical therapy labor market, therefore, is the Vail Valley and

thus is another strong indicator that the relevant geographic market for Sherman § 2 monopoly purposes is the Vail Valley.

40.     *Fifth*, with more than 80% market share and control over the supply of physical therapists in Vail Valley, Vail Health commands an overwhelmingly dominant position in the Vail Valley market.  Vail Health does not have any position in Denver because it has no offices there.  Its headquarters are in the Vail Valley, its clinical offices are in the Vail Valley, its employees are overwhelmingly in the Vail Valley, it overwhelmingly treats its patients in the Vail Valley, and its relationships with orthopedic surgeons who provide patient referrals are overwhelmingly practicing in the Vail Valley.

41.     *Sixth*, the exclusionary anticompetitive conduct of Vail Health against Sports Rehab and Winninger occurred in the Vail Valley.  Although that fact may not in and of itself determine the relevant geographic market for antitrust purposes, Vail Health's exclusionary behavior did not begin until she returned to the Vail Valley to open a competing physical therapy clinic in the autumn of 2015.  Vail Health did not attempt to solicit her to become part of Vail Health until it learned that she was opening a competing business.  And after learning about Winninger's return to the Vail Valley, Vail Health began to make statements like, "Competition is healthy, it gives you a chance to step back and evaluate things.   But technically, ***my job is to look at you as competition and my job would be to eliminate you***."  Vail Health also told Winninger you must "align or die," that is, align with Vail Health or die.  Vail Health's drive to destroy Winninger as a competitor did not occur until she opened an office in the Vail Valley, so these facts also suggest the relevant geographic market is the Vail Valley.

42.     All the factors above have allowed Vail Health to raise prices above

market levels without losing patients or attracting competitors.  The Vail Valley functions as a distinct market for physical therapy services and is thus the relevant geographic market for analyzing Vail Health's monopoly power for Sherman § 2 purposes.

## RELEVANT PRODUCT MARKET

43.     For antitrust purposes in this action, Plaintiffs define the relevant "product" market, or in this case "service" market, as physical therapy services that are most often provided for the treatment of a patient's physical injury to a knee, hip, shoulder, back, or the myriad of other possible injuries to the human anatomy.

44.     Physical therapy is the correct relevant product or service market because there are no alternative products or services that function as substitutes for the services provided by licensed physical therapists.  For example, if an individual injures his or her knee and has surgery for repair of a torn meniscus and a torn anterior cruciate ligament, what rehabilitative services would such a patient go to following reconstructive knee surgery for this type of knee surgery?  There simply are no other services that would be a substitute for physical therapy.

45.     And if physical therapy fees increased 200% as the result of the demand for anterior cruciate knee surgery arising out of ski accidents on the slopes of Vail and Beaver Creek, and the price for muscle massage wands increases only 50%, surgical patients would not switch to massagers as viable alternative treatment for the recovery from ACL surgery.  Thus, in this example, there is zero cross-elasticity of demand between physical therapy for patients recovering from ACL surgery and muscle massagers that can be purchased at Walgreens.  Thus, the two are not substitutes.

46.     It is very difficult to identify a substitute good or service for physical therapy.  In other words, if the price of physical therapy increases, it is difficult to identify another good or service where consumption would increase as a result of the price increase for physical therapy.  So an increase in the price of physical therapy will have zero impact on the price for muscle massage wands.  They are unrelated goods/services, so the cross-elasticity is zero.

47.     Vail Health's dominant market share in the relevant geographic and product/service markets, together with significant barriers to entry, provides it with the power to exclude competitive entrants and raise prices over an extended period of time above what would otherwise be a normal competitive price.  The ultimate result of this monopoly power is that Vail Health enjoys supra-competitive profits.

48.     The fact that Vail Health has the power to exclude competitors, such as Winninger and Sports Rehab, is demonstrated by the fact that there have been no new entrants into the Vail Valley physical therapy market for many years.  There have been no new competitors entering the market other that Sports Rehab for at least five years.  On the other side, over the past two years, three physical therapy providers—including Sports Rehab—have closed their Vail clinical offices as the result of the anticompetitive market conditions created by Vail Health's exercise of its monopoly power.  So competition in the Vail Valley physical therapy market has actually decreased over a period of at least five years.

49.     The high market concentration and the supra-competitive profits Vail Health realizes from physical therapy services should have triggered the entry of competitors into the market over the past five years.  But that has not occurred because

of Vail Health's exclusionary conduct and the existence of barriers to entry into the Vail Valley physical therapy market, as hereinafter alleged.

50.     The record of competitors leaving the Vail Valley market and the lack of competitors entering the Vail Valley market is not consistent with a competitive market. In fact, it is consistent with an anticompetitive market.

51.     Vail Health has the monopoly power to raise prices for physical therapy services between 20% to 50% above a competitive market price, and it has had the power to maintain and hold those prices for more than five years.   The prices Vail Health has had the ability to charge have persistently exceeded its short-run marginal costs, which is but one of several factors that confirm its substantial monopoly power.

52.     Both market power and monopoly power are demonstrated by Vail Health's resulting financial *and* economic profits, which are above what would be competitive market prices had Vail Health not possessed and utilized its monopoly power.  For example, by pricing its physical therapy services at about $140 per session as opposed to the more normal $65 to $90 rate per session Vail Health has been able to capture supra-competitive profits exceeding $20,000,000 per year.

## BARRIERS TO ENTRY

53.     Among the barriers to entry that prospective competitors face in Vail Health physical therapy market is the fact that has tied up about 70% of the Vail Valley labor market for physical therapists, all of whom are subject to restrictive nonsolicitation or noncompete covenants in their employment contracts with Vail Health.   Given the language of these restrictive covenants and the manner in which Vail Health has construed and vigorously enforced these restrictive covenants, any new market entrant hiring a Vail Health physical therapist would be required to forego any physical therapy

patients who have ever used (or even potentially used) Vail Health hospital for any service, including physical therapy, over an extended period of time.  That restriction is imposed for a period of one year after the physical therapist terminates employment with Vail Health, but the extent of the "reach-back" provision and the services it includes renders the covenant unreasonably restrictive.

54.     What this means is that a new market entrant would be foreclosed from providing physical therapy services to a preponderant segment of past, present, and even potential Vail Health patients for a period of a year after hiring any Vail Health physical therapist.  Alternatively, if the new entrant accepted a past, present, or even potential Vail Health patient, the entrant would be faced with years of litigation initiated by Vail Health, which has superior financial resources to challenge a new market entrant in comparison to a smaller firm entering the market.  In either event, the new entrant would be faced with substantial loss of revenues and additional costs no matter which way it turned out.

55.     Another barrier to entry is that Vail Health enjoys the resource of its hospital facility located in the heart of Vail that is contiguous or very close to Steadman and at least one of its Howard Head physical therapy locations.  Space for physical therapy facilities for a new market entrant in or around Vail Health hospital are prohibitively expensive.  Vail Health also enjoys a cost advantage over new entrants due to its historical cost structure and tax-exempt status as a nonprofit medical facility.

56.     Among the barriers to entry is an entrenched preference of orthopedic physicians of Steadman for physical therapy services provided by Vail Health's Howard Head physical therapy unit.  The referral of patients to Vail Health has a historical

genesis dating back to about 1993, and new market entrants would have to disrupt this referral preference in order to succeed.

57.     Another barrier to entry is the need for a new competitor to establish acceptable reimbursement agreements with health insurers of physical therapy patients. The establishment of reimbursement relationships with insurers can take years and would impose costs that few new entrants could bear and that Vail Health would not have to incur, or at least the costs would be much lower.

58.     Another barrier to entry is that Vail Health's physical therapy unit possesses a built-in marketing advantage over any new entrant to the market because of its hospital and surgical facilities.  Vail Health has information about patients before any surgical procedure occurs and is thus able to, and in fact does, contact prospective orthopedic surgery patients to sell the services of its Howard Head physical therapy unit.  Then, almost immediately after surgery, Vail Health again contacts the patient to solicit the patient for physical therapy services by its Howard Head unit.  The new entrant does not possess that built-in marketing advantage and thus would be at a revenue-generating and/or cost disadvantage in competing with Vail Health.

59.     Another barrier is the service market interconnections enjoyed by Vail Health.  The patient views Vail Health's physical therapy services as interconnected services that include surgical suites, anesthesia services, recovery rooms, hospital beds, and billing.  The interconnected nature of these services imposes upon a new market entrant a substantial barrier to attracting new physical therapy patients.

60.     Vail Health's pricing structure and resulting profits, taken together with its 80% market share and barriers to entry, demonstrate a *prima facie* case of monopoly

power.   As alleged below, Vail Health has maintained this monopoly power through anticompetitive conduct to exclude competitors that has market-level effects on competition, which in turn has deleterious effects on consumers through higher prices.

## VAIL HEALTH'S ATTEMPT TO ACQUIRE ADDITIONAL MONOPOLY POWER THROUGH A JOINT VENTURE

61.     In 2015, Vail Health began discussions with Steadman regarding the extension of the Steadman lease covering office and clinical space within the Vail Health facilities located at 181 West Meadow Drive, Vail, Colorado, and perhaps other locations in Colorado.  At about the same time, Steadman was considering opening its own physical therapy clinic that would be separate and apart from the physical therapy clinic operated by Vail Health and doing business under the Howard Head trade name.

62.     Because referrals from physicians at Steadman to Vail Health's physical therapy clinic constitute approximately 65% to 70% of its total physical therapy referrals—and thus revenues and profits—Vail Health became extremely concerned that it would lose its monopoly position for physical therapy services in the Vail Valley if it lost the Steadman referrals.

63.     To avoid the loss of Steadman referrals, Vail Health proposed a joint venture to form a partnership (or other legal entity) with Steadman physicians, whereby the joint venture would provide the physical therapy services to patients then provided by Vail Health's Howard Head unit.  Through this arrangement, Vail Health intended to expand and strengthen its dominant monopoly power.

64.     At about the same time, Vail Health attempted to bring Vail Summit Orthopedics, another group of orthopedic surgeons practicing in the Vail Valley, into the physical therapy joint venture.  Inclusion of Vail Summit would have meant that Vail

Health would have contractually tied up an even greater number of referrals, or at least ensured that Vail Health "locked in" its sources of referrals, thus expanding or at least maintaining its level of monopoly power.

65.     This attempt to combine with physicians of Steadman and Vail Summit constituted a violation of § 2 of the Sherman Act, 15 U.S.C. § 2, which makes it illegal for any person to "monopolize, **or attempt to monopolize**, or combine or conspire with any other person" "to monopolize any part of trade or commerce."  (emphasis added.)

66.     The parties to the proposed joint venture—at least Vail Health and Steadman—engaged in negotiations that resulted in four letters of intent extending over a period of approximately one year.  The last of which expired in the late fall 2016.

67.     In attempting to form a joint venture with Steadman and Vail Summit, Vail Health had a specific intent to significantly solidify and expand its monopoly of physical therapy services in the Vail Valley market.  Its intent was to:  (a) formalize its sources of referrals for physical therapy services that were made to Vail Health; (b) reduce the number of referrals that orthopedic physicians would make to competing physical therapy providers in the Vail Valley market; (c) erect greater barriers to entry for potential physical therapy providers in the Vail Valley market; (d) increase its market share, which had the dangerous probability of reaching 90%; (e) further reduce Vail Health's total average costs by spreading its fixed costs over a greater the volume of physical therapy visits; (e) increase its marginal revenue per visit by reducing total costs; and (f) ultimately expand and strengthen its monopoly power for physical therapy services in the Vail Valley market.

