# Exhibit 5

| | |
|---|---|
| DISTRICT COURT, EAGLE COUNTY<br>STATE OF COLORADO<br><br>885 Chambers Avenue<br>Eagle, CO 81631 | DATE FILED: April 1, 2019 8:09 AM<br>FILING ID: 254201CC3D7B2<br>CASE NUMBER: 2017CV30102 |
| **Plaintiffs:** LINDSAY WINNINGER, an individual, and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,<br><br>v.<br><br>**Defendants:** DORIS KIRCHNER, an individual, and VAIL CLINIC, INC. d/b/a VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation. | ▲   COURT USE ONLY   ▲ |
| **Counter-Plaintiff:** VAIL CLINIC, INC., D/B/A VAIL VALLEY MEDICAL CENTER, a Colorado corporation,<br><br>v.<br><br>**Counter-Defendants:** LINDSAY WINNINGER, an individual, and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company, | Case No: 2017CV030102<br><br>Div.: 4    Ctrm: 3 |
| **Third-Party Plaintiff:** VAIL CLINIC, INC., D/B/A VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation,<br><br>v.<br><br>**Third-Party Defendant:** DAVID J. CIMINO, an individual. | |
| Jesse Wiens, Colo. #33903<br>Fahrenholtz & Wiens LLC<br>100 West Beaver Creek Boulevard<br>Suite 236<br>Avon, CO 81620<br>Telephone: (970) 949-6500<br>E-mail: fwlawyers@gmail.com<br><br>Attorneys for Plaintiffs/Counter-Defendants LINDSAY WINNINGER and SPORTS REHAB CONSULTING LLC | |
| **PLAINTIFFS' STATEMENT REGARDING THE REFILING OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON THE DEFAMATION CLAIMS** | |

**INTRODUCTION**

On March 14, 2019, the Court issued an Order Granting Leave to Amend MSJ stating, in relevant part, that "the Court requests either an amended MSJ or a statement that the MSJ may stand as it is despite the amended complaint.  The pleading shall be filed within fourteen days."  In light of the fact that Defendants' motion for summary judgment was premised upon a complaint that predated the deposition testimony of key witnesses who are managers of The Steadman Clinic, and given that Defendants motion did not give credit to, inaccurately cited, mischaracterized, and omitted material defamatory statements made by Defendants, Plaintiffs anticipated that Defendants would accept the Court's invitation to refile their motion.

But on the afternoon of March 25, 2019, Defendants filed their Statement Concerning Their Motion For Summary Judgment.  In that Statement, Defendants not only declined to refile their summary judgment motion, but in the process made again false statements concerning the factual basis for their motion.  (Those statements will be addressed below.)  And the following morning, the Court issued an Order stating that "[t]he Court shall consider Defendants' MSJ as fully briefed and ripe.  No amendments to the Motion, Response or Reply shall be permitted so that the Court may begin the review process and issue an order."  In reading the Court's March 14 Order, it was Plaintiffs' understanding that both parties would have the opportunity to file a statement concerning whether Defendants' motion should be refiled.  The way it has turned out, however, Plaintiffs are not being provided with the opportunity to weigh in on this important issue.

It is for that reason that Plaintiffs file this statement of objections and ask that the Court consider Plaintiffs' request that: (1) Defendants refile their summary judgment

motion, or (2) grant Plaintiffs leave to file a 15-page sur-reply to Defendants' March 13

reply memorandum.  The grounds for Plaintiffs' request include the following:

- In the Rule 121 conference preceding Defendants' summary judgment motion, Plaintiffs informed Defendants that the motion was premature because an amended complaint would soon be filed and the motion would be a waste of the time of the Court and the parties.  Plaintiffs stated that Defendants should defer their filing until after the motion for leave to file the amended complaint was decided by the Court.  Plaintiffs also advised Defendants that further depositions would be taken, thus providing additional testimony as to Defendants' defamatory statements.  After those events had transpired, Plaintiffs suggested that Defendants' summary judgment could be made on a more complete record.  Defendants rejected Plaintiffs' suggestions, thus placing the parties and the Court in the present procedural conundrum.

- Defendants proceeded to file their summary judgment motion focusing on facts alleged in the Amended Complaint that had been filed before key witnesses had testified.  Defendants' motion, therefore, was based upon allegations premised upon what Plaintiffs anticipated these key witnesses would say in their deposition.  So Defendants' motion largely ignores the reality of discovery to date.  And what discovery Defendants cited in their motion is not reflective of the actual testimony and documentary evidence adduced to date.

