# Exhibit 2

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF COLORADO
2

3    SPORTS REHAB CONSULTING,      .   Case No. 19-CV-02075-WJM-GPG
     LLC, a Colorado limited       .
4    liability company, and        .
     LINDSAY WINNINGER, an         .
5    individual,                    .
                                    .
6             Plaintiffs,           .
                                    .   Wayne Aspinall Federal Bldg.
7    vs.                            .   402 Rood Avenue
                                    .   Grand Junction, CO  81501
8    VAIL CLINIC, INC.             .
     doing business as             .
9    VAIL HEALTH,                   .
     a Colorado nonprofit          .
10   corporation,                   .
                                    .
11            Defendants.           .   March 30, 2021
     . . . . . . . . . . . . . . .   2:01 p.m.
12

13        **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
             **GORDON P. GALLAGHER, UNITED STATES MAGISTRATE JUDGE**

14   APPEARANCES:

15   For the Plaintiffs:          Law Office of Allan L. Kildow
                                  By:  Allan L. Kildow
16                                709 Potato Patch Drive
                                  Vail, CO  81657
17                                (970) 390-6675

18   For the Defendants:          Davis Graham & Stubbs, LLP
                                  By:  Shannon Wells Stevenson
19                                By:  Daniel Richards
                                  1550 17th Street
20                                Suite 500
                                  Denver, CO  80202
21                                (303) 892-9400

22   Court Recorder:              Clerk's Office
                                  U.S. District Court
23                                402 Rood Avenue
                                  Grand Junction, CO  81501
24
     Also Present:                Caitlin Grimmer
25

