# Exhibit 2

| | |
|---|---|
| Colorado Supreme Court<br>2 East 14th Avenue<br>Denver, CO 80203 | DATE FILED: April 21, 2021<br>CASE NUMBER: 2021SA87 |
| Original Proceeding<br>District Court, Eagle County, 2017CV30102 | |
| **In Re:**<br><br>**Plaintiffs:**<br><br>Lindsay Winninger, an individual and Sports Rehab Consulting LLC, a Colorado limited liability company,<br><br>**v.**<br><br>**Defendants:**<br><br>Doris Kirchner, an individual and Vail Clinic, Inc. d/b/a Vail Valley Medical Center, a Colorado nonprofit corporation,<br><br>**3rd Party Defendant:**<br><br>David J. Cimino, an individual. | Supreme Court Case No:<br>2021SA87 |
| ORDER OF COURT | |

Upon consideration of the "Respondent's Motion to Limit Access to Certain Exhibits to their Response to Rule to Show Cause pursuant to District Court's Protective Order" and the "Opposition to Respondents' Motion to Limit Access to Certain Exhibits to their Response to Show Cause pursuant to District Court's Protective Order" and now being sufficiently advised in the premises, the Court ORDERS the following:

The Court DENIES Respondents' request to limit public access to Exhibits B, D, E, G, I, L, M, and N. Effective immediately, these documents are publicly available.

The Court GRANTS Respondents leave to FILE REDACTED VERSIONS of the following Exhibits to their Response to Show Cause as directed below:

- Exhibit O (Excerpts from Cimino Deposition): Redact client names appearing on pages 75–78.

- Exhibit P (Text Excerpts): Redact client names only.

- Exhibit R (Bernard Declaration): Redact patient names appearing on attachment to declaration.

Respondents have up to and including April 28, 2021 in which to submit redacted versions of Exhibits O, P, and R, which must be publicly filed and will be publicly available.  If redacted versions of Exhibits O, P and R are not submitted, these three exhibits filed on April 13, 2021 will be STRICKEN.

BY THE COURT, APRIL 21, 2021.

DATE FILED: April 13, 2021 5:16 PM
FILING ID: 4D9C7AFD699B0
CASE NUMBER: 2021SA87

# EXHIBIT D

# SUPPRESSED

## PHYSICAL THERAPY SERVICES AGREEMENT

**THIS PHYSICAL THERAPY SERVICES AGREEMENT** ("Agreement") is entered into by and between Vail Clinic, Inc., d/b/a Vail Valley Medical Center ("Hospital") and Rehabilitation & Performance Center at Vail, LLC. ("Group") and is dated as of November 1, 2004.

### RECITALS

**WHEREAS**, the Hospital is the owner and operator of a licensed general hospital in Vail, Colorado; and

**WHEREAS**, the Group is comprised of a staff which includes (1) physical therapists and occupational therapists who are registered to practice in the State of Colorado and have specialized training ("Therapists"), and (2) athletic trainers, therapy assistants, aides, technicians, and/or students who work for Group and operate under the supervision of Therapists ("PT Staff"); and

**WHEREAS**, the Hospital wishes to contract with Group for the administration, operation, and maintenance of the Physical Therapy Department ("Department") of the Hospital and for the provision of physical therapy services and rehabilitation services at the Hospital ("Services").

**WHEREAS**, the parties hereto have determined that, except as otherwise provided herein, the Services to be provided at the Hospital shall be provided exclusively by or through Group in order to: (i) promote the necessary control and standardization of the Services; (ii) ensure continuous availability of such Services at the Hospital, (iii) ensure proper and consistent administration of the Department; (iv) ensure appropriate and consistent supervision and training of Hospital personnel; (v) enhance and support morale among Hospital physicians and other Hospital personnel; (vi) promote appropriate use of Hospital equipment; (vii) reduce costs related to the operation of the Hospital; (viii) enhance the overall quality of patient care at the Hospital, and (ix) assist in identification and selection of appropriate new technology.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein, the parties agree:

1.    Obligations of the Hospital.

1.1 Operation of Facilities. The Hospital shall operate and maintain an appropriately equipped Department which shall be known as the "Howard Head Sports Medicine Center" which shall have physical facilities at the Hospital and at such other locations as the Hospital may establish (the "Facilities"). The parties shall consult and cooperate with each other in recommending and planning expansion or modification of the Department and related facilities as necessary to serve the needs of the medical community and the patients of the Hospital. The Hospital shall be responsible for the reasonable and necessary costs of the operation of the

DNVR1:60279190.04

ATTORNEYS' EYES ONLY

Department and the Facilities, including but not limited to janitorial service, laundry, gas, water, telephone service, heat, electricity, and taxes.

(a) Telephone service shall include long distance charges incurred in connection with providing the Services. Such service may include, if necessary for patient care and within the sole discretion of Hospital, a toll free number to the Facility to be used solely for matters directly related to the provision of services under this Agreement.

(b) Access to Hospital's computer network services shall be provided as needed and necessary for patient care as determined by Hospital within its sole discretion. The degree of such access shall be determined by Hospital and shall be consistent with all rules, regulations, and practices pertaining to the protection of personally identifiable health information and consistent with all standards to insure secure transmission and storage of electronic healthcare data.

1.2 <u>Medical Equipment and Supplies</u>. The Hospital shall provide all medical and hospital supplies used by the Department. Group shall assist by recommending supplies to be ordered and shall cooperate as necessary in the completion of all purchase orders in a manner designated by the Hospital. All such orders shall be subject to approval by the Hospital, which approval shall not be unreasonably withheld.

1.3 <u>New and Replacement Equipment</u>. The Hospital shall periodically consult with the Group regarding recommendations for the acquisition and purchase of any new equipment reasonably necessary for the proper and efficient operation of the Facilities. The Hospital shall also, at its sole expense, keep and maintain the existing equipment in the Facilities in good order and repair, and shall replace such equipment or any part of it which becomes worn out or obsolete.

1.4 <u>Director Support</u>. During the term of this Agreement and any extensions or renewals thereof, Hospital shall provide and make available, at its own expense, for the use by the Director of Physical Therapy appointed to serve as the Director of Department pursuant to Section 2.8 of this Agreement in connection with the performance of the Director's Duties under Section 2.9 of this Agreement, such equipment, furniture, files, office equipment, instruments, supplies and any and all other items as may be necessary for the proper and efficient operation and administration of the Department.

1.5 <u>Non-Therapist Personnel</u>. All personnel, other than Therapists and PT Staff, required for the operation of the Department shall be employed and paid by the Hospital, consistent with applicable budgets, Hospital rules, regulations, policies, personnel classifications and salary structures. All personnel decisions concerning these non-Therapist and non-PT Staff personnel, including, without limitation, salary decisions and termination or hiring decisions shall be made by the Hospital. Notwithstanding the foregoing, upon the written request of the Group to remove a Hospital employee from the Facility, Hospital shall not unreasonably deny such request.

2

ATTORNEYS' EYES ONLY

VAIL_00003427

1.6 Option to Provide Services at Additional Health Care Facilities. The parties agree that Group shall have an exclusive option to provide Services to any other newly established Department of the Vail Valley Medical Center or Health Care Facility owned or controlled by Hospital in Eagle or Summit Counties. (hereinafter "New Facility"). This shall include, but not be limited to, New Facilities acquired after the execution hereof, at which physical therapy services are rendered; provided that in the event there is an existing contract with another contractor to provide physical therapy services at such Vail Valley Medical Center or Health Care Facility which was in force prior to such or acquisition, the foregoing provision shall apply only if and when such contract is terminated or expired, provided, however, Hospital shall not exercise any right it may have to renew or extend any such contract, unless and until Group has been offered and failed to exercise pursuant to the terms of this Paragraph 1.6 an option to provide Services at the related New Facility. Hospital shall notify Group in writing at least one hundred twenty (120) days prior to the planned opening acquisition of any such New Facility or the expiration of the services contract for such new Facility, as applicable. Group shall have sixty (60) days from the date of such notice to advise Hospital in writing that it will provide Services at such New Facility pursuant to the provisions of this Agreement. Failure of Group to provide notice of its intent to provide Services within such time frame shall be deemed a lapse of Group's option, and Hospital shall have the right to obtain services from another provider. For purposes of this paragraph, a New Facility shall be defined as a Hospital or Health Care Facility (as further defined below) which is owned and operated by Hospital in Eagle or Summit County. For purposes of this paragraph the term "owned" by Hospital means a greater than fifty percent (50%) ownership interest by Hospital, either directly or indirectly, or a greater than fifty percent (50%) representation on the Board or other governing body of such entity, and the term "controlled" means the right, whether or not expressed, to exclusive management of any New Facility. Further, for purposes of this paragraph, a New Facility must have a license to provide hospital, inpatient or outpatient, surgical or diagnostic services under the applicable laws of the State of Colorado or be a facility where individuals are engaged in the provision of health care.

2.    Obligations of the Group.

2.1 Services. Except as provided in Section 1.6 above, Group shall provide, on an exclusive basis, physical therapy services, for any patient of the Hospital or the Facilities. All persons who receive Services at a Facility shall be regarded as and shall be registered as patients of the Hospital or the respective Facility at which the service is provided. All Services shall be provided in accordance with generally accepted professional standards, professional ethics, and in a manner which promotes continuity of care. Group shall not make any contracts or subcontracts for the provision of any Services it is obliged to provide pursuant to this Agreement with any person or persons who are not employees, or associates, or agents of Group, without the prior written consent of Hospital.

2.2 Call Coverage Requirements. INTENTIONALLY LEFT BLANK.

2.3 Professional Qualifications.

DNVR1:60279190.04                                    3

ATTORNEYS' EYES ONLY                                    VAIL_00003428

(a) <u>Therapist Requirements</u>. Any Therapist providing Services pursuant to this Agreement must be fully registered to practice physical therapy or occupational therapy in the State of Colorado, competent and qualified by reason of training and experience to provide physical and/or occupational therapy and rehabilitative services and an allied health member in good standing of the Medical Staff of the Hospital. If any Therapist offering or performing professional services under this Agreement has his or her membership on the Hospital's medical staff terminated for any reason or if adverse, corrective or disciplinary action is taken or imposed with respect to the hospital privileges or medical staff membership status of any such Therapist, such Therapist shall not perform professional services under this Agreement and Group shall arrange for other Therapist coverage.

(b) <u>General PT Staff Requirements</u>. Group shall use its best efforts to insure that all PT Staff are qualified to perform Services under this Agreement (whether employed by Group or independent contractors), including but not limited to assistants, aides, and technicians and that the PT Staff provide the Services consistent with applicable Hospital rules, regulations and policies. Group will use its reasonable efforts to cause all PT Staff to attend Hospital orientation and represent themselves as an extension of the Hospital in communication, dress, and mannerisms. If any PT Staff is in material violation of Hospital rules, regulations or policies or in material violation of this Agreement, Group agrees that Hospital has the right to request that Group initiate and document to the Hospital appropriate disciplinary action or if Group fails to cure such violation within 30 days, Hospital shall have the right to request that the offending person no longer provide Services under this Agreement. Group must meet/provide all immunization requirements for PT Staff, as well as other Hospital employee requirements. Additionally, Group will assure that all PT Staff providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

(c) <u>Utilization of Students</u>. Group shall use its reasonable efforts to assure that all students sponsored by Group, including but not limited to student physical therapists, assistants, aides, and technicians, comply with Hospital rules, regulations and policies. All students sponsored by Group shall operate under the direct supervision of a Therapist. Group will use its reasonable efforts to cause all students to represent themselves as an extension of the Hospital in communication, dress, and mannerisms. If any Student is in material violation of Hospital rules, regulations or policies or in material violation of this Agreement, and Group has failed to cure such violation within 30 days after receipt of written notice of such violation, Group agrees that Hospital shall have the right to request that the offending student no longer provide Services under this Agreement. Additionally, Group will assure that all Students providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

2.4 <u>Repair/Replacement</u>. The Group shall timely advise the Hospital when equipment for the Facilities needs repair or replacement or when new equipment is needed for the Facilities.

ATTORNEYS' EYES ONLY

VAIL_00003429

2.5 Policies and Standards. The Group shall provide coverage and professional services in accordance with all applicable policies governing medical standards for the delivery of Services as adopted by the Medical Staff of the Hospital. These policies shall be reviewed at least annually by a representative of the Surgery Committee of the Medical Staff and a member of the Hospital's Administrative Staff designated by the President/CEO of the Hospital with input of the Group. These policies shall incorporate, but not be limited to, applicable standards for the delivery of Services as set forth in the Standards for Accreditation of Hospitals of the Joint Commission of Accreditation of Healthcare Organizations and the Colorado Department of Public Health and Environmental Chapter for General Hospitals, and the standards set forth by the American Physical Therapy Association as amended from time to time.

2.6 Compliance with Law. Group shall: (a) cooperate with Hospital so that Hospital may meet any requirements related to the Department and/or the Services imposed on Hospital by all applicable federal, state and municipal statutes, regulations and ordinances, as amended from time to time; (b) at all times during the term of this Agreement, comply in all material respects with all applicable federal, state or municipal statutes, regulations and ordinances, as amended from time to time, in connection with performing its obligations under this Agreement;

2.7 Malpractice Liability Insurance. Any Therapist or PT Staff member providing services hereunder shall be covered by malpractice liability insurance of at least One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate. Such policy or policies shall be subject to the reasonable approval of the Hospital and shall be maintained in full force during the entire term of this Agreement. Such limits are subject to change, but at all times coverage must be in an amount as required by the Hospital's medical staff bylaws. Any cancellation or modification of any such policy shall be reported immediately to Hospital. Group and/or each Therapist shall provide Hospital, upon request, with certificates of such insurance coverage and/or statements from the insurance carrier(s) that Hospital will be notified at least 30 days prior to any cancellation, non-renewal or change in such coverage.

