# Exhibit 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-02075-WJM-GPG

SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,
and LINDSAY WINNINGER, an individual,

      Plaintiffs,

v.

VAIL CLINIC, INC. d/b/a VAIL HEALTH, a Colorado nonprofit corporation.

      Defendant.

---

**PLAINTIFFS' RESPONSES TO FIRST SET OF DISCOVERY REQUESTS**

---

      Under Rules 26, 33, 34, and 36 of the Federal Rules of Civil Procedure, Plaintiffs Sports Rehab Consulting LLC and Lindsay Winninger submit the following responses and answers to Vail Health's First Set of Discovery Requests.  Plaintiffs have not yet completed their investigation and analysis of the facts relating to this action, and fact discovery is continuing.  Plaintiffs' ongoing discovery, analysis, and investigation may disclose the existence of additional facts, add meaning to known facts, support new legal or factual contentions, and may lead to additions or modifications to these answers.

      The answers set forth below are therefore based on information currently known and available to Plaintiffs at the time these answers are made.  Accordingly, Plaintiffs reserve the right, at any time, to amend, revise, correct, add to, supplement, modify, or clarify any specific answers or objections.  Plaintiffs further reserve the right to make use of, or introduce in any hearing or at trial, information not known to exist at the time of

these answers, including information obtained in the course of discovery as may be required under the Federal Rules of Civil Procedure.

## **<u>REQUESTS FOR PRODUCTION</u>**

**<u>REQUEST FOR PRODUCTION NO. 1</u>:** All DOCUMENTS reflecting YOUR revenues, costs, and profits including without limitation YOUR financial statements, projections,and analyses.

<u>RESPONSE</u>:

All documents responsive to this Request No. 1 were for produced to Vail Health in the Eagle County state court action.  Responsive documents created since the date of the last production in the Eagle County state court action will be produced.

**<u>REQUEST FOR PRODUCTION NO. 2</u>:** All DOCUMENTS and COMMUNICATIONS related to YOUR costs, prices, revenues, and profits for the physical therapy services YOU render at all of your locations, including the services YOU render to PEOPLE who pay for the services directly, or to the extent applicable, the services YOU renderthat are paid for or reimbursed, in whole or in part, via a third-party arrangement, including medical insurance, medical plans, health care administration, or any other reimbursement mechanism.

<u>RESPONSE</u>:

All documents responsive to this Request No. 2 were produced to Vail Health in the Eagle County state court action.  Responsive documents created since the date of the last production in the Eagle County state court action will be produced.

**<u>REQUEST FOR PRODUCTION NO. 3</u>:** All DOCUMENTS and COMMUNICATIONS relating to the "relevant geographic market" and "relevant product or service market" alleged in YOUR Amended Complaint, including without limitation any competitors in these alleged markets.

<u>RESPONSE</u>:

Information supporting the allegations referred to in Request No. 5 is publicly-available information through the websites of physical therapy providers in the Vail Valley,

2

or are within the care, custody, or control of Vail health.  For example, Vail Health has produced documents supporting the Vail Valley area as the geographic market.  *See, e.g.,* 2019 CHNA Report ("primary service area of Eagle County, Colorado; 57% of patients were Eagle County residents, 40% by visitors from across the United States"); Vail_Fed_00000283 ("50+ years of community investment built by and for the people of the Vail Valley"); Vail_Fed_00000780 ("small local market").   Further, Vail Health's expansion of its physical therapy services to Aspen, Dillon, Frisco, Silverthorne, and Breckenridge further show that the relevant geographic market is the Vail Valley.  At this point in time, Plaintiffs are unaware of any such documents within their care, custody, or control.  At such time as documents responsive to Request No. 3 come within the care custody, or control of Plaintiffs, they will be produced in a manner consistent with Fed. R. Civ. P. 34.

**REQUEST FOR PRODUCTION NO. 4**:  All DOCUMENTS reflecting any business plan, competitive analysis, market analysis, or strategic plan related to YOUR business or relatedto the market for physical therapy services as alleged in the Amended Complaint.

RESPONSE:

All documents responsive to Request No. 4 have been produced in the Eagle County state court action.

**REQUEST FOR PRODUCTION NO. 5**:  All DOCUMENTS and COMMUNICATIONS to support YOUR contention that Vail Health employs 71% of the physical therapists and generates 80% of the physical therapy revenue in the Vail Valley as  alleged in Paragraph 38 of the Amended Complaint.

OBJECTION:  Plaintiffs object to Request No. 5 to the extent it seeks documents and information protected by the attorney-client privilege or work-product doctrine.

3

RESPONSE:

Information supporting the allegations referred to in Request No. 5 is publicly-available information through the websites of physical therapy providers in the Vail Valley, as well as by contacting those providers.  Information about Vail Health is in the care, custody, or control of Vail Health.  Since the filing of the Amended Complaint, Vail Health has produced documents in the Eagle County state court action, as well as this action, related to Vail Health physical therapy employment data.  *See, e.g.,* VH_Fed_00000769-70.  At such time as documents responsive to Request No. 5 come within the care custody, or control of Plaintiffs that are not privileged, they will be produced in a manner consistent with Fed. R. Civ. P. 26 and 34.  *See also* Answer to Interrogatory No. 2.

**REQUEST FOR PRODUCTION NO. 6**:  All DOCUMENTS and COMMUNICATIONS to support YOUR contention that Vail Health charges "supra-competitive" prices and captures "supra-competitive" profits as alleged in Paragraph 52 of the Amended Complaint.

RESPONSE:

Information supporting the allegations referred to in Request No. 6 may be found within billing documents and financial information produced by Vail Health in the Eagle County state court action, as well as in this action.   and this action, as well as deposition testimony of Vail Health Vice President Nicholas Brown in the Eagle County state court action.   Vail Health has also periodically posted pricing information to its website regarding rates for various physical therapy services.  By way of example, the following documents produced by Vail Health show the pricing for physical therapy services over the course of many years:

|  | 2010 | 2011 | 2012 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Evaluation/40 minutes** | 181.35 | 192.30 | 197.90 | 181.65 | 197.80 | 205.00 | 203.00 | 203.00 |
| **Manual Therapy/hour** | 288.60 | 306.20 | 315.00 | 289.20 | 314.80 | 326.80 | 368.00 | 368.00 |
| **Therapeutic Exercise/hour** | 323.00 | 342.60 | 352.60 | 323.80 | 352.00 | 366.40 | 376.00 | 376.00 |

Source: Vail_0051241, Vail_0051244, Vail_0051252, Vail_Fed_00000246-249; 2020 Chargemaster

Rates charged by other physical therapists in the Vail Valley are available by contacting the providers.  At such time as documents responsive to Request No. 6 come within the care custody, or control of Plaintiffs, they will be produced in a manner consistent with Fed. R. Civ. P.  26 and 34.

**REQUEST FOR PRODUCTION NO. 7:**  All DOCUMENTS and COMMUNICATIONS to support YOUR contention that securing space for physical therapy would be "prohibitively expensive" as alleged in Paragraph 55 of the Amended Complaint.

RESPONSE:

The cost of commercial/health care real estate in the Vail Valley is publicly available through real estate listings, real estate tax records, and is known to Vail Health as the result of the acquisition, leasing, and maintenance of its many health care facilities. All documents that Plaintiffs have within their care, custody, or control relating to the cost of real estate in the relevant geographic market were produced to Vail Health in the Eagle County state court action.  At such time as documents responsive to Request No. 7 come within the care custody, or control of Plaintiffs, they will be produced in a manner consistent with Fed. R. Civ. P. 26 and 34.

**REQUEST FOR PRODUCTION NO. 8:**  All DOCUMENTS and COMMUNICATIONS reflecting your agreements with any physical therapist, including any employment, non-compete and non-solicitation agreements, and including each version of any such agreement YOU have entered, as well as any policies, procedures, or trainings related to

5

YOUR physical therapists.

RESPONSE:

All documents responsive to Request No. 8 were produced to Vail Health in the Eagle County state court action.  Responsive documents created since the date of the last production in the Eagle County state court action, or relate to employees other than Cimino, will be produced.

**REQUEST FOR PRODUCTION NO. 9**:  All DOCUMENTS and COMMUNICATIONS relating to the prices charged and revenues realized for the physical therapy services provided to patients by YOU, including without limitation all contracts, agreements, and documents relating to prices for which medical insurers, medical plans, third-party health care administrators, and other health care reimbursement mechanisms have agreed to indemnify YOU for physical therapy services, and all contracts, agreements, and documents relating to prices YOU charge to patients who do not have medical insurance, a medical plan, or any other payment arrangement with a third-party.

RESPONSE:

All documents responsive to this Request No. 9 were for produced to Vail Health in the Eagle County state court action.  Responsive documents created since the date of the last production in in the Eagle County state court action will be produced.

**REQUEST FOR PRODUCTION NO. 10**:  All DOCUMENTS and COMMUNICATIONS relating to any efforts made by YOU to secure, obtain, or negotiate any agreement with any medical insurers, medical plans, third-party health care administrators, or other health care reimbursement entity to reimburse physical therapy services provided by YOU or any of YOUR employees.

RESPONSE:

No such documents exist.  At such time as documents responsive to Request No. 10 come within the care custody, or control of Plaintiffs, they will be produced in a manner consistent with Fed. R. Civ. P. 26 and 34.

**REQUEST FOR PRODUCTION NO. 11:** All DOCUMENTS and COMMUNICATIONS related to YOUR retained experts, including those that relate to compensation for the expert's study or testimony and those that identify facts, data, or assumptions that YOUR attorney provided and that the expert considered in forming the opinions to be expressed.

RESPONSE:

This request is premature as expert disclosures are not yet due under the Court's

Scheduling Order.  At such time as documents responsive to Request No. 11 come within

the care, custody, or control of Plaintiffs, such documents will be produced in a manner

consistent with the Scheduling Order that has been entered in this action; as well as a

manner consistent with Fed. R. Civ. P. 26 and 34.

**REQUEST FOR PRODUCTION NO. 12:** All DOCUMENTS and COMMUNICATIONS related to all compensation, salary, and benefits paid to WINNINGER and all other physical therapists paid by YOU.

RESPONSE:

All documents responsive to this Request No. 12 were produced to Vail Health in

the Eagle County state court action.  Responsive documents created since the date of

the last production in the Eagle County state court action will be produced.

## INTERROGATORIES

**INTERROGATORY NO. 1:** IDENTIFY and DESCRIBE all products and services included in the "relevant product or service market" alleged in YOUR Amended Complaint. For each of those products or services, include in the DESCRIPTION whether PEOPLE pay for the product or service directly, and/or whether the product or service is paid for or reimbursed, in whole or in part, via a third-party arrangement, including medical insurance, medical plans, health care administration, or any other reimbursement mechanism.

ANSWER:

The relevant service or product market applicable to this case is orthopedic

"physical therapy" as practiced by professionals licensed by the State of Colorado

pursuant to the authority of Title 12, Article 285, §§ 12-285-101, *et seq.*  As stated in C.R.S. § 12-285-102(b): "Physical therapy practice consists of patient and client management, which includes physical therapy diagnosis and prognosis to optimize physical function, movement, performance, health, quality of life, and well being across the life span and also includes contributions to public health service aimed as improving the health of the population…."

As defined in C.R.S. § 12-285-104(6)(a)(I): "'Physical therapy' means the examination, physical therapy diagnosis, treatment, or instruction of patients and clients to detect, assess, prevent, correct, alleviate, or limit physical disability, movement dysfunction, bodily malfunction, or pain from injury, disease, and other bodily conditions."

Charges that are incurred by individuals who receive physical therapy services are sometimes paid directly by the individual.  The charges incurred by individuals receiving physical therapy services are sometimes paid directly by the individual and the individual is later reimbursed, in whole and/or in part, via third-party arrangements, including Medicare, Medicaid, medical insurance, medical plans, health care administration, and other reimbursement mechanisms.  The charges incurred by individuals receiving physical therapy services are sometimes paid directly to the physical therapy provider via third-party arrangements, including Medicare, Medicaid, medical insurance, medical plans, health care administration, and other reimbursement mechanisms.

**INTEROGATORY NO. 2:**  For each of the products and services included in YOUR "relevant product or service market," IDENTIFY and DESCRIBE the PEOPLE who have sold or provided the products or services in YOUR alleged geographic market and when they did so. If the PERSON is an organization providing services, the response should address both the organization and all natural persons who provide the services on behalf of the organization.

