IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-cv-02075-WJM-GPG

SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,
and LINDSAY WINNINGER, an individual,

    Plaintiffs,

v.

VAIL CLINIC, INC. d/b/a VAIL HEALTH, a Colorado nonprofit corporation.

    Defendant.

---

## PLAINTIFFS' RULE 37 MOTION TO COMPEL #2
## RELATING TO VAIL HEALTH'S MONOPOLY POWER

---

## INTRODUCTION

Plaintiffs Sports Rehab Consulting and Lindsay Winninger move the Court pursuant to Fed. R. Civ. P. 37(a)(3)(B)(iii) and (iv), for an order compelling Vail Health to produce documents and answer interrogatories relevant to Vail Health's monopoly power. Proof of monopoly power is an essential element of monopolization under § 2 of the Sherman Act, as applied by controlling Supreme Court and Tenth Circuit antitrust law. The elements of monopolization under § 2 are "the possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."[1] In the Tenth Circuit, proof of monopoly power

---

[1] *Reazin v. Blue Cross & Blue Shield,* 899 F.2d 951, 973 (10th Cir. 1990) (quoting *Bright v. Moss Ambulance Serv.,* 824 F.2d 819, 823 (10th Cir.1987) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71 (1966)), *cert. denied,* 497 U.S. 1005.

requires a showing of both power to control prices[2] and power to exclude competition.[3] The evidence necessary to establish these elements may be summarized broadly as direct and indirect (circumstantial) evidence,[4] with direct evidence including proof of supracompetitive prices,[5] restricted output,[6] and exclusion of competitors.[7]  Indirect evidence includes data calculating market share[8] and pricing in excess of marginal or average cost.[9]  Plaintiffs' discovery here falls into those general categories.

*First,* Plaintiffs are entitled to evidence of supracompetitive prices[10] found in reimbursement claims and billing records for physical therapy services—that is, the electronic payment submissions to payors such as UnitedHealthcare, Anthem Blue Cross & Blue Shield, and Medicare, as but examples.  This information will show the price Vail

---

[2]    *Id.* (power to control prices is a critical element in the Tenth Circuit).
[3]    *Reazin,* 899 F.2d at 967; *Bright,* 824 F.2d at 824; *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos.,* 783 F.2d 159, 163 (10th Cir.1986).
[4]    *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002).
[5]    *Christy Sports LLC, v. Deer Valley Resort Co., Ltd.,* 555 F.3d 1188, 1198 (10th Cir. 2009); *Díaz Aviation Corp. v. Airport Aviation Servs.*, 716 F.3d 256, 265 (1st Cir. 2013).
[6]    *FTC v. Ind. Fed'n of Dentists,* 476 U.S. 447, 460 (1986) ("'proof of actual detrimental effects, such as a reduction of output' can obviate the need for an inquiry into market power"); *Broadcom Corp. v. Qualcom, Inc.*, 501 F.3d 297, 307 (3d Cir. 2007); *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *Christy Sports LLC, v. Deer Valley Resort Co., Ltd.,* 555 F.3d 1188, 1198 (10th Cir. 2009).
[7]    *Westman Comm'n Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1225 n.3 (10th Cir.1986), *cert. denied,* 486 U.S. 1005 (1988); *Forbes Magazine* (Nov. 7. 2017) ("hospitals in most communities have focused on reducing or eliminating competition") publicly-available at https://forbes.com/sites/robertpearl/2017/hospital.
[8]    *Grinnell*, 384 U.S. at 571 (quoting *Am. Tobacco v. United States*, 328 U.S. 781, 797 (1946)); *Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.,* 885 F.2d 683, 693, 696 (10th Cir.1989), *cert. denied,* 498 U.S. 972 (1990); *Shoppin' Bag,* 783 F.2d at 161 (monopoly power is typically analyzed by defendant's market share in relevant market).
[9]    *Dial Corp. v. News Corp.,* 165 F. Supp.3d 25, 41-42 (S.D.N.Y. 2016).
[10]   *Colo. Interstate*, 885 F.2d at 695-96 (citing P. Areeda & D. Turner, *Antitrust Law*, at ¶ 807 (3rd ed. 2007) ("Areeda") ("One measure of the degree of market power is the persistence of a firm's ability to profitably charge monopoly prices."); *Reazin,* 899 F.2d at 968 ("Market power is meaningful only if it is durable.").

