# Exhibit 24

Transcript of the Deposition Testimony of:

# Charles Crevling
July 22, 2021

Sports Rehab Consulting LLC

v.

Vail Clinic, Inc. d/b/a Vail Health

Civil No. 1:19-cv-02075-WJM-GPG



14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 1:19-CV-02075-WJM-GPG

_____

VIDEOCONFERENCE DEPOSITION OF CHARLES CREVLING
July 22, 2021

_____

SPORTS REHAB CONSULTING LLC, a Colorado limited
liability company, and LINDSAY WINNINGER, an
individual,

    Plaintiffs,

V.

VAIL CLINIC, INC. D/B/A VAIL HEALTH, a Colorado
nonprofit corporation,

    Defendant.

_____

       PURSUANT TO NOTICE, the videoconference deposition of CHARLES CREVLING, called for examination by the Plaintiffs herein, was taken with all parties appearing via videoconference, commencing at 9:33 a.m., on Thursday, July 22, 2021, taken before Jennifer Bajwa Melius, a Verbatim Stenographic Reporter and Registered Professional Reporter.

**Mile High Court Reporting and Video, Inc.   303-202-0210**
**contact@milehighreporting.com**

Deposition of:  Charles Crevling - July 22, 2021
Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health

```
                                                                    2
 1    APPEARANCES:
 2            SONYA BRAUNSCHWEIG, ESQ.
              5501 Irving Avenue South
 3            Minneapolis, Minnesota 55419
              612-819-2304
 4            sonya.braunschweig@gmail.com
 5                and
 6            ALAN L. KILDOW, ESQ.
              15204 Wildwood Road
 7            Burnsville, MN 55306
              970-390-6675
 8            akildow@aol.com
 9                For the Plaintiff Sports Rehab
                     Consulting and Lindsay Winninger
10
11            DANIEL A. RICHARDS, ESQ.
              Davis Graham & Stubbs LLP
12            1550 Seventeenth Street, Suite 500
              Denver, Colorado 80202
13            303-892-9400
              daniel.richards@dgslaw.com
14
                  For the Defendant Vail Clinic d/b/a
15                   Vail Health
16
              ERIN M. EISELEIN  ESQ.
17            Brownstein Hyatt Farber Schreck
              410 Seventeenth Street
18            Denver, Colorado 80202
              303-223-1251
19            eeiselein@bhfs.com
20                For the Deponent
21
22
23
24
25
```

Mile High Court Reporting and Video, Inc.  303-202-0210
contact@milehighreporting.com

**Deposition of:  Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

3

```
 1                     I N D E X
 2   EXAMINATION:                                    PAGE
 3   BY MR. KILDOW                                      5
 4   BY MR. RICHARDS                                  140
     _____
 5
 6   EXHIBITS:                                     MARKED
 7   12      Vail Health Services Governing Board      32
             Meeting Minutes, July 2, 2012
 8           (VH_Fed_00002271 to 00002275)
             (CONFIDENTIAL)
 9
     13      Vail Health 2012 Tax Return               46
10
     14      Vail Health Services Independent          63
11           Auditor's Report and Consolidated
             Financial Statements, October 31, 2013
12           and 2012
13   15      Vail Health Services Independent          71
             Auditor's Report and Consolidated
14           Financial Statements, October 31, 2015
             and 2014
15
     16      E-mail and Attachment                     86
16           Subject:  Howard Head
             Date:  2/9/2016
17           (VH_Fed_00002031 to 00002041)
             (CONFIDENTIAL)
18
     17      Vail Valley Medical Center Colorado      102
19           Health Facilities Authority Hospital
             Revenue Bonds
20
     18      Letter of Intent - Physical Therapy Joint 120
21           Venture dated 12/3/2015
             (VAIL_00003560)
22           (ATTORNEYS' EYES ONLY)
23   19      E-mail and Attachments                   131
             Subject:  HHSM Stats Version 5
24           Date:  10/19/2015
             (VH_Fed_00003071 to 00003072)
25           (CONFIDENTIAL)
```

