# EXHIBIT 5

| | |
|---|---|
| DISTRICT COURT, EAGLE COUNTY, COLORADO<br><br>Eagle County Justice Center<br>885 Chambers Avenue<br>Eagle, Colorado 81631 | DATE FILED: August 25, 2020 1:48 PM<br>FILING ID: F65D5507571F4<br>CASE NUMBER: 2017CV30102 |
| **Plaintiffs:**<br>LINDSAY WINNINGER, an individual, and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,<br><br>v.<br><br>**Defendants:**<br>DORIS KIRCHNER, an individual, and VAIL CLINIC, INC. D/B/A VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation, | ☐ COURT USE ONLY ☐ |
| **Counter-Plaintiff:**<br>VAIL CLINIC, INC. D/B/A VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation,<br><br>v.<br><br>**Counter-Defendants:**<br>LINDSAY WINNINGER, an individual, and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company, | Case No. 2017CV030102<br><br>Division 3 |
| **Third-Party Plaintiff:**<br>VAIL CLINIC, INC. D/B/A VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation,<br><br>v.<br><br>**Third-Party Defendant:**<br>DAVID J. CIMINO, an individual. | |

| Janet Savage, #11653 | |
| Jacqueline V. Roeder, #48046 | |
| Daniel A. Richards, #50457 | |
| DAVIS GRAHAM & STUBBS LLP | |
| 1550 17th Street, Suite 500 | |
| Denver, Colorado 80202 | |
| Telephone:  303.892.9400 | |
| Facsimile:  303.893.1379 | |
| E-mail:       janet.savage@dgslaw.com | |
|                    jackie.roeder@dgslaw.com | |
|                    daniel.richards@dgslaw.com | |
| *Attorneys for Defendant Doris Kirchner, Defendant, Counter-Plaintiff and Third-Party Plaintiff Vail Clinic, Inc. d/b/a Vail Health* | |
| | |
| Daniel M. Reilly, #11468 | |
| Clare S. Pennington, #37896 | |
| John M. McHugh, #45456 | |
| REILLY LLP | |
| 1700 Lincoln Street, Suite 2400 | |
| Denver, Colorado 80203 | |
| Telephone:      303.893.6100 | |
| Email:             dreilly@rplaw.com | |
|                        cpennington@rplaw.com | |
|                        jmchugh@rplaw.com | |
| *Attorneys for Defendant Doris Kirchner* | |

**[JUDGE GRANGER] DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to C.R.C.P. 56, Defendants Vail Clinic, Inc. ("Vail Health") and Doris Kirchner ("Defendants") move for summary judgment on Plaintiffs' remaining claims—specifically defamation Counts I, II, III, IX, XI, XIX, XXI, XXII, and tortious interference Counts XXV, XXVI, and XVII of Plaintiffs' First Amended Complaint.

## PRELIMINARY STATEMENT

Substantially true statements are not defamatory as a matter of law. A statement accusing a person of robbing a Chase bank, when in fact he robbed a Bank of America, is not defamatory. A statement accusing a person of robbing a bank in 2020, when in fact he robbed the bank in 2018,

is not defamatory. It is now undisputed that Plaintiff Lindsay Winninger took patient files and information, including documents containing protected health information ("PHI"), from Vail Health's server. Therefore, Defendants' alleged statements in 2016 and 2017 regarding Winninger's involvement in theft of patient files or information from Vail Health's Howard Head physical therapy practice, if made, were substantially true. To the extent Winninger claims that there are any minor discrepancies (and there are few, if any, discrepancies), such discrepancies do not render Defendants' alleged statements substantially false or defamatory.

Winninger stole thousands of documents—containing the PHI of hundreds of patients—before she left Vail Health's Howard Head physical therapy practice in 2012. In late 2015, before David Cimino left Howard Head to work for Winninger, he also stole documents containing the PHI of thousands of patients. In 2016 and 2017, according to Plaintiffs, various Vail Health personnel made statements that Winninger "had stolen patient files from Vail Health"; had "participated in" or "be[en] involved in stealing patient files from Vail Health"; or "had stolen thousands of patient files from Vail Health."[1] Those statements form the basis of each of Plaintiffs' remaining defamation claims. Through discovery in this case, it has become crystal clear that none of those alleged statements are defamatory, either because they are true, or because they are substantially true in light of Winninger's 2012 theft. Thus, the Court should grant summary judgment to Defendants on all of Plaintiffs' defamation claims.

Moreover, Plaintiffs' tortious interference claims fail for three reasons. *First*, because Plaintiffs' three tortious interference claims are based solely on alleged defamation by Defendants,

---

[1] Plaintiffs' allegations regarding Vail Health's alleged statements are assumed to be true only for purposes of deciding this summary judgment motion.

summary judgment on Plaintiffs' defamation claims mandates summary judgment for Defendants on Plaintiffs' tortious interference claims. *Second*, those claims also fail because Winninger fraudulently represented in amendments to agreements between Winninger and the Steadman Philippon Research Institute ("SPRI") (the "SPRI Agreement") and between Winninger and The Steadman Clinic (the "Steadman Agreement") that she had never obtained patient information without authorization, and Defendants could not have interfered with a fraudulently induced contract. *Third*, summary judgment should be granted for Defendants on the tortious interference claims of Plaintiff Sports Rehab Consulting LLC ("Sports Rehab") because Sports Rehab was not a party to, and has no financial interest in, the Steadman and SPRI Agreements.

