# Exhibit 41



**CAPRI COURT REPORTING, INC.**
*Certified Court Reporters*
0035 Bobcat Court
Carbondale, Colorado 81623
(970) 510-5131

---

DISTRICT COURT, EAGLE COUNTY, COLORADO
Case No. 2017CV030102

---

**VIDEOTAPED DEPOSITION OF NICHOLAS BROWN**
July 19, 2018

---

LINDSAY WINNINGER, an individual; and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,

    Plaintiffs,

v.

DORIS KIRCHNER, an individual; and VAIL CLINIC, INC., d/b/a VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation,

    Defendants.

---

VAIL CLINIC, INC., d/b/a VAIL VALLEY MEDICAL CENTER, a Colorado corporation,

    Counter-Plaintiff,

v.

LINDSAY WINNINGER, an individual; and SPORTS REHAB CONSULTING LLC, a Colorado limited liability company,

    Counter-Defendants.

---

VAIL CLINIC, INC., d/b/a VAIL VALLEY MEDICAL CENTER, a Colorado nonprofit corporation,

    Third-Party Plaintiff,

v.

DAVID J. CIMINO, an individual,

    Third-Party Defendant.

---

Page 2

```
 1              Videotaped deposition taken

 2     pursuant to the applicable provisions of the

 3     Code of Civil Procedure of the State of Colorado

 4     and the Rules of the Supreme Court thereof,

 5     before Kelly Capri, CCR, RPR, and Notary Public

 6     for the State of Colorado, taken at DoubleTree

 7     by Hilton Vail, 2211 North Frontage Road West,

 8     Vail, Colorado, commencing at 9:33 a.m., on

 9     Thursday, July 19, 2018.

10
       PRESENT:
11
            BRIGGS AND MORGAN, P.A., by
12          SONYA R. BRAUNSCHWEIG, ATTORNEY AT LAW
            80 South Eighth Street
13          Minneapolis, Minnesota 55402-2157
            (612) 977-8400
14          sbraunschweig@briggs.com
                      and
15          ALAN L. KILDOW, ESQ.
            15204 Wildwood Road
16          Burnsville, Minnesota 55306
            (970) 390-6675
17          alkildow@aol.com

18              appeared on behalf of the
                Plaintiffs/Counter-Defendants;
19
            DAVIS GRAHAM & STUBBS LLP, by
20          JANET SAVAGE, ATTORNEY AT LAW
            1550 Seventeenth Street
21          Suite 500
            Denver, Colorado 80202
22          (303) 892-7341
            janet.savage@dgslaw.com
23
                appeared on behalf of the
24              Defendants/Counter-Plaintiff;

25
```

```
                                                          Page 3

   1      PRESENT (Continued):

   2          THE MADDEN LAW FIRM, by
              JOHN W. MADDEN, III, ESQ.
   3          999 18th Street
              South Tower/Suite 1500
   4          Denver, Colorado 80202
              (303) 436-1111
   5          madden@themaddenfirm.com

   6              appeared on behalf of the Third-Party
                  Defendant.
   7
          ALSO PRESENT:
   8
              JULIE BUTCHER, CERTIFIED VIDEO SPECIALIST
   9          LINDSAY WINNINGER

  10                      *   *   *   *   *

  11

  12

  13

  14

  15

  16

  17

  18

  19

  20

  21

  22

  23

  24

  25
```

## Page 6

```
 1              PROCEEDINGS
 2           THE VIDEOGRAPHER:  Good morning.
 3           We are now on the record.
 4    The time is currently 9:33 a.m. on
 5    July 19, 2018.  This is the beginning
 6    of Media Unit No. 1 in the deposition
 7    of Nicholas Brown in the matter of
 8    Lindsay Winninger, et al. versus Doris
 9    Kirchner, et al., Case No. 2017CV030102
10    being heard in the District Court of
11    Eagle County, State of Colorado.
12           This deposition is being
13    taken at 2211 North Frontage Road West
14    in Vail, Colorado.  My name is Julie
15    Butcher.  I'm a certified legal
16    videographer with Mile High Reporting.
17    Our court reporter today is Kelly Capri
18    with Capri Court Reporting.
19           Please note that audio and
20    video recording will take place until
21    all parties have agreed to go off the
22    record.  Microphones are sensitive and
23    may pick up whispers, private
24    conversations, and cellular
25    interference.
```

