1

```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF COLORADO
 2

 3   SPORTS REHAB CONSULTING,      .   Case No. 19-cv-02075-WJM-GPG
     LLC, a Colorado limited       .
 4   liability company, and        .
     LINDSAY WINNINGER, an          .
 5   individual,                    .
                                    .
 6            Plaintiffs,           .
                                    .   Wayne Aspinall Federal Bldg.
 7   vs.                            .   402 Rood Avenue
                                    .   Grand Junction, CO  81501
 8   VAIL CLINIC, INC.             .
     doing business as             .
 9   VAIL HEALTH,                  .
     a Colorado nonprofit          .
10   corporation,                  .
                                    .
11            Defendants.          .   October 21, 2021
     . . . . . . . . . . . . . .   .   1:12 p.m.
12

13       TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
                WILLIAM T. RUCKRIEGLE, SPECIAL MASTER
14
     APPEARANCES:
15
     For the Plaintiffs:           Law Office of Allan L. Kildow
16                                 By:  Allan L. Kildow
                                   By:  Sonya Braunschweig
17                                 709 Potato Patch Drive
                                   Vail, CO  81657
18                                 (970) 390-6675

19   For the Defendants:           Davis Graham & Stubbs, LLP
                                   By:  Shannon Wells Stevenson
20                                 By:  Daniel Richards
                                   1550 17th Street
21                                 Suite 500
                                   Denver, CO  80202
22                                 (303) 892-9400

23   Court Recorder:               Clerk's Office
                                   U.S. District Court
24                                 402 Rood Avenue
                                   Grand Junction, CO  81501
25
```

2

1   Appearances continued:

2   Transcription Service:         AB Litigation Services
                                   216 16th Street, Suite 600
3                                  Denver, CO  80202
                                   (303) 296-0017
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1      (Time noted:  1:12 p.m.)

2           SPECIAL MASTER:  Sports Rehab Consulting v. Vail

3  Clinic, also known as Vail Health.  Vail Health is how I will

4  generally refer to the Respondent -- or Defendant, sorry.

5           The matters today come on for motions to compel

6  number one and number two, arguments on those, and if there

7  are any other issues, if there are any preliminary issues we

8  might get to those, and then tomorrow I think we're scheduled

9  for three and four.  I know we are.

10           FEMALE:  Judge Ruckriegle -- I apologize.

11           SPECIAL MASTER:  Yes.

12           FEMALE:  Are there documents like how -- for the

13  motions to compel, did they have numbers as to what they were

14  on the Federal Court docket?

15           SPECIAL MASTER:  Yes.

16           FEMALE:  Okay, I'll put those in the note here.

17  Motion number one went on the docket as 127 and motion number

18  two was docket number 129.

19           SPECIAL MASTER:  And then response to motion to

20  compel number one is number 152 and reply for motion to

21  compel number one is 165.

22           FEMALE:  Got it.

23           SPECIAL MASTER:  Then just for purposes of your

24  record -- we're not there yet -- but response to motion to

25  compel number two -- although I have it mistyped here -- is

1   156 and then the reply is 173.

2            FEMALE:  Got it.

3            SPECIAL MASTER:  I guess from my tutorial and

4   review of the PACER system that is the number that is most

5   commonly referred to you by you.  It is the -- what would be

6   the proper term for that?  Docket number?  In your system it

7   just shows number.

8            FEMALE:  Yeah, docket entry number.

9            SPECIAL MASTER:  Okay, so we're ready to start --

10  well, here's something I wanted to bring up before we get too

11  far into this because there's a lot of conversations and a

12  lot of pages taken up about conferral.  I realize that Ms.

13  Stevenson and Mr. Richards were not involved in the State

14  case and the record already reflects that I was and the other

15  counsel were.  We from time to time had discussions about

16  what is appropriate for conferral, and we may get back to

17  this but I just want to bring to everyone's attention that I

18  had early in that process indicated to counsel that I used to

19  enter an order -- as judge in that Fifth Judicial District --

20  an order on duty to confer.

21            I'm just going to briefly read it to you because

22  it references of course the State process, but the

23  definitions that are referred to there are applicable across

24  State and Federal cases, and I believe are consistent with

25  the intention of the duty to confer that both Judges Martinez

1  and Gallagher have referenced before.

2           I'm just going to read part of this and I'll be

3  glad to send you a copy of the order but obviously the State

4  order doesn't, you know, have a place in entering into the

5  Federal, but what it says is that, "Moving counsel shall

6  confer with opposing counsel before filing a motion."  That's

7  part of paragraph one.  And then we go to, "Identify and

8  attempt to resolve emerging issues before engaging a motion."

9           Again, I'm sure you're somewhat familiar with Rule

10  121-115(8) as well.  I know that you are the lead attorneys

11  in this case, therefore I think I've seen a couple of times

12  Ms. Roeder referencing that you are the experts in terms of

13  the Federal process as opposed to her.  I haven't even seen

14  Ms. Savage surface I don't think in any other pleadings in

15  the Federal case.

16           But the plain language definition of confer in the

17  American Heritage is, "To meet in order to deliberate

18  together or compare views; consult."  Then it goes on to

19  say, "To partake in interactive discussions with any party

20  who might potentially oppose the relief requested.  The

21  moving party must speak with a party either face-to-face or

22  via phone in order to satisfy the duty to confer."

23           Now there are other references in here as to

24  having a preliminary procedure that might allow for emails.

25  I know that has been referenced in some of the pleadings, and

1  I am not saying at all that we can't do that, but I do want

2  to have a structured process and it must ultimately end in an

3  actual conversation between counsel, which is sometimes

4  challenging.

5       Anyway, it goes on to say -- in terms of Rule 121

6  -- "If no conference has occurred the reason why shall be

7  stated on occasions where the moving party offers such a

8  reason in lieu of actually conferring the Court expects the

9  reason to be explained in substantial detail.  The Court also

10 expects it to fall within the realm of an unusual occurrence

11 that there wasn't actually a conferral."

12      Noting that on one end of the spectrum it will not

13 be acceptable for the moving party to make one phone call,

14 leave a message, and then go ahead and file the motion.  I

15 will say that in State practice that probably happens half of

16 the time which is I know, to many judges, a little

17 disconcerting, but anyway, we'll get through this.

18      And then -- well, not just leave a voice mail and

19 then go ahead and submit the correspondence.  I've

20 investigated that sometimes and it may be the call was at

21 4:32 and the motion was filed at 4:35.  That sort of thing, I

22 don't -- we don't want to have any of that.

23      The Court will not require the moving party to be

24 hamstrung and where a party has attempted to confer with the

25 opposing party on more than one occasion, left voice

1   messages, but nonetheless received no return response

2   communication.  Such circumstance then may vary.  Those two

3   are the extremes of course, and from there that would be a

4   circumstance where you could explain that in the why there

5   wasn't actually a conferral.

6           So I just wanted to start off with that to lay the

7   perspective to provide you with a perspective that this

8   Special Master has from both court and other proceedings in

9   terms of this and that was sort of the standard that I had

10  laid in the State case for the procedure that we would

11  follow.

12          Enough on that because it's now 1:22 according to

13  my clock and we need to get started with the motion to compel

14  number one.  But I will ask if there's anything preliminarily

15  that Plaintiffs have to address with the Special Master?

16          MR. KILDOW:  No, Your Honor.  I thank you for your

17  statement regarding the need to confer.

18          THE COURT:  Ms. Stevenson, I see you.  I don't see

19  Mr. Richards, but I guess he comes on --

20          MS. STEVENSON:  I'm sorry.  Just one thing I

21  wanted to make you aware of with respect to the conferral is

22  that we had had some disputes about this earlier in this case

23  and Judge Gallagher actually addressed the conferral

24  obligations, specifically in the context of this case with

25  the parties and said there was not a need to orally confer.

1  So just an unusual wrinkle that, you know, we have here and I

2  just wanted to make you aware of that.  It was before he had

3  even involved you as the Special Master.

4           SPECIAL MASTER:  I read that and I went back and

5  reviewed everything, plus I think there was maybe some

6  reference to that in one of your pleadings, but I also went

7  through all of those docket numbers and noticed he had done

8  that.

9           I know you're not trying to set me up for a

10 conflict between him but I believe that he has given me the

11 authority to set the rules for that and like I said there may

12 still be -- there is still room for some written exchange,

13 but the bottom line on all of that is there needs to be then

14 that conversation that we as members of this profession

15 understand is always a process that is recognized as being

16 reasonable.

17          MS. STEVENSON:  I certainly understand your

18 instructions on that.

19          SPECIAL MASTER:  Thank you.  Mr. Kildow, on motion

20 to compel number one, which I think is 127 but Angela has got

21 all of that and I saw that she exited, so we're on our own.

22          MR. KILDOW:  Thank you, Your Honor.  I will

23 address orally the motion to compel number one regarding

24 geographic market, which was filed by Plaintiff.  In our

25 papers we outlined the basic elements of section two,

1    monopolization and attempt to monopolize.  I won't repeat

2    those here.  I would say however that they're very basic

3    anti-trust law, really anti-trust 101.

4           What's we've tried to do is to cite United States

5    Supreme Court cases and Tenth Circuit law as the controlling

6    law that we feel should be the guide with respect to this

7    motion, and this case generally.

8           In response to the Plaintiff's motion I think it

9    bears noting that Vail Health did not cite a single case

10   taking issue with the cases that the Plaintiff's cited in

11   their motion, and so that law is what controls here as far as

12   the Plaintiffs are concerned.

13          The issue here is what anti-trust practitioners

14   call relevant geographic market, and it's my understanding

15   that it's not called geographic market, it's called relevant

16   geographic market because it is the market area and market

17   competition which is relevant to measuring the Defendant's

18   market share, which in turn may lead to the determination of

19   whether or not the Defendant has monopoly which would violate

20   Section 2.

21          There is a tremendous -- an incredible -- body of

22   law on this subject, but there is, in my opinion, a very

23   simple approach that we can follow here from the Tenth

24   Circuit, and that is the case that's cited in our brief and

25   it's called Lantec v. Novell, and it's found at 306 F.3d 103.

1         If we go to pages 1024 to 1027 it provides a very

2    concise guide to the elements necessary for determining the

3    relevant geographic market.  So we would ask that the Court

4    -- or suggest to the Court that that is an easy reference in

5    a very complicated area.

6         One of the things that Lantec talks about is

7    reliable data.  It keeps talking about reliable data, but in

8    our view this is an evidentiary issue as well as a legal

9    issue, that the parties are entitled to obtain reliable data

10   to determine the basic elements of geographic market.

11        The Lantec case recites a number of issues.  The

12   first one I would point out is consumer purchasing

13   preferences.  We need reliable data relating to consumer

14   preferences, which is why very often there is analyses of the

15   patient flows between geographic markets.  How many patients

16   will come in to a market and how many patients will go out of

17   the market to receive the therapy or the medical care that

18   they're referring to?

19        Judge Ruckriegle, when I talk about patients here

20   I'm talking specifically for this case about physical therapy

21   patients, but in the case law I think the same principals

22   apply whether it's a patient for a heart ailment or whatever

23   kind of medical treatment the individual would require.

24        SPECIAL MASTER:  We will have also the various

25   things but I think here we're clearly focusing on P.T.

1              MR. KILDOW:  Correct.  Now one of the points that

2    the Tenth Circuit made was that in the Lantec case the Utah

3    District Court excluded the Plaintiff's expert on the grounds

4    that, among other things, the expert didn't conduct a

5    consumer survey of the patients that were at issue in the --

6    defining the geographic market.

7              Now the Tenth Circuit agreed with the District

8    Court on the fact that the expert did not conduct a consumer

9    survey.  I would note that in this case the two plaintiffs

10   who were deposed here in the Federal case, one Brad

11   Schoenthaler, a German name --

12             SPECIAL MASTER:  I remember.

13             MR. KILDOW:  He was deposed on July 8th of this

14   year.  In that deposition the defendant, Vail Health, asked

15   Mr. Schoenthaler whether the Plaintiff had conducted a survey

16   regarding whether Vail Valley residents would be willing to

17   travel over Vail Pass to the Frisco, Dillon, and Silverthorne

18   area for physical therapy services, and Mr. Schoenthaler

19   answered no.  That was at page 33 of that deposition.

20             Then again on October 7th Lindsay Winninger was

21   deposed and the same question was asked at page 109 whether

22   the Plaintiff had conducted any surveys of the same issues

23   almost verbatim.

24             So that suggests to us that the survey issue is

25   something that Vail Health may bring up at a later point in

1   time pointing now to the Tenth Circuit case and Lantec.  Of

2   course the Plaintiff has long since anticipated that that's

3   an issue for an expert and -- but the expert to conduct the

4   survey needs to have the names and the addresses of the tens

5   of thousands of patients that have visited Vail Health

6   physical therapy clinic, both here in the Vail Valley and in

7   Summit County.

8           We have asked for that information and

9   surprisingly last night at about 5:08 we received some

10  information -- some information although no names or

11  addresses.  I'm going to address that again in just a moment.

12          Plaintiffs are also entitled to under the Lantec

13  case the price of the services at issue and the cost incurred

14  in providing those services.  And the Tenth Circuit dismissed

15  the case because of a lack of analysis in some of these basic

16  areas.  I think it's very clear that these are the required

17  elements more or less for the Tenth Circuit, to which the

18  Plaintiffs are entitled to discovery so they can present

19  evidence in summary judgment and trial of this case.

20          Why Vail Health is withholding that evidence I

21  don't know.  If they're going to seek the Plaintiffs on the

22  relevant geographic market issue they're going to have to do

23  it on the basis of the evidence that the Tenth Circuit has

24  identified in the Lantec case.

25          In responding to Plaintiff's motion number one,

1  and other motions, Vail has represented that these motions

2  involve facts in this anti-trust that have been litigated

3  fully in the Eagle County case.

