1

1    UNITED STATES DISTRICT COURT
DISTRICT OF COLORADO

2

3    SPORTS REHAB CONSULTING,      .   Case No. 19-cv-02075-WJM-GPG
LLC, a Colorado limited     .
4    liability company, and      .
LINDSAY WINNINGER, an       .
5    individual,                 .
.
6         Plaintiffs,            .
.   Wayne Aspinall Federal Bldg.
7    vs.                         .   402 Rood Avenue
.   Grand Junction, CO  81501
8    VAIL CLINIC, INC.           .
doing business as           .
9    VAIL HEALTH,                .
a Colorado nonprofit        .
10   corporation,                .
.
11        Defendants.            .   October 22, 2021
. . . . . . . . . . . . . . .   1:06 p.m.
12

13   **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
**WILLIAM T. RUCKRIEGLE, SPECIAL MASTER**

14   APPEARANCES:

15   For the Plaintiffs:          Law Office of Allan L. Kildow
By:  Allan L. Kildow
16                                By:  Sonya Braunschweig
709 Potato Patch Drive
17                                Vail, CO  81657
(970) 390-6675
18
For the Defendants:          Davis Graham & Stubbs, LLP
19                                By:  Shannon Wells Stevenson
By:  Daniel Richards
20                                1550 17th Street
Suite 500
21                                Denver, CO  80202
(303) 892-9400
22
Court Recorder:              Clerk's Office
23                                U.S. District Court
402 Rood Avenue
24                                Grand Junction, CO  81501

25

1    Appearances continued:

2    Transcription Service:          AB Litigation Services
                                     216 16th Street, Suite 600
3                                    Denver, CO  80202
                                     (303) 296-0017
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.

3

1              (Time noted:  1:06 p.m.)

2              SPECIAL MASTER:  I see Ms. Stevenson, Mr.

3   Richards, Ms. Braunschweig.  Do we have Mr. Kildow?

4              MR. KILDOW:  We do Your Honor, but by phone.  I

5   went to the computer doctor this morning.  I spent about 45

6   minutes with him and thought that I had it fixed but I have

7   tried it three times and I still cannot get in.

8              SPECIAL MASTER:  Well we'll be with you on phone.

9              We're ready to proceed with 19CV02075, Sports

10  Rehab Consulting v. Vail Clinic dba but known as Vail Health

11  is how I think most of us address the Defendant.

12             So before we take up motion to compel number three

13  are there any updates or preliminary matters for me?  I think

14  there was going to be -- oh yes, a review of all the material

15  that was provided by Vail Health after 5:00 on Wednesday some

16  time.

17             I'm not pushing that that was actually

18  accomplished as opposed to preparing for these hearings, so

19  just let me know what's the status on that or anything else,

20  Mr. Kildow?

21             MR. KILDOW:  Your Honor, we have gone over the

22  information that was provided and I don't know how much

23  detail you want to get into but it is significantly short of

24  what was asked for and has major holes in it.

25             Vail Health has information that is 95 percent

 1   complete in databases or in their servers that already exists

 2   and --

 3          SPECIAL MASTER:  Well I definitely didn't want to

 4   get into argument.  That one, which I've heard quite a few

 5   times.  But the point was I wanted to see if you had

 6   reviewed, what the status was.

 7          I heard significantly and I guess then we'll have

 8   to take that up as it goes, either as it relates to what

 9   we're doing today or at the end of the day I intend to -- I

10   hope we have sufficient time left to talk about how we

11   proceed going forward.  We've got motion to compel number six

12   and we've got some follow up on this.

13          So with that, is there anything else -- are you

14   going to need -- how much times are you going to need to be

15   able to evaluate what you think the deficiencies are?

16          MR. KILDOW:  A matter of days.  We've pretty much

17   identified the deficiencies.  We have a proposal for how to

18   proceed, but maybe we can take that up at the end of the

19   hearing.  I think today is going to be shorter than

20   yesterday.  But we have an idea of the correct way to proceed

21   on this.

22          SPECIAL MASTER:  Just to follow up on my comments,

23   that's not a maybe, that's a will.  I mean we will talk about

24   how to follow up with that and how to proceed on some of the

25   others.  So thank you.

5

1          Any other counsel have anything to address before

2  we dive into number three?

3          MR. KILDOW:  Yes, Your Honor.  I have one short --

4  at the end of the day we were finishing up on motion to

5  compel number two I just wanted to reiterate -- because I

6  think we were kind of cut short from a time standpoint --

7  that one of the pieces of information that Plaintiffs really

8  stress that they request is the private insurance payers and

9  the Medicare claims for the relevant period.  That's really

10  important.  It was dealt with in some detail in our motion

11  and reply.  That's all I wanted to emphasize once again.

12          SPECIAL MASTER:  Well I certainly didn't mean to

13  cut anybody short.  I think -- however it evolved towards the

14  end of that I did ask you to wrap it up but here's where I

15  perceive the challenge from my standpoint, and I think all of

16  you need to understand what I have as a challenge because

17  that's the line of communication that we need to have pretty

18  clearly made.

19          That is this difference of position with regard to

20  availability of the Medicare in particular.  I tried last

21  night to sort of refresh my recollection on my own about some

22  of the issues that we had with regard to Medicare and

23  Medicare billing.

24          So that's something that I am willing to give

25  brief time to.  The reason I say brief is not to cut you off

6

1   but to say I want to be focused.  I know the umbrella

2   arguments and I know the primary arguments that talk about

3   significant and so forth.  I want to know about the fine

4   tuning on in particular that availability.

5           So we can take that up now or we can take it up

6   later.  We're going to have plenty of time to get three and

7   four in today.

8           MR. KILDOW:  We can take it up now as far as I'm

9   concerned.  It actually goes together with part of number

10  four, but we can squeeze it in now.  It's up to you, Your

11  Honor.

12          SPECIAL MASTER:  If it goes better with four and

13  it might have some relationship then let's just get back to

14  it at that point in time.

15          The motion to compel number three is 132, the

16  response to motion to compel three is 154, and the reply is

17  171.  Is that accurate?

18          MR. KILDOW:  I believe it is, Your Honor.

19          MS. BRAUNSCHWEIG:  I think I'm showing the reply

20  as 163.

21          SPECIAL MASTER:  I believe motion to compel four

22  is 176.  I believe the response is 192 -- motion to compel is

23  157, response is 176, and reply is 192.

24          MS. BRAUNSCHWEIG:  Correct.

25          SPECIAL MASTER:  You may proceed.

1          MR. KILDOW:  Thank you.  Number three can be

2   summarized as a request for board minutes and agendas of the

3   Vail Health Board in an unredacted way from November 1, 2012

4   to the present.  Request for finance committee minutes and

5   agendas, steering committee meeting minutes, answers to

6   interrogatory for potential witnesses, and a privilege log.

7   The privilege log has been produced so we'll deal with that

8   later.

9          SPECIAL MASTER:  So when was that produced because

10  obviously as of the filing it wasn't.  I didn't hear anything

11  about that yesterday.

12          MR. KILDOW:  The date of production is in motion

13  to compel number five.  Sonya, do you have that date?

14          MS. BRAUNSCHWEIG:  September 10th.

15          SPECIAL MASTER:  Okay.

16          MR. KILDOW:  Starting with the Board minutes, they

17  have produced some Board minutes for certain periods of time

18  but they have redacted the Board minutes.  For example, on

19  July 15 they've redacted them, October 3, 2016, January 9,

20  April 10, and July 3, 2017.  And January 8, 2018.

21          But we contend that the Board minutes -- oh and

22  July 5, 2015 there was a Board of Directors meeting where

23  Michael Sheehan made a presentation on a strategic alliance

24  with the Steadman Clinic.  The presentation has not been

25  produced and we would ask for that.

1           The minutes also reflect that the Board approved a

2   number of Steadman and Research Institute agreements, but

3   Vail Health has not produced those Board approved agreements

4   either.  So we would ask for all unredacted minutes and that

5   the PowerPoint presentation presented for the first time on

6   August 6, 2021 be produced.

7           Your Honor, we'll get into this more in number

8   four.  These are very significant transactions that we're

9   talking about that the Board considered and approved.  The

10  Steadman Institute values the $43 million in "charitable

11  contributions" that it would make to SPRI to be worth $175

12  million.  We're not talking about chump change here.  These

13  are very, very significant issues that the Board of Directors

14  which represents not only the non-profit entity but the

15  community as well should be reproduced in unredacted form.

16          As to the next issue about finance committee

17  documents, these are very significant because the finance

18  committee is the entity that reviews the financial issues

19  that confront Vail Health.  We should be entitled to receive

20  those finance committee minutes.  We do not have those -- any

21  of them at all.

22          Then we should have also the minutes of the

23  steering committee.  That steering committee is directly

24  relevant to a number of issues.  It's relevant to market

25  share, geographic markets, it involves the expansion into

1  Summit County and parts of Pitkin County by both Vail Health

2  and the Steadman Clinic.  So we feel that the finance minutes

3  and the steering committee minutes should be produced.

4         Now the next I think is one of the most easily

5  understood of our requests is for example in interrogatory

6  number two we've asked for the identity of witnesses that

7  were involved in the collaborations regarding the strategic

8  partnerships, joint ventures, collaborations, combinations,

9  however they're denominated.

10        SPECIAL MASTER:  Are any of the exhibits that you

11  submitted accompanying 132 those requests?  I would prefer to

12  have it if it is one that shows Vail Health's response to

13  that.

14        FEMALE:  Your Honor, docket 128 will show you

15  that.

16        SPECIAL MASTER:  Let's proceed.

17        MR. KILDOW:  Looking at page 24 of the Vail Health

18  responses, the important part as far as this presentation is

19  that Vail Health says that incorporates the objections to

20  interrogatory number 11.  Given that incorporation of the

21  objection to number 12 we have to go back to page 20 for the

22  response to interrogatory 11.

23        SPECIAL MASTER:  I note that there's a slight

24  difference in the numbering.

25        MR. KILDOW:  Probably.

1                 SPECIAL MASTER:  It's page 19 in terms of their

2   response.

3                 MR. KILDOW:  In the hard copy it's 20.  We'll go

4   with 19.

5                 SPECIAL MASTER:  That's fine.  If you're talking

6   about the hard copy page then I do see that begins on page

7   20.

8                 MR. KILDOW:  Okay.  So basically these objections

9   can be divided into four or five different subject matter and

10  the first one if we look at four lines down from the top,

11  they object on the grounds that the information has been

12  covered in the State Court action.  That simply is not true.

13                What we got in the State Court action was copies

14  of the four letters of intent between the Steadman Clinic and

15  Vail Health to form this joint venture.  That's what we got.

16  This issue really wasn't an issue in the State Court action.

17  It had nothing to do with a combination relating to a

18  monopoly.  So there is no State Court action in discovery

19  relating to these Board minutes and issues relating to what

20  is asked in interrogatory 12.

21                On the right hand -- on page 21 at the top the

22  objection is that the Plaintiffs are seeking information not

23  relevant to any party's claim or defense insofar as the

24  requested information regarding joint ventures,

25  collaborations, strategic etcetera outside of Vail Valley is

1    concerned.  Plaintiffs allege only a monopoly to physical

2    therapy services in Vail Valley.

3             Now here is the relevance of what the parties --

4    that is the Steadman Clinic and Vail Health -- are doing in

5    Summit County.  This is going to take me a second.

6             If this was a single market, if Breckenridge,

7    Frisco, Summit were part of the same geographic market as the

8    Vail Valley there would have been no need for Vail Health to

9    expand its facilities, or Steadman to expand its services in

10   Summit County.

11            If there was capacity in terms of operating suites

12   for the Steadman folks, if there was adequate capacity for

13   the physical therapy services in Vail, if these are one

14   geographic market we would just say to the people in

15   Breckenridge if you need physical therapists you just drive

16   over to Vail.

17            The fact that they put those additional

18   facilities, and are expanding them significantly,

19   demonstrates as proof that the two are not the same market.

20   Summit County and the Vail Valley are separate geographic

21   markets.  I think we referred to in our reply to a recent

22   statements, one the Chief Executive Officer of Vail Health,

23   Will Cook, was recently quoted in a Summit newspaper saying

24   that the reason they are expanding over in Dillon is for one,

25   the convenience of the parties, and two, reducing the price

1   of the services.   That is direct evidence that Vail Health

2   admits that they are separate entities.

3             And in the deposition of Mr. O'Bryan, he testified

4   in his deposition on October 9th that the two are separate

5   markets.

6             So what happens over there is significant and

7   relevant from a geographic market standpoint, and it's also

8   relevant from a monopoly power standpoint because if Vail

9   Health did not have adequate operating suites in Vail and it

10  expanded over to Summit County it would be proof that they

11  had what's called in the economic part of anti-trust law

12  restricted output.   Monopolists have a greater degree of

13  monopoly power when there is inadequate productive capacity.

