# EXHIBIT 1

1

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF COLORADO
 2

 3   SPORTS REHAB CONSULTING,      .   Case No. 19-cv-02075-WJM-GPG
     LLC, a Colorado limited       .
 4   liability company, and        .
     LINDSAY WINNINGER, an         .
 5   individual,                   .
                                   .
 6              Plaintiffs,        .
                                   .   Wayne Aspinall Federal Bldg.
 7   vs.                           .   402 Rood Avenue
                                   .   Grand Junction, CO  81501
 8   VAIL CLINIC, INC.             .
     doing business as             .
 9   VAIL HEALTH,                  .
     a Colorado nonprofit          .
10   corporation,                  .
                                   .
11              Defendants.        .   October 21, 2021
     . . . . . . . . . . . . . . . .   1:12 p.m.
12
             TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE
13               WILLIAM T. RUCKRIEGLE, SPECIAL MASTER

14   APPEARANCES:

15   For the Plaintiffs:        Law Office of Allan L. Kildow
                                By:  Allan L. Kildow
16                              By:  Sonya Braunschweig
                                709 Potato Patch Drive
17                              Vail, CO  81657
                                (970) 390-6675
18
     For the Defendants:        Davis Graham & Stubbs, LLP
19                              By:  Shannon Wells Stevenson
                                By:  Daniel Richards
20                              1550 17th Street
                                Suite 500
21                              Denver, CO  80202
                                (303) 892-9400
22
     Court Recorder:            Clerk's Office
23                              U.S. District Court
                                402 Rood Avenue
24                              Grand Junction, CO  81501

25
```

1            If we go to pages 1024 to 1027 it provides a very
2   concise guide to the elements necessary for determining the
3   relevant geographic market.  So we would ask that the Court
4   -- or suggest to the Court that that is an easy reference in
5   a very complicated area.
6            One of the things that Lantec talks about is
7   reliable data.  It keeps talking about reliable data, but in
8   our view this is an evidentiary issue as well as a legal
9   issue, that the parties are entitled to obtain reliable data
10  to determine the basic elements of geographic market.
11           The Lantec case recites a number of issues.  The
12  first one I would point out is consumer purchasing
13  preferences.  We need reliable data relating to consumer
14  preferences, which is why very often there is analyses of the
15  patient flows between geographic markets.  How many patients
16  will come in to a market and how many patients will go out of
17  the market to receive the therapy or the medical care that
18  they're referring to?
19           Judge Ruckriegle, when I talk about patients here
20  I'm talking specifically for this case about physical therapy
21  patients, but in the case law I think the same principals
22  apply whether it's a patient for a heart ailment or whatever
23  kind of medical treatment the individual would require.
24           SPECIAL MASTER:  We will have also the various
25  things but I think here we're clearly focusing on P.T.

...

11

1  MR. KILDOW:  Correct.  Now one of the points that
2  the Tenth Circuit made was that in the Lantec case the Utah
3  District Court excluded the Plaintiff's expert on the grounds
4  that, among other things, the expert didn't conduct a
5  consumer survey of the patients that were at issue in the --
6  defining the geographic market.
7  Now the Tenth Circuit agreed with the District
8  Court on the fact that the expert did not conduct a consumer
9  survey.  I would note that in this case the two plaintiffs
10 who were deposed here in the Federal case, one Brad
11 Schoenthaler, a German name --
12 SPECIAL MASTER:  I remember.
13 MR. KILDOW:  He was deposed on July 8th of this
14 year.  In that deposition the defendant, Vail Health, asked
15 Mr. Schoenthaler whether the Plaintiff had conducted a survey
16 regarding whether Vail Valley residents would be willing to
17 travel over Vail Pass to the Frisco, Dillon, and Silverthorne
18 area for physical therapy services, and Mr. Schoenthaler
19 answered no.  That was at page 33 of that deposition.