68.     To achieve its intended goal of expanding and strengthening its monopoly power within the Vail Valley physical therapy market, Vail Health was willing to use, and as alleged throughout this amended complaint, did in fact engage in anticompetitive conduct.   This anticompetitive conduct included, but is not limited to, restrictive contracts that limit competition from Vail Health physical therapists who terminate their employment relationship with Vail Health, exclusionary behavior including:

- Exclusionary agreements that reduce demand for competitors' products or services;

- Exclusionary agreements that reduce consumer choice for products or services;

- Disparagement of the monopolist's competitors;

- Deceptive acts and misrepresentations to referrals (the "distributors");"

- Misrepresentations to consumers;

- Misrepresentations and misuse of law enforcement and regulatory processes; and

- Sham litigation.

69.     The expiration of the last of these letters of intent caused Vail Health a great deal of concern because it meant that Vail Health still faced the risk of Steadman reducing or cutting off all or most physical therapy referrals to Vail Health's Howard Head physical therapy unit.   And there did indeed come a time when Steadman management informed Vail Health's board and management—through Shannon and Kirchner—that Steadman might establish a physical therapy operation of its own.   Such an occurrence, of course, would have had a devastatingly deleterious financial impact on Vail Health.

70.     Beyond a debilitating financial blow to Vail Health, the establishment of a physical therapy unit by Steadman would have resulted in a dramatic effect on competition for physical therapy services in the Vail Valley.  Vail Health would have lost at least 50-60% of its physical therapy revenues and it would have been required to reduce its physical therapy staff dramatically.   The number of Vail Health's Howard Head physical therapists would have been reduced by at least 50%, with the bulk of them moving to the new Steadman physical therapy unit.

71.     The impact of such a new competitor would have first been felt in the competition for physical therapists, with their salaries initially being raised, but in the long run the level of physical therapy compensation would have reduced itself to a more normal level of market equilibrium.   The long-term reduction of market compensation levels for physical therapists would have had a beneficial effect upon the labor costs of other physical therapy providers in the Vail Valley market.   These lower labor costs would, in turn, have had the benefit of reducing the cost of physical therapy services to consumers over the long run.

72.     Another result of Steadman establishing its own physical therapy unit, which would have occurred almost immediately, would have been fierce competition between Vail Health's Howard Head and Steadman's new physical therapy unit.  This competition would have resulted in price reductions for physical therapy services paid by patients and their insurers.  Competition from Steadman would have required Vail Health to renegotiate its medical reimbursement contracts with health insurers, as well as reduce its publicly-announced prices to patients.  All of this would have benefitted consumers of physical therapy services and other physical therapy providers.

73.     Another result for the establishment of a Steadman physical therapy unit would have been competition to provide the highest quality physical therapy services in the Vail Valley.  That would have manifested itself from the competition for the most experienced and most qualified physical therapists and improvements in the services offered by Vail Health's Howard Head.  All of this would have benefited consumers.

74.     As described in detail later in this amended complaint, the prospective joint venture arrangement that Vail Health sought to consummate failed.  Vail Health's attempt to expand and strengthen its monopoly power constitutes the violation of § 2 of the Sherman Act.  Equally important, the collapse of the joint venture negotiations caused tragic and devasting antitrust injury to Winninger and Sports Rehab, as later alleged in this Complaint.

**VAIL HEALTH PLACED UNNECESSARILY ANTICOMPETITIVE
RESTRICTIONS IN THE STEADMAN CLINIC LEASE**

75.     Vail Health and Steadman signed a ten-year lease whereby Steadman would remain in its clinical facilities in the Vail Health medical building located at 181 Meadow Drive, Vail, Colorado.  The lease, however, prohibited Steadman from providing physical therapy services in the Vail Health leased space.  The lease restriction thereby functionally excludes Steadman from providing physically therapy services in the Vail Valley and precludes Steadman from becoming a competitor of Vail Health in the physical therapy market for ten years.

76.     The restrictive covenant in Steadman lease is unquestionably intended to reduce competition and has the effect of further enhancing Vail Health's monopoly power.  Although it would otherwise be lawful for a real estate owner to restrict or limit the uses of its property, such conduct may be impermissibly exclusionary under antitrust

law when practiced by a monopolist.  This is particularly true when viewing the myriad types of anticompetitive exclusionary conduct within the context of the relevant geographic and product or service markets.  Thus, when analyzed against the totality of Vail Health's anticompetitive behavior as a monopolist, the lease restriction excluding a potential competitor violates § 2 of the Sherman Act, 15 U.S.C. § 2.

**VAIL HEALTH PLACED UNNECESSARY ANTICOMPETITIVE RESTRICTIONS IN PHYSICAL THERAPISTS' EMPLOYMENT AGREEMENTS**

77.    At the time Vail Health took over the physical therapy clinic operations of RPC-Vail on or about November 1, 2012, it required physical therapists who had been employed by RPC-Vail and RPC-Denver to sign an employment agreement that contained certain restrictive covenants.

78.    Cimino was one of the RPC-Vail physical therapists who accepted Vail Health's offer, which was memorialized in an employment agreement drafted and presented by Vail Health.   The agreement contained the following nonsolicitation covenant:

> Non Solicitation
>
> During the term of your employment and for a period of one year thereafter you shall not…directly or indirectly solicit, divert, or take away, or attempt to solicit divert, or take away any business the Medical Center **has enjoyed or solicited prior to the date hereof** or at any time during your employment with the Medical Center. This provision however shall not be construed to require Employee to violate any law forbidding anti-competitive practices or any law regarding anti-trust.  (emphasis added.)

79.    C.R.S. § 8-2-113(2) provides that "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer ***shall be void***…."  (emphasis added.)  C.R.S. § 8-2-

113(2)(d) provides that the prohibition on covenants "shall not apply to...[e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel."   Vail Health enforces its nonsolicitation covenant against physical therapists who are not involved in or responsible for managing any aspect of its business.

80.   The nonsolicitation clause is not the type of employment agreement that is saved by the trade secret exception under § 8-2-113(2)(b).  The employment agreement that was drafted by Vail Health contains two separate and distinct covenants: paragraph "5. Confidential Information" and paragraph "6. Non-Solicitation."   Under controlling Colorado law, a separate trade-secret nondisclosure provision adequately protects a plaintiff's interests in its trade secrets, but the restrictive covenant does not enhance that protection.   Consequently, the trade secret provision may be valid, but the nonsolicitation covenant is not*.*  Vail Health, therefore, is holding the Vail Valley labor market for physical therapists hostage with employment agreements that are void under C.R.S. § 8-2-113(2).

81.   In addition, it is well-settled in Colorado that to be enforceable, a nonsolicitation provision must satisfy the established rule of reasonableness.   The covenant here is unreasonably overbroad and void *ab initio* because, by its very language—and as Vail Health construes it—the covenant restricted physical therapists who signed the employment agreement from doing *anything* to earn a living as a physical therapist if he or she left Vail Health.

82.   For example, under Vail Health's construction of the clause, any patient that checked into the hospital or physical therapy unit—or even potential patient—is off

limits to any physical therapist who signed the nonsolicitation agreement for a period of one year.

83.     And as to the time restriction, the therapist could not accept any physical therapy patient who had been a Vail Health patient "prior to the date hereof or at any time during your employment" and for a period of one year thereafter.  So if a patient had undergone an appendectomy at Vail Health in 2006, the therapist could not even *accept* that patient for physical therapy in 2016.  The covenant is unreasonably overbroad and therefore void *ab initio* under C.R.S. § 8-2-113(2).

84.     According to the deposition testimony of Vail CEO at the time Doris Kirchner, the physical therapists could not "directly or indirectly" solicit, attempt to solicit, or even accept patients who walked into a competing physical therapy clinic of their own volition.

85.     According to Kirchner and Vail Health, "indirectly" means that the physical therapist could not advertise or post a marketing piece with a hotel or in a public place because that would constitute "indirect" solicitation.

86.     According to the arguments advanced by Vail Health, a physical therapist formerly employed by Vail Health could not contact a physician for the purpose of informing the physician that the physical therapist was present in the Vail Valley and available to provide physical therapy services to the physician's patients.  Again, such contact, according to Vail Health, would constitute "indirect" solicitation.

87.     The language of the restrictive covenant shuts former Vail Health physical therapists completely out of the Vail Valley market because it explicitly states that its scope includes any patient who Vail Health—as a hospital or through its Howard Head

physical therapy unit—"has enjoyed or solicited."  That is, any patient who is *or was treated by or solicited* by Vail Health is off limits.  That means that the entire patient population of Vail Health is off limits.

88.     But the physical therapists who signed employment agreements like Cimino's do not know that the restrictive covenant is illegal.  All they know is what the agreement states on its face and its very language freezes them in place at the Vail Health physical therapy clinic doing business as Howard Head.  The threat of expensive, protracted litigation is sufficient to exclude physical therapists from the physical therapy labor pool for other physical therapy providers.  And given what happened to David Cimino, that fear is not unreasonable.

89.     The nonsolicitation covenants have the additional chilling effect of other physical therapy providers from hiring Vail Health physical therapists because if they hire such a physical therapist, they will face certain litigation initiated by Vail Health for "poaching" its physical therapists.  This is precisely what Vail Health did with respect to Sports Rehab by filing claims for aiding and abetting the breach of the employment agreement and for conspiracy to do the same.  The fact-intensive defense of "I didn't solicit the patient, they approached me" imposes the possibility of crushing legal costs, so competitors will never risk hiring a Vail Health physical therapist.

90.     As a monopolist, Vail Health's practice of tying up 70% of physical therapy labor pool with illegal nonsolicitation covenants is exclusionary and unnecessarily restrictive.  This practice has had a deleterious impact upon the labor pool from both the demand and supply side:  physical therapists cannot enter the labor pool and employers will not hire from the labor pool as a result of the restrictions.

91.    The restrictions imposed upon physical therapists in the Vail Valley have created and continue to create inefficiencies in the labor market and a consequent misallocation of human resources.  Since price is a function of service delivery costs and labor is one of those costs, Vail Health's causation of the inefficient labor market has resulted in inefficient service markets.  This misallocation has substantially increased costs to consumers of physical therapy services and increased the profits derived from those services by Vail Health to abnormal supra-competitive levels.

92.    At the time of filing this Amended Complaint, Plaintiffs do not know the precise language of the employment agreements other than Cimino's that Vail Health has required its physical therapists to sign.  Upon information and belief, however, the employment agreements in place today may be somewhat different but they are at least as restrictive and just as illegal as the one signed by Cimino.

93.    Vail Health's practice of requiring its physical therapists to sign such unnecessarily restrictive employment agreements constitutes anticompetitive conduct intended to exclude labor from the market that would otherwise be available to competitors, all of which is in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

## VAIL HEALTH'S STATED INTENT "TO ELIMINATE" WINNINGER FROM THE PHYSICAL THERAPY MARKET

94.    Into this monopolistic maelstrom entered Lindsay Winninger in September 2015, who only wanted to open her own physical therapy business.  To do that she needed clinical space, so she met with the Four Seasons Hotel to discuss available space for her new clinic.  Inexplicably, almost immediately after Winninger's Four Seasons meeting, a Vice President at Howard Head, Luke O'Brien, learned about

it and informed Vail Health CEO Kirchner that Winninger might be starting a competitive physical therapy clinic at the Four Seasons.

95.     The reason this information was immediately communicated to Vail Health's CEO soon became apparent.  O'Brien did a little digging and learned from the manager at the Four Seasons that the Four Seasons "was working with Philippon [managing partner of Steadman] and a PT named Lindsay on opening a small clinic in the Four Seasons."  That information was also immediately communicated to CEO Kirchner.