- Given the obvious deficiencies in the motion that were pointed out by Plaintiffs in their opposition to the motion, Defendants' reply memorandum is like a second motion in that it cites actual testimony but takes that testimony out of context, fails to cite deposition that is complete within the context of the testimony given, mischaracterizes testimony so that it gives the reader a false impression as to what was said, and omits to bring to the attention of the Court testimony that contradicts the testimony cited out by Defendants.  The manner in which Defendants directed this evidence renders it applicable to entirely different and additional legal authority.  And to all of these factual misstatements and the need for additional legal authority, Plaintiffs have been foreclosed from responding.  Plaintiffs are, therefore, working on a motion to be filed under C.R.C.P. 11.

Against that procedural background, Defendants should be required to refile their

motion for summary judgment so that there is no question as to the facts upon which it

relies and so that the Court has an accurate picture of the evidentiary record to date.  At

least as important, Plaintiffs should have the ability to supply additional legal authority

holding that the legal theory underpinning Defendants' reply arguments does not entitled them to summary judgment.  So as an alternative, Plaintiffs request leave to file a 15-page sur-reply to address new factual arguments that were raised for the first time in Defendants reply.  The new factual arguments also raise legal issues that Plaintiffs did not respond to in their reply because they were not at issue.

## FACTUAL BACKGROUND

A much more complete recitation of deposition testimony than is supplied by Defendants is set forth in the table below:

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| "Brown never told Adair that Winninger was involved" in the theft of patient files. (Defs.' Mot. for Summ. J. at 11.)<br><br>Defs.' Reply now addresses for the first time that:<br>"Adair "recall[ed] conversations with Nico Brown that he or she was involved."  (Reply at 8)<br><br>Defendants assert that Adair did not specify what specifically Brown (*id.*), which is incorrect.<br><br>Defendants do not address Adair's understanding that "he" was Cimino and "she" was Winninger. | **Adair Deposition**<br>Q.  …Did Nico Brown at any point in time ever tell you that he thought Lindsay Winninger may have been involved in taking the Vail Health medical files that contained PHI or other files?<br>A.  **I recall conversations with Nico Brown that he or she was involved.**<br><br>We had a discussion, and I guess I could have made the assumption based that Lindsay, you know, had hired Dave.  And I don't remember if it was a specific time frame, but we had a conversation regarding it.<br><br>Q.  Okay.  **And what was the conversation?**<br>A.  **That there were medical records, PHI, stolen from Howard Head.**<br>Q.  Okay.  And you knew at the time that the individual who downloaded these files was David Cimino, right?<br>A.  I believe so, at that time.<br><br>Q.  Okay.  **So would it be fair to say that you recall Mr. Brown telling you this sometime between, let's say January 1, 2017, and the partners' meeting we've discussed in February or March of 2017?**<br>A.  **I believe so.**<br><br>**Q.  All right.  So the "he" is Mr. Cimino.  Was it logical, then, for you to infer from what he [Brown] said that the "she" was Lindsay Winninger?**<br>**A.  I made an assumption that it was Lindsay.**<br>**Q.  Okay.  You made that assumption at the time he made the statement, right?**<br>**A.  From what I recall, yes.**<br>(Pls.' Mot. to Amend Ex. 4 at 196, 198-200, 202-03.)<br><br>**Brown Deposition**<br>Although Brown later changed his testimony, he testified he had such |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | conversations with Adair. |
| | Q.   Have you ever had any discussion with Kelly Adair that Lindsay Winninger was involved in the theft of Vail Health patient files? |
| | A.  Yes, I have. |
| | (Pls.' Opp'n to Mot. for Summ. J. Ex. 1 at 174-75.) |
| | **Drawbaugh Deposition** |
| | Q.  Did you have any discussions with Kelly Adair about the breach and whether Lindsay Winninger was involved in the theft of patient files? |
| | A.  Yes….More than one. |
| | ….I know that Kelly understood that she was implicated; and Kelly and I would talk about it and the decision to, you know—he knew she was implicated and was following direction from me to pull back on the work she was doing. |
| | (*Id.* at 93-94.)o |
| Defendants deny that "Shannon told Dr. Philippon that patient files had been stolen from Vail Health and Winninger was involved." (Defs.' Mot. for Summ. J. at 12.)  Defendants deny any conversation between Shannon and Dr. Philippon in which WInninger was involved in Cimino's conduct. (Reply at 8.) | **Philippon Deposition** |
| | Shannon met Drawbaugh and Dr. Philippon at the Sonnenalp Hotel, in which they that it would be good to make amends with Winninger. (Mot. to Amend Ex. 3 at 96). |
| | Drawbaugh and Dr. Philippon had a phone call with Shannon, in which they discussed that Winninger "just wanted to have an apology and she didn't feel—she didn't do anything wrong."  (Pls.' Mot. to Amend Ex. 3 at 102.) |
| | After the December 2016 meeting with Shannon, in which Dr. Philippon was shown the draft complaint, Dr. Philippon had a meeting with Winninger: |
| | Q.  Did you ever talk to Lindsay Winninger about whether she had received any information from Dave Cimino that he took from the hospital? |
| | A. I know Dan asked her directly, but I can tell you I remember Lindsay being in my office and telling me that she had nothing to do with that situation. So, yes, we discussed that situation, and she was in my office. I don't remember exact—I think this was in 2017 probably. Yeah. So I remember that specific instance. |
| | (*Id.* at 23.) |
| | Q.  Q. Okay. Did you ever express concerns over Lindsay Winninger having access to The Steadman Clinic database because of the fact that this issue was unresolved? |
| | A.  So I'll just give you a more complete answer. So initially David downloading the documents, I'm not worried about Lindsay. **Where I became worried is where I was told there might be a connection**, so—and it's nothing personal.  **I was told there was a connection**. So we have been through this before so—with another breach. So any time there is a potential for—or there's an unknown about someone getting access to our database, we're very protective of our database. **So of course I would be concerned if there's any accusation made**, I would be very concerned for the organization. |
| | (*Id.* 39-40.) |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | Q.  What did you and Mike Shannon discuss with respect to the complaint at that meeting on New Year's Eve? **A.  He just told me that it was a serious, serious situation**….**And I didn't know that Lindsay was potentially involved with that**. So what I'm trying to say is like, again, for me, nothing personal, **it's just if I hear someone has a potential civil or criminal complaint, we take that very seriously** for—you know, regardless of my—you know, my relationship with that person, it's very serious. So that's why I asked Dan to check on it. Q.  And what did Dan report back to you? **A.  He said he saw the complaint.** Q.  And what did he say about the complaint? **A.  Well, he—he said the same thing, that he was concerned.** (*Id.* at 70-71.)<br><br>Q.  