2

1    Appearances continued:

2    Transcription Service:          AB Litigation Services
                                     216 16th Street, Suite 600
3                                    Denver, CO  80202
                                     (303) 296-0017
4
     Proceedings recorded by electronic sound recording;
5    transcript produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    (Time noted:  2:01 p.m.)
 2             THE COURT:  All right.  Good afternoon, everybody.
 3   This is Gordon Gallagher, and we are here today in 19-CV-
 4   2075.  This is Sports Rehab, et al versus Vail Clinic, et al.
 5   And the matter comes on for a discovery dispute hearing
 6   today.  I have received and reviewed the discovery dispute
 7   chart, as well as all the attachments.
 8             And let me just make sure that everybody here can
 9   hear me.  I heard that Mr. Kildow was on for the plaintiffs.
10   Can you hear me, Mr. Kildow?
11             MR. KILDOW:  I can, Your Honor.
12             THE COURT:  All right.  Good afternoon.
13             MR. KILDOW:  Good afternoon.
14             THE COURT:  And I heard that Ms. Stevenson and Mr.
15   Richards were on for Vail Clinic.  Can you hear us?
16             MR. RICHARDS:  Yes, Your Honor.  Dan Richards can.
17             THE COURT:  And Ms. Stevenson?
18             MS. STEVENSON:  Yes, Your Honor, I can hear you.
19             THE COURT:  Okay.  And, Ms. Stevenson, or Mr.
20   Richards, does one or both of you intend to be addressing
21   things?  Or are you going to -- do you have any idea at this
22   point how you're going to essentially parse that out between
23   yourselves yet?  Just so I know who to turn to.
24             MS. STEVENSON:  Your Honor, it's Ms. Stevenson.  I
25   will be responding on most of the issues.  Mr. Richards is
```

4

1   more involved in the state case, and so he may have some

2   particular issues on which he is better informed.

3             THE COURT:  Okay.

4             And, Ms. Grimmer, let me make sure that you can

5   still hear us when we transferred things over into the

6   courtroom feed.

7             THE COURT CLERK:  I can hear you.

8             THE COURT:  Okay.

9             All right.  Give me a minute, folks.  I have to

10  update the computer with a new password from this morning and

11  I want to make sure that it populates with what I need from

12  that.

13        (Brief pause)

14            THE COURT:  Okay.  We are set to go.

15            So I have received the, as I noted, discovery

16  dispute chart and attachments, and reviewed it all in detail.

17  Let's start with an overriding issue that needs to

18  essentially get addressed first, that being waiver of

19  objections.

20            Mr. Kildow, if you want to start with any argument

21  that you have one way or the other with regard to objection

22  waivers?

23            MR. KILDOW:  Well, I don't have much beyond, or

24  anything beyond what we have cited in the chart.  It seems

25  that this should be, in this jurisdiction, a waiver of the

1    objections, particularly given the length of time that they

2    went unresponded to.  That is the written discovery, the

3    request for production of documents, were not timely

4    responded to for a long period of time, even if you consider

5    the stay.

6         But beyond on the authorities of the

7    (unintelligible) I don't have anything to say.

8         THE COURT:  Okay.  All right.  Thank you very

9    much.

10        Let me turn, Ms. Stevenson, to you for anything

11   further that you might have with regard to, first the waiver

12   argument is kind of a predicate matter that we need to get

13   out of the way one way or the other.

14        MS. STEVENSON:  Your Honor, you may recall back at

15   the beginning of this case there was sort of -- sort of fits

16   and starts where I think Your Honor was waiting to see how

17   the District Court ruled on the Colorado River motion and

18   delayed the scheduling conference a few times.  And each time

19   we were on the phone with the Court, Mr. Kildow brought up

20   the issue of discovery requests, and Your Honor was clear

21   that those were not pending and that we did not have to

22   respond until we had that issue of the stay resolved.

23        And then ultimately, you said, you know, no -- you

24   know, I'm going to wait to see how to handle this issue with

25   the stay, and you ended up granting a stay of discovery

1  pending the Court's resolution of the Colorado River motion

2  and said no discovery obligations until, you know, there's a

3  scheduling order entered.  And then as soon as we had our

4  scheduling conference back in the fall, I believe it was the

5  fall of 2020, we immediately provided our responses.  And I

6  believe that was consistent with everything the Court had

7  ordered all along.

8          THE COURT:  All right.  Any response to that, Mr.

9  Kildow, of any sort?

10          MR. KILDOW:  I do, Your Honor.

11          THE COURT:  Okay.  Go ahead.

12          MR. KILDOW:  The response is that they filed, I

13  believe October 7th, were not responsive to Judge Martinez's

14  order.  He lifted the stay on, I believe, August 26th, 27th,

15  28th, at least at the end of August.  So we have a federal

16  judge, federal court judge who has lifted the stay, and they

17  waited about six weeks to respond.  So I believe that they

18  have waived their objections.

19          THE COURT:  All right.  Give me just a moment,

20  please.  I want to take one more look at Exhibit D before

21  issuing an order here from the bench on this.

22      (Brief pause)

23          THE COURT:  All right.  In ruling on the issue of

24  whether there has been a waiver as to the objections here,

25  essentially the idea of an objection to not responding, I've

1   taken into account and incorporate the course of the record

2   made over this case, as well as my review of the specific

3   entries of CMECF, and of Defendant's Exhibit D, attached to

4   the discovery dispute here.

5          On January 28th of 2020, I held a scheduling

6   conference where I addressed discovery, the limits and the

7   deadlines as it pertains to the eventual scheduling order,

8   but I waited to issue a scheduling order until the stay

9   question was decided.  That is memorialized at Docket Entry

10  48.

11         On April the 21st of 2020, I granted a motion to

12  stay discovery pending resolution of Vail Health's pending

13  motion to dismiss pursuant to Rule 12(b)(6) and a motion to

14  dismiss for stay pursuant to the Colorado River doctrine, as

15  noted at Docket Entry 53.

16         And on August the 21st of 2020, the motion to

17  dismiss was denied, as is noted at Docket 55, entered by

18  Judge Martinez, and at that point time referring the matter

19  back to me for a scheduling conference and other appropriate

20  proceedings.

21         Then on October the 9th of 2020, I issued the

22  scheduling order, which is found at Docket Entry Number 71.

23         On October the 7th of 2019, the plaintiff served

24  their first set of requests for production, which is Exhibit

25  1 herein, and there's an argument that Vail Health, made by

1  plaintiffs, that Vail Health has waived all objections by not

2  responding.  However, the procedural history that I just set

3  forth factors into that timing in terms of the requests.

4          I've also reviewed *Pham versus Hartford Fire*

5  *Insurance Company*, which is found at 193 F.R.D. 659, a

6  district of Colorado case from 2000, which discusses

7  objections asserted in the first 71 days after service, and

8  also discusses an issue regarding good cause for any delay.

9          Here, I do find specifically that there was good

10 cause for any delay in responses.  That good cause has been

11 shown by the course of this case in the record that the Court

12 just discussed, and based on that, Vail Health has not waived

13 its right to object.  I will proceed with the discovery

14 dispute hearing, the substantive, which we need to now dive

15 into.

16         And let me go back to the chart here and we'll

17 discuss these.  Some of these are ripe for treatment going

18 through one by one, some of these I have specific issues that

19 I want to address as we go forward.  I expect that as to the

20 rest of the discovery dispute issues that I'm going to be

21 dealing with today, the specific discovery disputes, that

22 those will be ruled on by way of a written order which will

23 be forthcoming following this hearing in an appropriate

24 period of time.

25         So let me turn to request for production number

1   one, and those that are associated with it.  Because there's

2   a number of times here where the parties refer back to a

3   response, for example, to a prior discovery dispute hearing,