2.8 Director of Physical Therapy Department. Once each year during the term of this Agreement or such other times as necessary due to the resignation or other termination of the Group's nominee, the Group shall nominate a Therapist who is a member of the Group to be the Director of the Department ("Director"). The Director nominated by Group shall be subject to approval by Hospital, which approval shall not be unreasonably withheld. His or her nomination shall be submitted in writing to the Hospital at least 60 days in advance of the date the change will be effective.

2.9 Director's Duties. Director shall be in charge of and shall have full and exclusive responsibility for the provision and supervision of all administrative services in the Department and for the development and maintenance of procedures and protocols for administrative functions to assure the proper functioning of the Department in accordance with the standards set forth in this Agreement. Director may delegate these responsibilities to any other qualified PT Staff member of Group, subject to the approval by the Hospital. Such duties shall include, but shall not be limited to:

DNVR1:60279190.04

ATTORNEYS' EYES ONLY

VAIL_00003430

(a) Work closely with the Hospital's Administrative Staff and Medical Directors of Departments regarding the supervision of personnel employed in the Facilities in accordance with the Hospital's policies;

(b) Assist the Hospital in the preparation of operating and capital budgets for the Department;

(c) Be willing to serve or assist in the selection of Group members to serve on appropriate committees of the medical staff and assist in the administration or implementation of such other efforts that might enhance delivery of quality care;

(d) Oversee the maintenance of complete and accurate records for the Department;

(e) Review and assist with the development and monitoring, in cooperation with the Medical Staff and Hospital administration, of procedures and guidelines for the handling of patients, and coordination of Services with other services and departments of the Hospital;

(f) Advise the Hospital when necessary regarding technical/medical developments affecting the Services and appropriate changes in the Department;

(g) Assist the Hospital in the development and maintenance of community programs that enhance treatment in the Hospital's service area;

(h) Review of Services for quality of care and cost effectiveness;

(i) Scheduling of PT Staff for duties in the Facilities;

(j) Maintain skills and knowledge of current developments in the practice of physical therapy and use reasonable efforts to advance such knowledge and skills on the part of all Therapists;

(k) Perform such other duties as may from time to time be reasonably requested by the Hospital;

(l) Cooperate with Hospital in the development and provision of all educational and research programs related to the Department that may be offered by Hospital and shall devote reasonable time and effort to such programs; and

(m) Maintain his or her registration to provide physical or occupational therapy and rehabilitative services in Colorado in good standing, comply with all requirements of the State of Colorado for continuing medical education of registered therapists, and remain an active allied health member of the Medical Staff of the Hospital.

2.10 <u>INTENIONALLY LEFT BLANK</u>

ATTORNEYS' EYES ONLY                                                        VAIL_00003431

2.11 Compliance.  The Group also agrees to cooperate with Hospital in regulatory compliance activities and programs and agrees that the Director (or his or her designee, who will be a member of the Group) shall be designated under this Agreement to attend all general compliance education sessions conducted by the Hospital and shall be responsible for conveying information regarding the Hospital's compliance policies and procedures to all members of the Group who will be furnishing Services in the Facilities.

2.12 Cooperation Regarding External Audits and Investigations.  Except to the extent specifically prohibited by law, Group shall cooperate together, with the Hospital's Compliance Officer, in connection with any audit or investigation of the Hospital by any governmental or other third-party payer or insurance carrier with respect to services provided or billings submitted under this Agreement.  Group shall notify the Hospital Compliance Officer in writing within one (1) business day of receipt by Group of any subpoena or other written request for information (including requests for interviews of Group's personnel) other than routine requests from patients or payers in the ordinary course of business regarding billings subject to this Agreement.

2.13 Group Therapist Minimum Standards.  All persons performing functions as a Therapist shall comply in all material respects with Hospital's Medical Staff Bylaws, rules and regulations, and the policies and procedures established by Hospital from time to time.  Each Therapist shall participate in the Medicare and Medicaid programs and treat all patients referred to the Group or to the Therapist in a non-discriminatory manner.

2.14 Marketing.  Group shall not engage in any marketing or similar activities related to the Services or the Howard Head trade name unless approved in advance by Hospital.  Subject to the sole discretion of the Hospital, Hospital may share in the expenses of pre-approved marketing or similar activities.

2.15 Termination of Medical Staff Privileges.

(a) If any Therapist is prohibited from participating in any government health care program or is convicted of any offense related to health care, or the Medical Staff membership or privileges of any Therapist is terminated for any reason or if adverse, corrective or disciplinary action is taken or imposed with respect to such Therapist's registration to practice physical therapy or Medical Staff membership, such Therapist shall not perform Services under this Agreement and Group shall arrange for other therapist coverage.

(b) Existence or Terms of Agreement Shall Not Effect Medical Staff Privileges. Neither this Agreement nor its termination shall affect or modify the rights and responsibilities of any of the Therapists hereunder under the Bylaws of the medical staff of the Hospital or the medical staff privileges held by Therapists, which privileges shall continue to be governed by the provisions of the Bylaws and shall not in any way be dependent upon the existence of this Agreement.

ATTORNEYS' EYES ONLY                                                                                    VAIL_00003432

3.    Compensation, Fees and Charges.

3.1 Billing for Professional Medical Services. Hospital shall be solely responsible for, and solely entitled to, billing and collection of all charges for all professional physical therapy services provided by Group and Therapists in connection with this Agreement ("Billings For Professional Physical Therapy Services"). All Billings For Professional Physical Therapy Services will be under Hospital's own provider number and at its own expense. All professional therapy services billed by Hospital will be provided by Group or Therapists or "incident to" such Therapists' services as defined in the Medicare Carriers Manual. Hospital will be responsible for maintaining all documentation required to support such charges and Group and Therapists shall cooperate in preparing and maintaining timely and accurate records of all medical services provided to support such charges. Hospital shall defend, indemnify and hold Group harmless from all liability or damages with respect to Hospital's billing activities.

3.2 Billing and Collection. Hospital will bill and collect all professional charges for Group's Services under this Agreement. Group shall not bill any payers or beneficiaries for any Services provided under this Agreement, including any co-payments or deductibles.

3.3 Billing and Documentation Procedures. Group shall cause each Therapist and PT Staff member to become familiar with all billing and documentation procedures as reasonably requested by Hospital, and Group shall cooperate with Hospital in implementing and adhering to billing and documentation procedures established by Hospital, including completion of HCFA Form 855-R.

3.4 Monthly Payment Calculation. Group will be compensated for professional services rendered by Group pursuant to this Agreement by monthly payments calculated in accordance with the following methodology:

Step 1 – Hospital shall prepare and deliver to Group a monthly usage report for all professional services rendered by Group for the previous month not later than the tenth working or business day of the following month. The usage report will include all professional services provided by Group at the following Hospital departments and/or satellite clinic sites:

**All.**

The usage report will identify each distinct service rendered at the above identified departments and/or sites, the corresponding CPT code and modifier, if applicable, for each such service, each date of service, and the number of times each such service was provided in the previous month.

Step 2 – Hospital shall maintain a RVU table (the "Credited RVU Table") that will establish the RVUs to be credited to Group for each CPT code. The Credited RVU Table for Group is attached hereto as Addendum A. The Credited RVU Table will utilize RVU values from the most recent Medicare RBRVS (Resource-Based Relative Value Scale) Physician Fee Schedule. The Credited RVU Table may, by mutual

ATTORNEYS' EYES ONLY

agreement, have additional services added to it, together with assigned codes and RVU values. Only the work and malpractice RVUs, adjusted by the Colorado GPSI index, will be used to establish credited RVUs. For services for which a "54" modifier are appended, the work and malpractice RVU values shall be reduced by thirty percent (30%). If new services are offered during the course of this Agreement and the associated CPT code for the new service is included as an active service in the RBRVS Physician Fee Schedule that is current at the time the new service is first offered, the new service will be added to the RVU table and included in the calculation of Group's compensation from the date the service is added to the RVU table. It is the responsibility of Group to provide written notification to Hospital of any new services it believes should be added to the Credited RVU Table. Hospital has no obligation to retroactively credit RVUs associated with new services for which Group has not provided written notification. Only services included in the Credited RVU Table will be used to establish credited RVUs for the month during which the services were rendered.

Step 3 – Hospital will calculate the total RVUs credited to Group by matching the usage report described in Step 1 with the Credited RVU Table described in Step 2 to arrive at the total credited work and malpractice RVUs generated by Group.

Step 4– Each work and malpractice RVU credited to Group will be valued using a "Conversion Factor" of $66.42, subject to adjustment as provided in Section 2 below. This Conversion Factor will be used in determining the monthly compensation owed by Hospital to Group. The total monthly payment will be calculated by multiplying the total credited work and malpractice RVUs described in Step 3 by the Conversion Factor.

3.5 <u>Adjustments to Conversion Factor</u>. The Conversion Factor shall be subject to a Consumer Price Index (CPI") adjustment effective at the first day of the second year of this Agreement and on the first day of each year of this Agreement thereafter (in each case, the "Adjustment Date") as follows:

(a) The Consumer Price Index for all Urban Consumers, Denver, Boulder, Metro Area – All Items Index (CPI-U, 1982-84 equals 100), published by the United States Department of Labor, Bureau of Labor Statistics, shall be the "Index." The number indicated in the Index for the month in which the Commencement Date occurred and for the year then in effect, the Base Rent for which is be adjusted for the subsequent year, shall be the "Initial Base Index". The number indicated in the Index for the month nearest the Adjustment Date shall be the "Current Index". (Notwithstanding the foregoing, if the Index is published with numbers issued other than on a monthly basis, the Index number published for the date closest to the Commencement Date or the applicable Adjustment Date shall be the approximate Index number for determining the Initial Base Index or Current Index.)

ATTORNEYS' EYES ONLY                                                                                VAIL_00003434

(b)      On each Adjustment Date, the Current Index shall be compared to the Initial Base Index. If the Current Index has increased over the Initial Base Index, the Conversion Factor, throughout that year (and continuing until the next conversion factor adjustment) shall be set by multiplying the Conversion Factor for the previous year by a fraction, the numerator of which is the Current Index, and the denominator of which is the Initial Base Index. In no case shall the Conversion Factor as adjusted be less than the applicable Conversion Factor for the previous year.

(c)      If, on any Adjustment Date, the Current Index number is not yet available, the Conversion Factor shall remain the same as for the previous year, as it may have been increased through CPI adjustments or otherwise, until the Current Index number is published and available. At that time the Conversion Factor shall be adjusted and payments to the Group shall be adjusted retroactively from the applicable Adjustment Date.

(d)      If the Index is discontinued, the CPI adjustment shall be made using comparable statistics on the cost of living for the Denver, Boulder metropolitan area as computed and published by any agency of the United States Government or by a responsible financial periodical or recognized authority selected in the reasonable discretion of Hospital.

3.6 Annual Payment Reconciliation.  Within sixty (60) days following the end of each Hospital fiscal year, a reconciliation of the payments made pursuant to this Agreement during that fiscal year will be made. This reconciliation will be made by following the same four step methodology described above, but will utilize a usage report for the entire prior fiscal year. The annual reconciliation will account for any positive or negative adjustments made to service volumes for prior periods over the course of the year. The annual payment calculation will be compared to the sum of the payments made during the prior fiscal year. Any overpayments made to Group will be deducted from the next month's payment and following months, if necessary, for Services. If the remaining payments due Group under the Agreement are insufficient to fully reimburse the overpayment, Group shall pay the balance due within ten (10) days after the last payment credited toward the overpayment. Any underpayment owed by Hospital to Group will be added to the next month's payment for Services.

3.7 Medicare/Medicaid Claims. Group understands, and will ensure that all Therapists and PT Staff furnishing services on behalf of Group pursuant to this Agreement understand, that Hospital will submit claims to Medicare, Medicaid, and other governmental and private third party payers for physical therapy services and for hospital services. Group certifies that all encounter and medical record documentation prepared by Therapists or PT Staff shall be true and correct in all material respects and accurately represent each patient's medical condition, the Services provided, and other facts and circumstances surrounding Services provided pursuant to this Agreement. Group understands, and will ensure that all Therapists and PT Staff understand, that the submission of false information or the making of false claims to government or private health care payers may result in administrative, civil, and criminal sanctions against Group, Hospital, and such individual Therapist or PT Staff member. Group acknowledges that false or inaccurate statements in connection with billings or in medical records or other patient encounter

ATTORNEYS' EYES ONLY                    VAIL_00003435

documentation is not acceptable to the Hospital and that failure to comply with this Section 3.7 would be a material breach of this Agreement.

4.    Independent Contractor Status.

   4.1 Group Services. The Group and any Therapist and PT Staff member, if directly employed by Group, providing Service under this Agreement shall not be employees of the Hospital. The services of Group and any such Therapists and PT Staff member shall be those of independent contractors exercising their independent professional medical judgment.  The Group shall be subject to any quality assurance, peer or utilization review program established by the Hospital and the Medical Staff Bylaws of the Hospital.