ANSWER:

With respect to Vail Health, Vail Health has the most knowledge about those individuals employed by it since November 1, 2012, when it took over the physical therapy operations previously managed and physical therapy services rendered by RPC-Vail. *See, e.g.,* VH_Fed_00000769-70.  Plaintiffs do not have business records or first-hand knowledge related to any of the physical therapy providers in the Vail Valley (other than itself) in which to identify when the organization began providing physical therapy services or who was employed as physical therapists.  At the time of the filing of the Amended Complaint, Plaintiffs identified the following physical therapy operations, as well as the number of physical therapists in the Vail Valley based on publicly-available website information:

| Physical Therapy Operations Avon/Beaver Creek, Colorado | |
| --- | --- |
| PT Operator | PTs |
| Vail Health | 5 PTs |
| Axis Sports Medicine | 1 full-time PT, 1 part-time PT, 2 floater PTs |
| Altius Physical Therapy | 1 PT |
| Joint Worx | 2 full-time PT, 1-2 part-time floater PTs (Edwards) |
| Naviga8 | 1 part-time PT |
| Concierge Physical Therapy Colorado | 1 PT |
| Physical Therapy Operations Eagle/Gypsum, Colorado | |
| PT Operator | PTs |
| Vail Health | 7 PTs |
| Thrive PT | 1 PT |
| Axis Sports Medicine | 2 full-time PTs, 1 part-time floater PT |
| Competitive Edge Physical Therapy | 1 PT |
| Vail Integrative Medicine Clinic | 1 PT |

| Physical Therapy Operations Edwards, Colorado | |
|---|---|
| PT Operator | PTs |
| Vail Health | 5 PTs |
| Movement Physical Therapy | 2 PTs |
| Axis Sports Medicine | 3 PTs |
| Joint Worx | 1 full-time PT, 1-2 part-time floater PTs (Avon) |
| Vail Integrative Medicine Clinic | 2 full-time PTs |
| Vail Sports Medicine Physical Therapy | 2 PTs for offices in Vail and Edwards |
| Physical Therapy Operations Vail, Colorado | |
| PT Operator | PTs |
| Vail Health | 36 PTs |
| Vail Sports Medicine Physical Therapy | 2 PTs for offices in Vail and Edwards |
| Vail Integrative Medicine Clinic | No longer offers PT in Vail |
| Axis Sports Medicine | Closed Vail location |
| Sports Rehab Consulting | Opened December 15, 2015 and closed Vail location in approximately August 2018/Lindsay Winninger and David Cimino |

As Vail Health knows, RPC-Vail operated the physical therapy unit doing business under the trade name Howard Head from approximately the 1990s until October 31, 2012, when Vail Health terminated its agreement with RPC-Vail. Plaintiffs cannot identify each and every RPC-Vail employee over the course of approximately 15 years but has identified, to the best of its ability, the following former employees:

| | | |
|---|---|---|
| Kristin Schwarck | Gretchen Ebbeson | Christine Rost |
| Barbara Thomas | Britney Huntimer | Eric Dube |
| Amy Heflin | Christine Hasselbach | Mary Leone |
| Christina Black | Stephanie Drew | Molly O'Rourke Scanlon |
| Mary Dixon | Lori Myers | Alison Cofer |
| Salem Shaffer | Jeffrey Russel | Ami Doyle |
| Brady Baker | CJ Cebul | Terri Stashick |
| Carly Baker | Christina Russell | Lauren Johnson |
| Jonathan Kemptom | Julie Ehmann | Jill Sorensen |
| Robyn Ritsch | Jessica Sheeley | Andy Almonte |
| Andrea Sauer | Will Kruger | Scott Bartel |
| Ted Weber | Jennifer Gotantas | Paul Bersagel |
| Shayna Meka | Kathi Thomson | Sarah Bollwitt |

| | | |
|---|---|---|
| Emma Cannata | Laura Jean Shane | Zak Pramik |
| Meghan Curley | Danielle Sockolosky | Will Place |
| Sarah Elliott | Michael Wahoff | Christy Madison |
| Amanda Gonzales | Jennifer Wilde | Katheryn Baker |
| Kate Gregg | Emma Kellner | Kathy Gwin |
| Jenna Hodge | Brook Magstadt | Shannon Irish |
| Ana Jeronimus | Laura Olderog | Molly Bureta |
| Kate Johnson | Mark Ryan | Dina Proietti |
| Chelsea McMillin | Erin Schmitt | Dirk Kokmeyer |
| Meredith Mueller | Paul Westgard | Megan Taylor |
| Matt Mymern | Laurie Wohlt | Lisa Perry |
| Alison Nading | John Egge | Sarah Oaks |
| Luke O'Brien | Meghan Sheeran | Teresa Schuemann |
| Thomas Olson | Allie Hammond | Zach Chandler |
| Joe Pharez | Erin Harding | Eileen Yuskewich |
| Bobby Poehling | Courtney Zolin | Neil Masters |
| Meredith Pollaro | Ashley Dentler | Gentian Nuzzo |
| Kelly Schrader | Susan Brown | Marsha Messervey |

Vail Health itself is aware of the entities operating in the Vail Valley market.  In 2016, Vail Health identified the following entities as competitors of its physical therapy unit: Axis, JointWorx, Vail Integrative, and Sports Rehab.  *See* Vail_Fed_00000833.

**INTERROGATORY NO. 3**: For each PERSON to whom YOU rendered services, IDENTIFY the PERSON'S name and address and the location where they received YOUR services as well as the amount paid by that person or that person's third party provider.

ANSWER:

*See* native version of Genbook schedule produced in the Eagle County state court action on December 24, 2019, which Plaintiffs will update with additional information since that document was produced, and this Interrogatory will be supplemented.  *See also* invoices produced in the Eagle County state court action at SRC4410-16, 4538, 4544-45, 4559-62, 4594-99, 4612, 4681, 4626-28, 4639-42, 4682-83, 4707-11, 4732-33, 4744-47, 4800, 4817-27, 4867-68, 4875-78, 4893-94, 4910, 4918, 4924-27, 4938, 4962-63, 4978-79, 4990-93, 5023-24, 5028-30, 5039-47, 5071-75, 5092-93, 5101-06, 5120-24, 5141,

11

5176-81, 5195-200, 5235, 5247-48, 5321-24, 5345-46, 5350-53, 5385-87, 1225-42, 12364-84, 12394-95, 12654, 12657-58, 12675-76, 12683, 12697-99, 12704-112, 12762-63, 12785-92, 12796-97, 12802-07, 12814-15, 12869-71, 12885-86, 5461, 5469, 14745-46, 5477, 5479, 5481, 14747, 14752-53, 5525, 6552, 6626, 7574-75, 7630-32, 14754-55, 14757-60, 8558, 8581, 8703-04, 14761, 8788-89, 14766, 14768, 8819, 8843, 8895, 14769, 8939, 14770-79, 9219-20, 9236, 9244, 9256, 9263, 14784-87, 9336-37, 9351, 9363-64, 9370, 9423, 9440-41, 14788, 9507-08, 9520, 9542, 9548, 9587, 14794-96, 14801-07, 9994, 10558, 10568, 10585, 14808-11, 10590, 10657, 10671, 10675, 10677, 10687, 10689, 10691, 10694, 10701, 10790, 10804, 10816, 10823, 11254, 11260-61, 11283-85.  To the extent there are additional invoices created after the last production in the Eagle County state court action, those invoices will be produced, and this interrogatory will be supplemented.

**INTERROGATORY NO. 4**:  IDENTIFY and DESCRIBE each instance in which YOU allege Vail Health has "vigorously enforced" the restrictive covenants in its employment agreements, as alleged in Paragraph 53 of the Amended Complaint, and the factual basis for eachsuch allegation.

ANSWER:

The most obvious example of a "vigorous" attempt to enforce the restrictive covenants in a Vail Health employment agreement is the Eagle County state court case against David Cimino and Plaintiffs.  David Cimino is a physical therapist who has been driven from the Vail Valley geographic market through false statements and sham litigation in which Vail Health has deployed 7-11 lawyers in an attempt to enforce Cimino's

employment agreement. In doing so it is estimated that Vail Health has incurred approximately $4 million in attorneys' fees.

In the course of attempting to enforce the illegal restrictive covenants in Cimino's employment agreement, Vail Health's "lead" lawyer—Janet Savage—for an on behalf of Vail Health, has engaged in the following conduct: (a) fabricated false evidence of the solicitation of allegedly hundreds if not thousands of Vail Health patients and submitted that fabricated evidence to Vail Police Department and Eagle County District Attorney's office; (b) submitted (or caused to be submitted) false statements to the Colorado Department of Regulatory Agencies ("DORA") that Cimino and Winninger solicited Vail Health patients when they did not do so, and falsely alleged that Cimino had sent stolen Vail Health patient information to provide to Winninger and Sports Rehab when in fact Cimino had not done so; (c) made repeatedly false statements and filed false documents in the Eagle County state court action alleging that Cimino and Winninger had stolen thousands of Vail Health "trade secrets" when the information characterized as "trade secrets" was in fact created by another entity—RPC-Vail—years before Vail Health had even had access to them and had in fact been shared with thousands of individuals throughout the world. So these alleged "trade secrets" were not trade secrets at all. These are among the acts that Plaintiffs allege constitute "vigorous" enforcement.

**INTRROGATORY NO. 5:** IDENTIFY and DESCRIBE all bases to support YOUR contentions about what would have occurred if Steadman had established a physical therapy clinic, addressing each allegation from Paragraphs 70 through 73 of YOUR Amended Complaint, including Vail Health's need to reduce prices for physical therapy services, lost revenue, Vail Health's reduction in staff, short- and long-term effects on compensation, short- and long-term effects on costs, short- and long-term effects on prices, and Vail Health's need torenegotiate medical reimbursement contracts.

ANSWER:

Beyond a debilitating financial blow to Vail Health, the establishment of a physical therapy unit by Steadman would have resulted in a dramatic effect on competition for physical therapy services in the Vail Valley.  Vail Health would have lost at least 50-60% of its physical therapy revenues and it would have been required to reduce its physical therapy staff dramatically.  The number of Vail Health's physical therapists would have been reduced by at least 50%, with the bulk of them moving to the new Steadman physical therapy unit.

The impact of such a new competitor would have first been felt in the competition for physical therapists, with their salaries initially being raised, but in the long run the level of physical therapy compensation would have reduced itself to a more normal level of market equilibrium.  The long-term reduction of market compensation levels for physical therapists would have had a beneficial effect upon the labor costs of other physical therapy providers in the Vail Valley market.  These lower labor costs would, in turn, have had the benefit of reducing the cost of physical therapy services to consumers over the long run.

Another result of Steadman establishing its own physical therapy unit, which would have occurred almost immediately, would have been fierce competition between Vail Health's Howard Head and Steadman's new physical therapy clinic.  This competition would have resulted in price reductions for physical therapy services paid by patients and their insurers.  Competition from Steadman would have required Vail Health to renegotiate its medical reimbursement contracts with health insurers, as well as reduce

14

its publicly-announced prices to patients.  All of this would have benefitted consumers of physical therapy services and other physical therapy providers.

Another result for the establishment of a Steadman physical therapy unit would have been competition to provide the highest quality physical therapy services in the Vail Valley.  That would have manifested itself from the competition for the most experienced and most qualified physical therapists and improvements in the services offered by Vail Health's Howard Head.  All of this would have benefited consumers.

**INTERROGATORY  NO.  6**:   IDENTIFY  and  DESCRIBE  all  time  periods  when WINNINGER was unavailable to treat patients on-site at SRC's Vail clinic, including the reason why WINNINGER was  unavailable  and  whether  any  other  SRC  employee  was available to treatpatients.