Health charged each patient for physical therapy services by CPT codes. Relevant information also includes accounting information generated and maintained by Vail Health in the ordinary course of business that account for the billing (accounts receivable) and collections (revenues received). Plaintiffs are also entitled to cost information (direct and indirect) bearing on the profitability of the physical therapy clinic, including the costs and expenses relating to the hospital as an operating unit as a whole. (Cost allocation will likely be an issue here.) Vail Health is the party with direct knowledge of such information, its form, periodicity, and the identities of the employees (accountants, etc.) who have generated and maintained the information. It may be in the form of monthly, quarterly, or annual profit and loss statements, or other financial analyses such as analysis of contribution margins, etc. In short, this information goes to prices charged, costs incurred, and profits generated by the physical therapy clinic.[11]

*Second*, Plaintiffs' are entitled to evidence of Vail Health's market share for physical therapy in Eagle County, which includes Vail Health's employment records with the names, addresses, and start/end dates of the Vail Health physical therapists. Because relevant geographic market may encompass more than Eagle County, this information should be produced for all Vail Health physical therapists. Vail Health should also be compelled to produce utilization statistics for the physical therapy procedures (CPT codes) performed on a periodic basis, such as monthly or annually.

### CERTIFICATE OF CONFERRAL

Plaintiffs made numerous attempts to resolve this discovery dispute, including a March 30, 2021 informal discovery dispute conference with Magistrate Judge Gallagher,

---

[11] That is not to say that Vail Health has not produced any financial information, but it has not produced financial information consistently kept in the ordinary course of business.

which partly addressed Vail Health's objections to the first set of document requests.[12] No order as to monopoly power was issued. Since then, Plaintiffs have attempted to confer with Vail Health on discovery deficiencies,[13] which resulted in a call on May 26[14] that lasted about an hour and addressed only seven of twenty-five interrogatories; none of which Vail Health agreed to supplement. Plaintiffs sent another chart identifying discovery deficiencies,[15] and on June 14, 17, 24, and July 1, 14, and 19, 2021, Plaintiffs requested a conferral.[16] On July 19, Vail Health stated it would not confer as it would not "be a productive use of attorney time or clients' time" and that Magistrate Judge Gallagher "indicated" he would permit conferral by email.[17] Vail Health also stated it would respond to Plaintiffs' request (again) for patient data and other documents.[18] It has not.

## INADEQUATE DISCOVERY RESPONSES

On October 9, 2019, Plaintiffs served their first set of document requests,[19] which Vail Health responded to on October 9, 2020.[20] Five months later, Vail Health produced 55 documents. On March 1, 2021, Plaintiffs served a second set of discovery.[21] On April 30, 2021, Vail Health served its responses[22] and produced documents on May 28,

---

[12] See ECF No. 107 at Ex. 1 (filing discovery dispute chart submitted to Magistrate).
[13] Ex. 1 at attached letter [Pls.' letter on interrogatories]; Ex. 2 at attached chart [Vail Health's response]. Nor will Vail Health return Plaintiffs' calls. See, e.g., Ex. 3 at 1 [email].
[14] Before May 26, 2021, Plaintiffs requested a meet and confer on May 12, 14, 17, 18, 24, and 25. See Exs. 1-5 [email requests].
[15] Ex. 6 at attached chart [June 24 chart]; Ex. 10 [Vail Health's response].
[16] See Exs. 6-9, 11 [email requests].
[17] Ex. 11 at 1 [email]. But see ECF No. 105 at 12 [June 6, 2021 Order] ("this Court requires counsel to properly comply with the conferral requirements….the parties wish to confer via email to maintain an accurate record of the conversations, this Court will permit it"). Plaintiffs did not agree to confer only by email. See, e.g., Ex. 7 [email].
[18] Ex. 11 at 1 [email]. See also id. at 1-2 (listing 12 categories of missing documents).
[19] Ex. 12 [Pls.' 1st RFPs].
[20] Ex. 13 [Vail Health's Resp. to 1st RFPs].
[21] Ex. 14 [Pls.' 2d Set of Discovery].
[22] Ex. 15 [Vail Health's Resp. to 2d Set of Discovery].