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

**4**

1  　　　　　P R O C E E D I N G S
2  　　　　**THE STENOGRAPHER:** My name is Jenny
3  Melius. I'm a nationally certified stenographic
4  reporter. Today's date is July 22, 2021, and the time
5  is approximately 9:33 a.m.
6  　　　　This is the deposition of Charles
7  Crevling in the matter of Sports Rehab Consulting, LLC
8  and Lindsay Winninger versus Vail Clinic, Inc., venued
9  in the United States District Court for the District
10 of Colorado. The case number is
11 1:19-cv-02075-WJM-GPG.
12 　　　　At this time I will ask counsel to
13 identify themselves, state whom you represent, and
14 agree on the record that there is no objection to this
15 deposition officer administering a binding oath to the
16 witness remotely.
17 　　　　**MR. KILDOW:** My name is Alan Kildow,
18 spelled K-i-l-d-o-w. I am the attorney of -- one of
19 the attorneys of record for the plaintiffs in this
20 action, and I have no objection -- the plaintiffs have
21 no objection to your acting as the -- serving, I
22 should say, as the court reporter in this action.
23 　　　　**MR. RICHARDS:** Dan Richards,
24 R-i-c-h-a-r-d-s. I represent defendant Vail Health,
25 and we have no objection to the remote swearing of the

---

**5**

1  witness or conducting the deposition remotely.
2  　　　　**MS. EISELEIN:** And this is Erin
3  Eiselein, E-i-s-e-l-e-i-n. I'm the attorney for the
4  witness, Charles Crevling, and we also have no
5  objection to the remote swearing in of Mr. Crevling.
6  　　　　　CHARLES CREVLING,
7  having been first duly sworn, was examined and
8  testified as follows:
9  　　　　　EXAMINATION
10 BY MR. KILDOW:
11 　　Q.　Mr. Crevling, my name, as I have
12 announced, is Alan Kildow. I represent the plaintiffs
13 in this action, Sports Rehab Development -- or
14 Consulting and Lindsay Winninger.
15 　　　　I'm going to ask you questions today. I
16 will do my best to ask questions which are short and
17 succinct and hopefully easy to understand. I will do
18 my best to wait to ask a second question until you
19 have answered the question that was just posed.
20 Correspondingly, I would ask you to wait until I've
21 finished the question before you begin to answer.
22 　　　　We are doing something that is
23 technologically now somewhat common but until recently
24 was relatively unique, which is taking a deposition by
25 video -- by Zoom. And as Jenny has pointed out,

---

**6**

1  sometimes there's just a little bit of a lag between
2  the time you stop speaking and the other hear -- the
3  other person hears that. And so we have to be even
4  more vigilant than we really usually are in waiting
5  for the question to be completed and waiting for the
6  answer to be completed because, as expert as Jenny is,
7  it's hard to take down what's being said when two
8  people are talking over each other. Is that fair
9  enough?
10 　　A.　Fair enough.
11 　　Q.　Okay. You live in Glenwood Springs; is
12 that correct?
13 　　A.　Correct.
14 　　Q.　And could you state your address again
15 for the record?
16 　　A.　345 Woodruff Road, Glenwood Springs,
17 81601.
18 　　Q.　Okay. Is there anyone else that lives
19 there with you?
20 　　A.　My wife.
21 　　Q.　What's her name?
22 　　A.　Karen.
23 　　Q.　Okay. Are you represented by counsel
24 today?
25 　　A.　I am.

---

**7**

1  　　Q.　And that is Erin; is that correct?
2  　　A.　That is correct.
3  　　Q.　Is -- are you represented by anybody
4  else such as Mr. Richards?
5  　　A.　I am not.
6  　　Q.　Okay. Now, because you live in Glenwood
7  Springs, I can't be absolutely certain that I'm going
8  to be able to subpoena you for trial. I think I can,
9  but I can't be absolutely certain. And so today's
10 deposition plaintiffs intend to be a trial deposition
11 insofar as we will take this deposition as though you
12 are testifying in a court of law in Denver and there
13 was a judge and a jury there, okay?
14 　　A.　Yeah.
15 　　　　**MR. KILDOW:** And I will try to ask the
16 questions in a way that is -- that are
17 non-objectionable, but if Mr. Richards housed an
18 objection, not just to form but a trial objection, he
19 should state that objection on the record so that I
20 can add the foundation or rephrase the question in a
21 manner that is not objectionable.
22 　　　　Is that acceptable to everybody?
23 　　　　**MR. RICHARDS:** Mr. Kildow, I think we'll
24 proceed consistent with the Federal Rules of Civil
25 Procedure, and my objections will be consistent with

Deposition of: Charles Crevling - July 22, 2021
Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health