## CERTIFICATION OF CONFERRAL

Defendants have conferred with counsel for Plaintiffs regarding the relief requested in this motion on multiple occasions, including: by a December 24, 2019 letter to Plaintiffs, multiple emails between January 24, 2020 and January 27, 2020, and by telephone on August 17, 2020. At no point since Defendants filed their January 27, 2020 summary judgment motion and August 7, 2020 supplement have Plaintiffs agreed to dismiss their claims.

## PROCEDURAL BACKGROUND

The operative complaint in this matter is Plaintiffs' Verified Amended Complaint and Jury Demand dated February 22, 2018 ("Amended Complaint"). Plaintiffs' Amended Complaint alleges 24 counts of defamation (Counts I-XXIV), a claim for tortious interference with contract (Count XXV), a claim for tortious interference with current business relationship (Count XXVI), and a claim for tortious interference with prospective business relationship (Count XXVII).

On May 31, 2019, the Court granted in part Defendants' motion for summary judgement regarding most of Plaintiffs' defamation claims.[2] The Court granted summary judgment for Vail Health on all counts except Counts I, II, III, IX, XI, XIX, XXI, and XXII and for Ms. Kirchner on all counts except Counts I, II, and III. The purportedly defamatory statements alleged in those counts, and which are the subject of this motion for summary judgment, are described below.

## STATEMENT OF UNDISPUTED FACTS

### Vail Health

Vail Health is a nonprofit community healthcare system in the Vail Valley. (Ex. 1, Am. Compl. ¶ 13.) Vail Health provides physical therapy services under the name Howard Head Sports Medicine ("Howard Head"). (*Id.* ¶¶ 31, 34.) As a healthcare provider, Vail Health is subject to the Health Insurance Portability and Accountability Act ("HIPAA"), which requires Vail Health to take certain measures to safeguard PHI, including notifying patients if their PHI has been accessed or used for an unauthorized purpose. *See, e.g.*, 45 C.F.R. § 164.404.

### Lindsay Winninger's Theft of PHI

Plaintiff Lindsay Winninger worked as a physical therapist at Howard Head from February 2009 through May 2012. (Ex. 2, Winninger Dep. Tr. 37:23-38:4.) During that time, the Howard Head physical therapy practice was managed by Rehabilitation & Performance Center at Vail, LLC ("Proaxis"), but (a) all patients treated at Howard Head were Vail Health patients and (b) all PHI belonged to Vail Health. (Ex. 3, VAIL_00003425 at -3428 ("All persons who receive Services

---

[2] Defendants did not move for summary judgment at that time on Plaintiffs' three tortious interference claims, so those were not addressed by the court.

at a Facility shall be regarded as and shall be registered as patients of the Hospital [*i.e.*, Vail Health] or the respective Facility at which the service is provided.").)

When Winninger left Howard Head in 2012, she plugged a USB drive into her computer and downloaded documents from the hospital's server. (Ex. 2, at 95:24-96:2, 383:14-18.) Though it required a multi-year effort and multiple motions by Defendants, Winninger finally produced the documents she downloaded from Howard Head in two batches, one in December 2019,[3] and another in May 2020.[4]

---

[3] As early as January 2018, Vail Health sought production of any documents in Plaintiffs' possession misappropriated from Vail Health's server. (*See* Ex. 4, Vail Health's First Set of Discovery Requests to Plaintiff Lindsay Winninger at RFP Nos. 4, 7 (Jan. 11, 2018).) In November 2018, shortly after Winninger testified that she downloaded documents from Howard Head in 2012, Vail Health again sought production of those documents. (*See* Ex. 5, Vail Health's Response to Plaintiffs' Motion to Compel and Motion for Protective Order at 1-3 (Oct. 4, 2019) (summarizing history of dispute).) Plaintiffs repeatedly refused, requiring Defendants to file multiple motions. (*Id.*) On September 11, 2019, the Special Master ordered Plaintiffs to produce the documents Winninger downloaded from Howard Head, which prompted an additional flurry of motions from Plaintiffs resisting production. (*Id.*) On November 4, 2019, the Special Master again ordered Plaintiffs to produce the documents. (*See* Order on Plaintiffs' Motion to Compel and Prior Order for Lindsay Winninger to Produce Documents Predating May 2012 at 2 (Nov. 4, 2019)). Plaintiffs finally produced some of the documents Winninger downloaded with appropriate bates numbers on December 16, 2019.

[4] Defendants learned that Winninger's December 2019 production was incomplete in April 2020, when Plaintiffs' forensic expert testified that he had obtained from Winninger's computer more than 9,500 documents—far more than Plaintiffs produced in December 2019. (Ex. 6, Penrod Dep. Tr. at 362:19-364:11, 368:7-372:12.) Mr. Penrod further testified that he sent the more than 9,500 documents to Plaintiffs' counsel in October 2019, along with a spreadsheet showing those 9,500 documents. Plaintiffs' November and December productions only included approximately 8,000 documents. Plaintiffs also did not produce the spreadsheet showing their incomplete production. The Special Master subsequently granted Vail Health's motion to compel production of the documents, observing, "[Plaintiffs] represented that they had complied with the Order and produced all responsive documents. It clearly appears they did not." (Ex. 7, May 15, 2020 Order.)

In total, Winninger's December 2019 and May 2020 productions revealed that in or about 2012, she downloaded *9,826 documents* from the Howard Head shared drive. (Ex. 8, Crumbaker Decl. ¶¶ 3, 7.) Among those documents was ***the PHI of 710 patients***. (*Id.* ¶¶ 4, 8; Appendix A, Compilation of Documents Taken by Winninger Containing PHI (submitted to Court on encrypted USB drive.) There is no dispute that Winninger downloaded these documents from the Howard Head shared drive in or around 2012. (*See, e.g.*, Ex. 9, Pls.' Opp'n to Ds.' Mot. to Compel the Dep. of David Penrod at 2 (Apr. 20, 2020) ("There is no dispute that the documents produced on December 13, 2019, were documents that [Winninger] obtained during her employment with RPC-Vail/Proaxis.").)