## Page 7

```
 1           Counsel, will you please
 2    state your appearances, beginning with
 3    plaintiffs' counsel.
 4           MS. BRAUNSCHWEIG:  For Plaintiffs
 5    Lindsay Winninger and Sports Rehab
 6    Consulting, Sonya Braunschweig and Alan
 7    Kildow.
 8           MS. SAVAGE:  For Defendants
 9    Vail -- Vail Health Hospital and Doris
10    Kirchner, Janet Savage.
11           MR. MADDEN:  John Madden appearing
12    for the third-party defendant, David
13    Cimino.
14           THE VIDEOGRAPHER:  Will the court
15    reporter please administer the oath.
16               (WHEREUPON, the deponent
17                was duly sworn.)
18           NICHOLAS BROWN,
19    having been first duly sworn, was examined and
20    testified as follows:
21               EXAMINATION
22           BY MS. BRAUNSCHWEIG:
23    Q.  Mr. Brown, thank you for being here
24    today.
25    A.  Thank you.
```

## Page 8

```
 1    Q.  You understand that Vail Health is a
 2    regulated industry -- or is a regulated
 3    industry, correct?
 4    A.  Yes.
 5    Q.  And it's a health care provider that's
 6    regulated by various entities, correct?
 7    A.  Correct.
 8    Q.  And what kind of entities -- regulatory
 9    entities is Vail Health regulated by?
10    A.  So we're regulated by CMS.
11    Q.  And CMS is?
12    A.  Centers for Medicare & Medicaid
13    Services.
14    Q.  Anything else?
15    A.  There's regulation under CMS for the
16    OCR, Office of Civil Rights.
17    Q.  And what division of the government is
18    OCR regulated by -- is OCR a part of?  Excuse
19    me.
20           MS. SAVAGE:  Excuse me?
21    BY MS. BRAUNSCHWEIG:
22    Q.  Is OCR a part of the Department of
23    Human -- of Health and Human Services?
24    A.  It is.
25    Q.  Yes.
```

## Page 9

```
 1           Anything else?
 2    A.  The Joint Commission.
 3    Q.  And what's the Joint Commission?
 4    A.  It's an accreditation institution.
 5    Q.  Okay.  Anything else?
 6    A.  Various state entities, such as DORA,
 7    which is the Department -- I think it's the
 8    Department of Regulatory Activities.
 9    Q.  Agencies.
10    A.  Agencies, yeah.
11    Q.  I think it's Agencies.
12    A.  There's a lot of acronyms.
13    Q.  It's a strange -- a strange name.
14           Go ahead.  Anything else?
15    A.  I'm sure there's some I'm missing, but
16    those are the ones that are top of mind.
17    Q.  And when you say "various state
18    entities," would that just be within the state
19    of Colorado?
20    A.  That's correct.
21    Q.  Let's focus on -- I'll use the acronym
22    HHS.  You understand what I mean by HHS,
23    correct?
24    A.  Health and Human Services, to clarify.
25    Q.  Yes.
```

Page 186

```
 1    Q.   Did Mr. O'Brien ever call Lindsay a
 2  thief?
 3    A.   Not that I can recall.
 4    Q.   You were upset that she hired
 5  Mr. Cimino, weren't you?
 6    A.   Was I upset?
 7    Q.   Yes.
 8    A.   You know, I wasn't upset.  I had, you
 9  know, until this incident, I had great rapport
10  with Lindsay and Brad and Dave, and they were my
11  colleagues.  And really, the theft has really
12  changed a lot of that.  But no, I wasn't upset,
13  I don't believe so.
14    Q.   Do you think Ms. Winninger would be
15  involved in a theft?
16    A.   Do I think so?
17    Q.   Uh-huh.
18    A.   I don't really understand the question.
19    Q.   Do you think Ms. Winninger is the type
20  of person who would be involved in a theft of
21  Vail Health patient files?
22         MS. SAVAGE:  Object.  It calls for
23  speculation.
24    A.   Again, I think that that's what -- no,
25  based on her prior history.
```