4         As you know, Judge, some of the exclusionary

5  conduct at issue in this case involving false or incorrect

6  statements has been litigated in Eagle County, but those

7  false statements are not at issue in this motion or any of

8  the other motions that we'll talk about in the next couple of

9  days.  The issue on discovery into relevant geographic

10  markets has really nothing to do with the Eagle County false

11  statement.

12         In making the representation that all of this has

13  been kind of trod around in the Eagle County action, Vail

14  Health hasn't really cited a single piece of evidence that

15  goes to the big components of the Sherman Act, Section 220.

16         At issue here, as I said, under the Lantec case

17  are consumer preferences.  There were no issues or discovery

18  produced in the Eagle County action related to consumer

19  preference, whether they wanted to go to Summit County, or

20  Pitkin County, or any place else.  The issues here involve

21  the cost structure of Vail Health in providing the physical

22  therapy treatment.  There was nothing in the Eagle County

23  action that dealt with costs.  The same is true with price.

24  Prices are at issue here.

25         There were 40 insurance claims that were submitted

1   as part of the Eagle County action for the period prior to

2   November 1, 2012, but that period has been ruled not relevant

3   here.  We've appealed that to Judge Martinez, but for the

4   moment those 40 forms are not at issue.

5           There are other typical anti-trust issues like

6   barriers to entry that were not relevant in the part of the

7   Eagle County action.  Neither was market share, a fundamental

8   part of monopoly, market share wasn't part of the Eagle

9   County case either.

10          So as we've pointed out, there's almost no

11  discovery arising out of the Eagle County action which would

12  make the discovery that we're asking for here duplicative of

13  what went before Judge Grainger or yourself, Judge

14  Ruckriegle.

15          So what information do Plaintiff want?  Number

16  one, very, very complicated.  We'd like the names and

17  addresses of the Vail Health physical therapy patients that

18  Vail Health treated through the period November 1, 2012 to at

19  least as close to the present as they can get.

20          This is not a big deal because Vail Health has all

21  of that information, and is required to have all that

22  information by Colorado law.  I would just point out that as

23  part of motion to compel number two there is an Exhibit 25

24  that has all of the information that one could really ask

25  for.  Names, codes, treatment received by the patient, the

1   insurer.  The data that is there --

2            SPECIAL MASTER:  Hang on.  When you say Exhibit 25

3   is that out of your -- which was that attached to?  The

4   motion to compel, the initial one, only has Exhibits 1 to 17.

5   I'm just trying to make sure that I can attempt to pull this

6   up anyway.

7            MR. KILDOW:  Right, Your Honor.  It's motion

8   number 25 and it is --

9            SPECIAL MASTER:  I'm sorry, you said Exhibit 25,

10  but --

11           MR. KILDOW:  And it is part of Plaintiff's motion

12  to compel number two.

13           SPECIAL MASTER:  Which is filing number -- I'm

14  getting used to this so I'm going to --

15           FEMALE:  Maybe I can help.  I think it's 130-7.

16  It would be a restricted exhibit 7 and then it says Exhibit

17  25.

18           SPECIAL MASTER:  I'm going to try -- I forgot to

19  ask Angela about that.  I have had difficulty getting into

20  those restricted exhibits so I don't know -- I mean I know

21  that I'm supposed to have full access but I noticed that I

22  had difficulty.  I'm going to try it right now again.

23           FEMALE:  Your Honor, we also have difficulty

24  accessing the redacted exhibits and we had to call the help

25  desk to get us the proper access.  I don't know why.

1          SPECIAL MASTER:  You do not have permission to

2    view this document.

3          FEMALE:  That's what we were getting too.

4          SPECIAL MASTER:  All right, so --

5          MR. KILDOW: I can send it -- if there would be no

6    objection I could send it to you by email.

7          SPECIAL MASTER:  Well I need to get these -- if

8    there's no objection I would have you do that.  Ms.

9    Stevenson?

10          MS. STEVENSON:  I'm just trying to look at it,

11    Your Honor, because --

12          SPECIAL MASTER:  It was actually the first thing I

13    had on my agenda and then we were having difficulty getting

14    everybody on I blew past that and went to -- but I am blocked

15    from all of those things that are actually identified as

16    restricted.

17          MS. STEVENSON:  Your Honor, I don't know that as

18    this was an exhibit to motion to compel number two I'm

19    wondering if it wouldn't be appropriate to take it up when

20    we're talking about motion to compel number two.

21          SPECIAL MASTER:  Well --

22          MR. KILDOW:  It would be helpful if the Court

23    could -- if the Special Master could see the exhibit.

24          MS. STEVENSON:  I don't disagree with that.

25          MR. KILDOW:  I can't forward it to him by email.

1         MS. BRAUNSCHWEIG:  It's an Excel spreadsheet that

2    says 247 pages long for the month of November 2019 that has

3    the patient name, the address, the procedure, the rendering

4    provider, the CPT code.

5         MS. STEVENSON:  Your Honor, I guess what I -- I

6    think you can certainly review the document.  It was a

7    document produced in this case and we don't disagree that it

8    is possible to generate.  It certainly poses a number of

9    significant burdens but if that's the point of the exhibit we

10   don't -- we're not disputing that.

11        SPECIAL MASTER:  I guess at this point, and

12   especially since we have a little bit of a late start I don't

13   want to slow this down although -- and if you get ready to

14   send that to me you can when we go to number two.  We'll be

15   addressing both of those.  I've just emailed Angela as to why

16   but I don't know -- you know, we never -- she stepped away so

17   I'm not sure that I'll get the answer to that.

18        I do need to have access -- there are more than

19   one -- more than this document that I have restricted

20   response to.

21        All right, going back to video here.  Sorry.

22        MR. KILDOW:  I'll forward that when we get to

23   motion to compel number two.  It is sufficient to say -- and

24   I think that Ms. Stevenson agrees -- that the information

25   that is on this Exhibit 25 is what is from the Cerner

 1   software package that Vail Health has for I believe the

 2   entire relevant period that we're talking about, November 1,

 3   2012 to the present.

 4          It does contain -- as Ms. Braunschweig states --

 5   the facility that rendered the services, the general ledger I

 6   believe it is number, the patient name, the type of

 7   encounter, emergency or whatever, a description of the

 8   charge, the nature of the medical care provided along with

 9   the CPT code, the date of the activity, and the rendering

10   physician.  And then I believe there is a number of other

11   fields including the name of the insurer.  So this

12   information is available.

13          SPECIAL MASTER:  To refresh my recollection, Mr.

14   Kildow, did -- I know that we addressed Cerner and I think we

15   addressed at least disclosure of some of this type of

16   information.

17          MR. KILDOW:  Before, that's correct.

18          SPECIAL MASTER:  What's the difference between

19   what we addressed before and this now?  Is it a greater

20   breadth of information?  Is that --

21          MR. KILDOW:  It's two things.  First of all, the

22   chronological time period at issue is different.  Before it

23   was November 1 -- or October 31, 2012 and before.  Now it's

24   November 1, 2012 forward.

25          Number two, it's needed here for a completely

1    different purpose.  The information now relates to the scope

2    of the geographic market within which the monopoly power is

3    to be determined.  So this is relevant to this case for a

4    completely different purpose.

5         SPECIAL MASTER:  I understand that but my question

6    that I was trying to be refreshed on was how is this

7    information that you're requesting different from the

8    information that was required to be produced before?  I get

9    the different purpose but I thought that we had addressed

10   that.  I'll certainly see what Ms. Stevenson has to say about

11   that, but --

12        MR. KILDOW:  I do not believe that we addressed

13   the identity of the patients, their names, their addresses,

14   the treatment received, etcetera.  That was not addressed.

15        SPECIAL MASTER:  I get that is your position and

16   we'll -- so we're now at -- I know we got a late start but I

17   want to make sure that we have time to be able to complete

18   both of these today.  We're at 1:51 so we've been going for

19   about -- go ahead and try to get to the point of what you

20   want.  I know this is not the only thing you want.

21        Here's what I was concerned about in part.  There

22   seemed to be a dispute about this relevant geographic market

23   -- the area.  There's some reference to it being East Vail to

24   Gypsum, there was reference you made a little bit ago to also

25   Summit County.  Needless to say, there's also reference to

1   Basalt, which is still in Eagle County but is not within what

2   Plaintiffs had identified, I perceive, as being the relevant

3   geographic market of being East Vail to Gypsum.

4            I wanted to see do we have any sort of agreement

5   on that?  If not, it's my perception that if there is no

6   agreement that the Court, even through the Special Master,

7   could identify what that is.

8            MR. KILDOW:  Well from the Plaintiff's standpoint,

9   Your Honor, I want to make it perfectly clear that in our

10  complaint we defined the relevant geographic market, from our

11  standpoint, as the Vail Valley, meaning basically starting

12  from East Vail or the top of Vail Pass running west to

13  Glenwood Canyon.  Basically the last stop, as you well know,

14  is probably Dotsero, then the next real stop is Gypsum.

15           Although Eagle County runs over into Basalt we

16  have never said that Basalt is part of the geographic market.

17  They reference that in their response, but Basalt is not part

18  of the relevant geographic market.  That's not the way it was

19  defined in the complaint.  So that is our view of what the

20  relevant geographic market is.

21           THE COURT:  Thank you.

22           MS. STEVENSON:  Did you want me to respond on

23  that, Your Honor?

24           THE COURT:  Sure.

25           MS. STEVENSON:  So I mean our position -- and this

1    is with respect to discovery and what's relevant -- we've

2    relied on the precise market that the Plaintiffs had defined

3    to inform us as to what information has any relevance to this

4    case, and we've relied on the geographic market as they've

5    defined it.  Of course geographic market is an element of

6    their case that they have to prove, and it's usually done

7    through an anti-trust expert.  But this is the market that

8    they have pled and so that's what we've relied on.

9            THE COURT:  So what I heard the two of you just

10   say is that is the relevant geographic market.  I say East

11   Vail because I'm not aware of any population between there

12   and the top of Vail Pass.  And you can say Gypsum or -- there

13   are people in Dotsero, but let's say to Glenwood.  Is there a

14   concurrence on that?

15           MS. STEVENSON:  Your Honor --

16           MR. KILDOW:  There is from Plaintiff's standpoint.

17   We defined that the same way Vail Health has defined it, and

18   it's really a geographic -- it's a geological geographic --

19           SPECIAL MASTER:  I understand, but I need to know

20   whether Ms. Stevenson is --

21           MS. STEVENSON:  Your Honor, we 1,000 percent do

22   not agree for purposes of the case that that is a correct

23   geographic market.  But as the Defendant we don't have a

24   position about what their anti-trust complaint is trying to

25   prove.

1              Geographic market isn't a thing that businesses

2    just normally -- an analysis that they undertake.  It's an

3    artificial construct for purposes of proving an anti-trust

4    case.  We don't think they're going to be able to prove that

5    that is a relevant geographic market, but we're accepting

6    that for purposes of discovery and the information that

7    they're entitled to.

8              SPECIAL MASTER:  That's the question.  So --

9              MS. STEVENSON:  I want to be absolutely clear

10   we're not stipulating that that is the geographic market in

11   this case.

12             SPECIAL MASTER:  For purposes of discovery though

13   you are agreeing that it is --

14             MS. STEVENSON:  I'm agreeing with their --

15             SPECIAL MASTER:  -- in terms of the discovery

16   requests.

17             MS. STEVENSON:  I'm agreeing that they're entitled

18   to information about patients, revenue, etcetera in that

19   area.  I just don't want there to be any ambiguity that we do

20   not stipulate or agree by any stretch of the imagination that

21   that will ultimately be proven to be a relevant geographic

22   market, but we are willing to produce information about that

23   geographic area so that they can have what they need to make

24   their case.

25             SPECIAL MASTER:  All right.  Back to you, Mr.

1   Kildow.

2          MR. KILDOW:  I want to make sure that we are on

3   the same page here.  As we articulated in our reply in almost

4   every -- or in every anti-trust case where geographic market

5   is an issue unless the parties stipulate to what the

6   geographic market is the Plaintiff will set forth in his

7   complaint and in discovery this is what we believe the

8   geographic market is.

9          The Defendant says we believe the geographic

10  market is a different geographic market.  It's usually

11  larger.  Each side will say what the other side defines the

12  market as and provide discovery as to what facts support

13  their definition of the market.

14         Now the law as we have identified it says that

15  there has to be a significant amount of evidence as to why

16  that geographic market is what it is.  It has to do with are

17  people willing to drive from Breckenridge to Vail to receive

18  their physical therapy treatment at a greater price, a lower

19  price, whatever it is.  So it's the inflow and out flow of

20  patients from Summit County to Eagle County, or from Eagle

21  County to Summit County.

22         What Ms. Stevenson's position has been is that we

23  only look for discovery purposes at Eagle County.  That is,

24  as we've articulated in our reply brief, an argument that

25  fairly few anti-trust defendants have ever made and when that

1  argument has been made it has been rejected by the Court.

2  The geographic market is an issue of fact unless the parties

3  stipulate to it.

4        So it's our position that the geographic market is

5  the Vail Valley because people in the Vail Valley are not

6  going to drive over to Frisco, or Breckenridge, or

7  Silverthorne to receive cheaper therapy, and that people in

8  Summit County are not going to drive to Vail, or Avon, or

9  Edwards to receive physical therapy there.  Not that there's

10  never a patient that does that but on the whole patients

11  don't do that.  That's the way the analysis runs.

12        This is a measure of not only the preference of

13  the patient.  It's also a measure of the cost sensitivity of

14  the service, the cost of driving over, etcetera.  And so what

15  they have taken as a position is that they don't have to

16  supply any information regarding their view of what the

17  relevant geographic market is.

18        I understand that they say that they're -- for

19  monopoly purposes they don't have a geographic market in

20  mind, but at some point in time they are going to come up and

21  say oh no, we're wrong.  And so we are entitled under Rule 26

22  to find out what their defense is, and it certainly is -- if

23  it's Garfield County, or Pitkin County, or Summit County.  If

24  they claim -- they don't stipulate to what the geographic

25  market.