14            So that is a nutshell, two of the areas of

15  relevance.   I would point out -- it's an old case but it was

16  written by Bryan White from Colorado -- a 1962 case called

17  Continental Ore.

18            In that case the Supreme Court reversed the

19  District Court's exclusion of evidence of monopoly conduct of

20  the defendant that occurred eight years before -- or six

21  years before the company even came to the United States.   The

22  monopoly conduct occurred in Europe six years before the

23  company even came to the United States and was later charged

24  with Section 2 violations.

25            SPECIAL MASTER:   Citation please.

1          MR. KILDOW:  I can get it.

2          SPECIAL MASTER:  I will allow Ms. Braunschweig to

3   jump in whenever I make that request because I know she's a

4   little quicker on it.

5          MR. KILDOW:  I need 30 seconds to get it to you.

6          SPECIAL MASTER:  I do want it.  Let's go ahead.  I

7   don't want to distract you.  I apologize.

8          MR. KILDOW:  That's okay.  The next issue is that

9   the information is burdensome.  But the fact of the matter is

10  that Vail Health subscribes to a software system that

11  collects all of this information, it stores all the Board

12  documents, and these are readily available.  The software

13  system is called -- I have it, but all of the information

14  that we are asking is readily stored on Vail Health storage

15  systems for the Board minutes.  So the burdensome objection

16  really doesn't pass muster.

17         So that in a nutshell is where we stand on

18  providing us with the names of the individuals who were

19  involved.

20         I should say that there's one additional issue on

21  the issue of relevance that I don't want to overlook.  It's

22  very clear that Steadman was a competitor in the physical

23  therapy area.  Like many orthopedic groups who are starting

24  their own standalone physical therapy practice, Steadman was

25  considering doing the same thing and told Vail Health

 1   management so.

 2          That makes them horizontal competitors yet they

 3   went forward and exchanged information on prices of physical

 4   therapy and what would be charged for that group and for

 5   Summit County.

 6          So for all of these reasons this information that

 7   we're asking for is relevant.  Unredacted Board minutes,

 8   steering committee and finance committee minutes.

 9          The next issue relates to the attorney/client

10   privilege log.  We asked for the privilege log over a period

11   I believe of nine or ten months, and we did not get one until

12   the first part of September.  The privilege log contains over

13   500 entries on it.  We won't get into the details of that

14   because we have motion number five.

15          We said this does not comply with the requirement

16   of what information must be contained on the privilege log.

17   They said we'll go back and we will look at it and revise it

18   in certain ways, and we will provide that to you by a certain

19   date identified in our motion.

20          You know what?  We never got that reply.  They

21   didn't produce the privilege log after months, and months,

22   and months until after we filed this motion under Rule 37.

23   If we hadn't filed this motion we wouldn't be in the place of

24   having any kind of privilege log regardless of how inadequate

25   it is.

1        So this is another example where if we don't file

2    a motion under Rule 37 we don't get the information.   For

3    that reason -- we have spent a lot of time on these motions

4    -- we are entitled to attorney's fees for having to bring

5    this motion to get the privilege log, even as inadequate as

6    it is, and we will be discussing the details of that

7    privilege log at a later point in time.

8        So I think that's where we are, Your Honor, for

9    that motion.

10        SPECIAL MASTER:   Response?

11        MS. STEVENSON:   Thank you, Your Honor.   I'll start

12    with the Board documents.   If we could look at request 15 on

13    page 41 of docket 128.

14        So the request was for all agendas, minutes,

15    minutes of action, and all other records of the Board of

16    Directors of Vail Health and all committees of the Board of

17    Vail Health from 2004 to the present.   In response we said

18    we'll produce all of the agendas and minutes of the Board

19    that have any relationship to Howard Head or physical

20    therapy, and that's what we've done.

21        With respect to the redactions of information in

22    the Board documents, just to put it in context, obviously the

23    Board is supervising the entire Vail Health Hospital system.

24    The amount of time spent on Howard Head and physical therapy

25    is not much, but we provided all of the Board minutes and

1  agendas that do relate to it.

2        We've cited authority for the proposition that

3  redactions in Board minutes are proper for relevancy, and I

4  think there's an important point here.  We do have a

5  protective order in this case but Plaintiff has most recently

6  filed a motion challenging keeping the documents that we are

7  identifying as confidential or attorneys eyes only under seal

8  based on his belief that this information from this community

9  hospital should be publicly available.

10        So we do have pretty serious concerns about saying

11  we'll give you all of this stuff that has no relevance to

12  this case that is otherwise rather sensitive information

13  given the risk that Plaintiff is asking for it to all be made

14  public.  And it is not relevant to the case.

15        Your Honor, we have logged all of those redactions

16  and this isn't an extraordinary number of documents.  I do

17  think that if there was a need for in camera review we could

18  do that.  But I think in this case where there is very

19  obvious and discrete information relevant to the case and a

20  tremendous amount of information that is not that redactions

21  in this narrow instance are appropriate.

22        SPECIAL MASTER:  One of the questions I had

23  reflected on and anticipated asking today is where in the

24  middle of all this would an in camera review come in to play

25  because the disparate positions of the parties here is --

1   can't be resolved any other way, from my historical

2   perspective, not just in this case but generally when it gets

3   down to that type of thing.

4          If it's redacted I can't tell what that is either

5   attorney/client, or a relevance issue, or a confidentiality,

6   and so that's the concern that I have about us even

7   continuing with that -- well first was going to be the

8   privilege log.  Now there has been one.  There's a question I

9   guess of a follow up to that, but ultimately what about in

10  camera review.

11         So you touched on that and you can -- I don't want

12  to take you off track of your argument.

13         MS. STEVENSON:  I think we would be certainly fine

14  with that.  I mean it is a little bit odd because certainly

15  there are some Board minutes that we have deemed to be non-

16  responsive altogether and obviously the Court wouldn't review

17  those in camera.

18         You don't often have the Court reviewing material

19  that has not been produced for being non-responsive in camera

20  but I think here -- if the argument is because there's a

21  mention of Howard Head in one spot of the Board minutes it

22  seems like there could be some relationship to another topic

23  that the Board covered that day, I think if the Court wanted

24  to review those in camera we would certainly have no problem

25  with that.  Again, it's not an overwhelming amount of

1  material.

2        So the request was for production of all other

3  records of the Board of Directors and all committees of the

4  Board of Directors from January 1, 2004 to the present.  I

5  would find that request to be certainly not proportional to

6  the needs of the case.

7        In particular because any document that would

8  likely have been presented at a committee that was relevant

9  would have been picked up in our searches of the key people

10 involved with the issues related to this case, including Nick

11 Brown and Doris Kirchner, and that to review all of that

12 material is an extremely broad request.  I'm not even quite

13 sure what it means.  It would be overly burdensome and

14 unlikely to reveal anything that has not already been

15 produced in the case.

16        SPECIAL MASTER:  I commented yesterday about the

17 all, and of course that is of concern to the Special Master.

18 And something as broadly as all committees, I have no idea

19 what those are.  But do you have the same position since

20 we've talked about steering committee, finance, and so forth

21 of those in particular?

22        MS. STEVENSON:  This is the first time Mr. Kildow

23 has mentioned those particular committees.  I don't know how

24 extensive those records would be.  I'm happy to go ask, but

25 again, I just think it's extremely unlikely that there would

1   be anything found there that hasn't already been produced

2   from much more logical sources.

3           SPECIAL MASTER:  Why is that?

4           MS. STEVENSON:  Because Your Honor of the searches

5   that we've run and the extraordinary number of documents

6   we've reviewed on the files of Mr. Brown and Doris Kirchner,

7   who would have been the people involved in any such

8   presentation or communication with these committees.

9           SPECIAL MASTER:  I guess -- well, that's up to

10  their retirement so we do have since then, right?

11          MS. STEVENSON:  That's true although Mr. Brown

12  just left Vail Health at the end of April of this year so

13  that's --

14          SPECIAL MASTER:  Right, not as far back.

15          MS. STEVENSON:  We also did this for Will Cook,

16  who was the CEO who took the place of Ms. Kirchner.

17          SPECIAL MASTER:  So that's three, but I don't

18  right now have clear recollection of other names.  I hear you

19  saying it would likely -- but isn't there a better way by

20  really looking for the names of those committees in

21  particular?

22          MS. STEVENSON:  I don't know.  I mean obviously we

23  were looking at a request for all other records so that's a

24  lot of material to dig for.  I just think that the likelihood

25  that there would be anything there not already produced is

1   tiny.  It seems pretty remote.

2              SPECIAL MASTER:  I cannot -- I'm not in a position

3   obviously to have a frame of reference with regard to Vail

4   Health's response that the material was produced in the State

5   case, even if I were to have a refreshed recollection of what

6   all was ordered to be produced in the State case, but I know

7   that we had those discussions several times.  I don't know

8   what the rest of it is, so that's a concern that I have in

9   addition to --

10             MS. STEVENSON:  I'm not quite sure I understand

11  your -- I mean we looked at all Board meeting minutes from

12  2012 forward, which is what the Magistrate Judge had ordered

13  us to do.  I think there were a few that had been produced in

14  the State case but we reviewed all of them and produced any

15  additional ones that had not already been produced.

16             SPECIAL MASTER:  Okay.

17             MS. STEVENSON:  Mr. Kildow mentioned one

18  presentation related to Steadman that I think he saw

19  referenced in a Board minute.  We have produced all of the

20  documents relevant to any potential joint venture with

21  Steadman that relates to physical therapy.

22             Obviously Vail Health has a lot of dealings with

23  the Steadman Clinic that don't have anything to do with

24  physical therapy.  It's the orthopedic practice of the

25  hospital and is an enormous part of its business, and it has

21

1    a lot of relationships with Steadman with respect to that

2    orthopedic practice.  Again, it doesn't have anything to do

3    with physical therapy.

4              So we have produced everything related to Steadman

5    that concerns any joint venture that has a bearing on

6    physical therapy.  I think he was just blurring that line

7    saying because there was something about Steadman it should

8    have been produced.

9              SPECIAL MASTER:  Anything relating to physical

10   therapy.

11             MS. STEVENSON:  Correct.  I think that is

12   everything related to the Board question.  Then Plaintiffs

13   have raised a number of issues related to our responses to

14   interrogatories.  I would note that Judge Martinez did review

15   those in his order in docket 113 and said we had provided

16   substantive detailed responses to the interrogatories and

17   that the Court discerned no abuse of discovery practices.

18             But to be specific and to go to the one that Mr.

19   Kildow brought up with you which is interrogatory 12, there's

20   a lot of dents -- material here.

21             If you look at 12 it asks for a lot of things but

22   they're all physical therapy treatment relating to any joint

23   venture, collaboration, or strategic partnership.  Do you see

24   that?

25             SPECIAL MASTER:  I'm looking at it.

1          MS. STEVENSON:  So if this request is about stuff

2    related to this joint venture, collaboration, or strategic

3    partnership which Plaintiffs defined in their interrogatories

4    to be the specific proposed joint ventures with the Steadman

5    Clinic and Vail Summit Orthopedics.

6          If you go back to interrogatory 11 on the

7    preceding page there we said, "Subject to and without waiving

8    those objections," and then we provided all kinds of

9    information including participants in the discussions,

10   relevant documents, and conversations about each of those

11   joint ventures that Plaintiffs had asked for information

12   about.

13         I can tell you we produced -- we mention here

14   documents that have been produced in the State case, but

15   we've produced an enormous number of documents about all

16   three of those things in the Federal case, including the VSO

17   joint venture which related to Summit County.

18         SPECIAL MASTER:  The question that I had about in

19   camera review, you know this is one of those situations that

20   comes up once in a while between counsel sometimes in

21   discovery where there's a claim of non-production and then

22   there's a response that we've produced it.

23         How would you -- particularly in light of these

24   cases -- the State and the Federal -- there's a fair amount

25   of acrimony between the parties and sometimes too often

1  between counsel.  I already talked about that yesterday.

2          And the point is that I'm not sure how to resolve

3  that other than spending a fair amount of time reviewing

4  those productions in order to be able to say yes you did

5  produce or no you didn't produce.  I'm wanting to know if

6  there's another way that you see that that could be --

7          MS. STEVENSON:  Your Honor --

8          SPECIAL MASTER:  -- especially when it goes to

9  relevance.

10          MS. STEVENSON:  In our response on this motion --

11  at least Exhibits 5 and 6 -- we attached compilations of

12  documents that were reflecting these exact negotiations.  I

13  think there are many more than the ones we attached but we

14  just wanted to show --

15          SPECIAL MASTER:  So again, I can't go back and

16  forth.  So response is 163.

17          MS. STEVENSON:  154.

18          SPECIAL MASTER:  Exhibits --

19          MS. STEVENSON:  5 and 6.  Should I continue on?

20          SPECIAL MASTER:  Yes.

21          MS. STEVENSON:  You know, and then again back to

22  this sort of geographic market, I think Mr. Kildow's

23  statement that opening a new clinic somewhere means that

24  that's a new market, I mean there are multiple Howard Head

25  clinics within the Vail Valley so I think that's sort of a

1   logically fallacious point.