20 Then again on October 7th Lindsay Winninger was
21 deposed and the same question was asked at page 109 whether
22 the Plaintiff had conducted any surveys of the same issues
23 almost verbatim.
24 So that suggests to us that the survey issue is
25 something that Vail Health may bring up at a later point in

1 time pointing now to the Tenth Circuit case and Lantec.  Of
2 course the Plaintiff has long since anticipated that that's
3 an issue for an expert and -- but the expert to conduct the
4 survey needs to have the names and the addresses of the tens
5 of thousands of patients that have visited Vail Health
6 physical therapy clinic, both here in the Vail Valley and in
7 Summit County.
8          We have asked for that information and
9 surprisingly last night at about 5:08 we received some
10 information -- some information although no names or
11 addresses.  I'm going to address that again in just a moment.
12          Plaintiffs are also entitled to under the Lantec
13 case the price of the services at issue and the cost incurred
14 in providing those services.  And the Tenth Circuit dismissed
15 the case because of a lack of analysis in some of these basic
16 areas.  I think it's very clear that these are the required
17 elements more or less for the Tenth Circuit, to which the
18 Plaintiffs are entitled to discovery so they can present
19 evidence in summary judgment and trial of this case.
20          Why Vail Health is withholding that evidence I
21 don't know.  If they're going to seek the Plaintiffs on the
22 relevant geographic market issue they're going to have to do
23 it on the basis of the evidence that the Tenth Circuit has
24 identified in the Lantec case.
25          In responding to Plaintiff's motion number one,

1  and other motions, Vail has represented that these motions
2  involve facts in this anti-trust that have been litigated
3  fully in the Eagle County case.
4             As you know, Judge, some of the exclusionary
5  conduct at issue in this case involving false or incorrect
6  statements has been litigated in Eagle County, but those
7  false statements are not at issue in this motion or any of
8  the other motions that we'll talk about in the next couple of
9  days.  The issue on discovery into relevant geographic
10 markets has really nothing to do with the Eagle County false
11 statement.
12            In making the representation that all of this has
13 been kind of trod around in the Eagle County action, Vail
14 Health hasn't really cited a single piece of evidence that
15 goes to the big components of the Sherman Act, Section 220.
16            At issue here, as I said, under the Lantec case
17 are consumer preferences.  There were no issues or discovery
18 produced in the Eagle County action related to consumer
19 preference, whether they wanted to go to Summit County, or
20 Pitkin County, or any place else.  The issues here involve
21 the cost structure of Vail Health in providing the physical
22 therapy treatment.  There was nothing in the Eagle County
23 action that dealt with costs.  The same is true with price.
24 Prices are at issue here.
25            There were 40 insurance claims that were submitted

1   as part of the Eagle County action for the period prior to
2   November 1, 2012, but that period has been ruled not relevant
3   here.  We've appealed that to Judge Martinez, but for the
4   moment those 40 forms are not at issue.
5               There are other typical anti-trust issues like
6   barriers to entry that were not relevant in the part of the
7   Eagle County action.  Neither was market share, a fundamental
8   part of monopoly, market share wasn't part of the Eagle
9   County case either.
10              So as we've pointed out, there's almost no
11  discovery arising out of the Eagle County action which would
12  make the discovery that we're asking for here duplicative of
13  what went before Judge Grainger or yourself, Judge
14  Ruckriegle.
15              So what information do Plaintiff want?  Number
16  one, very, very complicated.  We'd like the names and
17  addresses of the Vail Health physical therapy patients that
18  Vail Health treated through the period November 1, 2012 to at
19  least as close to the present as they can get.
20              This is not a big deal because Vail Health has all
21  of that information, and is required to have all that
22  information by Colorado law.  I would just point out that as
23  part of motion to compel number two there is an Exhibit 25
24  that has all of the information that one could really ask
25  for.  Names, codes, treatment received by the patient, the

```
 1  insurer.  The data that is there --
 2              SPECIAL MASTER:  Hang on.  When you say Exhibit 25
 3  is that out of your -- which was that attached to?  The
 4  motion to compel, the initial one, only has Exhibits 1 to 17.