96.     Although O'Brien said he did not initially take the Sports Rehab/Four Seasons idea seriously, he informed Kirchner that Winninger had met with Dr. Philippon "multiple times in the last month" and "that she has the relationship with MJP [Dr. Philippon] to pull this off."  The implication of the "pull this off" statement is obvious:  Vail Health executives thought Winninger was about to start a new physical therapy clinic on behalf of Steadman, possibly located in the Four Seasons hotel complex, that would directly compete with Vail Health's Howard Head physical therapy clinic.

97.     This explains why O'Brien told Kirchner about the situation and raised the idea that he thereafter posited that Vail Health should consider the Four Seasons as a possible Howard Head clinic site—that is, move in and take away the site from Steadman and Winninger—to at least temporarily stymy the threat of a competing Steadman physical therapy clinic.

98.     Less than an hour later, Kirchner responded: "This is perplexing.  What are your thoughts on doing work at FS [the Four Seasons]? Why is Marc [Philippon] doing this?  What does Mark Herron [the manager of the Four Seasons] suggest?"  She

then forwarded O'Brien's email to Mike Shannon, Vail Health's Chairman of the Board, to get his input.

99.     At an October 13, 2015 meeting, Winninger, unaware of the danger into which she was placing herself, told O'Brien that she was indeed looking for space but had not yet signed a lease.  Winninger also explained that she was interested in living in Vail (after traveling for two years) but did not want to work for a traditional physical therapy clinic.  Meaning she wanted to run her own clinic in Vail and did not want to work for Vail Health.

100.    Upon hearing this, O'Brien stated, "I'm in a different position than what I used to be.  If I was in your position, I'd love to do it that way.  But I'm not in the same position that I used to be when we worked together.  I'm in charge now, and I have different responsibilities."   Although O'Brien said that he was not concerned about Winninger as a competitor in her first year of business, he said he "would be worried in years 3, 4, and 5."  O'Brien then said, "Competition is healthy, it gives you a chance to step back and evaluate things.  But technically, *my job is to look at you as competition and my job would be to eliminate you*."

101.    In a January 8, 2016 meeting that Winninger had with Nico Brown, another Howard Head Vice President, Brown told Winninger, "we're going to create a preferred provider network that would directly help things for you guys…it's align or die…."  In other words, one had to align with Vail Health to survive.  Shortly after the January 8, 2016 meeting, Brown apparently told people at Vail Health and Howard Head that he had no intention of collaborating with Winninger.

## THE IMPACT OF SPORTS REHAB'S
## HIRING OF PHYSICAL THERAPIST CIMINO

102.    Following through on her desire to establish her own physical therapy clinic in Vail, in late fall 2015, the new company (Sports Rehab) that she had started with another business partner, made an offer of employment to David Cimino to begin employment as a physical therapist, which he accepted.  Before joining Sports Rehab, Cimino had been employed by RPC-Vail as a clinic aid from July 2007 through December 2007.  He then left for physical therapy school and returned to RPC-Vail in July 2011, where he worked until November 2012 when Vail Heath took over the physical therapy clinic operating under the name Howard Head.  From November 2012, Cimino worked continuously with Vail Health/Howard Head until he joined Sports Rehab.

103.    On or about November 25, 2015, Cimino provided notice to his supervisor that he was resigning as a physical therapist from Vail Health's Howard Head unit. Cimino provided a five-week notice as a courtesy to allow Howard Head adequate time to find his replacement.  Cimino began his employment with Sports Rehab immediately after the New Year.

104.    On January 15, 2016, Vail Health legal counsel Janet Savage sent Winninger and Sports Rehab a letter informing her that Cimino had apparently taken certain files with him when he left Vail Health.  The receipt of the letter from Savage was the first time she had heard about Cimino taking any documents.  At no time prior to his employment with Sports Rehab did Winninger discuss taking Vail Health patient files or data, and Winninger was not aware any patient files or data had been taken when

Cimino started working at Sports Rehab. In short, Winninger was not involved in Cimino's copying of Vail Health files in any way.

105. The letter stated that she should not be soliciting Vail Health patients and should retain any Vail Health patient files that she had in her possession. Since neither Winninger and Sports Rehab, nor Cimino were soliciting any Vail Health patients, no further action was needed on that issue. And since Cimino never transferred to her any Vail Health patient files, nothing further was needed on that front either. A few months later, however, the hiring of Cimino took a very negative turn.

106. On April 15, 2016, Vail Health reported to the U.S. Department of Health & Human Services ("HHS") that there was a breach of patient health information based on documents that Cimino had in his possession after his departure from Vail Health. In reporting the reported breach to HHS, Vail Health was required to identify the type of breach—that is, whether the breach was because of:

- Hacking/IT Incident;

- Improper Disposal;

- Loss;

- Theft; or

- Unauthorized Access/Disclosure

107. Vail Health identified the alleged breach involving Cimino as an "Unauthorized Access/Disclosure"—*not a* "**theft**":

| Breach Report Results | | | | | | | |
|---|---|---|---|---|---|---|---|
| Expand All | Name of Covered Entity ⇕ | State ⇕ | Covered Entity Type ⇕ | Individuals Affected ⇕ | Breach Submission Date ⇕ | Type of Breach | Location of Breached Information |
| 0 | Vail Clinic, Inc. dba Vail Valley Medical Center, and dba Howard Head Sports Medicine | CO | Healthcare Provider | 3118 | 04/15/2016 | Unauthorized Access/Disclosure | Laptop, Network Server |

108.    Moreover, in making the submission to the HHS, Vail Health attested under federal law that the information provided to the HHS in the initial breach report was accurate.

109.    Similarly, on April 15, 2016, Vail Health provided notice to its patients, the press, and on its website about the breach but did not state that the data was "stolen" or that there was a "theft" of any information.  Rather, Vail Health told its patients and the public "about a potential disclosure of personal health information."  Vail Health stated that a former physical therapist had "improperly acquired protected health information," had "copied numerous physical therapy and occupational therapy records" on two USB electronic storage devices and took those devices with him when he departed.  Vail Health also stated that it "obtained the return of both electronic storage devices along with a signed certification from the former employee that he has not retained copies or otherwise provided any of the data to any other person or company."  The April 15, 2016 "Notice to Vail Health Center patients regarding Privacy Incident" was posted on Vail Health's website.

110.    In the Notice, Vail Health stated that on February 16, 2016, it discovered that a former Howard Head physical therapist—presumably Cimino, although he was not named in the notice—improperly copied physical therapy and occupational therapy records containing patient personal health information onto two USB electronic storage devices and "took those devices with him at the time he was starting with his new employer."  The data apparently "did NOT include social security numbers, dates of birth, credit card or bank account information, or addresses."

111.    Importantly, the Notice also states that "[t]o date, VVMC has demanded and obtained the return of both electronic storage devices along with a signed certification from the former employee that he has not retained copies or otherwise provided any of the data to any other person or company."

112.    The Notice further states that on or about April 15, 2016, separate letters were mailed to each patient whose personal health information was purportedly compromised.   The letters made the same, or substantially the same, statements as those made in the Notice and were sent to 3,116 Vail Health patients.

113.    Accordingly, on April 15, 2016, Vail Health reported to the federal government, the public, and its patients that it had demanded and obtained the return of the electronic storage devices from its former employee—Cimino—and that it had obtained a certification from the former employee—again Cimino—in which he stated that he had "not retained copies or otherwise provided any of the data to any other person or company."

114.    As Vail Health admits, Cimino returned the two USB devices to Vail Health by sending the devices by overnight mail to his attorney in Denver on February 4, 2016. On February 5, 2016, Cimino's attorney then delivered the USB devices to Cyopsis, Vail Health's computer forensic expert.   In the package delivered to Cyopsis, Cimino also returned two hard copy documents that were in his possession.

115.    Cimino also tried his best to identify documents that had been copied to his personal computer over many years (including while he was at RPC-Vail).   Cimino created a folder entitled "Attn VVMC docs from personal computer" and copied those

files to the USB external hard drive—the GoFlex device.  Almost all of the documents contained in that file dated from Cimino's employment with RPC-Vail, not Vail Health.

116.   So as of February 2015, Cimino voluntarily returned documents and information to Vail Health, which included documents that belonged to Cimino's former employer.  Cimino also informed Vail Health that he would delete any files on his personal computer once Vail Health gave him instruction to do so.  Vail Health never provided Cimino any instructions to delete any documents from his personal computer and still has not to this day.

117.   Cimino told Winninger that he had downloaded files to a USB drive, but he said he never intended to download any Vail Health patient files.  On March 4, 2016, Cimino's attorney informed Winninger that Cimino had returned all documents to Vail Health and that he had signed a sworn certification stating that he had returned the documents and that he had not transferred the files to anyone else.  Based on the facts above, Winninger thought Cimino could continue his relationship with Sports Rehab.

118.   Even though Vail Health assured the federal government, the public, and its patients that its former employee returned the personal health information and that no other person or company had the patient data, the Vail Police Department, Eagle County District Attorney's Office, and the doctors and clinics using Winninger and Sports Rehab's physical therapy services were told something much different.

## VAIL HEALTH'S SHAM USE OF GOVERNMENTAL PROCESSES

119.   ***Just three days after reporting the breach to the HHS***, on April 18, 2015, Vail Health—through its attorney Janet Savage—informed the Vail Police Department and Eagle County District Attorney's Office that Cimino was involved in the "***theft* of Protected Health Information**" from Vail Health, "***[h]e stole*** documents and

patient information from the VVMC shared drive," and that Winninger "***has been actively involved in these behaviors.***"   Notably, "to steal" means to take personal property illegally with the intent to keep it unlawfully.  Likewise, "theft" is defined as the felonious taking and removing of another's property with the intent to deprive the true owner of the property.

120.   Nothing new occurred between the three days that Vail Health reported the breach to HHS, Vail Health patients, and the public and to when Vail Health reported the incident to the Vail Police Department and Eagle County District Attorney. Instead, Vail Health CEO Doris Kirchner, Chairman of the Board Michael Shannon, and Howard Head Vice President Nicholas Brown, chose to publish numerous false statements implicating Winninger in Cimino's purported theft of 3,000 patient files  from Vail Health which, if true, would be a serious criminal offense under HIPAA.  So Vail Health either made false statements to HHS, its patients and the public, or it made false statements to the Vail Police Department and the Eagle County District Attorney.

121.   Vail Health's allegations concerning files that it did not create or own was done to fabricate evidence and mislead the Vail Police and the Eagle County District Attorney into believing that the "theft" related to a great number of Vail Health files and documents.  Proof of their intent is demonstrated by the request of Savage to the Eagle County Deputy District Attorney that Cimino should be prosecuted for 3,000 felonies.  In short, Vail Health, usually through Vail Health attorney Janet Savage, made false and misleading statements to law enforcement about purported felonies in which they asserted that Winninger was involved.

122.    Vail Health knew that Winninger's livelihood depends on her reputation for good character, integrity, and trustworthiness.   She works on a daily basis with prominent orthopedic doctors and clinics, preparing physical therapy programs to serve the doctors' patients.   She must abide by HIPAA, as well as other confidentiality requirements.   Any accusation that Winninger or her company stole patient records and violated HIPAA would be devastating to her and her business, thereby mortally wounding a significant competitor and excluding her and her company from the market.

123.    But on or about April 18, 2016, Janet Savage, as attorney for Vail Health, made defamatory statements about Lindsay Winninger in a letter sent to Detective Eric Bonta at the Vail Police Department.   Plaintiffs were unaware of the letter or the defamatory statements until January 16, 2018.