And before the break, you had testified with regard to the conversation that you had with Mike Shannon at that breakfast meeting, correct? A.  Yeah. Q.  Okay. Now, Mike Shannon has testified…that when he showed you the complaint…he did not use the word "criminal." A.  Oh, okay. Q.  Do you have any memory otherwise? A.  Well, I remember that word because that—I remember that word. Q.  What do you remember about that word? **A.  Criminal. Yeah, because that struck me. Criminal is different than civil….So for me, a criminal lawsuit or complaint is serious. Even more serious, yes….I have to say, I remember civil and criminal, because that's why I remember it. Because it was really serious for me personally to hear that word involving someone I knew. So that was -- I took that very seriously.** Q.  So is it your testimony that Mike Shannon used the word "criminal"? **A.  I remember hearing that word.** I don't know where I would have heard it from. Q.  But do you remember him saying that? **A.  I mean, he showed me the complaint, and I know it was a civil civil, and I know the word "criminal" was used.** Q.  But do you recall him using that word? **A.  Well, I didn't say it.** (*Id.* at 78-80.)<br><br>Q.  Did you ever tell Mike Shannon that the hospital should just apologize to Lindsay Winninger? A.  I don't know if I used these words, **but I know that Lindsay was asking for an apology. So I don't know if we used these words directly, but probably along these lines that—yeah, along these lines that it would be good for the hospital to make amend with Lindsay.** Q.  And did you say that to Mike Shannon before or after she had already sued them? A.  I want to say that—I don't know for certain, but I think it was before. Q.  Okay. And how did you know that Lindsay Winninger wanted an apology? Was it from Alan Kildow? A.  From Dan. |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | Q.  Dan told you that he had talked to Lindsay Winninger? <br><br> A.  Or maybe Lindsay told me.  Maybe Lindsay told me directly. **She just wanted an apology because she didn't feel that she was treated fairly and that she didn't do anything wrong, and she just wanted to have an apology**. <br> (*Id.* at 96.) <br><br> Q.  So you weren't trying to suggest that the hospital had done anything wrong, were you? <br> A.  Well, the way I would answer that is this:  **if there was accusations that were not accurate by the hospital, obviously I would say the hospital would have done something wrong.  So if the accusation were not accurate, I would side with Lindsay.**  (*Id.* at 107.) <br> Q.  Did Mike Shannon ever tell you that Lindsay Winninger had stolen documents? <br> A.  I don't know if he used that strong of words.  But I know Mike was just telling me, because I know her, that there were some implications. <br> * * * <br> I don't remember exactly what he said, **but here's what I understood, is that there's—Cimino was working for Lindsay, and there might be some kind of relationship in the—in the records taken from the hospital.** <br> (*Id.* at 110-11.) <br><br> **I think he was just telling me, Marc, there's an issue with David and there's implication that Lindsay might be connected to it.**  (*Id.* at 120.) <br><br> **[O]nce we found out that there might be some implication for her involving David with the files, we're very sensitive for any kind of HIPAA violation in our clinic, for many reasons.  So because of that we said, Well, let's resolve this to make sure we're 100 percent kosher that there is no issue here.**  And we never had that resolution.  We never found out—never had a piece of paper saying that everything is kosher, everything is fine.  I never saw that. (*Id.* at 133.) |
| Defendants deny that Kirchner told Drawbaugh that Winninger was involved in the theft of Vail Health patient files.  (Defs.' Mot. for Summ. J. at 13.) <br><br> Defendants allege that Drawbaugh recalled only one conversation with Kirchner.  (Reply at 5.) | **Drawbaugh Deposition** <br> Q.  Did Ms. Kirchner tell you what the issues [with Winninger] were? <br> A.  Just that there had been theft of records by a PT with Lindsay, and there were other factors in that PT taking—downloading on a thumb drive patient information. <br> Q.  Did Ms. Kirchner suggest when she told you that, that with respect to the theft of records by the PT that Lindsay Winninger may have been involved? <br> A.  **What I recall is she indicated she could be involved, and they were running forensics.** <br> Q.  **Did she ever report back to you on the forensics and how that investigation came out?** <br> A.  **No. We had a discussion on it.  I recall asking to see forensics, but I never saw forensics.** <br><br> Q.  **To the best of your recollection, what precisely did Ms.** |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | Kirchner tell you in that meeting.<br>A. **There were concerns on, you know, Lindsay Winninger being involved in the data patient—on the patient theft, I guess data theft.**<br><br>Q. **To the best of your recollection, did she say that they suspected that Lindsay Winninger was involved in the theft of the patient files or PHI?**<br>A. **Yes, she was implicated in…**<br>Q. **When you say that "she was implicated," that is Lindsay Winninger was implicated in the theft**?<br>A. **She could have been involved.**<br>Q. …And did Ms. Kirchner tell you how she could be involved?<br>A. No—I mean, **I interpreted it as could have been—I don't know. She instructed David to take it or she received the data. I don't know what was the implication. That's how I perceived it.**<br>(Pls' Mot. to Amend Ex. 2 at 32-35.)<br><br>Q. Had you heard from anyone else in the Vail Valley or beyond the Vail Valley that people had  been told or heard that Lindsay Winninger had been involved in—or alleged to have been involved in the theft of patient files?