4   and have essentially the same response.

5           So I will start on that one, Ms. Stevenson, with

6   you, as it is Vail Health's objection, and ask you to address

7   not only number one, but matters that are reasonably

8   associated with it where you would have a similar objection.

9   If you could go with that, please?

10          MS. STEVENSON:  Certainly, Your Honor.  And I

11  think your assumption is that you are focused on the issue

12  related to the time period.

13          THE COURT:  I'm sorry, you --

14          MS. STEVENSON:  -- (unintelligible).

15          THE COURT:  You were you a little bit garbled.

16  You said assumption, and then what you said after that was

17  garbled enough that I think the record wouldn't have picked

18  it up.

19          Ms. Barnes, are you -- yeah, Ms. Barnes is saying

20  the record wouldn't catch that.  So let me have you say

21  everything you said again after "assumption".

22          MS. STEVENSON:  My assumption is that you are

23  focused on the issue related to the time period.

24          THE COURT:  Absolutely.  The temporal scope is, I

25  think, critical to this.  We've got different discussions out

1   there with years from 2009 to 2012, and then other

2   discussions related to 2015 to the present.

3          As we move through this, and you may want to

4   address it now, we may address it later, but we're going to

5   need to address issues in terms of when the plaintiffs

6   entered into the market and how that relates to that time

7   period, whether that time period starts then or whether it

8   starts at some point reasonably before or whether it starts

9   after.  I think you're going to have some competing positions

10  on that, but let's address those at the appropriate time,

11  which might be now, from your perspective.

12         MS. STEVENSON:  Your Honor, I just put in some

13  (unintelligible), does that make me a little bit clearer?

14         THE COURT:  Yup.  Ms. Barnes is saying it makes

15  you clearer.  Thank you.

16         MS. STEVENSON:  Okay.  Great.  Certainly, Your

17  Honor.  So here's how I understand, you know, that the

18  plaintiffs entered into this market by their own allegations

19  in late 2015, and that roughly coincides with the statute of

20  limitations period for an antitrust claim based on when they

21  filed their complaint.

22         And I don't think that there is any blanket rule

23  that says nothing before they enter the market, or nothing

24  before the statute of limitations period is necessarily

25  irrelevant or not discoverable.

 1          However, how I read all of the cases is to say

 2  it's not per se irrelevant, it's not per se relevant, either.

 3  And just like with any discovery dispute you need to, you

 4  know, weigh the relevance and the burdens on producing the

 5  documents.

 6          And I would just note that here the allegations of

 7  the -- you know, the plaintiffs prime allegations with

 8  respect to anticompetitive conduct is that based on these

 9  defamatory statements that they allege that Vail Health made

10  about Ms. Winninger.  Certainly that subject has been

11  exhaustively discovered in the state case, and all of the

12  details regarding that relationship and any of those

13  allegations.  And that includes, Your Honor, one specific

14  issue that comes up in here which is related to the fact that

15  Howard Head used a third-party to staff its physical therapy

16  clinic from 2009 to 2012, and then in 2012 it didn't renew

17  that staffing agreement anymore.  That issue, too, has also

18  been exhaustively discovered in the state case.

19          So I want to be clear, I'm not taking a position

20  that there's nothing prior to 2015 that would be relevant

21  here, but I think everything that relates -- that is

22  probative of the plaintiff's allegations has been

23  exhaustively discovered from that time period.

24          Now, to the extent that plaintiffs want particular

25  financial information that predates their entry into the

 1   market, financial information from Vail, I think that becomes

 2   -- starts to have great more attenuated relevance and it

 3   starts to put significantly more burdens on Vail to produce

 4   it.  They've been through a number of transitions of their

 5   financial systems which makes it quite difficult to go back

 6   and get financial information from pre-2015.

 7            But I also want to be clear that, you know, if

 8   there are specific things that they would like I'm happy to

 9   investigate what types of burden it would be to get them for

10   that earlier period.  And I think there are some things that

11   we would probably be an agreement to produce, but I think to

12   just say as a blanket matter they're entitled to all

13   financial information that predates the time they even

14   entered into the market is too much.  And that's the basis

15   for our objections on most of these things.

16            THE COURT:  All right.  At this point in time, do

17   you have some read on what that burden would be?  Or is that

18   related to what the question poses in terms of a specific

19   item or items?

20            MS. STEVENSON:  You're exactly right, Your Honor.

21   It relates very much to what the particular item is.

22            THE COURT:  And has there, at least in your mind,

23   yet been a conferral as to the item, or items, that are being

24   sought pre-2015 to put you in the position to be able to make

25   an argument as to relevance and burden?

1            MS. STEVENSON:   There has not.

2            THE COURT:   Okay.

3            All right.   Any further arguments at this point

4   related to RFP Number 1 from Vail Health, or essentially

5   reasonably associated arguments, before I turn to Mr. Kildow?

6            MS. STEVENSON:   Not with respect to the time

7   period, Your Honor.   I can address the audited financial

8   statements, but that seems to be sort of a different issue.

9            THE COURT:   Okay.   Let's pause on that one and

10   I'll come back to audited financial statements here at the

11   moment so that we keep the record clear and organized.

12            And I'll turn to Mr. Kildow, and I'll ask you

13   particularly with regard to this argument that we've been

14   fleshing out in terms of relevant time period, what further

15   argument you like to make, sir.

16            MR. KILDOW:   Okay.

17       (Brief pause)

18            THE COURT:   Go ahead.

19            MR. KILDOW:   I cited *Grinnell* to Ms. Stevenson's

20   colleague last fall.   *United States versus Grinnell* is cited

21   in the table, it is really the, perhaps the granddaddy of the

22   most awesome cited case in a Sherman Act, Section 2 Case,

23   which is -- this is.   And for the Court, this is not only a

24   Section 2 monopolizations case, but a Sections 2 attempts to

25   monopolize case.   And that's a very important distinction.

1          If we look at a Tenth Circuit case that was cited

2     in the motions to dismiss, it's called *Lenox MacLaren*, and

3     it's found at 762 F.3d 1114.  And the local citation that I'm

4     going to refer to is that 1124.

5          In that case -- excuse me, the first citation I

6     think is to 1123.

7          In *Lenox*, the Tenth Circuit cited *Grinnell* for the

8     proposition that there are two elements of monopolization

9     under Section 2.  One is the power to control prices, and the

10    other one is the power to exclude competition.

11         On Page 1124, the *Lenox* court cites another Tenth

12    Circuit case, *Reazin, R-e-a-z-i-n, versus Blue Cross*, and

13    that is found at 899 F.2d 951, and that is also a Tenth

14    Circuit case.

15         *Lenox*, in *Lenox* the Tenth Circuit stated an off

16    cited principle of market -- of monopoly power, and that is

17    the durability of a defendant's market dominance.  Market

18    power, as the Tenth Circuit stated, is, quote, "Meaningful

19    only if it is durable."  And it cites reasons for that

20    proposition at Page 968.

21         Now, the reason that that principle is so

22    important goes back to another Tenth Circuit case which is

23    cited by us, it's *Colorado Interstate Gas Company versus*

24    *Natural Pipeline Company*, and that's at 85 F.2d 683.

25         Durability is an essential element of a Section 2

1   case for two reasons.

2          One is that the court must test whether the

3   defendant was able to exercise, market, or monopoly power in

4   the relevant geographic and service markets over a period of

5   time.  And that period of time depends on the case, but it

6   must be durable over a period of time.  Which is one reason

7   that in these antitrust cases you have a much more extended

8   time period in which the defendant's conduct is measured than