   4.2 Benefits. Neither the Group nor any Therapist or PT Staff member providing services under this Agreement shall be entitled to any of the rights or privileges of employment established for the Hospital's employees such as, but not limited to, vacation and sick leave with pay, paid holidays, life, accident or health insurance, workers compensation insurance or benefits, or severance pay upon termination of employment.

   4.3 Workers Compensation Insurance. The Group agrees to be responsible for procuring and maintaining adequate workers compensation insurance coverage for the Therapists and PT Staff members and other individuals employed by the Group who provide services under this Agreement in accordance with the requirements of the laws of the State of Colorado. The Group further agrees that if it fails to procure and maintain such workers compensation insurance, then (1) the Hospital shall not be responsible for any injury sustained by a Therapist or PT Staff member or other individual employed by the Group which would have been covered by such workers compensation insurance and (2) the Group shall indemnify and hold harmless the Hospital from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by the Hospital as a result of any injury sustained by a Therapist, PT Staff member, or other individual employed by the Group which would have been covered by such workers compensation insurance.

5.    Taxes.

   5.1 Group Taxes.  The Group shall be solely responsible for the payment of any and all federal, state or local taxes with respect to any income or compensation earned by the Group or any Therapist or PT Staff member under this Agreement, including federal and state withholding, FICA, FUTA, self-employment or any other such taxes.  The Hospital shall have no liability for such taxes.

   5.2 Hospital Taxes.  Hospital shall be solely responsible for the payment of any and all federal, state and local taxes with respect to any income or compensation earned by Hospital or any Hospital employee, including federal and state withholding, FICA, FUTA, or any other such taxes and any and all use or other taxes imposed on the Department or related to the ownership of the equipment and other assets of the Department.

DNVR1:60279190.04

ATTORNEYS' EYES ONLY

VAIL_00003436

6.  <u>Non-Competition by Group and Therapists.</u>

(a)  <u>Covenant Not to Compete.</u>  During the term of this Agreement, and for a period of one (1) year after any termination of this Agreement (i) by the Hospital for the Group's uncured breach of this Agreement resulting in termination of this Agreement or (ii) termination of this Agreement without cause by the Group, then neither the Group nor any shareholder or other person with an equitable ownership interest in the Group ("Owners") shall engage in the practice or delivery of physical therapy services in any medical services facility in Summit, or Eagle Counties, Colorado, without the prior written consent of the Hospital.  The covenants on the part of the Group and Owners in this Section 6 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any other claims or causes of action by the Group or Owners against the Hospital, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Hospital of said covenants.  The Group agrees that each Owner shall agree that such Owner will be bound by the terms of this Section 6 and shall execute and deliver to Hospital a Non-Competition Agreement in the form set forth on Exhibit A (which is attached to and made part of this Agreement).

(b)  <u>Liquidated Damages.</u>  The parties recognize and agree that, in the event the provisions in this Section 6 are breached by the Group or any Owner, the extent of actual damages sustained by the other party will be difficult to ascertain with precision.  Therefore, the parties expressly agree that the Hospital shall be entitled to liquidated damages in the amount of One Hundred Fifty Thousand Dollars ($150,000).  Each party shall indemnify and hold the other party harmless with respect to all costs and expenses (including reasonable attorney's fees and costs) incurred by the other party in successfully enforcing or defending against the covenants set forth in this Section 6.

(c)  <u>Construction of Covenant Not to Compete.</u>  If any portion of this covenant not to compete or its application is construed to be invalid, illegal or unenforceable, then the other portions of their application shall not be affected thereby and shall be enforceable without regard thereto.  If any covenant is determined to be unenforceable in equity because of its scope, duration, geographic area or similar factor, then the court or arbitrator making such determination shall have the power to reduce or limit such scope, duration, geographic area or other factor and such covenant shall then be enforceable in equity in its reduced or limited form.

(d)  The parties agree that these provisions are necessary in order to assure the quality and consistency of physical therapy services and coverage under this Agreement.

7.  <u>Powers and Authority.</u>  Nothing in this Agreement shall give Group the power or authority to contractually bind Hospital as to any matter without prior written authorization of the Hospital, which authorization may be withheld by Hospital in its sole and absolute discretion.

8.  <u>Confidentiality of Information.</u>  Neither Hospital nor the Group shall disclose to any person confidential information relating to the operation or administration of the Facilities or the Services, including, without limitation, confidential patient information or information contained in the medical records of the Hospital, without prior written consent of the other party or, where

DNVR1:60279190.04                                    12

ATTORNEYS' EYES ONLY

applicable, the patient or, unless and to the extent expressly required by applicable law, as required by the malpractice liability carriers insuring the Group regarding a claim or potential claim under such malpractice policy.

9.      Indemnification.

        9.1 Indemnification of Hospital.  It is agreed that the Hospital shall not be held liable for any act, error or omission of the Group or any Therapist rendering professional services pursuant to this Agreement.  The Group shall indemnify and hold harmless the Hospital from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by the Hospital as a result of any action, omission, or inaction of the Group, or its agents, associates or subcontractors under the terms of this Agreement.  However, this subparagraph shall not operate to indemnify the Hospital or relieve its liability with respect to any claims, damages, liabilities and judgments, including costs, expenses and attorney's fees, incurred as a result of any actions taken or omitted by the Hospital, its agents, subcontractors, employees, or assignees other than the Group.

        9.2 Indemnification of Group.  Hospital shall indemnify and hold harmless the Group from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by the Group as a result of any action, omission, or inaction of the Hospital, or its agents, associates, employees, or subcontractors under the terms of this Agreement.

10.     Amendment.  This Agreement shall not be amended except in writing executed by both parties.

11.     Term of Agreement.  The initial term of this Agreement shall be for a period of three (3) years beginning November 1, 2004, and ending October 31, 2007.  If Group is not in default under the terms of this Agreement, Group shall have the right and option to extend the Term of this Agreement for two (2) additional three (3) year periods (the "Extension Terms").  The right to Extension Terms shall be subject to the following terms and conditions.  Notwithstanding the foregoing, either Group or Hospital may terminate this Agreement, without penalty, at the end of the second (2nd) year of each term by giving the other party written notice thereof at least 120 days prior to the end of the second year.  The preceding sentence is intended, in part, to comply with the requirements of IRS Revenue Procedure 97-13.

        (a) Group's right and option to extend the Term of this Agreement, as set forth above, shall be exercised by giving a written notice of extension to the Hospital at least one hundred eighty (180) days before the expiration of the initial Term of this Agreement.

        (b) If this Agreement is extended for an additional three (3) year period as set forth herein, said extension(s) shall be on the same terms and provisions as set forth in this Agreement, except the right to Extension Terms shall not be a term or provision of this Agreement upon commencement of the second Extension Term.

DNVR1:60279190.04                                        13

ATTORNEYS' EYES ONLY                                                                              VAIL_00003438

12.    Termination.

12.1  Generally.  Either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement, provided such breach continues for five (5) days after receipt by the breaching party of written notice of non-performance of a monetary obligation or thirty (30) days after receipt by the breaching party of written notice of any other such breach from the non-breaching party.

12.2  Termination by Hospital.  The Hospital may terminate this Agreement, or retain at Hospital's expense additional Therapists to the extent necessary to provide adequate Therapist coverage, immediately by written notice to the Group upon the occurrence of any of the following events:

(a) The denial, suspension, revocation, termination, lapse, or voluntary relinquishment (under threat of disciplinary action) of any Therapist's license to render physical therapy services  in the State of Colorado if such therapist is not immediately prohibited by the Group from providing any Services hereunder;

(b) The denial, suspension, revocation, termination, relinquishment (under threat of disciplinary action), of any Therapist's Medical Staff membership or privileges at any health care facility, or of any such Therapists' registration, certificate, or license to practice physical or occupational therapy in any jurisdiction other than the State of Colorado and such event is known to Group and such Therapist is not immediately prohibited by Group from providing any Services hereunder;

(c) INTENTIONALLY LEFT BLANK;

(d) Breach by the Group of any of the confidentiality provisions hereof;

(e) Failure by the Group to maintain all insurance required under this Agreement if such insurance is not reinstated within five (5) business days after Group receives written notice of the lapse of a required insurance policy; or

(f) Any Therapist's conviction of a criminal offense related to health care, or Therapist's listing by a federal agency as excluded or otherwise ineligible for federal program participation, and such Therapist is not immediately prohibited by the Group from providing Services under this Agreement.

12.3  Termination Due to Legal Event.  If any governmental agency that administers the Medicare, Medicaid, or other federal program (or their representatives or agents), or any other federal, state or local governmental or nongovernmental agency, or any court or administrative tribunal passes, issues or promulgates any law, rule, regulation, standard, interpretation, order, decision or judgment, including but not limited to those relating to any regulations pursuant to state or federal anti-kickback or self-referral statutes (collectively or individually, "Legal Event"), which, in the good faith professional  judgment of either party (the "Noticing Party"), materially

ATTORNEYS' EYES ONLY                                                                            VAIL_00003439

and adversely affects such party's licensure, accreditation, certification, or ability to refer, to accept any referral, to bill, to claim, to present a bill or claim, or to receive payment or reimbursement from any federal, state or local governmental or non-governmental payer, or which subjects the Noticing Party to a risk of prosecution or civil monetary penalty, or which, in the good faith professional judgment of the Noticing Party, indicates a rule or regulation with which the Noticing Party desires further compliance, then the Noticing Party may give the other party notice of intent to amend or terminate this Agreement to the extent necessary to address the issues presented by the Legal Event. If the parties hereto are unable to agree, in good faith after a reasonable period of time, on appropriate modifications to the Agreement with respect to the Legal Event, either party shall be entitled to terminate this Agreement immediately upon receipt by the other party of its notice of termination. Except as otherwise required by applicable law, any amounts owing to either party hereunder shall be paid, on a pro rata basis, up to the date of such termination, and any obligation hereunder that is to continue beyond expiration or termination shall so continue pursuant to its terms.

12.4 <u>Effects of Termination of Agreement on Therapist</u>. Upon the expiration or earlier termination of this Agreement, neither party shall have any further obligation hereunder except for such obligations that had occurred prior to the date of termination and such obligations, promises or covenants contained in this Agreement that expressly extend beyond the term of this Agreement, including the non-competition clause above and tail coverage for medical malpractice.

13.    <u>Notices</u>. Notice to either party to this Agreement shall be by certified mail, return receipt requested or by hand delivery, with evidence of receipt, to the parties at the following addresses:

|  |  |
|---|---|
| to the Hospital: | President<br>Vail Valley Medical Center<br>181 West Meadow Drive<br>Vail, Colorado 81657 |
| to the Group: | Steve Stalzer<br>Howard Head Sports Medicine<br>181 West Meadow Drive, Suite 100<br>Vail, Colorado 81657 |

14.    <u>Waiver</u>. No waiver of any provision of this Agreement by either party shall be deemed to imply or constitute a further waiver of the same provision or any other provision of this Agreement.

15.    <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of the remaining provisions hereof shall not be affected, prejudiced or disturbed in any way.

16.    <u>Governing Law</u>. This Agreement shall be governed by the laws of the State of Colorado.

DNVR1:60279190.04

15

ATTORNEYS' EYES ONLY

VAIL_00003440

17.   Headings.  The headings of the various sections of this Agreement are inserted merely for the purpose of convenience and do not expressly or by implication limit, define or extend the specific terms of the sections so designated.

18.   Assignment.  This Agreement may not be assigned by the Group without the prior written approval of the Hospital, which approval may be withheld by Hospital in its sole and absolute discretion.  This Agreement may be assigned by the Hospital without written approval of the Group if the Assignee continues to operate the Facilities, and agrees to assume this Agreement as it relates to such Facilities.  In the event of all or substantially all of the sale of the Hospital's assets and any other transaction of similar effect where this Agreement would not otherwise be transferred by operation of law, the Hospital shall use all reasonable efforts to cause the acquiring entity to assume the obligations of the Hospital under this Agreement.

19.   Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, successors and assigns.

20.   Medicare Cost-Finding Effect.

20.1  Generally.  Until the expiration of four (4) years after the furnishing of such services pursuant to this Agreement, the Group shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, this Agreement, and books, documents and records of Group that are necessary to certify the nature and extent of the costs hereunder.

20.2  Subcontracts.  If Group carries out any of the duties of this Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years from the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, the subcontract, documents, or records of such organization that are necessary to verify the nature and extent of the cost hereunder.

21.   Complete Agreement.  This Agreement contains the complete agreement of the parties and supersedes all other agreements, oral or written, between the parties pertaining to the subject matter herein.

22.   Exclusivity.

22.1 Subject to the provisions of this Agreement, the Hospital shall not, without the prior written consent of Group, employ, contract with, or otherwise engage the services of any other physical therapy or medical corporation or partnership for the purpose of performing Services in the Hospital during the term of this Agreement, and no Therapist other than a Therapist

DNVR1:60279190.04

16

ATTORNEYS' EYES ONLY

VAIL_00003441

employed by Group or under contract with Group shall perform any such services in the Hospital during the term of this Agreement.

22.2 Subject to the provisions of this Agreement, Group shall not, without the prior written consent of Hospital, contract with, or otherwise provide physical therapy services, to any physician, group, clinic, hospital or facility in Eagle or Summit Counties during the term of this Agreement, except Group may provide physical therapy services in Summit County under a contract with Breckenridge Medical Center.