ANSWER:

Sports Rehab's Vail location opened on December 15, 2015 and closed in about August 2018.  Winninger has identified, to the best of her recollection and information available to her, the reasons she was unavailable.  To the extent Winninger cannot now recall—approximately 4-5 years later—the exact reason for her unavailability, the reason is identified as "Out of office."  Additionally, "Day off" refers to days in which Winninger took a day off during the week generally due to her full schedule throughout the week. Plaintiffs have not included weekends in the table below.

| Date | Reason | Other Employee Available |
|---|---|---|
| 12-24-15 to12-25-2015 | Holiday | |
| 1-8-2016 | Day off | Cimino |
| 1-12-2016 | Out to attend event | Cimino |
| 1-15-2016 and 1-18-2016 | Out of office with client/social | Cimino |
| 1-27-2016 | Day off | |
| 1-29-2016 | Family in town | Cimino |

| Date | Reason | Other Employee Available |
|---|---|---|
| 2-9-2016 | Day off | Cimino |
| 2-11-2016 | Outside meeting; day off | Cimino |
| 2-22-2016 to 2-23-2016 | Out of office for business | Cimino |
| 2-26-2016 and 2-29-2016 | Out of office with client | Cimino |
| 3-18-2016 | Day off | |
| 3-29-2016 | Out to attend conference | Likely Cimino |
| 4-4-2016 | Out of office with client | Cimino |
| 4-11-2016 to 4-13-2016 | Vacation | Cimino |
| 4-21-2016 to 4-22-2016; 4-25-2016 to 4-28-2016 | Out of office with client | Cimino |
| 4-29-2016 | Vacation | Cimino |
| 5-6-2016 | Vacation | Likely Cimino |
| 5-13-2016 | Vacation | Cimino |
| 5-16-2016 to 5-19-2016 | Out of office | Cimino |
| 6-8-2016 to 6-10-2016 | Out to attend conference | Cimino |
| 6-13-2016 | Vacation | Cimino |
| 6-21-2016 | Day off | Likely Cimino |
| 6-29-2016 | Day off | Cimino |
| 7-4-2016 | Holiday | |
| 7-5-2016 to 7-8-2016; 7-11-2016 to 7-14-2016 | Out of office with client | Cimino |
| 8-1-2016 to 8-2-2016 | Vacation | Cimino on 8-1-2016 |
| 8-18-2016 to 8-19-2016 | Day off | |
| 8-22-2016 to 8-26-2016 | Out of office | Cimino |
| 9-1-2016 to 9-2-2016 | Out of office with client | Cimino |
| 9-9-2016 | Conference | Cimino |
| 9-21-2016 | Out to attend meeting in Denver | Cimino |
| 9-22-2016 | Out to attend SPRI Golf Tournament | Cimino |
| 9-27-2016 | Out to lecture at Regis University | Cimino |
| 10-10-2016 to 10-11-2016 | Out of office with client | Cimino |
| 10-13-2016 to 10-14-2016 | Out of office | Cimino |

16

| Date | Reason | Other Employee Available |
|------|--------|--------------------------|
| 12-1-2016 to 12-2-2016; 12-5-2016 to 12-9-2016 | Out of office with client | |
| 12-16-2016 | Day off | |
| 12-28-2016 to 12-30-2016 | Out of office with client | |
| 1-10-2017 to 1-13-2017 | Out of office with client | |
| 2-15-2017 | In Vail but preparing for Wellness Program presentation at The Steadman Clinic | |
| 2-20-2017 | Out of office in Denver | |
| 3-2-2017 | Out of office with client | |
| 3-6-2017 | Out of office in Denver | |
| 3-10-2017 | Out to attend conference | |
| 3-14-2017 to 3-16-2017 | Out of office with client | |
| 3-27-2017 | Day off | |
| 4-10-2017 | Out of office with client | |
| 5-1-2017 to 5-4-2017 | Vacation | |
| 5-8-2017 | Out of office with client | |
| 5-9-2017 to 5-11-2017 | Out of office with client | |
| 5-18-2017 to 5-19-2017 | Out to attend conference | |
| 5-26-2017; 5-29-2017 | Out of office with client | |
| 6-12-2017 to 6-16-2017; 6-19-2017 to 6-23-2017 | Out of office with client | |
| 6-26-2017 to 6-29-2017 | Out of office with client | |
| 6-30-2017 | Day off | |
| 7-3-2017 | Vacation | |
| 7-4-2017 | Holiday | |
| 7-5-2017 | Out of office with client | |
| 7-7-2017 | Day off | |
| 7-10-2017 to 7-14-2017; 7-17-2017 to 7-21-2017 | Out of office with client | |
| 7-24-2017 | Family in town | |
| 7-31-2017 | Out of office with client | |
| 8-2-2017 | Out of office with client | |
| 8-8-2017 to 8-11-2017 | Out of office with client | |

| Date | Reason | Other Employee Available |
|---|---|---|
| 8-14-2017 to 8-18-2017 | Out of office with client | |
| 8-21-2017 to 8-23-2017 | Out of office with client | |
| 8-25-2017 | Day off | |
| 9-13-2017 to 9-15-2017; 9-18-2017 to 9-19-2017 | Vacation | |
| 9-20-2017 to 9-22-2017 9-25-2017 to 9-29-2017 | Out of office with client | |
| 10-2-2017 | Day off | |
| 10-5-2017 to 10-6-2017; 10-9-2017 to 10-13-2017 | Out of office with client | |
| 10-16-2017 to 10-20-2017; 10-23-2017 to 10-27-2017 | Out of office with client | |
| 10-30-2017 | Day off | |
| 11-20-2017 to 11-24-2017; 11-27-2017 | Out to attend conference | |
| 11-30-2017 to 12-1-2017 | Out to attend conference | |
| 12-20-2017 to 12-22-2017; 12-25-2017 to 12-26-2017 | Christmas holiday | |
| 1-4-2018 | Day off | |
| 1-15-2018 | Day off | |
| 1-24-2018 | Out of office with client | |
| 2-12-2018 to 2-13-2018 | Day off | |
| 3-16-2018 and 3-19-2018 | Vacation | |
| 4-10-2016 | Out of office in Denver for business | |
| 4-16-2018 to 4-20-2018 | Out of office with client | |
| 4-25-2018 to 4-26-2018 | Vacation | |
| 5-17-2018 to 5-18-2018 | Vacation | |
| 5-28-2018 to 6-1-2018 | Out of office with client | |
| 6-11-2018 to 6-14-2018 | Out of office with client | |
| 6-15-2018; 6-18-2018 to 6-22-2018 | Out of office with client | |
| 6-29-2018 | Out of office in Denver | |

| Date | Reason | Other Employee Available |
|---|---|---|
| 7-13-2018;<br>7-16-2018 to 7-20-2018;<br>7-23-2018 to 7-24-2018 | Out of office with client | |
| 7-25-2018 | Out of office | |
| 7-26-2018 to 7-27-2018;<br>7-30-2018 to 7-31-2018 | Vacation | |
| 8-3-2018 | Out of office for business | |
| 8-6-2018 to 8-7-2018 | Out of office with client | |
| 8-23-2018 | Day off | |
| 8-24-2018;<br>8-27-2018 to 8-31-2018;<br>9-3-2018 to 9-7-2018 | Out of office with client | |

**INTERROGATORY NO. 7:** IDENTIFY each alleged attempted or actual anticompetitive act by Vail Health and DESCRIBE how each act damaged YOU and/or anotherPERSON.

ANSWER:

**1.      VAIL HEALTH IS A MONOPOLY FOR GENERAL HOSPITAL SERVICES.**

Vail Health is by definition of the scope of its charter a monopoly in the relevant geographic market for general hospital services in the Vail Valley.  Vail Health has used and continues to use its monopoly power for general hospital services to acquire and enhance its monopoly power for specific hospital services such as outpatient care, and physical therapy in particular for purposes of this case.  In other words, Vail Health's wholistic monopolistic position has been used to acquire, maintain, and/or strengthen monopoly power in discrete medical practices such as physical therapy.  Dating back to November 1, 2004 (and before), and continuing through the present, as described below, Vail Health was not only a monopolist, but it engaged in exclusionary and anticompetitive conduct to leverage and maximize its monopoly power.  The fact that Vail Health is a monopoly has harmed consumers by decreasing choice and increasing the cost of health

care in the Vail Valley.

From approximately November 1, 1999, to October 31, 2012, Vail Health had a contractual relationship with RPC-Vail. (*See* Physical Therapy Services Agreement (the "Services Agreement.")) That contract included a number of anticompetitive restrictions:

(1) RPC-Vail was to be the "exclusive" provider of physical therapy services for Vail Health patients. (Service Agreement at 1.) This meant that existing and future physical therapy providers were foreclosed from competing with of RPC-Vail for Vail Health patients. It also meant that physical therapy providers who offered Vail Health patients better services or lower prices were cut-off from those competitive providers. This was an exclusive dealing agreement whereby Vail Health would steer patients with orthopedic injuries exclusively to RPC-Vail. This made no economic sense other than to (a) reduce consumer choice in terms of quality and price, and (b) harm rival physical therapy providers by creating barriers that protected RPC-Vail.

(2) Any person who was provided physical therapy services by RPC-Vail was to "be regarded and shall be registered as a patient of the Hospital [*i.e.*, Vail Health]." (Service Agreement § 2.1.) This provision is the reciprocal of the recital on page 1 of the Service Agreement in that is ensured that Vail Health captured all of the patients that came to RPC-Vail for physical therapy.

(3) Vail Health was to be the exclusive entity billing and collecting for the physical therapy services rendered by RPC-Vail. (Service Agreement § 3.) This meant that Vail Health established the prices for physical therapy for which Vail Health billed health care insurers and payers under Vail Health's contracts. It also resulted in Vail Health charging and collecting a significantly greater amount for physical therapy services than RPC-Vail otherwise could have charged had it done so itself. The Service Agreement, therefore, locked in a revenue stream for which it realized significant profits.

Over time, the physical therapy practice of RPC-Vail grew substantially, and it achieved a market share that is believed to exceed 60% or more in the Vail Valley market. As the volume of revenues that were generated from physical therapy services rendered

by RPC-Vail grew, under the billing and compensation arrangement of the Service Agreement Vail Health accumulated substantial profits that it would later use to cripple RPC-Vail, and in doing so acquire the monopoly power for itself.  This exclusive dealing contract caused harm to consumers of physical therapy by decreasing choice and significantly increasing the cost of those services by an estimated 25% to 40%.  The exclusive dealing contract also harmed competition in the Vail Valley by creating barriers to competitive physical therapy providers who had existing practices in the Vail Valley and also created barriers to entry to potential physical providers who would have otherwise entered the market but for the fact that Vail Health had the market "locked up." The exclusive dealing contract, therefore, harmed competition.

### 2. VAIL HEALTH'S WILLFULLY ANTICOMPETITIVE ACQUISITION OF MONOPOLY POWER IN THE PHYSICAL THERAPY MARKET.

At some point in 2012, Vail Health decided to terminate its contractual relationships with RPC-Vail and those relationships ended on October 31, 2012.  Vail Health's specific intent in terminating RPC-Vail was to acquire an outpatient medical provider that had already achieved monopoly power, that being the physical therapy service market. Individuals with knowledge of this willful intent to monopolize would include, but not be limited to, Vail Health's senior management—Doris Kirchner and Nicholas Brown—as well as the Vail Health Board of Directors.  With the takeover of RPC-Vail's physical therapy practice on November 1, 2012, Vail Health immediately became a monopolist in the physical therapy market in the Vail Valley.

Vail Health did not achieve monopoly status because of its superior skill, foresight, or competition on the merits.  On the contrary, during the period that RPC-Vail operated

its physical therapy clinic under the Howard Head trade name, Vail Health did not employ a single physical therapist and Vail Health itself was not licensed to provide physical therapy in Colorado during that time.  By definition, therefore, Vail Health could not have achieved monopoly status through competition on the merits—it was not even a competitor.

The termination of the exclusive dealing contract between Vail Health and RPC-Vail could have had a positive impact on competition for physical therapy services in the Vail Valley but for the manner in which it was implemented.  As described below, Vail Health poached most of the physical therapists who had been employed by RPC-Vail, thereby weakening a potential competitor.  Vail Health also locked physical therapists who it hired away from RPC-Vail into illegal employment contracts that had the deleterious effect of freezing the labor market for physical therapists in the Vail Valley.  This harmed physical therapists and harmed competition among physical therapy providers.  By creating a static labor market Vail Health harmed consumer choice for physical therapy services and increased the cost of those services to consumers.

### 3.   VAIL HEALTH'S EMPLOYMENT AGREEMENTS FOR ITS PHYSICAL THERAPISTS ARE ILLEGAL AND ANTICOMPETITIVE.

Having little or no knowledge of the actual practice of physical therapy, months before the expiration of the Service Agreement on October 31, 2012, Vail Health hired Nicholas Brown, one of the RPC-Vail physical therapists who may also have had some managerial role with RPC-Vail.  One of Brown's primary duties was to poach as many physical therapists as he could from RPC-Vail to work for the new Vail Health physical therapy operation.  And Brown was successful in doing that, which had a negative effect

on the ability of RPC-Vail to compete in the relevant markets and had a broader negative impact on competition generally in the relevant markets.  Vail Health solidified its monopoly power by impairing RPC-Vail and other competitors from obtaining the licensed physical therapists they needed to compete.  Vail Health not only poached the physical therapists, but it also tied them up with noncompete/nonsolicitation covenants in employment agreements the physical therapists were required to sign when they left RPC-Vail to join Vail Health.

The restrictive covenants in the employment agreements were then, and still are now, an unreasonable restraint of trade and a significant element of Vail Health's anticompetitive, monopolistic business strategy.  C.R.S. § 8-2-113(2) provides that "[a]ny covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void…."  Colorado courts have repeatedly confirmed that "[c]ovenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void."[1]   There are only two exceptions to the prohibitions on noncompete/nonsolicitation restrictions in Colorado.