4

July 15, and August 6, 2021, producing less than 1,500 documents (and many duplicates. In addition to the issues identified in March,[23] Plaintiffs addressed Vail Health's discovery deficiencies on May 12, June 24, and July 16.[24] Vail Health has not produced the monopoly power discovery, and it was not an issue in the state action. Finally, the relevant time period for discovery is from November 1, 2012 to the present.[25]

## ARGUMENT

### I. PLAINTIFFS ARE ENTITLED TO MONOPOLY POWER DISCOVERY.

#### A. Rule 37 Motion To Compel.

This motion seeks an order to compel Vail Health to produce documents and answer interrogatories. Rule 37 provides, in relevant part, that "[a] party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if…(iii) a party fails to answer an interrogatory submitted under Rule 33; or…(iv) a party fails to produce documents…as requested under Rule 34." It also provides that "an evasive or incomplete…response must be treated as a failure to disclose, answer, or respond."[26] Vail Health has not met its obligations under Rules 33 or 34.

#### B. Plaintiffs Are Entitled To Discovery Of Prices, Costs, And Profitability.

Most rural nonprofit hospitals lose money every year, but Vail Health's publicly available financial statements demonstrate that this 56-bed nonprofit hospital brings an average of about $45-$50 million in profit each year. Plaintiffs contend that one of the ways Vail Health achieves these extraordinary profits is through supracompetitive pricing

---

[23] *See* ECF No. 107 at Ex. 1.
[24] Ex. 1 at attached letter; Ex. 6 at attached chart; Ex. 11 at 1-2 (listing documents).
[25] *See* ECF No. 107 at 6 (stating relevant time period begins November 1, 2012).
[26] Fed. R. Civ. P 37(a)(3)(B)(iii) and (iv).

5

of its physical therapy services that are significantly above what would otherwise be the price in a competitive, nonmonopolistic market.

*Grinnell,* [27] quoting *U.S. v. E.I. du Pont dE Nemours and Co.,* provides the legal underpinning of the pricing and profits at issue.  It held: "Monopoly power is the **power to control prices** or exclude competition."[28]   "Price and competition are so intimately entwined that…[i]t is inconceivable that price could be controlled without power over competition or vice versa."[29]  It is "the power to charge a price higher than the competitive price without inducing so rapid and great an expansion of output from competing firms as to make the supracompetitive price untenable."[30]  It is the *sine qua non* of market power.[31]

In the healthcare context, the Ninth Circuit has held the issue on pricing is "whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price'…in the proposed market…."[32]  The use of the term "nontransitory" price increase is consistent with the Tenth Circuit in *Colorado Interstate Gas*: "One measure of the degree of market power is **the persistence of a firm's ability to profitably charge monopoly prices**.  If the evidence demonstrates that a firm's ability to charge monopoly

---

[27] 384 U.S. at 571.  *See also Reazin*, 899 F.2d at 967.
[28] 351 U.S. 377, 391 (1945) (emphasis added).
[29] *Id.*
[30] *Am. Academic Suppliers, Inc. v. Beckley–Cardy, Inc.,* 922 F.2d 1317, 1319 (7th Cir.1991); *United States v. Dentsply Int'l Inc.,* 399 F.3d 181, 189 (3d Cir.2005) (emphasizing a monopolist's power "to *maintain* market share") (quoting *United States v. Syufy Enters.,* 903 F.2d 659, 665–66 (9th Cir.1990)).
[31] IIB Areeda, ¶ 501, at 111 ("market power is the ability (1) to price substantially above the competitive level *and* (2) to persist in doing so for a significant period without erosion by new entry or expansion"). *See also Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 109 (1984) ("Market power is the ability to raise prices above those that would be charged in a competitive market.").
[32] *Saint Alphonsus Medical Center-Nampa Inc. v. St. Luke's Health System, Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015).

prices will necessarily be temporary, the firm will not possess the degree of market power required for the monopolization offense."[33] Thus, the prices charged, the costs incurred, and the profits generated are critical elements of discovery in a § 2 monopoly case. Although the necessity of producing that information cannot be disputed, thus far Vail Health has not produced claims information (prices) or accounting documents (revenues, costs, and profitability) maintained in the ordinary course of business.