---

**72**

1  Q.  Yeah. Did you work on the 2015 audited
2  financial statement?
3  A.  No.
4  Q.  Okay. Not at all?
5  A.  No.
6  Q.  Okay. Now --
7     MR. KILDOW: You can take that down,
8  Sonya.
9  Q.  (By Mr. Kildow) Did you ever create --
10  strike that.
11     During the time that you were the chief
12  financial officer of Vail Health, did you create
13  income statements or statements of operation or
14  otherwise known as P&Ls, profit and loss statements,
15  for the physical therapy clinic known as Howard Head?
16  A.  Never created a profit and loss
17  statement for Howard Head. We --
18  Q.  Did you create any kind of an accounting
19  summary or statement for the physical therapy clinic?
20  A.  Let me finish, okay, Alan?
21  Q.  Oh, I'm sorry. I didn't mean to
22  interrupt.
23  A.  No. We're fine because it's just a --
24  you know, we never created an income statement for
25  Howard Head or cardiology or whatever, but we did do

**73**

1  financial analysis of programs. That's not the same
2  as creating a P&L or a balance sheet or anything like
3  that.
4  Q.  Fair enough. What was the -- so who is
5  responsible for doing that?
6  A.  Well, if you were looking at a service
7  line, it would be the finance team and/or the director
8  of that area, and they would work with finance team
9  members.
10  Q.  In the instance of the physical therapy
11  group, would the -- the manager or officer in charge
12  of that group would have been Nicholas Brown when you
13  were there?
14  A.  Nicholas Brown and -- was the primary
15  contact for Howard Head after Vail Clinic, Inc. took
16  over management of the physical therapy business,
17  but -- you know.
18  Q.  So after November 1, 2012, it was Brown
19  who was the principal --
20  A.  Yeah. I think --
21  Q.  -- manager?
22  A.  -- Nicholas became the primary contact.
23  So there was two VPs, he being one and Luke O'Brien as
24  the other.
25  Q.  What was the format for the financial

**74**

1  analysis for the physical therapy entity after
2  November 1, 2012?
3     MR. RICHARDS: Objection to form.
4  A.  So essentially, it would be taking a
5  look at what was billed versus what was collected and
6  then looking at the direct costs related to those
7  services.
8  Q.  (By Mr. Kildow) Were you involved in,
9  if not the process, per se, but reviewing those
10  numbers?
11  A.  I would have been involved in reviewing
12  that type of analysis for any of the services of the
13  organization.
14  Q.  And so when you say "billed" versus
15  "collected," an invoice may have gone out for $100,
16  the insurer or Medicare then paid $50, and so you
17  analyzed those two elements of revenue?
18     MR. RICHARDS: Objection to form.
19  A.  Yes.
20  Q.  (By Mr. Kildow) When you say "direct
21  costs," what direct -- what would you include in
22  direct costs?
23     MR. RICHARDS: Objection to form.
24  A.  Basically, anything that was involved in
25  the clinics themselves of the providing of care.

**75**

1  Q.  (By Mr. Kildow) Would you include the
2  allocated cost of the building costs in the -- as a
3  direct cost?
4  A.  No.
5     MR. RICHARDS: Objection to form. Vague
6  as to time frame.
7  Q.  (By Mr. Kildow) Let's say from
8  November 1, 2012, until the time you left in 2015,
9  okay? So the building costs were not -- how about,
10  let's say, the costs that would be associated with
11  your billing department? Was there an allocation of
12  those costs?
13  A.  That's an overhead cost.
14     MR. RICHARDS: Objection to form.
15     (Stenographer clarification.)
16  A.  Billing is an overhead cost, not a
17  direct cost. You know, if you were a standalone
18  entity, some -- you know, a private physician group,
19  they would be looking at full costs versus
20  contribution margins, but I don't know if we want to
21  get that deep.
22  Q.  (By Mr. Kildow) Did you ever look at
23  confirmation margins?
24  A.  That by -- yes, of course we did across
25  service lines.

**Deposition of:  Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

Page 76

1   Q.  Mr. Crevling, what do you mean about
2   "across service lines"?
3       A.  So orthopedics would be a service line,
4   cardiology would be a service line, cancer is a
5   service line, internal med is a service line.
6       Q.  Was there ever a reporting or any
7   financial document prepared for the Howard Head Sports
8   Medicine physical therapy operation after November 1,
9   2012, relating to the contribution margin, if any,
10  that had contributed to Vail Health?
11          MR. RICHARDS:  Objection to form.
12      A.  I can't --
13          MR. RICHARDS:  Foundation.
14      A.  I can't say that there was or was not.
15      Q.  (By Mr. Kildow)  Who would know that?
16      A.  I'm not sure it would -- who would be
17  able to say, "Yeah, we created that."  It would have
18  come from finance.  So, you know, would we have looked
19  at physical therapy?  Probably so.
20      Q.  I can't --
21      A.  We did that on a regular basis with
22  services across the organization.  But physical
23  therapy is downstream.  It's not as much of a feeder
24  as an internal medicine.  It gets fed more than feeds.
25      Q.  With respect to the format of billed