As required by HIPAA, Vail Health disclosed Winninger's theft of PHI to the U.S. Department of Health and Human Services, Office of Civil Rights ("OCR") and the public. After Winninger produced the initial set of documents she downloaded from Howard Head in December 2019, Vail Health submitted a notice of the breach to OCR (Ex. 10) and sent letters to the Vail Health patients whose PHI Winninger stole (Ex. 11).

Upon learning in May 2020 that Winninger had stolen additional documents containing PHI, Vail Health was required to file an addendum to its prior breach notice with OCR. (Ex. 12.) Also on or about June 23, 2020, Vail Health sent notification letters to the affected patients informing them that their PHI had been compromised, as required by HIPAA. (*See, e.g.*, Ex. 13.) Because the breach caused by Winninger had now impacted more than 500 patients, Vail Health also was required to send media notices to Colorado news organizations. (*See, e.g.*, Ex. 14.)

<u>David Cimino's Theft of PHI</u>

David Cimino, the third-party defendant, joined Howard Head as a physical therapist in approximately November 2012. (Ex. 1, Am. Compl. ¶ 35.) His signed offer of employment from Vail Health included clauses prohibiting him from misusing Vail Health's confidential information or soliciting business away from Vail Health. (*See* Ex. 15, VAIL_00000625.)

In March 2014, while Cimino was working at Howard Head, Winninger founded Sports Rehab. (Ex. 2, Winninger Dep. Tr. 22:25-23:4.) In late 2015, Sports Rehab opened a physical therapy clinic in Vail, Colorado. (*Id.* at 23:25-25:24.)

In November 2015, while working for Vail Health and without Vail Health's knowledge, Cimino accepted an offer of employment from Sports Rehab. (Ex. 16, Cimino Dep. Tr. 75:4-9.) He began treating Sports Rehab patients almost immediately thereafter, while he was still employed by, and receiving a salary from, Vail Health. (*E.g.*, Ex. 17, SRC002854, 2854-2858.) On December 1, 2015, Cimino formally resigned from his Vail Health position effective at the end of the year. (Ex. 16, Cimino Dep. Tr. 18:11-18.) The same day, he plugged a USB device into his work computer and downloaded thousands of Vail Health patient records. (*Id.*; Ex. 18, Bernard Decl. ¶ 4.) On December 30, 2015, Cimino connected another USB device and downloaded additional patient files, as well as confidential, proprietary, and trade secret materials. (Ex. 18, Bernard Decl. ¶ 4.) Cimino downloaded thousands of documents (*id.* ¶ 6; *see also* Ex. 16, Cimino Dep. Tr. 28:9-29:13, 32:9-34:6), which included PHI of thousands of patients. (Appendix B, Compilation of Documents Containing PHI Taken by Cimino (submitted to Court on encrypted USB drive).)

After a January 8, 2016 meeting with Winninger and Schoenthaler, Nico Brown (a Senior Vice President of Vail Health and leader of Howard Head) became suspicious and sought permission from Vail Health's information technology department to search Cimino's Vail Health computer. Upon searching Cimino's computer, Brown found: emails from Winninger to Cimino asking him to post Sports Rehab flyers announcing his availability for appointments at Sports Rehab (while he was still working at Howard Head); downloaded Vail Health documents; invoices on Sports Rehab letterhead for Cimino's treatment of a U.S. Ski Team member while he was employed by Vail Health; and emails to and from him at a Sports Rehab email address while employed by Vail Health. (Ex. 19, SRC000734, SRC000738.)

After discovering this information on Cimino's computer, Vail Health sent cease and desist letters to Cimino and Winninger on January 15, 2016. (*Id.*) That letter specifically instructed both Winninger and Cimino to stop engaging in behaviors that violated Cimino's non-solicitation agreement with Vail Health and to return any Vail Health information Mr. Cimino may have taken. (*Id.*)

When Vail Health sent this letter, Vail Health did not yet know that Cimino had downloaded thousands of patient files and confidential and proprietary Vail Health information from Vail Health's shared server. Although Defendants assume for purposes of this motion that Winninger was unaware that Cimino downloaded documents from Vail Health's server before his departure, Defendants note that there is substantial evidence to the contrary. For example, even though Vail Health's January 15, 2016 cease and desist letter did not mention Vail Health's server (*id.*), shortly after receiving the letter, Winninger sent a text message to Cimino stating, "I need

you to email what you took off their *servers.* Or any other info you have." (Ex. 20, SRC002757 (emphasis added).)

After Vail Health discovered this information on Cimino's Vail Health computer, it engaged a computer forensic expert, Cyopsis, to examine Cimino's Vail Health computer. Cyposis's examination revealed that Cimino had plugged two USB devices into his Vail Health work computer. (Ex. 18, Bernard Decl. ¶ 4.) On February 3, 2016, Vail Health sent a letter to Cimino demanding that he return the two devices. (Ex. 21, SRC000965.) On February 5, 2016, Cimino's attorney delivered the devices to Cyopsis. (Ex. 18, Bernard Decl. ¶ 5.) When Cyopsis examined those devices, it learned that Cimino had downloaded thousands of patient files and other confidential and proprietary Vail Health information onto the two devices. (*Id.* ¶ 6; Appendix B.) On March 2, 2016, Vail Health sent another letter to Cimino's attorney, informing him that Vail Health had learned that he had downloaded significant amounts of protected health information. (Ex. 22, SRC000546.) In that letter, Vail Health informed Cimino it was important he certify that he had returned all documents and had not given them to anyone else.