Page 187

```
 1         But also, based on her text
 2  message to Mr. O'Brien saying that, You know
 3  everybody takes their files off of the shared
 4  drive, I think that that opinion was wrong.  And
 5  I think -- and I'm saddened by that.
 6  BY MS. BRAUNSCHWEIG:
 7    Q.   And so do you think she stole materials
 8  from Vail Health?
 9    A.   I don't know.
10    Q.   Did you ever have a discussion where
11  you used the terminology that Ms. Winninger
12  stole physical therapists from Howard Head?
13    A.   No, I don't believe so.
14    Q.   And did you ever have a discussion with
15  Mr. O'Brien that you needed to ensure that
16  Ms. Winninger didn't steal any more physical
17  therapists from Howard Head?
18    A.   So I do remember having a conversation
19  with Luke about retention of employees and
20  making sure that people felt appreciative and
21  rewarded in their care and -- but it's an
22  ongoing thing.  I currently serve on the
23  Recruitment and Retention Subcommittee of the
24  board.  We've been meeting for eight months.
25  Retention of employees is a huge part of a
```

Page 188

```
 1  well-functioning organization.
 2    Q.   And you wanted to make sure
 3  Ms. Winninger didn't take any more employees;
 4  isn't that correct?
 5    A.   I think retention, in general, is the
 6  important thing.  I think turnover hurts
 7  companies, irrespective of where those
 8  individuals go.
 9    Q.   So losing two physical therapists to
10  Sports Rehab was a problem for you?
11    A.   So not necessarily, because if it was
12  two in a year, this would meet kind of normal
13  retention -- turnover -- voluntary turnover
14  amounts.  More than two, and especially at that
15  time, given difficulties recruiting and time to
16  fill, that does become a problem for a business.
17  But it doesn't really matter where the
18  individuals go.  If you have a demand for your
19  business and your supply isn't there to fill
20  that demand, it's obviously not good.
21    Q.   Why was Mr. O'Brien so concerned about
22  Ms. Winninger possibly opening up a physical
23  therapy office in the Four Seasons?
24         MS. SAVAGE:  Object.  It calls for
25  speculation.
```

Page 189

```
 1    A.   Yeah, you would have to ask Mr. O'Brien
 2  that, but . . .
 3  BY MS. BRAUNSCHWEIG:
 4    Q.   Did you have any discussions with
 5  Mr. O'Brien about hearing that Ms. Winninger
 6  would be opening up an office in the Four
 7  Seasons?
 8    A.   I did.
 9    Q.   And what discussions did you have with
10  him about it?
11    A.   That he heard that she was.
12    Q.   And did you also hear that Mr. Herron,
13  Mark Herron, had told Mr. O'Brien, purportedly,
14  that she was opening up that office with
15  Dr. Philippon?
16    A.   I don't recall exactly, but I don't
17  think that that's what Luke told me.
18    Q.   How much business do you get from
19  The Steadman Clinic for physical therapy
20  services?
21    A.   How would you like me to define "how
22  much"?
23    Q.   Percentage of PT services for
24  referrals.
25    A.   Percentage of their services?
```

Page 190

```
 1    Q.   Uh-huh.
 2    A.   I don't know, because I don't have a
 3  totality of knowing how many they refer
 4  elsewhere.
 5    Q.   Isn't it true that Vail Health and
 6  The Steadman Clinic were interested in
 7  potentially looking at a joint venture to open
 8  up a physical therapy practice?
 9    A.   So there's been a lot of different
10  conversations over the years with various
11  providers on ways in order to collaborate.
12  There's various nondisclosure agreements
13  surrounding those.  At present we're purely an
14  outpatient department of the hospital.
15    Q.   In 2015 were you involved in the
16  negotiation of agreements with The Steadman
17  Clinic for leasing space?
18    A.   I was not.
19    Q.   And were you involved in negotiation of
20  physical therapy services with respect to
21  The Steadman Clinic in 2015?
22         MS. SAVAGE:  Objection, vague.
23    A.   So I was involved with discussions.
24  BY MS. BRAUNSCHWEIG:
25    Q.   Were you involved in the agreements
```

Page 191

```
 1  related to physical therapy services that were
 2  entered into by Vail Health and The Steadman
 3  Clinic?
 4    A.   I don't believe that there were
 5  agreements between Vail Health and The Steadman
 6  Clinic regarding physical therapy except for
 7  nondisclosure agreements.
 8    Q.   And what do you mean by "nondisclosure
 9  agreements"?
10    A.   They're mutual nondisclosure
11  agreements.
12    Q.   And the mutual nondisclosure agreement
13  went to what issue?
14    A.   The exploration of collaboration on
15  therapy services.
16    Q.   And when was the initial agreement
17  entered into for the exploration of therapy
18  services?
19    A.   You know, I don't recall exactly.  It
20  was -- I wasn't a part of the initial
21  discussions.
22    Q.   Were you involved in any amendments to
23  the agreement?
24         MS. SAVAGE:  Well, object, vague.
25  What agreement?
```