1          We're entitled to know how many Vail residents

2     would drive to Frisco and vice versa.  That's why the

3     information of patient names and addresses, as set forth in

4     Exhibit 25, is so important.  That's one of the parts of our

5     motion to compel.  We feel that under the interrogatory

6     number 17 we are entitled to know where the patients come

7     from, where they were treated because Vail Health had -- they

8     had clinics in Frisco, Silverthorne, and Breckenridge at

9     various points in time between November 1, 2012 and the

10    present.  So we can easily track those if we have that

11    information, and that's what we're entitled to.

12          If they would stipulate that they are not going to

13    present any evidence outside of Vail Valley then that would

14    be one thing, but I have a feeling that when we get to that

15    point they're going to say oh no, that's the wrong geographic

16    market.  It's actually -- let's say for example, Garfield,

17    and here are all the facts that support the conclusion that

18    Garfield County -- that it has to be added to the geographic

19    market.

20          So that's why Ms. Stevenson's argument is just

21    wrong as a matter of law.  We need in flow and out flow data.

22    That is really the law.

23          SPECIAL MASTER:  All right, I do want to keep

24    moving since we got the late start.  So you've got about ten

25    minutes left in order for me to give them the fair amount.

 1   Everybody is not going to get the full time that we had

 2   originally just roughly anticipated but I don't think that we

 3   need to have that much argument on it anyway.  So go ahead to

 4   any other --

 5           MR. KILDOW:  I'll finish up very quickly, Your

 6   Honor.  Last night at about 5:08 we received a spreadsheet

 7   with all sorts of information.  It isn't nearly complete.  It

 8   doesn't have the names or addresses of the patients.  We

 9   don't know who prepared it, what source of information it

10   came from, or anything else.  But the fact that they have

11   provided us something the evening before this hearing when

12   the interrogatory and request of production of documents has

13   been outstanding for six and a half months, and the fact that

14   they are producing this information which is incomplete at

15   this point in time, we under Rule 37, we are entitled to our

16   attorney's fees for having to bring this motion.  If we

17   wouldn't have brought this motion we wouldn't get any

18   information.

19           SPECIAL MASTER:  How long are you going to need to

20   evaluate that material?  I'm certainly not pleased that it

21   was just produced the night before to throw a wrench into

22   this hearing, but how long are you going to need to evaluate

23   that to determine what is not in compliance with your

24   request?  I suppose against Exhibit 25 that you have

25   referenced but I haven't yet seen.

 1              MR. KILDOW:  Your Honor, how about to the time of

 2   tomorrow's hearing.

 3              SPECIAL MASTER:  That's certainly reasonable

 4   obviously but I want to be careful about taking any time away

 5   from tomorrow's hearing.  But I think we have over scheduled.

 6   I mean scheduled plenty of time.  So that's fine.  In the

 7   meantime I'll have Exhibit 25 at least and maybe I'll have an

 8   answer to my question why I'm not in there.  Go ahead.

 9              MR. KILDOW:  So in conclusion we want in flow and

10   out flow data, patient names and addresses.  Thank you.

11              SPECIAL MASTER:  All right, thank you.  Ms.

12   Stevenson.

13              MS. STEVENSON:  Thank you, Your Honor.  I want to

14   respond to your concern about this production that we made

15   yesterday.  The information that we provided was the exact

16   information that we told the Plaintiffs we would provide them

17   at page ten of our response to their motion to compel on

18   September 2nd.

19              It has been a Herculean effort to put this

20   together, and we've communicated with them about it a couple

21   of times since we listed out all the information that we

22   would provide.  Up until this date that we provided it it's

23   taken well in excess of 50 man hours of Vail Health employee

24   time and it is an enormous amount of information.

25              It provides from fiscal year 2014 through 2020 I

 1   think everything that Mr. Kildow has asked for, including

 2   every patient physical therapy visit that has happened in any

 3   of the relevant geographic market, as they put it.  All of

 4   the codes, all of the procedures that were performed, what

 5   was paid for those procedures, who the relevant insurance

 6   carrier was if there was one, the facility where the

 7   procedure happened, the zip code of the patient, patient

 8   identification number.  It's about 20 columns of information

 9   for each year in excess of 100,000 rows of data.

10            THE COURT:  So I take it that you put this exhibit

11   together from other information, is that --

12            MS. STEVENSON:  We had to integrate multiple

13   databases of information to try to get this together.  But it

14   hasn't --

15            THE COURT:  Well I certainly will acknowledge that

16   in your -- in my notes on the old fashioned way on your

17   response I had written when, why not yet, and things like

18   that that I could show you, but I read your earlier responses

19   that you would be producing, and I know that document was

20   filed September 2nd.  So given my review of that the last

21   couple of days I was ready to ask that question but you've

22   now answered in part.

23            MS. STEVENSON:  And again, I will tell you -- I do

24   want you to know we were riding herd as hard as we could on

25   these employees to put this together.  As you might expect,

1  the hospital is facing any number of incredibly pressing

2  issues between COVID and vaccines and mental health, and we

3  were getting a lot of push back on the amount of time folks

4  had to spend on this, but we did push it as hard as we could.

5           I do regret that it was, you know, yesterday, but

6  we had represented we would provide the information and we've

7  done that.

8           Now I want to speak specifically to the question

9  about patient names and addresses.  This is a tremendous

10  concern to the hospital.  First of all, from the very

11  beginning of responding to this discovery request we had told

12  the Plaintiffs, you know, we don't want to produce what

13  you've provided but we will work with you on providing the

14  information in some sort of de-identified form.  The

15  Plaintiffs actually represented that that would be okay.

16           I think what I hear Mr. Kildow saying now -- and I

17  don't think he's ever raised this until these actual motions

18  -- is that he thinks he needs patient name and address

19  information in order to do consumer surveys.  This is

20  incredibly troubling.

21           I mean what he's saying is he would take this

22  highly sensitive protected health information -- I know you

23  understand the background of the case and the sensitivities

24  to this issue overall -- and use that information to give to

25  an expert who would then reach out to these individuals for

1   purposes of getting information about this case.  That cannot

2   happen.  I think that would be a massive breach of the

3   hospital's -- everyone's obligations with respect to keep

4   this patient health information protected.

5         He's got the zip codes for each and every one of

6   these patients listed, which I think is the information that

7   he actually could conceivably need.  But I want to speak

8   about -- I agree that often times experts will conduct

9   consumer surveys in areas to determine geographic market, but

10  those are not done -- and certainly are not necessarily done

11  by contacting actual -- certainly of a health facility --

12  actual patients.  They're done by using focus group entities

13  and sending out broad surveys in the same way you would do if

14  you were a marketing company or something like that.

15        There's certainly nothing that has prevented him

16  and his expert from undertaking those activities to survey

17  people in the Vail Valley, or Summit County, or anywhere else

18  as to what their preferences would be with respect to seeking

19  physical therapy services.  But the notion that he can use a

20  patient list from the hospital to do that is not something

21  that can be done.

22        I think that really is where our dispute is

23  narrowed down to is patient names and addresses.  Again, for

24  the reasons I've articulated I do not believe that we can

25  produce that information.

1          THE COURT:  I did pursue that but the other is

2    what I have referenced in terms of this relevant geographic

3    market.  I understand that you don't want to stipulate to

4    that and why, but you either can stipulate to it for

5    discovery purposes or I'll order it for discovery purposes,

6    whichever way you want to do that.

7          But I do think that you -- I want to understand

8    your position with regard to -- not the factual issue but for

9    purposes of discovery your position as to what it is.  Does

10   that include Summit?  Does that include Garfield?  Does that

11   include Basalt?

12         MS. STEVENSON:  Again, Your Honor, I think the

13   critical point here is that first of all -- I mean again,

14   this is a market that they have to define and prove.  There

15   is no burden on Vail Health to say no, there's a different

16   market.  We can just say we don't think your market is

17   correct.  In fact, with the very loose product market that

18   they've defined, I don't even think we could define a market.

19         Now again, I think Mr. Kildow is just skipping

20   ahead also to what expert discovery is about.  So typically

21   it is an expert who says this is a relevant geographic market

22   and this is how I've defined it, and then we will have a

23   competing expert.  Depending on what they say I think our

24   responding expert could either say no, your market is wrong

25   because of x, y, and z, or it could say your market is wrong

1  and here's what the market should be.  But there's no

2  obligation on the Defendant to define a market.

3          SPECIAL MASTER:  If that's correct -- I'm not

4  conceding that yet either, so we both can take those

5  positions about what we're not conceding -- but the point is

6  if that's correct then based upon what I have seen in the

7  pleadings, based upon exhibits, based upon fact that they're

8  a new facility -- I forget which exactly -- and then in

9  Dillon that's opening in days now, then why would it be

10  reasonable to wait until there's an initial discovery of

11  expert when we know that that area could be greater than what

12  Plaintiffs have claimed the relevant geographic market to be,

13  and then do discovery on that.

14          Let their expert then say here's my opinion on

15  what the relevant geographic market is and let your expert

16  state what they believe it is as opposed to waiting until if

17  I only give them the information between -- this is my

18  simplified analysis here.  If I only give them that

19  information between East Vail and Glenwood Canyon now but

20  later your expert says oh no, I think it's beyond that then

21  that would be subject to reopening discovery to what your

22  expert had access to that they didn't have access to.

23          That's my concern.  Now tell me I shouldn't have

24  it or tell me that you'll be willing to produce that

25  information as it relates to that potentially expanded area.

1          MS. STEVENSON:  Your Honor, I think there's a

2    couple of issues going on here.  The first one is certainly

3    Howard Head has had at least one, and I think maybe more,

4    physical therapy clinics in Summit County for a very long

5    time.  This isn't an area they just moved into.

6          SPECIAL MASTER:  No, I didn't mean to say --

7          MS. STEVENSON:  Right, and with respect to Basalt,

8    it's a clinic they have recently opened that is part of a

9    surgical center.

10          I don't understand what -- the fact that there are

11   patients -- and there are many other physical therapy

12   providers obviously in both of those areas.  I'm not clear

13   what Mr. Kildow would do with patient records from Summit

14   County -- the test of course here is if Howard Head were to

15   raise its prices a certain amount would people be willing to

16   go other places for physical therapy, or is there just

17   nowhere else they can go, they can only go to Howard Head

18   because it's monopolous and it's too difficult to go anywhere

19   else, and therefore they will pay those higher prices.

20          I'm not seeing how the discovery that he's

21   requesting helps him -- has any relevance to that argument.

22   Again, I think he's correct.  What you do then is send out

23   consumer surveys and you have your expert survey people.  If

24   you start to think maybe the market's bigger then I suppose

25   you could then send them out to a broader market.

1          But you know -- and again, come back to the

2    burdensomeness issue, it has taken tens and tens and tens of

3    employee hours to do this analysis and pull this together for

4    the market that the Plaintiffs have defined.  It will be, you

5    know, incredibly burdensome to do it for these other places.

6          Again, with respect to Basalt, that's a brand new

7    clinic.  It's not even -- the relevant time period was back

8    in 2016.

9          SPECIAL MASTER:  So that leads me to the next

10   point which is -- I mean a segue from my earlier question

11   about why limit it now and then later have another expansion

12   after you get an expert report.  In material that you

13   recently provided did you limit to only East Vail to Gypsum?

14   Let's just call it that but we know what we're talking about.

15   Or did you include patients and zip codes from Summit,

16   Garfield, and that Garfield to Basalt corridor?

17          MS. STEVENSON:  So we limited it to people who

18   were treated within the geographic market.  If those people's

19   homes are in Summit or in Basalt or Garfield or anywhere else

20   then they're included in the data.

21          MR. KILDOW:  Excuse me, could I submit a question?

22   I didn't quite get the last part.  Are you saying in the

23   information you sent that includes let's say Breckenridge,

24   Silverthorne, Frisco, and wherever else?

25          SPECIAL MASTER:  Well, if they've treated in the

1    Vail Valley area.  Right?  That's what I heard you say.

2              MS. STEVENSON:  Yes, that's correct.

3              MR. KILDOW:  But then are you producing the

4    spreadsheet beyond the Vail Valley?

5              MS. BRAUNSCHWEIG:  No, not quite, Allan.  So if

6    you were treated in a Frisco, Silverthorne, or Breckenridge

7    facility that data is not there.  If they were treated in the

8    Vail Valley and came from Breckenridge to the Vail Valley --

9              MR. KILDOW:  Okay, I understand.

10             SPECIAL MASTER:  So that raises the -- that

11   reinforces the issue that I was asking about with regard to

12   -- I understand that you don't now -- that your argument is

13   you don't now have to declare what you believe the relevant

14   geographic market is, but if I read this in your response,

15   you're saying you're willing to -- and they don't have the

16   benefit of my hand movement but they know what that is.

17             But if you're saying you're willing to agree to

18   their -- for purposes of discovery -- but not provide it

19   outside of that area then to me the potential for you to

20   later come back and say well, our expert said the relevant

21   geographic market includes Summit County, parts of Garfield,

22   and Basalt, and there's even reference in there about

23   possibly to Aspen.

24             I don't -- I would have to say -- but I can't

25   speak for the judges.  I have a little bit of experience in

1  that area.  If the discovery were limited only to the area

2  that you agree with Plaintiffs as being the relevant

3  geographic market of being Vail Valley then that would -- in

4  my mind if you had objected to providing discovery outside of

5  that area -- preclude you and your expert from later coming

6  back and saying oh no, we think it is bigger than that.

7        Because then we'd have to start over with another

8  set of discovery based upon the information that your expert

9  had used in providing their opinion to contradict the

10 "relevant geographic market".

11       I may be missing a point and hoping that you would

12 clarify that for me, but it's not my first rodeo.  I foresee

13 that coming as a possible result if I don't give what you

14 have argued to be an inappropriately broad discovery.