2           But again, they requested information about the

3   proposed joint venture with Vail Summit Orthopedics.  We have

4   produced all the documents that we could find on that

5   proposed joint venture.  They also did a subpoena to Vail

6   Summit Orthopedics and got all their documents on that.  So I

7   think that topic is pretty well covered.

8           Then finally with respect to the privilege log, we

9   had assured Plaintiffs repeatedly that we were providing a

10  privilege log.  We were trying to complete our document

11  production first.  Of course, we had the court order us just

12  as we were finishing our initial production to then expand

13  our review back to 2012, which we did.  We completed that

14  production on August 6th.  At that time Plaintiffs also had

15  not produced a privilege log.

16          I think within about a week of that date they

17  filed their motion complaining about our privilege log, and

18  our response was that we will have it done by September 10th,

19  and we gave it to them on September 10th.  I know that

20  Plaintiffs have filed another motion on this and we've been

21  discussing with them some of the questions that they had.

22          So with respect to the length of it, that's part

23  of the reason it took a long time to get together, and one

24  reason for the length is that we individually logged -- when

25  we had an email string we individually log each email so that

1  the basis for privilege was articulated for each entry, which

2  generates quite a long document.  I don't think there's

3  anything inappropriate about that.  We reviewed lots, and

4  lots, and lots of documents to make our production and there

5  was a lot to put on the privilege log.

6           SPECIAL MASTER:  Mr. Kildow was saying that you

7  hadn't followed up on the re-evaluated privilege log.  Did

8  you just now say that you have?

9           MS. STEVENSON:  No, we have been working on it and

10  I think we have about three to four hours left of work to do

11  to address the concerns that they've raised.

12           SPECIAL MASTER:  Thank you.  Sounds like you were

13  finished, Ms. Stevenson?

14           MS. STEVENSON:  The only other thing I would add,

15  Your Honor, is Mr. Kildow didn't raise them in his argument

16  but in the brief it did mention a few other interrogatories

17  and I just wanted to make sure that the Court realized that

18  in those interrogatories we refer back to our answers to

19  earlier interrogatories.  We refer back to our responses to

20  interrogatories like one, two, three, and four.  And that's

21  where we answered all of these questions substantively.  I

22  just wanted to make sure that was clear.

23           SPECIAL MASTER:  You mean clear that that was your

24  position?

25           MS. STEVENSON:  Well clear that the response was

 1   referring back to the answers to earlier interrogatories.

 2           SPECIAL MASTER:  Okay.  Well yesterday as I

 3   mentioned I was concerned about the -- but Vail Health will

 4   produce thus and so -- now that we're talking about the

 5   privilege log -- at a later in point in time and here we are

 6   -- respectfully they filed motions, now there have been some

 7   both production and there has been a privilege log but

 8   there's more to come.  The concern is that it has had to at

 9   least sequentially -- just as the production from Wednesday

10   just preceded these hearings, some of these productions have

11   come about after filing motions.

12           MS. STEVENSON:  Your Honor, which --

13           SPECIAL MASTER:  Your position about why, you

14   know, the burdensomeness and how people have been working on

15   those but I mean I'm trying to  make sure that now that I

16   have that responsibility on addressing these motions to

17   compel that we can really get more timely responses,

18   productions for what you're going to produce than there has

19   been.  Go ahead.

20           MS. STEVENSON:  With respect to the privilege log,

21   again it was quite long and I think we completed it about a

22   month after we finished our document productions.

23           Certainly Plaintiffs had no reason to doubt that

24   we were going to give them a privilege log.  We had assured

25   them that we would, you know, we just needed to get the work

1   done and finish it, and there's many obligations going on in

2   this case and in other cases.

3          I think the only other production that's occurred

4   since we finished our production on August 6th is just that

5   patient data which, you know, when I look back at the record

6   on that I think the trouble -- and Mr. Richards alluded to

7   this yesterday -- is last communication we had had from

8   Plaintiffs on that was a chart raising 46 different discovery

9   dispute issues.  It's hard to triage which of those are

10  serious and which of them they want to file motions to compel

11  about.

12         I think a heads up of we're going to file a motion

13  to compel on this issue by such and such date would be

14  helpful, but it is quite difficult when you receive a chart

15  of 46 discovery issues to respond to them all immediately.

16         SPECIAL MASTER:  Anything else, Ms. Stevenson?

17         MS. STEVENSON:  I think that's everything I have

18  with respect to motion to compel number three, Your Honor.

19         SPECIAL MASTER:  Mr. Kildow, reply?

20         MR. KILDOW:  I'll try to be as quick as I can.

21  The Special Master has raised a good point, a very good

22  point, about what is -- what has been produced in the State

23  Court and what has not been produced in the State Court,

24  what's relevant and what is not.  There is a Magistrate in

25  the District of Colorado -- I think Ms. Wayne, but I can't be

1  certain.  I should have that case in front of me but I don't

2  -- who has an excellent resolution when a party says this has

3  already been produced in prior litigation.

4         When Vail Health makes that -- asserts that they

5  do not provide any substantive or definitive statement of

6  what was produced.  Of course the Plaintiffs disagree

7  vehemently with about 90 percent of that.

8         The solution that the Magistrate in the District

9  of Colorado came up with is when you say this has already

10 been produced just give us the Bates numbers so then the

11 other side can identify those and say oh yes, you did produce

12 it before and I'm sorry that I missed that, or if it wasn't

13 they can put it on the list.

14        But I would ask the Court that when they make the

15 statement that they've produced this in the State case they

16 be required to identify what document that is relevant to a

17 particular request or interrogatory has been produced and

18 identify it by a Bates number.  That would solve a lot.

19        SPECIAL MASTER:  Well I did mention it yesterday

20 that if there has been a production then identify that

21 production so that it could be verified.

22        MS. STEVENSON:  And we have done that in our

23 discovery responses.  Look at even response 11 that we've

24 just been looking at it references numerous documents that

25 were produced in the State case with that Vail prefix.

1            MR. KILDOW:  And none of the number 11 are at

2  issue here, and they are a tiny fraction of what is asserted

3  -- constantly asserted.  So that's my suggestion.

4            The other --

5            SPECIAL MASTER:  And so I do want to hear from you

6  but here's my point.  I read those and I also read references

7  in the pleadings here in that time for purposes of alerting

8  counsel to that but not if there is a dispute as I just now

9  heard between the two of you as to whether those are actual

10 prior productions that are adequate.

11           MS. STEVENSON:  I also just want to be clear with

12 respect to this particular -- these joint ventures we did

13 reference all of the documents that we had produced in the

14 State case that were relevant, but we also made significant

15 additional productions in the Federal case and we gave you --

16 in those Exhibits 5 and 6, that's what those compilations

17 are.  Those are the documents we've additionally produced in

18 the Federal case.  I just don't understand what the dispute

19 is here.

20           SPECIAL MASTER:  I'm hesitant to go back there but

21 I might.

22           MS. STEVENSON:  I'm perplexed as to whether Mr.

23 Kildow is saying he thinks there are joint venture documents

24 related to the joint ventures that he identified, Steadman

25 and VSO, that haven't been produced because we produced them

1   in the State case, we produced them in the Federal case,

2   they've been used as deposition exhibits in multiple

3   depositions.  I'm just sort of perplexed by this allegation.

4           MR. KILDOW:  At some point, Your Honor, when

5   you're ready I'd like to respond to that and continue on from

6   where I was.

7           SPECIAL MASTER:  So I will let you continue.  I

8   guess respond also.  But I mean that just brings up the very

9   point.  I'm trying to identify how to resolve this and yet

10  even by looking at your Exhibit 5, Ms. Stevenson, I don't

11  know that this -- I mean this doesn't resolve it from my

12  perspective.

13          MS. STEVENSON:  We tried to provide some

14  illustrative examples.  I mean I suppose if you want every

15  document related to a joint venture that's been produced in

16  this case we can give it to you.  It will be an extremely

17  large amount of material.

18          SPECIAL MASTER:  My previous question was how do

19  you suggest that that be resolved or evaluated for resolution

20  as opposed to this way that I don't think is adequate.

21  What's the parallel -- that's not the right way to put it but

22  what would be the parallel -- what would be a procedure

23  similar to in camera review where the Special Master could

24  just decide okay that is or that isn't sufficient other than

25  every single one.  That is not going to happen.

1          MS. STEVENSON:  I mean I'm not complaining about

2   the production so I don't -- I mean I don't -- it's hard for

3   me to imagine what Mr. Kildow thinks he's missing.  He has

4   term sheets, presentations, he has emails about the proposed

5   joint ventures.  He subpoenaed Steadman and VSO for their

6   documents.  They gave him everything and it wasn't anything

7   more than what we had given him.  I guess I could put

8   together a spreadsheet with a list of documents.  I don't

9   know if that would --

10          SPECIAL MASTER:  Well I do have a potential

11   solution in mind that kept me awake last night -- that along

12   with my shoulder.  I'll go back to Mr. Kildow and let him

13   finish his and then we'll talk about -- we'll see where we

14   are and go on to the other matters.

15          Ultimately I do have a thought about resolution to

16   this.  It just -- even though I spent a year and a half in

17   the other case and was sometimes frustrated with the conflict

18   between counsel I just still have a hard time understanding

19   how the specifics of this can't be resolved.  I can certainly

20   resolve the bigger issues and those kinds of requests, but

21   anyway.  Mr. Kildow, back to you.

22          MR. KILDOW:  I'm going to go back to where I was

23   when I was talking about the Bates numbers.  That was only

24   part of -- the beginning, the salad part of my suggestion on

25   this issue.

1              I think that when we look at motion number five,

2    the privilege log which is not before the Court now, there is

3    no question but there is going to have to be an in camera

4    review of I think a lot of documents.

5              And so the suggestion that the Board minutes be

6    part of that -- we think that the Board minutes should be

7    produced, especially in this non-profit community hospital.

8    It should be produced in unredacted form.   They should be

9    part of the public record, and they will be at some point

10   part of the public record.

11             But I think for the moment there should be a

12   review by the Special Master to find out whether -- if you

13   say that there's no relevancy at all I will probably be

14   satisfied with that but I think that that is a solution.

15   Identify what you say was produced in the State Court action,

16   then you can look at that and we can see did they provide,

17   whether they're adequate or not.   Our position is none of

18   this really was an issue in the State Court action so to say

19   that it was in the State Court action, it has to be looked at

20   by you.

21             And I would now like to move on to the -- Ms.

22   Stevenson said we have produced term sheets.   That is not

23   true.   They did not produce term sheets.   The term sheets

24   that we have, there is one.   One term sheet that was produced

25   by Vail Summit Orthopedic Foundation.   They -- and she also

 1  said that we subpoenaed Vail Summit and they produced

 2  everything.  Ms. Stevenson said that twice.

 3          The fact of the matter is Vail Summit has

 4  objected, they have produced one document.  One document, and

 5  that is the term sheet.  They did not give us everything.

 6          So the next issue is --

 7          SPECIAL MASTER:  So that I can be clear when you

 8  say one document and the term sheet, you said term sheets.

 9          MR. KILDOW:  If I said it in a plural fashion I

10  was wrong.  Sheet.

11          SPECIAL MASTER:  It might have been my mistake

12  between my ear and my hand but I did write that down in the

13  plural.

14          MR. KILDOW:  Yes.  Now the next thing from just a

15  procedural standpoint, Vail Health keeps saying that they

16  have conducted a reasonable search and that they have

17  produced everything.  What they have not done however -- and

18  I think that we provide the Court with ample authority that

19  when you say you've produced everything or you've conducted a

20  reasonable search to identify the custodial -- the document

21  custodian who searched and what were the search terms.  They

22  have provided us with none of that information.  There's no

23  affidavit or declaration saying this is what we've done.

24          What we know is now we're finding out that there

25  are dozens of names that come up on documents that there's no

1    evidence that they've searched those emails either.  For

2    example, Ms. Hannah, who Brown testified to on Tuesday has

3    been involved in creating much of the financial data that he

4    relied on and has been produced to us.

5            So to say that they have done this comprehensive

6    search, there should be an affidavit setting forth what they

7    have done, who they searched, what the parameters of the

8    search were.

9            What Ms. Stevenson has overlooked, she says we

10   have produced everything relating to the joint venture that

11   was referred to initially.  Well that joint venture was the

12   beginning of a long negotiation in combination that resulted

13   in $43 million being agreed to be transferred to the Steadman

14   Clinic over time, and a relationship that involved a lease or

15   leases and that Steadman valued at $174 million.  The

16   combination is extending to Summit County.