 5  I'm just trying to make sure that I can attempt to pull this
 6  up anyway.
 7              MR. KILDOW:  Right, Your Honor.  It's motion
 8  number 25 and it is --
 9              SPECIAL MASTER:  I'm sorry, you said Exhibit 25,
10  but --
11              MR. KILDOW:  And it is part of Plaintiff's motion
12  to compel number two.
13              SPECIAL MASTER:  Which is filing number -- I'm
14  getting used to this so I'm going to --
15              FEMALE:  Maybe I can help.  I think it's 130-7.
16  It would be a restricted exhibit 7 and then it says Exhibit
17  25.
18              SPECIAL MASTER:  I'm going to try -- I forgot to
19  ask Angela about that.  I have had difficulty getting into
20  those restricted exhibits so I don't know -- I mean I know
21  that I'm supposed to have full access but I noticed that I
22  had difficulty.  I'm going to try it right now again.
23              FEMALE:  Your Honor, we also have difficulty
24  accessing the redacted exhibits and we had to call the help
25  desk to get us the proper access.  I don't know why.
```

```
 1              SPECIAL MASTER:  You do not have permission to
 2   view this document.
 3              FEMALE:  That's what we were getting too.
 4              SPECIAL MASTER:  All right, so --
 5              MR. KILDOW: I can send it -- if there would be no
 6   objection I could send it to you by email.
 7              SPECIAL MASTER:  Well I need to get these -- if
 8   there's no objection I would have you do that.  Ms.
 9   Stevenson?
10              MS. STEVENSON:  I'm just trying to look at it,
11   Your Honor, because --
12              SPECIAL MASTER:  It was actually the first thing I
13   had on my agenda and then we were having difficulty getting
14   everybody on I blew past that and went to -- but I am blocked
15   from all of those things that are actually identified as
16   restricted.
17              MS. STEVENSON:  Your Honor, I don't know that as
18   this was an exhibit to motion to compel number two I'm
19   wondering if it wouldn't be appropriate to take it up when
20   we're talking about motion to compel number two.
21              SPECIAL MASTER:  Well --
22              MR. KILDOW:  It would be helpful if the Court
23   could -- if the Special Master could see the exhibit.
24              MS. STEVENSON:  I don't disagree with that.
25              MR. KILDOW:  I can't forward it to him by email.
```

1            MR. KILDOW:  Your Honor, how about to the time of
2   tomorrow's hearing.
3            SPECIAL MASTER:  That's certainly reasonable
4   obviously but I want to be careful about taking any time away
5   from tomorrow's hearing.  But I think we have over scheduled.
6   I mean scheduled plenty of time.  So that's fine.  In the
7   meantime I'll have Exhibit 25 at least and maybe I'll have an
8   answer to my question why I'm not in there.  Go ahead.
9            MR. KILDOW:  So in conclusion we want in flow and
10  out flow data, patient names and addresses.  Thank you.
11           SPECIAL MASTER:  All right, thank you.  Ms.
12  Stevenson.
13           MS. STEVENSON:  Thank you, Your Honor.  I want to
14  respond to your concern about this production that we made
15  yesterday.  The information that we provided was the exact
16  information that we told the Plaintiffs we would provide them
17  at page ten of our response to their motion to compel on
18  September 2nd.
19           It has been a Herculean effort to put this
20  together, and we've communicated with them about it a couple
21  of times since we listed out all the information that we
22  would provide.  Up until this date that we provided it it's
23  taken well in excess of 50 man hours of Vail Health employee
24  time and it is an enormous amount of information.
25           It provides from fiscal year 2014 through 2020 I

1  think everything that Mr. Kildow has asked for, including
2  every patient physical therapy visit that has happened in any
3  of the relevant geographic market, as they put it.  All of
4  the codes, all of the procedures that were performed, what
5  was paid for those procedures, who the relevant insurance
6  carrier was if there was one, the facility where the
7  procedure happened, the zip code of the patient, patient
8  identification number.  It's about 20 columns of information
9  for each year in excess of 100,000 rows of data.