124.    The April 18 letter refers to Winninger and Sports Rehab close to two dozen times.   For example, after accusing Cimino of stealing Vail Health medical records, Savage's letter states that Winninger "admits that she was aware of Cimino's activities…."    Savage's letter also states that Vail Health "knows" that "Lindsay Winninger has been actively involved in these behaviors."

125.    The letter signed by Savage also states that Cimino "accessed the information on those devices on February 5, 2016," even though the devices were actually in the possession of Cyopsis on February 5, 2016.   Savage knew that it was impossible for Cimino to access the devices on February 5 because Cimino's attorney informed Savage that Cimino was sending the USB devices on February 4, 2016.   Once Cimino's attorney received the USB devices on February 5, 2016, he immediately informed Savage.   Savage then coordinated the pick-up of the devices from Cimino's

attorney to Cyopsis, which included the packaging that showed that Cimino sent the devices to his attorney on February 4, 2016.

126.   The statements made by Savage were false and made with the then present intent to induce the Eagle County District Attorney to file criminal charges against *both* Cimino and Winninger.   These "facts" were fabricated by Savage and amounted to a "frame up" of Winninger for conduct that she was not involved with and knew nothing about.

127.   The April 18 letter attaches and relies upon a number of exhibits.   One of them is identified as Exhibit 8, which is described as a spreadsheet of "evidence" of stolen files prepared by "Cyopsis," the forensic computer expert retained by Vail Health. Craig Bernard, the principal of Cyopsis, has now testified under oath that Cyopsis did not prepare Exhibit 8.   This directly contradicts what Savage had represented to the Vail Police Department—that is, that Exhibit 8 was created by Cyopsis.

128.   Exhibit 8 was actually the creation of someone at the Davis Graham law firm.   (Davis Graham has invoked the work-product privilege and has refused to identify the individual who actually created Exhibit 8).   Exhibit 8 includes false and misleading statements and conceals material evidence from the Vail Police Department and Eagle County District Attorney to make it appear that Cimino "stole" information that he did not, and of course loop Winninger into the whole thing.   The creation of Exhibit 8 constituted the deliberate modification and falsification of material evidence to law enforcement in violation of Colorado law.

129.   Vail Health's modification and concealment of material evidence was done to facilitate Vail Health's argument that the Eagle County District Attorney should charge

Cimino with 3,000 felony counts, apparently to force Cimino to plead to a crime he did not commit.   It was also done to portray Winninger as an accomplice with criminal culpability.   Any plea that Cimino would have entered into would not only have destroyed Cimino but was intended to destroy Winninger right along with him.

130.   Vail Health asserted to the Vail Police Department that Cimino "plugged the first device in on December 1, 2015 at 7:57 am and downloaded hundreds of files from the VVMC shared drive.   He thereafter connected a second USB device on December 30, 2015 at 6:00 am."

131.   Vail Health never informed the Vail Police Department whether the "first device" was the Go-Flex or the Flash Drive, and neither did it indicate whether the "second device" was the Go-Flex or Flash Drive.   Vail Health also never informed the Vail Police Department that Cimino did not directly download any documents on the Go-Flex device on December 1 or 30, 2015, nor could he have done so because the Go-Flex device was not compatible with Vail Health's computer system.   The failure to identify the relevant devices was a material omission intended to mislead and misdirect the Vail Police Department and the Eagle County District Attorney to believe that Cimino stole documents from Vail Health.

132.   Moreover, the assertion that the devices were plugged in on December 1 and 30 is curious because the documents produced from the Flash Drive portion of Exhibit 8 do not reflect a December 1 or December 30 create date, thereby demonstrating the falsity of the source and authenticity of Exhibit 8 (or the authenticity of the documents produced—that is, they did not come from the Flash Drive).

133.   The statement to law enforcement in Vail Health's April 18, 2016 letter was that "Lindsay Winninger has been actively involved in these behaviors."  This was Vail Health's way of saying that Winninger was involved in felonious criminal conduct, as depicted on Exhibit 8.  Vail Health made these statements without ever reviewing the documents alleged to be "evidence" of the felonious criminal conduct of Winninger.  (In fact, Craig Bernard, the Cyopsis forensic computer expert of Vail Health, testified that he never was asked to produce to Vail Health the documents on the USB devices, although Cyopsis could have done so in three short days.)

134.   Curiously—or perhaps not so curiously—on April 18, 2016, the very same day that Savage sent the letter and Exhibit 8 to the Vail Police Department, an "anonymous" ethics complaint was filed against Cimino with the Colorado Department of Regulatory Agencies ("DORA").   (The April 18, 2018 complaint will be referred to herein as the "DORA Complaint I.")   DORA Complaint I specifically named Cimino, identified the nature of the complaint as "fraud," and described Cimino's conduct as "[v]iolation of HIPAA policy and theft of confidential information."  It also summarized the complaint as: "December 2015 theft from previous employer of tens of thousands of protected health information documents which included more than 3000 patient's protected health information."

135.   The person who filed the anonymous DORA Complaint I has not been identified or disclosed (presumably that would be required of Vail Health if it actually knew the identity) as of the filing of this action, but a number of unique pieces of information contained in the Dora Complaint I were known only to about five or six Vail

Health managers, two outside law firms, and Vail Health's computer forensic consultant at the time of its April 18, 2016 filing.

136.   As stated above, for example, the identity of Cimino as the former Vail employee downloading the Vail Health patient files was not known outside this very small group of Vail Health managers, its outside attorneys, and computer forensic consultant.  This information was, however, set forth in Savage's April 18, 2018 letter to the Vail Police Department.  The DORA Complaint I, therefore, would appear to come from one of those Vail Health managers or an agent of Vail Health because Vail Health told its patients on April 15, 2016 that it was "not naming the former employee at this time because there is an active law enforcement investigation."

137.   Then, on April 27, 2016, a second anonymous complaint was filed with DORA by some unidentified and undisclosed person.  (This second complaint will be referred to as "DORA Complaint II.")  The DORA Complaint II again specifically named Cimino and provided a summary of the complaint as: "[t]his PT [identified as Cimino] is under criminal investigation and is known to have downloaded confidential patient information on his last day of employment with VVMC and downloaded this information on an external hard drive for personal gain."  There was no way for the public to identify Cimino in either the DORA Complaints II because as of April 27, 2016, Vail Health had not "nam[ed] the former employee…because there [was] an active law enforcement investigation."

138.   After receiving the two "anonymous" complaints, DORA requested information from Vail Health regarding the data breach.

139.   In response, on July 25, 2016, Vail Health (through Tanya Rippeth) published the same defamatory statements from the April 18, 2016 Savage letter to Andrew Schwab at DORA.  In other words, the July 25, 2016 Rippeth letter was based on and substantially the same as the April 18, 2016 letter drafted by Savage and provided to the Vail Police Department.  And as Rippeth testified under oath, Rippeth relied on most of the statements made in her letter to DORA based on conversations with outside counsel Janet Savage and Howard Head Vice President Nicholas Brown.

140.   Notably, DORA Complaint I was submitted on Monday, April 18, 2016, just three days after Vail Health's notice of the breach was mailed to patients on Friday, April 15, 2016, by ID Experts located in Portland, Oregon.  It was unlikely that most, if not all, of the 3,116 patients had not yet received the breach notice as of April 18, 2016, the time the DORA Complaint I was filed.  Further, April 18, 2016 is the exact same day that Savage sent Vail Health's letter to the Vail Police Department.  Likewise, DORA Complaint II was submitted to DORA on April 27, 2016, the exact same day the HIPPA Journal published an article on the Vail Health breach.  A reasonable inference is that the filing of DORA Complaints I and II was not a coincidence but part of Vail Health's broader plan to use governmental processes to eliminate Winninger and Sports Rehab. This reasonable inference is borne out of the fact that many of the statements in DORA Complaints I and II were only known to Vail Health and its agents.

141.   Other than Vail Health, Rippeth could not identify anyone outside of Vail Health other than Vail Health's counsel Davis Graham and its computer forensic consultant Cyopsis that knew Cimino was involved in the data breach.  None of the notices provided to the press, public, or patients identified Cimino, and Vail Health did

not even identify Cimino in the April 15, 2016 breach notification submitted to HHS.  No patient apparently contacted Vail Health to inquire about Cimino's identity when DORA Complaints I and II were filed.  (Rippeth Dep. at 169-72)  Further, as Vail Health has admitted, it would not have identified Cimino even if someone had inquired into his identity because there was an active law enforcement investigation going on.  And to date, Vail Health has identified only one patient that inquired about the breach.  In response to that patient's inquiry, which was not sent until after DORA Complaint I and II were filed, Vail Health never identified nor named Cimino as the physical therapist involved in the data breach.

142.  Additionally, both DORA Complaint I and II contain information known only to Vail Health and its agents—that is, "*tens of thousands* of protected health information documents" were purportedly stolen and that Cimino "downloaded confidential patient information on *his last day of employment* with VVMC and downloaded this information on an *external hard drive for personal gain*" (emphasis added).  This information was not publicly known when DORA Complaints I and II were filed.  Nothing in the notices provided to the patients or public identified the number of documents at issue, that Cimino was the physical therapist that downloaded patient information, that he did so on his last day of employment, or that one of the devices was an external hard drive.

143.  As to the contention that Cimino downloaded documents on his last day of employment, only Vail Health and its agents had access to this information.  For example, in Vail Health's April 15, 2016 internal report of the breach, which was submitted by Howard Head Vice President Nicholas Brown, the report states that

"Cimino had secretly copied numerous PT and OT records from the HHSM shared network drive on December 1, 2015 and on December 30, 2015 (*his last day of employment*)...." (emphasis added). The Vail Health signatories to that internal report were limited to Margie Lim-Morrison, Darrell Messersmith, Nicholas Brown, Rick Smith, and Ryan Kolczak. None of the notices sent to the patients or the public press releases identify the date Cimino left Vail Health's employment.

144. Nor was it disclosed that Cimino used an "external hard drive" to download documents. The notices provided to the patients and the public press releases repeatedly (and only) state that "two USB electronic storage devices" were used by Cimino. Vail Health never disclosed that an "external hard drive" was used. Significantly, the Vail Police Department did not even know that until five months after the police investigation was opened against Cimino. Until August 2016, the Vail Police Department believed that two flash drives/thumb drives were used by Cimino. It was only when Cyopsis told the Vail Police Department in August 2016, that an external hard drive was used that the Vail Police Department understood that one of the USB devices was a flash/thumb drive and the other was a I TB Seagate external hard drive.

145. Similarly, it was not until about spring 2018 that Winninger and Sports Rehab first learned about the number of documents at issue. That information came from Janet Savage, who characterized the number as "tens of thousands" of documents. Winninger and Sports Rehab also did not initially know that Cimino used an external hard drive—that information was not disclosed in the December 2016 complaint shown to Steadman, nor was it included in the August 2017 counterclaim Vail Health filed in the Eagle County action.

146.   So the only individuals that had knowledge of this information in April 2016 were Davis Graham, Cyopsis, and management at Vail Health including Chief Executive Officer Doris Kirchner, Board Chairman Michael Shannon, Howard Head executives Nicholas Brown and Luke O'Brien, Vail Health IT personnel Ryan Kolczak and Darrell Messersmith, Chief Administrative Officer Rick Smith, and Risk Manager Margie Lim-Morrison.   To the extent other Vail Health physical therapists knew about Cimino's involvement in the breach, they had no incentive to submit an "anonymous" complaint regarding one of their friends and colleagues.   Nor would they have been privy to the information disclosed in DORA Complaint I or II.