<br>A. Yes.<br>Q. Who?<br>A. **Whenever—each time, whenever things happened, Lindsay—I approached Lindsay, as CEO, who was working as a consultant.  I probably inquired—I know I inquired multilple times on this, and the held to the same story.  She wasn't involved**….<br>(*Id.* at 47.)<br><br>Q. You testiied that many of the doctors and the staff ceased communicating with Ms. Winninger and dealing with Winninger after the breach incident occurred, correct?<br>A. Yes.<br>Q. **Would it be fair to say that, based on your observation and contact with Ms. Winninger, that this essentially has destroyed her professional life in the valley?**<br><div align="center">* * *</div>A. **From The Steadman Clinic and Steadman Philippon Research Institute, we never reengaged in business with her.**<br>(*Id.* at 49-50.)<br><br>Q. Did most of the negative statements about Lindsay Winninger occur before or after you signed those contracts [with Winninnger] on August of 2016?<br>A. Both before and after.<br>(*Id.* at 50-51.)<br>Q. And at the time that Ms. Kirchner made the—they provided you a copy of the [draft] complaint to read, were you aware that, in fact, Dr. Philippon had already seen a copy of the draft complaint?<br>A. Yes. |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
|  | Q.  How did you know that?<br>A.  He called me after the meeting.<br>Q.  After the meeting between Dr. Philippon and Mr. Shannon?<br>A.  Correct.<br>Q.  What did Dr. Philippon say about that meeting?<br>A.  That Mike had shown him a criminal complaint, and **it's far worse than what we thought.**<br>Q.  How was it far worse?<br>A.  **It's criminal, you know, if all this was actually—actually occurred.**<br>Q.  **Did Dr. Philippon convey to you, when he talked to you about that meeting between him and Mr. Shannon, that he had come away with the perception or understanding that, in fact, the facts alleged in the [draft] complaint were true?**<br>A.  **Yes.**<br>Q.  **And that Ms. Winninger had, in fact, been involved in the theft of patient files**?<br>A.  **Yes.**<br>(*Id.* at 64-65.)<br>Q.  When you had that meeting [in January 2017] with Ms. Kirchner at which time she showed you the complaint, did she make any comments to you, say anything that—"We've done quite a bit of research on this, and we have done the forensics now, and we—she was involved"?<br>A.  Well, I felt there were thorough forensics done.<br>Q.  How did you think that? Did she say that?<br>A. Yeah, there were -- yeah, I think the word "forensics" was used.<br><div align="center">* * *</div>Q.  She [Kirchner] told you in that meeting that forensics had been run?<br>A.  Correct.<br>Q.  **Did she tell you that they had, in fact, traced these stolen files to Winninger?**<br>A.  **I don't recall the exact words, but that is what I believed.**<br>Q.  Is that what you believed based on what she [Kirchner] said and the complaint taken together as a whole?<br>A.  Yes.<br>(*Id.* at 67-68.)<br><br>Q.  Did you ask Ms. Kirchner when you were in her office looking at the complaint to give you facts, provide you with proof that she had done this, Lindsay Winninger had done this?<br>A.  I recall asking to see the forensics.<br>Q.  And how did she respond?<br>A.  It was confidential to Vail Health.<br>Q.  Did she say that she had that proof?<br>A. Did she say what?<br>Q.  Did she say that she actually had that proof, but just couldn't provide it to you?<br>A.  That's the way I understood it.<br>(*Id.* at 73.)<br><br>Q.  And then there was a discussion among the physicians [in February 2017], at which you were in attendance, about Ms. Winninger?<br>A.  Correct.<br>Q.  And the decision was to cease working with her altogether, correct? |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | A. Yes.<br>Q.  What were the reasons that were given for ceasing to work with her?<br>A.  Just at that point the implication of criminal activity….we all felt, you know, as a responsibility to the organization, that, you know, we just had a responsibility to the organization.  And so we pretty much shut everything down.<br>(*Id.* at 70-71.)<br><br>Q.  Between the time that Nico Brown met with Lindsay Winninger on or about…January 9, 2016, and the April 15, 2016, notice of breach, did Doris Kirchner ever tell you that Lindsay Winninger had been involved in the theft of Vail Health files?<br>**A.  Doris indicated [before August 2016] that Lindsay was involved in the theft….**<br><br>Q.  How many times did Ms. Kirchner say that Lindsay Winninger had been involved in the theft of Vail Health patient files?<br>A.  I'm not sure how many times.  **I mean, from the beginning, the implication was that Lindsay was involved.**<br>Q.  …**the implying was being done by Ms. Kirchner, right?**<br>A.  Correct.<br>(*Id.* at 88-89.)<br><br>Q.  How many times did Ms. Kirchner say that Lindsay Winninger had been involved in the theft of Vail Health patient files?<br>A.  I'm not sure how many times.  I mean, from the beginning, the implication was that Lindsay was involved.<br>(*Id.* at 90.)<br><br>Q.  …[S]omebody is accused of a felony that could send them to prison for ten years, and nobody asked any questions about what proof—<br>A.  No, I think….<br>I think that Kelly and I, you know—….<br>I think everyone believed that the, you know—the ongoing process was that Vail Health was doing their due diligence and was thorough on it **and it was true.**<br>(*Id.* at 95.)<br><br>Q.  Was there anything that anyone else said in about this time of January of 2016 that suggested tthat Lindsay Winninger might be involved in the breach?<br>A.  [Steadman doctor] Tom Clanton came to me and indicated that he had concerns.<br>Q.  Do you recall what he said about what his concerns were?<br>A.  On ethics regarding taking patients from Howard Head.<br>(*Id.* at 20.) |