9   you do another typical, more typical, civil cases.  That

10  market power extends long before the statute of limitations

11  is run, and it also has, actually, nothing to do, or very

12  little to do, it depends on the case, with the plaintiff's

13  entry into the market.

14         Because, as is the case here, the entity that

15  operated the physical therapy clinic at issue became, or

16  acquired, monopoly power, probably sometime in 2002 or 2004

17  or 2005.  What that principle of durability does is actually

18  a principle that is more favorable to the defendant than it

19  is to the plaintiff, because if a defendant merely has the

20  monopoly power for a short transitory period of time the

21  court would not (unintelligible) that it was a violation --

22  it was violating Section 2.

23         In this case we will prove, and are entitled to

24  prove, that monopoly power was acquired sometime in the mid-

25  2000s and there was a contract that was in place.  They

1   entered into a -- Vail Health entered into a written

2   contract.  We believe that there was a preceding contract,

3   but we have not found that, or it hasn't been produced.

4           But on November 1, 2004, Vail Health entered into

5   a contract with an outfit we'll just call RPC Vail, which was

6   the entity that is not a department of Vail Health, it's an

7   independent contractor, a separate legal entity, and

8   separately managed entity.  They entered into an exclusive

9   dealing contract which allowed Vail Health to capture a

10  percentage of the profits that were realized by that monopoly

11  power.

12          And eventually, on November 1, 2000 and -- or I'll

13  say October 31, 2012, that -- that exclusive dealing contract

14  expired; it was not renewed.  And the actual facts would show

15  that it was really a hostile takeover, but that's not for

16  this hearing.

17          And so what Vail did on November 1, 2012, is it

18  acquired, for its own account, through its own corporate

19  existence, a monopoly, which makes it a Section 2

20  monopolization case.  And we are entitled to explore that

21  principle of durability and whether or not Vail Health and

22  the predecessor exercised the ability to raise prices above

23  what would otherwise have been market prices and exclude

24  competition going back to that period of time.

25          And I would note that Vail Health tried to

1    distinguish *Grinnell* in their comments that are in the chart.

2    *Grinnell* cannot be distinguished, it is a case that

3    establishes a rock (phonetic) with the principles that govern

4    Section 2.

5              You might say that a party, their facts are

6    different than *Grinnell*, but as we pointed out, in *Grinnell*

7    the case was decided by the Supreme Court in 1966, and the

8    period of acquisitions over which *Grinnell* acquired what is

9    now widely known as ADT, the burglary alarm system, went back

10   to 1906.

11             Now, the other case that is now accepted as one of

12   the bedrocks of Section 2 monopolization is the *Microsoft*

13   case, which was decided by the DC circuit in 2001.  And this

14   is the famous Microsoft that we all use, and they were found

15   to be monopolists.

16             How a -- how a defendant acquires their monopoly

17   power is a critical component of an antitrust case, and

18   *Microsoft* is one of the most recent ones, and it's found the

19   most attention.  Because it started out -- the court started

20   out with the analysis of the evolution of Windows, which we

21   all, I think, know, in 1982, when Bill Gates and his

22   colleagues started the company.  And it went through all of

23   the evolution of the genesis of Windows and all the

24   permutations and the actions of Microsoft as that product

25   developed and whether there were exclusionary acts of

1  Microsoft to exclude competitors from the market.

2         But in that case the duration of the analysis was

3  19 years.  And so what is important with respect to that

4  principle, and this principle is also more favorable to

5  Defendants than it is to Plaintiffs, if a defendant has

6  acquired monopoly power through its skill and its knowledge

7  and its what's called competition on the merits, then it's

8  conduct as a monopolist will be less likely to be found to be

9  a violation of Section 2.

10         However, if a monopolist simply acquired another

11  monopolist, or acquired market share (unintelligible)

12  acquired for itself a monopoly, then it will be more likely

13  to be violative of Section 2.

14         One cannot look at the law of antitrust by a case,

15  it is a body of law.  And as the Court has taken a look at

16  *Microsoft* and all of its progeny and the cases that are

17  referred to, you can see it's a big body of law.  But this is

18  the law, and I would hate to see us get off to a bad start

19  with attempting to restrict what are principles espoused or

20  developed by the United States Supreme Court, and here the

21  Tenth Circuit, and we end up with a big, long, motion

22  briefing and appeal process.

23         So from a temporal standpoint there is no question

24  under controlling law that the plaintiffs in this case are

25  entitled to go back as far as the request for production,

1  number one, and other requests have asked for.

2          Thank you.

3          THE COURT:  All right.  Thank you, Mr. Kildow.

4          Let me turn back, then, Ms. Stevenson, to you for

5  any final words on the topic.

6      (No audible response.)

7          THE COURT:  And, Ms. Stevenson, if you are saying

8  something, or think you are, you're still muted.  All right.

9  There we go.

10          MS. STEVENSON:  Sure.  Thank you, Your Honor.

11  Just a few things.

12          The first is, I don't think there are any

13  allegations in the complaint that suggests that Vail Health

14  or Howard Head would have any monopoly in the physical

15  therapy market, certainly any time prior to this period when

16  it did not renew its contract with RBC Vail.  And so to the

17  extent that Mr. Kildow was suggesting that, I don't think

18  that's supported anywhere in his complaint.

19          And, you know, clearly, I disagree with a lot of

20  those factual characterizations he just put on.  I don't

21  think he's going to be able to show that Vail Health or

22  Howard Head had any monopoly for physical therapy services at

23  any time, including within the last five years.

24          With respect to the cases of *Grinnell* and

25  *Microsoft*, these don't relate to discovery issues in any way.

1   And obviously those cases are quite unique examples of

2   antitrust cases that don't have very much factual similarity

3   to our case here.

4          And then again, the bulk of what I was hearing

5   from him is that what was relevant was his position -- and I

6   just want to be clear about the facts here.  Howard Head used

7   a third-party staffing company to staff its physical and to

8   treat its physical therapy patient, and then it just did not

9   renew that staffing contract and decided to staff the clinics

10  itself.  I think that's what he's describing as a hostile

11  takeover, which it was not.

12         But in any event, those particular facts, all the

13  facts surrounding the termination of that relationship, those

14  have all been thoroughly discovered in the state court case.

15  And so I guess again I'll come back to my initial position

16  which is, if there's some specific information that he thinks

17  is important to his case that predates December 2015, I'm

18  happy to, you know, consider that and look to see what the

19  burdens of getting that information, or whether there even is

20  any information available.

21         But I just think to say as a blanket rule Vail

22  Health is required to produce, you know, all documents back

23  to 2009, or trying to predate even the germane period of time

24  that he is talking about is the basis for his monopolization

25  claim, I think that that -- there's the burdens there

1   outweigh any relevance that's been articulated in any way in

2   this case.

3            THE COURT:  All right.  Give me just a moment,

4   please.

5        (Brief pause)

6            MR. KILDOW:  Excuse me, Your Honor, this is Alan

7   Kildow.  I didn't -- if you said something, I didn't --

8            THE COURT:  Oh, I'm sorry.  I said give me just a

9   moment, please.  Thank you.

10            MR. KILDOW:  Thank you.

11        (Brief pause)

12            THE COURT:  All right.  Mr. Kildow, can you give

13   us some specific examples, so that we have it for the record,

14   of what you are looking for prior to 2015?

15            Essentially, I'm trying to get a read on whether

16   there is enough specificity out there yet or not that would