23.      Dispute Resolution and Attorney's Fees.  The parties agree that it is their intent to make a good faith attempt to resolve any dispute between them in an informal and amicable manner. To this end, the parties agree to informally discuss with each other any dispute arising out of this Agreement or any matter relating to the services which are the subject matter of this Agreement prior to submitting such dispute to a court of law or arbitrator for final resolution. In the event of any dispute regarding any provision hereof, or arising out of or in connection with the performance of this Agreement, the parties hereto shall first attempt to resolve any dispute concerning this Agreement or arising in any way out of the performance of this Agreement through nonbinding mediation.  In the event the dispute cannot be resolved within thirty (30) days by the parties in good faith through nonbinding mediation, the dispute shall be settled exclusively by binding arbitration, which shall be conducted in Vail, Colorado or such other venue as near thereto as practicable in accordance with the rules of the American Arbitration Association.  Such arbitration shall be before a single arbitrator acceptable to both parties who shall be bound by applicable law and the terms of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement at Vail, Colorado.

VAIL CLINIC, INC. d/b/a
VAIL VALLEY MEDICAL CENTER

Date: _10/19/04_                By: _Thomas Zellers_

Thomas J. Zellers
President & Chief Executive Officer

Attest:_____

REHABILITATION & PERFORMANCE CENTER AT VAIL, INC

DNVR1:60279190.04                 17

ATTORNEYS' EYES ONLY

Date:_____

By: _____

(Name) John Atkins

(Title) President

DNVR1:60279190.04

18

ATTORNEYS' EYES ONLY

VAIL_00003443

## EXHIBIT A

## NONCOMPETITION AGREEMENT

This Noncompetition Agreement is entered into and shall be effective as of _____ by and between the Vail Clinic, a Texas nonprofit corporation, d/b/a Vail Valley Medical Center (the "Hospital") and Rehabilitation & Performance Center at Vail, LLC (the "Group") and the Owners whose signatures appear below (each an "Owner"). This Non-competition Agreement is required by Section 6 of the Physical Therapy Services Agreement dated _____ between the Hospital and the Group (the "Physical Therapy Services Agreement").

    1.  <u>Execution of Non-competition Agreement Required as Condition of Performing Services</u>.  The Group and each Owner understands and agrees that he/she is required to execute and deliver this Non-competition Agreement before he/she can provide services under the Physical Therapy Services Agreement.

    2.  <u>Non-competition</u>.  During the term of the Physical Therapy Services Agreement, and for a period of two (2) years after any uncured breach resulting in termination of the Physical Therapy Services Agreement, or the termination of the Agreement by the Group (unless the Group terminates for cause in accordance with Section 12.1(b)), neither the Group nor any Owner shall (1) engage in the delivery of physical therapy services in, or (2) engage in any way, directly or indirectly, in any manner whatsoever, whether as a shareholder, director, officer, joint venture, partner, sole proprietor, investor or, in any other ownership or financial capacity whatsoever, or as an employee, consultant, agent, representative or operator of any physical therapy facilities or medical services facilities in Summit or Eagle County without the written consent of the Hospital.

    3.  <u>Attorneys' Fees</u>.  In the event of a breach of this Non-competition Agreement by the Owner, it is agreed that the Hospital in addition to other remedies available, shall be entitled to an award of its reasonable attorneys' fees and costs incurred in enforcing its rights hereunder.

    4.  <u>Liquidated Damages</u>.  The Owner agrees that the breach of this Non-competition Agreement by the Owner would materially damage the Hospital's business operations and that such breach would cause the Hospital to incur costs and suffer losses, the actual extent and exact amount of which cannot be determined at the time of executing this Non-competition Agreement. Accordingly, upon an Owner's breach of this Non-competition Agreement, such Owner shall be obligated to pay the amount of Fifty Thousand Dollars ($50,000) to the Hospital as liquidated damages, provided, however, that the liquidated damages payable by the Group and the Owners shall not exceed $150,000 in the aggregate.  The foregoing amount is intended to be and shall constitute liquidated damages, and is not imposed as a penalty.  The Owner shall indemnify and hold the Hospital harmless with respect to all costs and expenses (including reasonable attorney's fees and costs) incurred by the Hospital in successfully enforcing the covenants set forth in this Non-competition Agreement against such Owner.

    5.  <u>Construction of Covenant Not to Compete</u>.  If any portion of this Non-competition Agreement or its application is construed to be invalid, illegal or unenforceable, then the other portions or their application shall not be affected thereby and shall be enforceable without regard thereto.  If any covenant is determined to be unenforceable in equity because of its scope,

ATTORNEYS' EYES ONLY

duration, geographic area or similar factor, then the court or arbitrator making such determination shall have the power to reduce or limit such scope, duration, geographic area or other factor and such covenant shall then be enforceable in equity in its reduced or limited form. The parties acknowledge that if any provision of this Non-competition Agreement is held in a tribunal of competent jurisdiction to be unenforceable in any respect, such provision shall be deemed to be amended, and shall be binding upon the undersigned to the maximum extent deemed reasonable and enforceable by such tribunal.

6. Preliminary Injunction. The parties recognize and agree that, in the event the provisions in this Non-competition Agreement are breached or threatened to be breached by an Owner, the Hospital shall additionally be entitled to entry of a preliminary injunction without posting any bond or security and a permanent injunction thereafter, in addition to any other legal or equitable remedies that may be available.

7. Adequacy of Consideration. The parties specifically agree that there has been adequate and fairly negotiated consideration exchanged by the parties to support the execution and enforcement of this Non-competition Agreement.

8. Reasonableness. The parties agree that the liquidated damages provision set forth above is not unconscionable and that the amount of damages agreed to in advance is fair, reasonable and proportionate to the presumed injury which would occur as a result of a breach of this Non-competition Agreement. The parties acknowledge that the geographic and durational restraints set forth above have been carefully considered and negotiated between the parties. In light of these understandings and the other consideration provided in this Non-competition Agreement and the Physical Therapy Services Agreement, the parties acknowledge that the covenant not to compete is reasonable and will not unduly restrict the Owner's ability to practice physical therapy.

This Noncompetition Agreement is intended to be effective as of _____, notwithstanding actual execution on a different date.

By: _____
Its: _____

**THE VAIL CLINIC, a TEXAS NONPROFIT CORPORATION d\b\a VAIL VALLEY MEDICAL CENTER**

By: _____
Its: _____
Date: _____

OWNER

_____

OWNER

_____

DNVR1:60279190.04                    20

Date:_____    Date:_____

**OWNER**                 **OWNER**

Date:_____    Date:_____

**OWNER**                 **OWNER**

Date:_____    Date:_____

ATTORNEYS' EYES ONLY          VAIL_00003446



**Howard Head**
**Sports Medicine Centers**
*A service of Vail Valley Medical Center*

April 26, 2007

Greg Repetti,
Vail Valley Medical Center
181 West Meadow Drive
Vail, CO 81657

Beaver Creek Medical Center
1280 Village Road
Avon, CO 81620
Tel. (970) 949-5522
Fax (970) 949-9459

Re: Extension of Physical Therapy Services Agreement

Breckenridge Medical Center
655 South Park Avenue, Plaza I
Breckenridge, CO 80424
Tel. (970) 547-2763
Fax (970) 547-1969

Dear Greg,

Eagle Medical Center
232 Broadway
Eagle, CO 81631
Tel. (970) 328-5470
Fax (970) 569-7556

Please consider this letter as notification that Rehabilitation and Performance Center at Vail, LLC wishes to exercise the right to extend the Term of the Physical Therapy Services Agreement as set forth in the current agreement (page 13).

Edwards Medical Center
322 Beard Creek
Edwards, CO 81632
Tel. (970) 569-7777
Fax (970) 569-7778

Thank you for the opportunity to continue our work with Vail Valley Medical Center.

Keystone Medical Center
1252 County Road 8
Keystone, CO 80435
Tel. (970) 468-1787
Fax (970) 468-7908

John Atkins
President
Rehabilitation and Performance Center at Vail, LLC

Frisco Medical Center
360 Peak One Drive, Suite 370
Frisco, CO 80443
Tel. (970) 668-3169
Fax (970) 668-3243

Silverthorne Medical Center
265 Tanglewood Lane
Silverthorne, CO 80498
Tel. (970) 262-0179
Fax (970) 513-4513

Vail Valley Medical Center
181 West Meadow Drive
Vail, CO 81657
Tel. (970) 476-1225
Fax (970) 479-7193

WestStar Clinic
108 South Frontage Road West
Vail, CO 81657
Tel. (970) 479-7291
Fax (970) 477-3110

ATTORNEYS' EYES ONLY

VAIL_00003425



**Howard Head**
**Sports Medicine Centers**
*A service of Vail Valley Medical Center*

Beaver Creek Medical Center
1280 Village Road
Avon, CO 81620
Tel. (970) 949-5522
Fax (970) 949-9459

Breckenridge Clinic
505 South Main Street, Suite A1
Breckenridge, CO 80424
Tel. (970) 547-2763
Fax (970) 470-6633

Eagle Healthcare Clinic
377 Sylvan Lake Road
Eagle, CO 81631
Tel. (970) 328-6715
Fax (970) 470-6699

Edwards Medical Center
322 Beard Creek Road
Edwards, CO 81632
Tel. (970) 569-7777
ax (970) 569-7778

Frisco Medical Center
360 Peak One Drive, Suite 370
Frisco, CO 80443
Tel. (970) 668-3169
Fax (970) 668-3243

Gypsum Recreation Center
52 Lundgren Boulevard
Gypsum, CO 81637
Tel. (970) 777-2700
Fax (970) 470-6647

Keystone Medical Center
1252 County Road 8
Keystone, CO 80435
Tel. (970) 468-1787
Fax (970) 470-6627

Silverthorne Clinic
265 Tanglewood Lane
Silverthorne, CO 80498
Tel. (970) 262-0179
Fax (970) 513-4513

US Bank Clinic
108 South Frontage Road West
Vail, CO 81657
Tel. (970) 479-7291
Fax (970) 477-3110

Vail Valley Medical Center
181 West Meadow Drive
Vail, CO 81657
Tel. (970) 476-1225
Fax (970) 470-6653

Downtown Denver Clinic
*(Owned and Operated by RPC, LLC)*
999 18th Street, Suite 250
Denver, CO 80202
Tel. (303) 295-1403
Fax (303) 297-3021

April 4, 20010

Doris Kirchner
Vail Valley Medical Center
181 West Meadow Drive
Vail, CO 81657

Re: Extension of Physical Therapy Services Agreement

Doris,

Please consider this letter as notification that Rehabilitation and Performance Center at Vail, LLC wishes to exercise the right to extend the Term of the Physical Therapy Services Agreement as set forth in the current agreement (page 13).

Thank you for the opportunity to continue our work with Vail Valley Medical Center.

Steve Stalzer
Rehabilitation and Performance Center at Vail, LLC

ATTORNEYS' EYES ONLY

## PHYSICAL THERAPY SERVICES AGREEMENT
## (PROAXIS AND VVSC)

**THIS PHYSICAL THERAPY AGREEMENT** ("Agreement") is entered into by and between Vail Valley Surgery Center, LLC ("VVSC") and Proaxis Vail, LLC ("Group") and is dated as of ~~April 2~~, 2012 (the "Effective Date").

## RECITALS

**WHEREAS,** VVSC is developing an ambulatory surgery center located at 320 Beard Creek Road, Edwards, Colorado, which is expected to open in 2012 (the "Surgery Center"); and

**WHEREAS,** the Group is comprised of a staff which includes (1) physical therapists and occupational therapists who are registered to practice in the State of Colorado and have specialized training ("Therapists"), and (2) athletic trainers, therapy assistants, aides, technicians, and/or students who work for Group and operate under the supervision of Therapists ("PT Staff"); and

**WHEREAS,** VVSC wishes to facilitate the delivery of physical therapy and rehabilitation services ("Services") to its patients at the Surgery Center, therefore VVSC wishes to engage Group to provide Services to patients at appropriate locations within the Surgery Center all on the terms and conditions herein set forth.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants herein, the parties agree:

1.      Obligations of VVSC.

        1.1  Operation of VVSC.  The VVSC shall operate, maintain and provide to the Group, space within the Surgery Center, including such space as may be reasonably necessary for the proper and efficient operation and conduct of Services.

        1.2  Equipment and Supplies.  The VVSC shall provide equipment, support services, utilities and all medical and hospital supplies as may be necessary for the proper and efficient operation and conduct of Services.

        1.3  Telephone Service.  VVSC shall provide and maintain telephone service in the Surgery Center for the use of Group in connection with the provision of Services but VVSC shall not be responsible for the cost of an answering service, cell phones, pagers or other telecommunications expense or for unauthorized long-distance calls made by any person to or on behalf of the Group, all of which shall be at the Group's sole expense.

        1.4  Non-Therapist Personnel.  All personnel, other than Therapists and PT Staff, required for the provision of Services in the Surgery Center, shall be employed and paid by VVSC, consistent with applicable budgets, VVSC rules, regulations, policies, personnel classifications

DM2\3465086.2

and salary structures.  All personnel decisions concerning these non-Therapist and non-PT Staff personnel, including, without limitation, salary decisions and termination or hiring decisions shall be made by VVSC.