The first is C.R.S. § 8-2-113(2)(b), which permits such restrictions when it is necessary to protect trade secrets.  The physical therapy clinic that Vail Health acquired through aggressive conduct did not have any trade secrets and since then Vail Health has not developed any trade secrets applicable to physical therapy that would satisfy the definitional elements of a trade secret under the Colorado Uniform Trade Secrets Act

---

[1]       *Phoenix Capital, Inc. v. Dowell Phoenix*, 176 P.3d 835, 844 (Colo. Ct. App. 2007); *Atmel v. Vitesse Semiconductor Corp.,* 30 P.3d 789, 793 (Colo. Ct. App. 2001); *DBA Enters., Inc. v. Findlay,* 923 P.2d 298, 302 (Colo. Ct. App.1996)).

("CUTSA"), C.R.S. § 7–74–102(4).  In fact, there is no such thing as a trade secret in the healing arts.  The second exception is C.R.S. § 8-2-113(2)(d), which provides that the prohibition on covenants "shall not apply to ... [e]xecutive and management personnel and officers and employees who constitute professional staff to executive and management personnel."  The exclusionary conduct that Plaintiffs allege in this case does not involve physical therapists involved in management, so § 8-2-113(2)(d) is not applicable.  Nevertheless, the noncompete/nonsolicitation restrictions that the Vail Health physical therapists were required to sign are nothing more than naked restraints of trade.

Not only are the physical therapists' restrictive covenants illegal restraints on trade, but Vail Health also uses them in an incredibly aggressive, predatory way to stifle competition in the labor market for physical therapy in the Vail Valley.  The covenant in the Vail Health physical therapists' employment agreements is unreasonably and unnecessarily overbroad.  It keeps the physical therapists from doing *anything* to earn a living as physical therapists if they leave Vail Health and remain in the Vail Valley. According to Doris Kirchner, Vail Health's former CEO, if a physical therapist leaves Vail Health the therapist cannot directly or indirectly solicit, attempt to solicit, or even accept patients who walk into a competitor's office of their own volition without any contact with the departed Vail Health physical therapist.  The obvious intent of the noncompete/nonsolicitation clause is to shut the therapists completely out of the Vail Valley market if they leave their employment with Vail Health.

The manner in which the covenants are enforced, as described Plaintiffs' Answer to Interrogatory No. 4 above, sends the message to Vail Health employees that if they

24

leave Vail Health to compete for physical therapy business in the Vail Valley, they will be crushed by a barrage of litigation.  Similarly, competitive physical therapy providers would not attempt to hire a Vail Health physical therapist because they would be subjected to the same excessively costly litigation war.  Vail Health's objective in requiring its physical therapists to sign employment agreements with these unreasonable and illegal restrictive covenants is to harm rivals by monopolizing the labor market for physical therapists and frighten other physical therapy providers from competing for talented physical therapists through its velvet-glove threat of "death by litigation."  Vail Health's conduct makes no economic sense other than to impair and exclude competition.  Not only have Vail Health's illegal employment contracts that had the deleterious effect of freezing the labor market for physical therapists in the Vail Valley they have also harmed consumer choice for physical therapy services, thereby decreasing quality and increased the cost of those services to consumers by decreasing competition.  As described below, in the Eagle County state court case, Plaintiffs have been directly harmed and are entitled to recover their attorney fees in that action.

### 4. VAIL HEALTH'S PREDATORY CONVERSION OF RPC-VAIL'S BUSINESS RECORDS AFTER THE 2012 HOSTILE TAKEOVER.

The physical therapy practice of RPC-Vail was built by its founders John Atkins and Topper Hagerman, along with the guidance of famed orthopedic surgeon Richard Steadman, the founder of The Steadman Clinic, beginning in the mid-1980s.  The initial orthopedic rehabilitation techniques were developed and documented almost exclusively by Hagerman beginning as early as the mid-1980s.  As RPC-Vail's physical therapy grew these techniques were disseminated to everyone at RPC-Vail, as well as the other

Proaxis locations that were established later in Denver and the Carolinas.  All physical therapists at RPC-Vail and later at the Proaxis locations had unlimited access to the multitude of educational and training materials that RPC-Vail and later Proaxis created. These educational materials were distributed throughout the United States and indeed throughout the world to tens of thousands of patients, visiting physical therapists, physical therapy residents, visiting doctors, fellows at Steadman, and anyone else who wanted a copy.  These materials include protocols, treatment binders, "dot" sheets, sport tests, and exercise programs including photos and videos of exercises, which are more fully described below:

▪   **Protocols**:  Protocols summarize the steps necessary to recover from various injuries and surgeries; they provide guidelines as to what a patient can and cannot do and outline goals, precautions, and timelines for recovery.  So by application, protocols must contain information known and understood by physical therapists around the world. Hagerman initially created the RPC-Vail protocols, which are still widely used today, and not just by Vail Health.

▪   **Treatment Binders:**  RPC-Vail also created binders  related to various treatments, including post-operative treatment for hip surgeries by Dr. Philippon. Given the unlimited access to these binders, it is not surprising that they been used by other doctors to create their own rehabilitation programs.

▪   **"Dot" Sheets:**  RPC-Vail also created "dot" sheets, which are one to two page summaries of specific protocols.  They too contain information known and understood by physical therapists and orthopedic surgeons. If not, there would be no use for them.  Patients provide the "dot" sheets to their hometown physical therapists who can use the standard exercises identified. These "dot" sheets have been attached to many published articles and posted on various websites—in other words, widely disseminated and never treated as confidential.

▪   **Sport Tests:**  Atkins and Hagerman, in conjunction with Dr. Steadman, also developed a sport test to gauge how a particular athlete was performing.  Proaxis South Carolina and RPC-Vail both published articles on what is now known as the "Vail Sport Test."  Despite this, the multitude of studies done since, and the dissemination of this test over the internet, Vail Health took the remarkable position in the Eagle County state court case that the Vail Sport Test was a trade secret

26

under CUTSA that Vail Health owned.  Vail Health now claims it still owns it but claims it is confidential.

▪   **Exercises And Photos:**  As technology advanced, RPC-Vail took photos of exercises, which were incorporated into materials provided to the patient, used in protocols, published in articles, and provided to and used by others. Physical therapists took the pictures and posed as the subject doing standard exercises that anyone now can Google.

In sum, these materials, were accessible to not just to RPC-Vail physical therapists and staff, they were also used by the other Proaxis offices, including in Denver and the offices in the Carolina.   No restrictions were ever imposed by any office on the dissemination of this information.  No one was ever told they were confidential or trade secrets.  How could they be?  RPC-Vail and Proaxis created an atmosphere of openness, and they gave these educational medical materials to medical professionals, physical trainers, fellows, residents—literally, anyone who asked.

Despite the fact that RPC-Vail and Proaxis had developed all of these materials over decades, with absolutely no input from Vail Health, upon the termination of the Service Agreement on October 31, 2012, Vail Health refused to return these documents and information to RPC-Vail from the shared drive dedicated to RPC-Vail on the Vail Health computer system.   Despite requests and demands for return of RPC-Vail's documents and information, Vail Health refused to return what rightfully belonged to RPC-Vail and Proaxis.   Also of importance is that upon the termination of the Service Agreement, Vail Health did not negotiate, purchase, or obtain an assignment of any documents, or information that had been created and owned by RPC-Vail and Proaxis when the relationship between or among the parties ended on October 31, 2012.  Vail Health's conduct, therefore, was the tortious conversion of RPC-Vail property for the

purpose of monopolizing the physical therapy market in the Vail Valley.  As shall be discussed below, Vail Health's conversion (theft?) of RPC-Vail's property would later provide a deceitful pretext for sham litigation against Cimino and Plaintiffs for the misappropriation of "trade secrets" that Vail Health and its attorneys knew were never trade secrets under CUTSA, and even if they were the documents and information were neither created nor purchased by Vail Health.

The conduct of Vail Health described in this section caused harm to RPC-Vail, a competitor of Vail Health.  As described in later sections of this response to Interrogatory No. 7, the conversion of RPC-Vail's records would later cause David Cimino, Lindsay Winninger, and Sports Rehab damages in defending sham claims of the misappropriation of "trade secrets" that Vail Health did not create or purchase.  All of this caused harm to competition for physical therapy providers in the Vail Valley.  Another significant element of damage was and is being suffered by Vail Health, a nonprofit hospital whose publicly-stated objective is to provide cost-effective medical services to those individuals who live within the territory of its geographic charter.  The colossal amounts of money (at least $4 million) that Vail Health has and is spending chasing a few physical therapists makes no economic sense because there is absolutely no possibility that it will be recovered from Plaintiffs or David Cimino.  The only plausible explanation for this predation is to drive Plaintiffs and Cimino from the Vail Valley market for physical therapy services.  And that is anticompetitive exclusionary conduct that violates § 2 of the Sherman Act.  That money would have been better spent reducing the cost of medical services provided by Vail Health.

**5.    VAIL HEALTH'S ATTEMPT TO ACQUIRE ADDITIONAL MONOPOLY POWER THROUGH A JOINT VENTURE.**

At some point in time, estimated by Plaintiffs at this stage of the litigation to be sometime in 2015, Vail Health began discussions with Steadman regarding the extension of the Steadman lease covering office and clinical space within the Vail Health facilities located at 181 West Meadow Drive, Vail, Colorado, and perhaps other locations in Colorado.  At about the same time, Steadman was considering opening its own physical therapy clinic that would be separate and apart from the physical therapy clinic operated by Vail Health and doing business under the Howard Head trade name.

Because referrals from physicians at Steadman to Vail Health's physical therapy clinic constitute approximately 65% to 70% of its total physical therapy referrals—and thus revenues and profits—Vail Health became extremely concerned that it would lose its monopoly position for physical therapy services in the Vail Valley if it lost the Steadman referrals.  To avoid such a loss of Steadman referrals, Vail Health proposed a joint venture to form a partnership (or other legal entity) with Steadman physicians, whereby the joint venture would provide the physical therapy services to patients then provided by Vail Health's Howard Head unit.  Through this combination, Vail Health intended to expand and strengthen its dominant monopoly power.  At about the same time, Vail Health attempted to bring Vail Summit Orthopedics ("VSO"), another group of orthopedic surgeons practicing in the Vail Valley, into the physical therapy joint venture.  Inclusion of VSO would have meant that Vail Health would have contractually tied up an even greater number of referrals, or at least ensured that Vail Health "locked in" its sources of referrals, thus expanding or at least maintaining its level of monopoly power.

In attempting to form a joint venture with Steadman and VSO, Vail Health had a specific intent to significantly solidify and expand its monopoly of physical therapy services in the Vail Valley market.  Its intent was to:  (a) formalize its sources of referrals for physical therapy services that were made to Vail Health; (b) reduce the number of referrals that orthopedic physicians would make to competing physical therapy providers in the Vail Valley market; (c) erect greater barriers to entry for potential physical therapy providers in the Vail Valley market; (d) increase its market share, which had the dangerous probability of reaching 90%; (e) further reduce Vail Health's total average costs by spreading its fixed costs over a greater the volume of physical therapy visits; (e) increase its marginal revenue per visit by reducing total costs; and (f) ultimately expand and strengthen its monopoly power for physical therapy services in the Vail Valley market.

The expiration of the last of these letters of intent in the fall of 2015 caused Vail Health a great deal of concern because it meant that Vail Health still faced the risk of Steadman reducing or cutting off all or most physical therapy referrals to Vail Health's Howard Head physical therapy unit.  And there did indeed come a time when Steadman management informed Vail Health's board and management—through Michael Shannon and Doris Kirchner—that Steadman might establish a physical therapy operation of its own.  Such an occurrence, of course, would have had a devastatingly deleterious financial impact on Vail Health.

### 6.    VAIL HEALTH PLACED UNNECESSARILY ANTICOMPETITIVE RESTRICTIONS IN THE STEADMAN CLINIC LEASE.

In 2017, Vail Health and Steadman signed a ten-year lease whereby Steadman would remain in its clinical facilities in the Vail Health medical building located at 181 W.