This information is also relevant because it commonly (usually) is the basis for indirect evidence of market power through economic analyses. Price and marginal cost analyses are generally-accepted economic means of analyzing the probability that given prices are supracompetitive.[34] That is because prices in a competitive market tend toward marginal cost; prices substantially above that cost are supracompetitive by definition.[35] But implicit within a marginal cost analysis is that market power exists in degrees, and the *degree* of supracompetitiveness is a metric for measuring monopoly power. If there is robust competition between Vail Health and other perfectly interchangeable competitive physical therapy services, then charging supracompetitive prices would not have been profitable for Vail Health over the long run, and its prices would have been driven toward an equilibrium with marginal cost. If no competition offering substitutable services exists, then prices may be extremely supracompetitive, limited only by the consumer's willingness and ability to pay for, or to forgo, physical therapy services (consumer harm). And if Vail Health competes against imperfectly interchangeable substitutes, prices may

---

[33]   885 F.2d at 695-96 (emphasis added).
[34]   *Id.*, Areeda, ¶ 503b (discussing Lerner Index, which is a ratio of a product's margin, or the difference between the price and marginal cost, to its price. The ratio falls between 0 and 1, 0 indicates complete absence of market power and 1 represents market power).
[35]   *In re Aggrenox Antitrust Litig.*, 199 F. Supp.3d 662, 667 (D. Conn. 2016).

be somewhat supracompetitive within limits determined by the degree of effective interchangeability and monopoly power. Regardless of the extent of the supracompetitive prices of Vail Health, Plaintiffs are entitled to discovery to prove supracompetitive prices through various econometric analyses, including marginal cost analyses.

Marginal cost may be defined in its simplest terms as the cost of producing one additional unit of a product or service. Here, that means the variable incremental cost incurred in producing one incremental unit of physical therapy. Any incremental cost may then be compared with the incremental revenue generated by that last unit of physical therapy. Marginal cost and total cost are related in that fixed and variable costs are considered to calculate the total cost, although that does not mean that fixed or "sunk" costs are necessarily included in a marginal cost/marginal revenue analysis. The revenue generated by the last unit of output, minus the marginal cost incurred in producing the last unit, is called marginal revenue. And marginal revenue that contributes $1 to fixed costs is often referred to as the contribution margin. If the margin of contribution to fixed cost is positive, economist would expect a rational producer in a competitive market to continue producing additional units of the product or service until marginal revenue reaches zero, meaning the next unit of output would not generate any contribution to fixed costs and further output would not be profitable. This analysis, obviously, requires information of the firm's prices and costs. If the firm has significantly positive marginal revenues, it is likely that it has charged its customers (here, patients) supracompetitive prices, which thus strongly suggests it has had the monopoly power to do so. Plaintiffs are entitled to Vail Health's revenue, cost, and profitability information.

### C. Plaintiffs Are Entitled To Discovery Of Vail Health's Market Share.

Proof of monopoly power is almost universally required in § 2 cases,[36] and although it can be measured in a number of ways, the most commonly used test is the percentage of a firm's share of the relevant market. Market share is typically determined on a on a case-by-case basis (in *Reazin*, the Tenth Circuit found that a range of 47% and 62% was sufficient[37]), but the Tenth Circuit has stated that "[w]e prefer the view that market share percentages may give rise to presumptions, but will rarely conclusively establish or eliminate market or monopoly power."[38]

Here, Plaintiffs allege that in the relevant markets for physical therapy (product and service) in the Vail Valley (geographic), Vail Health maintains a market share of 80% in terms of revenue and about 70% in terms of the physical therapists it employs as compared to other competitors in Eagle County. Those numbers are derived from websites and publicly-available data, but Plaintiffs are entitled to hard evidence of Vail Health's yearly physical therapy head count, its utilization rates, and its billed and collected revenues. With that information, Plaintiffs can more precisely calculate Vail Health's market share by comparing Vail Health's aggregate number of physical therapists and its collected revenues in Eagle County with those of its competitors. Thus far, Vail Health has provided only a smattering of documents, but the documents are not employment records, or revenue and cost information kept in the ordinary course of business. Plaintiffs therefore seek physical therapist employment information, the number of patient therapy units ("utilization") charged by each therapist, the per unit rates charged, and collected revenues.