---

Page 77

1   versus collected, who within Vail Health, if you know,
2   determined the pricing or the amount that would be
3   billed to an entity beginning December -- or excuse
4   me -- November 1, 2012, to the end of your tenure
5   there?
6           MR. RICHARDS:  Objection to form.
7           MS. EISELEIN:  Objection.  Form.
8       A.  It would have been finance working with
9   the department directors.  They would determine what
10  the charges were.
11      Q.  (By Mr. Kildow)  Who within finance
12  would have worked with Nicholas Brown and Luke
13  O'Brien?
14      A.  It would have --
15          MS. EISELEIN:  Objection.  Form.
16          MR. RICHARDS:  Same.
17      A.  It would have been myself or -- and/or a
18  financial analyst.
19      Q.  (By Mr. Kildow)  And who, again, would
20  the financial analyst be?  If you know.
21      A.  During that time, it would have been --
22  probably would have been Tim Wise.
23      Q.  Wise, W-i-s-e?
24      A.  Yeah.
25      Q.  Do you know where Mr. Wise is now?

---

Page 78

1       A.  Yeah.  He works for me here.
2       Q.  In Glenwood?
3       A.  Yeah.
4       Q.  Okay.  Were there any documents --
5   financial documents, accounting documents, price
6   analyses -- that were generated when you went through
7   that pricing process?
8           MR. RICHARDS:  Objection to form.
9           MS. EISELEIN:  Same objection.
10      A.  You know, the analysis, a lot of them
11  were printed and discussed, but there's no formal
12  document.  There's no formal income statement, so
13  there wouldn't have been -- I can't say that anything
14  would have been kept, if that's where you're going.
15      Q.  (By Mr. Kildow)  Now, did you file those
16  and maintain them over the long run?
17      A.  No.
18          MR. RICHARDS:  Objection to form.
19      A.  No.  So, you know, they're -- again,
20  they're not legal documents or anything like that, so
21  there was lots of analysis done but no formal
22  recordkeeping of that analysis.
23      Q.  (By Mr. Kildow)  Tell me the analysis
24  that would have been conducted.
25      A.  I think --

---

Page 79

1           MS. EISELEIN:  Objection.  Form.
2           MR. RICHARDS:  Objection to form.
3       A.  I think I already have.  So, you know,
4   if you were looking at a service line, again, it would
5   be billed and collections and looking at direct costs
6   and does that add or subtract from the entity's
7   financial health.
8       Q.  (By Mr. Kildow)  Was there a margin that
9   you were trying to achieve in billing for the physical
10  therapy group while you were there?
11          MR. RICHARDS:  Objection to form.
12      A.  There was never a margin set for
13  physical therapy, to the best of my knowledge.  So
14  there's an overall budget and, of course, there was
15  a -- you know, a budgeted income for the organization
16  as a whole.  But the reality is, you know, the surgery
17  drives, not physical therapy.
18      Q.  (By Mr. Kildow)  Because they're taking
19  from the surgery side from Steadman or VSO or somebody
20  like that?
21      A.  Right.  They're getting referrals from
22  surgery.  It's -- you know, in any hospital, the OR is
23  going to be the economic engine.
24      Q.  Were the budgets formally submitted up
25  the chain on an annual basis?

---

**Deposition of:  Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

80

1   A.   The budgets are approved by the board.
2   By the finance committee, it's submitted to the board
3   and approved by the board.
4   Q.   Fair enough.  Just to be clear, in many
5   organizations, a department or division will create a
6   budget for their entity for the year, and it will be
7   sent up the line and then eventually put into an
8   aggregate budget for the organization and approved by
9   the board?
10   A.   That is correct.  So every department
11   works with the budget team for their own budget:
12   FTEs, supplies, whatever expenses they're expecting
13   for the following year.
14   Q.   Were those budgets filed and maintained
15   over time, to the best of your knowledge?
16   MR. RICHARDS:  Objection.  Foundation.
17   A.   There was no formal keeping of the
18   budgets beyond the year that you're in.  Did that
19   level of detail exist for a year or two back?
20   Probably so.
21   Q.   (By Mr. Kildow)  When you set -- when
22   prices were discussed, was that on an annual basis or
23   some other period of time?
24   MR. RICHARDS:  Objection to form.
25   A.   Unless there was a contract negotiation