Cimino's data theft violated HIPAA and caused Vail Health to incur significant damages. Among other things, on April 15, 2016, Vail Health had to provide notice to regulatory agencies of the breach and provide notice to the more than 3,000 patients whose data was taken by Cimino. (*See* Ex. 23, VAIL_00000165.)

<u>Alleged Statements by Vail Health</u>

For purposes only of this Motion, Defendants assume (but do not concede) that the following statements were made following discovery of Cimino's theft of Vail Health patient information:

- **Count I:** "In spring 2016, [Doris] Kirchner [Vail Health's CEO] told Dan Drawbaugh of The Steadman Clinic that Winninger had known about and participated in downloading Vail Health patient files." (Ex. 1, Am. Compl. ¶ 119; *see also* Ex. 24, Pls. Lindsay Winninger and Sports Rehab Consulting LLC's Second Supp. Answers to Defs.' First Set of Interrogs., at 8.)

- **Count II:** "In summer 2016, Kirchner told Dan Drawbaugh of The Steadman Clinic that Winninger had stolen patient files from Vail Health and that the clinic should not be associated with her because of that." (Ex. 1, Am. Compl. ¶ 130; *see also* Ex. 24, at 8.)

- **Count III:** "In fall 2016, Kirchner told Dan Drawbaugh of The Steadman Clinic that Winninger had stolen patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 141; *see also* Ex. 24, at 8.)

- **Count IX:** "In summer 2016, Michael Shannon told Dan Drawbaugh of The Steadman Clinic that Winninger had stolen thousands of patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 207; *see also* Ex. 24, at 9.)

- **Count XI:** "In December 2016, Michael Shannon told Dan Drawbaugh of The Steadman Clinic that Winninger had stolen thousands of patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 229; *see also* Ex. 24, at 9.)

- **Count XIX:** "In January 2017, Michael Shannon spoke to Dan Drawbaugh of The Steadman Clinic and told Drawbaugh that Winninger had stolen thousands of patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 317; *see also* Ex. 24, at 9.)

- **Count XXI:** "During the week of February 6, 2017, Michael Shannon spoke to Al Perkins, a Board Member of the Steadman Philippon Research Institute, and told him that Winninger had stolen 3,000 patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 339; *see also* Ex. 24, at 9.)

- **Count XXII:** "In about January or February, 2017, Nicholas Brown spoke to Kelly Adair of The Steadman Clinic and stated that Winninger was involved in stealing patient files from Vail Health." (Ex. 1, Am. Compl. ¶ 350; *see also* Ex. 24, at 10.)

<u>The Steadman and SPRI Agreements</u>

While Vail Health was responding to the data breach caused by Cimino, Winninger was pitching her consulting services to The Steadman Clinic and SPRI, which are located in Vail Health's facility. Those discussions resulted in the execution of two Consulting Services Agreements with Winninger—one with The Steadman Clinic, and one with SPRI, dated

August 17, 2016 (months after Plaintiffs allege Defendants began defaming Winninger to the Steadman doctors). (Ex. 25, STEADMAN-0000686; Ex. 26, STEADMAN-0000693.) Sports Rehab was not a party to either agreement. (*Id.*)

In May 2017, due to the ongoing dispute between Vail Health and Sports Rehab and Winninger regarding the theft from Vail Health of documents containing proprietary information and PHI, Steadman and SPRI requested that Winninger execute amendments to those contracts ("Amendments") containing the following representations:

> Consultant represents and warrants that at no time prior to the Amendment Effective Date has she directly or indirectly (i.e., through a third party agent or representative, or employee):
>
> > (a) Obtained confidential or proprietary information of another health care provider, including, but not limited to, any hospital, clinic, or medical or scientific research institute, by any means not authorized by such health care provider or research institute or otherwise in a manner or through means inconsistent with federal or state confidentiality or privacy law; or

(Ex. 27 at SRC002326, SRC002328; *see* Ex. 28, 6/17/20 Drawbaugh Dep. Tr. 28:10-20.) Remarkably, despite taking thousands of documents from the Howard Head shared drive, including hundreds of documents containing PHI, Winninger signed the Amendments—falsely representing to Steadman and SPRI that she had never obtained PHI from a healthcare provider in an unauthorized manner. (Ex. 27 at SRC002327, SRC002330.)

After the Steadman and SPRI Agreements were executed, Winninger began to perform services under those agreements. (Ex. 29, 8/28/18 Drawbaugh Dep. Tr. 51:21-24.) However, by mid-2017, Winninger performed no further consulting services for Steadman or SPRI. (*Id.* at 73:16-74:2.)

## LEGAL STANDARD

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." C.R.C.P. 56(c). The moving party bears the initial burden of showing that there is no genuine issue of material fact for trial and that it is entitled to judgment as a matter of law. *Urban v. Beloit Corp.*, 711 P.2d 685, 687 (Colo. 1985). Once the movant has met this burden, the nonmoving party must designate admissible evidence that presents a genuine issue of material fact for trial. C.R.C.P. 56(e); *Urban*, 711 P.2d at 687. If the nonmoving party fails to present such evidence, the moving party is entitled to judgment as a matter of law. C.R.C.P. 56(e); *Zolman v. Pinnacol Assurance*, 261 P.3d 490, 496 (Colo. App. 2011).