Page 192

```
 1  BY MS. BRAUNSCHWEIG:
 2    Q.   The exploration of therapy services
 3  agreement, were you involved in any amendments
 4  related to that agreement.
 5    A.   The only -- would be extending -- I
 6  believe there was a -- it was an extension of a
 7  letter of intent.  So part of that letter of
 8  intent was the nondisclosure.
 9    Q.   And when was the letter of intent
10  entered into?
11    A.   I don't exactly recall, but I believe
12  it was 2016.
13    Q.   And when did the extension expire?
14    A.   Again, I don't recall.
15    Q.   Would it have been in 2017?
16    A.   No.  I believe it was in '16, but I
17  don't recall specifically.
18    Q.   Would it have been in November of 2016?
19         MS. SAVAGE:  Asked and answered.
20    A.   Yeah, I don't recall specifically.
21  BY MS. BRAUNSCHWEIG:
22    Q.   Why were you concerned that
23  Ms. Winninger was potentially providing physical
24  therapy services in The Steadman Clinic?
25         MS. SAVAGE:  I'm going to object,
```

Page 193

```
 1  lack of foundation.
 2    A.   I don't know that she was providing
 3  physical therapy services.  Are you saying -- in
 4  The Steadman Clinic space.  Are you saying that
 5  she was?
 6  BY MS. BRAUNSCHWEIG:
 7    Q.   No, I'm not saying that at all.
 8    A.   Okay.  So I -- I don't --
 9    Q.   Are you aware of a text message
10  exchange with Mr. O'Brien in which he asked you
11  would it be a violation of their lease agreement
12  if Ms. Winninger was in there treating patients
13  in The Steadman Clinic?
14    A.   I'm aware of that text.
15    Q.   And what did you do about that text?
16    A.   I believe I called Luke and I told him
17  to speak with Doris.
18    Q.   And do you know if he spoke to Doris
19  Kirchner?
20    A.   I believe they did speak.
21    Q.   And do you know what the discussion
22  was?  Did Mr. O'Brien share that with you?
23    A.   I think that they discussed the rumor,
24  and I'm pretty sure counsel would have been
25  involved as it relates to the legal matter
```

Page 194

```
 1  surrounding the lease.
 2     Q.   And when you say "counsel would have
 3  been involved," who are you referring to?
 4     A.   In that case it probably would have
 5  been Don Auten, A-u-t-e-n.
 6     Q.   And is that an attorney on behalf of
 7  Vail Health?
 8     A.   Yes.
 9     Q.   Okay.  So --
10     A.   And perhaps Matt Jones or Greg Brodek
11  depending on what the date was.
12     Q.   Matt Jones and Greg --
13     A.   And/or Greg Brodek.
14     Q.   Are they all with the same law firm?
15     A.   They are all with Duane Morris.
16     Q.   In Philadelphia?
17     A.   I don't know exactly what office.  I
18  know they're based in Philadelphia.
19     Q.   And do you recall when that discussion
20  occurred between you and Mr. O'Brien?
21     A.   I called him, likely, that day when I
22  received the text.
23     Q.   And do you know when you received the
24  text?
25     A.   I would have to look at the text
```

Page 195

```
 1  message chain to tell you exactly.
 2     Q.   Now, the exploration of the physical
 3  therapy services with The Steadman Clinic, that
 4  never became -- never came to fruition, correct?
 5     A.   That's correct.
 6     Q.   And do you know when they were -- when
 7  those discussions fell apart?
 8     A.   Well, as the exploration took place,
 9  there were various barriers that we became aware
10  of.  And I don't remember exactly when the
11  official "no" came about, but I believe it was
12  sometime in the fall of '16.
13     Q.   Did The Steadman Clinic ever provide
14  you projections as to what they thought -- the
15  revenues they could earn on a physical therapy
16  service?
17     A.   On if they ran a physical therapy
18  service?
19     Q.   Correct.
20     A.   Yes, they did.
21     Q.   Where are those documents?
22          MS. SAVAGE:  They've been
23  produced.
24          THE DEPONENT:  Yeah.
25     A.   I believe they've been produced.
```