15       MS. STEVENSON:  Your Honor, I think I agree with

16 you to the extent that certainly if our expert were to come

17 in and say here's an opinion that I have reached and I did so

18 by relying on all of the zip code data from patients treated

19 at Howard Head facilities in Summit County, and that was

20 information that we said was outside the scope of discovery.

21 I think that would be a fair thing for the Plaintiff to say

22 that's not fair, you told us we couldn't have that data and

23 now your expert has relied on it.

24       But I think if our expert were to conclude that

25 their market definition was inappropriate and could be bigger

1   based on information that is in the public domain, or based

2   on consumer surveys that our own expert did I'm not sure that

3   that would be inappropriate.

4           Again, my point is I don't know that the data is

5   really helpful.  I don't actually quite frankly see how they

6   use it to prove a relevant geographic market or not.  We've

7   nevertheless gone ahead and produced everything that they had

8   asked for.  But I think it's -- you're maybe going a little

9   further than I would go in terms of what would be a need to

10  reopen a discovery.

11          SPECIAL MASTER:  And really my point here is --

12  well, in part -- that was speculative.  But secondly I'm

13  going to go right to the issue.  As of this point you are

14  saying you object to -- do not want to produce -- the Summit

15  County and the Garfield County corridor we'll call it, that

16  corner over there.  Is that your position?

17          MS. STEVENSON:  That is correct.

18          SPECIAL MASTER:  Because that's unduly burdensome?

19          MS. STEVENSON:  Correct.  And of marginal, if any,

20  relevance based on Plaintiff's own allegations.

21          SPECIAL MASTER:  Their allegations that the Vail

22  Valley is the relevant geographic market.

23          MS. STEVENSON:  Correct.  Your Honor, I did want

24  to give you one legal citation on that that I think supports

25  us on this point.  The case is Radium Music License

 1   Commission and its citation is 2020 U.S. District Lexis

 2   243375.  I'm happy to send that to you if it's helpful.

 3          SPECIAL MASTER:  Please do.  Thank you.  So that

 4   sort of just as a slight diversion here raises an issue that

 5   I want to make clear.  I do operate on the process of you

 6   being able to send me email form the citations that you make

 7   that I request just like the exhibit there since I can't

 8   quite get into that yet, but we're going to get that

 9   straightened out.  But those are things that I do have -- if

10   you don't have it it's terry@ruckriegle.com.  All lower case.

11          Anything else, Ms. Stevenson, before I give Mr.

12   Kildow some brief time to respond and then I think we can get

13   caught up, take our break, and go to number two.

14          MS. STEVENSON:  I think the one other thing that I

15   just want to address because it seems to keep coming up is

16   Plaintiff's counsel suggesting that we have taken the

17   position that all discovery relevant to this case happened in

18   the State Court action.

19          Of course that is not the case.  However, almost

20   all of the allegations of anti-competitive conduct that have

21   been made in this case are virtually regurgitated directly

22   from the State Court action.

23          I know that you're familiar with that, but you

24   know, those allegations of defamation or improper reporting

25   to agencies, those are the precise allegations that are made

 1   in this case.  Of course, those things have been exhaustively

 2   discovered in the State Court action, and are all relevant to

 3   this case.  Of course we've produced I think over 6,900 pages

 4   of documents now in this case relative to all the new anti-

 5   trust issues.  I just want to be clear, many of those pages

 6   represent huge spreadsheets with multiple sub-pages and a

 7   tremendous amount of information in them.

 8           So I take issue with the fact that there's any

 9   suggestion that we have not provided a tremendous amount of

10   discovery in this case, even given the fact that all of the

11   discovery about the alleged anti-competitive conduct had

12   already taken place in the State Court action.  This just

13   keeps coming up and so I just wanted to make that point.

14           SPECIAL MASTER:  I'm aware or familiar with both

15   the claim there and some of the references, and from my

16   perspective it's probably going to take me just some time to

17   refresh my recollection but I do have a good recollection of

18   what was ordered to be produced.  Certainly I don't think

19   that it's necessary to reproduce if it can be accurately

20   referenced and cited.  That seemed to be one issue at some

21   point in time there.  Rather than just saying we've already

22   produced it, just I would expect a citation.  I know that you

23   attorneys and your firm are quite capable of doing that,

24   being specific if it's incorporating by reference those

25   productions.

1          MS. STEVENSON:  Oh sure, and I was just trying to

2    address the notion that -- we've certainly not taken the

3    position that there's no discovery that needs to be done in

4    this case because it's all been done in the State case.

5    That's why we produced so much information in this case which

6    is relevant to the issues that have not been litigated.

7          SPECIAL MASTER:  Thank you.  Mr. Kildow?

8          MR. KILDOW:  Very quickly, Your Honor.  First of

9    all, I don't know about this recent case that was just

10   mentioned.  I don't know if that was -- I don't recall that

11   being in their brief.  But in my extensive reading of anti-

12   trust law relating to geographic market I haven't been able

13   to come across a single case where there isn't a comparison

14   of geographic markets.  In other words, geographic market A

15   is 100,000 square miles and geographic market B is 200,000

16   square miles.

17         They are competing.  That is the law.  If we look

18   at the cases that we've cited, all of those cases involved a

19   comparison.  The requirement of the Plaintiff to identify the

20   geographic market is dependent upon that comparison.  So we

21   can't prove that our market is necessarily absolutely correct

22   other than geologically here unless we have access to data

23   outside of the geographic market.  As I said before, would

24   people travel from Vail to Breckenridge to get physical

25   therapy, or vice versa.  So naturally we are entitled to

1    that.   That is the law of the Tenth Circuit.

2            The Defendant here has not cited a single case to

3    undercut Lantec and all of the other Tenth Circuit cases in

4    the body of Federal law, so this is not -- this is the law.

5    We get to compare outside.

6            Number two, experts can only testify to facts that

7    have been proven in the record and what they could rely on

8    outside of those facts based upon their experience.   But to

9    do this requires the evidence as to what is in Count A and

10   what is in County B.

11           We have cited a number of health care merger

12   cases, for example the Hershey case.   This is the way it's

13   done.   We compare the sizes of the geographic counties, we

14   compare the costs incurred, we compare the prices, we compare

15   the costs and price sensitivities between competing relevant

16   counties.

17           Ms. Stevenson is pushing -- trying to push this

18   case in a direction that is simply not supported by -- from

19   my standpoint -- any Federal case that I have read.   I

20   haven't read the last one, but for the Tenth Circuit

21   standpoint Lantec is the case -- is one of the cases.

22           So we get to look at cost, prices, facilities, the

23   structure of the market, the preferences.   How can we compare

24   the preferences between the counties if we don't have the

25   data?   That is just the way it works.   And so I encourage the

1   Court to remain within the absolutely tried and true law when

2   it comes to the definition of geographic market, and what Ms.

3   Stevenson is suggesting is not in any way the Federal law

4   relating to geographic market.

5          SPECIAL MASTER:  I'll go back and re-review that.

6   Here's -- I think I understand pretty clearly because I know

7   what you're saying.  Let me ask you a pointed question.  Why

8   do you need the names and addresses?  Whatever your answer is

9   -- as opposed to just the zip code?  This was my impression

10  when I first read the motion after Judge Gallagher referred

11  them to me.

12         Secondly, do you intend to conduct any survey by

13  contacting those patients?

14         MR. KILDOW:  The answer to the second part is yes.

15  The answer to the first part has to do with survey

16  technology.  What we would do is to focus these survey

17  samples on those people within the patient pool of Vail

18  Health, and we would probably enter into some agreement or

19  stipulation with Vail Health as to the questions that would

20  be asked.  They would not involve things that would be PHI

21  related.

22         What we would -- but the difference is how do you

23  pick out the samples to be surveyed.  We are talking about

24  tens or hundreds of thousands of patients with respect to

25  Vail Health alone, and so to just survey randomly people who

1   have no orthopedic problems, no need for a physical

2   therapist, have never been to a physical therapist, have no

3   idea of what the cost of physical therapy would be would be

4   -- let's just face it, not very meaningful.  You're going to

5   people who are in that market and conduct the survey that

6   way.  And so it's a much better, much more accurate

7   situation.  And the idea of the survey is set forth in the

8   Tenth Circuit case of Lantec.  This is a matter of law.  We

9   are entitled to do that.  The only question is how we do it

10  so we don't breach any PHI rules, and we can do that.

11          Unfortunately I know a little bit about Vail

12  Health and they do patient surveys themselves.  You know, how

13  was your stay, did you find it acceptable.  Were the services

14  okay?  We can do that kind of a survey, you went for physical

15  therapy, would you travel to get that same physical therapy,

16  would you travel to Breckenridge to get it and save $20.00.

17  Vice versa.  Very simple.

18          SPECIAL MASTER:  Well, I considered that thinking

19  ahead too because otherwise -- and we -- this case is all

20  about access to confidential information and breaches of

21  that.  And I anticipated even if I granted you what you're

22  asking for an extremely strict protective order, which

23  according to your response just now would not have allowed

24  that type of survey.

25          By the same token, recognizing that surveys are

1  galore and whether that's follow up -- I've had many follow

2  ups from my experiences with hospitals and P.T.  So I think

3  that there's room if the parties would be reasonable for

4  that, but I won't go further than that in terms of trying to

5  work this out, but I think that's the kind of thing.  There

6  has to be some ability.

7         Statistics 101 that I took before any of you were

8  around would say that actually you need both the sampling of

9  patients and of non-patients.  It's not just that it wouldn't

10  be relevant to the people who weren't going to be there.  In

11  order to have a proper database you would have to include

12  everybody.  You don't load it with one or the other.  So I --

13  that's my perspective on it and I feel confident having had

14  lots of experts talk about surveys before.

15         All right, anything else that you have, Mr.

16  Kildow?

17         MR. KILDOW:  No, that's it.  One thing, this case

18  is only in small part about the exclusionary conduct that

19  occurred that is the subject of the Eagle County action.  The

20  Court, based on what we submitted, is not familiar with all

21  of the exclusionary elements of this case that we contend

22  violate the Sherman Act and make Vail Health violative of the

23  Sherman Act.  I just wanted to make that last point clear.

24         SPECIAL MASTER:  If I said only I didn't mean

25  only, but maybe genesis is a more appropriate term for --

1   anyway, that's neither here nor there.  Thank you.

2          All right, let's take until 3:00.  I know that we

3   don't have Angela there but everybody can go off -- maybe

4   she's back.

5          FEMALE:  I'm back.

6          SPECIAL MASTER:  So we could just go off camera

7   and off audio, right?

8          FEMALE:  Either you can shut your camera off and

9   also your audio, or you can log off and log back on.

10         SPECIAL MASTER:  Well, I'm hoping that Mr. Kildow

11  takes some of that time to see if he can actually log on for

12  the next portion, but if not we'll do that.

13         Angela, I don't know if you can answer the

14  question that I emailed you which is why I'm getting this

15  response when I try to get into -- and specifically this one

16  Exhibit 25 that says --

17         FEMALE:  If you want to go ahead and go to it I

18  might be able to help.

19         MS. STEVENSON:  Yeah, it's denying him access.  It

20  says you do not have access to this document.

21         SPECIAL MASTER:  It says you do not have

22  permission to view this document.

23         FEMALE:  So you are in PACER, is that correct?

24         SPECIAL MASTER:  Right.  I'm in the docket.

25         FEMALE:  And it says -- okay, here's where I want

1  to say so you see this warning with the exclamation mark,

2  correct?

3         SPECIAL MASTER:  Yes.  There's a warning.  It just

4  says you're not --

5         FEMALE:  If you go to the left of it does it say

6  view document in a little gray box?

7         SPECIAL MASTER:  No, it -- I had passed the view

8  document and clicked on it and that's when this other that

9  said you do not have permission.

10         FEMALE:  We thought you had permission to

11  everything.  Have you been able to look at other restricted

12  documents?

13         SPECIAL MASTER:  No.

14         FEMALE:  We'll get you that.

15         SPECIAL MASTER:  It seems to be a mixed bag

16  because some of them I get that specifically and again, help

17  me -- Ms. Stevenson, have you had that problem at all?

18         MS. STEVENSON:  I don't think that should be a

19  problem to the parties in the case.  I mean the restriction

20  is there to prevent people in the public I think from seeing

21  the files.

22         FEMALE:  Yes, we had to go to the -- call the help

23  desk and they resolved it.  I don't know what they did buy

24  they resolved it.  You're supposed to have full access and so

25  that's why I was wondering if you were able to see some of

1    the restricted documents at least.

2              SPECIAL MASTER:  My answer is I have been able to

3    see some of the restricted documents but there are others

4    that indicate they're restricted but then some of the others

5    I get -- when I click on view document I get this response.

6    Again, counsel can you -- which exhibit -- there was a motion

7    --

8              MS. STEVENSON:  25.

9              SPECIAL MASTER:  Exhibit 25.

10             MS. STEVENSON:  Docket entry 130-7.

11             FEMALE:  If you're still having that right now I

12   will suggest you call the help desk.

13             SPECIAL MASTER:  I've got that number I suppose

14   some place.

15             FEMALE:  I can give it to you from memory.  I

16   didn't know if you wanted to do it right now or not.

17             SPECIAL MASTER:  No, I don't.  I mean I will do

18   that later because -- but it is specifically with regard to

19   130 and Exhibit 7.

20             FEMALE:  Do you want me to shoot that to you in an

21   email right now?

22             SPECIAL MASTER:  Yeah, that's what I'm thinking.

23             FEMALE:  That's what I'm going to do.

24             SPECIAL MASTER:  Having said that I know we talked

25   about a 15 minute but I was going to give you 20 back when we

1   were at -- so what would you like to have, Counsel?  15 or

2   20?

3             MS. STEVENSON:  3:00 is fine with me.

4             SPECIAL MASTER:  I need a little bit more than

5   that.  Let's start back up at 3:05.