17           What we have is a series of non-competes that --

18   between players at both vertical and horizontal levels of

19   competition which is, in our opinion, a violation of the

20   Sherman Act.  We're entitled to those documents.

21           What she's doing -- what they are doing is cutting

22   this off and saying what happened in the summer of 2015 and

23   2016 is all there is to it.  That isn't it.  That negotiation

24   went on for a long period of time and all of it is relevant

25   to a Section 2 attempt to monopolize and a monopolization.

1    We're entitled to that.

2              And so --

3              SPECIAL MASTER:   I will say that that is one of

4    the concerns that I have from both reviewing the pleadings

5    and the documents and hearing the arguments is those -- and

6    having had the experience in the State case -- those

7    particular references from time to time, whether in a Board

8    meeting or a committee meeting or in a public media document

9    are not in and of themselves able to be compartmentalized

10   because they instead show an overall ebb and flow of

11   relationships in these areas that as everything has pointed

12   out now have resulted in a facility in Dillon, a facility in

13   Basalt, a number of physical therapy offices in various

14   places.   And it's pretty hard to say well because it was

15   dropped in 2015 or 2016 that it doesn't have -- that was the

16   end of it and it doesn't have any relationship to '20 or '21

17   or '22.

18             MS. STEVENSON:   I guess Your Honor on that point

19   we have produced documents I know relating to joint venture

20   discussions up through 2018 for sure.   I do want to make sure

21   it's clear none of these joint ventures ever happened.   They

22   were discussions and then they fizzled.   So --

23             SPECIAL MASTER:   And do you think that because

24   they fizzled -- they weren't followed through on -- that that

25   means --

 1            MS. STEVENSON:  They were followed through on --

 2            SPECIAL MASTER:  -- that that means they're not

 3  relevant?

 4            MS. STEVENSON:  No, no.  I think they are relevant

 5  and that's why we produced documents on them.  But I think to

 6  the extent that this is the basis for their anti-competitive

 7  conduct they're saying you considered a joint venture that

 8  you didn't do --

 9            I do think that Mr. Kildow is taking quite a bit

10  of liberties and trying to say anything that happened with

11  respect to a physical therapy discussion is somehow then

12  related to the overall relationship between Vail Health

13  Hospital and Steadman, which again is a much larger

14  relationship that has many more components to it than have

15  anything to do with this.

16            I mean he's referring to a charitable donation

17  made to the Steadman Research Institute which again, it

18  doesn't have anything to do with physical therapy.  I don't

19  know what else to say about it.  But I think he's blurring

20  the lines on these things.  He's asked about joint ventures

21  that were considered with Steadman and with VSO and he's

22  gotten all of the documents that we can locate related to

23  that.

24            I guess coming back to this question on reasonable

25  search, certainly they have known the custodians that we have

1   searched because that's part of the metadata that we provide

2   when we produce documents.  If they had wanted another

3   custodian they can certainly ask for that.  I'm more than

4   happy to provide search terms.  They have not ever brought

5   that issue up until last week.

6           SPECIAL MASTER:  I don't remember now which of the

7   documents but I did read the issue of search terms in there.

8   And I certainly dealt with that in the State case in terms of

9   search terms also.  So if that's your position that's your

10  position.  I remember it being brought up, not just today

11  orally but in a document.

12          Again, I don't really want to -- I don't say that

13  to quibble with you.  I just say that I do have that

14  recollection.

15          MS. STEVENSON:  Again, we're happy to address

16  that, we just haven't had -- didn't know that was a concern

17  of theirs.

18          SPECIAL MASTER:  Okay.  Did you have anything

19  else, Mr. Kildow?  It sounded like you were -- I know that

20  you tend to think while we're addressing one of the other

21  issues and then something else might come up but I want to

22  make sure we don't have anything else on this matter before

23  we move on.

24          MR. KILDOW:  Your Honor, I think that the time --

25  we've spent a lot of time on this so I will close my remarks

1    so we can move on to the next motion.

2              SPECIAL MASTER:  Now that we're ready to take up

3    four then we'll talk about some of these other issues.  I

4    would suggest that we take a break now and then come back and

5    take it up, and then talk about where we go on these things

6    raised here such as in camera review, and then also rather

7    loosely talk about number five.  Then hopefully we can let

8    everybody out of here a little early.

9              So let's take 15 minutes.  Thank you.

10              (Recess from 2:37 p.m. until 2:51 p.m.)

11              SPECIAL MASTER:  Ready to proceed on Plaintiffs

12   motion to compel number four, which I think we had finally

13   gotten around to identifying that's 157, response 176, reply

14   192.  Mr. Kildow?

15              MR. KILDOW:  Before we go into the depth of this

16   motion this citation was requested before or I mentioned it

17   before.  It is part of motion number four but the request was

18   for Continental Ore Company v. Union Carbide.  It's 370 U.S.

19   690 with a local citation at 699, a 1962 case by the United

20   States Supreme Court.

21              SPECIAL MASTER:  Thank you.

22              MR. KILDOW:  I don't want to drag the State Court

23   proceeding into this but many months ago I suspect you

24   thought I was half crazy talking about the issue of the

25   rendering provider asking for commissions that Vail Health

1   made to insurers and to Medicare.  That all raised questions

2   -- it opened a can of worms that is really striking, and it

3   reminds me of All the President's Men and just follow the

4   money.

5          This small hospital in Vail makes lots of money,

6   so we've been kind of following the money for some time,

7   which explains why a small rural hospital would spend so much

8   money chasing a physical therapist who lives in Edwards and

9   drives to Leadville every day for $30.00 an hour.

10          It is what Robert Bork said in his book, The Anti-

11  Trust Paradox, when the conduct of a party makes no economic

12  sense you have to ask why.  Often times the answer is because

13  there is anti-competitive conduct going on.

14          The reason that we have included the first section

15  of our reply brief is that Vail Health has not conducted a

16  reasonable search.  The reason we put that number one and we

17  feel it's so important is that they have not said what they

18  have done to conduct a reasonable search.

19          If we go to page 13 of their response, which is

20  docket 176, again at page 13, the heading is Vail Health does

21  not have the referral information Plaintiff requests in

22  interrogatory number four.  And it says, and I quote, at the

23  bottom of page 13, "Vail Health explained that it does not

24  compile or create the requested referral information --"

25  that is of doctor referrals to physical therapy -- "in the

1    ordinary course of business and it would be impractical and

2    burdensome to create this kind of analysis."

3           If you're wondering why we want information on

4    their reasonable search side of things it's because we have

5    recently deposed the two Vice Presidents of Howard Head and

6    Mr. O'Bryan, who testified on the 9th of October, he

7    testified that yes, in fact those referrals are tracked very

8    closely and that Nick Brown is the guy who tracks them.

9           Then Mr. Brown was deposed on Tuesday and he

10   testified oh yes, all of that is tracked very closely.  I

11   track it and I have a system for tracking it.  So what we

12   have is probably the two most knowledgeable witnesses who

13   have testified in the last ten days or so that have both

14   undercut the heading at page 13 of the reply brief.  So we

15   are entitled to the referrals.

16          Ms. Stevenson's contention that we have done

17   reasonable searches is absolutely undercut by the testimony

18   of those two very knowledgeable witnesses.  We are entitled

19   to all of the referral information.

20          It does relate directly to this anti-trust suit.

21   It relates because between Steadman and VSO they had --

22   depending on the time -- about 65 percent of the business of

23   Vail Health.   65 percent.  And in 2016 in December the CEO

24   of Steadman sent a text message to Ms. Kirchner, the CEO of

25   Vail Health, and Ms. Kirchner typed that text into an email

1    to Mike Shannon, the Chairman of the Board, and it basically

2    said -- and Mr. Brown testified and confirmed the email in

3    his deposition on Tuesday.  The message basically said just

4    want to give a heads up we are considering going our own

5    independent way when it comes to physical therapy.  We are

6    thinking of going to establish our own physical therapy

7    facility.

8            Now most rural hospitals lose money -- two-thirds

9    of them lose money every year.  This one makes $50 million a

10   year.  What would be the consequences if Vail Health lost its

11   referrals?  It wouldn't just be for physical therapy

12   referrals.  It would be for the use of operating suites

13   because most orthopedic surgery today is done on an

14   ambulatory surgery basis.  Knee surgery used to be two,

15   three, four days in the hospital.  That's not the case today.

16   People walk in and walk out the same day after a knee

17   replacement.  Two-thirds of all knee replacements are done on

18   an ambulatory basis.

19           That means that the surgeons at Steadman and VSO

20   don't need a hospital nearly to the extent that they did

21   before.  What would happen if Steadman walked away?  That

22   really starts the whole -- I'm not going to use the word

23   conspiracy but we'll just say the ball rolling with respect

24   to this anti-competitive activity.

25           So we are entitled to all of the documents

1   relating to this joint venture that started in the summer of

2   2015 and then went on over into 2018.

3           But in 2015 and 2016 Vail Health went out and

4   engaged a whole host of consultants.  We don't have most --

5   or in some cases any -- of the information that relates to

6   what the consultants have done.

7           I'll give you one example.  They engaged Deloitte

8   Touche to do a valuation and/or consultation and guess what

9   they say.  Oh, we can't locate that document.  Well they had

10  the document at some point in time and this lawsuit was not

11  long after that engagement occurred.  What happened to it?

12          Did they -- and I would like Ms. Stevenson

13  actually -- I'd invite her to get on, did you call up

14  Deloitte say hey, we hired you guys a while ago and paid a

15  bunch of money.  Do you have this report?  Do you have these

16  documents?  Having dealt with Deloitte my guess is they've

17  got it.  Did Vail Health do that or did this just vanish into

18  thin air?  They have an attorney from a major law firm in

19  Philadelphia.  Did they call up him and say do you still have

20  that Deloitte report?  My guess is he's still got it if they

21  keeps records like I know big firms do.

22          Then there are other -- two other consultants.

23  Their reports and most of their communications are subject to

24  privilege.  So the idea that Doris Kirchner, without the

25  assistance of any -- or involvement of any attorney retains a

1  consultant that that consultant and his work and his reports

2  are subject to a privilege.  The idea that all of this stuff

3  is privileged and is not relevant is -- it's just not

4  correct.

5          So we have identified in our motion what we want

6  in terms of documents --

7          MS. BRAUNSCHWEIG:  Allan, it's in the beginning of

8  the reply.

9          MR. KILDOW:  It's on page two.  That is for the

10 combinations that occurred for the development of the medical

11 facility in Summit County and in Basalt.  We would like the

12 joint venture physical therapy documents -- or we want the

13 consulting work for that, the joint venture including the

14 consultant's fair market value analysis and communications.

15         The joint term sheet that Vail Health refuses to

16 produce.  And I notice that we put in here at the time that

17 we filed this document that we did not have the term sheet.

18 Ms. Stevenson said that they produced it.  That is simply not

19 true.  We put it in here.  If she could show us the term

20 sheets that she has produced that would be fine.  She can't

21 do that because as I said, the only one we got was one for

22 Vail Summit Orthopedic Foundation.

23         We'd like the same thing for Steadman.  We'd like

24 the offer that Steadman made to Vail to become part of a

25 private equity offering for the physical therapy operation.

1    We don't have anything relating to that.

2           Then finally, we want Vail Health information

3    about Vail Health contributions to SPRI to the tune of $4.3

4    million a year.  It's almost impossible to find out what that

5    $4.3 million was for or is for.  How is it that the $4.3

6    million a year for ten years could possibly have any material

7    value to the hospital?

8           Stem cell research?  Sure, there's stem cell

9    research.  That is pretty much complete.  The technology and

10   the value of it is known.  But one of the things that's not,

11   you can't get stem cell replacement and have insurance pay

12   for it, or Medicare pay for it, or anybody else to pay for it

13   other than out of your pocket.  The author Brown, who wrote

14   many best-selling books was the kind of patient that gets a

15   stem cell injection.  It's not for the people down in Gypsum

16   or Dotsero or Eagle.  It's not for the average guy.  So why

17   is Vail Health spending $4.3 million that is only for the

18   rich?  Maybe it's not because it's for research.  Maybe it's

19   because it is part of a larger deal.

20          Because one of the things that came out of all

21   this is that -- we don't have these but we have enough

22   information to infer that it is -- Steadman has agreed not to

23   compete with Howard Head.  We believe the same thing is true

24   with VSO.  It has agreed not to compete with Howard Head.

25   The information that we have relating to the joint venture,

1  the proposed joint venture, is that they were all going to

2  enter into non-compete.  They would all be -- and Vail Summit

3  Orthopedic with its purchase of -- association with Avalanche

4  over -- is -- they're all in a horizontal level of

5  competition.

6           So what it is is Vail Health had an idea that they

7  were going to tie up the entire Valley and Summit County as

8  well from a physical therapy standpoint, which is not

9  divorced from orthopedic surgery.  The former CFO of Vail

10 Health, Charlie Crevling, testified that how surgery went so

11 went physical therapy, and how those orthopedic practices

12 went so went the fortunes of the hospital.  The reason is

13 because the Shaw Cancer Institute is a department they lose

14 money on, the gynecology operation they lose money on, the

15 general surgery department they make no money on.