10             THE COURT:  So I take it that you put this exhibit
11 together from other information, is that --
12             MS. STEVENSON:  We had to integrate multiple
13 databases of information to try to get this together.  But it
14 hasn't --
15             THE COURT:  Well I certainly will acknowledge that
16 in your -- in my notes on the old fashioned way on your
17 response I had written when, why not yet, and things like
18 that that I could show you, but I read your earlier responses
19 that you would be producing, and I know that document was
20 filed September 2nd.  So given my review of that the last
21 couple of days I was ready to ask that question but you've
22 now answered in part.
23             MS. STEVENSON:  And again, I will tell you -- I do
24 want you to know we were riding herd as hard as we could on
25 these employees to put this together.  As you might expect,

29

1   the hospital is facing any number of incredibly pressing
2   issues between COVID and vaccines and mental health, and we
3   were getting a lot of push back on the amount of time folks
4   had to spend on this, but we did push it as hard as we could.
5              I do regret that it was, you know, yesterday, but
6   we had represented we would provide the information and we've
7   done that.
8              Now I want to speak specifically to the question
9   about patient names and addresses.  This is a tremendous
10  concern to the hospital.  First of all, from the very
11  beginning of responding to this discovery request we had told
12  the Plaintiffs, you know, we don't want to produce what
13  you've provided but we will work with you on providing the
14  information in some sort of de-identified form.  The
15  Plaintiffs actually represented that that would be okay.
16             I think what I hear Mr. Kildow saying now -- and I
17  don't think he's ever raised this until these actual motions
18  -- is that he thinks he needs patient name and address
19  information in order to do consumer surveys.  This is
20  incredibly troubling.
21             I mean what he's saying is he would take this
22  highly sensitive protected health information -- I know you
23  understand the background of the case and the sensitivities
24  to this issue overall -- and use that information to give to
25  an expert who would then reach out to these individuals for

```
 1   purposes of getting information about this case.  That cannot
 2   happen.  I think that would be a massive breach of the
 3   hospital's -- everyone's obligations with respect to keep
 4   this patient health information protected.
 5              He's got the zip codes for each and every one of
 6   these patients listed, which I think is the information that
 7   he actually could conceivably need.  But I want to speak
 8   about -- I agree that often times experts will conduct
 9   consumer surveys in areas to determine geographic market, but
10   those are not done -- and certainly are not necessarily done
11   by contacting actual -- certainly of a health facility --
12   actual patients.  They're done by using focus group entities
13   and sending out broad surveys in the same way you would do if
14   you were a marketing company or something like that.
15              There's certainly nothing that has prevented him
16   and his expert from undertaking those activities to survey
17   people in the Vail Valley, or Summit County, or anywhere else
18   as to what their preferences would be with respect to seeking
19   physical therapy services.  But the notion that he can use a
20   patient list from the hospital to do that is not something
21   that can be done.
22              I think that really is where our dispute is
23   narrowed down to is patient names and addresses.  Again, for
24   the reasons I've articulated I do not believe that we can
25   produce that information.
```

1          THE COURT:  I did pursue that but the other is
2    what I have referenced in terms of this relevant geographic
3    market.  I understand that you don't want to stipulate to
4    that and why, but you either can stipulate to it for
5    discovery purposes or I'll order it for discovery purposes,
6    whichever way you want to do that.
7          But I do think that you -- I want to understand
8    your position with regard to -- not the factual issue but for
9    purposes of discovery your position as to what it is.  Does
10   that include Summit?  Does that include Garfield?  Does that
11   include Basalt?
12         MS. STEVENSON:  Again, Your Honor, I think the
13   critical point here is that first of all -- I mean again,
14   this is a market that they have to define and prove.  There
15   is no burden on Vail Health to say no, there's a different
16   market.  We can just say we don't think your market is
17   correct.  In fact, with the very loose product market that
18   they've defined, I don't even think we could define a market.