147.   In Vail Health's July 25, 2016 letter to DORA, Vail Health again implicated Winninger and Sports Rehab in conduct violating criminal and licensure laws.   The letter makes the same false and defamatory statements that Savage's April 18, 2016 letter to the Vail Police Department.   Most notably, Rippeth states that Vail Health "knows" that "Lindsay Winninger has been actively involved in these behaviors."   Rippeth testified, however, that she did not "know" whether Winninger was involved in the misconduct alleged in the letter because she did not conduct any independent investigation into the matter.   Further, Rippeth testified that she had only "suspicions" that Winninger was involved, and as of May 29, 2019, the day she was deposed, Rippeth still had no confirmation whether Winninger was involved in the purported theft.   When questioned as to whether she had serious doubts about Winninger's involvement, Rippeth testified that she "didn't know" one way or the other whether Winninger had any involvement. (Rippeth Dep. at 269-70)   Yet, Rippeth never told DORA that fact even though she knew that Cimino could lose his license based on the facts alleged by Vail Health.

148.   Although Rippeth understood that a letter to DORA could detrimentally affect Cimino's licensure—that is, that DORA could revoke his license—and that it was important to present accurate and complete facts to DORA, Rippeth did not conduct an independent investigation as to whether the statements in the letter were true, accurate, or complete.   Instead, she relied on Howard Head executive Nicholas Brown and attorney Janet Savage to verify most of the statements made in the DORA letter.

149.   The statements and implication that Winninger and Sports Rehab was involved in criminal conduct was clearly false and strategically made with the intention to implicate Winninger and Sports Rehab in criminal conduct with the hopes that DORA would investigate Winninger and revoke her license as well.   Vail Health continued with this line of attack even after it had been told by the Vail Police Department on June 3, 2016  that Winninger was not the subject of any police investigation. Specifically, Vail Health (through attorney Savage) asked the Vail Police Department if Lindsay Winninger was a subject of…investigation."   The detective in charge "told her that at this time [he] did not have any solid information that showed she was involved in the criminal aspects of this case, but that could change based on what Cimino" would say.   The Vail Police Department never interviewed Cimino, and there was no further information provided to or identified by the Vail Health Police Department that implicated Winninger in Cimino's purported theft of Vail Health patient files.   And even though the Vail Police Department stated there was no "solid information that showed [Winninger] was involved in the criminal aspects of this case," Vail Health again asserted that it knew that Winninger was involved in criminal conduct when it responded to DORA's investigative inquiry.

150.   By implicating Winninger in Cimino's purported misconduct, Vail Health sought to use governmental entities, such as the Vail Police Department and Eagle County District Attorney to have criminal charges filed against Winninger.  Similarly, Vail Health sought to use DORA to investigate Winninger and have her physical therapy license revoked.  Vail Health, however, was not successful in doing either.

## VAIL HEALTH FALSELY ACCUSED WINNINGER OF THEFT IN STATEMENTS TO STEADMAN

151.   Vail Health did not limit its torching of Winninger and Sports Rehab to governmental entities.  It also sought to destroy her reputation and relationship with Steadman and SPRI.

152.   In about spring 2016, Steadman Chief Administrative Officer Dan Drawbaugh had discussions with a number of doctors in Steadman, including Drs. Clanton, LaPrade, and Philippon, who expressed concern about the breach. Specifically, "there were implications that [Winninger] could have been involved in" the theft.  (Drawbaugh Dep. at 17-18)   Drs. Philippon, LaPrade, and Clanton voiced concerns that Winninger had taken patients from Howard Head.  (*Id.* at 21-26)  In fact, Drawbaugh testified that "everyone knew" about Winninger, and there was a perception that Winninger was involved in Cimino's purported theft of patient files.  (*Id.* at 26) There is only one possible source for these allegations and that is Vail Health.

153.   Drawbaugh also explained that the statements about Winninger being involved in Cimino's theft of Vail Health patient files essentially spread like wildfire throughout Steadman.  All it took was a suggestion that Winninger was involved in very, very serious criminal activity for her to be shut out of Steadman.  (*Id.* at 41-43)  This was the exact effect that Vail Health hoped for.

46

154.   In summer 2016, Chief Executive Officer Doris Kirchner indicated to Drawbaugh that Winninger was involved in Cimino's purported theft of Vail Health patient files.  (*Id.* at 89)  Although Drawbaugh could not recall the number of times Kirchner made such statements to him, Drawbaugh testified that from the beginning, the implication by Kirchner was that Winninger was involved.  (*Id.* at 90)

155.   Kirchner also led Drawbaugh to believe that there was an ongoing investigation being undertaken by Vail Health and that Vail Health had proof that Winninger was involved in Cimino's purported theft of patient files.  (*Id.* at 95)  But Kirchner never would provide any specifics about the evidence supporting such serious allegations against Winninger and Sports Rehab.  (*Id.* at 92-93)  Instead, when Steadman asked Kirchner to provide proof of this alleged theft of patient files, Kirchner told Drawbaugh that Vail Health could not provide Steadman that information.  Kirchner made the statement in such a manner so as to leave Drawbaugh with the distinct impression that Kirchner and Vail Health did indeed have evidence supporting the allegation of criminal conduct by Winninger and/or Sports Rehab.

156.   At the time Kirchner made the statements to Drawbaugh, neither Kirchner, Shannon, Brown, O'Brien, nor anyone else at Vail Health—including their legal counsel and forensic expert—had any proof that Winninger or Sports Rehab were involved in Cimino's purported "theft" of Vail Health files, whether that be medical files, patient files, files containing PHI, trade secrets, or confidential, or proprietary documents or information.  Kircher made the statements to Drawbaugh knowing full-well that she did not have any evidence.  Kirchner made the statements to give the false impression that Vail Health had such information and that the criminal violations were significant.

157.   Vail Health Board Chairman Michael Shannon also told Dr. Philippon and Drawbaugh that Vail Health patient files were stolen and that Winninger was involved. Shannon admitted under oath that he had no factual basis for the statement, which explains why he never provided any specifics about the evidence that he had to support such egregious allegations against Winninger and Sports Rehab.

158.   Nicholas Brown also made false statements to Kelly Adair of Steadman. Brown told Adair that "he" and "she" was involved in stealing patient files from Vail Health.   (Adair Dep. at 96, 198-200, 202-03)   Adair understood that "he" referred to Cimino and "she" referred to Winninger.

## VAIL HEALTH'S INTENSIFICATION OF ITS EFFORTS TO "ELIMINATE" WINNINGER FROM THE MARKET

159.   Going into the late fall 2016, there were at least four dynamics working against Winninger and Sports Rehab, the confluence of which would be catastrophic for them.   *First*, Steadman provides an overwhelming majority of the physical therapy referral business to Vail Health—certainly more than 70%.   *Second*, Winninger had a close relationship with Dr. Marc Philippon, the managing partner of Steadman, as well as many of the Steadman physicians, and Vail Health now knew that she had a contractual relationship with Steadman and SPRI.   These two factual elements alone made Winninger a target for Vail Health.

160.   *Third,* there was the collapse of the joint venture negotiations between Vail Health and Steadman partners and the termination of the final letter of intent in the late fall 2016.   Vail Health was convinced that if Steadman opened its own physical therapy clinic, Vail Health would lose tens of millions in revenues and profits.

161.   And *finally*, Vail Health thought that if Steadman set up its own physical therapy clinic in competition with Vail Health's Howard Head unit, Winninger was going to be a principal organizing force and manager.   So these factual dynamics set in motion the admonition of Vail Health Vice President Luke O'Brien from ten months earlier: ***"[M]y job…would be to eliminate you.***"   And from the late fall 2016 to winter 2017, that is exactly what Vail Health did.

162.   Vail Health accelerated its campaign to destroy Winninger so she would not be a competitive threat and so she would be eliminated as a possible driver in a Steadman physical therapy unit that would compete with Vail Health.   Vail Health also found a way to contractually keep Steadman out of the physical therapy market through exclusionary lease restrictions so that Vail Health could continue to capture Steadman referrals to maintain its monopoly power.

## VAIL HEALTH'S INTENSIFIED DEFAMATORY
## CAMPAIGN AGAINST WINNINGER

163.   On December 31, 2016, Shannon met with the managing partner of Steadman, Dr. Marc Philippon, for breakfast at the Sonnenalp Hotel in Vail.   At the breakfast meeting, Shannon showed Dr. Philippon a complaint that Dr. Philippon understood to be criminal in nature.   Dr. Philippon recalls hearing the word "criminal" being used.   Dr. Philippon knows he did not use the word "criminal," and the only other person at the meeting was Shannon.   (Philippon Dep. at 78-80)

164.   We now know that the complaint shown to Dr. Philippon was styled as a civil complaint, but it contained so many alleged criminal violations that it reads like a criminal indictment.   Anyone without knowledge of the difference between a civil

complaint and a criminal indictment could easily have understood the complaint shown to Dr. Philippon to be the initiation of criminal proceedings.

165.    For example, the complaint alleged that Winninger and Sports Rehab "stole[] confidential and trade secret information" from Vail Health.  Winninger and Sports Rehab also "stole[] thousands of patient files in violation of the Health Insurance Portability and Accountability Act of 1996…." That is, Winninger and Sports Rehab committed crimes under federal law.

166.    The complaint goes on to assert that Winninger and Sports Rehab's "purpose for stealing patient health information was to solicit VVMC's [now Vail Health's] patients and gain an unfair economic advantage."  Vail Health contended that these purported acts were "prohibited by state and federal statutory law…."

167.    The complaint further alleges that "Cimino stole confidential and proprietary information, including VVMC [now Vail Health] protocols and other confidential materials."  It then stated that "Winninger and Sports Rehab "knew about, and actively participated in Cimino's theft of confidential and proprietary information."

168.    The complaint further alleges that Winninger and Sports Rehab "solicited, and/or were, at all relevant times, aware of, complicit in and actively involved in, Cimino's theft of VVMC's [now Vail Health's] patient files, including protected health information, as well as, the theft of VVMC's [now Vail Health's] confidential, proprietary and trade secret business information and copyright protected business records."

169.    The complaint then states that Winninger, Sports Rehab, and Cimino "intended to use and, on information and believe, did use these patient files and

confidential information to solicit patients and to compete against VVMC [now Vail Health] and Howard Head."

170.    And finally, Shannon told Dr. Philippon that the complaint was going to be filed against Winninger the next day, so it was logical for Dr. Philippon to conclude that criminal proceedings against Winninger were about to commence.    Vail Health's campaign of character assassination continued from there.

171.    In early January 2017, Steadman Chief Executive Officer Dan Drawbaugh met Kirchner at her office where she showed him the same complaint that Shannon showed Dr. Philippon a few days before.  The complaint was sitting on Kirchner's desk, and she told Drawbaugh that he could look at it but could not take a copy.

172.    Drawbaugh reviewed it, and he too understood that it was against Winninger and was criminal in nature.  Kirchner informed Drawbaugh that forensics had been run, and based on Kirchner's statements, Drawbaugh also understood that the forensics had traced the stolen files to Winninger.  Drawbaugh asked to see the forensics, but Kirchner would not show it to him, claiming instead that it was "confidential" to Vail Health.  (Drawbaugh Dep. at 52-68, 73)

173.    So Kirchner led Drawbaugh to believe Vail Health had proof that Winninger was involved in the theft, but Kirchner just could not show him.  But the real reason Kirchner could not show Drawbaugh is because the only forensics that Vail Health had received were from Cyopsis, and the analysis from that firm proved *nothing* about Winninger's involvement in Cimino's purported theft of Vail Health patient files, as Vail Health's own forensic expert confirmed during his deposition.