| DEFS.' CONTENTION | ACTUAL RECORD EVIDENCE |
|---|---|
| | Q.  When those doctors came to you, what did they say?<br>A.  There were issues with—we consider Vail Health a partner organization, and there were issues between Vail Health and Lindsay.<br>Q.  And did they say what those issues between Vail Health and Lindsay were?<br>A.  Patients that were Howard Head patients being recruited to her business.<br>(*Id.* at 23.)<br><br>A.  … there were issues with Lindsay—and I'm repeating myself—but issues with Lindsay on her hiring of David Cimino; and that there could be patient—so I knew early on there could be patients that were being recruited out of Howard Head to Lindsay. That's what I understood. And Marc—Marc was angry about that.<br>Q.  Well, was it your opinion when you heard that, that the solicitation of clients would be a reputational issue, a business ethics issue?<br>A.  Yes, definitely.<br>Q.  And if she did—if she did that solicitation, that would reflect negatively on her reputation?<br>A.  Correct.<br>(*Id.* at 97-98.) |

## ARGUMENT

## I.  DEFENDANTS SHOULD BE REQUIRED TO REFILE THEIR MOTION FOR SUMMARY JUDGMENT DUE TO THEIR FAILURE TO ACCURATELY REPORT RECORD FACTS AND DEPOSITION TESTIMONY.

Defendants, like all other litigants to civil actions in Colorado, have an obligation to accurately and completely set forth the facts supporting their motion for summary judgment.  Where there are factual disputes rendering summary judgment inapplicable, Defendants have an obligation to report those facts to the Court.  In this case, Defendants have not done so, and as a consequence, the Court should order them to refile their motion with a complete recitation of the facts.

## II.  DEFENDANTS' REPLY MEMORANDUM RAISES NEW LEGAL ISSUES NOT RAISED IN THEIR OPENING MOTION.

At the very least, Plaintiffs should be granted leave to file a sur-reply memorandum addressing Defendants' reply memorandum, which, although unstated, is actually based upon a legal proposition under the law of defamation that is very different than the one

that was argued in its motion.  And that is that for a statement to be defamatory under the facts of this case, a witness had to use the precise words "Lindsay Winninger stole 3,000 Vail Health patient files."   Now, it must be recognized that Plaintiffs have cited to numerous statements where Defendants said just that.  But there are many additional statements that do not use those precise words, but the meaning is the same.

For example:  Steadman COO Kelly Adair testified:

> Q.  …Did Nico Brown at any point in time ever tell you that he thought Lindsay Winninger may have been involved in taking the Vail Health medical files that contained PHI or other files?
>
> A.  I recall conversations with Nico Brown that he or she was involved.
>
> A.  I made an assumption that it was Lindsay.[1]

Steadman Managing Partner Dr. Marc Philippon testified:

> A.  I think he was just telling me, Marc, there's an issue with David and there's implication that Lindsay might be connected to it.

And when you put all of these statements together with the draft complaint that Defendants circulated, there can be no question that Defendants did indeed say, "Cimino stole confidential and proprietary information, including VVMC [now Vail Health] protocols and other confidential materials."   It then stated that "***Winninger and Sports Rehab "knew about, and actively participated in Cimino's theft of confidential and proprietary information."***[2]   So Plaintiffs have presented record evidence that Defendants conveyed, explicitly and implicitly, that Winninger "stole" Vail Health records.

---

[1]        Pls.' Mot. to Amend Ex. 4 at 196, 198-200, 202-03.  ("A defamatory statement is made concerning the person to whom its recipient correctly, or mistakenly but reasonable understands that it was intended to refer." *Keohane v. Stewart*, 882 P.2d 1293, 1299 (Colo. 1994).)

[2]        Second Amended Complaint at ¶ 165 (emphasis added).

The unspoken argument that runs throughout Defendants' reply memorandum is that summary judgment should be entered on a particular defamation claim if the exact words "Winninger stole the files"—was not used in each particular instance.  That theory, however, is an incorrect statement of the law of defamation, and Plaintiffs should be entitled to address that theory in a sur-reply memorandum.  In *Keohane v. Stewart*, the Colorado Supreme Court held that when a court and jury analyze a defamatory statement there must be two levels of inquiry:

> The first inquiry is whether the statement is "sufficiently factual to be susceptible of being proved true or false."  *Milkovich*, 497 U.S. at 21, 110 S.Ct. at 2707.  The second inquiry is weather reasonable people would conclude that the assertion is one of fact.  *Id*.  The factors relevant to the circumstances surround the assertion, including the medium through which the information is disseminated and the audience to who the statement is directed.  []  [A] court must examine the entire context of a publication and the dramatic intonations of the speaker).  The factors are essential to insure that society's desire to protect speech and robust public debate does not create a license to commit character assassination.[3]

In making the arguments in their summary judgment reply memorandum (or in their motion either), Defendants did not alert the Court to the need to examine the entire context of the false statements made by Defendants.