17   allow the defense to be in a posture to do address both the

18   relevance and the burden.  So what are you looking for prior

19   to 2015, to the extent you can outline that in a couple of

20   minutes?

21            MR. KILDOW:  It's right there in our request for

22   production of documents.  We want all of their financial

23   statements, audited and unaudited, quarterly, and then later

24   on ask for specific costs and other elements of their

25   financial performance to be broken down.

1            Why is this -- why is this important?  It's

2    because one of the major issues in antitrust law is what --

3    does the defendant charge a super competitive price, and does

4    it reap super competitive profits.  And the only way that's

5    done is by the price charged and the revenue generated and

6    the costs incurred and how that translates into the profit.

7    Does it realize a super competitive profit?  Is that super

8    competitive profit realized because of the market power that

9    it has to charge those prices?

10           And the audited financial statements have a

11   significant amount of specific information about the physical

12   therapy operation as it relates to the hospital as a -- as a

13   whole.  One of the most important things one of their eight

14   important things, that we are going to have as an issue in

15   this case is, what is the relevant graphic market, whether

16   financial statements actually are admissions and define the

17   relevant geographic market.

18           The other thing it does is it puts the line that

19   Ms. Stevenson talked about as to the relationship between RPC

20   Vail and Vail Health during the relevant period, and that is

21   if they were an independent contractor, did they pay their

22   own independent taxes.  And so they are an essential

23   component, those numbers are an essential component to find

24   out what the pricing was.

25           What we have not discussed is who set the prices

1   for the physical therapy services.  And that was -- they were

2   actually -- we, excuse me, believe that they were set through

3   the insurance pricing contracts that Vail Health had with its

4   healthcare insurance pay awards.

5          And so all of this comes together, in terms of

6   Vail Health's overall profits, the costs paid to the -- the

7   RPC Vail, and then there's also the cost burden issues that

8   are included in all of that, all which would go to and must

9   be segregated out between Vail Health and RPC Vail during

10  that relevant period of time.

11         The audited financial statements, there's no

12  burden at all.  They're all publicly filed.  But the time

13  period is going to establish that it was Vail Health who set

14  the prices, that they were super competitive prices, that

15  those prices were maintained over a long period of time prior

16  to the acquisition in 2012.

17         When we talk about 2009 to 2012, we're talking

18  about three years.  We're being charitable as far as the time

19  period that we're looking at.  It is a short period of time

20  by antitrust -- for antitrust purposes.

21         So as far as a burden -- well, first of all, let

22  me just that the record straight --

23         THE COURT:  Mr. Kildow, let me --

24         MR. KILDOW:  -- and say that --

25         THE COURT:  Let me have Ms. Stevenson address the

1  burden.  What I was looking for right now was specificity as

2  to what you want, and the answer I'm getting is that's the

3  specificity.  So let me have Ms. Kildow -- or, I'm sorry, Ms.

4  Stevenson address the burden, at least in the first instance,

5  and then I'll turn back to you if there's any further issue

6  to address on that.

7          Ms. Stevenson, in terms of specificity, a couple

8  of questions.  How is that not specific enough?  And in terms

9  of individualized burdens for the things that are being

10  requested, how is it too burdensome as to some or all of

11  those items?

12          MS. STEVENSON:  So, Your Honor, let me kind of

13  break this into a few categories.

14          With respect to the audited financial statements,

15  those -- that is not burdensome, I agree with that.  The

16  problem with the audited financial statements is that they

17  have no information whatsoever that's specific to physical

18  therapy services.  They are audited financial statements for

19  the entire hospital system and the numbers are all

20  consolidated and we would not be able to divide any

21  information about the pricing, costs, or anything else

22  relevant to Howard Head or physical therapy services.  So I

23  think those are kind of in a separate bucket.  But I agree,

24  those would not be burdensome to produce.

25          With respect to other financial statements.  What

1   I can tell you is that Howard Head doesn't generate its own

2   financial statements.  It doesn't have audited or unaudited

3   financial statements that are created or produced.  They're

4   sort of -- the way it works, and what I've given in briefs to

5   Mr. Kildow already, is there is a financial reporting system

6   that the hospital has and people can go in and essentially

7   search and extract what information they want to try to

8   extract.  And so what I did for Mr. Kildow from December 2015

9   forward was to pull out all of the revenues for Howard Head

10   and the relevant costs and give him those.  Again, they're

11   not audited or unaudited, but they're -- they have that type

12   of information in them.

13        If I have to go back before that we're talking

14   about having to access a financial system that the hospital

15   no longer uses, it's going to take significant investment of

16   IT resources to figure out what can even be extracted from

17   that system, if anything.  And so that's where I'm going

18   with, you know, the fact that if we were just to say, well,

19   you know, give me first (unintelligible) revenues and costs

20   prior to 2015, it becomes substantially more burdensome.

21        Then with respect to pricing.  You know, we've

22   provided all of our, they're called "charge master pricing

23   charts," again from December 2015 forward, which are sort of

24   the standard rate prices.

25        Mr. Kildow has raised the issue of the third-party

1    insurance carrier payments.  We have provided our contracts

2    with those third-party payors, many of which go back well

3    before 2015.  And I think there is some discussion he raised

4    in the charts, he said that there's some we haven't produced.

5    I'm happy to look into that, I just haven't had a chance to

6    do it yet.

7           But I do think it's important to call out, you

8    know, that plaintiffs' business here, they didn't -- their

9    business was to not take insurance.  They didn't want to be

10   in the business of having any third-party payers, they were a

11   cash only business.  And so I think the pricing as it relates

12   to third-party payers becomes somewhat attenuated with

13   respect to relevance, and that's not even the business they

14   were in.

15          And, you know, again I'll just (unintelligible)

16   community hospital system, you know, it takes insurance, it

17   takes Medicare, it has -- allows for indigent folks to have a

18   pay system for indigent people, you know, to pay

19   substantially less.

20          So, you know, I think all the information that the

21   plaintiffs are going to have is going to show that we quite

22   clearly were not charging any super competitive prices at any

23   period in time.

24          THE COURT:  All right.

25          Mr. Kildow, any brief response to that?  And then

1  I'm going to move on from there to the relevant market

2  argument, and I'll start with you on that.  But let's finish

3  this topic up first.

4           MR. KILDOW:  Yeah.  Let me just say why the

5  financials -- the audited financial statements to the

6  hospital as a whole are important.

7           The first reason would be that under the

8  arrangement that Vail Health had with RBC Vail prior to

9  November 1, 2012, there were a number -- there were things

10 such as space, personnel, certain personnel, computer access

11 and things like that, that need to be allocated with --

12 there'd have to be some allocable analysis as to what the

13 actual costs for RBC Vail were, and those -- those facts were

14 not developed in the state court action; they weren't even

15 asked for.

16          We did ask for the insurance contracts -- or,

17 excuse me, claims, which were never provided.  And the

18 insurance contracts, I really don't want to get into this, I

19 don't think the Court -- we'll probably have to come back and

20 talk about what has actually been provided, even after 2015.