2.      Obligations of the Group.

2.1  Group shall provide physical therapy services for any patient of VVSC.  All persons who receive Services in the Surgery Center shall be regarded as and shall be registered as patients of the Surgery Center.  All Services shall be provided in accordance with generally accepted professional standards, professional ethics, and in a manner which promotes continuity of care. Group shall not make any contracts or subcontracts for the provision of any Services it is obliged to provide pursuant to this Agreement with any person or persons who are not employees, or associates, or agents of Group, without the prior written consent of VVSC.

2.2  Therapist Requirements.  Any Therapist providing Services pursuant to this Agreement must be fully registered to practice physical therapy or occupational therapy in the State of Colorado, competent and qualified by reason of training and experience to provide physical and/or occupational therapy and rehabilitative services and an allied health member in good standing of the Medical Staff of the Vail Valley Medical Center.  If any Therapist offering or performing professional services under this Agreement has his or her membership on the Vail Valley Medical Center's medical staff terminated for any reason or if adverse, corrective or disciplinary action is taken or imposed with respect to the hospital privileges or medical staff membership status of any such Therapist, such Therapist shall not perform professional services under this Agreement and Group shall arrange for other Therapist coverage.

2.3  General PT Staff Requirements.  Group shall use its best efforts to insure that all PT Staff are qualified to perform Services under this Agreement (whether employed by Group or independent contractors), including but not limited to assistants, aides, and technicians and that the PT Staff provide the Services consistent with applicable VVSC rules, regulations and policies.  Group will use its reasonable efforts to cause all PT Staff to attend VVSC orientation and represent themselves as an extension of VVSC in communication, dress, and mannerisms.  If any PT Staff is in material violation of Vail Valley Medical Center or VVSC rules, regulations or policies or in material violation of this Agreement, Group agrees that VVSC has the right to request that Group initiate and document to VVSC appropriate disciplinary action or if Group fails to cure such violation within 30 days, VVSC shall have the right to request that the offending person no longer provide Services under this Agreement.  Group must meet/provide all immunization requirements for PT Staff, as well as other VVSC employee requirements. Additionally, Group will assure that all PT Staff providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

2.4  Utilization of Students.  Group shall use its reasonable efforts to assure that all students sponsored by Group, including but not limited to student physical therapists, assistants, aides, and technicians, comply with Vail Valley Medical Center and VVSC rules, regulations and policies.  All students sponsored by Group shall operate under the direct supervision of a

- 2 -

DM2\3465086.2

ATTORNEYS' EYES ONLY

Therapist. Group will use its reasonable efforts to cause all students to represent themselves as an extension of VVSC in communication, dress, and mannerisms. If any Student is in material violation of Vail Valley Medical Center or VVSC rules, regulations or policies or in material violation of this Agreement, and Group has failed to cure such violation within 30 days after receipt of written notice of such violation, Group agrees that VVSC shall have the right to request that the offending student no longer provide Services under this Agreement. Additionally, Group will assure that all Students providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

2.5  Policies and Standards.  The Group shall provide coverage and professional services in accordance with all applicable policies governing medical standards for the delivery of Services as may be adopted from time to time by the Medical Staff of VVSC. These policies shall be reviewed at least annually by a representative of VVSC Medical Staff and a member of VVSC's Administrative Staff designated by the Governing Council of VVSC with input of the Group. These policies shall incorporate, but not be limited to, applicable standards for the delivery of Services as may be set forth by the Accreditation Association for Ambulatory Healthcare, and the Colorado Department of Public Health and Environmental Chapter for General Hospitals, and the standards set forth by the American Physical Therapy Association as amended from time to time.

2.6  Compliance with Law.  Group shall: (a) cooperate with VVSC so that VVSC may meet any requirements related to the provision of Services in the Surgery Center imposed on VVSC by all applicable federal, state and municipal statutes, regulations and ordinances, as amended from time to time; (b) at all times during the term of this Agreement, comply in all material respects with all applicable federal, state or municipal statutes, regulations and ordinances, as amended from time to time, in connection with performing its obligations under this Agreement

2.7  Malpractice Liability Insurance.  Any Therapist or PT Staff member providing services hereunder shall be covered by malpractice liability insurance of at least One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate. Such policy or policies shall be subject to the reasonable approval of VVSC and shall be maintained in full force during the entire term of this Agreement. Such limits are subject to change, but at all times coverage must be in an amount as required by VVSC's medical staff bylaws. Any cancellation or modification of any such policy shall be reported immediately to VVSC. Group and/or each Therapist shall provide VVSC, upon request, with certificates of such insurance coverage and/or statements from the insurance carrier(s) that VVSC will be notified at least 30 days prior to any cancellation, non-renewal or change in such coverage.

2.8  Cooperation Regarding External Audits and Investigations.  Except to the extent specifically prohibited by law, Group shall cooperate in connection with any audit or investigation of VVSC by any governmental or other third-party payer or insurance carrier with respect to services provided or billings submitted under this Agreement. Group shall notify the VVSC Manager in writing within three (3) days of receipt by Group of any subpoena or other request for information (including requests for interviews of Group's personnel) other than routine requests

- 3 -

DM2\3465086.2

ATTORNEYS' EYES ONLY

from patients or payers in the ordinary course of business regarding billings subject to this Agreement.

3.  <u>Compensation, Fees and Charges</u>.

    3.1 <u>Billing for Professional Medical Services</u>.  VVSC shall be solely responsible for, and solely entitled to, billing and collection of all charges for all professional physical therapy services provided by Group and Therapists in connection with this Agreement ("Billings For Professional Physical Therapy Services").  All Billings For Professional Physical Therapy Services, if any such billings are permitted by law, will be under VVSC's own provider number and at its own expense.  All professional therapy services billed by VVSC will be provided by Group or Therapists or "incident to" such Therapists' services as defined in the Medicare Carriers Manual.  VVSC will be responsible for maintaining all documentation required to support such charges and Group and Therapists shall cooperate in preparing and maintaining timely and accurate records of all medical services provided to support such charges.  VVSC shall defend, indemnify and hold Group harmless from all liability or damages with respect to VVSC's billing activities, except to the extent that such liability or damages arise from the negligence or willful misconduct of Group or any of its agents or employees.

    3.2 <u>Billing and Collection</u>.  VVSC may, if allowed by law, bill and collect all professional charges for Group's Services under this Agreement.  Group shall not bill any payers or beneficiaries for any Services provided under this Agreement, including any co-payments or deductibles.

    3.3 <u>Billing and Documentation Procedures</u>.  Group shall cause each Therapist and PT Staff member to become familiar with all billing and documentation procedures as reasonably requested by VVSC, and Group shall cooperate with VVSC in implementing and adhering to billing and documentation procedures established by VVSC. Group shall certify compliance with this Section 3.3 to VVSC upon written request.

    3.4 <u>Monthly Payment Calculation</u>.  Group will be compensated for professional services rendered by Group pursuant to this Agreement by monthly payments calculated in accordance with the following methodology:

    <u>Step 1</u> – Group shall prepare and deliver to VVSC a monthly usage report for all professional services rendered by Group for the previous month not later than the tenth working or business day of the following month.  The usage report will include all professional services provided by Group at the Surgery Center.  The usage report will identify each distinct service rendered at the Surgery Center, the corresponding CPT code and modifier, if applicable, for each such service, each date of service, and the number of times each such service was provided in the previous month.

    <u>Step 2</u> – Group shall maintain a RVU table (the "Credited RVU Table") that will establish the RVUs to be credited to Group for each CPT code.  The Credited RVU Table for Group is attached hereto as <u>Addendum A</u> from the most recent Medicare

DM2\3465086.2

ATTORNEYS' EYES ONLY

VAIL_00003452

RBRVS (Resource-Based Relative Value Scale) Physician Fee Schedule.  The Credited RVU Table may, by mutual agreement, have additional services added to it, together with assigned codes and RVU values.  Only the work and malpractice RVUs, adjusted by the Colorado GPSI index, will be used to establish credited RVUs.  For services for which a "54" modifier are appended, the work and malpractice RVU values shall be reduced by thirty percent (30%).  If new services are offered during the course of this Agreement and the associated CPT code for the new service is included as an active service in the RBRVS Physician Fee Schedule that is current at the time the new service is first offered, the new service will be added to the RVU table and included in the calculation of Group's compensation from the date the service is added to the RVU table.  It is the responsibility of Group to provide written notification to VVSC of any new services it believes should be added to the Credited RVU Table. VVSC has no obligation to retroactively credit RVUs associated with new services for which Group has not provided written notification.  Only services included in the Credited RVU Table will be used to establish credited RVUs for the month during which the services were rendered.

Step 3 – Group will calculate the total RVUs credited to Group by matching the usage report described in Step 1 with the Credited RVU Table described in Step 2 to arrive at the total credited work and malpractice RVUs generated by Group.

Step 4– Each work and malpractice RVU credited to Group will be valued using a "Conversion Factor" of $78.44, subject to adjustment as provided in Section 3.5 below.  This Conversion Factor will be used in determining the monthly compensation owed by VVSC to Group.  The total monthly payment will be calculated by multiplying the total credited work and malpractice RVUs described in Step 3 by the Conversion Factor.

Step 5 – A 20% discount shall be applied to the entire monthly bill by Group prior to submission to VVSC. This discount is provided in consideration for patients seen at VVSC whose care is billed to VVSC but whom could potentially be eligible to receive care on an outpatient basis. Both parties have agreed that this is the best methodology for providing the best possible care, in the right environment, while considering the financial impact to both parties.

3.5 Adjustments to Conversion Factor.  The Conversion Factor shall be subject to a Consumer Price Index ("CPI") adjustment effective at the first day of the second year of this Agreement and on the first day of each year of this Agreement thereafter (in each case, the "Adjustment Date") as follows:

    (a)     The Consumer Price Index for all Urban Consumers, Denver, Boulder, Metro Area - All Items Index (CPI-U, 1982-84 equals 100), published by the United States Department of Labor, Bureau of Labor Statistics, shall be the "Index."  The number indicated in the Index for the month in which the Commencement Date occurred and for the year then in effect, the Base Rent for which is be adjusted for the subsequent year,

- 5 -

DM2:3465086.2

ATTORNEYS' EYES ONLY

shall be the "Initial Base Index". The number indicated in the Index for the month nearest the Adjustment Date shall be the "Current Index". (Notwithstanding the foregoing, if the Index is published with numbers issued other than on a monthly basis, the Index number published for the date closest to the Commencement Date or the applicable Adjustment Date shall be the approximate Index number for determining the Initial Base Index or Current Index.)

(b)     On each Adjustment Date, the Current Index shall be compared to the Initial Base Index. If the Current Index has increased over the Initial Base Index, the Conversion Factor, throughout that year (and continuing until the next conversion factor adjustment) shall be set by multiplying the Conversion Factor for the previous year by a fraction, the numerator of which is the Current Index, and the denominator of which is the Initial Base Index. In no case shall the Conversion Factor as adjusted be less than the applicable Conversion Factor for the previous year.

(c)     If, on any Adjustment Date, the Current Index number is not yet available, the Conversion Factor shall remain the same as for the previous year, as it may have been increased through CPI adjustments or otherwise, until the Current Index number is published and available. At that time the Conversion Factor shall be adjusted and payments to the Group shall be adjusted retroactively from the applicable Adjustment Date.

(d)     If the Index is discontinued, the CPI adjustment shall be made using comparable statistics on the cost of living for the Denver, Boulder metropolitan area as computed and published by any agency of the United States Government or by a responsible financial periodical or recognized authority selected in the reasonable discretion of VVSC.

3.6 Annual Payment Reconciliation.   Within sixty (60) days following the end of each VVSC fiscal year, a reconciliation of the payments made pursuant to this Agreement during that fiscal year will be made. This reconciliation will be made by following the same four step methodology described above, but will utilize a usage report for the entire prior fiscal year. The annual reconciliation will account for any positive or negative adjustments made to service volumes for prior periods over the course of the year. The annual payment calculation will be compared to the sum of the payments made during the prior fiscal year. Any overpayments made to Group will be deducted from the next month's payment and following months, if necessary, for Services. If the remaining payments due Group under the Agreement are insufficient to fully reimburse the overpayment, Group shall pay the balance due within ten (10) days after the last payment credited toward the overpayment. Any underpayment owed by VVSC to Group will be added to the next month's payment for Services.

3.7 Medicare/Medicaid Claims. Group understands, and will ensure that all Therapists and PT Staff furnishing services on behalf of Group pursuant to this Agreement understand, that VVSC may submit claims to Medicare, Medicaid, and other governmental and private third party payers for physical therapy services and for hospital services. Group certifies that all encounter and medical record documentation prepared by Therapists or PT Staff shall be true and correct in all material respects and accurately represent each patient's medical condition, the

- 6 -

ATTORNEYS' EYES ONLY

Services provided, and other facts and circumstances surrounding Services provided pursuant to this Agreement. Group understands, and will ensure that all Therapists and PT Staff understand, that the submission of false information or the making of false claims to government or private health care payers may result in administrative, civil, and criminal sanctions against Group, VVSC, and such individual Therapist or PT Staff member. Group acknowledges that false or inaccurate statements in connection with billings or in medical records or other patient encounter documentation is not acceptable to VVSC and that failure to comply with this Section 3.7 would be a material breach of this Agreement.