Meadow Drive, Vail, Colorado.  The lease, however, prohibited Steadman from providing physical therapy services in the Vail Health leased space.  The lease restriction functionally excludes Steadman from providing physical therapy services in the Vail Valley and precludes Steadman from becoming a competitor of Vail Health in the physical therapy market for ten years.  The restrictive covenant in the Steadman lease is unquestionably intended to reduce competition and has the effect of further enhancing Vail Health's monopoly power.  Although it would otherwise be lawful for a real estate owner to restrict or limit the uses of its property, such conduct may be impermissibly exclusionary under Sherman Act § 2 when practiced by a monopolist.  This is particularly true when viewing Vail Health's myriad anticompetitive, exclusionary conduct within the context of the relevant geographic and product or service markets.  Thus, when analyzed against the totality of Vail Health's anticompetitive behavior as a monopolist, the lease restriction excluding a potential competitor violates § 2 of the Sherman Act.

The exclusion from the physical therapy market of a potentially formidable competitor has had a markedly negative impact of the market for physical therapy services in the Vail Valley.  *First*, consumers of these services have been deprived of the ability to choose alternative high-quality physical therapy, something that Steadman unquestionable would have provided.  *Second*, by excluding Steadman from providing physical therapy services in its space in Vail, the market lost a competitor that would have driven costs down, which would have been to the benefit of consumers.  In short, the exclusionary clause in the Steadman lease caused injury to competition.

### 7.   VAIL HEALTH'S STATED INTENT "TO ELIMINATE" WINNINGER FROM THE PHYSICAL THERAPY MARKET.

Into this monopolistic maelstrom entered Lindsay Winninger in September 2015, who only wanted to open her own physical therapy business.  To do that she needed clinical space, so she met with the Four Seasons Hotel to discuss available space for her new clinic.  Inexplicably, almost immediately after Winninger's Four Seasons meeting, a Vice President at Howard Head, Luke O'Brien, learned about it and informed Vail Health CEO Kirchner that Winninger might be starting a competitive physical therapy clinic at the Four Seasons.  The reason this information was immediately communicated to Vail Health's CEO soon became apparent.  O'Brien did a little digging and learned from the manager at the Four Seasons that the Four Seasons "was working with Philippon [managing partner of Steadman] and a PT named Lindsay on opening a small clinic in the Four Seasons."  That information was also immediately communicated to CEO Kirchner.

Although O'Brien said he did not initially take the Sports Rehab/Four Seasons idea seriously, he informed Kirchner that Winninger had met with Dr. Philippon "multiple times in the last month" and "that she has the relationship with MJP [Dr. Philippon] to pull this off."  The implication of the "pull this off" statement is obvious:  Vail Health executives thought Winninger was about to start a new physical therapy clinic on behalf of Steadman, possibly located in the Four Seasons hotel complex, that would directly compete with Vail Health's Howard Head physical therapy clinic.  Not long thereafter, during the winter of 2017, the attorney retained by Vail Health with respect to Winninger—Davis Graham

attorney Janet Savage—admitted that Vail Health's concern of was that Winninger was going to "start a second Howard Head."

This explains why O'Brien told Kirchner about the situation and raised the idea that he thereafter posited that Vail Health should consider the Four Seasons as a possible Howard Head clinic site—that is, move in and take away the site from Steadman and Winninger—to stymy the threat of a competing Steadman physical therapy clinic at least temporarily. After all, Dr. Philippon had already negotiated a lease for Steadman with the Four Seasons. Less than an hour later, Kirchner responded: "This is perplexing. What are your thoughts on doing work at FS [the Four Seasons]? Why is Marc [Philippon] doing this? What does Mark Herron [the manager of the Four Seasons] suggest?" She then forwarded O'Brien's email to Mike Shannon, Vail Health's Chairman of the Board, to get his input.

At an October 13, 2015 meeting, Winninger, unaware of the danger into which she had placed herself, told O'Brien that she was indeed looking for space but had not yet signed a lease. Winninger also explained that she was interested in living in Vail (after traveling for two years). But she wanted to run her own clinic in Vail and did not want to work for Vail Health. Upon hearing this, O'Brien stated, "I'm in a different position than what I used to be. If I was in your position, I'd love to do it that way. But I'm not in the same position that I used to be when we worked together. I'm in charge now, and I have different responsibilities." Although O'Brien said that he was not concerned about Winninger as a competitor in her first year of business, he said he "would be worried in years 3, 4, and 5." O'Brien then said, "Competition is healthy, it gives you a chance to

step back and evaluate things.  But technically, ***my job is to look at you as competition and my job would be to eliminate you***."

In a January 8, 2016 meeting that Winninger had with Nico Brown, another Howard Head Vice President, Brown told Winninger, "we're going to create a preferred provider network that would directly help things for you guys…it's align or die…."  In other words, one had to align with Vail Health to survive.  Shortly after the January 8, 2016 meeting, Brown apparently told people at Vail Health and Howard Head that he had no intention of collaborating with Winninger.   Vail Health's specific intent to maintain its monopoly harmed competition and was the direct cause of damages to Plaintiffs.

### 8.   VAIL HEALTH'S PREDATORY SHAM LEGAL PROCESS AGAINST PLAINTIFFS.

#### a.   Vail Police Department And Eagle County District Attorney.

On April 18, 2015, Vail Health—through its attorney Janet Savage—informed the Vail Police Department and Eagle County District Attorney's Office that Cimino was involved in the "***theft of Protected Health Information***" from Vail Health, **"[h]e stole** documents and patient information from the VVMC shared drive," and that Winninger "***has been actively involved in these behaviors.***"  This was just three days after the breach was reported to the U.S. Department of Health and Human Services, Office for Civil Rights, notice was posted to Vail Health's website, and letters were sent to patients whose data was involved in the breach.  Notably, the representations Vail Health made to the federal government, its own patients, and the public in general never mentioned, let alone asserted, that Cimino "stole" anything, or that Winninger was involved in any "theft."

Vail Health's allegations concerning files that it did not create or own was done to fabricate evidence and mislead the Vail Police and the Eagle County District Attorney into believing that the "theft" related to a great number of Vail Health patient files and documents.  Proof of their specific intent to destroy competitors is demonstrated by the request of Savage to the Eagle County Deputy District Attorney that Cimino should be prosecuted for 3,000 felonies.  That Vail Health intended the Vail Police Department to investigate Winninger and file charges against her is also borne out by Savage's inquiry to the Vail Police Department on June 3, 2016, in which Savage "wanted to know if Lindsey Winninger was a subjection of [the Police Department's] investigation."   In short, Vail Health, usually through Vail Health attorney Janet Savage, made false and misleading statements to law enforcement about purported felonies in which Savage, on behalf of Vail Health, asserted that Winninger was involved.

Vail Health knew that Winninger's livelihood depends on her reputation for good character, integrity, and trustworthiness.  She works on a daily basis with prominent orthopedic doctors and clinics, preparing physical therapy programs to serve the doctors' patients.  She must abide by HIPAA, as well as other confidentiality requirements.  Any accusation that Winninger or her company stole patient information and violated HIPAA would be devastating to her and her business, thereby mortally wounding a significant competitor and excluding her and her company from the market.

But on or about April 18, 2016, Janet Savage, as attorney for Vail Health, made false statements about Winninger in a letter sent to Detective Eric Bonta at the Vail Police Department.   Plaintiffs were unaware of the letter or the false statements until

35

January 16, 2018, when the letter was first produced in the Eagle Count state court case. The April 18 letter refers to Winninger and Sports Rehab close to two dozen times.  For example, after accusing Cimino of stealing Vail Health medical records, Savage's letter states that Winninger "admits that she was aware of Cimino's activities…."  Savage's letter also states that Vail Health "knows" that "Lindsay Winninger has been actively involved in these behaviors"—meaning, Cimino's purported "theft" of Vail Health documents.  But Vail Health Vice President in charge of the physical therapy operation—Nico Brown—testified in July 2018 that the only information that they had t was:  "So other than he [Cimino] was actively working for SRC, which is her [Winninger's] company, that is all the evidence that we had."  And when asked at his deposition what did Winninger steal, Brown stated:  "I don't know that she stole anything."  Despite having no information—even in July 2018—to support the allegations in the April 18 letter, neither Vail Health, Brown, nor Savage ever informed the Vail Police Department that its "conclusions" about Winninger being involved in Cimino's "theft" were unsupported by any evidence other than Cimino was employed by Sports Rehab.

The letter signed by Savage also states that Cimino "accessed the information on those devices on February 5, 2016," even though the devices were actually in the possession of Cyopsis on February 5, 2016.  Savage knew that it was impossible for Cimino to access the devices on February 5 because Cimino's attorney informed Savage that Cimino was sending the USB devices on February 4, 2016.  Once Cimino's attorney received the USB devices on February 5, 2016, he immediately informed Savage. Savage then coordinated the pick-up of the devices from Cimino's attorney to Cyopsis,

which included the packaging that showed that Cimino sent the devices to his attorney on February 4, 2016.

The statements made by Savage were false and made with the then present intent to induce the Eagle County District Attorney to file criminal charges against *both* Cimino and Winninger.  These "facts" were fabricated by Savage and amounted to a "frame up" of Winninger for conduct that she was not involved with and knew nothing about.  The April 18 letter attaches and relies upon a number of exhibits.  One of them is identified as Exhibit 8, which is described as a spreadsheet of "evidence" of stolen files prepared by "Cyopsis," the forensic computer expert retained by Vail Health.  But Craig Bernard, the principal of Cyopsis, testified under oath that Cyopsis did not prepare Exhibit 8 and instead that was someone at Davis Graham.  This directly contradicts what Savage had represented to the Vail Police Department—that is, that Exhibit 8 was created by Cyopsis.

Exhibit 8 was actually the creation of someone at the Davis Graham law firm. (Davis Graham has invoked the work-product privilege and has refused to identify the individual who actually created Exhibit 8).  Exhibit 8 includes false and misleading statements and conceals material evidence from the Vail Police Department and Eagle County District Attorney to make it appear that Cimino "stole" information that he did not, and of course frame Winninger with accusations of felonious theft.  The creation of Exhibit 8 constituted the deliberate modification and falsification of material evidence to law enforcement in violation of Colorado law.

Vail Health asserted to the Vail Police Department that Cimino "plugged the first device in on December 1, 2015 at 7:57 am and downloaded hundreds of files from the

VVMC shared drive.  He thereafter connected a second USB device on December 30, 2015 at 6:00 am."  Vail Health never informed the Vail Police Department whether the "first device" was the Go-Flex or the Flash Drive, and neither did it indicate whether the "second device" was the Go-Flex or Flash Drive.  Vail Health also never informed the Vail Police Department that Cimino did not directly download any documents on the Go-Flex device on December 1 or 30, 2015, nor could he have done so because the Go-Flex device was not compatible with Vail Health's computer system.  The failure to identify the relevant devices was a material omission intended to mislead and misdirect the Vail Police Department and the Eagle County District Attorney to believe that Cimino stole documents from Vail Health.

Moreover, the assertion that the devices were plugged in on December 1 and 30 is curious because the documents produced from the Flash Drive portion of Exhibit 8 do not reflect a December 1 or December 30 create date, thereby demonstrating the falsity of the source and authenticity of Exhibit 8 (or the authenticity of the documents produced—that is, they did not come from the Flash Drive).

The statement to law enforcement in Vail Health's April 18, 2016 letter was that "Lindsay Winninger has been actively involved in these behaviors."  This was Vail Health's way of saying that Winninger was involved in felonious criminal conduct, as depicted on Exhibit 8.  Vail Health made these statements without ever reviewing the documents alleged to be "evidence" of the felonious criminal conduct of Winninger.  (In fact, Craig Bernard, the Cyopsis forensic computer expert of Vail Health, testified that he never was asked to produce to Vail Health the documents on the USB devices, although Cyopsis

could have done so in three short days.)  The officer investigating the breach "told her that at this time [he] did not have any solid information that showed that she was involved in the criminal aspects of this case, but that could change based on what Cimino told me." In furtherance of implicating Winninger in Cimino's purported theft, Savage then provided lists of questions to be asked of Cimino, which focused almost exclusively on Winninger and Sports Rehab.

Finally, there are other false statements in the April 18 letter and representations made to the Vail Police Department.  Specifically, Brown and Vail Health has repeatedly stated that Brown became suspicious of Sports Rehab's and Winninger's intentions during the January 8, 2016 meeting between him and Sports Rehab.  We know that could not be true because Winninger actually taped the conversation, which was unknown to Brown in 2016.  It is now apparent from the audio of that meeting, that Brown was attempting to find out as much as he could about Sports Rehab, not to collaborate, but to gain information about a competitor.  It was Brown's actions that were suspicious, not Sports Rehab's, as Brown repeatedly sought access to Sports Rehab's travel agreements despite having no need for those agreement.