---

[36] *Westman,* 796 F.2d at 1222.
[37] *Reazin*, 899 F.2d at 969-70 (collecting cases and discussing the extent of market share necessary to create a presumption of monopoly power).
[38] *Id.* at 967.

## II. VAIL HEALTH'S INADEQUATE DISCOVERY RESPONSES.

**Interrogatory No. 17** seeks information related to each provider contract that Vail Health had during the relevant period. Vail Health limited its answer from December 2015 to the present.[39]  Additionally, Vail Health has omitted payors, such as Medicare and Medicaid, which it is required by law to have a provider agreement.[40]  It should be ordered to supplement this interrogatory identifying all provider contracts for the relevant period.

**Request No. 3** seeks documents relating to the prices charged and revenues realized for physical therapy services, including contracts and other documents relating to pricing, as well as self-pay documents.[41]  Vail Health produced some provider contracts but not all.  It objected to producing the Medicare, Medicaid, and (possibly) Tricare agreements because they purportedly do not include pricing.[42]  But that reads the request too narrowly.  By its very nature, a provider contract is integral to pricing—that is, the agreement states that the provider will accept payments for services provided to patients covered by the plan.  For example, the Medicare Provider Agreement (CMS-460) states that "the approved charge, determined by the MAC/carrier, shall be the full charge for the service covered under Part B."[43]  CMS-460 also states that if an entity bills for "outpatient physical and occupational therapy services…[the] Medicare fee schedule amounts are 5% higher…."[44]  Vail Health should be ordered to produce all payor agreements.

---

[39]   Ex. 15 at Interrog. No. 17 [Vail Health's Resp. to 2d Set of Discovery].
[40]   *See, e.g.,* 42 C.F.R. § 489.3 ("*Provider agreement* means an agreement between CMS and one of the providers specified in §489.2(b) [(1) hospitals] to provide services to Medicare beneficiaries and to comply with the requirements of section 1866 of the Act."); 42 C.F.R. § 489.11(b) (noting a signed agreement is sent back to hospital)**.**
[41]   Ex. 13 at Request No. 3 [Vail Health's Response to 1st RFPs].
[42]   Ex. 10 at 3 [Vail Health's chart response].
[43]   Ex. 16 [CMS-460].
[44]   *Id.* at 2.

**Request No. 19** seeks to obtain the applications, revalidations, renewals, changes in status, assignments, and reassignments submitted to any payer.[45] Vail Health refuses to produce any such documents, including for Medicare, Medicaid, and Tricare. So the Medicare, Medicaid, and Tricare agreements are relevant to this request as well. Vail Health should be ordered to produce these documents for the relevant period.

**Interrogatory No. 18** seeks information related to Vail Health's setting physical therapy prices in its chargemaster, which is used to generate the patient's bill for medical services and contains the prices of all services, goods, and procedures for which a separate charge exists.[46] Vail Health's answer is deficient. Its response is limited to 2016-2019, even though the time period is from November 1, 2012 to the present. Despite having five months to "investigate"[47] basic information integral to its core business, Vail Health has not identified those employees involved in setting prices from 2012-2015 or 2020-21. Nor has it confirmed "the precise process used to develop Vail Health's chargemaster as it relates to physical therapy for the [2012]-2018 period,"[48] or the components used to set those prices. As to the process used in 2019, Vail Health identifies, in vague terms, that physical therapy prices were set at the 25th percentile found within *nThrive's Knowledge Source Tool*, but again, identifies no components used to set those prices. Vail Health should be ordered to correct these deficiencies.