---

81

1   going on, pricing was annual.  So, you know, if a
2   payer came to, there might be a negotiation that could
3   have an impact.  But in general, it was once a year.
4   Q.   (By Mr. Kildow)  When was it per year?
5   Was it usually a specific time or period of months?
6   A.   Well, the budget would start several
7   minutes -- not minutes -- months before the end of the
8   fiscal year, and budget assumptions would be made,
9   including volumes, inflation rates, things like that.
10   And, you know, obviously, you're putting
11   together a straw man and looking at results and trying
12   to make that budget work.  And once it was agreed
13   upon, then it went, again, as I said, to finance
14   committee, and then, if it was blessed, it would go to
15   the board.
16   Q.   With respect to the physical therapy
17   clinic when you were there, when you're going through
18   this process of determining price -- prices to be
19   charged, did you ever consider the competition's
20   pricing?
21   MR. RICHARDS:  Objection to form.
22   MS. EISELEIN:  Objection.  Form.
23   MR. RICHARDS:  Foundation.
24   A.   So, yes, we did.  But when we did price
25   increases in general, they were across-the-board price

---

82

1   increases.  So it would be, like, 3 percent across the
2   board or 2 or 4.  Seldom was there, you know, specific
3   pricing done for any individual entity.
4   But when you set up new codes, of
5   course, you're going to look at what does Medicare pay
6   you and what do competing facilities charge if you can
7   get that information.
8   Q.   (By Mr. Kildow)  Would you -- it would
9   be fair to say that the prices that Medicare would pay
10   had some influence on the price that you would charge
11   for physical therapy?
12   MR. RICHARDS:  Objection to form.
13   A.   Well, it's -- I wouldn't say that's
14   specific to physical therapy.  I would say that's
15   specific to pricing across the board.
16   Q.   (By Mr. Kildow)  Would physical therapy
17   be included in that?
18   A.   Of course.
19   MR. RICHARDS:  Objection to form.
20   Q.   (By Mr. Kildow)  So when you say that
21   you looked at pricing across the board, would it be
22   fair to say, Mr. Crevling, that management would say,
23   "Look, we're going" -- "all things being equal, given
24   inflation, our costs, we'd like to shoot for 2 percent
25   increase for cardiology, 2 percent increase for

---

83

1   emergency, 2 percent increase for physical therapy,"
2   et cetera?
3   MR. RICHARDS:  Objection to form.
4   MS. EISELEIN:  Objection.  Form.
5   A.   So the finance committee board would
6   never get involved at that level.  And again, it would
7   be looked at overall for the organization.  Now,
8   obviously, there would be -- you know, there's
9   differences in practices, but in general, again, if
10   you're looking overall, what does that 2 percent or
11   3 percent mean to the organization?  And you could
12   have different contract terms with an insurer for
13   different types of services.
14   Q.   (By Mr. Kildow)  During the time that
15   you were the chief financial officer, was there a
16   person that was involved primarily in creating or
17   negotiating contracts in terms with, let's say, United
18   Healthcare or Anthem Blue Cross Blue Shield?
19   A.   That would be primarily me.
20   Q.   Primarily you?
21   A.   Yes.
22   Q.   Okay.  Anybody else?  Or you were the
23   guy?
24   A.   I was the guy.  So obviously, you need
25   financial analysis of whatever might be considered on

145

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, Jennifer Bajwa Melius, Verbatim

 4    Stenographic Reporter and Registered Professional

 5    Reporter, do hereby certify that prior to the

 6    commencement of the examination of CHARLES CREVLING,

 7    said witness was remotely sworn via videoconference to

 8    testify to the truth in relation to the matters in

 9    controversy between the parties hereto; that identity

10    of the witness was verified via satisfactory evidence

11    per the Rules; that said examination was taken in

12    machine shorthand by me and was thereafter reduced to

13    typewritten form; and that the foregoing is a true and

14    accurate transcript of the questions asked, testimony

15    given, and proceedings had.

16              I further certify that I am not related

17    to any party herein, nor their counsel, and have no

18    interest in the result of this litigation.

19              IN WITNESS WHEREOF, I have affixed my

20    signature this 3rd day of August, 2021.

21

22
                          _____
23
                          Jennifer Bajwa Melius
24                        Registered Professional Reporter

25
```