## ARGUMENT

## I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR DEFENDANTS ON PLAINTIFFS' REMAINING DEFAMATION CLAIMS

It is undisputed that in 2012 Winninger took documents containing PHI from the Howard Head shared drive within Vail Health's server. Thus, the Court should grant summary judgment for Defendants on Plaintiffs' remaining defamation claims. "[B]ecause the threat of protracted litigation could have a chilling effect on the constitutionally protected right of free speech, prompt resolution of defamation actions[] by summary judgment . . . is appropriate." *Fry v. Lee*, 408 P.3d 843, 849 (Colo. App. 2013).

"Truth is a complete defense to defamation. However, absolute truth is not required." *Gordon v. Boyles*, 99 P.3d 75, 81 (Colo. App. 2004). "A defendant asserting truth as a defense in

a libel action is not required to justify every word of the alleged defamatory matter." *Fry*, 408 P.3d at 848-49 (internal quotation marks omitted); *id.* at 854 ("To be actionable, an allegedly defamatory statement must contain a material falsehood."). "[I]nstead, a defendant need only show substantial truth, that is, *the substance, the gist, the sting of the matter is true*." *Gordon*, 99 P.3d at 81 (emphasis added) (internal quotation marks omitted). "The test is whether the challenged statement produces a different effect upon the reader than that which would be produced by the literal truth of the matter." *Fry*, 408 P.3d at 849; *see also Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 987 (7th Cir. 2004) ("Any inaccuracies which do no incremental damage to the plaintiff's reputation do not injure the only interest that the law of defamation protects.").

Courts have consistently dismissed claims or granted summary judgment for defendants on defamation claims where the statement at issue is substantially true, even if the statement contains some errors. *See, e.g.*, *Global Relief Found.*, 390 F.3d at 987 (granting summary judgment to defendants on defamation claim where article reported that government had added charity to list of suspected terrorism funders but, in fact, charity was not added to list until months after article's publication); *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 302 (2d Cir. 1986) (reversing jury verdict and holding that, as a matter of law, statement that a person was cheating on his wife was substantially true where person was not currently cheating on his wife but had in the past); *Tannerite Sports LLC v. NBCUniversal Media LLC*, 135 F. Supp. 3d 219, 235 (S.D.N.Y. 2015) (dismissing defamation claim where article described commercially available targets that explode when shot with a gun as "bombs"), *aff'd*, 864 F.3d 236, 249 (2d Cir. 2017); *PBM Prods., LLC v. Mead Johnson Nutrition Co.*, 678 F. Supp. 2d 390, 402 (E.D. Va. 2009) (granting summary judgment on defamation claim with respect to statement that Plaintiff "has ignored the court's two

prior injunctions," even though the injunctions were no longer in force at the time the statement was made), *aff'd*, 639 F.3d 111, 119 (4th Cir. 2011).

Here, Plaintiffs have eight remaining defamation claims: Counts I, II, III, IX, XI, XIX, XXI, and XXII.[5] The alleged statements in those counts can be grouped into three categories: statements that Winninger stole patient files from Vail Health (Counts II and III); statements arguably implying that Winninger was "involved" with the theft of patient files from Vail Health (Counts I and XXII); and statements that Winninger stole "thousands" of patient files (Counts IX, XI, XIX, and XXI).

The allegedly defamatory statements in the first category contend that Winninger "had stolen patient files from Vail Health" and "had stolen patient files from Vail Health and that [The Steadman Clinic] should not be associated with her because of that." (Ex. 1, Am. Compl. Counts II and III.) Those statements are true. It is undisputed that Winninger stole in 2012 documents containing PHI of more than 700 patients. (Ex. 8, Crumbaker Decl.)

Winninger may argue that such statements are defamatory because she actually took PHI from Proaxis, which managed Vail Health's Howard Head clinic until October 31, 2012. Such an argument is flawed for two reasons. *First*, it is undisputed that even though Proaxis managed Vail Health's Howard Head clinic in 2012, the files of patients treated in the Howard Head clinic belonged to Vail Health, as stated in the agreement between Vail Health and Proaxis. (Ex. 3, VAIL_00003425 at -3428 ("All persons who receive Services at a Facility shall be regarded as and shall be registered as patients of the Hospital [*i.e.*, Vail Health] or the respective Facility at which the service is provided.").) *Second*, even if that were not the case, and Winninger in fact

---

[5] Defendant Kirchner is the alleged speaker only in Counts I, II, and III.

stole patient files from Proaxis rather than Vail Health, the statements in the first category (Counts II and III) are still substantially true. *See, e.g.*, *Gordon*, 99 P.3d at 81 (holding that a statement is substantially true if "the substance, the gist, the sting of the matter is true"). To conclude otherwise requires a belief that public knowledge of Winninger's theft of PHI from Proaxis has a different "sting" than theft of PHI from Vail Health.

The allegedly defamatory statements in the second category contend that Winninger was "involved in stealing patient files" and "had known about and participated in downloading Vail Health patient files." (Ex. 1, Am. Compl. Counts I and XXII.) Those statements are true, as Winninger necessarily "participated in" and was "involved in" her own theft of patient files in 2012. However, even if the references to "involved in" or "participated in" could be interpreted as an implication that Winninger was involved in *Cimino's* theft of patient files, the statements are substantially true. As an initial matter, the truth (that Winninger stole patient files herself) is *worse* than if she played some unspecified secondary role in Cimino's theft of patient files.