Page 196

```
 1  BY MS. BRAUNSCHWEIG:
 2     Q.   The Steadman Clinic had projections of
 3  their own related to them opening up their own
 4  clinic, correct?
 5     A.   The Steadman Clinic had worked with, I
 6  believe it was Sullivan Cotter to produce a
 7  pseudo pro forma or forecast of what a financial
 8  projection could look like based on their
 9  assumptions for a standalone physical therapy.
10     Q.   And who is Sullivan Cotter?
11     A.   Sullivan Cotter is a business
12  consulting group, I think.  I think they do a
13  number of different things.  I never met with
14  them.  I don't know.
15     Q.   Do you recall the documents that they
16  provided to you?  Did they have a logo of
17  Sullivan Cotter on them?
18     A.   I don't recall.  I just know that
19  Kelly, I believe, told me that this was based on
20  Sullivan Cotter.  I think that's in an e-mail.
21     Q.   Okay.
22          MS. BRAUNSCHWEIG:  Those documents
23  have not been produced, Counsel.
24          MS. SAVAGE:  Well, they have been.
25          MS. BRAUNSCHWEIG:  No, they have
```

Page 197

```
 1  not.
 2          MS. SAVAGE:  Well, they have been.
 3          MS. BRAUNSCHWEIG:  Then identify
 4  the Bates number for those documents.
 5          MS. SAVAGE:  Well, I can't do that
 6  sitting here in the middle of a
 7  deposition.
 8          MS. BRAUNSCHWEIG:  Then
 9  Mr. Kotlarczyk will do that.
10          MS. SAVAGE:  Well, no.
11  Mr. Kotlarczyk won't do that in the
12  middle of a deposition.  But those have
13  been produced.
14          MS. BRAUNSCHWEIG:  No.
15          MS. SAVAGE:  In fact, it looks
16  like you might be pulling one out of
17  your notebook right now.
18          MS. BRAUNSCHWEIG:  Oh, no.  This
19  is not a Sullivan Cotter document.
20          MS. SAVAGE:  Oh, okay.  Well, I
21  don't think he said it was.
22          MS. BRAUNSCHWEIG:  He said that
23  there was a Sullivan Cotter projection
24  that he received from The Steadman
25  Clinic.
```

Page 198

```
 1            THE DEPONENT:  No, I --
 2            MS. SAVAGE:  That's misstating
 3       what --
 4            THE DEPONENT:  That's not what I
 5       said.
 6            MS. SAVAGE:  That's misstating the
 7       witness's testimony.
 8            THE DEPONENT:  I said that at
 9       The Steadman Clinic that Kelly had
10       worked with Sullivan Cotter as a
11       consultant to create -- I believe their
12       CFO, Greg Paschke, was also part of
13       that.
14  BY MS. BRAUNSCHWEIG:
15       Q.   And how did you receive that document?
16       A.   I don't remember exactly.  I think
17  Kelly shared it with me or e-mailed Doris and
18  myself.  I would have to look at the e-mail to
19  give you specifics.
20       Q.   I would, too, because I don't have it.
21            MS. SAVAGE:  You do have it.
22            MS. BRAUNSCHWEIG:  Exhibit 67.
23                 (WHEREUPON, Deposition
24                  Exhibit No. 67 was marked
25                  for identification.)
```

Page 199

```
 1  BY MS. BRAUNSCHWEIG:
 2       Q.   I am handing you what has been
 3  identified as Exhibit 67.  It is a memo with a
 4  letter -- or a letter memo --
 5       A.   Uh-huh.
 6       Q.   -- from you, Mr. Brown, to Kelly Adair.
 7  Do you see that?
 8       A.   I do.
 9            MS. SAVAGE:  Yeah, this is one of
10       the documents that's been marked
11       "Attorneys' Eyes Only"; so it needs to
12       be treated in a manner that's
13       consistent.  And I think there may be
14       couple of others that also need to be
15       treated in a manner consistent with the
16       Court's protective order.
17  BY MS. BRAUNSCHWEIG:
18       Q.   And it's dated March 27, 2017.  Do you
19  see that?
20       A.   Okay.  I do.
21       Q.   And it says in the second line, "The
22  memo is in response to the pro forma you shared
23  regarding a potential TSC standalone rehab
24  business."  Do you see that?
25       A.   Yep.
```