6             MS. STEVENSON:  Thank you.

7             (Recess from 2:47 p.m. until 3:04 p.m.)

8             SPECIAL MASTER:  Are you ready to go?

9             MR. KILDOW:  Ready to go.

10            SPECIAL MASTER:  Thank you.  So we'll move to

11  motion number two which we had identified as number 129.

12            MR. KILDOW:  Correct.

13            SPECIAL MASTER:  You may proceed.

14            MR. KILDOW:  Thank you.  This is Allan Kildow

15  addressing Plaintiff's motion to compel number two relating

16  to monopoly.  In our brief we cited innumerable Supreme Court

17  and Tenth Circuit cases setting forth the law as to how

18  monopoly power is established under the Sherman Act, Section

19  2.

20            Basically there is just about nothing that is not

21  relevant to the proof of monopoly power.  It has to do with

22  the defendant's prices, the market prices, restricted output,

23  market share, marginal costs and average costs.  So the

24  entire scope of the Defendant's business is at issue in a

25  monopoly case.

1          I suppose I could summarize Vail Health's response

2    to the motion as maybe a little bit over broad, but basically

3    we produced all we have and we don't have to produce a report

4    that are not produced ordinarily.

5          We had the good fortune of deposing one of the

6    Vice Presidents of Howard Head Sports Management.  He is no

7    longer with Vail Health.  His name is Nick Brown.  We deposed

8    him, it's my recollection on Saturday the 9th of October, and

9    then Tuesday of this month, the 19th, we deposed the Vice

10   President, and then later a Senior Vice President of Vail

11   Health, Howard Head Sports Management.

12        SPECIAL MASTER:  Who was that?

13        MS. BRAUNSCHWEIG:  I'm sorry, I was having

14   problems with my connection.  It was causing -- so I called

15   in a couple of times.

16        SPECIAL MASTER:  When you say you deposed the

17   former Vice President, who was that?

18        MR. KILDOW:  Nicholas Brown.  And we're seeking

19   price information that was charged to the patient, to the

20   healthcare insured, and to Medicare.  What we've learned --

21   and we're also seeking all the information we can find about

22   the costs that Vail Health incurred in providing the physical

23   therapy services.

24        What we've learned in this deposition of -- the

25   two depositions.  One, Mr. O'Bryan testified that there is

1  the either report or software called the Direct Cost Report

2  and during the deposition of Nick Brown we learned that there

3  is a software system that the management uses to operate the

4  Vail Health, and in particular Howard Head.  That software

5  system is called (inaudible).  It has information in it that

6  can be -- lead us to financial statements, it contains costs

7  and expense information, salaries, revenues generated from

8  physical therapists, etcetera.

9         What we learned is that is not something that --

10  in the old days businesses used to run periodic reports in

11  paper format to provide managers so they could review that

12  paper and run their business.

13         Now days there is software that permit the

14  managers to access the information.  It may reside on the

15  software system, but not necessarily be published in the form

16  of a written format.

17         What we learned is basically -- we don't have the

18  transcript of Mr. Brown back yet but the software system

19  included information data that you can create just about any

20  kind of report that you want to see out of it.  Part of that

21  system is the MRR system, which is apparently a separate

22  system.  We really don't know.  But Mr. Brown testified --

23  confirmed what Mr. O'Bryan said.  You can get just about any

24  kind of information off these systems that you want.

25         Now I don't know why we haven't received that

1    information but we have not.  We cited in our reply brief a

2    Colorado Federal District Court case called Crock v.

3    Effervescent, and the Court said there with respect to

4    database storage -- which is what we're talking about here --

5    the law does not support the Defendant's verbal sleight of

6    hand.

7              SPECIAL MASTER:  What is the cite on that?

8              MR. KILDOW:  The cite is 2017 U.S. District Lexis

9    184498, District of Colorado, February 8, 2017.

10             The Court went on to say, "If information is

11   stored in a database requiring reports to be run from the

12   database it is not the creation of new evidence or

13   discovery."  And I think that because the reports from this

14   database were not run periodically Vail Health is taking the

15   position that we don't have to produce something that isn't

16   there.  But the data is there in digital form.

17             It's very easy to run reports and the exhibits

18   that are pended to the memoranda filed in these motions are

19   basically -- many of them are from these databases.  But

20   they're run by people like Mr. Brown who are running them for

21   different purposes and so they take this, they take that,

22   whether it's the revenue or cost information, to generate

23   their report.  But the data is there.

24             SPECIAL MASTER:  Are you referencing any exhibits

25   that you attached to 129?  I heard you say something about it

1   and I wanted to make sure I was following.

2           MR. KILDOW:  Yeah.  Let's just take page one for

3   example.  Let's look at Exhibit 15, if we could.  I have it

4   in front of me.  When the Court is ready let me know.

5           MS. STEVENSON:  Are you sure that's the right

6   exhibit number?  Which one are you referring to?

7           MR. KILDOW:  I'm referring to Plaintiff's Exhibit

8   15.  It's the 2015 -- I guess maybe it's Exhibit 1.  I don't

9   know.  I guess it's Exhibit 1, it's the 2015 financial

10  statement.

11          MS. STEVENSON:  Okay, that's a different exhibit

12  number than 1.  Just a second.

13          SPECIAL MASTER:  I had looked at these but I

14  couldn't keep them all open.

15          MS. STEVENSON:  If you go to Exhibit 19.

16          SPECIAL MASTER:  Within the submission of Exhibit

17  1 -- of Document 129 the exhibits only go to 17.

18          MS. STEVENSON:  That's because it's probably the

19  protected one.  You only have the ones that are not

20  protected.

21          MR. KILDOW:  Yeah, these are all marked attorney's

22  eyes only.  If you don't have access to them then you're not

23  going to have them.

24          SPECIAL MASTER:  So I'm going back then to 129 and

25  I don't see the 19 within 129.  I do see it in the collateral

1  of 130 restricted documents.

2         MS. STEVENSON:  Right, that's where it is.  It

3  would be in --

4         SPECIAL MASTER:  Number 2 in 130.

5         MR. KILDOW:  I have it as document 2 within 130.

6  It's marked on the first page AEO.  So I don't know if you

7  have it or not.

8         SPECIAL MASTER:  Well I was able to open that one

9  up so it's -- in terms of its permissiveness.

10         MR. KILDOW:  Great.  Let's start with 1417 which

11  is the first page of the exhibit.  The upper left hand side

12  is Harold Duper to Nicholas Brown.  Duper at the time was the

13  CFO.

14         Turn one, two, three, four pages to the place

15  holder native file production, 1420.  We can see the

16  following data is from a digital native format.  I'd like you

17  to turn to the next page which gives us an example of what

18  we're referring to.  It says HH income statement roll up.

19         SPECIAL MASTER:  I may be on the wrong page.

20  There I am.  Yes.

21         MR. KILDOW:  MR Department, Fiscal Month of

22  October.  Then to the right is actual 2016, actual 2017,

23  actual 2018.  Do you see that?

24         SPECIAL MASTER:  Yes sir.

25         MR. KILDOW:  So what we have here are income

1   statements run for Howard Head from this data base.  We asked

2   for income statements for Howard Head for the period that's

3   relevant here starting November 1, 2012 to the present and

4   they basically said we don't have it.  We have given you what

5   we have.  Well, this information in this format can be

6   generated from the database.

7          If we look at -- if we go two more pages we have

8   additional information found there in a little bit greater

9   detail than the summary financial statement.  It runs from

10  page eight -- I can't even tell just looking at it -- all the

11  way over to page 21.

12         This is the kind of information that we're looking

13  for.  This is the kind of information we're entitled to but

14  they haven't produced -- given us access to it in the form

15  that it's kept in the database.  What they've done is given

16  us a little bit here and a little bit there, stuff that's run

17  primarily -- a lot of it is run actually by -- or at the

18  direction of Nicholas Brown, who is not an accountant.

19         Vail Health never gave us any indications --

20  didn't identify any names as to who the people were in the

21  accounting department who had firsthand knowledge of this

22  information.  We found some of it out very recently.  I guess

23  it was referenced in an email or two but Mr. Brown testified

24  that one of the people that has this kind of knowledge is a

25  woman by the name of Carol Hanson.

1       We've been crawling around in the dark on our

2   hands and knees looking for information.  We don't know who

3   to talk to.  They haven't identified anything in the

4   interrogatories of people who have knowledge of this stuff,

5   the pricing, the cost, profitability.  And this stuff comes

6   from that database.

7       So this really gets to what you started out

8   talking about, Judge, and that is meet and confer.  As you

9   know, Judge, we're taking this case on a contingency basis.

10  We're not interested in doing anything more than we have to

11  get the data that is necessary for the Plaintiff to prove

12  their case.

13      So if we could talk through what we -- what they

14  have from the database, the MRR database, and of course

15  they've got the complete medical database in Cerner which

16  they have to maintain as a matter of law.  Then we could get

17  the information we need.

18      What we have is a little bit here, a little bit

19  there.  There's nothing comprehensive.  There's nothing that

20  you can track from month to month or quarter to quarter, or

21  even annually to annually.  It's all from a hodge podge.

22      And what the Lantec case stresses, of course, is

23  what I said before, reliable data.  We are entitled to

24  reliable data and it's the old fashioned idea of original

25  proof.  And the fact is -- unfortunately or fortunately,

1  depending on how you look at it -- it's digital databases,

2  digital software systems that modern businesses run on.  We

3  are entitled to the cost information that is found on these

4  databases.  That's what we want, number one.  I think that

5  there's no question under the law that we are entitled to

6  pricing information, cost information, and profitability

7  information.

8          SPECIAL MASTER:  So to make sure that I

9  understand, you started off by saying that Mr. Brown or Mr.

10  O'Bryan testified to all of this information being somewhere

11  in there but from what I'm hearing you say now is it just

12  depends upon what you identify as a request to retrieve.

13          MR. KILDOW:  Well, I guess the answer is yes, and

14  I think our request for production of documents is specific

15  enough that they could tell what is being asked and what

16  information is available.  We haven't had ever a chance to

17  talk with anybody about what is available and what would be

18  responsible from a digital standpoint.

19          If we talk about it in old fashioned accounting

20  terms to create a financial statement or a balance sheet,

21  what goes into a ledger, we could do that.  But it seems to

22  me that based on the testimony provided two days ago Vail

23  Health has the information that would be directly relevant to

24  the pricing, cost, and profitability issues relating to the

25  Howard Head physical therapy clinic.

1          The Court should order that that information be

2     available -- made available to us.  And I think that we have

3     to have probably a meet and confer probably between our

4     expert and Vail Health's accountant -- there's a specific

5     group that they have -- so that we can identify that

6     information.

7          SPECIAL MASTER:  Tell me what you mean by -- what

8     you conceive of as a meet and confer between the experts.  Is

9     that to explain more clearly what the request would have to

10    be to retrieve the information?  This is a little bit

11    different take on the meet and confer.

12         MR. KILDOW:  Correct.  What I'm talking about if

13    we're back to the exhibit that we were just talking about and

14    the data that is found on pages 8, 9, etcetera, going back

15    off data like that that identifies salary, real estate costs,

16    administrative costs, overhead management costs, general

17    overhead expenses associated with providing the physical

18    therapy, etcetera, and what the profit -- which in the non-

19    profit world comes down to excess of revenues over expenses

20    -- for Vail Health on a regular periodic basis.

21         SPECIAL MASTER:  So in this exhibit you have

22    referenced from page 8 to page whatever, 21 or something, are

23    those -- is that information that has been provided since

24    that's an exhibit that you submitted accompanied to your

25    motion?  Is that adequate for 2016, 2017, and 2018?  Or so

 1   that I understand are you asking for something different?

 2   Does that loop back to that expert conferral thing that

 3   you're talking about?

 4              MR. KILDOW:  Well that's a very good question.

 5   The way I think it should go, first of all, for example, we

 6   don't know who compiled this information.  We don't know

 7   precisely who did that and for what purpose.  Generally

 8   speaking in my experience businesses create periodic data

 9   that is compiled by qualified accountants and technology data

10   people for management.

11              We have to think about how we get this information

12   into evidence.  Into something prepared by the individuals

13   who are assigned to the physical therapy department by Vail

14   Health to prepare this information on a periodic basis.  How

15   do you do that?  Where does it come from?  Is this a true and

16   correct portrayal of let's say the salaries and wages in

17   2016.  Is this -- how did you come up with this indirect

18   allocation in 2017?  So we have some person with personal

19   knowledge who can testify to that.

20              I can assure you that Mr. Brown and Mr. O'Bryan

21   are not that person.  They are users of the information.

22   They may ask for tailored reports to be prepared but they are

23   not the force of the information.  So we need to have the

24   name of an individual or individuals who can talk

25   knowledgably about this and say this is the information that

1    we can generate from the strata system or the MRR system.

2              And it could end up being like a typical financial

3    statement.  On the other hand, we could go down to the

4    general ledger level if we want.  We don't necessarily want

5    to go down to the general ledger level, but if we have to do

6    that to authenticate the data we're willing to do that.

7              But it seems to me that now that we've got at

8    least some toehold into this information we should be able to

9    get it.  The stuff that has been produced by Vail Health is

10   scattered all over the place.

11             There's no foundation to it.  We don't know who

12   prepared it, we don't know where it comes from.  Specifically

13   it's from one period and another period.  Can we cobble

14   something together in bits and pieces?  Yes.  But it doesn't

15   present a comprehensive financial picture of revenues, costs,

16   and profitability through the relevant period of time that

17   we're talking about with somebody who has the personal

18   knowledge that can authenticate this information, how it is

19   assembled, and what it reflects.  That's what we want.

20             SPECIAL MASTER:  So I'm trying to make sure that I

21   understand you clearly, and I keep wanting to refer back to

22   our earlier conversation about this information -- so much of

23   this information being there but it's just a matter of

24   knowing what to ask for.  Let me put it in that simplistic

25   term.