16          Judge, it's my understanding that you live over in

17 Breckenridge and this is just not rocket science.  If you

18 take Breckenridge and -- what's the other ski area over there

19 up towards the pass?  Between the two ski areas --

20          SPECIAL MASTER:  There's four.

21          MR. KILDOW:  All you have to do if you're a

22 surgeon is go over there to the ski patrol check with an

23 ambulance and tell them that you'll take them in and get them

24 fixed.  It's like a funnel that has 50,000 or more potential

25 orthopedic accidents on the hill every weekend.  The same

1  thing over here in Vail.  30,000 to 35,000 on Saturday.

2  That's why you have these enormous orthopedic practices here

3  in Vail.

4        So all of this is a money making operation that

5  Vail Health intended to tie everything up.  One of the

6  interesting things about what Ms. Stevenson said, she said

7  you know this never came about.  Well first of all, even if

8  it did she has neglected over and over and over again to

9  acknowledge Colorado Interstate Gas where the Tenth Circuit

10 said that if it doesn't happen that doesn't matter.  The non-

11 consummation of the deal does not obviate liability under

12 Section 2, attempt to monopolize.  That is the law.

13        We've cited those over and over but she still

14 comes back and says this never happened.  Well you know what?

15 First of all the law says even if it didn't happen you're

16 still potentially liable.  But here it did happen and that's

17 where Continental Ore comes into play.  If you look at the

18 whole Vail Health accomplished its anti-competitive objective

19 by keeping Steadman out of the market, which would have had

20 an absolutely devastating financial impact on Vail Health if

21 that had occurred.

22        As an aside, they had to execute Lindsay Winninger

23 along the way because she was going to run Vail Health's

24 already -- or Steadman had approached her as running their

25 physical therapy facility.  When the whole thing looked like

1   it was going to blow up and she was going to take off and

2   work for Steadman they executed her with these false

3   statements.

4          Nevertheless, we are entitled to all of the things

5   set forth in the second paragraph of our reply brief, and we

6   don't have them.  They have withheld all of the documents

7   relating to valuations.  Valuation documents are very

8   important here because they reveal, among other things, the

9   specific intent to monopolize, which is a part of the

10  requirement of Spectrum Sports, a United States Supreme Court

11  case, and Section 2, attempt to monopolize in the Tenth

12  Circuit.

13         So what we want is those things and we want the

14  identity of the witnesses that have been involved.  The fact

15  that we had to bring this motion to get them to produce this

16  information really warrants the award of attorney fees

17  because the reality is that there has been nothing that's

18  happened in this case unless we fight like hell to get it.

19  That means motions.

20         So that's where I stand.  Thank you.

21         SPECIAL MASTER:  Mr. Richards?

22         MR. RICHARDS:  Thank you, Your Honor.  So Mr.

23  Kildow finished his presentation by making certain

24  allegations against the hospital, essentially arguing that

25  Vail Hospital is just a money making scheme that provides no

1  benefits to the residents of the Vail Valley.  I think that

2  -- you know, I'm not going to try to argue the merits here so

3  I'll resist from responding to everything that Mr. Kildow

4  argued.

5          But Vail Health Hospital provides a level of

6  service that is almost unheard of for a rural mountain

7  hospital like Vail Health.  In addition to that, Mr. Kildow

8  referenced for example stem cell therapy.  I think there are

9  very few rural hospitals in mountain communities where

10  advanced therapies such as stem cell therapy are available.

11  So his effort to really characterize what is an effort to

12  have a hospital that provides a broad range of services in a

13  community that might not otherwise have them is really just

14  baseless.

15          But more importantly for the disputes before us,

16  which are discovery disputes -- and I'm not going to attempt

17  to win the merits here on our motion -- on Plaintiff's motion

18  related to a discovery dispute -- but the most important

19  takeaway from Mr. Kildow's argument is he is focused on the

20  hospital as a whole, and he wants documents that have nothing

21  to do with physical therapy.  And he's stated that expressly

22  as we've been talking right now.

23          You know, we can talk about the specifics but

24  Plaintiffs crafted their complaint to allege a monopoly with

25  respect to physical therapy services.  The only joint

1    ventures they alleged in the complaint relate to VSO and

2    Steadman, and that's the scope of their complaint.  Their

3    effort to expand the scope of discovery to issues that don't

4    relate to the Vail Valley, issues that don't relate to

5    physical therapy, is improper and it's an effort to expand

6    the scope of discovery beyond what's permissible.

7            We sent to you yesterday an example of a case

8    that's held that discovery is limited to the geographic

9    market Plaintiffs have alleged.  Here that's the Radio Music

10   case that we sent to you.  It actually cites a number of

11   cases therein that have held similarly, that Plaintiffs

12   aren't entitled to all documents.  They're entitled to the

13   documents within the alleged geographic scope.  It's really

14   quite well established.

15           As to the specific documents the Plaintiffs have

16   requested, one thing just to keep in mind is with respect to

17   proportionality Plaintiffs -- one of the Plaintiffs co-

18   owners, Brad Schoenthaler, has admitted that Plaintiff

19   suffered no damages as a result of the proposed but not

20   consummated joint venture with VSO.  He also admitted that

21   Plaintiff suffered no damages with respect to the proposed

22   but not contemplated joint venture with Steadman.

23           And so in evaluating all of these questions we

24   have to keep in mind that Plaintiff's own owner has admitted

25   that they suffered no damages.

1            But you know the big picture here is we're not

2     disputing that we're going to produce documents related to

3     joint ventures with Steadman and VSO related to the provision

4     of physical therapy services in the Vail Valley.  And we have

5     produced, and we have produced those documents.

6            I think there were a couple of items that Mr.

7     Kildow suggested specifically.  One was a Deloitte report.

8     Based on the document that references the Deloitte report,

9     document 128-2, and it's page 83 of 97 and it references

10    opportunities for expansion, but there's nothing about the

11    document that suggests in any way that that Deloitte report

12    relates to physical therapy specifically as opposed to the

13    hospital as a whole.  Again, the scope of Plaintiff's

14    complaint is not the hospital as a whole, it is physical

15    therapy services.  So there's really no reason to believe

16    that the Deloitte report is in any way relevant to this

17    litigation.

18           In addition to that, we've searched for the

19    Deloitte report.  We have not been able to identify a copy.

20    It's also the -- the Deloitte report is from 2013 and so it's

21    from quite a long time ago so it's not particularly

22    surprising that we haven't been able to locate a copy.

23           Mr. Kildow also mentioned certain valuations that

24    were prepared by Haverford and HGA.  There are certain

25    aspects of that valuation process that are non-privileged and

1   we produced the documents that relate to those.  But for

2   example there are certain aspects of the valuation that were

3   shared with Steadman.  To the extent that was done we've

4   produced that.

5          However the attorneys in connection with Vail

6   Health retained these valuation experts to look at issues

7   related to the Stark clause among others which include

8   ensuring that any transactions happen at a fair market value.

9   So we have asserted privilege with respect to many of the

10  documents related to HGA and Haverford.  We believe that

11  those issues will be resolved in connection with motion to

12  compel number five.  We've logged the documents that we claim

13  to be privileged and we've produced the documents that we

14  don't claim to be privileged.

15         So I think that's just an issue where we're going

16  to have to look at Vail Health's privilege log and make a

17  determination in connection with motion to compel number

18  five.  But we're not withholding documents that we view as

19  non-privileged with respect to Haverford and HGA.

20         There was also a reference to a term sheet.  There

21  are a couple of things to keep in mind here.  The first is

22  what Ms. Stevenson was referencing is a term sheet that was

23  exchanged between Vail Health and Steadman, not a term sheet

24  that was exchanged between Vail Health and VSO, which is a

25  separate orthopedic group.

1          We have produced the letter of intent and other

2    transaction documents related to the transaction with

3    Steadman, and I can pull that up.  Your Honor, this is a

4    letter of intent for the physical therapy joint venture

5    between the Steadman Clinic and Vail Health.  This has been

6    produced for some time.  So we really have produced the

7    letter of intent with respect to the Steadman joint venture.

8          Then we'll keep continuing down there's a terms

9    and conditions -- this is the term sheet with respect to the

10   Steadman Clinic.  So we have produced the term sheet with

11   respect to the Steadman Clinic.  There are a number of

12   versions of this that have been produced.

13         So the idea that Mr. Kildow was suggesting that

14   Ms. Stevenson made a false representation when she suggested

15   that we had produced term sheets, it's just not accurate.

16   Ms. Stevenson accurately represented we produced term sheets

17   and we have.

18         The term sheet that there is somewhat of a dispute

19   about it seems is there is also a term sheet with VSO.

20   Plaintiffs have a copy of that term sheet.  It was produced

21   by VSO's counsel in response to Plaintiff's subpoena.  Vail

22   Health has looked for a copy of that term sheet.  The only

23   copy of that term sheet that it has been able to identify is

24   a privileged copy received from its lawyers.

25         We have not -- there does not appear -- there is

1  not an email from Nick Brown or someone else involved in this

2  transaction transmitting that term sheet to VSO.  To the best

3  of our knowledge, as we stated in our brief, we believe that

4  that term sheet was handed over at a meeting in a paper copy

5  and that's why VSO had it without it being attached to an

6  email.

7           So this is ultimately kind of a moot point because

8  Plaintiffs have a copy of the term sheet and we've looked for

9  a non-privileged copy and we can't find one.

10           SPECIAL MASTER:  So let me just take that as an

11  example here.  Do you or don't you have it, Plaintiff?

12           MR. KILDOW:  We have the Vail Summit Orthopedic

13  Foundation term sheet.  One document that was received from

14  VSO's counsel.  That's it.  The term sheet that they're

15  talking about with Steadman, we never received that.  Not

16  true.

17           MR. RICHARDS:  Sorry, that's --

18           MR. KILDOW:  What document --

19           MS. BRAUNSCHWEIG:  Wait, wait.  Let me clarify

20  what we don't have.  There were two joint ventures proposed.

21  The first joint venture is the document that he showed you on

22  the screen.  That was in 2015.

23           SPECIAL MASTER:  Steadman.

24           MS. BRAUNSCHWEIG:  Steadman, yes.  That was

25  produced in the State Court action.  What we didn't know at

1   the time was that there was also a proposal with VSO at the

2   same time.   Then in 2016 when that joint venture failed they

3   entered into -- or they tried to propose a second joint

4   venture which they call the MSO joint venture, MSO being

5   Managed Service Organization.

6           The term sheet that we received from VSO relates

7   to the Managed Service Organization from December of 2016.

8   Steadman also had a term sheet and it is on their privilege

9   log.   A copy of the term sheet that was provided to VSO is

10  also on their privilege log.

11          We kept asking them to produce the term sheet for

12  VSO and Steadman and they will not produce it because they

13  claim the copy of the term sheet on the privilege log is

14  privileged, even though it's a copy of what was given to

15  Steadman and VSO.

16          MR. RICHARDS:   Your Honor, they have a copy of the

17  term sheet from 2016.   It has been produced by VSO.   This is

18  a moot point.   We have searched for a copy that was sent to

19  Steadman or sent to VSO by email.   We have not located it.

20  We have specifically looked for this in the emails of the

21  persons involved in the transactions.   If there were a copy

22  that was not received from the lawyers in connection with

23  receiving legal advice we would produce it.   But it's

24  ultimately a moot point because they have a copy of the term

25  sheet.

1    SPECIAL MASTER:  Well I'm very confused here and

2  this is like two kids with their cookies in their mouth and

3  in their hands and walking away from the cookie jar saying I

4  didn't do it, he did it, and she did it, and so forth.

5    Here's the point.  Are there these agreements that

6  you have identified as -- I'm sorry, as privileged -- are

7  they in the privilege log?

8    MR. RICHARDS:  Yes.

9    SPECIAL MASTER:  One from VSO, one from Steadman.

10    MR. RICHARDS:  The sense that we're withholding

11  them on the basis -- there is a draft copy of a term sheet

12  received from the lawyers that is on our privilege list.

13  Directly from outside counsel.

14    SPECIAL MASTER:  So -- well, we're going to get

15  into a problem with that.  With that being your approach that

16  it came from outside counsel.

17    MR. RICHARDS:  Your Honor, to be clear --

18    SPECIAL MASTER:  To be clear, we're going to have

19  a problem.  But you --

20    MR. RICHARDS:  Well --

21    SPECIAL MASTER:  -- haven't produced it if you've

22  identified it in the privilege log, right?

23    MR. RICHARDS:  Your Honor, privileged --

24    SPECIAL MASTER:  I'm hoping that you don't produce

25  what you put in the privilege log.

1          MR. RICHARDS:  The privileged copies have not been

2     produced.  We have searched for a non-privileged copy -- in

3     other words a copy that was sent to VSO or Steadman, and

4     there is no such email sending this document to Steadman or

5     sending this document to VSO.