19         Now again, I think Mr. Kildow is just skipping
20   ahead also to what expert discovery is about.  So typically
21   it is an expert who says this is a relevant geographic market
22   and this is how I've defined it, and then we will have a
23   competing expert.  Depending on what they say I think our
24   responding expert could either say no, your market is wrong
25   because of x, y, and z, or it could say your market is wrong

1  and here's what the market should be.  But there's no
2  obligation on the Defendant to define a market.
3             SPECIAL MASTER:  If that's correct -- I'm not
4  conceding that yet either, so we both can take those
5  positions about what we're not conceding -- but the point is
6  if that's correct then based upon what I have seen in the
7  pleadings, based upon exhibits, based upon fact that they're
8  a new facility -- I forget which exactly -- and then in
9  Dillon that's opening in days now, then why would it be
10 reasonable to wait until there's an initial discovery of
11 expert when we know that that area could be greater than what
12 Plaintiffs have claimed the relevant geographic market to be,
13 and then do discovery on that.
14            Let their expert then say here's my opinion on
15 what the relevant geographic market is and let your expert
16 state what they believe it is as opposed to waiting until if
17 I only give them the information between -- this is my
18 simplified analysis here.  If I only give them that
19 information between East Vail and Glenwood Canyon now but
20 later your expert says oh no, I think it's beyond that then
21 that would be subject to reopening discovery to what your
22 expert had access to that they didn't have access to.
23            That's my concern.  Now tell me I shouldn't have
24 it or tell me that you'll be willing to produce that
25 information as it relates to that potentially expanded area.

1             MS. STEVENSON:  Oh sure, and I was just trying to
2  address the notion that -- we've certainly not taken the
3  position that there's no discovery that needs to be done in
4  this case because it's all been done in the State case.
5  That's why we produced so much information in this case which
6  is relevant to the issues that have not been litigated.
7             SPECIAL MASTER:  Thank you.  Mr. Kildow?
8             MR. KILDOW:  Very quickly, Your Honor.  First of
9  all, I don't know about this recent case that was just
10 mentioned.  I don't know if that was -- I don't recall that
11 being in their brief.  But in my extensive reading of anti-
12 trust law relating to geographic market I haven't been able
13 to come across a single case where there isn't a comparison
14 of geographic markets.  In other words, geographic market A
15 is 100,000 square miles and geographic market B is 200,000
16 square miles.
17            They are competing.  That is the law.  If we look
18 at the cases that we've cited, all of those cases involved a
19 comparison.  The requirement of the Plaintiff to identify the
20 geographic market is dependent upon that comparison.  So we
21 can't prove that our market is necessarily absolutely correct
22 other than geologically here unless we have access to data
23 outside of the geographic market.  As I said before, would
24 people travel from Vail to Breckenridge to get physical
25 therapy, or vice versa.  So naturally we are entitled to

1  that.  That is the law of the Tenth Circuit.
2           The Defendant here has not cited a single case to
3  undercut Lantec and all of the other Tenth Circuit cases in
4  the body of Federal law, so this is not -- this is the law.
5  We get to compare outside.
6           Number two, experts can only testify to facts that
7  have been proven in the record and what they could rely on
8  outside of those facts based upon their experience.  But to
9  do this requires the evidence as to what is in Count A and
10 what is in County B.
11          We have cited a number of health care merger
12 cases, for example the Hershey case.  This is the way it's
13 done.  We compare the sizes of the geographic counties, we
14 compare the costs incurred, we compare the prices, we compare
15 the costs and price sensitivities between competing relevant
16 counties.
17          Ms. Stevenson is pushing -- trying to push this
18 case in a direction that is simply not supported by -- from
19 my standpoint -- any Federal case that I have read.  I
20 haven't read the last one, but for the Tenth Circuit
21 standpoint Lantec is the case -- is one of the cases.