174.   Based on the complaint, Drawbaugh understood that Vail Health was saying that Winninger and Sports Rehab had stolen or been involved in the theft of thousands of patient files and that the patient files were being used for Winninger and Sports Rehab's own economic advantage.  Based on his discussions with Kirchner and the allegations in the complaint, Drawbaugh thought that Vail Health had the facts to back up its serious (and criminal) allegations against Winninger.  (*Id.*)

175.   The statements made by Vail Health in the complaint were false and known to be false at the time they were published to Dr. Philippon and Drawbaugh.  The complaint was in fact merely a sham, and Vail Health never had any intent to actually file the complaint.  The false and defamatory statements in the complaint were made with Vail Health's then present malicious intent to destroy Winninger's professional and personal reputation, as well as the professional reputation of Sports Rehab, with Steadman and the orthopedic surgeons who were its members.  It was, in fact, a concerted character assassination by Vail Health to drive Winninger and Sports Rehab out of the Vail Valley market.  In other words, these were exclusionary acts to destroy competitors of Vail Health in the relevant product or service market—physical therapy—in the Vail Valley geographic market.

176.   The attacks against Winninger and Sports Rehab continued.  During the week of February 6, 2017, Shannon called SPRI Board member Al Perkins purportedly to discuss a position as philanthropy chair.  Somehow, the conversation turned to Winninger, with Shannon telling Perkins that "he did not know why Dan Drawbaugh was hanging around [Winninger] because she wasn't a good person and she had stolen

records from Vail Health to start her own business."   Shannon told him that the theft involved 2,500 to 3,000 patient records.  (Perkins Dep. at 15-23)

177.   Immediately after the call, Perkins contacted Drawbaugh and told him what Shannon had said.  Perkins's recollection is very clear.  He says he repeated what Shannon had said, that is, "he didn't know why [Drawbaugh] was hanging around Lindsay Winninger because she had stolen records from Vail Health."  (*Id.*)  Although Drawbaugh could not recall Perkins exact words, Drawbaugh confirmed that Shannon said Winninger was implicated in the theft of Vail Health files.  (Drawbaugh Dep. at 43-46)  Perkins eventually told Dr. Philippon about his conversation with Shannon.

178.   Shannon later had another call with Perkins.   Again, the topic of conversation turned to Winninger.   Perkins told Shannon that he did not know Winninger very well and that during their last conversation, Shannon had said that Winninger stole records from Vail Health.   In an apparent attempt to deny his involvement in making such false statements, Shannon denied the conversation. Perkins did not know what to say, given he knew (and had a distinct recollection of) what Shannon had told him about Winninger and Cimino.  (Perkins Dep. at 19, 40-41)

## THE TERMINATION OF WINNINGER AND
## END OF THE RELATIONSHIP WITH STEADMAN AND SPRI

179.   In February 2017, a partnership meeting was held at Steadman. Winninger presented a wellness program that she had created for Steadman under her consulting agreement with Steadman.   The wellness program presentation was well received, and Winninger was told that she did a terrific job in developing the program. Unbeknownst to her, immediately after she left the meeting, Steadman had a closed-door session to discuss Winninger and her contracts.

180.    During the closed-door meeting, there were questions and discussions about Winninger's involvement with respect to the data breach involving Cimino—specifically, her involvement in the theft of Vail Health patient files.  Various doctors made comments about the situation and questioned whether the wellness program and the agreement with Winninger should be put on hold.  The doctors wanted information as to whether WInninger was involved in Cimino's purported theft of Vail Health patient files.  The doctors viewed the statements "as a very serious matter" and ultimately put the wellness program and Winninger's contracts on hold.  (Adair Dep. at 167-82)

181.    Given that Vail Health had *zero* baseline knowledge and no evidence that Winninger had done anything improper—and actually were in possession of a sworn statement that stated otherwise—Vail Health made its statements with the then present intent to destroy Winninger's personal and professional reputation and ultimately force Winninger and Sports Rehab out of the physical therapy business in Vail Valley.  This is exactly what happened when Steadman decided not to continue its relationship with Winninger and Sports Rehab.

### WINNINGER AND SPORTS REHAB TRIED TO MITIGATE THE DAMAGE BUT WERE UNSUCCESSFUL IN DOING SO

182.    On January 25, 2017, Winninger was called in for a meeting with Dr. Philippon and others from Steadman.  Winninger was specifically questioned about the statements being made by those associated with Vail Health, and, in particular, whether she stole patient files from Vail Health.

183.    Winninger informed Dr. Philippon and those present that she was not involved in any theft of patient files and informed them of the steps she had taken to

clear her name and reputation.  As it later turned out, those protestations were to no avail.

184.   At about the same time, Winninger provided Drawbaugh and Dr. Philippon a signed copy of the sworn certification provided by Cimino to Vail Health, which stated that Winninger did not obtain or have access to the patient files purportedly taken by Cimino.  Although Winninger had asked Vail Health to provide a copy of the certification, it refused to provide the sworn statement.

185.   To quash the false statements being made about her, Winninger also had her computer forensically reviewed, at her own expense, by a certified forensic computer examiner, David Penrod.  His forensic review found no evidence of Vail Health patient files or electronic healthcare records on her computer during the relevant period.  Nor was there any evidence that USB thumb drives had ever been attached to Winninger's computer during the relevant time period.  On March 2, 2017, Winninger voluntarily provided Penrod's report to Savage, as Vail Health's attorney.

186.   At the same time, Winninger also provided Savage and Vail Health with a sworn affidavit stating that she and Sports Rehab were not involved in Cimino's purported theft of Vail Health patient files, nor did she ever see or use that information. Winninger also voluntarily offered to sit for a deposition so she could clear her name, but Vail Health refused to accept Winninger's invitation.

187.   In contrast, Winninger requested that Vail Health provide any evidence that it had demonstrating that Winninger or Sports Rehab accessed Vail Health patient files.  Vail Health never provided any evidence and still to this day—close to four years after the incident, has not done so.

188.    In early 2017, Winninger requested that Vail Health retract the statements made by Vail Health and inform all Vail Health Board members, as well as the doctors at Steadman and Vail Summit Orthopaedics, that Winninger and Sports Rehab did not take any Vail Health patient files.  Vail Health never responded to this request and has never retracted the false statements made by its executives and managers.

189.  In February 2017, Winninger also contacted Shannon by e-mail, explaining that she was not involved in Cimino's purported theft of Vail Health patient files.  Winninger also provided her sworn affidavit stating that she was not involved in Cimino's taking of documents from Vail Health.  Winninger offered to meet with Shannon to discuss the situation and requested that he stop making defamatory statements about her.  Shannon never provided Winninger with the common courtesy of a response to her e-mail.

190.   Despite these efforts, Winninger was unable to undo or mitigate the damage to her professional reputation caused by the false and malicious statements published by Kirchner, Shannon, Brown, or O'Brien.  By late fall 2016, physicians at Steadman, who formerly referred their patients to her and Sports Rehab, ceased referring patients to Winninger and Sports Rehab.

191.   Although Winninger took measures to clear her name by providing the results of the forensic review, Cimino's certification, and Winninger's affidavit to Steadman and Vail Health, the damage was done.  Because of Vail Health's false statements, Dr. Philippon, as managing partner of Steadman, terminated the Clinic's and SPRI's relationship with Winninger in March 2017.

192.    In March 2017, Dr. Philippon held a meeting with Winninger, Talena Williams, and Kelly Adair.   At that meeting, Dr. Philippon discussed the allegations against Winninger that she had been involved in the theft of Vail Health patient files. Dr. Philippon questioned Winninger about her involvement in the theft, which he took to be a serious allegation.   Winninger was very upset and cried during the meeting.   (Adair Dep. at 152-61)   Winninger informed Dr. Philippon and those in attendance that she had nothing to do with the alleged theft of Vail Health patient files by Cimino.   It made no difference.   Winninger's contractual and referral relationship with Steadman and SPRI were put on hold until she cleared her name.

193.    Some physicians also told Winninger that they needed to end their professional relationship until the alleged theft of patient files was "cleared up."   In other words, the physical therapy work would cease until Winninger cleared her name.   So Steadman doctors stopped sending Winninger and Sports Rehab orthopedic physical therapy referrals.   Referrals from other clinics, such as Vail Summit Orthopedics, also ceased.   As a result of Kirchner, Shannon, Brown, and Vail Health's false and defamatory statements, Winninger and Sports Rehab lost substantial business and were forced to close Sports Rehab's Vail office in September 2018.

### VAIL HEALTH'S FAILURE TO CONDUCT ANY INVESTIGATION OR DUE DILIGENCE AND VAIL HEALTH'S LACK OF ANY REASONABLE BASES FOR THEIR GOVERNMENTAL PETITIONS

194.    Plaintiffs allege that the conduct of certain of Vail Health's officers and directors has been replete with anticompetitive intent from January 15, 2016 through the present.   A non-inclusive list of anticompetitive conduct includes the making of a false factual statement with reckless disregard as to its truth or falsity, the failure to interview witnesses who are available to supply or verify facts relevant to the statement to be

made, disregard for exculpatory evidence, the fabrication of evidence, and the intent to abuse governmental processes to delay, foreclose, or otherwise destroy a competitor for the purpose of excluding the competitor from the market.

195.   At the time Vail Health officers and representatives made their statements to the Vail Police Department on April 18, 2016, they had no evidence that Winninger had solicited Vail Health patients.  They could not identify a single Vail Health patient then, and over three years later, they cannot identify a single patient now.

196.   At the time Vail Health officers and representatives made their statements to the Vail Police Department on April 18, 2016, they had no evidence that Winninger had stolen or been involved with Cimino's purported "theft" of Vail Health patient files. They could not identify a single Vail Health patient file then, and over three years later, they cannot identify a single patient file now.

197.   At the time Vail Health officer and representatives made their statements to the Vail Police Department on April 18, 2016, they had no forensic computer evidence that Winninger had used any Vail Health patient files to solicit Vail Health patients or used them for any other purpose.

198.   At the time Vail Health officers and representatives made their statements to the Vail Police Department on April 18, 2016, Vail Health had told the United States Department of Human Services that the files Cimino had taken had been returned to Vail Health.

199.   At the time Vail Health officers and representatives made their statements to the Vail Police Department on April 18, 2016, Vail Health had told Vail Health's

patients that the files the unnamed physical therapist had taken had been returned to Vail Health.

200.   With respect to any verification of facts through statements from witnesses, in February 2017, Winninger sent an e-mail to Vail Health Board Chair Michael Shannon stating that she had not been involved with Cimino in the taking of Vail Health documents.   Winninger requested that she be given the chance to speak with him personally to explain that she was not involved in Cimino's data breach or theft of Vail Health files.   The Chairman did not provide Winninger the courtesy of responding to Winninger, and he certainly did not provide her with the opportunity to have a conversation with him.

201.   With respect to any verification of facts through statements from witnesses, Winninger was never asked any questions by Vail Health or its legal counsel. In March 2017, Winninger provided Vail Health, through their legal counsel, with a sworn affidavit testifying that she was not involved in, did not take, and never received any Vail Health patient files from Cimino.

202.   In March 2017, Winninger offered Vail Health, through its legal counsel, the opportunity to depose her concerning any facts she might have surrounding the data breach and Vail Health files.  Vail Health did not accept that invitation.

203.   In March 2017, Winninger offered Vail Health, through its legal counsel, the opportunity to have her computer examined by an independent computer expert. Vail Health did not accept that invitation.