Importantly, for the purpose of this statement, if Defendants had defined their defamation argument so narrowly in their opening motion, Plaintiffs would have responded quite differently because the legal theory of their very restrictive analysis of the law of defamatory statements in their reply is fundamentally different from the legal analysis in their opening motion papers.  And the later theory is fundamentally wrong as a matter of law.  But one example is that in ruling upon the summary judgment motion,

---

[3]      882 P.2d 1293, 1299 (Colo. 1994).

the Court must not only examine the entire context of the defamatory statement but must also look to the impact the statement had on the individuals who heard the statements. Defendants do not provide the Court with anything close to sufficient or complete deposition testimony to provide "the entire context" of the defamatory statements.

Moreover, "[a] statement may be defamatory 'if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter a third person from associating or dealing with him.' *Restatement (Second) of Torts* § 559 (1976); C.J.I.2d § 22.8 (1980)."[4] "In addition, the defamatory language does not have to prejudice the plaintiff in the eyes of a majority of the community. It is only necessary that the plaintiff be prejudiced in the eyes of a 'substantial and respectable minority' of the community."[5] In their reply, in making the very restrictive argument concerning Defendants' defamatory statements, Defendants do not make any attempt to analyze the understanding of the individuals who heard the statement or the impact of their false statements on the Steadman management. For example, Dr. Philippon testified:

> [O]nce we found out that there might be some implication for her involving David with the files, we're very sensitive for any kind of HIPAA violation in our clinic, for many reasons. So because of that we said, Well, let's resolve this to make sure we're 100 percent kosher that there is no issue here. And we never had that resolution. We never found out—never had a piece of paper saying that everything is kosher, everything is fine. I never saw that.[6]

Defendants' statements were obviously understood to "harm the reputation" of Winninger and "lower [her] in the estimation" of both Steadman and SPRI:

---

[4]     *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351, 1357 (Colo. 1983).
[5]     *Id.* (citing *Restatement (Second) of Torts* § 559, comment e).
[6]     Pls.' Mot. to Amend Ex. 3 at 133.

> Q.   Would it be fair to say that, based on your observation and contact with Ms. Winninger, that this essentially has destroyed her professional life in the valley?
>
> * * *
>
> A.   From The Steadman Clinic and Steadman Philippon Research Institute, we never reengaged in business with her.[7]

None of this was addressed in the new legal theory espoused in Defendants reply, but this analysis would be essential for this Court to properly analyze the defamatory statements on this summary judgment motion.

Yet another legal issue implicated by Defendants' reply memorandum—one that Plaintiffs should be entitled to address in a sur-reply—is what may be called "defamation by undisclosed facts."   The deposition testimony of Steadman CEO Dan Drawbaugh graphically illustrates this principal:

> Q.  She [Kirchner] told you in that meeting [in January 2017] that forensics had been run?
>
> A.  Correct.
>
> Q.  Did she tell you that they had, in fact, traced these stolen files to Winninger?
>
> A.  I don't recall the exact words, but that is what I believed.
>
> Q.   Is that what you believed based on what she [Kirchner] said and the complaint taken together as a whole?
>
> A.  Yes.[8]

Kirchner suggested that Defendants were confirming that Winninnger was involved in the theft of records through "forensics" that Drawbaugh asked for but was never provided:

---

[7]       Pls.' Mot. to Amend Ex. 2 at 49-50.
[8]       *Id.* at 68.

Q.   Did Ms. Kirchner suggest when she told you that, with respect to the theft of records by the PT that Lindsay Winninger may have been involved?

A**.  What I recall is she indicated she could be involved, and they were running forensics.**

Q.  **Did she ever report back to you on the forensics and how that investigation came out?**

A.  **No. We had a discussion on it.  I recall asking to see forensics, but I never saw forensics.**[9]

From his conversations with Kirchner, Drawbaugh understood that Vail Health had proof that Winninger was involved in Cimino's purported theft of patient files:

Q.   Did you ask Ms. Kirchner when you were in her office looking at the complaint to give you facts, provide you with proof that she had done this, Lindsay Winninger had done this?