21 We only have a couple.  We don't even have the Medicare

22 provider agreement, and there are at least 20 or 25 insurers

23 that we don't have contracts for.

24          But this is not just a community hospital, that's

25 what they'd like to tell themselves though.  We've got a $500

 1 million balance sheet that has net equities in this balance

 2 sheet.  They may try to help some indigent folks, but it's

 3 one of the most expensive hospitals in the state, and she's

 4 depending on the year Colorado is either the second or the

 5 fourth most expensive state in the country, so this is not

 6 some group that is, you know, out there getting a service.

 7           All of the information that goes into the pricing

 8 is directly relevant to this case.  Back to that, and we're

 9 only asking for three years before the 2012 time period

10 begins.  So that is not, by antitrust service purposes, a

11 lengthy period of time at all.

12           THE COURT:  Okay.

13           All right.  Let's move on from that and I'll ask

14 you to address it, you know, and let's limit these if we can

15 to about five minutes per argument, in terms of the relevant

16 market scope.

17           And I'll start, Mr. Kildow, with you.  And within

18 that I'd ask you to address both the relevant product market

19 and the relevant geographic market, if you could, please.

20           MR. KILDOW:  The relevant product market is not

21 going to be something that will be determined, I don't think,

22 by the parties per se.  There may be some documents that may

23 exist where we've asked for them, but that is really: what is

24 physical therapy and what competes with it?

25           For example, does chiropractic compete with

1    physical therapy?  And that also is an issue that's important

2    for the issue of market and monopoly power.

3            You have to define the geographic market, the

4    relevant geographic market, and the relevant service market.

5    The relevant service market -- or, excuse me, the geographic

6    market, is going to be based on, or influenced by, where the

7    patients that go to Vail Health come from, both as to general

8    services and as to the physical therapy component.  And so

9    where there -- who are their clients, in terms of the

10   demographics?  Do 60 percent of them come from Vail Valley?

11   Do 40 percent come from Vail Valley?  What are the

12   demographic background -- breakdowns for their -- for those

13   products?

14           THE COURT:  Okay.  And do you have a read on what

15   you think that is at this point, or is that too early for

16   you?

17           MR. KILDOW:  Well, as far as the demographics, it

18   would probably -- I don't.  It's going to come from, they

19   have a, you know, a computer system that -- they're required,

20   first of all, they're required by Colorado law to keep

21   medical records for 10 years.  And so they can identify the

22   name of the person, what, you know, what procedure they had

23   at Vail Health, when they had that procedure, their name,

24   their address.  And that's all stored on a computer for a

25   period of 10 years, and so that should be easy for them to

 1  come up with.  They're required by law to keep it.

 2              THE COURT:  All right.

 3              Ms. Stevenson, as to the relevant market scope and

 4  the two said prongs of that from your perspective, please.

 5              MS. STEVENSON:  Sure.

 6              So, Your Honor, I mean, I'm not sure that the

 7  issue is -- I mean, Mr. Kildow was just talking about

 8  producing the patients' data.  I don't -- I mean, to the

 9  extent he thinks that's simple than RFP Number 5, I guess I

10  would disagree with that.  I do think he's asked some later

11  discovery requests that would get more specifically to that.

12              With respect to -- you know, and he's correct in

13  what he's saying, which is it's not Vail Health creates

14  regular documents defining irrelevant geographical market, or

15  relevant product market for physical therapy services.

16              So, you know, I think the question becomes, well,

17  how do we have to search for those documents?  Certainly we

18  are looking for any documents that identify, you know, what

19  our physical therapy services are, who we think competitors

20  in the market are.  But, you know, if you're talking about

21  going back to November of 2011, a lot of this has to be done

22  just by searching emails for things, and it doesn't lend

23  itself real neatly to search terms, and so the burdens there

24  become pretty high the further back in time you go to even

25  try to locate any such documents.

 1            But, and again, I think they're still going back

 2   to predates of time where they even appear to be alleging

 3   that we had any monopoly power, and so --

 4            And I just want to make sure that you are asking

 5   about the time period objection on the relevant market, is

 6   that correct?

 7            THE COURT:  Right.  I think that's what it's

 8   relevant to in terms of that objection --

 9            MS. STEVENSON:  Right.

10            THE COURT:  --  RFP Number 5.

11            MS. STEVENSON:  Right.

12            And so, again, I just think the burdens of this

13   particular RFP are difficult because, you know, this isn't,

14   for example, you know, like with financial statements you can

15   say they exist, they don't exist, I can produce them.  This

16   is a very broad, sweeping, and somewhat vague, request for

17   documents that are not easily for sure.

18            And so if you're talking about going back four

19   more years prior in time, essentially having to look through

20   those emails of people who are no longer with the company,

21   those create significant IT burdens to try to even locate

22   those documents, and then to review them, again where there

23   are no necessarily clear search terms to limit your search,

24   that's where the burdens come from what the respective that.

25            THE COURT:  Okay.

1            All right.  Anything else on that issue that we --

2    you think we need to discuss, Mr. Kildow?

3            MR. KILDOW:  Yes.

4            Number one, Ms. Stevenson, I think, is completely

5    wrong.  That information is available on Therapy Source, and

6    we can discuss the search terms so long as we have the time

7    period that is applicable.  But search terms might be a way

8    to run searches against Therapy Source and come up with that

9    information, which is there.

10           And that's all I have on that subject.

11           THE COURT:  Okay.  Give me just a moment, please.

12       (Brief pause)

13           THE COURT:  All right.  As to RFP Number 6, Mr.

14   Kildow, it would appear to me that the argument that we just

15   engaged in, or heard on RFP Number 5, are probably rather

16   similar, but do you think there's more on RFP Number 6 that

17   we need to get on the record?

18           MR. KILDOW:  No.  I mean, that should be a

19   relatively easy -- easy one.  We just ask -- you just ask

20   Nicholas Brown who your competitors are.

21           One of the things that's striking about this case,

22   Your Honor, is that there are, on the competitive side, a

23   very small number of competitors, probably less than six or

24   seven or eight, and some of them are down at the onsies,

25   twosies, beyond the physical therapy offices.  So I am

1  confident that Mr. Brown, the vice president, has got that

2  stuff right in the top of his head.

3              THE COURT:  All right.

4              Ms. Stevenson, on that one, anything further with

5  regard to RFP Number 6 that you think we need to discuss?

6              MS. STEVENSON:  No, Your Honor.  It's just the

7  same issues I articulated on with respect to Number 5.

8              THE COURT:  All right.  That appeared to be the

9  case.  But give me a moment here.

10        (Brief pause)

11             THE COURT:  All right.  Number 7 seems to be a bit

12  of a spin on somewhat of the same issue.  But, Mr. Kildow, in

13  terms of Number 7 and the joint merger, or joint venture

14  merger issue with Steadman Clinic, what else would you like

15  to say on that issue, sir?

16             MR. KILDOW:  Well, first of all, I think that this

17  is an issue that would be a Rule 12 issue.  But the Rule 12

18  time -- or the time for Rule 12 motions has come and gone and

19  it's not an appropriate issue for discovery.  But I do

20  understand where you're coming from, and let me give you a

21  few thoughts on that.  If you'll just give me two seconds?

22        (Brief pause)

23             MR. KILDOW:  And that's my two seconds.

24             I begin by pointing out, first of all, this joint

25  venture, it's very difficult for you to have a sufficient