4.     Independent Contractor Status.

      4.1 Group Services. The Group and any Therapist and PT Staff member, if directly employed by Group, providing Service under this Agreement shall not be employees of VVSC. The services of Group and any such Therapists and PT Staff member shall be those of independent contractors exercising their independent professional medical judgment.   The Group shall be subject to any quality assurance, peer or utilization review program established by VVSC and the Medical Staff Bylaws of the Vail Valley Medical Center or of VVSC.

      4.2 Benefits. Neither the Group nor any Therapist or PT Staff member providing services under this Agreement shall be entitled to any of the rights or privileges of employment established for VVSC's employees such as, but not limited to, vacation and sick leave with pay, paid holidays, life, accident or health insurance, workers compensation insurance or benefits, or severance pay upon termination of employment.

      4.3 Workers Compensation Insurance. The Group agrees to be responsible for procuring and maintaining adequate workers compensation insurance coverage for the Therapists and PT Staff members and other individuals employed by the Group who provide services under this Agreement in accordance with the requirements of the laws of the State of Colorado. The Group further agrees that if it fails to procure and maintain such workers compensation insurance, then (1) VVSC shall not be responsible for any injury sustained by a Therapist or PT Staff member or other individual employed by the Group which would have been covered by such workers compensation insurance and (2) the Group shall indemnify and hold harmless VVSC from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by VVSC as a result of any injury sustained by a Therapist, PT Staff member, or other individual employed by the Group which would have been covered by such workers compensation insurance.

5.     Taxes.

      5.1 Group Taxes. The Group shall be solely responsible for the payment of any and all federal, state or local taxes with respect to any income or compensation earned by the Group or any Therapist or PT Staff member under this Agreement, including federal and state withholding, FICA, FUTA, self-employment or any other such taxes.  VVSC shall have no liability for such taxes. Group shall indemnify and hold VVSC harmless from any and all damages, payments, losses and costs, including attorneys' fees, in the event that VVSC is determined by the Internal

- 7 -

DM2:3465086.2

Revenue Service, any court of law or any governmental taxing authority to be liable or responsible for such taxes.

5.2 <u>VVSC Taxes</u>. VVSC shall be solely responsible for the payment of any and all federal, state and local taxes with respect to any income or compensation earned by VVSC or any VVSC employee, including federal and state withholding, FICA, FUTA, or any other such taxes and any and all use or other taxes imposed on VVSC or related to the ownership of the equipment and other assets of VVSC.

6.      INTENTIONALLY LEFT BLANK

7.      <u>Powers and Authority</u>. Nothing in this Agreement shall give Group the power or authority to contractually bind VVSC as to any matter without prior written authorization of VVSC, which authorization may be withheld by VVSC in its sole and absolute discretion.

8.      <u>Confidentiality of Information</u>. The Group shall not disclose to any person confidential information relating to the operation or administration of VVSC or the provision of Services, including, without limitation, confidential patient information or information contained in the medical records of VVSC, without prior written consent of VVSC or, where applicable, the patient or unless and to the extent expressly required by applicable law, or as required by the malpractice liability carriers insuring the Group regarding a claim or potential claim under such malpractice policy.

9.      <u>Indemnification</u>.

9.1 <u>Indemnification of VVSC</u>. It is agreed that VVSC shall not be held liable for any act, error or omission of the Group or any Therapist rendering professional services pursuant to this Agreement. The Group shall indemnify and hold harmless VVSC from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by VVSC as a result of any action, omission, or inaction of the Group, or its agents, associates or subcontractors under the terms of this Agreement. However, this subparagraph shall not operate to indemnify VVSC or relieve its liability with respect to any claims, damages, liabilities and judgments, including costs, expenses and attorney's fees, incurred as a result of any actions taken or omitted by VVSC, its agents, subcontractors, employees, or assignees other than the Group.

9.2 <u>Indemnification of Group</u>. VVSC shall indemnify and hold harmless the Group from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by the Group as a result of any action, omission, or inaction of VVSC, or its agents, associates or subcontractors under the terms of this Agreement to the extent such acts are covered by VVSC's insurance coverage.

10.     <u>Amendment</u>. This Agreement shall not be amended except in writing executed by both parties.

DM2\3465086.2

- 8 -

11.     Term of Agreement.  The term of this Agreement shall be for a period of twelve (12) months beginning on the Effective Date.

12.     Termination.

12.1   Generally.  Either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement, provided such breach continues for five (5) days after receipt by the breaching party of written notice of non-performance of a monetary obligation or thirty (30) days after receipt by the breaching party of written notice of any other such breach from the non-breaching party.

12.2   Immediate Termination by VVSC.  VVSC may terminate this Agreement, or retain at VVSC's expense additional Therapists to the extent necessary to provide adequate Therapist coverage, immediately by written notice to the Group upon the occurrence of any of the following events:

        (a) The denial, suspension, revocation, termination, lapse, or voluntary relinquishment (under threat of disciplinary action) of any Therapist's license to render physical therapy services  in the State of Colorado if such therapist is not immediately prohibited by the Group from providing any Services hereunder;

        (b) The denial, suspension, revocation, termination, relinquishment (under threat of disciplinary action), of any Therapist's Medical Staff membership or privileges at any health care facility, or of any such Therapists' registration, certificate, or license to practice physical or occupational therapy in any jurisdiction other than the State of Colorado and such event is known to Group and such Therapist is not immediately prohibited by Group from providing any Services hereunder;

        (c) Breach by the Group of any of the confidentiality provisions hereof;

        (d) Failure by the Group to maintain all insurance required under this Agreement if such insurance is not reinstated within five (5) business days after Group receives written notice of the lapse of a required insurance policy; or

        (e) Any Therapist's conviction of a criminal offense related to health care, or Therapist's listing by a federal agency as excluded or otherwise ineligible for federal program participation, and such Therapist is not immediately prohibited by the Group from providing Services under this Agreement.

12.3   Termination Due to Legal Event.  If any governmental agency that administers the Medicare, Medicaid, or other federal program (or their representatives or agents), or any other federal, state or local governmental or nongovernmental agency, or any court or administrative tribunal passes, issues or promulgates any law, rule, regulation, standard, interpretation, order, decision or judgment, including but not limited to those relating to any regulations pursuant to state or federal anti-kickback or self-referral statutes (collectively or individually, "Legal Event"),

- 9 -

DM2:3465086.2

ATTORNEYS' EYES ONLY

VAIL_00003457

which, in the good faith professional judgment of either party (the "Noticing Party"), materially and adversely affects such party's licensure, accreditation, certification, or ability to refer, to accept any referral, to bill, to claim, to present a bill or claim, or to receive payment or reimbursement from any federal, state or local governmental or non-governmental payer, or which subjects the Noticing Party to a risk of prosecution or civil monetary penalty, or which, in the good faith professional judgment of the Noticing Party, indicates a rule or regulation with which the Noticing Party desires further compliance, then the Noticing Party may give the other party notice of intent to amend or terminate this Agreement to the extent necessary to address the issues presented by the Legal Event. If the parties hereto are unable to agree, in good faith after a reasonable period of time, on appropriate modifications to the Agreement with respect to the Legal Event, either party shall be entitled to terminate this Agreement immediately upon receipt by the other party of its notice of termination. Except as otherwise required by applicable law, any amounts owing to either party hereunder shall be paid, on a pro rata basis, up to the date of such termination, and any obligation hereunder that is to continue beyond expiration or termination shall so continue pursuant to its terms.

      12.4  <u>Effects of Termination of Agreement on Therapist</u>. Upon the expiration or earlier termination of this Agreement, neither party shall have any further obligation hereunder except for such obligations that had occurred prior to the date of termination and such obligations, promises or covenants contained in this Agreement that expressly extend beyond the term of this Agreement, including the non-competition clause above and tail coverage for medical malpractice.

      13.   <u>Notices</u>. Notice to either party to this Agreement shall be by certified mail, return receipt requested or by hand delivery, with evidence of receipt, to the parties at the following addresses:

| | |
|---|---|
| to VVSC: | Laura Baxley Millard, Administrator<br>Vail Valley Surgery Center<br>181 West Meadow Drive<br>P. O. Box 1270<br>Vail, Colorado 81658 |
| to the Group: | Steve Stalzer<br>Howard Head Sports Medicine<br>181 West Meadow Drive, Suite 100<br>Vail, Colorado 81657 |

14.   <u>Waiver</u>. No waiver of any provision of this Agreement by either party shall be deemed to imply or constitute a further waiver of the same provision or any other provision of this Agreement.

15.   <u>Severability</u>. If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of the remaining provisions hereof shall not be affected, prejudiced or disturbed in any way.

- 10 -

DM2:3465086.2

ATTORNEYS' EYES ONLY

VAIL_00003458

16.     Governing Law.  This Agreement shall be governed by the laws of the State of Colorado.

17.     Headings.  The headings of the various sections of this Agreement are inserted merely for the purpose of convenience and do not expressly or by implication limit, define or extend the specific terms of the sections so designated.

18.     Assignment.  This Agreement may not be assigned by the Group without the prior written approval of VVSC, which approval may be withheld by VVSC in its sole and absolute discretion. This Agreement may be assigned by VVSC without written approval of the Group if the Assignee continues to operate the Surgery Center.  In the event of the sale of the Surgery Center's assets and any other transaction of similar effect where this Agreement would not otherwise be transferred by operation of law, VVSC shall use all reasonable efforts to cause the acquiring entity to assume the obligations of VVSC under this Agreement.

19.     Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, successors, and, in the case of VVSC, assigns.

20.     Medicare Cost-Finding Effect.

        20.1  Generally.  Until the expiration of four (4) years after the furnishing of such services pursuant to this Agreement, the Group shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, this Agreement, and books, documents and records of Group that are necessary to certify the nature and extent of the costs hereunder.

        20.2  Subcontracts.  If Group carries out any of the duties of this Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years from the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, the subcontract, documents, or records of such organization that are necessary to verify the nature and extent of the cost hereunder.

21.     Complete Agreement.  This Agreement contains the complete agreement of the parties and supersedes all other agreements, oral or written, between the parties pertaining to the subject matter herein.

22.     Dispute Resolution and Attorney's Fees.  The parties agree that it is their intent to make a good faith attempt to resolve any dispute between them in an informal and amicable manner. To this end, the parties agree to informally discuss with each other any dispute arising out of this Agreement or any matter relating to the physical therapy services which are the subject matter of this Agreement prior to submitting such dispute to a court of law or arbitrator for final resolution. In the event of any dispute regarding any provision hereof, or arising out of or in connection with

- 11 -

DM2\3465086.2

ATTORNEYS' EYES ONLY

the performance of this Agreement, the parties hereto shall first attempt to resolve any dispute concerning this Agreement or arising in any way out of the performance of this Agreement through nonbinding mediation.  In the event the dispute cannot be resolved within thirty (30) days by the parties in good faith through nonbinding mediation, the dispute shall be settled exclusively by binding arbitration, which shall be conducted in Vail, Colorado or such other venue as near thereto as practicable in accordance with the rules of the American Arbitration Association.  Such arbitration shall be before a single arbitrator acceptable to both parties who shall be bound by applicable law and the terms of this Agreement.

23.     <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts, each of which is an original as against any party whose signature appears on the counterpart. Multiple, separately signed counterparts taken together constitute one and the same instrument. This Agreement is binding when one or more counterparts of it, individually or taken together, bear the signatures of all of the parties.

        IN WITNESS WHEREOF, the parties have executed this Agreement at Vail, Colorado.

**VAIL VALLEY SURGERY CENTER, LLC**

Date: 4-2-12

By: _____
        Laura Baxley-Millard, Administrator

**PROAXIS VAIL, LLC**

Date: 4-02-2012

By: _____
        Steve Stalzer, Regional President

- 12 -

DM2\3465086.2

ADDENDUM A

CREDITED RVU TABLE

DM2\3465086.2

ATTORNEYS' EYES ONLY

VAIL_00003461

### PHYSICAL THERAPY SERVICES AGREEMENT
### (Proaxis AND VVSC)

**THIS PHYSICAL THERAPY AGREEMENT** ("Agreement") is entered into by and between Vail Valley Surgery Center, LLC ("VVSC") and Proaxis Vail, LLC. ("Group") and is dated as of January 1, 2012.

### RECITALS

**WHEREAS,** VVSC is the operator of a licensed ambulatory surgery center located in premises owned by and leased from Vail Valley Medical Center in Vail, Colorado; and

**WHEREAS,** the Group is comprised of a staff which includes (1) physical therapists and occupational therapists who are registered to practice in the State of Colorado and have specialized training ("Therapists"), and (2) athletic trainers, therapy assistants, aides, technicians, and/or students who work for Group and operate under the supervision of Therapists ("PT Staff"); and

**WHEREAS,** VVSC wishes to facilitate the delivery of physical therapy and rehabilitation services ("Services") to its patients, therefore VVSC wishes to engage Group to provide Services to patients at appropriate locations within the Surgery Center ("Surgery Center") all on the terms and conditions herein set forth.

**NOW, THEREFORE,** in consideration of the mutual promises and covenants herein, the parties agree:

1.      Obligations of VVSC.

        1.1 Operation of VVSC. The VVSC shall operate, maintain and provide to the Group, space within the Surgery Center, including such space as may be reasonably necessary for the proper and efficient operation and conduct of Services.

        1.2 Equipment and Supplies. The VVSC shall provide equipment, support services, utilities and all medical and hospital supplies as may be necessary for the proper and efficient operation and conduct of Services.