More importantly, Brown sought to review Cimino's employment file *before* the meeting.  And after the meeting, when it became clear to Brown that Sports Rehab was forging a relationship with Steadman—one of the most significant sources of physical therapy referrals for Vail Health—that Brown sought access to Cimino's emails.  Brown's effort had nothing to do with Sports Rehab's self-pay business model, which had been known to Vail Health before the meeting, but rather the risk that Winninger and Sports

Rehab would supplant Vail Health as Steadman's go to resource for physical therapy, or that Steadman would be organizing its own physical therapy unit with Winninger.

The letter also states that Vail Health is "the" official medical for the USA women's alpine ski team, implying that a USA ski member must go to Vail Health for physical therapy, which is untrue.  Further, Vail Health asserted that Cimino took trade secret information was false.  *See* Interrog. No 7. related to trade secrets.  Further, Vail Health asserted that some of the documents were copyrighted, but it did not inform the Vail Police Department that the documents were originally copyrighted by RPC-Vail/Proaxis, or were not actually copyrighted at all.  Instead, Vail Health, after it took over the operations of the physical therapy unit doing business as Howard Head—and stole RPC-Vail/Proaxis's documents—that Vail Health slapped a copyright on the RPC-Vail/Proaxis documents to make it look like Vail Health had created the documents, when in fact, it did not create or own the RPC-Vail/Proaxis documents.

By continually trying to implicate Winninger in Cimino's purported misconduct, Vail Health sought to use governmental entities, such as the Vail Police Department and Eagle County District Attorney, to have criminal charges filed against Winninger.

> **b.    Colorado Department Of Regulatory Agencies.**

On April 18, 2016, the very same day that Savage sent the letter and Exhibit 8 to the Vail Police Department, an "anonymous" ethics complaint was filed against Cimino with the Colorado Department of Regulatory Agencies ("DORA").  (The April 18, 2016 complaint will be referred to herein as the "DORA Complaint I.")  DORA Complaint I specifically named Cimino, identified the nature of the complaint as "fraud," and described

Cimino's conduct as "[v]iolation of HIPAA policy and theft of confidential information."  It also summarized the complaint as: "December 2015 theft from previous employer of tens of thousands of protected health information documents which included more than 3000 patient's protected health information."

The person who filed the anonymous DORA Complaint I has not been identified or disclosed (presumably that would be required of Vail Health if it actually knew the identity), but a number of unique pieces of information contained in the Dora Complaint I were known only to about five or six Vail Health managers, two outside law firms, and Vail Health's computer forensic consultant at the time of its April 18, 2016 filing.  In other words, the information in the "anonymous" complaint was only known by Vail Health and its agents, as well as Cimino himself.

As stated above, for example, the identity of Cimino as the former Vail employee downloading the Vail Health patient files was not known outside this small group of Vail Health managers, its outside attorneys, and computer forensic consultant.  This information was, however, set forth in Savage's April 18, 2015 letter to the Vail Police Department.  Neither the letter nor the investigative report prepared by the Vail Police Department had been given to anyone as of April 18, 2015.  The DORA Complaint I, therefore, would appear to come from one of those Vail Health managers or an agent of Vail Health because Vail Health told its patients on April 15, 2016 that it was "not naming the former employee at this time because there is an active law enforcement investigation."

Then, on April 27, 2016, a second anonymous complaint was filed with DORA by some unidentified and undisclosed person.  (This second complaint will be referred to as "DORA Complaint II.")   The DORA Complaint II again specifically named Cimino and provided a summary of the complaint as: "[t]his PT [identified as Cimino] is under criminal investigation and is known to have downloaded confidential patient information on his last day of employment with VVMC and downloaded this information on an external hard drive for personal gain."  There was no way for the public to have identified Cimino in either the DORA Complaints II because as of April 27, 2016, Vail Health had not "nam[ed] the former employee…because there [was] an active law enforcement investigation."

After receiving the two "anonymous" complaints, DORA requested information from Vail Health regarding the data breach.  In response, on July 25, 2016, Vail Health (through Tanya Rippeth) published the same false statements from the April 18, 2016 Savage letter to Andrew Schwab at DORA.  In other words, the July 25, 2016 Rippeth letter was based on and substantially the same as the April 18, 2016 letter drafted by Savage and provided to the Vail Police Department.  And as Rippeth testified under oath, Rippeth relied on most of the statements made in her letter to DORA based on conversations with outside counsel Janet Savage and Howard Head Vice President Nicholas Brown.

Notably, DORA Complaint I was submitted on Monday, April 18, 2016, just three days after Vail Health's notice of the breach was mailed to patients on Friday, April 15, 2016, by ID Experts located in Portland, Oregon.  It was unlikely that most, if not all, of the 3,116 patients had not yet received the breach notice as of April 18, 2016, the time

42

the DORA Complaint I was filed.  Further, April 18, 2016 is the exact same day that Savage sent Vail Health's letter to the Vail Police Department.  Likewise, DORA Complaint II was submitted to DORA on April 27, 2016, the exact same day the HIPPA Journal published an article on the Vail Health breach.  A reasonable inference is that the filing of DORA Complaints I and II was not a coincidence but part of Vail Health's broader plan to use governmental processes to eliminate Winninger and Sports Rehab.  This reasonable inference is borne out of the fact that many of the statements in DORA Complaints I and II were only known to Vail Health and its agents.

Other than Vail Health, Rippeth could not identify anyone outside of Vail Health other than Vail Health's counsel Davis Graham and its computer forensic consultant Cyopsis that knew Cimino was involved in the data breach.  None of the notices provided to the press, public, or patients identified Cimino, and Vail Health did not even identify Cimino in the April 15, 2016 breach notification submitted to HHS.  No patient apparently contacted Vail Health to inquire about Cimino's identity when DORA Complaints I and II were filed.  (Rippeth Dep. at 169-72)  Further, as Vail Health has admitted, it would not have identified Cimino even if someone had inquired into his identity because there was an active law enforcement investigation going on.  And to date, Vail Health has identified only one patient that inquired about the breach.  In response to that patient's inquiry, which was not sent until after DORA Complaint I and II were filed, Vail Health never identified nor named Cimino as the physical therapist involved in the data breach.

Additionally, both DORA Complaint I and II contain information known only to Vail Health and its agents—that is, "***tens of thousands*** of protected health information

documents" were purportedly stolen and that Cimino "downloaded confidential patient information on *his last day of employment* with VVMC and downloaded this information on an ***external hard drive for personal gain***" (emphasis added). This information was not publicly known when DORA Complaints I and II were filed. Nothing in the notices provided to the patients or public identified the number of documents at issue, that Cimino was the physical therapist that downloaded patient information, that he did so on his last day of employment, or that one of the devices was an external hard drive.

As to the contention that Cimino downloaded documents on his last day of employment, only Vail Health and its agents had access to this information. For example, in Vail Health's April 15, 2016 internal report of the breach, which was submitted by Howard Head Vice President Nicholas Brown, the report states that "Cimino had secretly copied numerous PT and OT records from the HHSM shared network drive on December 1, 2015 and on December 30, 2015 (*his last day of employment*)...." (emphasis added). The Vail Health signatories to that internal report were limited to Margie Lim-Morrison, Darrell Messersmith, Nicholas Brown, Rick Smith, and Ryan Kolczak. None of the notices sent to the patients or the public press releases identify the date Cimino left Vail Health's employment.

Nor was it disclosed that Cimino used an "external hard drive" to download documents. The notices provided to the patients and the public press releases repeatedly (and only) state that "two USB electronic storage devices" were used by Cimino. Vail Health never disclosed that an "external hard drive" was used. Significantly, the Vail Police Department did not even know that until five months after the police investigation

44

was opened against Cimino.  Until August 2016, the Vail Police Department believed that two flash drives/thumb drives were used by Cimino.  It was only when Cyopsis told the Vail Police Department in August 2016, that an external hard drive was used that the Vail Police Department understood that one of the USB devices was a flash/thumb drive and the other was a I TB Seagate external hard drive.

Similarly, it was not until about spring 2018 that Winninger and Sports Rehab first learned about the number of documents at issue.  That information came from Janet Savage, who characterized the number as "tens of thousands" of documents.  Winninger and Sports Rehab also did not initially know that Cimino used an external hard drive— that information was not disclosed in the December 2016 complaint shown to Steadman, nor was it included in the August 2017 counterclaim Vail Health filed in the Eagle County state court case.

So the only individuals that had knowledge of this information in April 2016 were Davis Graham, Cyopsis, and management at Vail Health including Chief Executive Officer Doris Kirchner, Board Chairman Michael Shannon, Howard Head executives Nicholas Brown and Luke O'Brien, Vail Health IT personnel Ryan Kolczak and Darrell Messersmith, Chief Administrative Officer Rick Smith, and Risk Manager Margie Lim-Morrison.  To the extent other Vail Health physical therapists knew about Cimino's involvement in the breach, they had no incentive to submit an "anonymous" complaint regarding one of their friends and colleagues.  Nor would they have been privy to the information disclosed in DORA Complaint I or II.

In Vail Health's July 25, 2016 letter to DORA, Vail Health again implicated Winninger and Sports Rehab in conduct violating criminal and licensure laws.  The letter makes the same false and false statements that Savage's April 18, 2016 letter to the Vail Police Department.  Most notably, Rippeth states that Vail Health "knows" that "Lindsay Winninger has been actively involved in these behaviors."   Rippeth testified, however, that she did not "know" whether Winninger was involved in the misconduct alleged in the letter because she did not conduct any independent investigation into the matter.  That is because she simply relied upon Brown and Savage as the basis for her letter.  Further, Rippeth testified that she had only "suspicions" that Winninger was involved, and as of May 29, 2019, the day she was deposed, Rippeth still had no confirmation whether Winninger was involved in Cimino's purported theft.  When questioned as to whether she had serious doubts about Winninger's involvement, Rippeth testified that she "didn't know" one way or the other whether Winninger had any involvement.  (Rippeth Dep. at 269-70)  Yet Rippeth never told DORA that fact even though she knew that Cimino could lose his license based on the facts alleged by Vail Health.  In fact, Rippeth told Brown in an email that this was the piece in which Cimino would lose his license.

Although Rippeth understood that a letter to DORA could detrimentally affect Cimino's licensure—that is, that DORA could revoke his license—and that it was important to present accurate and complete facts to DORA, Rippeth did not conduct an independent investigation as to whether the statements in the letter were true, accurate, or complete.  Instead, she relied on Howard Head executive Nicholas Brown and attorney Janet Savage to verify most of the statements made in the DORA letter.  In fact, Rippeth

testified that she only had "suspicions" about Winninger's involvement in Cimino's purported theft, and yet despite only have "suspicions," she did not state that to DORA in her letter.    Instead, she represented that her "conclusion" was that Winninger was involved in Cimino's purported theft.    Notably, as of May 2019, at the time of her deposition, Rippeth still did not know whether Winninger had any involvement in Cimino's purported theft of Vail Health files.

The statements and implication that Winninger and Sports Rehab was involved in criminal conduct was clearly false and strategically made with the intention to implicate Winninger and Sports Rehab in criminal conduct with the hopes that DORA would investigate Winninger and revoke her license as well.  Vail Health continued with this line of attack in the DORA letter even after it had been told by the Vail Police Department on June 3, 2016 that Winninger was not the subject of any police investigation.   (Rippeth apparently had never been told of this significant fact.)  The Vail Police Department never interviewed Cimino, and there was no further information provided to or identified by the Vail Health Police Department that implicated Winninger in Cimino's purported theft of Vail Health patient files.  In fact, Winninger was never even contacted by the Vail Police Department as part of its investigation into Cimino.  And even though the Vail Police Department stated there was no "solid information that showed [Winninger] was involved in the criminal aspects of this case," Vail Health again asserted that it knew that Winninger was involved in criminal conduct when it responded to DORA's investigative inquiry.

### c.   Vail Health's Sham Trade Secrets Litigation.

Despite having told the Vail Police Department in April 2016 that Cimino had "stole" Vail Health trade secrets, Vail Health refused to identify the trade secrets purportedly at issue until the Eagle County district court ordered Vail Health to identify the trade secrets. On April 6, 2018, two years after asserting that trade secrets were stolen by Cimino, Vail Health identified 1,485 trade secrets at issue out of 2,999 documents identified as having been downloaded by Cimino on December 1 and 30, 2015.  By April 23, 2018, the number had changed to 1,530 trade secret documents out of a total of 6,416 documents.  Two years later, that number is now down to 483 trade secret documents, of which the only distinguishing factor for 479 is that they contain protected health information.

Notably, none of the documents are identified as trade secrets on the face of the documents, and both Kolczak and Messersmith testified that they were not aware of any trade secret documents ever being identified by Vail Health.  This is significant because both were involved in the Cimino data breach and are aware of the IT systems and the restrictions imposed by IT based on requests from departments.