**Request No. 18** seeks documents discussing, supporting, or identifying any factors, costs, or expenses associated with pricing physical therapy services in the

---

[45] Ex. 15 at Request No. 19 [Vail Health's Resp. to 2d Set of Discovery].
[46] *Id.* at Interrog. No. 18.
[47] *Id.*
[48] *Id.*

11

chargemaster.[49] Other than a few emails discussing repricing hand therapy and self-pay, no documents have been produced related to any factors or costs associated with pricing physical therapy services. In its Initial Disclosure, Vail Health admits that it has "market analyses used to set HHSM's prices,"[50] and yet it has not produced any such analyses for the relevant time period. Instead, on August 6, 2021, Vail Health produced one report generated by representatives at *nThrive* **six months after** the 2019 chargemaster was set. This, however, does not provide any analyses **by Vail Health as to how it set prices** from 2012 to the present. It should be ordered to produce this information.

**Request No. 2** seeks annual, quarterly, and monthly financial statements, projections, and financial analyses for Howard Head.[51] Vail Health produced a financial statement for 2015[52] to one of its consultants but has not produced similar financial statements for any other years. One document produced (income statement rollup) includes each Howard Head location for years 2016-2018,[53] so that information is available, but even then, some information in the "roll up" was "estimated" by Nicholas Brown, the former head of Howard Head[54] and reflects a highly-positive contribution margin. And despite a robust process to set budgets that the Vail Health Finance Committee approves on a yearly basis,[55] the approved budgets were not produced, or

---

[49] *Id.* at Request No. 18.
[50] Ex. 17 at 4 [Initial Disclosures].
[51] Ex. 13 at Request No. 2 [Vail Health's Response to 1st RFPs].
[52] Ex. 18 at VH_Fed002031, 2041 [Haverford engagement].
[53] Ex. 19 at VH_Fed001420 [rollup analysis].
[54] *Id.* at VH_Fed001418. Vail Health CEO Cook provided this analysis to a private equity consultant for The Steadman Clinic, apparently to show Howard Head's profitability to partner with Steadman in its private equity offering as to physical therapy. *See* Ex. 20 at VH_Fed004678, 4681 [Cook email providing rollup analysis].
[55] Ex. 21 at VH_Fed_00948 [Monthly report]. *See also* Ex. 24 at 79:24-80:20 [Crevling Dep.] (discussing budget process before Crevling left Vail Health in July 2015).

any financial reports provided to the Board or its committees. Vail Health has also not produced the Howard Head monthly leadership team reports from November 1, 2012 to the present; a produced subset include projections and other relevant information.[56]

**Request No. 4** seeks documents related to the costs and incurred and profits realized for Howard Head, including salary, benefits, and administrative, and overhead costs.[57] Vail Health contends it produced this information in VH_Fed000764,[58] which is a 2015-2020 summary charted created by Vail Health in *November 2020 as part of this litigation*. None are broken down by location or category,[59] such as $31.6 million in "indirect costs" and $48.1 in "direct costs," and the summary is inconsistent with other produced documents.[60] The summary "created" in November 2020 makes it appear that Vail Health has been operating Howard Head at a loss for over five years, but at the same time, Vail Health has hired additional physical therapists, increased financial incentives for employees, updated its locations, and expanded its operations into Summit County and Basalt.[61] Vail Health should be ordered to produce detailed information about the actual costs incurred, as well as how any indirect (or direct) costs are allocated across Vail Health as a general business practice. Additionally, the Finance Department ran yearly financial analyses,[62] the data of which should be maintained in the general ledger, trial balances, and its billing and medical record systems; none has been produced.

---

[56] Ex. 21 [examples of monthly reports].
[57] Ex. 13 at Request No. 4 [Vail Health's Resp. to 1st RFPs].
[58] See Ex. 15 at Request No. 22 [Vail Health's Resp. to 2d Set of Discovery].
[59] Ex. 22 at VH_Fed000764 [Nov. 2020 summary information].
[60] *Id.*
[61] *See, e.g.,* Ex. 23 at VH_Fed001372-73 [year in review]. The Boersma yearly and monthly summaries have not been produced for the entire relevant period.
[62] Ex. 24 at 72:11-75:23; 78:1-79:7 [Crevling Dep.].