In any event, courts have consistently held that an allegation that a person committed a bad act is substantially true if the person in fact committed that bad act at some point in the past. *See Guccione*, 800 F.2d at 302 (statement that person was cheating on his wife substantially true where he had done so in the past); Restatement (Second) of Torts § 581A, cmt. c (1977) ("If the accusation is general and implies the commission of unspecified misconduct of a particular type, the statement is true if the plaintiff committed any misconduct of that type. Thus, a charge that another is an embezzler is true if he committed a single act of embezzlement."); *see also Hughes v. Hughes*, 122 Cal. App. 4th 931, 937 (Cal. App. 2004) (upholding jury finding that "our dad's a pimp" is substantially true because dad was previously a pimp). Statements that Winninger

15

"participated in" or was "involved in" the theft of patient files from Vail Health are true, or at least substantially true.

The allegedly defamatory statements in the final category contend that Winninger "had stolen thousands of patient files" or "had stolen 3,000 patient files." (Ex. 1, Am Compl. Counts IX, XI, XIX, XXI.) Those statements are substantially true and thus not defamatory. Again, it is undisputed that Winninger stole documents containing PHI of more than 700 patients. Minor discrepancies between facts asserted in allegedly defamatory statements and the actual facts are insufficient to support a claim for defamation. Courts have consistently found that statements are substantially true and not defamatory in the face of such minor inconsistencies. *See, e.g.*, *Fry*, 408 P.3d at 849. (finding substantial truth where journalist wrote that political candidate plagiarized campaign materials even though journalist omitted facts that the political candidate apologized and added citations); *Gordon*, 99 P.3d at 81 (finding substantial truth where radio-host said police officer had "problems with domestic violence" where police officer had been arrested but not convicted of domestic violence five years earlier); *see also Cyprien v. Bd. of Sup'rs ex rel. Univ. of La. Sys.*, 5 So. 3d 862, 867 (La. 2009) (holding that it was substantially true that applicant for basketball coaching position had submitted a false resumé even though applicant had most recently submitted an accurate resumé). Allegations that Winninger stole thousands of patient files has the same "sting" as an allegation that she stole nearly a thousand patient files. *See Gordon*, 99 P.3d at 81. Thus, such statements are not defamatory.

Accordingly, the Court should grant summary judgment to Defendants on defamation Counts I, II, III, IX, XI, XIX, XXI, and XXII.

**II.      SUMMARY JUDGMENT SHOULD BE GRANTED FOR DEFENDANTS ON PLAINTIFFS' TORTIOUS INTERFERENCE CLAIMS**

Plaintiffs assert three other claims that are also the subject of this motion: tortious interference with contract (Count XXV), tortious interference with current business relationship (Count XXVI),[6] and tortious interference with prospective business relationship (Count XXVII).

While Colorado recognizes tortious interference with contract, which is intended to protect the relationship between parties to a contract, the protection provided by the tort "is not absolute." *Mem'l Gardens, Inc. v. Olympian Sales & Mgmt. Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984). Tortious interference with contract "is premised on the existence of a contract between a plaintiff and a third party." *Colo. Nat'l Bank of Denver v. Friedman*, 846 P.2d 159, 170 (Colo. 1993). "To be liable for intentional interference with contract, a defendant must 1) be aware of a contract between two parties, 2) intend that one of the parties breach the contract, 3) and induce the party to breach or make it impossible for the party to perform the contract." *Krystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 871 (Colo. 2004). "In addition, the defendant must have acted 'improperly' in causing the result." *Id.*; *see also* Restatement (Second) of Torts § 766 ("One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract."). Further, Colorado law "provides less protection for

---

[6] Defendants previously filed a motion to dismiss Plaintiffs' tortious interference with current business relationships claim, which the Court denied. (Defs.' Mot. to Dismiss (June 12, 2017); Order: Order Granting [sic] Defs.' Mot. to Dismiss (July 13, 2017).) This Motion is without prejudice to Defendants' position, which it preserves for any potential appeal, that a claim for tortious interference with current business relationships is not viable as a matter of law.

contracts terminable at will because an interference with a contract terminable at will is an interference with a future expectancy, not a legal right. If a person is free to terminate a contract when he chooses, the other party has no legal assurance of future performance." *Mem. Gardens*, 690 P.2d at 211.

A claim for tortious interference with current business relationship, to the extent it exists, has the same elements as a claim for tortious interference with contract. "A claim of tortious interference with current business relations requires [plaintiff] to show: (1) he had *a contract* with a third party; (2) defendants *knew of the contract's existence*; (3) defendants intentionally induced the third party to breach the existing *contract*; (4) defendants acted improperly; and (5) defendants' actions caused plaintiff to incur damages." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008) (emphasis added).

The third claim is only slightly different: "[t]ortious interference with a prospective business relation requires a showing of intentional and improper interference preventing formation of a contract." *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 500 (Colo. 1995); *see also* Restatement (Second) of Torts § 766B ("One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation[.]").

A.      **Because Defendants' Alleged Statements Are Substantially True, Plaintiffs Cannot Establish the Improper Conduct Element of Their Tortious Interference Claims**

As relevant here, all three tortious interference claims require evidence that the defendant "acted improperly." *Krystkowiak*, 90 P.3d at 871; *Campfield*, 532 F.3d at 1122; *Amoco Oil Co.*, 908 P.2d at 500. Plaintiffs assert that Defendants' alleged defamatory statements alone satisfy this

improper conduct element. (*See, e.g.*, Ex. 1, Am. Compl. ¶¶ 389-390 (alleging that tortious interference was caused by "repeated defamatory statements made about Winninger and Sports Rehab").) However, because Defendants' statements are substantially true and thus not defamatory, Plaintiffs' claims of tortious interference fail as a matter of law. *See, e.g.*, *Fry*, 408 P.3d at 855-56 (affirming dismissal of ancillary claims where the underlying conduct was an alleged defamatory news article found to be substantially true); *Jefferson Cnty. School Dist. v. Moody's Investor's Servs., Inc.*, 175 F.3d 848, 858 (10th Cir. 1999) (affirming dismissal of tortious interference claims where the underlying conduct was a statement of opinion and thus not defamatory); *Buckhannon v. US W. Commc'n, Inc.*, 928 P.2d 1331, 1335 (Colo. App. 1996) (affirming dismissal of tortious interference claims where the underlying conduct was an alleged defamatory statement subject to absolute privilege).