Page 200

```
 1       Q.   Is that memo that you're referring to
 2  in this document The Steadman Clinic document
 3  that was created in conjunction with Mr. Adair,
 4  Greg Paschke, and the Sullivan Cotter group?
 5       A.   Yes.
 6       Q.   And do you know when that memo was
 7  provided to you from The Steadman Clinic?
 8       A.   I can't recall exactly.  It would have
 9  been prior to March 27.
10       Q.   And at the time that you wrote this
11  memo, had the extension on the discussions
12  regarding the exploration of physical therapy
13  services, had that expired yet?
14       A.   I believe --
15            MS. SAVAGE:  Objection, vague.
16       A.   I believe that time period had expired.
17  BY MS. BRAUNSCHWEIG:
18       Q.   Okay.  Now, it says in the next
19  paragraph there was another document that was
20  shared with The Steadman Clinic on April 7,
21  2016.  Do you see that?
22       A.   I do.
23       Q.   And do you know where that document is?
24       A.   Yes.  I have a copy of that document.
25       Q.   Okay.  And do you know why that
```

Page 201

```
 1  document hasn't been produced in this
 2  litigation?
 3            MS. SAVAGE:  I object and instruct
 4       the witness not to answer.
 5            MS. BRAUNSCHWEIG:  On what
 6       grounds?
 7            MS. SAVAGE:  Privilege.
 8                 (WHEREUPON, Mr. Kildow and
 9                  Ms. Braunschweig conferred
10                  outside the hearing of the
11                  court reporter.)
12            MS. SAVAGE:  No, you don't
13       voir dire on privilege.
14            THE COURT REPORTER:  I'm sorry.  I
15       didn't hear what he said.
16            MS. SAVAGE:  He whispered to
17       Ms. Braunschweig, "Go voir dire on
18       privilege."  So I'm responding to that
19       whispered communication.
20  BY MS. BRAUNSCHWEIG:
21       Q.   Mr. Brown, did you see the document
22  request in this litigation?
23       A.   I did.
24       Q.   And can you tell me how you went about
25  identifying documents relevant to this lawsuit?
```

Page 202

1    A.   Yeah.  Anything that related to Lindsay
2    and SRC and the theft, that joint venture did
3    not relate to them.  And so --
4    Q.   Did you --
03:15 5    A.   -- I'm not sure how it's related.
6    Q.   I didn't ask that question.  I was
7    asking about your document production in this
8    case.
9    A.   Okay.
03:15 10   Q.   Let's start with your e-mails.  Did you
11   personally review your e-mails to determine what
12   documents would be provided to your counsel?
13   A.   I did.
14   Q.   Did your counsel ever have access to
03:15 15   your e-mail account or was given a copy of your
16   e-mail account?
17        MS. SAVAGE:  I'm going to object
18        and instruct the witness not to answer
19        on the grounds of privilege.
03:16 20   BY MS. BRAUNSCHWEIG:
21   Q.   Mr. Brown, are you the only one who
22   searched your e-mails for documents relevant to
23   this lawsuit?
24        MS. SAVAGE:  I object and instruct
03:16 25        the witness not to answer.

Page 203

1         MS. BRAUNSCHWEIG:  On what
2         grounds?
3         MS. SAVAGE:  Privilege.
4    BY MS. BRAUNSCHWEIG:
03:16 5    Q.   Mr. Brown, tell me how you went about
6    identifying documents in response to the
7    document request.
8    A.   So --
9         MS. SAVAGE:  You can answer that.
03:16 10        THE DEPONENT:  Okay.
11   A.   I reviewed my e-mails with several
12   search terms:  Dave Cimino, Lindsay Winninger,
13   breach, theft, PHI.  I think that was it.
14   BY MS. BRAUNSCHWEIG:
03:16 15   Q.   And did you use the full name of David
16   Cimino?
17   A.   I did, abbreviated and full name.
18   Q.   And did you search for SRC?
19   A.   Oh, yes, I would have done that as
03:17 20   well.
21   Q.   And did you search Sports Rehab?
22   A.   I did, yeah.
23   Q.   And did you produce all the e-mails to
24   your counsel?
03:17 25   A.   To the best of my knowledge, yes,