 1            And then two, knowing who could explain what it

 2    shows or identify it.  And having reviewed Vail Health's

 3    responses some of those people may not be around.  So I'm

 4    trying to -- I don't know that I can break this down to a

 5    scalpel type analysis of getting there, especially since it's

 6    over a broad period of time, back to 2012, but I need to try

 7    to understand what it is that you're actually asking for so

 8    as to not fall into what the Court Special Master we always

 9    have, and that is it being too overly broad, saying

10    everything and becoming what we do recognize as a fishing

11    expedition.

12            Part of that -- the reason I'm asking you is

13    because I'm -- in your argument I'm hearing that you're not

14    quite sure that you know what to be asking for.  That then is

15    a problem for me in terms of ordering something other than

16    saying the whole damn thing.  I'm not doing that, so --

17            MS. BRAUNSCHWEIG:  Your Honor --

18            SPECIAL MASTER:  I also hear you saying conferral

19    would help.  That is a segue into me saying these emails back

20    and forth between you have not been received well by the

21    other two judges, and I understand why having now seen them,

22    but let's get down to what would be productive.  If you can

23    identify that and not in the -- I mean I'm very aware -- and

24    I've just used those cases recently about the anything and

25    everything, all of whatever language you want to use, and

 1    that's not something that judges or special masters

 2    customarily say sure, have at it.

 3           MS. BRAUNSCHWEIG:  Your Honor, I know you don't

 4    generally like for people to talk but could I maybe offer

 5    something here that maybe explains it a little bit better?

 6           SPECIAL MASTER:  Since I asked for the explanation

 7    and I foresee that Mr. Kildow could probably use the

 8    assistance, sure.  The other counsel doesn't know but that's

 9    one of my normally strict but there's always exceptions to

10    the rule is one counsel argues.  But you can give me the

11    explanation that I'm looking for if you can.

12           MS. BRAUNSCHWEIG:   Sure.  I'll try to be as

13    succinct as I possibly can.  Mr. Brown asked the Department

14    of Vail Health to generate financial information for him for

15    purposes of establishing -- to quantify issues related to the

16    joint venture between Vail Summit Orthopedic and the clinic

17    in Vail Health to establish a joint physical therapy new

18    business.

19           As part of that he analyzed and created and

20    modified the information that was produced to him from the

21    financial department.  So what we have are revisions to

22    financial statements that he received, and we don't know

23    exactly those revisions, but if you look at the page right

24    after the place holder he identifies down at the bottom some

25    of the changes that he makes.

1          SPECIAL MASTER:  That was what we talked about --

2   I think we had that as eight, but I do not see after the

3   place holder -- well --

4          MS. BRAUNSCHWEIG:  There's a place holder and then

5   there's income roll up, and then he has assumptions down

6   below --

7          SPECIAL MASTER:  Yes.

8          MS. BRAUNSCHWEIG:  -- and it says excludes

9   depreciation, benefits, it excludes NICO, allocated based on

10  gross patient revenue.  So from this document it appears that

11  he's taken financial information that's received from the

12  finance department and making changes to it for his own

13  purposes to analyze whatever he wants.

14          So one of the things that he's done is on indirect

15  allocations in one of the exhibits -- I don't know if it's

16  this one -- he's estimated what real estate values are.  That

17  isn't normally something that Mr. Brown would do, but he has

18  gone off and done his own allocation as to how the costs were

19  split in some of the documents.

20          And so what we're asking for is the original

21  income statement produced by the department as it originally

22  was produced.  What we have is Mr. Brown's modifications to

23  the income statement, and so what we need are the income

24  statements and all the backup detail that goes to the

25  indirect costs, the salary and wages.

1        The reason why this is important is because they

2   have another exhibit later which is a one page summary of

3   their income statement, but it doesn't match Mr. Brown's.  So

4   we have multiple versions that are purportedly the same thing

5   that don't match.  So we don't know what is the official

6   income statement for the Howard Head department.  And we

7   don't know what's been put into indirect expenses.  We just

8   have a category called indirect expenses.  We have no idea

9   what's been loaded into that indirect expense, which is

10  relevant to the contribution margin analysis under anti-trust

11  law.

12        SPECIAL MASTER:  So that raises the second part of

13  my question as to how that can be accomplished without an

14  order for anything and everything.  I don't mean to

15  oversimplify but I mean that's what I hear is you want this

16  income statement, and you want all of the backup data.  To me

17  it seems -- I think I heard Vail Health in some instances

18  saying well, you can get that at deposition.

19        So I'm trying to figure out what the base line

20  appropriate documentary production would be that of course,

21  as we saw in the State case several times, might then lead to

22  the necessity for an inquiry from somebody -- and this goes

23  back to Mr. Kildow's statement about who created this -- but

24  an inquiry into what is behind it.

25        So there's two ways of finding what's behind it,

1   just telling them to produce everything that's behind it,

2   which is broad, or producing those reports and then

3   determining what is a more refined follow up production than

4   all the backup data.

5           MR. KILDOW:  Okay, Your Honor.  I'd like to answer

6   that question if I could.

7           THE COURT:  Well probably the last time we go back

8   and forth.

9           MR. KILDOW:  Here's what we're asking for.  We're

10  asking for the information found on page 6 through 51, that

11  is the -- not all those pages are populated because this is

12  from a digital database, I guess.  It really looks like it's

13  about 25 pages -- as prepared by or can be prepared by the

14  financial or accounting group of Vail Health from the

15  database that has contained this information from 2012 to

16  2020.  That's something Vail Health can put their arms

17  around, and as Mr. Brown said they can run just about

18  anything off that system that you want in terms of a report.

19          THE COURT:  I'm not taking that as a direct quote

20  but I understand what you're representing in terms of his

21  testimony.

22          MR. KILDOW:  And then to have them enter

23  interrogatories as to who is this person.  We can't do a

24  deposition without knowing who the people are and having

25  something -- I mean I've deposed a lot of accountants in my

1  life and usually you depose an accountant because they're the

2  auditor, the guy who ran the audit, and we have documents in

3  front of us from which you can ask questions.

4       That's all we ask.  So this would give us the

5  information we want.  They've got the information.  That's

6  what their Vice President just testified to on Tuesday.  It's

7  just a matter of running the report.

8       SPECIAL MASTER:  I understand.  And I -- again,

9  I'm not taking that as a direct quote.  I understand that's

10 what you said.  There's a limit to any system but I don't

11 want to go there.  Do you have anything else before I give

12 Mr. Richards the floor?

13      MR. KILDOW:  On this motion to compel?

14      SPECIAL MASTER:  Yes.

15      MR. KILDOW:  I do, Your Honor.  We need the TARE

16 information.  In other words, what they submitted to TARE,

17 which is the private insurer, and Medicare, and what

18 individual self-payers actually were billed.  We don't have

19 any of that.  That is important for us to know what is the

20 difference between this charge master idea that they say is

21 very important and is the starting point.  What was actually

22 billed to the patient, the payer, and the Medicare, and what

23 was received by Vail Health.

24      The charge master is kind of like a rate in a

25 hotel and it's not necessarily what people pay if they book

1  it through booking.com or Orbitz, or something like that.  So

2  what is the discount?  We're entitled to know that.  If they

3  want to stipulate that the charge master constitutes the

4  prices that were charged, we'll be glad to take that but in

5  the end I know they're going to say that's not actually what

6  we billed and that's not actually what was paid.  Let's face

7  it, there is a discount that's involved when you work through

8  an insurance company or Medicare.  So we want that as well.

9          And then the next thing we want goes to market

10  share.  We are entitled to know the number of physical

11  therapists that were employed there and their individual

12  salaries.  If all the salaries are rolled up into the

13  financial information that would be one thing, but we are

14  entitled to know the number of physical therapists that they

15  had each year, the identity of a person who can testify that

16  this was our head count and these were our salaries for each

17  year.

18          And so we want that information as well.  So

19  basically two additional areas which one of the big ones,

20  that is the reimbursement claims that were submitted to the

21  payers.  Two, the headcount for the physical therapists.

22          MS. BRAUNSCHWEIG:  Allan, the employment

23  agreements.

24          MR. KILDOW:  And the employment agreements for

25  each of the physical therapists.

1          SPECIAL MASTER:  Mr. Richards?

2          MR. RICHARDS:  I think I'd like to start just by

3   talking about the financial data.  I think there is one very

4   important piece of information to clarify.  On a number of

5   occasions Plaintiffs referenced Vail Health financial data.

6   I think it's important to clarify that when they're talking

7   about Vail Health financial data I believe that they're

8   limiting their request to Howard Head financial data and not

9   to Vail Health as a whole.  I don't think that there's a

10  dispute about that based on Plaintiff's argument but to the

11  extent there is I'd be happy to address it.

12         SPECIAL MASTER:  Let me just get that clarified

13  then.  Is there any?  Because I know that we do have a

14  tendency sometimes to speak in the broader Vail Health sense

15  but you are just asking for the Howard Head, right?

16         MR. KILDOW:  We are asking for Howard Head data

17  except where there is an allocation of costs from the

18  hospital to Howard Head.  I think that that can be

19  accomplished -- this is a conferral issue.  It depends on how

20  the allocation of real estate occurs on the statements and

21  cost allocations relating to Howard Head.

22          The reason that's important is that they -- Mr.

23  Brown has several times stated that they over-allocate real

24  estate costs to the physical therapy group which reduces the

25  income of Howard Head.  In other words, it's a transferal of

1  costs from an unprofitable division, say oncology, to the

2  profitable division.  That's a complicating factor.

3          Whether that can be accomplished through the

4  overall financial statements of Vail Health, which are

5  publicly available in some form or another and the actual

6  internal accounting documents relating to Howard Head we have

7  to wait and see, but on the whole Mr. Richards is correct.

8          SPECIAL MASTER:  Let's go forward with that

9  acknowledgement.

10          MR. RICHARDS:  So Your Honor, with respect to the

11  financial data we have produced what Plaintiffs requested in

12  the request for production number two, which is cited in

13  their motion to compel.

14          So request for production number two requests

15  annual, quarterly and monthly financial statements, and that

16  we have produced and we produced it months ago.

17          Now there is a complication with Vail Health's

18  financial system, which is they're not able to pull accurate

19  data prior to FY2015 directly from the financial system.

20  Therefore for the period prior to 2015 we searched the emails

21  of people who were involved at the time for financial

22  statements that were prepared in the ordinary course of

23  business at that time and we've produced those.

24          Your Honor, I think it would -- if it's all right

25  I would like to -- there were a number of financial

 1   statements that I wanted to share on my screen but given the

 2   issue I had with my microphone I've been kicked out.  Would

 3   it be all right if we take a five minute break for me to get

 4   these issues sorted out?  Then we can circle back.

 5           SPECIAL MASTER:  I would be happy to do that so

 6   that we can have the benefit of those.  We'll take five here.

 7               (Recess from 3:58 p.m. until 4:05 p.m.)

 8           MR. RICHARDS:  Counsel, I'm emailing you now what

 9   is Vail Health 00000764.

10           Can you see the Excel spreadsheet that is

11   currently on the screen?

12           SPECIAL MASTER:  Yes.

13           MR. RICHARDS:  So what this is is an income

14   statement that Vail Health produced for fiscal year 2015

15   through fiscal year 2020 and this is pulled from the system

16   that Mr. Kildow was referencing.  It provides very detailed

17   information for those years that are at issue here.

18           It provides unique FIN which is essentially the

19   number of patients that went through Howard Head, total

20   charges, payment amounts, direct costs, contribution margin,

21   indirect costs, net income, and it provides those on a

22   monthly basis for each fiscal year from FY2015 through

23   FY2020.

24           This is very detailed financial information.  It's

25   information as it's maintained in the ordinary course of

1  business, and this is the information that Vail Health is

2  able to pull from its financial system from FY2015 forward.

3  There was a financial system change over in FY2015 and

4  information prior to that period is not easy to pull or

5  really possible to pull in an accurate way from the prior

6  years.

7            So what we've done here is we've produced the

8  income statement information that we were able to locate as

9  maintained in the ordinary course of business from FY2015

10  forward.  For the period prior to FY2015 what we did is we

11  looked at reports that were created in the ordinary course of

12  business and produced those to the extent we could locate

13  them through a reasonable search.

14            So what I'd like to do is just pull up an example

15  of one of those spreadsheets that we've produced for the

16  earlier period that we can't access through Vail Health's

17  financial system.  This is just one example of such a report

18  and we've produced many.

19            It is VHFed 2492.  I just emailed it.

20            MR. KILDOW:  How many pages is it?

21            MR. RICHARDS:  Judge, do you see the Excel

22  spreadsheet that's currently on the screen?

23            SPECIAL MASTER:  Yes.

24            MR. RICHARDS:  This is an example of what we've

25  produced for the period prior to FY2015, again trying to

1    cover the whole discovery period here from November 1, 2012

2    through the present.  You can see it's Howard Head Sports

3    Medicine.  It has annual patient visits, gross revenue,

4    inpatient services, outpatient services, total gross revenue,

5    gross revenue per visit, total net revenue, direct expenses

6    broken down into salaries and wages, productive salaries.

7    It's very detailed financial information from fiscal year end

8    October 31, 2013, October 31, 2014, and October 31, 2015.  So

9    that covers that prior period for which we weren't able to

10   pull data directly from Vail Health's financial system.

11           So we believe that we have produced financial data

12   that's sufficient to allow Plaintiffs to perform whatever

13   analyses they want.  This is data that is maintained in the

14   ordinary course of business.  Plaintiffs can give this data

15   to their experts and their experts can crunch the numbers and

16   perform whatever analyses they believe are necessary.  So

17   with respect to financial data we believe we have produced

18   that information.