6          SPECIAL MASTER:  So have you directly asked VSO or

7     Steadman if they have a copy of that?

8          MR. RICHARDS:  So VSO has produced their copy.  We

9     have not asked Steadman, a third party, for a copy of the

10    document recently but we previously -- Plaintiffs subpoenaed

11    Steadman for all of these materials and in addition to that

12    we subpoenaed Steadman in the State case for documents

13    related to these joint ventures.

14          So the idea that Steadman has something when

15    they've been subpoenaed twice already is -- they've responded

16    to two subpoenas on this.  This is an area that has been

17    beaten to death in terms of discovery.  There's just not

18    further information out there that hasn't been discovered.

19          MS. BRAUNSCHWEIG:  The subpoena in this --

20          MR. RICHARDS:  Excuse me --

21          SPECIAL MASTER:  No, no, no.  We're not going to

22    do that again.

23          MS. BRAUNSCHWEIG:  I'm sorry.

24          SPECIAL MASTER:  You know, I mean did let it

25    happen but I'm a parent.  I learn by those mistakes.  So all

1   right, go ahead then Mr. Richards.

2           MR. RICHARDS:  So I think with respect to -- the

3   only other issue that Mr. Kildow raised was related to

4   referrals.  I think we need to look at their specific request

5   on that.  So let me go ahead and pull up their request.  This

6   is interrogatory number 14.

7           SPECIAL MASTER: I'll get there.  Page 25.  What

8   did we have that -- that's several pages back.  So that is

9   your response -- that's Exhibit 5, is it?

10          MR. RICHARDS:  It's document 128.

11          SPECIAL MASTER:  128, page 26.  Okay.

12          MR. RICHARDS:  So Your Honor, what they requested

13  is identified by year and each doctor group, including but

14  not limited to Steadman and VSO, the number of patients and

15  the amount of revenues and profits that were generated by

16  doctor referrals to Howard Head for each year from November

17  1, 2004 to the present.  In doing so identify whether those

18  referrals, revenues, or profits were realized by RPC Vail or

19  Vail Health.

20          So you know, it was an extremely broad request

21  that not only requested information related to referrals but

22  also revenues and profits attributable to those referrals.

23  You know, profits attributable to referrals just -- it's just

24  not information that Vail Health is able to identify.  It's

25  not tracked on that basis.

 1              And you know, in addition to that we don't agree

 2     with Plaintiff's characterization -- for example Mr.

 3     O'Bryan's testimony that this information was easy to pull

 4     and identify.  So I think that that's an issue where we think

 5     that this information is unduly burdensome and overly broad.

 6              SPECIAL MASTER:  So that hits the two points --

 7     and I'm sorry to interrupt but I don't want to let that go

 8     because it's very important.  First of all, I am concerned

 9     about representations that counsel each make with regard to

10     what was or wasn't testified to without having a transcript

11     to verify that.  And so -- not that I necessarily want a

12     transcript but I'm just saying that's a slippery slope.

13              The second thing with regard to that is -- now I

14     lost my train of thought there because I was very concerned

15     about that.  But it is a -- it's not just a broad request

16     it's a multi-faceted request.  That in and of itself causes

17     me to hesitate in terms of granting it.

18              But that doesn't address the problem, which is if

19     it were to be broken down I have concerns based upon history

20     of the other case as well as recent history of this case that

21     we would have the same arguments propounded as to why it

22     wouldn't have to be produced.

23              There -- and I don't want to get distracted by the

24     breadth and quality of the interrogatory as opposed to the

25     substance of it in terms of physical therapy referrals.

1       I apologize for interrupting you but I want to try

2   to keep it in a direction that I believe might be helpful to

3   the Master in terms of making decisions.

4       MR. RICHARDS:  Your Honor, I think the only other

5   point I want to make is that we've produced information

6   related to referrals and analyses that were conducted in the

7   ordinary course of business.

8       An example is referenced in our response to

9   interrogatory 14.  This is document 128 at page 27.  So for

10  example this is an analysis of referral sources from 2013 to

11  2016.  So we have produced this information when it was

12  performed in the ordinary course of business and so --

13      SPECIAL MASTER:  27 looks like interrogatory 16.

14  Maybe we're off on these numbers again just because of the

15  tracking.  Is it response to interrogatory --

16      MR. RICHARDS:  Number 14.

17      SPECIAL MASTER:  14?

18      MR. RICHARDS:  So it's on page 26 of the response,

19  page 27 of document 128.

20      SPECIAL MASTER:  Well my page 27 goes into

21  interrogatory 16 and beyond, so I'm not sure that I'm

22  following.

23      MR. RICHARDS:  Your Honor, it's in --

24      SPECIAL MASTER:  Is it in 14?

25      MR. RICHARDS:  It is in 14.  The last paragraph of

1  the response to 14, there's a reference to a document that

2  was produced in this litigation, VHFED 00000875.  And that's

3  an analysis of referral sources to Howard Head from 2013 to

4  2016.

5         SPECIAL MASTER:  Well I guess as I expressed to

6  Ms. Stevenson, I see that number but I don't know that that's

7  what is contained therein.

8         MR. RICHARDS:  Your Honor, I can pull it up if

9  that would be helpful.

10         SPECIAL MASTER:  You know, I'm just saying that

11  all those references to the Master are different than making

12  those references to counsel who has those -- access to those

13  Bates numbers.

14         MR. RICHARDS:  I understand entirely and this is

15  an example where we attached this response -- I don't think

16  there's any dispute that that's an analysis of referral

17  sources from 2013 to 2016.  If Plaintiffs disagree with that

18  they can certainly state that in their response, but I think

19  it's undisputed.  If the Special Master would like I'm happy

20  to pull it up right now.

21         SPECIAL MASTER:  When you say -- well, I'll let

22  you do that.  When you say it's an analysis of referral

23  sources -- I guess if you pull it up I can see -- is that by

24  individual doctor to physical therapy entity?

25         MS. STEVENSON:  I've got that.  Your Honor, we

1    produced documents -- and in fact Mr. Kildow used one in one

2    of these recent depositions that has extensive referral

3    information, both from practice group over multiple years and

4    then on an individual doctor by doctor basis, the number of

5    referrals for each one of those named doctors.  I think

6    that's probably the document that Mr. Richards is pulling up.

7    I know Plaintiffs have it because they just used it in the

8    deposition.

9            In any event, we have no objection to producing

10   these documents that reflect any analysis we've done for our

11   referral sources, and we've produced them.

12           SPECIAL MASTER:  I guess the dispute is over

13   whether you produced them or not, is that correct, Mr.

14   Kildow?

15           MR. KILDOW:  That is correct.

16           SPECIAL MASTER:  So other than me ordering it, how

17   do you -- I'm not -- I keep getting back to this question how

18   do you perceive that being resolved, yes we did, no we

19   didn't?  Because I can spend as much time as necessary in

20   reviewing all those if that's what we're down to.

21           MR. KILDOW:  Are you asking me, the Plaintiff's

22   lawyer, Your Honor.  Or are --

23           SPECIAL MASTER:  I am asking you first because I

24   was speaking to you last.  Yeah.  But I've posed that

25   question a few times.

1          MR. KILDOW:  Vail Health will produce, in this

2     case for example, 2013 to 2016.  But they will use that and

3     say we have produced this information, but it's only limited

4     to 2013 to 2016.  They have this information by (inaudible)

5     right down to the number of referrals that Dr. Viola, my

6     neighbor, made in whatever it was.  They have this

7     information but they're not producing the full gamut of

8     information on the basis of year, to year, to year, to year.

9          What we want to do, and what we're entitled to do,

10    is show the depth of the relationship between Steadman and

11    VSO on a year by year basis by doctor so we can see what kind

12    of -- whether it's a shoulder problem, or a hip problem,

13    etcetera, and the amount of money that's generated by those

14    referrals.  They have that information.  They can tell you

15    how many referrals there are and then they can show you how

16    many -- what do they call them?  Utilizations.

17          In other words, you have a problem with your

18    shoulder, the doctor recommends you for time number one for

19    physical therapy.  But then you sign up or you get let's say

20    ten sessions with a physical therapist.  They can tell you

21    how many referral visits each doctor has.  But they don't

22    produce it comprehensibly.  And they have the ability to do

23    that and that's all we're asking for.

24          SPECIAL MASTER:  But tell me what you mean by

25    comprehensively because I've heard you say a few different

1    things and that's why I'm confused.  I've also heard you say

2    they haven't produced it, so then I'm looking at 128 and I

3    see that they have produced it, but now you've clarified that

4    they haven't produced it for 2012 and post-2016.

5              So that's --

6              MR. KILDOW:  Correct.

7              SPECIAL MASTER:  -- what then they haven't

8    produced.  And so then the other is how do you want it --

9    this is why I say, respectfully, that number 14 is overbroad

10   and almost incomprehensible in terms -- but it's multi-

11   faceted.  I apologize.  I won't be judgmental.  It is multi-

12   faceted.  And so do you want it by doctor?  Do you want it by

13   -- what is it that you want?

14             And I don't want to spend the argument time here

15   because you guys are going to have to do this.  You are going

16   to have to confer.  That's where we are headed.  Because a

17   definitive position with regard to not just that yes, we've

18   produced it, no you haven't produced it.  I want it

19   identified as how -- in what form it is if it has been

20   produced and in what form it is that you're requesting.  The

21   problem is when I look at interrogatory 14 I'm not sure where

22   to start breaking that down.

23             I mean I could.  I could.  I could say we'll do it

24   by year, but that wouldn't be good enough because you also

25   want it by doctor.  Then you say well it's not just the

1    referrals.  We want the revenues and the profits and so

2    forth.  That's why this interrogatory is overbroad and it is

3    almost incomprehensible in terms of trying to respond to it

4    because it's not what I see as being something that can be

5    clearly ruled on.

6              I could rule that they -- I can't rule that they

7    haven't provided it because I see that they have provided it

8    with regard to 2013 to August of 2016.  So I couldn't do

9    that.  So I say well it's denied because they -- you see what

10   I'm saying?

11             MS. BRAUNSCHWEIG:  Your Honor --

12             MR. KILDOW:  Yes I do and I'd like to respond --

13             MS. BRAUNSCHWEIG:  Judge --

14             THE COURT:  One or the other, not both of you.  So

15   you guys decide which one.

16             MS. BRAUNSCHWEIG:  Well Allan, there's --

17             MR. KILDOW:  No.

18             MS. BRAUNSCHWEIG:  Okay.  Sorry, there's an

19   exhibit that has the information in it.

20             MR. KILDOW:  Go ahead.

21             MS. BRAUNSCHWEIG:  All right.  It would be 158-24,

22   which is Exhibit 44.

23             SPECIAL MASTER:  I'm not sure that I can get

24   there.  Well, you're going to have to --

25             MS. BRAUNSCHWEIG:  Could I --

1          SPECIAL MASTER:  You're going to have to --

2          MS. BRAUNSCHWEIG:  Yeah, I can -- yeah, I can

3    summarize it.  It has a referral that Mr. Brown ran from

4    Source Med that's by doctor by unit, and that's what we asked

5    for in the written discovery back and forth when we were

6    trying to reach a compromise or discuss it.  We asked for the

7    documentation that went to Exhibit 44.

8          There is a report that Mr. Brown ran by year and

9    we only have it I think in that exhibit for two years where

10   it has the doctor name and the unit of physical therapy that

11   were generated by that referral.

12         MR. RICHARDS:  Judge, may I respond?

13         SPECIAL MASTER:  I see it now.  Tell me -- of

14   course up to now I haven't been able to get into this, but

15   that's a separate issue that I believe is now resolved.  Your

16   point is --

17         MS. BRAUNSCHWEIG:  If you go to the referral

18   source analysis for some years they've just given us this one

19   page or part of one page of this referral source analysis.

20         SPECIAL MASTER:  The gross numbers.

21         MS. BRAUNSCHWEIG:  Right, the gross numbers.  And

22   some of the sheets don't have the billable unit.  Those are

23   important because referrals are -- if you look at fiscal year

24   2015 the referrals are 3,000 but what that number doesn't

25   tell you is that -- how many physical therapy visits are

1    generated from those 3,000 referrals, which is why you have

2    to go down to the billable unit to see the difference in

3    percentage.

4            So the referrals are 45 percent from Steadman, but

5    when you look at the billable units, which is the amount of

6    revenue that would be generated from those services it's 54

7    percent.  So quite a bit higher.  And when you add VSO to it

8    it goes up to almost 70 percent.

9            So when you scroll through the spreadsheet that's

10   attached we have the individual -- we have a report that was

11   run with the individual referrals, so it tells you it's the

12   breakdown of the first category of the gross number of

13   referrals.  If you keep scrolling down to -- there's a couple

14   of years in here.  It's about page 27 in the exhibit.