22          So we get to look at cost, prices, facilities, the
23 structure of the market, the preferences.  How can we compare
24 the preferences between the counties if we don't have the
25 data?  That is just the way it works.  And so I encourage the

1  Court to remain within the absolutely tried and true law when
2  it comes to the definition of geographic market, and what Ms.
3  Stevenson is suggesting is not in any way the Federal law
4  relating to geographic market.
5           SPECIAL MASTER:  I'll go back and re-review that.
6  Here's -- I think I understand pretty clearly because I know
7  what you're saying.  Let me ask you a pointed question.  Why
8  do you need the names and addresses?  Whatever your answer is
9  -- as opposed to just the zip code?  This was my impression
10 when I first read the motion after Judge Gallagher referred
11 them to me.
12          Secondly, do you intend to conduct any survey by
13 contacting those patients?
14          MR. KILDOW:  The answer to the second part is yes.
15 The answer to the first part has to do with survey
16 technology.  What we would do is to focus these survey
17 samples on those people within the patient pool of Vail
18 Health, and we would probably enter into some agreement or
19 stipulation with Vail Health as to the questions that would
20 be asked.  They would not involve things that would be PHI
21 related.
22          What we would -- but the difference is how do you
23 pick out the samples to be surveyed.  We are talking about
24 tens or hundreds of thousands of patients with respect to
25 Vail Health alone, and so to just survey randomly people who

1    have no orthopedic problems, no need for a physical
2    therapist, have never been to a physical therapist, have no
3    idea of what the cost of physical therapy would be would be
4    -- let's just face it, not very meaningful.  You're going to
5    people who are in that market and conduct the survey that
6    way.  And so it's a much better, much more accurate
7    situation.  And the idea of the survey is set forth in the
8    Tenth Circuit case of Lantec.  This is a matter of law.  We
9    are entitled to do that.  The only question is how we do it
10   so we don't breach any PHI rules, and we can do that.
11              Unfortunately I know a little bit about Vail
12   Health and they do patient surveys themselves.  You know, how
13   was your stay, did you find it acceptable.  Were the services
14   okay?  We can do that kind of a survey, you went for physical
15   therapy, would you travel to get that same physical therapy,
16   would you travel to Breckenridge to get it and save $20.00.
17   Vice versa.  Very simple.
18              SPECIAL MASTER:  Well, I considered that thinking
19   ahead too because otherwise -- and we -- this case is all
20   about access to confidential information and breaches of
21   that.  And I anticipated even if I granted you what you're
22   asking for an extremely strict protective order, which
23   according to your response just now would not have allowed
24   that type of survey.
25              By the same token, recognizing that surveys are

44

1  galore and whether that's follow up -- I've had many follow
2  ups from my experiences with hospitals and P.T.  So I think
3  that there's room if the parties would be reasonable for
4  that, but I won't go further than that in terms of trying to
5  work this out, but I think that's the kind of thing.  There
6  has to be some ability.
7              Statistics 101 that I took before any of you were
8  around would say that actually you need both the sampling of
9  patients and of non-patients.  It's not just that it wouldn't
10 be relevant to the people who weren't going to be there.  In
11 order to have a proper database you would have to include
12 everybody.  You don't load it with one or the other.  So I --
13 that's my perspective on it and I feel confident having had
14 lots of experts talk about surveys before.
15              All right, anything else that you have, Mr.
16 Kildow?
17              MR. KILDOW:  No, that's it.  One thing, this case
18 is only in small part about the exclusionary conduct that
19 occurred that is the subject of the Eagle County action.  The
20 Court, based on what we submitted, is not familiar with all
21 of the exclusionary elements of this case that we contend
22 violate the Sherman Act and make Vail Health violative of the
23 Sherman Act. I just wanted to make that last point clear.
24              SPECIAL MASTER:  If I said only I didn't mean
25 only, but maybe genesis is a more appropriate term for --