204.   And now, on May 30, 2019, an independent computer forensic expert Michael Horwith examined Winninger and Sports Rehab's computers and web-based

system for documents and information from November 1, 2015 to the present. Using all methods of forensic review and e-discovery near dupe analysis, the independent expert incurred time and was paid in excess of $50,000 to conduct the investigation. The independent expert then produced his findings in a report where he made the following conclusions with respect to Plaintiffs:

- At pages 6 and 10 of the Report, the independent expert states that there is no evidence that the two Cimino USB devices were attached to any of the Sports Rehab computers—that is, the computers of Winninger, Harder, and Schoenthaler;

- At page 8 of the Report, the independent expert states that other than the MCL Weekly Rehab Schedule, which was a document created for a Sports Rehab patient, no other downloaded documents were found on the Sports Rehab computers;

- At page 11 of the Report, the independent expert states that there was no deletion of documents or files detected on the Sports Rehab computers;

- At page 12 of the Report, the independent expert states that no wiping software was detected on the Sports Rehab computers and that it did not appear that any shredders were used either;

- Using a "fuzzy" or "near duplicate" document search, the independent expert identified five documents similar to documents on the Cimino USB devices. None contained any protected health information. Instead, they included the following:

  (i)    The Weekly Rehab Scheduled discussed above;

  (ii)   The MPFL Reconstruction dot sheet protocol, which is handed out to hundreds of patients, physical therapists, and residents;

  (iii)  David Cimino's resume;

  (iv)   A referral form for physical therapist recommendation in Florida, which was emailed by a Howard Head physical therapist to Winninger; and

  (v)    A one-page summary on Sports Rehab letterhead that provided bullet points regarding total joint health.

205.   In sum, none of the documents found on the Sports Rehab computers or web-based cloud platform related to any of the 3,116 patients that Vail Health claim

received notice of the data breach and that Vail Health has alleged were transferred by Cimino to Winninger and Sports Rehab.

206.    Vail Health's Board Chairman and the officers who were involved in this incident all testified in their depositions that they did not know on December 31, 2016, or at the time of their depositions two years later, whether Cimino had transferred any Vail Health files to Winninger or whether any Vail Health patients had been solicited by Winninger or Cimino, and they would need to wait until the report of the independent expert was issued.   That has now come to pass, and it has been confirmed that Vail Health's assertions of solicitation and theft were baseless.

## VAIL HEALTH'S SHAM USE OF GOVERNMENTAL PROCESS

207.    As previously alleged, Shannon and Kirchner showed Dr. Philippon and Drawbaugh a complaint alleging that Winninger, Cimino, and Sports Rehab conspired together to steal documents and patient files from Vail Health for their own economic gain.  The complaint was nothing more than a ruse.  Vail Health never had any intention to file the complaint.  Nor did it until Winninger and Sports Rehab filed an action in state court to clear their name and hold Vail Health accountable for its defamatory and tortious conduct.   Vail Health's "complaint" was filed over seven months after the complaint was initially shown to Steadman and over a year-and-half after the data breach.  Vail Health used the "complaint" as a substitute for providing Drawbaugh with evidence of the alleged theft.  It was intended to give Drawbaugh (and Dr. Philippon, as alleged below) with the false impression that Vail Health was serious about the allegations and actually had supporting evidence—when Vail Health did not.

208.    At or prior to the time Shannon showed the complaint to Dr. Philippon, Shannon had performed no research or fact gathering that would have led him to

conclude that Winninger had in anyway been involved in Cimino's purported "theft" of patient files, although that charge was expressly asserted in the complaint he showed to Dr. Philippon.  That charge was factually baseless and false at the time it was made.

209.   At or prior to the time Shannon showed the complaint to Dr. Philippon, he had performed no research or fact gathering that would have led him to conclude that either Winninger or Cimino had been soliciting Vail Health's patients, although that charge was expressly asserted in the complaint he showed to Dr. Philippon.   That charge was factually baseless and false at the time it was made.

210.   As a matter of fact, at the time of his deposition in this action in 2018, Shannon could not identify a single Vail Health patient that Winninger or Cimino had solicited, although that charge was expressly asserted in the complaint that he showed Dr. Philippon.  That charge was factually baseless and false at the time it was made.

211.   At or prior to the time Kirchner showed the complaint to Drawbaugh, she had performed no research or fact gathering that would have led her to conclude that Winninger had in anyway been involved in Cimino's purported "theft" of patient files, although that charge was expressly asserted in the complaint she showed Drawbaugh. That charge was factually baseless and false at the time it was made.

212.   At or prior to the time Kirchner showed the complaint to Drawbaugh, she had performed no research or fact gathering that would have led her to conclude that either Winninger or Cimino had been soliciting Vail Health's patients, although that charge was expressly asserted in the complaint she showed Drawbaugh.

213.   At or prior to the time Kirchner showed the complaint to Drawbaugh, she had performed no research or fact gathering that would have led her to conclude that

either Winninger or Cimino had been soliciting Vail Health's patients, although that charge was expressly asserted in the complaint she showed Drawbaugh. That charge was factually baseless and false at the time it was made.

214. As a matter of fact, at the time of her 2018 deposition, Kirchner could not identify a single Vail Health patient that Winninger or Cimino had solicited. She testified that it would be improper to contact Vail Health patients to determine whether they had been solicited by Winninger, Cimino, or anyone else associated with Sports Rehab.

215. If Vail Health had an actual intent to file the complaint against Cimino, Winninger, or Sports Rehab, it would have done so immediately in 2016. Claims based upon the breach of employment agreements—the wrongful taking of trade secrets and solicitation of clients—are typically brought virtually immediately after an employee terminates employment. This is because of the exigency created by the possible loss of customers or dispersion of trade secrets.

216. Then, on New Year's Eve, fifty-four weeks after sending its January 15, 2016 cease-and-desist letters, months after the joint venture letter of intent had expired and hope of collaboration with Steadman over physical therapy was fading, then and only then did Vail Health spring a "complaint" and publish it *first and directly* to Winninger's and Sports Rehab's business and contractual counterparties.

217. On New Year's Eve 2016, Vail Health had no more information than it did on January 15, 2016, when it had its attorney send the cease-and-desist letter to Winninger and Sports Rehab—that is, (a) Vail Health had not received any computer "forensics" of the computers of Winninger or her colleagues as Sports Rehab, so they did not know whether any Vail Health patient files or other information had been

transferred to its computers; (b) Vail Health representatives had not reviewed any information taken by Cimino, as their forensic expert Craig Bernard confirmed in his deposition; (c) Vail Health representatives have all testified that they did not know on December 31, 2016 or at the time of their depositions whether any Vail Health files had been transferred by Cimino to Winninger; (d) Vail Health's representatives have all testified later that they did not know on December 31, 2016 or at the time of their depositions whether any Vail Health patients had been solicited by Winninger; (e) the Vail Police informed Vail Health's attorney—Janet Savage—that they did not have any evidence that Winninger had been involved in any theft of Vail Health patient files or confidential or proprietary information; and (g) in dealing with the U.S. Department of Health & Human Services, Vail Health did not inform the agency that Winninger or anyone else had stolen Vail Health patient files.  Instead, Vail Health informed HHS that there had been an unauthorized taking of files, but they were returned to Vail Health.

218.   Given Vail Health's lack of any evidence supporting the allegations made in the complaint published to Dr. Philippon and Drawbaugh, it is clear that the complaint was a sham in that it was (and is) objectively baseless and was never intended to be filed.  (Thus, it will hereinafter be referred to as the "Sham Complaint.")  Instead, the Sham Complaint, with all of its baseless allegations against Winninger and Sports Rehab, was a well-planned strategy of Vail Health and its legal counsel to interfere *directly* with the business relationships of a Vail Health competitor.

219.   The Sham Complaint was never filed and was nothing more than a ruse to convince Steadman that Winninger and Sports Rehab were bad actors—criminals—with whom Steadman should not be associated.   The allegations in the Sham Complaint

were knowingly false and made with the malicious intent to defame and destroy the reputations of Winninger and her colleagues at Sports Rehab and thereby delay, disrupt, and ultimately destroy their physical therapy business.

220.   And it worked because soon thereafter Steadman discontinued its relationship with Winninger and Sports Rehab because of her legal problems.   And Steadman and SPRI ended their contractual relationship with Winninger as well.

221.   The allegations and legal assertions in the Counterclaims and Amended Counterclaims (collectively, the "Counterclaims") in the Eagle County action are virtually identical to those found in the Sham Complaint.   Vail Health and its attorneys had no more evidence to support the factual allegations and claims when they were filed than when Sham Complaint was first published to Dr. Philippon on December 31, 2016 and shortly thereafter to Drawbaugh.

222.   Against this procedural background—the lack of any investigation or due diligence or any reasonable basis to expect a favorable outcome, Vail Health serially engaged the unsuccessful assertion of Winninger's criminal, administrative, and civil culpability.   Vail Health took its governmental petitioning so far as to state to an executive of Steadman that Winninger would be criminally charged in connection with the theft of Vail Health patient files.

223.   Vail Health's petitions include:

- The unsuccessful attempt to have Winninger criminally prosecuted by Eagle County, as herein before alleged;

- The unsuccessful attempt to have Winninger's physical therapy license revoked by DORA, as herein before alleged;

- The direct intervention with Plaintiffs' business relationships and the successful disruption of those relationships, as herein before alleged; and

- The filing and serving of Vail Health's Counterclaim and Amended Counterclaims in Eagle County, Case No. 2017CV030102, without any factual or legal basis for those claims.

224.   Vail Health's petitions were made without probable cause.  As alleged above, Vail Health performed no investigation or due diligence to determine whether the allegations upon which its petitions were based were factually supportable or instead were merely frivolous and objectively baseless.

225.   The Report of the independent forensic expert demonstrates that Vail Health's petitions were made without regard to their factual or legal merits and were and are objectively baseless.  The petitions were and continue to be mere shams to cover what was and is nothing more than an attempt to interfere directly with the business relationships of competitors—Winninger and Sports Rehab—and to foreclose and exclude them from the Vail Valley physical therapy market.

226.   Vail Health's sham petitioning of these multiple governmental entities constitutes anticompetitive exclusionary conduct in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

### THE IMPACT OF VAIL HEALTH'S ANTICOMPETITIVE CONDUCT ON COMPETITION AND CONSUMERS

227.   Vail Health's anticompetitive and exclusionary conduct has harmed competition in numerous ways.  The monopolization of over 80% of the Vail Valley physical therapy labor market has resulted in a substantial increase in the labor costs of Vail Health competitors.  As alleged above, Vail Health has required physical therapists to sign unreasonable and unnecessarily expansive restrictive covenants in their employment agreements that are actually void *ab initio* under Colorado law.

228.   The restrictive covenants have the effect of reducing the supply of qualified physical therapists in the Vail Valley geographic market that would otherwise be available because, if the covenants were strictly followed as written, a physical therapist moving from Vail Health to a competitor would be prohibited from treating *any* patient who had *ever* been treated or solicited by Vail Health.  As written, the physical therapist could not treat patients who had been marketed or solicited by Vail Health.

229.   So the prospective physical therapy provider would be required to hire the now former Vail Health physical therapist and accept that fact that the new employee would be substantially underutilized for a period of one year after being hired.  That restriction, therefore, substantially increases physical therapy providers' labor costs and ultimately increases the prices that physical therapy patients have been required to pay.

230.   The covenants also raise prices because if a competitor was inclined to accept the risk that Vail Health would attempt to strictly enforce the restrictive covenants in court, the prospective physical therapy competitor would face the debilitating costs of litigating against Vail Health.  As Sports Rehab has learned, such litigation is not a financially tenable option, which explains why no other known physical therapy provider has hired a Vail Health physical therapist.

231.   Whichever way a competitor turns, therefore, Vail Health's anticompetitive conduct has increased physical therapy costs in the Vail Valley geographic market, which costs are a harm to competitors and are ultimately passed along to consumers in the form of higher prices.  And paying higher prices is a direct harm to consumers.