A.  I recall asking to see the forensics.

Q.  And how did she respond?

A.  It was confidential to Vail Health.

Q.  Did she say that she had that proof?

A. Did she say what?

Q.   Did she say that she actually had that proof, but just couldn't provide it to you?

A.  That's the way I understood it.[10]

What this testimony demonstrates is that Kirchner was implying that there was forensic evidence tying Winninger to the theft of Vail Health patient records.  Steadman asked for that forensic evidence, but Defendants never provided any.  This is because they did not even have the ability to run such "forensics" without Winninger's computer, so Kirchner's

---

[9]      *Id.* at 32-35 (emphasis added).

[10]     *Id.* at 73.

statement was false at the time it was made.  And shortly thereafter, Winninger offered to have her computer examined by an independent forensic expert, but that invitation was declined by Defendants.

What Kirchner was implying, of course, is that "we have or will have" evidence proving the theft by Winninger, and Steadman executives relied on that representation. The law of defamation is that "[w]hen a statement of opinion is actionable, the action arises not from the opinion itself, but rather from the 'false assertion, implied or explicit, that the speaker is privy to certain facts, unknown to his general audience, which are supportive of the opinion and detrimental to the persona about whom the opinion is expressed."[11]  That is exactly what Kirchner was doing—falsely implying that Defendants were privy to information confirming Winninger's theft that Steadman did not have.

Kirchner's implication was false in three respects: *First, a*t the time Kirchner's statement was made to Drawbaugh, Defendants had not begun and did not even have the ability to begin a forensic examination of Winninger's computer.  *Second, a*t the time Kirchner made her statement to Drawbaugh, she did not have any evidence to support any assertion—whether that be implicit or explicit—proving that Winninger had stolen any patient files.  *Finally,* Kirchner repeatedly testified in her deposition that she did not know in 2016 or 2017, and does not know now whether Winninger stole Vail Health patient files. And that implication had dire consequences for Winninger and Sports Rehab:

> Q.  And then there was a discussion among the physicians [in February 2017], at which you were in attendance, about Ms. Winninger?
>
> A.  Correct.

---

[11]     *Sall v. Barber,* 782 P.2d 1216, 1219 (Colo. Ct. App. 1989).

Q.  And the decision was to cease working with her altogether, correct?

A.  Yes.

Q.  What were the reasons that were given for ceasing to work with her?

A.  Just at that point the implication of criminal activity….we all felt, you know, as a responsibility to the organization, that, you know, we just had a responsibility to the organization. And so we pretty much shut everything down.[12]

So the law of defamatory statements that are implied should be something that Plaintiffs should be able to address in a sur-reply memorandum.

## **CONCLUSION**

For the foregoing reasons, Defendants should be required to refile their motion for summary judgment or, at the very least, Plaintiffs should be granted leave to file a sur-reply memorandum to address the new legal theory raised in their reply memorandum.

Dated:  March 28, 2019

*s /Alan L. Kildow*
Jesse Wiens, Colo. #33903
Fahrenholtz & Wiens LLC
100 West Beaver Creek Boulevard
Suite 236
Avon, CO 81620
Telephone: (970) 949-6500
E-mail:  fwlawyers@gmail.com

Sonya R. Braunschweig (admitted *pro hac vice*)
5501 Irving Avenue South
Minneapolis, MN  55419
Telephone:  (612) 819-2304
E-mail:  sonya.braunschweig@gmail.com

---

[12]    Pls.' Mot. to Amend Ex. 2 at 70-71.

Alan L. Kildow (admitted *pro hac vice*)
15204 Wildwood Road
Burnsville, MN 55306
Telephone:  (970) 390-6675
E-mail:  alkildow@aol.com

Attorneys for Plaintiff and Counter-Defendants
Lindsay Winninger and Sports Rehab Consulting LLC

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 28, 2019, I served a true and correct copy of Plaintiffs' Statement Regarding The Refiling Of Defendants' Motion for Summary Judgment On The Defamation Claims, including declarations and exhibits, through the Court's e-filing system on:

> Janet A. Savage
> Jackie Roeder
> Michael Kotlarczyk
> Davis Graham & Stubbs LLP
> 1550 17th Street, Suite 500
> Denver, CO  80202
> Counsel for Defendants/Counter-Plaintiff
>
> John W. Madden, III
> The Madden Law Firm
> 999 18th Street
> Suite 1500 South
> Denver, CO  80202
> Counsel for Third-Party Defendant

> *s/ Jesse Wiens*
> Jesse Wiens