```
 1  amount of background on this issue unless you've had the
 2  chance to read the complaint, because the chart that we put
 3  together does provide you with the facts that would give you
 4  all of the information you would need to make a fully
 5  informed decision on this issue.  So let me give you just two
 6  -- two things.
 7            THE COURT:  Yeah, I --
 8            MR. KILDOW:  This whole --
 9            THE COURT:  I have reviewed the complaint, and
10  will again.  So to the extent that it's in there, there's no
11  huge need to do anything other than --
12            MR. KILDOW:  Okay.
13            THE COURT:  -- to point out what section you're
14  referring to so we have that in association with this.
15            MR. KILDOW:  Yeah.  The facts that I'm referring
16  to are the period of time in 2015, 2016, 2017.  We don't know
17  the precise dates, because we haven't got all the discovery
18  on this.  But the Steadman Clinic, which is a relatively
19  famous national and somewhat international orthopedic clinic,
20  was in discussions with Vail Health to do a joint venture
21  whereby the two would combine to form a selective physical
22  therapy operation for the, I think now roughly 13 orthopedic
23  surgeons, at the Steadman Clinic.
24            That proposed joint venture did not come to
25  fruition; it was never consummated.  So that falls under the
```

1    section to attempt to monopolize part of the Sherman Act.

2              Probably the most cited case on that issue is

3    *Sports Spectrum [sic] versus McQuillan*, which we have

4    included in the chart.  And the relevant language is found at

5    890 to 91 in the local citation, of three elements for

6    attempted monopolization.

7              One is that the defendant is engaged in predatory

8    or anticompetitive conduct.  I think that our complaint does

9    that in spades.

10             Number two, there was a specific intent to

11   monopolize.  The documents, the four documents produced on

12   this issue in the state court case, demonstrate a specific

13   intent to join together.  And Vail Health we have alleged had

14   about 65 to 70 percent market share, and so it was either

15   gaining monopoly status or maintaining monopoly status.

16             And three, there was a dangerous probability of

17   achieving monopoly power.  It already had monopoly power and

18   it obtained more monopoly power.

19             Now, the *Spectrum* case is important in setting out

20   the elements of that defense, attempted monopolization.

21             We cited another case as a further refinement of

22   that issue, and that is the *DuPont versus Kolon Industries*

23   case, which we cited in our chart.  And the defendant took

24   issue with it and thinks that it doesn't support that

25   proposition.

1           But at Page 451 -- 452 I think it is, 452, there

2    is an important line, it's keynote 53 at the top of the page.

3    And it reads, "Attempted monopolization employs," quote,

4    "methods, means, and practices which would, if successful,

5    accomplish monopolization."  If successful.

6           If successful is the part of that case for which

7    it was cited, because "attempt to monopolize" means just what

8    it says under the applicable case law.  It does not

9    necessarily mean that the attempt to monopolize actually

10   succeeded.  If two entities seek to combine, and they would

11   have a dangerous probability of becoming gaining market or

12   monopoly power, if they don't ultimately join together that

13   doesn't mean that there is not an attempt to monopolize.

14          Typically attempt to monopolize means that there

15   is an unsuccessful attempt to achieve monopoly status.  There

16   are several cases for which that stands, or that proposition

17   stands, and one is -- well, I'm just going to go directly to

18   the -- to the Tenth Circuit cases.

19          The one Tenth Circuit case is *Bright versus Moss*,

20   and it is at 824 F.2d 819, the local citation is at 823.

21          And in that case they identify four factors and

22   they do not require -- in the Tenth Circuit there is not a

23   requirement for a fully consummated agreement between the two

24   perspective monopolists.

25          The Fifth Circuit has said in the *United States*

1    *versus American Airline* case, "We hold that an agreement is

2    not an absolute requirement for the offense of attempted

3    joint monopolization in the government's complaint which did

4    not allege the completion or that consummation of the

5    contract was required."

6            I have one more case on that to score.  But in the

7    Tenth Circuit, and in other circuits, a failed attempt to

8    monopolize is not what is required.  What is required is the

9    intent to monopolize.  That is the difference between Section

10   2 as it relates to monopolization and Section 2 as it relates

11   to an attempt to monopolize.

12           THE COURT:  All right.

13           MR. KILDOW:  So I would also put in there the

14   Colorado *Interstate* case, which we've already cited, as an

15   example of the (unintelligible) on attempts to monopolize.

16           So the idea that there's some restriction on

17   discovery into the joint venture, that is not something that

18   -- I think it's -- that's for summary judgment.  It's in our

19   complaint, and we're entitled to that information.  And it

20   has not been fully disclosed, or I should say, the discovery

21   has not been fully developed in the state court action.  I

22   think we've got about six documents on that issue.

23           THE COURT:  All right.  Thank you, Mr. Kildow.

24           Let me turn to Ms. Stephenson, ma'am, for your

25   response on that issue, and then I'll come back to the