        1.3 Telephone Service. VVSC shall provide and maintain telephone service in the Surgery Center for the use of Group in connection with the provision of Services but VVSC shall not be responsible for the cost of an answering service, cell phones, pagers or other telecommunications expense or for unauthorized long-distance calls made by any person to or on behalf of the Group, all of which shall be at the Group's sole expense.

RPCK041208                                      1

1.4 <u>INTENTIONALLY LEFT BLANK</u>

1.5 <u>INTENTIONALLY LEFT BLANK</u>

1.6 <u>Non-Therapist Personnel</u>. All personnel, other than Therapists and PT Staff, required for the provision of Services in the Surgery Center, shall be employed and paid by VVSC, consistent with applicable budgets, VVSC rules, regulations, policies, personnel classifications and salary structures. All personnel decisions concerning these non-Therapist and non-PT Staff personnel, including, without limitation, salary decisions and termination or hiring decisions shall be made by VVSC.

2.     <u>Obligations of the Group</u>.

2.1  Group shall provide physical therapy services for any patient of VVSC. All persons who receive Services in the Surgery Center shall be regarded as and shall be registered as patients of the Surgery Center. All Services shall be provided in accordance with generally accepted professional standards, professional ethics, and in a manner which promotes continuity of care. Group shall not make any contracts or subcontracts for the provision of any Services it is obliged to provide pursuant to this Agreement with any person or persons who are not employees, or associates, or agents of Group, without the prior written consent of VVSC.

2.2  <u>Therapist Requirements</u>. Any Therapist providing Services pursuant to this Agreement must be fully registered to practice physical therapy or occupational therapy in the State of Colorado, competent and qualified by reason of training and experience to provide physical and/or occupational therapy and rehabilitative services and an allied health member in good standing of the Medical Staff of the Vail Valley Medical Center. If any Therapist offering or performing professional services under this Agreement has his or her membership on the Vail Valley Medical Center's medical staff terminated for any reason or if adverse, corrective or disciplinary action is taken or imposed with respect to the hospital privileges or medical staff membership status of any such Therapist, such Therapist shall not perform professional services under this Agreement and Group shall arrange for other Therapist coverage.

2.3  <u>General PT Staff Requirements</u>. Group shall use its best efforts to insure that all PT Staff are qualified to perform Services under this Agreement (whether employed by Group or independent contractors), including but not limited to assistants, aides, and technicians and that the PT Staff provide the Services consistent with applicable VVSC rules, regulations and policies. Group will use its reasonable efforts to cause all PT Staff to attend VVSC orientation and represent themselves as an extension of VVSC in communication, dress, and mannerisms. If any PT Staff is in material violation of Vail Valley Medical Center or VVSC rules, regulations or policies or in material violation of this Agreement, Group agrees that VVSC has the right to request that Group initiate and document to VVSC appropriate disciplinary action or if Group fails to cure such violation within 30 days, VVSC shall have the right to request that the offending person no longer provide Services under this Agreement. Group must meet/provide all immunization requirements for PT Staff, as well as other VVSC employee requirements. Additionally, Group will assure that all PT Staff providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph

ATTORNEYS' EYES ONLY                                                                    VAIL_00003463

be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

    2.4 <u>Utilization of Students</u>.  Group shall use its reasonable efforts to assure that all students sponsored by Group, including but not limited to student physical therapists, assistants, aides, and technicians, comply with Vail Valley Medical Center and VVSC rules, regulations and policies.  All students sponsored by Group shall operate under the direct supervision of a Therapist.  Group will use its reasonable efforts to cause all students to represent themselves as an extension of VVSC in communication, dress, and mannerisms.  If any Student is in material violation of Vail Valley Medical Center or VVSC rules, regulations or policies or in material violation of this Agreement, and Group has failed to cure such violation within 30 days after receipt of written notice of such violation, Group agrees that VVSC shall have the right to request that the offending student no longer provide Services under this Agreement.  Additionally, Group will assure that all Students providing Services under this Agreement shall be covered by workers compensation insurance as provided in Paragraph 4.3 and by liability insurance as provided in Paragraph 2.7.

    2.5 <u>Policies and Standards</u>.  The Group shall provide coverage and professional services in accordance with all applicable policies governing medical standards for the delivery of Services as may be adopted from time to time by the Medical Staff of VVSC.  These policies shall be reviewed at least annually by a representative of VVSC Medical Staff and a member of VVSC's Administrative Staff designated by the Governing Council of VVSC with input of the Group.  These policies shall incorporate, but not be limited to, applicable standards for the delivery of Services as may be set forth by the Accreditation Association for Ambulatory Healthcare, and the Colorado Department of Public Health and Environmental Chapter for General Hospitals, and the standards set forth by the American Physical Therapy Association as amended from time to time.

    2.6 <u>Compliance with Law</u>.  Group shall: (a) cooperate with VVSC so that VVSC may meet any requirements related to the provision of Services in the Surgery Center imposed on VVSC by all applicable federal, state and municipal statutes, regulations and ordinances, as amended from time to time; (b) at all times during the term of this Agreement, comply in all material respects  with all applicable federal, state or municipal statutes, regulations and ordinances, as amended from time to time, in connection with performing its obligations under this Agreement

    2.7 <u>Malpractice Liability Insurance</u>.  Any Therapist or PT Staff member providing services hereunder shall be covered by malpractice liability insurance of at least One Million Dollars ($1,000,000) per occurrence and Three Million Dollars ($3,000,000) in the aggregate. Such policy or policies shall be subject to the reasonable approval of VVSC and shall be maintained in full force during the entire term of this Agreement.  Such limits are subject to change, but at all times coverage must be in an amount as required by VVSC's medical staff bylaws.  Any cancellation or modification of any such policy shall be reported immediately to VVSC.  Group and/or each Therapist shall provide VVSC, upon request, with certificates of such insurance coverage and/or statements from the insurance carrier(s) that VVSC will be notified at least 30 days prior to any cancellation, non-renewal

RPCK041208                                      3

ATTORNEYS' EYES ONLY

least 30 days prior to any cancellation, non-renewal or change in such coverage.

2.8 <u>Cooperation Regarding External Audits and Investigations</u>.  Except to the extent specifically prohibited by law, Group shall cooperate in connection with any audit or investigation of VVSC by any governmental or other third-party payer or insurance carrier with respect to services provided or billings submitted under this Agreement.  Group shall notify the VVSC Manager in writing within three (3) days of receipt by Group of any subpoena or other request for information (including requests for interviews of Group's personnel) other than routine requests from patients or payers in the ordinary course of business regarding billings subject to this Agreement.

3.      <u>Compensation, Fees and Charges</u>.

3.1 <u>Billing for Professional Medical Services</u>.  VVSC shall be solely responsible for, and solely entitled to, billing and collection of all charges for all professional physical therapy services provided by Group and Therapists in connection with this Agreement ("Billings For Professional Physical Therapy Services").  All Billings For Professional Physical Therapy Services, if any such billings are permitted by law, will be under VVSC's own provider number and at its own expense.  All professional therapy services billed by VVSC will be provided by Group or Therapists or "incident to" such Therapists' services as defined in the Medicare Carriers Manual.  VVSC will be responsible for maintaining all documentation required to support such charges and Group and Therapists shall cooperate in preparing and maintaining timely and accurate records of all medical services provided to support such charges.  VVSC shall defend, indemnify and hold Group harmless from all liability or damages with respect to VVSC's billing activities.

3.2 <u>Billing and Collection</u>.  VVSC may, if allowed by law, bill and collect all professional charges for Group's Services under this Agreement.  Group shall not bill any payers or beneficiaries for any Services provided under this Agreement, including any co-payments or deductibles.

3.3 <u>Billing and Documentation Procedures</u>.  Group shall cause each Therapist and PT Staff member to become familiar with all billing and documentation procedures as reasonably requested by VVSC, and Group shall cooperate with VVSC in implementing and adhering to billing and documentation procedures established by VVSC.

3.4 <u>Monthly Payment Calculation</u>.  Group will be compensated for professional services rendered by Group pursuant to this Agreement by monthly payments calculated in accordance with the following methodology:

<u>Step 1</u> – Group shall prepare and deliver to VVSC a monthly usage report for all professional services rendered by Group for the previous month not later than the tenth working or business day of the following month.  The usage report will include all professional services provided by Group at the Surgery Center.  The usage report will identify each distinct service rendered at the Surgery Center, the corresponding CPT code and modifier, if applicable, for each such

ATTORNEYS' EYES ONLY

and modifier, if applicable, for each such service, each date of service, and the number of times each such service was provided in the previous month.

Step 2 – Group shall maintain a RVU table (the "Credited RVU Table") that will establish the RVUs to be credited to Group for each CPT code. The Credited RVU Table for Group is attached hereto as Addendum A from the most recent Medicare RBRVS (Resource-Based Relative Value Scale) Physician Fee Schedule. The Credited RVU Table may, by mutual agreement, have additional services added to it, together with assigned codes and RVU values. Only the work and malpractice RVUs, adjusted by the Colorado GPSI index, will be used to establish credited RVUs. For services for which a "54" modifier are appended, the work and malpractice RVU values shall be reduced by thirty percent (30%). If new services are offered during the course of this Agreement and the associated CPT code for the new service is included as an active service in the RBRVS Physician Fee Schedule that is current at the time the new service is first offered, the new service will be added to the RVU table and included in the calculation of Group's compensation from the date the service is added to the RVU table. It is the responsibility of Group to provide written notification to VVSC of any new services it believes should be added to the Credited RVU Table. VVSC has no obligation to retroactively credit RVUs associated with new services for which Group has not provided written notification. Only services included in the Credited RVU Table will be used to establish credited RVUs for the month during which the services were rendered.

Step 3 – Group will calculate the total RVUs credited to Group by matching the usage report described in Step 1 with the Credited RVU Table described in Step 2 to arrive at the total credited work and malpractice RVUs generated by Group.

Step 4– Each work and malpractice RVU credited to Group will be valued using a "Conversion Factor" of $78.44, subject to adjustment as provided in Section 3.5 below. This Conversion Factor will be used in determining the monthly compensation owed by VVSC to Group. The total monthly payment will be calculated by multiplying the total credited work and malpractice RVUs described in Step 3 by the Conversion Factor.

Step 5 – A 20% discount shall be applied to the entire monthly bill by Group prior to submission to VVSC. This discount is provided in consideration for patients seen at VVSC whose care is billed to VVSC but whom could potentially be eligible to receive care on an outpatient basis. Both parties have agreed that this is the best methodology for providing the best possible care, in the right environment, while considering the financial impact to both parties.

3.5 Adjustments to Conversion Factor. The Conversion Factor shall be subject to a Consumer Price Index (CPI") adjustment effective at the first day of the second year of this Agreement and on the first day of each year of this Agreement thereafter (in each case, the "Adjustment Date") as follows:

RPCK041208                              5

(a)      The Consumer Price Index for all Urban Consumers, Denver, Boulder, Metro Area - All Items Index (CPI-U, 1982-84 equals 100), published by the United States Department of Labor, Bureau of Labor Statistics, shall be the "Index."  The number indicated in the Index for the month in which the Commencement Date occurred and for the year then in effect, the Base Rent for which is be adjusted for the subsequent year, shall be the "Initial Base Index".  The number indicated in the Index for the month nearest the Adjustment Date shall be the "Current Index".  (Notwithstanding the foregoing, if the Index is published with numbers issued other than on a monthly basis, the Index number published for the date closest to the Commencement Date or the applicable Adjustment Date shall be the approximate Index number for determining the Initial Base Index or Current Index.)

(b)      On each Adjustment Date, the Current Index shall be compared to the Initial Base Index.  If the Current Index has increased over the Initial Base Index, the Conversion Factor, throughout that year (and continuing until the next conversion factor adjustment) shall be set by multiplying the Conversion Factor for the previous year by a fraction, the numerator of which is the Current Index, and the denominator of which is the Initial Base Index.  In no case shall the Conversion Factor as adjusted be less than the applicable Conversion Factor for the previous year.

(c)      If, on any Adjustment Date, the Current Index number is not yet available, the Conversion Factor shall remain the same as for the previous year, as it may have been increased through CPI adjustments or otherwise, until the Current Index number is published and available.  At that time the Conversion Factor shall be adjusted and payments to the Group shall be adjusted retroactively from the applicable Adjustment Date.

(d)      If the Index is discontinued, the CPI adjustment shall be made using comparable statistics on the cost of living for the Denver, Boulder metropolitan area as computed and published by any agency of the United States Government or by a responsible financial periodical or recognized authority selected in the reasonable discretion of VVSC.

3.6 Annual Payment Reconciliation.  Within sixty (60) days following the end of each VVSC fiscal year, a reconciliation of the payments made pursuant to this Agreement during that fiscal year will be made.  This reconciliation will be made by following the same four step methodology described above, but will utilize a usage report for the entire prior fiscal year.  The annual reconciliation will account for any positive or negative adjustments made to service volumes for prior periods over the course of the year.  The annual payment calculation will be compared to the sum of the payments made during the prior fiscal year.  Any overpayments made to Group will be deducted from the next month's payment and following months, if necessary, for Services.  If the remaining payments due Group under the Agreement are insufficient to fully reimburse the overpayment, Group shall pay the balance due within ten (10) days after the last payment credited toward the overpayment.  Any underpayment owed by VVSC to Group will be added to the next month's payment for Services.