Further, the designation of any documents as trade secret or confidential was not done by Vail Health as a regular course of its business operations.  Instead, the designation was first done in about March 2018, after the Eagle County district court ordered that the trade secrets be identified.  Brown apparently reviewed the 6,400 documents in one day to designate the documents—as part of this litigation—based on parameters given to them by Davis Graham, its lawyers.  (O'Brien only reviewed several documents).

First, Brown represented that he reviewed all the documents to designate them as PHI, confidential, or trade secret.  But it is impossible to review 6,400 documents in 6-8 hours, as Brown testified is the amount of time it took him to review the documents.  Even at the more generous 8 hours, 800 documents would have had to be reviewed every hour, equating to approximately 13 documents every minute.  No electronic document review system can process documents that quickly.

Second, that Vail Health's lawyers had to give Vail Health parameters to identify trade secret documents shows that Vail Health never identified any documents prior to this litigation as trade secrets.  Brown himself admitted at his deposition that he did not know what a trade secret was without advice from counsel.

Third, having not identified the documents until 2018, it was therefore impossible for Vail Health employees to have any knowledge of what was designated a purported trade secret or not.  In fact, Brown—who was in management at Vail Health since 2012—stated that he never saw any list or a description of document by the physical therapy unit before December 2015 that identified any trade secrets.

Fourth, having generally stored these documents on the shared drive for many years, and with hundreds of employees having access to these documents, the documents were not maintained as trade secrets in any way.  Vail Health knew all this and despite these facts continues to assert that trade secrets were misappropriated.

Finally, none of the purported 1,485 trade secrets or the 479 documents containing PHI have been found on any Sports Rehab computers, emails, or on the Sports Rehab

electronic storage system.  Despite this, Vail Health continues to assert that it has a trade secret misappropriation claim against Winninger and Sports Rehab.

As to the RPC-Vail documents that Winninger had in her possession, Vail Health originally identified over 4,000 documents as trade secrets in November 2019 in response again to the Eagle County district court having to order Vail Health to do so.  Shortly thereafter, this number was reduced so that only about 37 trade secret documents were identified in December 2019.  Then, in January 2020, Vail Health asserted that there were no trade secrets at issue with respect to Winninger. Despite this, Vail Health continues to assert that it has a trade secret claim against Winninger.

Vail Health also asserts that it has a claim against Winninger for purportedly taking "confidential" documents.  But Winninger was never an employee of Vail Health, the documents she has were educational materials as Topper Hagerman, Winninger, and Schoenthaler have all testified to, the documents are publicly-available over the internet, they were never designated as confidential by Vail Health or any other party, Vail Health did not have any ownership interest in the documents when Winninger obtained them, the documents were not created by or paid for by Vail Health and so therefore any assertion that Winninger stole "confidential" documents from Vail Health is known to be utterly false.  Finally, Brown himself testified that he never saw any list of confidential documents or a document that identified the purported confidential documents of the physical therapy unit prior to December 2015.

All of these illegal and exclusionary acts were anticompetitive under § 2 of the Sherman Act and are the direct and proximate cause of diving Winninger and Sports

Rehab from the market for physical therapy in the Vail Valley. Those damages significantly exceed $5 million. The exclusion of Winninger and Sports Rehab from the Vail Valley has harmed competition and deprived consumers of an alternative source of high-quality physical therapy services.

### 9. THE IMPACT OF SPORTS REHAB'S HIRING OF CIMINO.

Following through on her desire to establish her own physical therapy clinic in Vail, in late fall 2015, the new company (Sports Rehab) that she had started with another business partner, made an offer of employment to David Cimino to begin employment as a physical therapist, which he accepted. Before joining Sports Rehab, Cimino had been employed by RPC-Vail as a clinic aid from July 2007 through December 2007. He then left for physical therapy school and returned to RPC-Vail in July 2011, where he worked until November 2012 when Vail Heath took over the physical therapy clinic operating under the name Howard Head. From November 2012, Cimino worked continuously with Vail Health/Howard Head until he joined Sports Rehab.

On or about November 25, 2015, Cimino provided notice to his supervisor that he was resigning as a physical therapist from Vail Health's Howard Head unit. Cimino provided a five-week notice as a courtesy to allow Howard Head adequate time to find his replacement. Cimino began his employment with Sports Rehab immediately after the New Year.

On January 15, 2016, Vail Health legal counsel Janet Savage sent Winninger and Sports Rehab a letter informing her that Cimino had apparently taken certain files with him when he left Vail Health. The receipt of the letter from Savage was the first time she

51

had heard about Cimino taking any documents.  At no time prior to his employment with Sports Rehab did Winninger discuss taking Vail Health patient files or data, and Winninger was not aware any patient files or data had been taken when Cimino started working at Sports Rehab.  In short, Winninger was not involved in Cimino's copying of Vail Health files in any way.

The letter stated that she should not be soliciting Vail Health patients and should retain any Vail Health patient files that she had in her possession.  Since neither Winninger and Sports Rehab, nor Cimino were soliciting any Vail Health patients, no further action was needed on that issue.  And since Cimino never transferred to her any Vail Health patient files, nothing further was needed on that front either.  A few months later, however, the hiring of Cimino took a very negative turn.

On April 15, 2016, Vail Health reported to the U.S. Department of Health & Human Services ("HHS") that there was a breach of patient health information based on documents that Cimino had in his possession after his departure from Vail Health.  In reporting the reported breach to HHS, Vail Health was required to identify the type of breach—that is, whether the breach was because of:

- ▪ Hacking/IT Incident;
- ▪ Improper Disposal;
- ▪ Loss;
- ▪ Theft; or
- ▪ Unauthorized Access/Disclosure

Vail Health identified the alleged breach involving Cimino as an "Unauthorized

Access/Disclosure"—*not a* "**theft**":

| Breach Report Results | | | | | | | |
|---|---|---|---|---|---|---|---|
| Expand All | Name of Covered Entity ◇ | State ◇ | Covered Entity Type ◇ | Individuals Affected ◇ | Breach Submission Date ◇ | Type of Breach | Location of Breached Information |
| 0 | Vail Clinic, Inc. dba Vail Valley Medical Center, and dba Howard Head Sports Medicine | CO | Healthcare Provider | 3118 | 04/15/2016 | Unauthorized Access/Disclosure | Laptop, Network Server |

Additionally, in the submission to the OCR, Vail Health never asserted that Cimino had stolen anything during the six years that the OCR has been investigating the breach.  And from the documents produced in the Eagle County action between Vail Health and the OCR, Vail Health has still not asserted that there was any theft by Cimino. Moreover, in making the submission to the HHS, Vail Health attested under federal law that the information provided to the HHS in the initial breach report was accurate.

Similarly, on April 15, 2016, Vail Health provided notice to its patients, the press, and on its website about the breach but did not state that the data was "stolen" or that there was a "theft" of any information.  Rather, Vail Health told its patients and the public "about a potential disclosure of personal health information."  Vail Health stated that a former physical therapist had "improperly acquired protected health information," had "copied numerous physical therapy and occupational therapy records" on two USB electronic storage devices and took those devices with him when he departed.  Vail Health also stated that it "obtained the return of both electronic storage devices along with a signed certification from the former employee that he has not retained copies or otherwise provided any of the data to any other person or company."  The April 15, 2016 "Notice to Vail Health Center patients regarding Privacy Incident" was posted on Vail Health's website.

In the Notice, Vail Health stated that on February 16, 2016, it discovered that a former Howard Head physical therapist—presumably Cimino, although he was not named in the notice—improperly copied physical therapy and occupational therapy records containing patient personal health information onto two USB electronic storage devices and "took those devices with him at the time he was starting with his new employer."  The data apparently "did NOT include social security numbers, dates of birth, credit card or bank account information, or addresses."

Importantly, the Notice also states that "[t]o date, VVMC has demanded and obtained the return of both electronic storage devices along with a signed certification from the former employee that he has not retained copies or otherwise provided any of the data to any other person or company."  The Notice further states that on or about April 15, 2016, separate letters were mailed to each patient whose personal health information was purportedly compromised.  The letters made the same, or substantially the same, statements as those made in the Notice and were sent to 3,116 Vail Health patients. Accordingly, on April 15, 2016, Vail Health reported to the federal government, the public, and its patients that it had demanded and obtained the return of the electronic storage devices from its former employee—Cimino—and that it had obtained a certification from the former employee—again Cimino—in which he stated that he had "not retained copies or otherwise provided any of the data to any other person or company."

As Vail Health admits, Cimino returned the two USB devices to Vail Health by sending the devices by overnight mail to his attorney in Denver on February 4, 2016.  On February 5, 2016, Cimino's attorney then delivered the USB devices to Cyopsis, Vail

Health's computer forensic expert.   In the package delivered to Cyopsis, Cimino also returned two hard copy documents that were in his possession.

Cimino also tried his best to identify documents that had been copied to his personal computer over many years (including while he was at RPC-Vail).   Cimino created a folder entitled "Attn VVMC docs from personal computer" and copied those files to the USB external hard drive—the GoFlex device.   Almost all of the documents contained in that file dated from Cimino's employment with RPC-Vail, not Vail Health. So as of February 2015, Cimino voluntarily returned documents and information to Vail Health, which included documents that belonged to Cimino's former employer.   Cimino also informed Vail Health that he would delete any files on his personal computer once Vail Health gave him instruction to do so.   Vail Health never provided Cimino any instructions to delete documents from his personal computer and still has not to this day.

Cimino told Winninger that he had downloaded files to a USB drive, but he said he never intended to download any Vail Health patient files.   On March 4, 2016, Cimino's attorney informed Winninger that Cimino had returned all documents to Vail Health and that he had signed a sworn certification stating that he had returned the documents and that he had not transferred the files to anyone else.   Based on the facts above, Winninger thought Cimino could continue his relationship with Sports Rehab.

Even though Vail Health assured the federal government, the public, and its patients that its former employee returned the personal health information and that no other person or company had the patient data, the Vail Police Department, Eagle County

District Attorney's Office, and the doctors and clinics using Winninger and Sports Rehab's physical therapy services were told something much different.

Additionally, in the Eagle County action, Winninger produced documents from her employment with RPC-Vail, which she believed had been the educational and training materials that she had obtained during her course of employment with RPC-Vail.  She discovered, however, in the Eagle County action that the documents also contained protected health information, which she had inadvertently obtained from the shared drive where the documents were stored and not protected.  She did not intend to take the files and did not knowingly do so.  Rather, the files appear to have been misfiled in general educational and training materials accessed by hundreds of employees over the course of many years.  After the documents had been produced, Vail Health provided notice to the OCR regarding the protected health information at issue, as well as providing notice by way of letter to the patients and issuing a public notice on its website.  Notably, as with Cimino, Vail Health asserted that there was an inadvertent downloading of documents by Winninger.  At no point, before or since, has Vail Health disclosed to the OCR, or its patients that Winninger stole the documents containing protected health information.

### 10.   VAIL HEALTH FALSELY ACCUSED WINNINGER OF THEFT IN STATEMENTS TO STEADMAN.

In about spring 2016, Steadman Chief Administrative Officer Dan Drawbaugh had discussions with a number of doctors in Steadman, including Drs. Clanton, LaPrade, and Philippon, who expressed concern about the breach.  Specifically, "there were implications that [Winninger] could have been involved in" the theft.  Drs. Philippon, LaPrade, and Clanton voiced concerns that Winninger had taken patients from Howard

Head.  In fact, Drawbaugh testified that "everyone knew" about Winninger, and there was a perception that Winninger was involved in Cimino's purported theft of patient files. There is only one possible source for these allegations and that is Vail Health.

Drawbaugh also explained that the statements about Winninger being involved in Cimino's theft of Vail Health patient files essentially spread like wildfire throughout Steadman.  All it took was a suggestion that Winninger was involved in very, very serious criminal activity for her to be shut out of Steadman.  This was the exact effect that Vail Health hoped for.

In summer 2016, Vail Health CEO Kirchner indicated to Drawbaugh that Winninger was involved in Cimino's purported theft of Vail Health patient files.  Although Drawbaugh could not recall the number of times Kirchner made such statements to him, Drawbaugh testified that from the beginning, the implication by Kirchner was that Winninger was involved.  Kirchner also led Drawbaugh to believe that there was an ongoing investigation being undertaken by Vail Health and that Vail Health had proof that Winninger was involved in Cimino's purported theft of patient files.  But Kirchner never would provide any specifics about the evidence supporting such serious allegations against Winninger and Sports Rehab.  Instead, when Steadman asked Kirchner to provide proof of this alleged theft of patient files, Kirchner told Drawbaugh that Vail Health could not provide Steadman that information.   Kirchner made the statement in such a manner so as to leave Drawbaugh with the distinct impression that Kirchner and Vail Health did indeed have evidence supporting the allegation of criminal conduct by Winninger and/or Sports Rehab.