**Request No. 17** seeks patient information related to the procedures, charges, and paid amounts for physical therapy services[63]--that is, the payer submissions and reimbursements. Vail Health produced one document for the month of November 2019 showing this information is available in Cerner,[64] Vail Health's medical record system. Although the November 2019 report does not include patient addresses, Vail Health was required by law to maintain this information for 10 years.[65] Other than the one month of data, Vail Health has not produced the required patient data here or in the state court action.[66] Further, the HIPAA Qualified Protective Order protects patient information, so there can be no confidentiality issue in producing this data.[67]

**Request Nos. 9 and 10** seek employment records identifying each physical therapist employed by Vail Health, including the employment agreements and start dates, the end dates of employment, as well as any post-employment agreements.[68] Other than producing ten examples of employment agreements—albeit in redacted form—Vail Health has produced no other documents allowing Plaintiffs to conduct a yearly market-share analysis based on the number of physical therapists employed by Vail Health.

---

[63] Ex. 15 at Request No. 17 [Vail Health's Resp. to 2d Set of Discovery].
[64] Ex. 25 [Nov. 2019 patient data].
[65] 6 Colo. Code Reg. 1011-1, chap. 4 § 81.02(2).
[66] Vail Health produced limited patient information for 40 patients in the state court action but that ***predated*** November 1, 2012.
[67] Vail Health has previously produced unredacted patient data under the HIPAA Qualified Protective Order, so it cannot assert privacy interests to avoid that discovery. *See* ECF No. 76 at 1, 3 [Protective Order]; Ex. 25. *See also Henry A. v. Willden*, 271 F.R.D. 184, 190 (D. Nev. 2010) ("The court's protective order governing confidentiality …applies to all of the files or documents of any child who has been or is in DFS custody, and prohibits use of this confidential information for any purpose other than the prosecution, defense or settlement of this action. The protective order is detailed and comprehensive and is sufficient to protect the privacy interests at stake.").
[68] Ex. 13 at Request Nos. 9-10 [Vail Health's Resp. to 1st RFPs]. The employment-related agreements are relevant to barriers to entry, the subject of another motion.

### III. PLAINTIFFS ARE ENTITLED TO AN AWARD OF ATTORNEY'S FEES.

Rule 37(a)(5) provides that if a party moving to compel discovery is successful, the court "must" award the moving party its reasonable attorney fees. But the court "must not" order this payment if: (i) the motion was filed without a good faith effort to obtain the discovery; (ii) the opposing party's response or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust. Here, Plaintiffs repeatedly made a good faith effort to resolve this discovery dispute through the informal discovery dispute process, numerous communications, and repeated requests for conferrals.

In contrast, Vail Health's refusal to confer or produce basic, and unquestionably relevant, monopoly power information is not in any way justified. It is like saying the principles of relevant markets articulated by the Supreme Court in *Grinnell*[69] are not controlling, or that evidence of monopoly power articulated by the Tenth Circuit in *Reazin*[70] does not apply. An award of attorney's fees is therefore appropriate here.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' motion to compel in its entirety.

---

[69] 384 U.S. at 570-71.  *Grinnell* has been cited as controlling law in 1,262 cases as of this writing and cited by 3,677 law review and other scholarly articles.
[70] 899 F.2d at 973.

Dated:  August 10, 2021

*s/Alan L. Kildow*
Alan L. Kildow, MN# 0143133
790 Potato Patch Drive
Vail, CO 81657
Telephone: (970) 390-6675
E-mail:  alkildow@aol.com

Jesse Wiens, Colo. #33903
Fahrenholtz & Wiens LLC
100 West Beaver Creek Boulevard
Suite 236
Avon, CO 81620
Telephone: (970) 949-6500
E-mail:  fwlawyers@gmail.com

Attorneys for Plaintiffs Lindsay Winninger and Sports Rehab Consulting LLC

16

## CERTIFICATE OF SERVICE

     I hereby certify that on August 10, 2021, I served a true and correct copy of Plaintiffs' Rule 37 Motion to Compel #2 Relating To Vail Health's Monopoly Power, including exhibits, some of which are filed as restricted under the protective order issued in this case, via the Court's ECF system on:

> Shannon Stevenson
> Janet A. Savage
> Jackie Roeder
> Daniel Richards
> Davis Graham & Stubbs LLP
> 1550 17th Street, Suite 500
> Denver, CO  80202
>
> Counsel for Defendant

                                    *s/ Alan L. Kildow*
                                    Alan L. Kildow