Indeed, Colorado law and the First Amendment both require the dismissal of tortious interference claims based upon non-defamatory statements. Under Colorado law, a plaintiff cannot show "that the interference was intentional and improper" by pointing to a substantially true, non-defamatory statement. *Jefferson Cnty. School Dist.*, 175 F.3d at 858 (quoting *Amoco Oil Co.*, 908 P.2d at 500). Further, the First Amendment prohibits state tort law from prohibiting statements that are substantially true. *See, e.g.*, *Fry*, 408 P.3d at 856 (holding that without a "material falsity, recovery is barred by the First Amendment"); *see also Jefferson Cnty. School Dist.*, 175 F.3d at 857-58 (where plaintiff cannot identify a false statement of fact, it would be "inconsistent with applicable First Amendment principles" to allow recovery on tortious interference claims) (citing *Hustler Magazine v. Falwell*, 485 U.S. 46, 108 (1988)).

Because there are no defamatory statements underlying Plaintiffs' claims of tortious interference, Counts XXV, XXVI, and XXVII should be dismissed in their entirety.

**B.      Plaintiffs' Tortious Interference with Contract Claims Cannot Succeed Because Steadman and SPRI Would Not Have Contracted with Winninger If They Knew of Her Theft of PHI**

Winninger's false representations to Steadman and SPRI in the Amendments that she had never obtained unauthorized access to patient records is fatal to Plaintiffs' tortious interference with contract claims.

In May 2017, Steadman and SPRI requested that Winninger execute Amendments in which she represented that she had never "[o]btained confidential or proprietary information of another health care provider . . . by any means not authorized by such health care provider or research institute or otherwise in a manner or through means inconsistent with federal or state confidentiality or privacy law." (Ex. 27 at SRC002326, SRC002328.) Winninger signed the Amendments, despite taking documents containing the PHI of hundreds of patients from the Howard Head shared drive— falsely representing to Steadman and SPRI that she had never obtained PHI from a healthcare provider in an unauthorized manner. (*Id.* at SRC002327, SRC002330.)

Dan Drawbaugh, the CEO of Steadman and SPRI, testified that the representations in the Amendments were "important to The Steadman Clinic [and SPRI] in moving forward with [their] consulting agreement with Ms. Winninger." (Ex. 28 at 30:11-14, 31:8-12.) He further testified that if Winninger had been unwilling to sign the Amendments, Steadman and SPRI would not have moved forward with the consulting agreements. (*Id.* at 31:13-24.) For example, with respect to SPRI, Mr. Drawbaugh testified as follows:

Q. And the same thing for SPRI, if she had come back to SPRI and said I cannot make this representation and warranty because it is not true, would SPRI have moved forward with a consulting arrangement with Ms. Winninger?

A. No.

(*Id.* at 31:19-24.)

Mr. Drawbaugh was then shown the HIPAA breach notice that Vail Health submitted to OCR in February 2020 regarding Winninger's theft of PHI from Howard Head. (*Id.* at 35:17-36:12; Ex. 10, Dep. Ex. 290.) After reviewing that language and being asked to assume that the physical therapist described in the breach notice was Winninger, Mr. Drawbaugh confirmed that Winninger could not have truthfully affirmed the representations and warranties in the Amendments. (Ex. 28 at 36:13-37:1 ("Q. Okay. And so if the description [in the breach notice] were true, Ms. Winninger could not have signed the representation and warranty truthfully. Do you believe that? A. Yes.").)

Accordingly, it is undisputed that Winninger had already committed a material breach of the Steadman and SPRI Agreements on the date she signed the Amendments by falsely certifying that she had never stolen PHI from a healthcare provider. That is fatal to Plaintiffs' tortious interference with contract claims. Plaintiffs' tortious interference with contract and tortious interference with current business relationship claims require proof that the defendants "induce[d] the party to breach or ma[d]e it impossible for the party to perform the contract" and that the defendants' allegedly improper conduct "caused" the breach. *See Krystkowiak v. W.O. Brisben Cos., Inc.*, 90 P.3d 859, 871 (Colo. 2004); *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1122 (10th Cir. 2008). The contract also cannot be procured by fraud. Restatement (Third) of Torts: Liab. for Econ. Harm § 17, cmt. k (2020) ("[I]f the plaintiff procured the counterparty's consent to the contract by fraud . . . [the plaintiff] is not in a position to complain if the contract is subject to interference by

another."). Here, however, because Winninger committed a material and fraudulent breach when she signed the Amendments, Steadman and SPRI were entitled to terminate the contracts at any time, and their alleged suspension or termination of the contracts (Ex. 1, Am. Compl. ¶ 384) was not a breach. Moreover, even if there were a breach by Steadman or SPRI (which there was not), it was caused by Winninger's own conduct, not any action by Defendants. Thus, Plaintiffs' claims for tortious interference with contract and tortious interference with current business relationship fail, as a matter of law.