Page 204

1    everything that I found.
2    Q.   Did you cull anything out and -- did
3    you determine that you thought certain documents
4    weren't relevant and so did not produce them to
03:17 5    your counsel?
6    A.   Not really.  I mean, I went through the
7    search terms and took those and provided them.
8    Q.   Okay.  And how did you provide those
9    e-mails to your counsel?
03:17 10        MS. SAVAGE:  So objection and
11        instruction not to answer, privilege.
12   BY MS. BRAUNSCHWEIG:
13   Q.   Mr. Cimino -- I mean, Mr. Brown, did
14   you forward e-mails to your counsel when you
03:17 15   came across a document that had any of those
16   terms in it?
17        MS. SAVAGE:  The same instruction.
18   BY MS. BRAUNSCHWEIG:
19   Q.   Mr. Cimino, did you --
03:17 20        MS. SAVAGE:  Mr. Brown.
21   BY MS. BRAUNSCHWEIG:
22   Q.   Excuse me.  Mr. Brown, when you
23   identified e-mails responsive to the request or
24   with the search terms, did you download those to
03:18 25   a CD to be provided to your counsel?

Page 205

1    A.   No, I did not download them to a CD.
2    Q.   And did anyone confirm with you as to
3    the documents and information found in your
4    e-mail accounts?
03:18 5         MS. SAVAGE:  Well, by "anyone," if
6         there's anyone besides your counsel,
7         you can answer.  If it's with your
8         attorney, you cannot.
9    A.   So no one besides myself and counsel.
03:18 10   BY MS. BRAUNSCHWEIG:
11   Q.   And did counsel ever have access to
12   your e-mail account at Vail Health?
13        MS. SAVAGE:  The same instruction,
14        the same objection.  It's privileged.
03:18 15   BY MS. BRAUNSCHWEIG:
16   Q.   Okay.  So now we have the documents
17   that were produced as part of your initial
18   disclosures, which means that your counsel
19   thought this document was relevant.
03:19 20   A.   Okay.
21   Q.   And I am asking you now to produce the
22   documents that are referenced in this memo so we
23   can see the full discussion between you and
24   The Steadman Clinic.  Will you do that for us,
03:19 25   please?

Page 206

```
 1            MS. SAVAGE:  No.  You direct that
 2   request to me, not to the witness.  And
 3   I will confer with my client about that
 4   issue.  As you know, that is the
 5   subject of a motion in front of the
 6   court, so . . .
 7            The other thing I would
 8   note is, by the way, is this is Vail
 9   1477, which I don't think is part of
10   the initial disclosures.
11            MS. BRAUNSCHWEIG:  Yes, it is.
12   BY MS. BRAUNSCHWEIG:
13      Q.   So, Mr. Brown --
14            MS. SAVAGE:  And this is, by the
15   way -- this is, by the way, one of the
16   documents that you earlier were arguing
17   had not been produced.
18            MS. BRAUNSCHWEIG:  This is not the
19   document.
20            MS. SAVAGE:  I don't know what
21   "the document" is, then.
22   BY MS. BRAUNSCHWEIG:
23      Q.   Mr. Brown, is this the document that
24   Kelly Adair provided to you that has the
25   projections that The Steadman Clinic provided to
```

Page 207

```
 1   you?
 2      A.   This is not.  This was my response.
 3      Q.   Thank you.
 4            If we turn to the second page,
 5   did you draft the -- did you create the table on
 6   the second page?
 7      A.   I did.
 8      Q.   And where did the information as to the
 9   "Total" column come from?
10      A.   That came from our internal systems.
11      Q.   Okay.  And how do your internal systems
12   log a particular clinic referral?
13      A.   So they wouldn't do it by -- in that
14   way.  They would produce a document with
15   referrals from different physicians, and you
16   would then have to group the physicians by group
17   and add those together in order to get the
18   total.
19      Q.   Okay.  And that's how you arrived at
20   that -- at the total number, right?
21      A.   Yeah.  And the same thing with the
22   third column, the "Primary Care, ER, and Direct
23   Access."  Direct access isn't individual.  It's
24   when a patient comes in without -- directly to a
25   physical therapist.
```

Page 208

```
 1      Q.   And if my calculation is correct, the
 2   total -- the percentage totals are adding up to
 3   100 percent; is that correct?
 4      A.   They should.
 5      Q.   Okay.  So besides The Steadman Clinic
 6   and Vail Summit Orthopaedics, just focusing on
 7   outside clinics, those are your two main
 8   referral sources, correct?
 9      A.   Yes, correct.  I mean, the other part
10   of the business in FY '14 was 49 percent and
11   then 43 percent, 46 percent, and then 46 percent
12   overall.
13      Q.   But I'm talking about outpatient doctor
14   referrals -- I mean, outside doctor referrals
15   are coming from The Steadman Clinic and Vail
16   Summit Orthopaedics?
17      A.   Yes.
18      Q.   Are there any other clinics that would
19   be referring work to you that are -- or they're
20   just de minimis?
21      A.   No, there's -- that would be part of
22   the other percentage.
23      Q.   Okay.
24      A.   So primary care, ER physicians.  There
25   would be other physicians as well as direct
```