19           SPECIAL MASTER:  So the part that you showed me

20   didn't look like enough to perform what I'm perceiving to be

21   the analysis requested.  So maybe it's just because that was

22   a sampling of it, but --

23           MR. RICHARDS:  I think in some sense, Your Honor,

24   this is the information that Plaintiffs requested.  Their

25   request for production number two requests all annual,

 1   quarterly, and monthly financial statements.  And so that's

 2   what we produced for 2015 forward.  To the extent that we

 3   were able to identify that information in emails or in other

 4   sources for the period prior to 2015 we produced that

 5   information.

 6            SPECIAL MASTER:  That looked like annual to me.

 7   Was there also then monthly and quarterly that was

 8   accompanying that?

 9            MR. RICHARDS:  So that was -- Your Honor, that was

10   annual.  So that was a report that was brought in the

11   ordinary course of business.  In that case it was brought on

12   an annual basis so that's what we produced.

13            I think the key here is that Vail Health is not

14   able to pull accurate data from prior to FY2015 from its

15   current financial system.  So the kind of detailed report

16   that I showed you that had indirect costs, direct costs on a

17   monthly basis, we are not able to recreate that information

18   in the same manner that a decision maker would have seen that

19   information at the time.

20            SPECIAL MASTER:  That is something that I read and

21   I've heard you say.  For me it seems to contradict my

22   perception from working in this case, even though it's not

23   the first time I've heard that certain data isn't available

24   to Vail Health, but I can't imagine that Vail Health hasn't

25   the capability of searching through that old system to get

1    the -- close to the quality of information that is now

2    available that Mr. Brown testified to.

3                   MR. RICHARDS:  Yeah --

4                   SPECIAL MASTER:  I mean I just can't imagine that

5    Vail Health would let that be.  At one point earlier when I

6    required some additional production from Vail Health I said

7    you're going to have to go back and figure out how to do

8    that, go try it again, and your co-counsel could verify that.

9    So that's my concern about it.

10                  Let me ask you, who put that together?  How was

11   that put together?

12                  MR. RICHARDS:  For pre-15, that was a document

13   that was pulled from Vail Health's financial system at the

14   time by I believe Nick Brown.

15                  SPECIAL MASTER:  At the time meaning what time?

16                  MR. RICHARDS:  I'd have to pull back up the cover

17   email but I believe it was approximately 2015, something

18   along those lines.  2016.

19                  So basically the explanation for why they're not

20   able to pull data from the prior system is that in 2018 Vail

21   Health migrated financial systems and they only pulled data

22   from the prior three years when they did that.  Then the old

23   system went off line after that migration had occurred.  For

24   purposes of the ordinary course of business they don't need

25   data that goes back ten years.  So they made a decision not

1   to maintain the data.

2           But we understand that Plaintiffs want that data

3   and so that's why we searched for financial statements that

4   were created in the ordinary course of business prior to that

5   time period and have produced that.  So we believe that

6   Plaintiffs have what they need and we've done a reasonable

7   search that is proportional to the needs of this case to

8   provide the financial information that's necessary.

9           I think there was also some discussion in Mr.

10  Kildow's argument about Plaintiffs don't know where this data

11  comes from, Plaintiffs feel that they won't be able to

12  authenticate it, things along those lines.  You know, already

13  in the anti-trust case they deposed Vail Health's former CEO,

14  the number one at Howard Head, the number two at Howard Head,

15  and they're shortly going to depose the Vail Health CEO.

16          In terms of authentication and questions about how

17  data was created those are questions that can be posed to

18  witnesses at depositions.  To the extent that Plaintiffs

19  didn't ask those questions that is their failing and it's not

20  our responsibility to provide narrative explanations about

21  every document that was produced.

22          I think we're happy to have discussions with

23  Plaintiffs about specific documents and provide information,

24  but at the end of the day it's Plaintiff's responsibility to

25  ask questions at depositions and determine what information

1    came from which sources and how it was created.

2              SPECIAL MASTER:  You can see my facial expressions

3    and Plaintiffs can't, but yes to a point.  But you need to at

4    least provide a sufficient amount of information as the

5    starting point as to who was responsible for that material

6    and who -- let's put it in the -- if you were trying to

7    authenticate this information and get it admitted into court

8    merely based upon what you just said it wouldn't get in.  And

9    so it is not unreasonable to request at least identification

10   of a person for those two different types of annual reports

11   as a source of who would be able to authenticate those.  Are

12   you following?

13             MR. RICHARDS:  I do.  I think Plaintiffs are well

14   aware of Vail Health's Chief Financial Officers, both past

15   and present, and they have the ability to notice those people

16   for depositions.

17             So I don't think this is a situation where they do

18   not know who created these documents or who would be able to

19   authenticate them.  I think if you put one of these documents

20   in front of Vail Health's CEO or you put it in front of Nick

21   Brown, every one of these financial statements is attached to

22   an email, or attached to a cover letter.  As Plaintiff showed

23   when they were brought up at exhibit where it had Carol

24   Druper and Nick Brown.  So they know who the people they need

25   to talk to --

1          SPECIAL MASTER:  I understand -- I'm sorry for

2    interrupting but I understand what you're saying.  But you

3    have it too.  You can give that name more quickly than they

4    have to guess at who it is.  And I understand the CEO versus

5    some other level of an executive, but I have a hard time

6    believing that just identifying a person is burdensome.

7          MR. RICHARDS: I don't think -- if they had asked a

8    request for admission or an interrogatory about who created

9    this document we'd answer.  And if they have a specific

10   targeted question about who created a particular financial

11   report we're happy to look into it if it's not clear from the

12   document.  So I don't mean to suggest that we're unwilling to

13   provide that information but they need to be targeted

14   requests about specific documents and then we can consider

15   them one on one.

16         But I don't think that Plaintiffs are in a

17   position where they are unable to determine or authenticate

18   documents.  That's something that I think is well within

19   their ability.  I don't think that we have frustrated that

20   effort in any way, shape, or form.

21         Another thing that Mr. Kildow has mentioned on a

22   number of occasions is that they don't have access to pricing

23   information.  Again, that's just not accurate.  We've

24   produced Vail Health's charge masters for the relevant

25   period.  We have also produced the payer contracts that

1  provide discounts off of those charge masters.

2            Then in addition to that in this most recent

3  production of data yesterday -- which the client had worked

4  very hard to pull together -- we have not only provided the

5  prices in the charge master and -- but we've also provided

6  exactly what Vail Health was paid for each encounter.  That

7  includes whether there were any discounts provided to the

8  patients, any discounts provided to the insurer, all that

9  information is there on an encounter by encounter basis.

10            So it's -- the idea that we haven't produced

11  information regarding pricing I think is really just not

12  accurate.

13            SPECIAL MASTER:  I understand.  But if I were to

14  take -- without seeing what you produced last night -- but

15  juxtapose that against the request in the motion to compel I

16  would have to say that's evidence of it not having been

17  produced before yesterday.  Or at least a portion of that.  I

18  don't want to in any way demean the work that you say has

19  been done, but really that might have -- had they had that

20  earlier -- avoided the necessity for today or tomorrow's

21  hearing.

22            That's what I'm interested in is cutting to the

23  chase about production of -- and as you heard me say to Ms.

24  Stevenson, I had written down a number of times here why not

25  now, when is that going to be produced because in several of

1   those referenced you were working to get that produced but in

2   some instances that was even back to September 2nd which is

3   now a month and a half ago.  If I take what you're saying I

4   can still not avoid the recognition that it wasn't -- part of

5   that wasn't previously produced.

6           MR. RICHARDS:  Your Honor, in our response to

7   their request for production which requested patient

8   information we stated specifically that we were willing to

9   meet and confer about producing a sub-set of that data that

10  did not include patient information.  Subsequent discussions

11  did not move that discussion forward.

12          When Plaintiffs filed their motion to compel it

13  became clear that we were not going to come to some kind of

14  mutual negotiated agreement about the scope of the

15  information produced, and we worked diligently to produce the

16  information that was available.  And so I don't think that

17  this is a situation where we stonewalled them until they

18  filed a motion to compel.  We stated our willingness to

19  confer about it.

20          I think, Your Honor, to a certain extent what

21  happens here is they have raised so many issues -- many of

22  which we view as meritless -- that some of the more important

23  issues for discussion have gotten lost in that back and

24  forth.

25          I think this is an example where stated in our

 1   response in good faith that we were happy to confer, and it

 2   was just flooded by a number of discovery disputes that were

 3   raised.

 4            I think the other piece of that, Your Honor, is

 5   that prior to the production yesterday we had produced

 6   sufficient information to determine the prices that Vail

 7   Health charged.  The reason for that is because we had

 8   produced in our initial production the charge masters that

 9   provide Vail Health's prices as well as the payer agreements

10   that provide discounts off of those prices.  So Plaintiffs

11   have been able to for months determine what Vail Health

12   charged for each procedure.

13            The charge master is very detailed.  It shows on a

14   procedure by procedure basis what price Vail Health charges.

15   So in some ways this is just additional information really as

16   to pricing.  This is not a situation where they were unable

17   to determine what our prices were.

18            In addition, Your Honor, we also produced

19   documents related to self-pay prices, and so that's another

20   area where for months we've produced documents that provide

21   information related to Vail Health's prices.

22            I think there were a couple of statements that Mr.

23   Kildow made that there is nothing that is not relevant in an

24   anti-trust case, and the entire scope of the Defendant's

25   business is subject to discovery.  You know, those

1   statements, he's pulling those from decisions that really

2   don't address discovery issues.  When you look at decisions

3   that address discovery issues in anti-trust cases it's not

4   unlimited discovery and it's not necessarily all relevant

5   information.  It's information that is relevant and

6   proportional to the needs of the case.

7        Here I think that those concepts are very

8   important, especially given the years of discovery that Vail

9   Health has been involved in with I guess these very same

10  Plaintiffs against exactly the same conduct that they're

11  complaining of.  So it's very important to keep that

12  proportionality concept in mind as we go forward.  That's

13  straight out of Rule 26.

14        I think in many cases Plaintiffs acknowledge that

15  Vail Health has produced much responsive information but they

16  just want that additional bit of information that they claim

17  hasn't been produced.  I think applying the principals of

18  proportionality we've produced these financial statements for

19  months.  We've produced pricing information for months.  So

20  we really have pushed to try to get them this information

21  that they need as soon as possible.

22        SPECIAL MASTER:  So two things.  One is it's hard

23  for me to tell -- I've asked and the questions I've heard you

24  respond -- I still have some hesitation in accepting it took

25  that long, even if it was whatever, 70 or 80 hours of work to

 1   produce that.  Especially on the eve of --

 2            I realize to a certain extent that you may not

 3   have control over that, but your client certainly knows that

 4   there have been previous orders for production of material

 5   and in too many instances that's been at a late point in

 6   time.  And so I'm concerned about that part of it.

 7            I agree that proportionality has relevance here,

 8   and I disagree with Mr. Kildow regardless of how he cited

 9   those cases.  I know you can always cherry pick language

10   there.  Anything and everything is not -- and I've already

11   mentioned that this Master and the Court do not agree that

12   anything and everything is --

13            So part of what as a Special Master and as a judge

14   we do is to also weigh, evaluate kind of the credibility of

15   the arguments as to what is and isn't appropriate.  But one

16   of the things about proportionality that is difficult for me

17   to understand is I've heard that before in the State case.

18   I've read it in this case, and I understand that but merely

19   saying it doesn't make it so.

20            My question is how do I give that any weight

21   without any other evidential representation as to how

22   burdensome that would be.  Because in some instances, such as

23   this production yesterday and ones that I've experienced

24   before in this case, then it is doable but it's hard for me

25   to say well it's overly burdensome since when pushed came to

 1   shove and it was ordered it was produced.  That's the

 2   challenge.  How do I give it the weight you want me to give

 3   it in terms of the proportionality factor, the evaluation of

 4   it?

 5             MR. RICHARDS:  Yeah.  Your Honor, I think that

 6   this is a situation where we're not -- we've produced this

 7   information.  It took some time to get it together -- and as

 8   the person who led the charge on collecting this information,

 9   I can tell you that there were real material burdens that

10   were imposed on Vail Health personnel to put this information

11   together.

12             We're talking people who were working on suicide

13   prevention data for the State that had to put that project

14   aside to work on this.  They did it and they did it as

15   quickly as they could, but there were real burdens.

16             But at the end of the day we have produced the

17   data and I don't think that this is a scenario where -- we're

18   not saying it's disproportionate.  We've already produced the

19   data.  So I think it's more with respect to other requests

20   that Plaintiffs may make that I raise the proportionality

21   point.

22             But they're real.  There are real burdens here

23   that are imposed on Vail Health.  So I think in terms of

24   what's happened in the State case, obviously discovery has

25   been hard fought in the State case.  Both parties in the

1    State case had been ordered to produce information that they

2    were dragged kicking and screaming against producing.  And

3    they did it.  When Vail Health was ordered to produce

4    information it did.

5            So I don't -- I think we went into this case with

6    the State Court history in mind and tried to produce things

7    as quickly as we could.

8            They also raised this issue of the number of

9    physical therapist employees.  I think we'd be happy to have

10   a discussion about providing that information in some way,

11   shape, or form.  I don't believe there's an interrogatory

12   requesting the number of physical therapist employees.

13           Instead what Plaintiffs requested were copies of

14   all employment agreements with physical therapists and what

15   we produced were exemplars of the employment agreements from

16   2012 through the present that show what employment

17   restrictions were in place.

18           The reason that Plaintiffs are interested in the

19   employment restrictions is because they claim that one of the

20   alleged categories of anti-competitive conduct is the

21   imposition of a non-solicitation agreements in physical

22   therapists employment agreements.

23           This is an issue that's been known in the State

24   case.  Obviously it was at issue in Mr. Chimino's employment

25   agreement.  In addition to that we produced employment

1    agreements from the relevant period that show that the same

2    or similar non-solicitation agreements still remain in place.