15   There's no Bates number because it was produced in --

16            SPECIAL MASTER:  27 has Phillipon and Green?

17            MS. BRAUNSCHWEIG:  Right.  And so this is the

18   backup detail to the summary at the very beginning where it

19   shows that there were almost 30,000 billable units of

20   physical therapy related to Dr. Mark Phillipon from the

21   Steadman Clinic.  We tried to explain to them that this is

22   what -- the type of information that we seek.  Unfortunately

23   we weren't able to resolve it.  But if you look at the last

24   page in the exhibit --

25            SPECIAL MASTER:  Tell me what you mean by you

1  weren't able to resolve it.  I mean you have this --

2          MS. BRAUNSCHWEIG:  Well they wouldn't produce us

3  the same kind of data.  I mean they have the ability --

4  that's why I said if you turn to the last page of the exhibit

5  it says that the report is run by Source Med, Nick Brown.

6  And he put in a date range to get the data.  So we understood

7  that this data -- at least this portion of the data was

8  available and so we asked them to produce us the underlying

9  reports that would support the numbers because the summary

10 numbers mean nothing without the underlying data for

11 evidentiary purposes.

12          SPECIAL MASTER:  See now we're -- I mean I

13 perceive anyway that in this process of this hearing,

14 particularly with this, that's why I was asking is there any

15 way to do this without -- because I've heard the argument but

16 the arguments themselves are overbroad and over generalized.

17 We have complied, no you haven't, yes -- and that doesn't

18 resolve it.

19          This helps although as I see this I hear you're

20 asking for something different, and that then ties back to

21 the breadth and language of 14 itself.  Instead of being

22 broken down -- because you can just sit here as we've done

23 for a couple of days and talked about well you did or didn't

24 comply, but this is one run on four line sentence of an

25 "interrogatory" that easily can be argued well small t wasn't

1   complied with because of this analysis that you're talking

2   about now.  But until this presentation line of inquiry it is

3   impossible from your presentation and from the briefing at

4   least to tell whether it was or wasn't.  That's the problem

5   that I see.

6          I want to get that resolved, and I've asked four

7   or five times how do you suggest that we do that.  I will

8   stop there.  I will let Mr. Richards finish, and then we'll

9   talk about how to resolve this and other discovery issues,

10  because somebody has to do that and I've heard from two

11  judges that that's me.  So I'll do it.  Mr. Richards?

12         MR. RICHARDS:  Thank you, Your Honor.  I'd just

13  like to pull up briefly a document that has a slightly

14  broader breadth, the one that we meant to go that's

15  referenced specifically by Bates number in our response to

16  interrogatory 14.  I'll just pull that up.  Judge, can you

17  see the Excel spreadsheet that's currently on the screen?

18         SPECIAL MASTER:  I see one for FY13 down to 18YTD.

19         MR. RICHARDS:  That's right, so this is an

20  analysis of referrals that was performed in the ordinary

21  course of business from FY2013 all the way through to FY2018.

22  This is a document that we have produced, and it includes

23  detailed analysis for each of those years including FY2013,

24  2014, 2015, 2016.  There's FY12 information in there, FY17,

25  FY18.

1    So we've produced this information to Plaintiffs.

2    And so there are these statements about we haven't provided

3    this information, we haven't produced this information, and

4    that's just not accurate.

5    SPECIAL MASTER:  Well I'm not sure that I would go

6    that far with it.  You've produced something, and that could

7    be classified as information, but even though I've commented

8    on the interrogatory itself, from what you just showed me I

9    would easily say that doesn't comply with the interrogatory,

10   albeit overbroad, because it has summaries.  I'm not sure how

11   far I want to go down into the data to back that up.  That is

12   something that does concern me.  That's directed at

13   Plaintiffs as to how far we go.

14   Now I started to comment earlier -- I did comment

15   a while ago about the testimony of Nick Brown and O'Bryan,

16   but I'm not sure that just because it's represented that they

17   said that all of this could be -- anything can be produced

18   out of this program, I don't necessarily buy that because

19   that's -- I'm not sure that it can be, but more than what you

20   just showed me could be.

21   So for me it needs to be more specifically

22   identified as to what is claimed to not have been provided,

23   and that needs to be evaluated in whether it can be provided.

24   And if you cannot agree on that then the Master is

25   responsible for ruling on whether it's in compliance or not

1  and whether there are any sanctions that are appropriate or

2  not.

3          So Mr. Richards, do you have anything else to pull

4  up on after showing me that document?

5          MR. RICHARDS:  Your Honor, subject to any further

6  argument that Plaintiffs have we don't have anything further

7  at this point.  We've tried in our response to motion to

8  compel number four to include copious specific citations and

9  include attachments and examples explaining each of the

10  issues they've raised, and so I think that we largely stand

11  on our briefs and nothing further at this time.

12          SPECIAL MASTER:  All right.  We're just about to

13  4:00 so I do want to wrap this up so that we've got time to

14  address the issues that I've just now raised, certainly with

15  regard to the issue of in camera review, and a process that

16  I've yet to hear a suggestion that I can -- that I'm able to

17  identify and relate to.

18          MR. KILDOW:  Your Honor, I would like to address

19  that last question that you raised, the one -- when and if

20  it's appropriate.

21          SPECIAL MASTER:  Well do you have anything else on

22  four that you haven't previously argued?  I understand your

23  arguments and I'm pretty used to --

24          MR. KILDOW:  (inaudible) some things but you've

25  got the gist of things so I'm just going to leave it as it is

```
 1  on the record.  I'd like to make the suggestion when you have
 2  time.
 3            SPECIAL MASTER:  Then we're finished with four,
 4  and I would like to get to these other issues, so I guess we
 5  could start with that and work backwards to any others, not
 6  the least of which is in camera review.  That is number five
 7  and all of that.  But I'll let you start, Mr. Kildow, with
 8  your suggestion as to a process.
 9            MR. KILDOW:  Yes, I have a suggestion.
10            SPECIAL MASTER:  Good.
11            MR. KILDOW:  I would like the Special Master to
12  order the parties to meet and confer.  We identify from the
13  Plaintiff side specifically what we want based on what we
14  have seen, both from a data standpoint and from a scope of
15  time standpoint, and to fill in any holes we have.  Then the
16  parties have the meet and confer on a conference call and
17  hash out what Vail Health has and what they don't have.  But
18  I think that they should have someone from their data
19  processing group available so that they can identify what
20  they have and what they don't have.
21            We do not have an interest in writing motion after
22  motion.  We do not have an interest in making argument after
23  argument.  We are willing to compromise and to narrow what we
24  want and need.  And so we're amenable.  We don't want to see
25  this just go on and on and on, and so we are amenable to
```

1   doing that.

2            So I think that is the process that should be -- I

3   also think that the Board minutes should be submitted to the

4   Special Master for review.  Ms. Stevenson said we're not

5   talking about an overwhelming number of documents, but that

6   should be done.  Whether we disagree with you or not we'll

7   probably never know, but you have made your decision and you

8   have made your decision as to whether it's relevant or not.

9   I'm confident that it's going to have to go that route when

10  we get to the privilege logs in number five.

11           So that's my suggestion.

12           SPECIAL MASTER:  Let me just follow up on that and

13  ask you said Board minutes.  Are you also talking about the

14  finance committee and the --

15           MR. KILDOW:  Steering committee.

16           SPECIAL MASTER:  Steering.

17           MR. KILDOW:  Yeah, I would put both of those in

18  there too.

19           SPECIAL MASTER:  Well the first one you hit on the

20  head.  I did let the cat out of the bag earlier about the

21  conferring.  But I think I would like to hear from counsel as

22  to this suggestion, and particularly with regard to having

23  someone from data processing, because I can't make -- I can

24  make a decision but I hate to make a decision based on

25  representations as to what Nick Brown or O'Bryan testified

1  to.   I would like to know what the limits are in terms of

2  those searches from somebody that knows what they are hired

3  to do.  So Ms. Stevenson?

4            MS. STEVENSON:  Sure.  Your Honor, I'm amenable to

5  what Mr. Kildow is proposing in certain respects.  I think it

6  would be helpful if they could send a list of things that

7  they wanted.  The reason I say this rather than just saying

8  let's all get on the phone is that I have had the past

9  experience of getting on the phone for something like this

10 and having them ask a bunch of questions, which of course I

11 have to go back to my client to get an answer to, and then

12 being accused of not conferring because I don't know the

13 answer off the top of my head.  So --

14            SPECIAL MASTER:  Well I think --

15            MS. STEVENSON:  -- having it would be helpful.

16            SPECIAL MASTER:  Yeah, I heard him get to that

17 point on my third line here is Plaintiffs need to identify

18 what they need.  They need to restructure this to ask for --

19 first of all there have been -- now there's the privilege log

20 so that doesn't apply in part anyway to the briefing.  And

21 then now there's the production of the 20th.  So they need to

22 identify that and send that to you, then you need to confer.

23 Is that what you were saying?

24            MS. STEVENSON:  Yes, Your Honor.

25            SPECIAL MASTER:  Mr. Kildow?

1        MR. KILDOW:  Yeah.

2        SPECIAL MASTER:  So Ms. Stevenson, go ahead.

3        MS. STEVENSON:  I do resist the notion of having a

4   meeting with Plaintiff's counsel and a data person from Vail

5   Health, because quite frankly the number of systems that they

6   use is very complex and you usually have to talk to multiple

7   people to get some of these answers.

8        And also I just think that's -- you know, Mr.

9   Kildow is entitled to take depositions and ask questions of

10  the people he wants to ask questions of, but I'm not aware of

11  any obligation to just make your in house person available

12  for a free for all.  I would resist doing that outside of the

13  appropriate formal process.  But I'm happy to try to figure

14  out who the right people are and answer those questions.

15       MR. KILDOW:  Could I make one comment, Your Honor?

16       SPECIAL MASTER:  Okay.

17       MR. KILDOW:  Ms. Stevenson said we're entitled to

18  take depositions.  That's true, however there's two problems

19  with that.  Number one, we have a limit of ten depositions

20  total, and we just don't have that many depositions that we

21  can take.  Many of them are non-party, so that's a problem

22  with a limit of ten.

23       And then the discovery period ends a week from

24  today, and we're up against the deadline, so that's a

25  problem.  But it seems to me that if we provide you with a

1  list, you know there may be different areas, you can identify

2  the people that you need to help you address those issues and

3  we can do it informally.

4           SPECIAL MASTER:  Respectfully I really don't want

5  to hear they can do depositions again.  I mean that's not a

6  practical solution to these particular problems as I see it.

7  Maybe you can explain what you meant since you have a puzzled

8  look on your face, but I just -- that's not going to be my

9  solution to it is to say well you can take a deposition.

10 Because I am not prepared at this point in time -- even

11 though I've been appointed to address discovery issues -- I'm

12 not prepared to make any recommendation to the magistrate

13 judge or a judge that that be expanded because of the obvious

14 concerns of delay.

15          So I'm open to language as to how you want me to

16 put it.  I mean it starts off with Plaintiffs identifying

17 specifically what they need in terms of their prior discovery

18 requests that have not been produced.  I mean seriously, this

19 is about you conferring and working through this to a 50 or

20 75 percent level in my view, because I can figure it out and

21 you guys are better lawyers than I am.  I'm just a dumb

22 judge, as they say.

23          So I would like for you to use your skills to say

24 here's how we resolve this problem, except for we just

25 disagree about this piece or that piece, and then identify

1    that.  And then -- setting aside the deadline of a week from

2    now because I don't have any doubt that if I convey to either

3    one of the judges -- or if you convey in a request to extend

4    that time -- then that would be verified by me.  The point is

5    to get it done and done right.  Artificial deadlines for

6    discovery are disastrous for reversal at a later point in

7    time and that's everybody's waste of time.

8              So Ms. Stevenson, I heard your objection to having

9    the data processing person present because it may be more

10   than one person, and two, because you don't want them subject

11   to some line of inquiry in an informal way.  I mean that

12   could lead to a problem.  I would hope not.

13             MR. KILDOW:  Your Honor, could I just make a

14   comment real quickly.  Hearsay is a horrible, horrible thing.

15   In the State Court action the first statement was that the

16   claims information were in a warehouse -- that it was in

17   paper form and in a warehouse.  Eventually we got to the

18   deposition of the billing person who said oh no, they've

19   never been in paper.  They're all electronic and we have them

20   but during a limited period of time.

21             So having the data person there -- in that case

22   the billing person -- was enormously beneficial because we

23   cut through what took us months to cut through.  We're not

24   here to go months -- we're very practical in this sense.

25             SPECIAL MASTER:  Well we did have that problem.  I

1   grant you that.  Certainly if counsel didn't know that they

2   do now.  But that was certainly a problem.  That's the kind

3   of thing that I had in mind when I was reflecting on this

4   last night and this morning in terms of how to approach the

5   problem.  Merely ruling doesn't address the problem of

6   producing what can be produced and moving on.