232.   By acquiring a market share of over 80% and corresponding monopoly power, Vail Health has raised prices to physical therapy consumers above what would

otherwise be a competitive market equilibrium price. Vail Health is charging patients 25-50% or more above other providers' prices. These prices are paid because of reimbursement agreements that Vail Health has with health insurers, which are ultimately passed along to consumers in the form of higher insurance premiums.

233.    The adverse impact that Vail Health's anticompetitive behavior has had on competition and consumers is illustrated by the fact that in the past three years, three of Vail Health's competitors have closed offices in Vail, Colorado. In addition, there have been no new entrants into the market, although economics teaches that competitors should be entering the market to capture some of Vail Health's supra-competitive prices and profits. But that has not happened, which strongly suggests that Vail Health's exclusionary practices have injured—and continue to injury—competition.

234.    The fact that there has been a decrease in the number of competitors in the market and thus an increase in Vail Health's monopoly power is proof that Vail Health's monopoly position and its exclusionary conduct have had, and are continuing to have, deleterious effects on competition. The market is not static—it is instead moving in an enhanced monopolistic and therefore anticompetitive direction. For example, although Vail Health's exclusionary conduct has enabled it to exercise additional market power, the exercise of that power has not been offset by additional valuable services or lower prices that would benefit consumers.

235.    That there has been a decrease in the number of competitors and an increase in market concentration (that is, concentration toward Vail Health) means that there has been a decrease in the profitability of competitors of Vail Health in the Vail

Valley physical therapy market. Plaintiffs allege that competitors are suffering a decrease in output resulting in a deterioration in profits.

236. The fact that there has been a decrease in the number of competitors in the relevant geographic and service markets not only shows that competitors are being excluded from the market but that the weakening financial condition of existing competitors demonstrates that they lack the capacity to expand their output to challenge Vail Health's supra-competitive prices and profits.

237. The anticompetitive nature of the Vail Valley physical therapy market, which has persisted over the course of over five years, demonstrates that Vail Health's monopoly power is not transitory but has in fact been persistent and durable over an extended period of time.

238. The monopoly power of Vail Health and its anticompetitive exclusionary conduct have had an actual, deleterious, and anticompetitive effect on competition for physical therapy services in the Vail Valley geographic market.

## PLAINTIFFS' ANTITRUST INJURY

239. The exclusionary conduct alleged above violates § 2 of the Sherman Act, 15 U.S.C. § 2. As a direct and proximate result of Vail Health's anticompetitive exclusionary conduct, Winninger and Sports Rehab have been forced out of their physical therapy profession and business in the Vail Valley geographic market.

240. As the direct and proximate result of their exclusion from these relevant markets, they have suffered economic and financial injury in the form of lost capital, loss of past income, and will lose future income that would otherwise have been earned if Vail Health had not abused its monopoly power by engaging in these exclusionary acts.

241.   Winninger and Sports Rehab are therefore entitled to an award of monetary damages substantially exceeding $1 million, the exact amount of which shall be proven at trial.   Pursuant to 15 U.S.C. § 15, the award of damages shall be trebled and interest awarded at the statutory rate.   Winninger and Sports Rehab are also entitled to statutory costs and reasonable attorneys' fees in prosecuting this action.

## CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF SHERMAN ACT § 2, 15 U.S.C. § 2**
**VAIL HEATH'S MONOPOLIZATION**

242.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 241 as if set forth fully herein.

243.   Vail Health has owned, maintained, and operated the physical therapy clinic doing business under the Howard Head trade name since November 1, 2012, in Vail, Colorado.   Vail Health has, at all times relevant to this action, employed approximately 55-75 licensed physical therapists as part of its physical therapy clinic.

244.   Vail Health maintained a market share in the physical therapy market for the Vail Valley geographic market of 80% or more during the period of December 1, 2012, through the present.

245.   The physical therapy market is the relevant product or service market for antitrust purposes and includes therapy for the preservation, enhancement, or restoration of movement and physical function impaired or threatened by disease, injury, or disability that utilizes therapeutic exercise, physical modalities (such as massage and electrotherapy), assistive devices, and patient education and training.

246.    The relevant geographic market for antitrust purposes is the Colorado county of Eagle from East Vail, Colorado, to Gypsum, Colorado.

247.    From and after November 1, 2012 through the present, Vail Health has exercised market power and monopoly power to raise and maintain supra-competitive prices for physical therapy services and exclude competitors in the Vail Valley geographic market.

248.    Vail Health has been able to create and maintain its dominant position for physical therapy services in the Vail Valley geographic market through the exclusionary conduct alleged in this amended complaint.

249.    Vail Health has been able to acquire, create, and maintain its dominant, monopoly position for physical therapy services in the Vail Valley geographic market by monopolizing the labor market for physical therapists in the Vail Valley geographic market.  Vail Health has monopolized the market by requiring all physical therapists who become employed by Vail Health to sign an unreasonable, illegal, and anticompetitive employment agreement.

250.    Vail Health has also engaged in anticompetitive acts and conduct by defaming competitor Winninger and disparaging Sports Rehab's business reputation in the Vail Valley medical community, and by tortiously interfering with Winninger's consulting contracts, all in an attempt to maintain Vail Health's monopoly over physical therapy services in the Vail Valley geographic market.

251.    The acts and conduct of Vail Health, as hereinbefore alleged, have been willful and intentional and constitute violations of § 2 of the Sherman Act, 15 U.S.C. § 2, which provides that it is illegal for any person "to monopolize, attempt to monopolize, or

combine or conspire with any other person" "to monopolize any part of trade or commerce."

252.   As the direct and proximate cause of Vail Health's violations of § 2 of the Sherman Act, 15 U.S.C. § 2, Winninger and Sports Rehab have been damaged in their profession and business.

253.   As the direct and proximate cause of Vail Health's violations of § 2 of the Sherman Act, 15 U.S.C. § 2, competition in the physical therapy market in the Vail Valley has been injured.

254.   Plaintiffs Winninger and Sports Rehab are therefore entitled to an award of damages they have sustained as the result of Vail Health's anticompetitive conduct, the exact amount of which shall be proven at trial.

255.   Pursuant to 15 U.S.C. § 15, Plaintiffs are entitled to an award of treble the amount of actual damages sustained as the result of Vail Health's anticompetitive conduct, together with their attorneys' fees and costs.

## COUNT II

### VIOLATIONS OF SHERMAN ACT § 2, 15 U.S.C. § 2; VAIL HEALTH'S ATTEMPT TO MONOPOLIZE

256.   Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 255 as if set forth fully herein.

257.   Vail Health has owned, maintained, and operated the physical therapy clinic doing business under the Howard Head trade name since November 1, 2012, in Vail, Colorado.   Vail Health has, at all times relevant to this action, employed approximately 55-75 licensed physical therapists as part of its physical therapy clinic.

258.   Vail Health maintained a market share in the physical therapy market for the Vail Valley geographic market of 80% or more during the period of December 1, 2012, through the present.

259.   The physical therapy market is the relevant product or service market for antitrust purposes and includes therapy for the preservation, enhancement, or restoration of movement and physical function impaired or threatened by disease, injury, or disability that utilizes therapeutic exercise, physical modalities (such as massage and electrotherapy), assistive devices, and patient education and training.

260.   The relevant geographic market for antitrust purposes is the Colorado county of Eagle from East Vail, Colorado, to Gypsum, Colorado.

261.   From and after November 1, 2012 through the present, Vail Health has exercised market power and monopoly power to raise and maintain supra-competitive prices for physical therapy services and exclude competitors in the Vail Valley geographic market.

262.   Vail Health has been able to create and maintain its dominant, monopoly position for physical therapy services in the Vail Valley geographic market through the exclusionary conduct alleged in this complaint.

263.   In 2015, Vail Health began discussions with Steadman regarding the extension of the Steadman lease covering office and clinical space within the Vail Health facilities located at 181 West Meadow Drive, Vail, Colorado, and perhaps other locations in Colorado.  At about the same time, Steadman was considering opening its own physical therapy clinic that would be separate and apart from the physical therapy clinic operated by Vail Health and doing business under the Howard Head trade name.

264.    Because referrals from physicians at Steadman to Vail Health's physical therapy clinic constitute approximately 65% to 70% of its total physical therapy referrals—and thus revenues and profits—Vail Health became extremely concerned that it would lose its monopoly position for physical therapy services in the Vail Valley if it lost the Steadman referrals.

265.    To avoid the loss of Steadman referrals, Vail Health proposed a joint venture to form a partnership (or other legal entity) with Steadman physicians, whereby the joint venture would provide the physical therapy services to patients then provided by Vail Health's Howard Head unit.  Through this arrangement, Vail Health intended to expand and strengthen its dominant monopoly power.

266.    At about the same time, Vail Health attempted to bring Vail Summit Orthopedics, another group of orthopedic surgeons practicing in the Vail Valley, into the physical therapy joint venture.  Inclusion of Vail Summit would have meant that Vail Health would have contractually tied up an even greater number of referrals, or at least ensured that Vail Health "locked in" its sources of referrals, thus expanding or at least maintaining its level of monopoly power.

267.    This attempt to combine with physicians of Steadman and Vail Summit constituted a violation of § 2 of the Sherman Act, 15 U.S.C. § 2, which makes it illegal for any person to "attempt to monopolize" "any part of trade or commerce."

268.    As described in this amended complaint, the prospective joint venture arrangement that Vail Health sought to consummate failed.  When it did, it caused tragic and devasting antitrust injury to Winninger and Sports Rehab, as described above.

269.   The acts of Vail Health, as hereinbefore alleged, constitute the use of anticompetitive conduct with the then present intent to monopolize the Vail Valley market for physical therapy services.   Given the 80% market share and monopoly power that Vail Health already possessed, there was a dangerous probability that this attempted monopolization would have generated additional monopoly power for Vail Health, all in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

270.   As the direct and proximate cause of Vail Health's attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, Winninger and Sports Rehab have been damaged in their profession and business.

271.   As the direct and proximate cause of Vail Health's attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, competition in the physical therapy market in the Vail Valley has been injured.

272.   Plaintiffs Winninger and Sports Rehab are therefore entitled to an award of damages they have sustained as the result of Vail Health's anticompetitive conduct, the exact amount of which shall be proven at trial.

273.   Pursuant to 15 U.S.C. § 15, Plaintiffs are entitled to an award of treble the amount of actual damages sustained as the result of Vail Health's anticompetitive conduct, together with their attorneys' fees and costs.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Sports Rehab Consulting LLC and Lindsay Winninger request the following relief:

(a)    Judgment in favor of Plaintiffs and against Vail Health on both of Plaintiffs' claims for relief;

(b)     An award of compensatory, noncompensatory, and all other allowable damages to Plaintiffs and against Vail Health in an amount to be determined at trial, with damages to be trebled, plus interest;

(c)     Costs and reasonable attorneys' fees incurred in this matter, including expert witness fees; and

(d)     All other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial on all issues so triable.


Dated:  September 27, 2019          _s/ Alan L. Kildow_
                                    Alan L. Kildow, MN# 0143133
                                    790 Potato Patch Drive
                                    Vail, CO 81657
                                    Telephone: (970) 390-6675
                                    E-mail:  alkildow@aol.com

                                    Jesse Wiens, Colo. #33903
                                    Fahrenholtz & Wiens LLC
                                    100 West Beaver Creek Boulevard
                                    Suite 236
                                    Avon, CO 81620
                                    Telephone: (970) 949-6500
                                    E-mail:  fwlawyers@gmail.com