```
 1   definition of combined as a separate topic after that.

 2            MS. STEVENSON:  Well, Your Honor, I might be able

 3   to sweep both of those in together, which is, you know, I

 4   think we have a different view of the law than the plaintiffs

 5   do with respect to what constitutes attempted monopolization.

 6   I don't think our decision to not enter a joint venture with

 7   Steadman Clinic could be -- could be conduct that would form

 8   the basis of a Section 2 claim.

 9            But at the end of the day, we're not -- we're not

10   withholding any documents based on that objection, or with

11   our objection regarding the word combination.  And so as it

12   relates to discovery, I just don't see that these are issues

13   that require any resolution right now.

14            You know, I think the bigger point is that the

15   plaintiff asked for all of these documents in the state court

16   case.  I'll just give you an example, their document request

17   in the state court action was for, "All documents sent to or

18   received from the Steadman Clinic that relate to any

19   potential joint venture for rehabilitation services."

20            So these topics have just been covered, and I

21   think all the relevant documents have been produced.

22            Certainly if there are any, we will produce them.

23   And so I don't -- I don't know that we need a resolution of

24   what things -- you know, whether the decision to not enter a

25   joint venture can or can't support a claim for any
```

 1  competitive conduct right now.

 2           THE COURT:  Okay.  Do you think from your --

 3           MS. STEVENSON:  And I'm happy to say more if the

 4  Court has any --

 5           THE COURT:  Okay.

 6           MS. STEVENSON:  -- specific questions on that.

 7           THE COURT:  Well, let me -- do you think we need

 8  more, at least at this point, Ms. Stevenson, in terms of the

 9  controlling depth -- well, and actually I'll come back to you

10  on that here in a moment.

11           I want to ask in a couple of minutes, Mr. Kildow,

12  if you want to outline what you're view is of combined or

13  combination.  Looking at the chart it says that you don't

14  want to waste the Court's time with case citations on such a

15  well-known issue, but from the Court's perspective we need to

16  know what you're relying on.  So in a couple of minutes, what

17  is your definition of combined or combination as it

18  specifically applies to this circumstance?

19           MR. KILDOW:  Well, first of all, Section 2

20  specifically uses the language "combined."  And combined in

21  antitrust law means however two separate entities get

22  together; whether it's in a partnership, in a corporate

23  arrangement, in a joint venture, or whatever.  Combination is

24  the ubiquitous term.

25           And I sent, I thought, I thought it was in our

1   chart, but maybe it wasn't, I sent the defendant something

2   that, I think it was the (unintelligible) case that where a

3   combination was used, the word was used five times, or six

4   times, in a -- in one paragraph.

5            But to combine means to get together.  To create a

6   business organization under which they are both operating

7   together.  It is a combination.  I mean, I can -- I can give

8   you 150 cases that -- on that point, but I guess I didn't --

9   I didn't really -- it's in Section 1 and Section 2 of the

10  Sherman Act.

11           And the joint, the combination of the Steadman

12  Clinic and Vail Health was a very, very big deal.  And the

13  reason that it's relevant here is because the exclusionary

14  conduct, the predatory conduct that Ms. Winninger and her

15  company had (unintelligible) is a direct result of that

16  combination.  Vail Health thought that --

17           THE COURT:  All right.

18           MR. KILDOW:  -- Ms. Winninger was going to form

19  her own Howard Head with the Steadman Clinic.

20           The lead attorney on this case, or maybe it was

21  Ms. Stevenson, (unintelligible) Janet Savage admitted that,

22  that they thought that Ms. Winninger was going to go off and

23  form a second Howard Head.  And that's why all of this

24  happened, why all of this money is being spent.  And there's

25  more.

 1            But it is two entities combining that trigger the

 2    threshold elements of the Sherman Act, as they just set forth

 3    in the *Spectrum* case, *Spectrum Sports*, and as we have

 4    received in the *Bright versus Moss* case, so -- and that --

 5    that cites the *Reazin* case, also, which was the subject of

 6    discussion in the (unintelligible).

 7            So that's part of this case.  And we have almost

 8    every element required under *Spectrum* and under the *Bright*

 9    *versus Moss* case, and *Reazin*.

10            THE COURT:  All right.  Thank you, Mr. Kildow.

11            Ms. Stevenson, any response with regard to that?

12            MS. STEVENSON:  Your Honor, again, I disagree with

13    Mr. Kildow's factual characterization of what Ms. Winninger

14    was proposing to do with Steadman.  And I've seen all the

15    documents on it, because they've already been produced, both

16    from Vail Health and from Steadman.  And so, again, I just,

17    I'm not sure what the dispute here is.

18            They've asked for all the documents regarding any

19    proposed joint venture of any kind with Steadman, and we've

20    agreed that we've already produced to them, or to the extent

21    there's anything that hasn't been produced we will produce

22    it.

23            But, again, I think this issue has just been

24    thoroughly litigated in the state court action.

25            MR. KILDOW:  Well, we're not in the state court

1  action right now, and they weren't fully litigated in the

2  state court action.  And Steadman wasn't even asked to

3  produce any documents relating to this in the state court

4  action.  You weren't there, Ms. Stevenson --

5          THE COURT:  All right.  Well --

6          MR. KILDOW:  -- I was.  It wasn't -- I wasn't

7  requested.

8          THE COURT:  All right.  Thank you.

9          Give me a moment here and I will come back to the

10 parties in just a minute.  I'm going to take about a two-

11 minute recess and I'll be back with -- I'll be back with the

12 parties here in just a moment.

13         MR. KILDOW:  Thank you.

14     (Brief pause)

15         THE COURT:  Okay.  And we are back on the record

16 after a brief recess.  Oh.

17         THE COURT CLERK:  Your Honor, (unintelligible).

18         THE COURT:  Ms. Grimmer left.  She's going to call

19 back, so I don't know if she's back on yet or not.

20         MS. GRIMMER:  Caitlin Grimmer.

21         THE COURT:  All right.  I think, Ms. Grimmer, that

22 you can probably hear me.  But are you back on?

23         MS. GRIMMER:  I am back on, Judge.

24         THE COURT:  Okay.  Fantastic.  Thank you.

25         All right.  We took a brief recess and I needed to

 1   review a couple of things.

 2           So in terms of proceeding from here, here's what

 3   the Court's going to do next.  It's my view that a

 4   preliminary order is necessary at this point defining some of

 5   the scope and other terms that are out there, and we will

 6   issue that as quickly as reasonably possible.

 7           Following that, it appears to the Court that there

 8   will need to be an exchange between the parties as to what

 9   the parties believe has already been produced, either in this

10   action or in the state court action, because it sounds like

11   there might be some disagreement as to that.  And then there

12   will need to be a conferral between the parties within the

13   bounds of the order that the Court issues as to what still

14   needs to be produced or not.

15           And then following that, it would not surprise me

16   at all if we're going to be addressing some follow-on

17   discussions with other disputes that may arise or may not be

18   resolved by that, but that's the fodder for another day and

19   we're not ready to get to that point yet.

20           So the next thing that the parties will get is a

21   preliminary order as to as much of this as we can resolve

22   based on the record that has been made so far, the chart, the

23   arguments, and the Court's review of the pertinent case law.

24   And as I said, I'll try to get that out to the parties as

25   quickly as reasonably possible.

1          All right.  I don't think there's anything else

2    that we absolutely have to address today.  But, Mr. Kildow,

3    without going back into argument, anything else that you

4    think we need to address today?

5          MR. KILDOW:  Well, we got through, I think, number

6    eight, and we've got additional eight, nine, ten, et cetera.

7          THE COURT:  And I'm not closing the door on those.

8    I'm going to come back to those after an initial order has

9    been issued based off of what we have so far.

10          All right.

11          MS. STEVENSON:  Your Honor, I --

12          MR. KILDOW:  Well, what I'm --

13          THE COURT:  Hold on just a second.  Ms. Stevenson,

14    I'll come --

15          MR. KILDOW:  I (unintelligible) like --

16          THE COURT:  -- to you in just a moment.

17          Hold on, Mr. Kildow.  Go ahead and repeat what you

18    just said so you and I aren't talking at the same time.

19          MR. KILDOW:  Your Honor, I just -- I just want to

20    say that I have to confess, and I just want to say this for

21    the record, I'm concerned about the time frame that we're

22    talking about and the procedures.  You know, we're going on,

23    it will be soon into two years in this case without, really,

24    any discovery.

25          THE COURT:  All right.  Your concern is noted for

1   the record.

2           MR. KILDOW:   Thank you.

3           THE COURT:   Ms. Stevenson, any further words that

4   you think we need to hear today?

5           MS. STEVENSON:   Your Honor, that (unintelligible)

6   raised two issues, they're at the end of the chart, they're

7   not specific to any of the Plaintiff's discovery requests.

8   And I don't think that we need to address any of them here

9   now, with the exception of the Plaintiff's subpoena for

10  Michael Horwith, who was the independent forensic expert

11  appointed by the state court.   And I don't know whether it --

12  this may not be an issue that we have to raise in a discovery

13  dispute with you, but I think that Vail Health needs too

14  likely move to quash the subpoena because we think it's in

15  violation of the state court's orders which prohibit the

16  parties from communicating directly with that expert.

17          And we're just in sort of a bind of a situation

18  because the parties have filed multiple motions in the state

19  court related to Mr. Horwith and what he was supposed to do

20  with his materials, because he is, I think, trying to retire.

21  And while those motions were briefed, the Colorado Supreme

22  Court granted a Rule 21 petition on a sort of narrow issue

23  related to the state court action and has, for right now,

24  stayed the District Court action.   And so the District Court

25  is not able to continue ruling on what Mr. Horwith was

 1  supposed to do with those materials until that stay is

 2  lifted.

 3          And so it just creates a dilemma, you know, with

 4  the notion that he has a subpoena in this case outstanding

 5  for him to produce documents and to appear for a deposition

 6  that we think will be in violation of the state court's

 7  orders.

 8          THE COURT:  All right.  So that -- and I think

 9  your earlier comment on that was appropriate in that it will

10  have to be addressed, I believe, by most appropriately a

11  motion to quash, so that we get a more fulsome record with

12  regard to that.

13          MS. STEVENSON:  Got it.

14          THE COURT:  Okay.

15          MR. KILDOW:  Your Honor, let me ask you this.  Is

16  conferral something that is required or desired in resolving

17  these kinds of disputes?

18          THE COURT:  In which dispute specifically are you

19  referring to?

20          MR. KILDOW:  Discovery disputes generally, like --

21          THE COURT:  Okay.

22          MR. KILDOW:  -- the subpoena.

23          THE COURT:  Absolutely.  Discovery disputes are

24  the disputes that probably are often in most need of

25  conferral for a lot of reasons.  One of the biggest ones is,

1    unlike many of the filings that come before the Court, the

2    Court doesn't know what has and hasn't been exchanged and a

3    lot of discovery disputes in many cases can be resolved just

4    by talking about them.  So, yes, it is absolutely required.

5               MS. STEVENSON:  And because Mr. Kildow, we should

6    --

7               MR. KILDOW:  Because (unintelligible) --

8               MS. STEVENSON:  We should absolutely, we should

9    confer about Mr. Horwith and what we can do about that.  I'm

10   happy to do that.

11              MR. KILDOW:  There has been no discussions --

12              THE COURT:  Okay.  Well, then --

13              MR. KILDOW:  -- (unintelligible) resolved.

14              THE COURT:  Then please have that discussion,

15   because that may resolve the issue for you all.  And if it

16   doesn't, it might tailor it some.

17              All right.  Well, I appreciate everybody's

18   participation and thorough review of this, and we will get an

19   order out to you as quickly as we can.

20              Have a good afternoon, everybody.

21              MR. KILDOW:  Thank you.

22              MS. STEVENSON:  Thank you.

23                   (Time noted:  3:33 p.m.)

24                        * * * * *

25

48

1                          CERTIFICATE

2           I, RANDEL RAISON, certify that the foregoing is a

3    correct transcript from the official electronic sound

4    recording of the proceedings in the above-entitled matter, to

5    the best of my ability.

6

7

8    _____          June 3, 2021

9    Randel Raison

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25