RPCK041208                               6

                                                           VAIL_00003467

3.7 <u>Medicare/Medicaid Claims</u>. Group understands, and will ensure that all Therapists and PT Staff furnishing services on behalf of Group pursuant to this Agreement understand, that VVSC may submit claims to Medicare, Medicaid, and other governmental and private third party payers for physical therapy services and for hospital services.  Group certifies that all encounter and medical record documentation prepared by Therapists or PT Staff shall be true and correct in all material respects and accurately represent each patient's medical condition, the Services provided, and other facts and circumstances surrounding Services provided pursuant to this Agreement.  Group understands, and will ensure that all Therapists and PT Staff understand, that the submission of false information or the making of false claims to government or private health care payers may result in administrative, civil, and criminal sanctions against Group, VVSC, and such individual Therapist or PT Staff member.  Group acknowledges that false or inaccurate statements in connection with billings or in medical records or other patient encounter documentation is not acceptable to VVSC and that failure to comply with this Section 3.7 would be a material breach of this Agreement.

4.      <u>Independent Contractor Status</u>.

4.1 <u>Group Services</u>. The Group and any Therapist and PT Staff member, if directly employed by Group, providing Service under this Agreement shall not be employees of VVSC.  The services of Group and any such Therapists and PT Staff member shall be those of independent contractors exercising their independent professional medical judgment.   The Group shall be subject to any quality assurance, peer or utilization review program established by VVSC and the Medical Staff Bylaws of the Vail Valley Medical Center or of VVSC.

4.2 <u>Benefits</u>. Neither the Group nor any Therapist or PT Staff member providing services under this Agreement shall be entitled to any of the rights or privileges of employment established for VVSC's employees such as, but not limited to, vacation and sick leave with pay, paid holidays, life, accident or health insurance, workers compensation insurance or benefits, or severance pay upon termination of employment.

4.3 <u>Workers Compensation Insurance</u>. The Group agrees to be responsible for procuring and maintaining adequate workers compensation insurance coverage for the Therapists and PT Staff members and other individuals employed by the Group who provide services under this Agreement in accordance with the requirements of the laws of the State of Colorado.  The Group further agrees that if it fails to procure and maintain such workers compensation insurance, then (1) VVSC shall not be responsible for any injury sustained by a Therapist or PT Staff member or other individual employed by the Group which would have been covered by such workers compensation insurance and (2) the Group shall indemnify and hold harmless VVSC from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by VVSC as a result of any injury sustained by a Therapist, PT Staff member, or other individual employed by the Group which would have been covered by such workers compensation insurance.

RPCK041208                                        7

ATTORNEYS' EYES ONLY                                                              VAIL_00003468

5.      Taxes.

5.1 Group Taxes.  The Group shall be solely responsible for the payment of any and all federal, state or local taxes with respect to any income or compensation earned by the Group or any Therapist or PT Staff member under this Agreement, including federal and state withholding, FICA, FUTA, self-employment or any other such taxes.  VVSC shall have no liability for such taxes.

5.2 VVSC Taxes.  VVSC shall be solely responsible for the payment of any and all federal, state and local taxes with respect to any income or compensation earned by VVSC or any VVSC employee, including federal and state withholding, FICA, FUTA, or any other such taxes and any and all use or other taxes imposed on VVSC or related to the ownership of the equipment and other assets of VVSC.

6.      INTENTIONALLY LEFT BLANK

7.      Powers and Authority.  Nothing in this Agreement shall give Group the power or authority to contractually bind VVSC as to any matter without prior written authorization of VVSC, which authorization may be withheld by VVSC in its sole and absolute discretion.

8.      Confidentiality of Information.  The Group shall not disclose to any person confidential information relating to the operation or administration of VVSC or the provision of Services, including, without limitation, confidential patient information or information contained in the medical records of VVSC, without prior written consent of VVSC or, where applicable,  the patient or unless and to the extent expressly required by applicable law, or as required by the malpractice liability carriers insuring the Group regarding a claim or potential claim under such malpractice policy.

9.      Indemnification.

9.1 Indemnification of VVSC.  It is agreed that VVSC shall not be held liable for any act, error or omission of the Group or any Therapist rendering professional services pursuant to this Agreement.  The Group shall indemnify and hold harmless VVSC from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by VVSC as a result of any action, omission, or inaction of the Group, or its agents, associates or subcontractors under the terms of this Agreement.  However, this subparagraph shall not operate to indemnify VVSC or relieve its liability with respect to any claims, damages, liabilities and judgments, including costs, expenses and attorney's fees, incurred as a result of any actions taken or omitted by VVSC, its agents, subcontractors, employees, or assignees other than the Group.

9.2 Indemnification of Group.  VVSC shall indemnify and hold harmless the Group from and against any and all claims, damages, liabilities and judgments, including costs, expenses and attorney's fees incurred by the Group as a result of any action, omission, or inaction of VVSC, or its agents, associates or subcontractors under the terms of this Agreement to the extent such acts are covered by VVSC's insurance coverage.

RPCK041208                                              8

10.     Amendment.  This Agreement shall not be amended except in writing executed by both parties.

11.     Term of Agreement.  The term of this Agreement shall be for a period of twelve (12) months beginning January 1, 2012 and ending December 31, 2012.

12.     Termination.

12.1  Generally.  Either party may terminate this Agreement upon breach by the other party of any material provision of this Agreement, provided such breach continues for five (5) days after receipt by the breaching party of written notice of non performance of a monetary obligation or thirty (30) days after receipt by the breaching party of written notice of any other such breach from the non-breaching party.

12.2  Immediate Termination by VVSC.  VVSC may terminate this Agreement, or retain at VVSC's expense additional Therapists to the extent necessary to provide adequate Therapist coverage, immediately by written notice to the Group upon the occurrence of any of the following events:

(a) The denial, suspension, revocation, termination, lapse, or voluntary relinquishment (under threat of disciplinary action) of any Therapist's license to render physical therapy services in the State of Colorado if such therapist is not immediately prohibited by the Group from providing any Services hereunder;

(b) The denial, suspension, revocation, termination, relinquishment (under threat of disciplinary action), of any Therapist's Medical Staff membership or privileges at any health care facility, or of any such Therapists' registration, certificate, or license to practice physical or occupational therapy in any jurisdiction other than the State of Colorado and such event is known to Group and such Therapist is not immediately prohibited by Group from providing any Services hereunder;

(c) INTENTIONALLY LEFT BLANK;

(d) Breach by the Group of any of the confidentiality provisions hereof;

(e) Failure by the Group to maintain all insurance required under this Agreement if such insurance is not reinstated within five (5) business days after Group receives written notice of the lapse of a required insurance policy; or

(f) Any Therapist's conviction of a criminal offense related to health care, or Therapist's listing by a federal agency as excluded or otherwise ineligible for federal program participation, and such Therapist is not immediately prohibited by the Group from providing Services under this Agreement.

RPCK041208                                    9

ATTORNEYS' EYES ONLY                                                    VAIL_00003470

12.3 <u>Termination Due to Legal Event</u>. If any governmental agency that administers the Medicare, Medicaid, or other federal program (or their representatives or agents), or any other federal, state or local governmental or nongovernmental agency, or any court or administrative tribunal passes, issues or promulgates any law, rule, regulation, standard, interpretation, order, decision or judgment, including but not limited to those relating to any regulations pursuant to state or federal anti-kickback or self-referral statutes (collectively or individually, "Legal Event"), which, in the good faith professional judgment of either party (the "Noticing Party"), materially and adversely affects such party's licensure, accreditation, certification, or ability to refer, to accept any referral, to bill, to claim, to present a bill or claim, or to receive payment or reimbursement from any federal, state or local governmental or non-governmental payer, or which subjects the Noticing Party to a risk of prosecution or civil monetary penalty, or which, in the good faith professional judgment of the Noticing Party, indicates a rule or regulation with which the Noticing Party desires further compliance, then the Noticing Party may give the other party notice of intent to amend or terminate this Agreement to the extent necessary to address the issues presented by the Legal Event. If the parties hereto are unable to agree, in good faith after a reasonable period of time, on appropriate modifications to the Agreement with respect to the Legal Event, either party shall be entitled to terminate this Agreement immediately upon receipt by the other party of its notice of termination. Except as otherwise required by applicable law, any amounts owing to either party hereunder shall be paid, on a pro rata basis, up to the date of such termination, and any obligation hereunder that is to continue beyond expiration or termination shall so continue pursuant to its terms.

12.4 <u>Effects of Termination of Agreement on Therapist</u>. Upon the expiration or earlier termination of this Agreement, neither party shall have any further obligation hereunder except for such obligations that had occurred prior to the date of termination and such obligations, promises or covenants contained in this Agreement that expressly extend beyond the term of this Agreement, including the non-competition clause above and tail coverage for medical malpractice.

13. <u>Notices</u>. Notice to either party to this Agreement shall be by certified mail, return receipt requested or by hand delivery, with evidence of receipt, to the parties at the following addresses:

to VVSC:  Laura Baxley Millard, Administrator
Vail Valley Surgery Center
181 West Meadow Drive
P. O. Box 1270
Vail, Colorado 81658

to the Group:  Steve Stalzer
Howard Head Sports Medicine
181 West Meadow Drive, Suite 100

RPCK041208  10

ATTORNEYS' EYES ONLY

Vail, Colorado  81657

14.     Waiver.  No waiver of any provision of this Agreement by either party shall be deemed to imply or constitute a further waiver of the same provision or any other provision of this Agreement.

15.     Severability.  If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity of the remaining provisions hereof shall not be affected, prejudiced or disturbed in any way.

16.     Governing Law.  This Agreement shall be governed by the laws of the State of Colorado.

17.     Headings.  The headings of the various sections of this Agreement are inserted merely for the purpose of convenience and do not expressly or by implication limit, define or extend the specific terms of the sections so designated.

18.     Assignment.  This Agreement may not be assigned by the Group without the prior written approval of VVSC, which approval may be withheld by VVSC in its sole and absolute discretion. This Agreement may be assigned by VVSC without written approval of the Group if the Assignee continues to operate the Surgery Center.  In the event of the sale of the Surgery Center's assets and any other transaction of similar effect where this Agreement would not otherwise be transferred by operation of law, VVSC shall use all reasonable efforts to cause the acquiring entity to assume the obligations of VVSC under this Agreement.

19.     Binding Effect.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective personal representatives, successors, and, in the case of VVSC, assigns.

20.     Medicare Cost-Finding Effect.

        20.1  Generally.  Until the expiration of four (4) years after the furnishing of such services pursuant to this Agreement, the Group shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, this Agreement, and books, documents and records of Group that are necessary to certify the nature and extent of the costs hereunder.

        20.2  Subcontracts.  If Group carries out any of the duties of this Agreement through a subcontract, with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve-month period, with a related organization, such subcontract shall contain a clause to the effect that until the expiration of four (4) years from the furnishing of such services pursuant to such subcontract, the related organization shall make available, upon written request by the Secretary of Health and Human Services, or upon request by the Comptroller General, or any of their duly authorized representatives, the subcontract, documents, or records of such organization that are necessary to verify the nature and extent of the cost hereunder.

RPCK041208                              11

21.    <u>Complete Agreement</u>.  This Agreement contains the complete agreement of the parties and supersedes all other agreements, oral or written, between the parties pertaining to the subject matter herein.

22.    INTENTIONALLY LEFT BLANK

23.    INTENTIONALLY LEFT BLANK

24.    <u>Dispute Resolution and Attorney's Fees</u>.  The parties agree that it is their intent to make a good faith attempt to resolve any dispute between them in an informal and amicable manner. To this end, the parties agree to informally discuss with each other any dispute arising out of this Agreement or any matter relating to the anesthesia services which are the subject matter of this Agreement prior to submitting such dispute to a court of law or arbitrator for final resolution. In the event of any dispute regarding any provision hereof, or arising out of or in connection with the performance of this Agreement, the parties hereto shall first attempt to resolve any dispute concerning this Agreement or arising in any way out of the performance of this Agreement through nonbinding mediation.  In the event the dispute cannot be resolved within thirty (30) days by the parties in good faith through nonbinding mediation, the dispute shall be settled exclusively by binding arbitration, which shall be conducted in Vail, Colorado or such other venue as near thereto as practicable in accordance with the rules of the American Arbitration Association.  Such arbitration shall be before a single arbitrator acceptable to both parties who shall be bound by applicable law and the terms of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement at Vail, Colorado.

**VAIL VALLEY SURGERY CENTER LLC**

Date: 1/18/12                        By: _Laura Baxley Millcard_

Laura Baxley-Millard
Administrator

**PROAXIS VAIL, LLC**

Date: 1/23/2012                    By: _____

Steve Stalzer
Regional President

RPCK041208                                      12

[VVMC LETTERHEAD]

VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED
AND VIA E-MAIL

July ___, 2012

Proaxis Denver, LLC (f/k/a RPC-Denver, LLC)
999 18th Street, Suite 250
Denver, CO 80202

Ladies and Gentlemen:

This letter serves as notice of the non-renewal and termination of the License and Use Agreement between Proaxis Denver, LLC (f/k/a RPC-Denver, LLC) and Vail Clinic, Inc., d/b/a Vail Valley Medical Center, dated as of August 1, 2008 (the "Agreement"), effective as of August 1, 2012, in accordance with Section 2 of the Agreement.

Sincerely,


Doris J. Kirchner
President and Chief Executive Officer,
Vail Valley Medical Center

DM2\3657561.1

ATTORNEYS' EYES ONLY                                                                VAIL_00003447