At the time Kirchner made the statements to Drawbaugh, neither Kirchner,

Shannon, Brown, O'Brien, nor anyone else at Vail Health—including their legal counsel and forensic expert—had any proof that Winninger or Sports Rehab were involved in Cimino's purported "theft" of Vail Health files, whether that be medical files, patient files, files containing PHI, trade secrets, or confidential, or proprietary documents or information.  Kircher made the statements to Drawbaugh knowing full-well that she did not have any evidence.  Kirchner made the statements to give the false impression that Vail Health had such information and that the criminal violations were significant.

Vail Health Board Chairman Michael Shannon also told Dr. Philippon and Drawbaugh that Vail Health patient files were stolen and that Winninger was involved. Shannon admitted under oath that he had no factual basis for the statement, which explains why he never provided any specifics about the evidence that he had to support such egregious allegations against Winninger and Sports Rehab.

Nicholas Brown also made false statements to Kelly Adair of Steadman.  Brown told Adair that "he" and "she" was involved in stealing patient files from Vail Health.  Adair understood that "he" referred to Cimino and "she" referred to Winninger.

Going into the late fall 2016, there were at least four dynamics working against Winninger and Sports Rehab, the confluence of which would be catastrophic for them. *First*, Steadman provides an overwhelming majority of the physical therapy referral business to Vail Health—certainly more than 70%.  *Second*, Winninger had a close relationship with Dr. Marc Philippon, the managing partner of Steadman, as well as many of the Steadman physicians, and Vail Health now knew that she had a contractual relationship with Steadman and SPRI.  These two factual elements alone made

Winninger a target for Vail Health.   *Third,* there was the collapse of the joint venture negotiations between Vail Health and Steadman partners and the termination of the final letter of intent in the late fall 2016.  Vail Health was convinced that if Steadman opened its own physical therapy clinic, Vail Health would lose tens of millions in revenues and profits.  And *finally*, Vail Health thought that if Steadman set up its own physical therapy clinic in competition with Vail Health's Howard Head unit, Winninger was going to be a principal organizing force and manager.  So these factual dynamics set in motion the admonition of Vail Health Vice President Luke O'Brien from ten months earlier: ***"[M]y job…would be to eliminate you.***"   And from the late fall 2016 to winter 2017, that is exactly what Vail Health did.

Vail Health accelerated its campaign to destroy Winninger so she would not be a competitive threat and so she would be eliminated as a possible driver in a Steadman physical therapy unit that would compete with Vail Health.  Vail Health also found a way to contractually keep Steadman out of the physical therapy market through exclusionary lease restrictions so that Vail Health could continue to capture Steadman referrals to maintain its monopoly power.

On December 31, 2016, Shannon met with the managing partner of Steadman, Dr. Marc Philippon, for breakfast at the Sonnenalp Hotel in Vail.  At the breakfast meeting, Shannon showed Dr. Philippon a complaint that Dr. Philippon understood to be criminal in nature.  Dr. Philippon recalls hearing the word "criminal" being used.  Dr. Philippon knows he did not use the word "criminal," and the only other person at the meeting was Shannon.  We now know that the complaint shown to Dr. Philippon was styled as a civil

complaint, but it contained so many alleged criminal violations that it reads like a criminal indictment.  (Notably, Shannon himself repeatedly characterized the draft complaint as a "criminal complaint" at this deposition that is, until his counsel intervened to correct him.) Anyone without knowledge of the difference between a civil complaint and a criminal indictment could easily have understood the complaint shown to Dr. Philippon to be the initiation of criminal proceedings. For example, the complaint alleged that Winninger and Sports Rehab "stole[] confidential and trade secret information" from Vail Health. Winninger and Sports Rehab also "stole[] thousands of patient files in violation of the Health Insurance Portability and Accountability Act of 1996…."  That is, Winninger and Sports Rehab committed crimes under federal law.  Only "covered entities" are subject to HIPAA.  The complaint goes on to assert that Winninger and Sports Rehab's "purpose for stealing patient health information was to solicit VVMC's [now Vail Health's] patients and gain an unfair economic advantage."  Vail Health contended that these purported acts were "prohibited by state and federal statutory law…."

The complaint further alleges that "Cimino stole confidential and proprietary information, including VVMC [now Vail Health] protocols and other confidential materials." It then stated that "Winninger and Sports Rehab "knew about, and actively participated in Cimino's theft of confidential and proprietary information."  The complaint further alleges that Winninger and Sports Rehab "solicited, and/or were, at all relevant times, aware of, complicit in and actively involved in, Cimino's theft of VVMC's [now Vail Health's] patient files, including protected health information, as well as the theft of VVMC's [now Vail Health's] confidential, proprietary and trade secret business information and copyright

protected business records."   The complaint then states that Winninger, Sports Rehab, and Cimino "intended to use and, on information and believe, did use these patient files and confidential information to solicit patients and to compete against VVMC [now Vail Health] and Howard Head."

And finally, Shannon told Dr. Philippon that the complaint was going to be filed against Winninger the next day, so it was logical for Dr. Philippon to conclude that criminal proceedings against Winninger were about to commence.   Vail Health's campaign of character assassination continued from there.

In early January 2017, Steadman CEO Drawbaugh met Kirchner at her office where she showed him the same complaint that Shannon showed Dr. Philippon a few days before.   The complaint was sitting on Kirchner's desk, and she told Drawbaugh that he could look at it but could not take a copy.   Drawbaugh reviewed it, and he too understood that it was against Winninger and was criminal in nature.   Kirchner informed Drawbaugh that forensics had been run, and based on Kirchner's statements, Drawbaugh also understood that the forensics had traced the stolen files to Winninger.   Drawbaugh asked to see the forensics, but Kirchner would not show it to him, claiming instead that it was "confidential" to Vail Health.

So Kirchner led Drawbaugh to believe Vail Health had proof that Winninger was involved in the theft, but Kirchner just could not show him.   But the real reason Kirchner could not show Drawbaugh is because the only forensics that Vail Health had received were from Cyopsis, and the analysis from that firm proved *nothing* about Winninger's

involvement in Cimino's purported theft of Vail Health patient files, as Vail Health's own forensic expert confirmed during his deposition.

Based on the complaint, Drawbaugh understood that Vail Health was saying that Winninger and Sports Rehab had stolen or been involved in the theft of thousands of patient files and that the patient files were being used for Winninger and Sports Rehab's own economic advantage.  Based on his discussions with Kirchner and the allegations in the complaint, Drawbaugh thought that Vail Health had the facts to back up its serious (and criminal) allegations against Winninger.

The statements made by Vail Health in the complaint were false and known to be false at the time they were published to Dr. Philippon and Drawbaugh.  The complaint was in fact merely a sham, and Vail Health never had any intent to actually file the complaint.  The false statements in the complaint were made with Vail Health's then present malicious intent to destroy Winninger's professional and personal reputation, as well as the professional reputation of Sports Rehab, with Steadman and the orthopedic surgeons who were its members.  It was, in fact, a concerted character assassination by Vail Health to drive Winninger and Sports Rehab out of the Vail Valley market.  In other words, these were exclusionary acts to destroy competitors of Vail Health in the relevant product or service market—physical therapy—in the Vail Valley geographic market.

The attacks against Winninger and Sports Rehab continued.  During the week of February 6, 2017, Shannon called SPRI Board member Al Perkins purportedly to discuss a position as philanthropy chair.  Somehow, the conversation turned to Winninger, with Shannon telling Perkins that "he did not know why Dan Drawbaugh was hanging around

[Winninger] because she wasn't a good person and she had stolen records from Vail Health to start her own business."   Shannon told him that the theft involved 2,500 to 3,000 patient records.  (Perkins Dep. at 15-23)

Immediately after the call, Perkins contacted Drawbaugh and told him what Shannon had said.  Perkins's recollection is clear.  He says he repeated what Shannon had said, that is, "he didn't know why [Drawbaugh] was hanging around Lindsay Winninger because she had stolen records from Vail Health." (*Id.*)  Although Drawbaugh could not recall Perkins exact words, Drawbaugh confirmed that Shannon said Winninger was implicated in the theft of Vail Health files.  Perkins eventually told Dr. Philippon about his conversation with Shannon.

Shannon had another call with Perkins.  Again, the topic of conversation turned to Winninger.  Perkins told Shannon that he did not know Winninger very well and that during their last conversation, Shannon had said that Winninger stole records from Vail Health.  In an apparent attempt to deny his involvement in making such false statements, Shannon denied the conversation.  Perkins did not know what to say, given he knew (and had a distinct recollection of) what Shannon had told him about Winninger and Cimino.

These tortious and exclusionary acts were anticompetitive under § 2 of the Sherman Act and are the direct and proximate cause of diving Winninger and Sports Rehab from the market for physical therapy in the Vail Valley.  Those damages significantly exceed $5 million.  The exclusion of Winninger and Sports Rehab from the Vail Valley has harmed competition and deprived consumers of an alternative source of high-quality physical therapy services.

**INTERROGATORY NO. 8:** IDENTIFY the factual basis for and all DOCUMENTS supporting the allegations in YOUR Amended Complaint regarding all prices charged for physical therapy services by Vail Health.

Answer:

Information supporting the allegations referred to in Interrogatory No. 8 is uniquely in the hands of Vail Health, and Vail Health has refused to produce thus far complete and detailed information regarding its pricing. Vail Health has periodically posted pricing information to its website regarding rates for various physical therapy services, which was publicly available at the time Plaintiffs filed the Amended Complaint. Additionally, since the filing of the Amended Complaint, Vail Health has produced billing documents and financial information produced in the Eagle County state court action and this action, which is more fully identified below. *See also* July 19, 2019 Brown Dep. at 221:3-22:8.

By way of example, the following documents produced by Vail Health show the pricing for physical therapy services over the course of many years:

|  | 2010 | 2011 | 2012 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **Evaluation/40 minutes** | 181.35 | 192.30 | 197.90 | 181.65 | 197.80 | 205.00 | 203.00 | 203.00 |
| **Manual Therapy/hour** | 288.60 | 306.20 | 315.00 | 289.20 | 314.80 | 326.80 | 368.00 | 368.00 |
| **Therapeutic Exercise/hour** | 323.00 | 342.60 | 352.60 | 323.80 | 352.00 | 366.40 | 376.00 | 376.00 |

Source: Vail_0051241, Vail_0051244, Vail_0051252, Vail_Fed_00000246-249; 2020 Chargemaster

**INTERROGATORY NO. 9:** IDENTIFY the factual basis for and all DOCUMENTS supporting your allegations in ¶ 48 of YOUR Amended Complaint that three physical therapy providers "have closed their clinical offices as the result of anticompetitive market conditions created by Vail Health's exercise of its monopoly power."

ANSWER:

*See* Answer to Interrogatory No. 2, Chart for Vail, Colorado.

## <u>REQUESTS FOR ADMISSION</u>

**REQUEST TO ADMIT NO. 1:**  Admit that SRC works on a cash payment system and does not directly contract with insurance companies.

> <u>RESPONSE</u>:

> Admit.

**REQUEST TO ADMIT NO. 2:**  Admit that YOU intended SRC to operate exclusively on "a cash pay model" and that YOU chose not to go the route of accepting any insurance payments.

> <u>RESPONSE</u>:

> Deny.


Dated: March 30, 2021                    *s/ Alan L. Kildow*
                                         Alan L. Kildow, MN# 0143133
                                         790 Potato Patch Drive
                                         Vail, CO 81657
                                         Telephone: (970) 390-6675
                                         E-mail:  alkildow@aol.com

                                         Jesse Wiens, Colo. #33903
                                         Fahrenholtz & Wiens LLC
                                         100 West Beaver Creek Boulevard
                                         Suite 236
                                         Avon, CO 81620
                                         Telephone: (970) 949-6500
                                         E-mail:  fwlawyers@gmail.com

                                         Attorneys for Plaintiff Sports Rehab Consulting
                                         LLC and Lindsay Winninger

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2021, I served a true and correct copy of Plaintiffs Responses to Vail Health's First Set of Discovery Requests by email, on the following:

Janet Savage
Jacqueline V. Roeder
Shannon Wells Stevenson
Daniel A. Richards
Davis Graham & Stubbs LLP
1550 17th Street, Suite 500
Denver, CO 80202
janet.savage@dgslaw.com
jackie.roeder@dgslaw.com
shannon.stevenson@dgslaw.com
daniel.richards@dgslaw.com

Counsel for Defendant Vail Clinic, Inc.

_s/ Alan L. Kildow_
Alan L. Kildow