### C. Defendants Are Entitled to Summary Judgment on Sports Rehab's Tortious Interference Claims Because Sports Rehab Was Not a Party to the Steadman or SPRI Agreements

Summary judgment should also be granted for Defendants on the tortious interference with contract and tortious interference with current business relationship claims of Sports Rehab for the additional reason that Sports Rehab was not a party to either agreement. If a plaintiff is not a party to the contract at issue, it has no claim for tortious interference with that contract. *See, e.g.*, *Colo. Nat'l Bank of Denver*, 846 P.2d at 170 ("[Tortious interference with contract] is premised on the existence of a contract *between a plaintiff* and a third party." (emphasis added)). The only parties to the Steadman Agreement are Steadman and Winninger, and the only parties to the SPRI Agreement are SPRI and Winninger. (*See* Ex. 25 (STEADMAN-0000686); Ex. 26 (STEADMAN-0000693).)

Further, Winninger and her partner in Sports Rehab, Bradley Schoenthaler, agreed that "whatever [Winninger] received in the form of payment for [her] consulting services would not become revenues belonging to Sports Rehab Consulting." (Ex. 30, Schoenthaler Dep. Tr. 106:25-107:4.) That confirms that Sports Rehab had no interest in the Steadman or SPRI Agreements.

Thus, because the Steadman Agreement and SPRI Agreement are the only contracts with which Defendants are alleged to have interfered, Sports Rehab can have no claim for tortious interference with contract or tortious interference with current business relationship.

## III. VAIL HEALTH IS ENTITLED TO ITS FEES AND COSTS UNDER § 13-17-102

C.R.S. Section 13-17-102 permits the Court to award "reasonable attorney fees against any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification." As described above, Plaintiffs have for more than three years pursued defamation claims based on alleged statements by Vail Health that Winninger stole PHI from Vail Health. Plaintiffs, however, have known since the inception of the lawsuit that Winninger *was* involved in taking PHI from Vail Health. In fact, Mr. Schoenthaler admitted at his recent deposition that Winninger informed Sports Rehab in 2016, before Sports Rehab filed its complaint, that she had downloaded documents from the Howard Head server before she left Howard Head. (Ex. 31, 4/14/20 Sports Rehab 30(b)(6) Dep. Tr. 294:5-296:3.) Plaintiffs therefore knew before they filed the lawsuit that the defamation claims at issue here lacked substantial justification and should not be pursued.

Nevertheless, Plaintiffs filed the lawsuit and then went to great lengths for more than two years to avoid disclosing this truth to Defendants while forcing Defendants to spend extensive resources defending against the lawsuit. The recent disclosure by Plaintiffs of nearly 10,000 documents that Winninger took from Vail Health's shared server while she was working at Howard Head Sports Medicine, including documents containing the PHI of more than 700 patients, demonstrates the frivolous and groundless nature of Plaintiffs' defamation and wrongful

interference claims. Defendants therefore respectfully request that the Court award their reasonable attorneys' fees and costs incurred in defending against these unjustified claims.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant summary judgment for Defendants with respect to defamation Counts I, II, III, IX, XI, XIX, XXI, XXII, and tortious interference Counts XXV, XXVI, and XVII of the First Amended Complaint, and award Defendants reasonable attorneys' fees and costs incurred in defending this action.

Dated: August 25, 2020

DAVIS GRAHAM & STUBBS LLP

_s/Janet Savage_
Janet Savage, #11653
Jacqueline V. Roeder, #48046
Daniel A. Richards, #50457

*Attorneys for Defendant Doris Kirchner and Defendant, Counter-Plaintiff and Third-Party Plaintiff Vail Clinic, Inc. d/b/a Vail Health*

REILLY LLP
Daniel M. Reilly, #11468
Clare S. Pennington, #37896
John M. McHugh, #45456

*Attorneys for Defendant Doris Kirchner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing DEFENDANTS MOTION FOR SUMMARY JUDGMENT was filed via Colorado Courts E-Filing on this 25th day of August 2020, which will serve notice to the following:

John W. Madden, III
THE MADDEN LAW FIRM
999 18th Street, Suite 1500 South
Denver, Colorado 80202
Telephone: 303.436.1111
Email: madden@themaddenfirm.com

*Counsel for Third-Party Defendant David Cimino*

Jesse Wiens
FAHRENHOLTZ & WIENS, LLC
P.O. Box 1988
Avon, Colorado 81620
Telephone: 970.949.6500
Facsimile: 970.331.0794
Email: fwlawyers@gmail.com

*Counsel for Plaintiffs/Counter-Defendants Lindsay Winninger and Sports Rehab Consulting, LLC*

Daniel M. Reilly, Clare S. Pennington, John M. McHugh
REILLY LLP
1700 Lincoln Street, Suite 2400
Denver, Colorado 80203
Telephone: 303.893.6100
Email:  dreilly@rplaw.com
        cpennington@rplaw.com
        jmchugh@rplaw.com

*Counsel for Defendant Doris Kirchner*

<u>Copy emailed to:</u>

Sonya Braunschweig (admitted pro hac vice)
5501 Irving Avenue South
Minneapolis, Minnesota 55419
Telephone: 612.819.2304
E-mail: sonya.braunschweig@gmail.com

Alan L. Kildow (admitted pro hac vice)
15204 Wildwood Road
Burnsville, Minnesota 55306
Telephone: 970.390.6675
E-mail: alkildow@aol.com

*Counsel for Plaintiffs/Counter-Defendants Lindsay Winninger and Sports Rehab Consulting, LLC*

*s/ Paige Finnell*
_____
Paige Finnell