Page 209

```
 1   access.
 2      Q.   And do you know the percentage of
 3   physical therapy business in the Vail Valley
 4   from this document?
 5      A.   I don't.  You're asking about total
 6   market size?
 7      Q.   I'm just asking about the referrals
 8   here.  Are they -- can you give me a percentage
 9   of what the referrals are for the Vail Valley?
10      A.   I can't.  I don't know what the total
11   amount is.  I know what the total is that they
12   come to us for.
13            But I don't know how many PT
14   referrals are sent out and how many individuals
15   actually go and follow up and use PT; or are
16   they going to, you know -- you can go to a
17   substitute, like a chiropractor or a personal
18   trainer as well.  There's, you know -- there's a
19   lot of ways that customers may or may not
20   access.
21      Q.   As I understand this document, the
22   analysis does not capture the total number of
23   visits that you would get from an individual
24   doctor for an individual patient; is that
25   correct?
```

Page 298

1   **Q.**   Yes.
2   **A.**   Okay.  Yeah, I have seen this.
3         MS. SAVAGE:  Okay.  Thank you.  I
4   have nothing else.
05:21 5   MR. MADDEN:  Thank you very much.
6         THE VIDEOGRAPHER:  This will
7   conclude the deposition of Nicholas
8   Brown and the end of Media Unit No. 4.
9   The time is currently 5:21 p.m., and we
05:21 10   are off the record.
11         (WHEREUPON, the deposition
12          concluded at 5:21 p.m.
13          on this date,
14          July 19, 2018.)
15         * * * * *

Page 299

1   STATE OF COLORADO   )
                        )
2   COUNTY OF E A G L E   )

3         I, KELLY CAPRI, Notary Public
4   for the State of Colorado, a Certified Court
5   Reporter and Registered Professional Reporter,
6   do hereby certify:
7         That previous to the
8   commencement of the examination of the deponent,
9   the deponent was duly sworn to testify the whole
10   truth concerning the matters herein;
11         That the foregoing deposition
12   transcript was reported stenographically by me,
13   was thereafter reduced to typewriting under
14   my personal direction, and constitutes a true
15   record of the testimony given and the
16   proceedings had;
17         That the said deposition was
18   taken before me at the time and place specified;
19         That the said deposition was
20   adjourned as stated herein;
21         That the reading and signing by
22   the deponent of the deposition transcript was
23   agreed upon as stated herein;
24         That I am not a relative or
25   employee or attorney or counsel, nor a relative

Page 300

1   or employee of such attorney or counsel for any
2   of the parties hereto, nor interested directly
3   or indirectly in the outcome of this action.
4         IN WITNESS WHEREOF, I do
5   hereunto set my hand and affix my seal of office
6   at Carbondale, Colorado, on July 26, 2018.

10   _____
    Kelly Capri, CCR, RPR
11   Notary Public for the State of Colorado
    My commission expires:  9/15/2020
12
    RPR Certificate No. 021469

Page 301

1   CERTIFICATE OF DEPONENT
    (Disregard if signature is waived)
2
3   I have read my deposition, and the same is
4   true and accurate, save and except for changes
5   and/or corrections, if any, as indicated by me
6   on the Errata Sheet hereof.
7   Errata Sheet(s) Attached [ ]  No Changes [ ]

9   _____
10   NICHOLAS BROWN

11   SUBSCRIBED AND SWORN to before me this _____
12   day of _____, 2018.
13   My commission expires:  _____

15   _____
    Notary Public
16   _____
17   Street Address
18   _____
    City, State, Zip
19
    Re:  *Winninger v. Kirchner, et al.*
20   Deposition of:  NICHOLAS BROWN
    Date of Deposition:  July 19, 2018
21   Reported By:  Kelly Capri, CCR, RPR
22   Please Return the Executed Certificate to:
23         CAPRI COURT REPORTING
           0035 Bobcat Court
24         Carbondale, Colorado 81623
           (970) 510-5131
25         Kelly@CapriCourtReporting.com