3         So there's really very little question about the

4    fact that non-solicitation agreements are in effect and Vail

5    Health believes that those are proper and not in any way

6    anti-competitive.  That will be an issue that we litigate on

7    the merits.

8         But in terms of Plaintiff's request to identify

9    all -- to produce all employment agreements we think for an

10   almost ten year period that's an issue where we believe

11   proportionality comes into play and we have produced

12   exemplars of the employment agreements for the relevant

13   period.

14        SPECIAL MASTER:  That's one of the types of things

15   that I did order in proportionality.  One of those was a ten

16   or twenty percent sampling, so --

17        MR. RICHARDS:  Yes Your Honor, and I think that

18   this is a similar approach, providing information that showed

19   these non-solicitation agreements remained in effect for

20   physical therapists, but each physical therapist employee,

21   producing their employment agreement is burdensome.

22        SPECIAL MASTER:  Well, I don't know if you have

23   anything else but I need to get a power cord for my other

24   computer that I have some of these things pulled up on and

25   then I'll get back to Mr. Kildow.

1    I really want to make sure that they've got plenty

2    of time to review -- to at least do an initial review of the

3    material that you provided.  In the end I am going to require

4    a follow up conferral, but we'll talk about the follow up on

5    all this.  I need to get a power cord.

6                    (Recess from 4:38 p.m. until 4:44 p.m.)

7                    SPECIAL MASTER:  Mr. Kildow, are you ready?

8                    MR. RICHARDS:  Judge, if I could just add one --

9                    SPECIAL MASTER:  Oh yes.

10                    MR. RICHARDS:  I just want -- given your comments

11   if an affidavit or something along those lines would be

12   helpful with respect to the pre-2015 data or the burden

13   involved in producing the data that we produced last night we

14   would be happy to provide that.

15                    SPECIAL MASTER:  I don't think that's necessary

16   for what's been done.  I was particularly referencing some of

17   the other pleadings in the motions response replies and your

18   argument on proportionality in saying that in regard to those

19   arguments in your pleadings I didn't have anything like that

20   to base it on, but I don't want to try to get too bogged down

21   in that, but I recognize that merely saying it doesn't

22   necessarily mean it's so, so keep that in mind in the future.

23                    But I hope we have a better course of conduct than

24   the recent history in terms of getting some of these things

25   produced without the necessity of extra work to do things

1   like affidavits or to have somebody do a study of how long

2   this would take because half of that time could be more

3   productively spent in just producing it.  So that's my view

4   but thank you for the offer.

5           MR. RICHARDS:  Thank you.

6           SPECIAL MASTER:  Mr. Kildow?

7           MR. KILDOW:  Thank you, Your Honor.  I'm going to

8   start with the document which was produced in the Brown

9   deposition.  I believe it was Exhibit 1.  It is a one page

10  document that goes from 2015 to 2020.

11          SPECIAL MASTER:  Are you trying to refer to it in

12  a way that we can see it?  My first question is do you think

13  we're going to be able to finish on time?  We were doing

14  really well I just want to make sure since we've taken a

15  couple of breaks.

16          MR. KILDOW:  I'll go as fast as I can.  I think

17  you know -- I'll pick this up.  Number one I was trying to

18  refer to this orally because I can't put it up.  It is the

19  exhibit, the one pager, that he put up.  I think that he

20  referred to this as a financial statement.  It's 2015 to

21  2020.

22          SPECIAL MASTER:  All right.

23          MS. BRAUNSCHWEIG:  I can email it if that would

24  help.

25          MR. KILDOW:  Well I don't think we have that much

1     time.  But email it to Judge Ruckriegle.

2               SPECIAL MASTER:  I recall it and I'll look at it

3     later.

4               MR. KILDOW:  It's not a financial statement, Your

5     Honor.  It is not.  It is nothing like any financial

6     statement I've ever seen.  Some very, very unusual things

7     that would be in any financial statement such as

8     contributions and direct costs, and how those things were

9     arrived at is simply impossible to derive.  So if we looked

10    at Federal Rule of Evidence 803 and 902, you were correct, we

11    would never get this into evidence.  It would be -- take a

12    monumental amount of testimony for anybody who prepared this

13    to put it into evidence.  And so if we had things broken down

14    as a financial statement along the lines of what I identified

15    to you before for each of these years that would be helpful.

16              I think we are absolutely entitled to that because

17    this is not a financial statement.  The direct costs, what

18    goes into the direct costs?  How do you come up with $6

19    million of direct costs in an entity that generates $16

20    million of revenue each year?

21              A contribution margin is an economic term that is

22    very important in an anti-trust case.  We have to know how

23    that contribution is arrived at.  Contribution margin just by

24    definition is an economic term.

25              SPECIAL MASTER:  So when you say you have to know

1  how that is arrived at are you saying that that needs to be

2  produced in discovery or is that more appropriate in a

3  deposition because it's a little hard to figure out how to

4  order that that be produced in a rather lengthy response to

5  interrogatory -- or in conjunction with an RFP.

6          MR. KILDOW:  That's why it was asked for financial

7  statements for all these years, and then once the financial

8  statement is produced we can do a deposition of the person

9  who has the best knowledge of those financial statements and

10 can identify how they arrived at $6 million of direct costs.

11         I think if you ask anybody how did you arrive at

12 this $6 million in 2015 for direct costs that's going to be

13 hard for somebody to testify to off the cuff in a deposition.

14 So that's why all we asked for is the same type of financial

15 statement information and back up that was produced for those

16 years, produced by somebody who isn't even an accountant and

17 isn't even in the financial department.

18         This would be very, very difficult to get into

19 evidence in any court of law.  It doesn't pass the muster of

20 902 or 903.  We don't even know who is competent to testify

21 to it.  We've asked for that information and they won't give

22 it to us.  That's why meet and confer could be very important

23 to truncating the thrashing around that we're going --

24         SPECIAL MASTER:  This is a truncated meet and

25 confer.  Only it's got me in it to give you some direction.

1           MR. KILDOW:  Well this is the first meet and
2    confer we've had.
3           SPECIAL MASTER:  Thank you.  I know, but that's
4    what I'm saying.  And you will have more.  But I think this
5    is -- the direction I'm going right now is what is requested,
6    what is needed versus requested.  I'm trying to get you to
7    recognize that distinction as well as Defendants to recognize
8    the difference between saying that something is overbroad and
9    burdensome and saying what is accomplishable.  So thank you.
10          I shouldn't have interrupted you because I was
11   asking if you were going to be able to finish on time.  I
12   appreciate you concurring on some of my observations there as
13   far as the evidence and admissibility.  So let me give you
14   the floor to finish.
15          MR. KILDOW:  Thank you.  I am on your side.  I'm
16   not in this just to spin the wheels.  I want to speed the
17   information that can be gotten into evidence that is -- as
18   the Lantec Court called -- reliable information.  Give it to
19   me, give us financial statements as we asked.  Give us the
20   name of somebody who can testify to that.
21          With respect to the pre-2015 -- anything that has
22   been destroyed at the time this information apparently went
23   off line and is no longer available, we had filed a motion to
24   amend the State Court complaint to include a monopoly claim.
25   So we've got an issue that needs to be addressed as to where

1  that information would go to -- where that information went

2  to, I should say.

3            We need information about the charge master.  How

4  was that charge master determined?  I have to tell you that

5  we deposed the two Senior Vice Presidents.  They didn't know

6  anything about prices, not involved in prices.  Brown

7  testified to the same thing before 2019.  He said, "He wasn't

8  me.  I didn't do it and I don't know anything about it."

9            SPECIAL MASTER:  That's a real easy thing for me

10  to just hit on the nail.  Who is that?

11            MR. KILDOW:  Yeah, that's what we want to know.

12  We asked --

13            SPECIAL MASTER:  Who is it?

14            MR. KILDOW:  Who is that person who --

15            SPECIAL MASTER:  Let me take over here.

16            MR. RICHARDS:  Your Honor, we identified the

17  individuals involved in putting together the charge master in

18  our interrogatory responses.

19            SPECIAL MASTER:  That's yesterday or you're

20  talking about before?

21            MR. RICHARDS:  Correct, in our interrogatory

22  responses that we served months ago we identified by name the

23  individuals that we believe were involved in preparing the

24  charge master in 2019 and in the prior years that we know of.

25            SPECIAL MASTER:  Back to you, Mr. Kildow.

1           MR. KILDOW:  With respect to the issue of

2   proportionality if we could have a meet and confer we could

3   have somebody identify from the Human Resources Department

4   the names of the individuals who are physical therapists for

5   each year and the type of employment contract and

6   restrictions on solicitation that they had and sign a

7   stipulation to that effect.  A stipulation to that effect

8   will get rid of a huge -- a not insignificant part of the

9   burden of the case.  I want to work with these people to

10  figure out how to do all of the discovery that is in play.

11          I'm not here to reinvent the wheel or to do things

12  that are unnecessary.  I want to be as efficient as possible.

13  I've spent 39 years of my life trying to figure out how to do

14  that and I think I have.

15          But Judge, when we ask for a meet and confer we

16  have to have somebody that's going to pick up the phone and

17  talk.

18          SPECIAL MASTER:  I made that point earlier.  I'm

19  not going to get sucked into this, Mr. Kildow, because I read

20  your letters and that language in there, you've read the

21  Court's order from Judge Martinez and after you requested

22  that he take over the discovery.  You have to understand that

23  he doesn't like that kind of acrimony.  And we've already

24  talked about that before.

25          So I don't think you've quite figured it out, and

1  I haven't quite figured it out.  But the point is if you --

2  if there was going to be a meet and confer that kind of

3  language cannot be involved in it, so just keep that in mind

4  in the future because you're going to be meeting and

5  conferring.  That's where I started this hearing.

6          MR. KILDOW:  (inaudible) and you have our

7  commitment that we will do it.  The issue with Judge Martinez

8  -- I don't want to get in that --

9          SPECIAL MASTER:  That's long ago.  But let me have

10 you finish because I do want to wrap this up and then have

11 time to get ready for tomorrow and a couple of other things.

12         MR. KILDOW:  That's my request.  Financial

13 statements, somebody who can testify to them, a stipulation

14 on the physical therapists.

15         SPECIAL MASTER:  It sounds like they're not going

16 to give you a stipulation unless you're willing to work on

17 that, and that would be a conferral.  So are you willing to

18 accept some sampling?

19         MR. KILDOW:  Yes.

20         SPECIAL MASTER:  Let's work on that.

21         MR. KILDOW:  Apparently there's two or three types

22 of agreements, so what they are and which ones apply to which

23 people.

24         SPECIAL MASTER:  And not a total list of

25 everybody.  I just believe in being open and I think that

1    we've been able to accomplish quite a bit.  That's what this

2    type of hearing is certainly about.  It's different than

3    maybe some true evidentiary hearings.  So anyway, do you have

4    anything else to add?

5              MR. KILDOW:  That's it, Your Honor.

6              SPECIAL MASTER:  Thank you very much.  And so with

7    that in mind you're going to have the opportunity to review

8    the material that was produced yesterday, and then we'll

9    maybe start off with a brief summary of that.  And I don't

10   want to go into every detail but I want to have some

11   understanding of what the parameters are that we might be

12   needing to deal with.  Then we'll move into motions to compel

13   three and four.

14             I guess at some point we'll recognize the reality

15   of motion five and the response and reply time on that.

16   Anything else?

17             MR. RICHARDS:  Your Honor, just very briefly.  Mr.

18   Kildow made this point about the information we produced not

19   being financial statements.  That information is pulled

20   directly from Vail Health's financial system.  The important

21   -- it's not manipulated in any way.  It's exactly as it's

22   maintained in the ordinary course of business.  It's unclear

23   to me why he doesn't kind of trust or believe that.

24             But the key point to understand here is that

25   Howard Head is just a business unit within Vail Health, so

 1  Howard Head doesn't have audited financial statements in the

 2  same way that a parent company would.  So it's just an

 3  important point to understand.  The information that was

 4  produced is what's maintained in the ordinary course of

 5  business, and that's the key point.

 6         SPECIAL MASTER:  Well, I did address that as me

 7  having some difficulty in perceiving that as any financial

 8  statement that I'm accustomed to viewing in my tenure.  But

 9  we'll for now move beyond that and take the recess for the

10  evening.

11         I hope Mr. Kildow that you and Ms. Braunschweig

12  can accomplish the connection tomorrow because it can be

13  done.  Maybe you need to start earlier and get that

14  assistance if necessary.

15         MR. KILDOW:  I think I'm going to have to drive

16  down to Edwards to the only real computer shop in town and

17  have them pull some applications off and re-establish them.

18  I think that's what I'm going to have to do.

19         SPECIAL MASTER:  And you do have the information

20  that was provided by Angela about what -- how you have to

21  connect from Judge Gallagher's instruction sheet, right?

22         MR. KILDOW: I do have that and I've talked to the

23  technical people at the United States District Court in

24  Denver.  I have been informed that your app might be subject

25  to other uses of that application that require -- they

1   basically corrupt your attempts to get into this application.

2   But I probably just need to pull one off and put a new one

3   up.

4            SPECIAL MASTER:  Well it was -- I didn't get it

5   the first time or the second time, but I did after that and I

6   was able to recreate that today, so I'm confident that with

7   maybe some assistance you'll be able to do that.

8            Anything else before we adjourn and reconvene at

9   1:00 tomorrow?

10            MR. KILDOW:  Not for Plaintiffs.

11            MR. RICHARDS:  Not from Defendant.

12            SPECIAL MASTER:  Thank you and have a good

13   evening, everyone.

14                    (Time noted:  5:04 p.m.)

15                        *  *  *  *  *

16                         CERTIFICATE

17       I, RANDEL RAISON, certify that the foregoing is a

18   correct transcript from the official electronic sound

19   recording of the proceedings in the above-entitled matter, to

20   the best of my ability.

21

22

23   _____          November 12, 2021

24   Randel Raison

25