7            MR. KILDOW:  There's also the appellate issue.  I

8   mean if you can force the parties to get into a room and

9   agree then that obviates an appellate issue on both sides.

10           SPECIAL MASTER:  I can be optimistic about that,

11  but that remains -- I would leave that up to you.  As I said,

12  that's part of your --

13           MR. KILDOW:  We would be pleased to have the leave

14  of the Special Master if we could suggest a proposed order,

15  but we would do that in conjunction with opposing counsel and

16  try to submit something to you that would be a practical

17  solution.  If there are certain areas that we cannot come to

18  an agreement on then the Special Master could step in and say

19  well, this is how it's going to go.

20           SPECIAL MASTER:  I'm willing to do that.  I guess

21  with the reminder of the deadline.  I'm not sure what your

22  timing is.  But I want to be clear that I do expect counsel's

23  participation to try to resolve this in the vein that I

24  described here.

25           Before I say you confer about the order what can I

1  answer in terms of any other questions, Ms. Stevenson,

2  besides what you have raised?

3        MS. STEVENSON:  Your Honor, I'm not -- I don't

4  think I have any questions right now.  I mean I do think, you

5  know, this is one of these things that as you work through it

6  there may be questions that arise, but I think it's going to

7  depend a lot on what specifically Plaintiffs are asking for

8  and --

9        SPECIAL MASTER:  So what is your suggestion?  I

10 think I just heard Mr. Kildow saying that you guys confer

11 about a joint order.  But the other would be that they

12 provide to you the Plaintiff's list of information needed in

13 conjunction with what has been produced since -- what was

14 produced and has been since the time of the original

15 pleadings here.

16        I almost hate to formalize it in that I would

17 rather that you work sincerely to accomplish the end goal of

18 production, as I said what can be and needs to be, and then

19 I'll decide what doesn't need to be.

20        But you are in a much better position -- this is

21 one of those things that having lived in this case and other

22 Special Master cases I've learned as we've had, you know,

23 motions and arguments develop --

24        MR. KILDOW:  Judge, I probably jumped to the idea

25 of an order too quickly and I don't mean to.  What I suggest

1    we do is not put it in the form of an order but just a list

2    of things that we need and the parameters.  And we'll submit

3    that to them and they can tell us what we can do and what we

4    can't, and then we can sit down and talk about the --

5              SPECIAL MASTER:  Okay, Ms. Stevenson?

6              MS. STEVENSON:  I think that seems fine.

7              SPECIAL MASTER:  And I would be copied on that

8    just so that I'm up to speed from time to time about your

9    progress.

10             MR. KILDOW:  We can do that.  We certainly can.

11             SPECIAL MASTER:  You have an objection to that?

12             MS. STEVENSON:  Not at all.

13             SPECIAL MASTER:  Well, I think that is it on that

14   particular issue.  Then do we want to tackle the issue of in

15   camera review now?  I don't want to develop any response to

16   number five and opportunity to argue that but we could maybe

17   reduce that.

18             MS. STEVENSON:  Your Honor, two quick things.  One

19   with respect to this list of documents that Plaintiffs think

20   they should get.  It would be helpful to me to have it -- to

21   have whichever discovery request they're referring back to

22   included in the list.

23             Then with respect to the -- if you're referring to

24   the motion to compel number five, we haven't even filed our

25   response to that yet.

1      SPECIAL MASTER:  That's what I'm saying.  I know,

2  yeah.  I wasn't trying to cut you off of that.  I was just

3  trying to say I do -- because I did not read it because I

4  knew we were having this proceeding, and then two, that you

5  hadn't filed a response.  So I was holding off on that and I

6  had already recognized in this process that some form of in

7  camera review with regard to -- before I even knew the

8  privilege log had in part at least been produced, I just

9  anticipated that we were getting there.

10      So if you want to forego that for now, but my

11 thought was in order to not delay maybe we should start --

12      MS. STEVENSON:  Are we talking about the Board

13 minutes?  That was my understanding of the in camera review.

14      SPECIAL MASTER:  Two different things.  There was

15 the privilege log and then there was the Board minutes he was

16 asking for.  He asked for that specifically.

17      MS. STEVENSON:  Just to be clear, we actually put

18 -- the redactions from the Board minutes, they're not for

19 privilege, they're for relevance, but we did log them in our

20 privilege log.

21      SPECIAL MASTER:  Well I'm still -- yes, talking

22 about some form of in camera review relating to the privilege

23 log.  Though I haven't seen the privilege log so I didn't

24 realize that you had put that in there as well.

25      MS. STEVENSON:  Well if we're talking about -- if

1    you think you want to do an in camera review of the

2    unredacted Board minutes to confirm that the redacted

3    material is not relevant I think that's fine.  I think we've

4    -- that is ripe.  I think the privilege issues are not ripe

5    because we've not finished briefing the motion yet.

6              SPECIAL MASTER:  Okay.

7              MS. STEVENSON:  Or we could wait and do it all at

8    one time after we've finished the motion to compel number

9    five.

10             SPECIAL MASTER:  The only reason I was thinking

11   about approaching it now was to keep things moving but now

12   that I realize that in the privilege log they're both there

13   I'm slightly reluctant to start digging in to that when I

14   haven't had the briefing completed on number five.

15             Well, here's how we'll start.  The Plaintiffs will

16   identify what documents and information they need after

17   having had these hearings and the recent productions.  They

18   will present that to Vail Health by when, Mr. Kildow or Ms.

19   Braunschweig?  You know, including the reference to which

20   request for production interrogatory it is.

21             MS. BRAUNSCHWEIG:  Right.  Right.  Does ten days

22   seem reasonable to you, Judge?

23             SPECIAL MASTER:  It's reasonable to me.

24             MS. BRAUNSCHWEIG:  Okay.

25             SPECIAL MASTER:  All right.  Without counting

1  numbers I think it's November 1st.

2          MS. BRAUNSCHWEIG:  Could we make it November 2nd?

3          SPECIAL MASTER:  That's fine.  Sure.

4          MS. BRAUNSCHWEIG:  Thank you.

5          SPECIAL MASTER:  Are we then in general

6  concurrence that I won't tackle any partial in camera review

7  at this time?

8          MR. KILDOW:  Well from Plaintiff's standpoint we'd

9  like to get going on it.  I think that there are one or two

10  legal questions that have to be addressed such as if you send

11  a copy to an attorney does the whole document then become

12  privileged.

13          SPECIAL MASTER:  Yes, well that's why I wouldn't

14  tackle those yet.  And so -- but I think --

15          MR. KILDOW:  I would like to get going on it if we

16  could because then things keep moving.

17          SPECIAL MASTER:  Yeah I know.  Well I would too

18  except for what am I going to do, brief that separately as

19  opposed to just wait for the --

20          MR. KILDOW:  No, I understand.

21          SPECIAL MASTER:  All right, so that's in abeyance.

22          MS. STEVENSON:  Your Honor, just in the -- to be

23  fully candid here, Plaintiffs have asked a couple of weeks

24  ago, you know, our position on filing a motion to extend

25  discovery and expert disclosure deadlines, and I hear what

1   you're saying about that.

2          We did inform that we would oppose that motion.

3   We've been doing discovery in this case alone for 13 months,

4   and I understand that you know we may or may not win that

5   issue or may win in part or not, but I'm happy to continue to

6   follow up on issues that they think are unresolved from our

7   discovery responses.  I just wanted to be clear I didn't want

8   to stipulate to some sort of wholesale extension of

9   discovery.

10          SPECIAL MASTER:  I have been involved 13 months.

11   I'm speaking from my perspective of trying to actually

12   resolve all of this in a reasonably short period of time, but

13   as we just discussed with number five and in camera review,

14   that really can't be accomplished by next Friday.

15          MS. STEVENSON:  Of course.  I wouldn't expect it

16   to be and I don't have any objection to us completing all the

17   outstanding issues that have been raised in these motions.

18          SPECIAL MASTER:  That might be one way of

19   addressing it, so I'll let you confer about that if you can

20   come to an agreement, if you can't it's -- I mean I was

21   trying to focus on getting these to resolution.

22          That refreshes my recollection.  In one of these

23   pleadings there was reference to something in the State case

24   that the Special Master had not yet ruled on.  I know there's

25   costs and attorney's fees that were awarded and then the case

 1   went up to the Supreme Court and back, and COVID, and this

 2   and that and the other and I haven't gotten back to it.  Then

 3   in the meantime Judge Gallagher and Judge Martinez appointed

 4   me in this case.

 5             What is that that I need to try and identify?  I

 6   apologize for taking your counsel time here --

 7             MR. KILDOW:  It's a bill of cost issue.  We

 8   resubmitted our bill of cost.  I've got it on my -- Ms.

 9   Braunschweig of course has prepared it and we have it ready

10   to submit to you.  We can have it to you --

11             MS. BRAUNSCHWEIG:  No, Allan --

12             SPECIAL MASTER:  I know that is pending.  There

13   was a reference about ruling on --

14             MS. BRAUNSCHWEIG:  Yeah, there was redacted

15   document ordered to be reviewed in camera related to the

16   Steadman documents.  And then that issue was presented to you

17   and the last communication that we had is that you were going

18   to pick up the document from Terry Farney to review that.

19             SPECIAL MASTER:  Well email me.

20             MS. BRAUNSCHWEIG:  Okay.

21             SPECIAL MASTER:  I have lost track of that.  I

22   thought I had cleaned up all except for this.

23             MS. BRAUNSCHWEIG:  Oh, and there was a -- there's

24   also -- maybe I shouldn't raise this but there was another

25   one related to an in camera review of the documents that Ms.

1  Haroda had in her files and they were redacted.  That came

2  through the billing part of the case.  The issue of billing

3  documents and --

4           SPECIAL MASTER:  Well email me, copy counsel

5  there.  Do not copy this court, needless to say.  Not that

6  you would for that but I want to try to clean that up.  I did

7  not -- I looked at it briefly.  What's the trial date?

8           MS. BRAUNSCHWEIG:  We don't have one yet.

9           SPECIAL MASTER:  You don't have one.

10          MS. BRAUNSCHWEIG:  Not yet.

11          SPECIAL MASTER:  All right.  4:30 on the nose.

12  Anybody have anything else?

13          MR. KILDOW:  Not from Plaintiff.

14          SPECIAL MASTER:  Okay.  Any clarification on

15  anything that I -- that we just went over?

16          MS. BRAUNSCHWEIG:  Yeah, I do have a question.  In

17  terms of the timing if we get them our list within ten days

18  or eleven days what should their response be in terms of

19  timing?  That would be helpful. Then the conferral that needs

20  to happen.  That gives us -- helps us with our expectation.

21          SPECIAL MASTER:  I know the standard answer on

22  that is it depends on how long your list is but in light of

23  what we've discussed here, what sort of time frame?

24          MS. STEVENSON:  Well Your Honor, I would go about

25  it two ways.  I mean it seems to me that two weeks is

1   probably -- I would hope -- a reasonable amount of time to

2   get a response certainly to the great bulk of issues.

3   Alternatively we could wait and see what the list looks like

4   and then give you an estimate as soon as we get it.

5          SPECIAL MASTER:  I'd rather set a limit now, and

6   two weeks is not unreasonable but since they've had ten days

7   -- you know, you're responding to their list and then a

8   conferral.  Let me say November 12th.  Are you going to

9   complain about that?  If you do I'll go to the 15th.

10          MS. STEVENSON:  Either one is fine.  I mean I

11   think we'll be working to get it done as quickly as we can

12   and if it's -- there's one or two issues that are outstanding

13   I will give an explanation for that.

14          SPECIAL MASTER:  Thank you.  And then if that's

15   done what's the conferral deadline?  The 22nd?  If it's not

16   then we lose a week automatically with Thanksgiving.

17          MR. KILDOW:  I would say the 22nd at the latest,

18   yeah.  I would say the week of the 15th to the 19th.

19          MS. STEVENSON:  I think the 19th would be fine.

20          SPECIAL MASTER:  Good.  That's reasonable.  Thank

21   you.  Okay, anything else?

22          MR. KILDOW:  None from Plaintiff, Judge.

23          SPECIAL MASTER:  Thanks for bringing that up.

24   That is helpful to make sure that we've got some solid

25   deadlines.  Okay.

1          MR. KILDOW:  Thank you, Judge.

2          SPECIAL MASTER:  Thank you, everybody.  Have a

3    good weekend.

4          MS. STEVENSON:  Thank you.  Have a nice weekend.

5          MS. BRAUNSCHWEIG:  You too.

6          SPECIAL MASTER:  We'll be in recess.

7                (Time noted:  4:33 p.m.)

8                     *  *  *  *  *

9                      CERTIFICATE

10       I, RANDEL RAISON, certify that the foregoing is a

11   correct transcript from the official electronic sound

12   recording of the proceedings in the above-entitled matter, to

13   the best of my ability.

14

15

16   _____    November 12, 2021

17   Randel Raison

18

19

20

21

22

23

24

25