# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

SPORTS REHAB CONSULTING LLC, a
Colorado limited liability company, and
LINDSAY WINNINGER, an individual,

      Plaintiffs,

v.

VAIL CLINIC, INC. d/b/a VAIL HEALTH,
a Colorado nonprofit corporation

      Defendant.

Civil Action No. 1:19-cv-02075-WJM-GPG

<u>**Expert Report of Monica Noether, Ph.D.**</u>

**CONFIDENTIAL**

CONFIDENTIAL

# **Table of Contents**

I.   Professional Experience and Qualifications ............................................................ 2

II.   Summary of Issues and Opinions ........................................................................ 3

III.   Background on the Parties, the Area and the Data on which Plaintiffs' Expert
Relies .......................................................................................................................5

   A.   The Parties.................................................................................................... 5

   B.   The Area....................................................................................................... 6

   C.   The Colorado All Payor Claims Database ................................................... 7

IV.   Market Structure ................................................................................................ 8

   A.   Market Definition: Product .......................................................................... 9

   B.   Market Definition: Geographic .................................................................. 18

   C.   Competitors to Vail Health/Howard Head.................................................. 24

V.   Economic Analysis ........................................................................................... 29

   A.   Summary of Plaintiffs' and Dr. Schafer's Antitrust Allegations Regarding the
Competitive Effect of Howard Head's Alleged Behavior ......................................... 29

   B.   Howard Head's Rates are Consistent with Those of Other Colorado Hospital-
Based Providers ........................................................................................................ 31

   C.   Dr. Schafer's Assessment of Howard Head Pricing and Margins is so Full of
Errors that it is Meaningless ..................................................................................... 35

   D.   Howard Head has not prevented competitive entry through its employment of a
substantial number of local physical therapists ........................................................ 44

   E.   Proximity to Vail Hospital or The Steadman Clinic is not critical to successful
operation of a physical therapy practice ................................................................... 47

   F.   Howard Head's reporting of theft of its patient records is not anticompetitive................ 48

   G.   Howard Head has a right to impose non-solicitation agreements in its
employment arrangements ......................................................................................... 50

   H.   Proposed Joint Venture Between Steadman and Vail Health Does Not Pose
Competitive Concerns................................................................................................ 52

VI.   Even if SRC Had Difficulty Entering Vail, This Does Not Imply Any Harm to
Competition................................................................................................................ 55

VII.   Conclusion ...................................................................................................... 58

CONFIDENTIAL

## I.      PROFESSIONAL EXPERIENCE AND QUALIFICATIONS

1.      I am a vice president of Charles River Associates ("CRA"), an economic consulting firm headquartered in Boston, Massachusetts. I have specialized in health care economics for nearly forty years, focusing on provider reimbursement, antitrust, and other policy issues relevant to dynamic health care markets.

2.      I have published articles on competition and reimbursement in health care markets in economics journals, including the *Journal of Health Economics*, *Health Affairs,* the *Journal of Labor Economics*, and the *Journal of Law and Economics*, and in medical journals, including the *New England Journal of Medicine*, the *Journal of Vascular Surgery*, and *The Annals of Thoracic Surgery*. I have also served as a referee for both economics and medical journals, including the *American Economic Review*, *Health Services Research*, the *Journal of the American Medical Association*, the *Journal of Political Economy*, the *Journal of Health Economics*, and the *RAND Journal of Economics*. I have presented health care policy research to the United States Congress and both state and federal government agencies, including numerous state departments of insurance, the Federal Trade Commission ("FTC"), and the Department of Justice.  I have also testified as an economic expert before federal and state courts and regulatory agencies on liability and damages disputes in the health care industry.

3.      I previously worked at the FTC, where I served as a Commissioner Advisor and as Deputy Assistant Director of the Competition Division within the Bureau of Economics. After leaving the FTC and before joining CRA, I was managing vice president of Abt Associates Inc., a global policy research and consulting firm, working for both government agencies such as the Health Care Financing Administration (now the Centers for Medicare and Medicaid Services or "CMS") and a variety of provider groups on issues related to reimbursement and competition.

4.      While my expertise spans the diverse and complex health care industry, much of my focus has been on provider markets, particularly hospitals and professionals.  In multiple matters, I have assessed, from an economic perspective, the competitive issues associated with allegations of foreclosure and attempted monopolization such as those in question in this case.  In addition, I have evaluated the market dynamics associated with dozens of horizontal and vertical mergers among health care providers, which raise many of the same competitive questions.

5.      I have a Ph.D. in economics and an M.B.A. in finance and economics from the University of Chicago. A copy of my curriculum vitae, which describes my background, including my education and publications, is attached as **Appendix A**. CRA is being compensated for my work in this matter at my standard rate of $1150 per hour. The compensation of CRA for my services

CONFIDENTIAL

as well as those of other staff working under my direction, is not affected by the outcome of this matter. The materials I relied on in forming my opinions are cited throughout my report and listed in **Appendix B**.

## II.   SUMMARY OF ISSUES AND OPINIONS

6.     I was asked by counsel for Vail Clinic, Inc., d/b/a Vail Health ("Vail Health") to evaluate, from the perspective of a health economist, the allegations that Sports Rehab Consulting LLC and Lindsay Winninger ("Plaintiffs") raise in their Amended Complaint.[1] Specifically, I was also asked to assess the analysis and conclusions provided by Plaintiffs' economist, Dr. Leslie Schafer.[2]

7.     Based on my analysis as well as my experience and expertise, I conclude the following:

a.   Howard Head Sports Medicine, the physical therapy practice of Vail Health, competes with a variety of other modalities and other physical therapy practices, even in the overly narrow "Vail Valley area" alleged by Plaintiffs as the relevant market in which to assess competition.

b.   Plaintiffs fail to define valid relevant product and geographic markets.  Defining a market for antitrust purposes requires assessing the preferences of consumers, *i.e.*, it asks the question of what products or services consumers view as potential substitutes.

- From a product or service perspective, other treatment modalities, including chiropractic, massage and acupuncture, can often achieve the same goals as physical therapy.

- Geographically, Howard Head competes with providers in Summit County to the East as well as in Garfield County to the West.  In addition, a substantial portion of its patients live much further away, including out-of-state, many of whom could seek care closer to home.  This high percentage of out-of-state patients that Howard Head treats as well as SRC's concierge business model, which is premised on physical therapists traveling to patients if patients desire, both suggest that Howard Head faces competition from providers in a much broader geographic area.

c.   In limiting her defined market to physical therapy services in the Vail Valley area, Plaintiffs' expert ignores evidence that points to broader product and geographic markets, and her empirical analyses designed to define the relevant product and geographic markets are so flawed as to be meaningless and misleading.

---

[1] Sports Rehab Consulting, LLC and Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. Plaintiffs' Amended Complaint and Jury Demand. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, September 27, 2019 ["Amended Complaint"].
[2] Expert Report of Leslie E. Schafer, Ph.D., Filed in Sports Rehab Consulting, LLC and Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, January 10, 2022 ["Schafer Report"].

CONFIDENTIAL

d.  Plaintiffs' expert relies on the Colorado All Payor Claims Data for all her analyses: this data set is incomplete and unrepresentative of the universe of physical therapy services provided in the state, rendering all her opinions based on these data unreliable.

e.  None of the Plaintiffs' allegations that Howard Head acted anticompetitively are valid, including allegations relating to Howard Head's:

- use of non-solicit agreements, which are necessary and routinely used to protect costly investments in, for example, staff training and protocol development;

- proximate location to and integration with the hospital, which can benefit patients and their physicians through greater convenience and care integration;

- contracts with third party payors, into which the vast majority of physical therapy practices nationwide enter;

- referrals from orthopedic surgeons, which reflect Howard Head's quality of service and enhance integration of care;

- considerations of potential physical therapy joint ventures with orthopedic groups, none of which were consummated;

- statements regarding Plaintiff Winninger's taking of patient health information, which have been judicially determined to be true; and

- use of governmental process to report a patient record data breach, which was necessary to prevent further damage as well as to protect Vail Health's own reputation with physicians and patients.

f.  Instead, all of Howard Head's actions noted by Plaintiffs are common business practices that any vigorous competitor would undertake.

g.  Dr. Schafer's empirical analyses of Howard Head's pricing of physical therapy services are based on data that are insufficient for the analyses she performs; they are so methodologically flawed as to be meaningless; and they draw incorrect and misleading conclusions.  When I correct her faulty analyses, I find that Howard Head's prices are at most equivalent to relevant comparators and may be lower.

h.  The failure of Sports Rehab Consulting LLC, one possible competitor, to establish a competitive practice in the Vail area does not represent a harm to competition.

CONFIDENTIAL

## III.   BACKGROUND ON THE PARTIES, THE AREA, AND THE DATA ON WHICH PLAINTIFFS' EXPERT RELIES

### A.  The Parties

8.    Vail Health is a "nonprofit community health care system serving patients and guests from around the world."[3]  The system includes a 56-bed acute care rural hospital in Vail, Colorado as well as multiple outpatient medical care facilities across the area.  While Vail Health is particularly recognized for its world-renowned orthopedic care, it provides a wide range of inpatient and outpatient medical services, including emergent, urgent and trauma care, cancer and cardiac services and general adult and pediatric medical and surgical services.  Vail Health accepts publicly and privately insured patients, as well as the uninsured in all its service lines.[4]  Moreover, as an acute care hospital, Vail Health is open to patients "24-7" and operates an emergency department.[5] It is also licensed as a Level 3 trauma center and operates a helipad.  Vail Health is designated by CMS as a Sole Community Hospital.[6] CMS created this designation in recognition of the special cost challenges facing hundreds of small rural hospitals nationwide that are the only hospitals in their areas.[7]  It is designed to maintain access to important health services for Medicare beneficiaries. "The SCH program ensures the viability of hospitals that are geographically isolated and thus play a critical role in providing access to care."[8]

9.    Vail Health provides physical therapy through Howard Head Sports Medicine ("Howard Head"), a division of Vail Health that Vail Health operates.  Howard Head was founded in 1990 and offers a comprehensive array of physical therapy services at ten locations in Eagle and Summit Counties.[9]  It provides a broad range of treatment modalities including brain and balance care, hand therapy, treatment of chronic pain, hernia repair, occupational therapy, oncology and lymphedema therapy, orthopedic and sports rehabilitation, pediatric therapies, pelvic health, performance testing and training, physical therapy

---

[3] Vail Health. "About." https://www.vailhealth.org/about
[4] Vail Health. "Insurance." https://www.vailhealth.org/patients-and-visitors/insurance;
VH_Fed_00006607.xlsx provides the payor breakdown for Howard Head.
[5] In order to receive Medicare payments, hospitals must meet CMS Conditions of Participation. *See* Centers for Medicare & Medicaid Services. "Conditions of Coverage (CfCs) & Conditions of Participation (CoPs)." https://www.cms.gov/Regulations-and-Guidance/Legislation/CFCsAndCoPs.
[6] Alliance for Rural Hospital Access. "List of SCHs by State." https://static1.squarespace.com/static/5c13fd4150a54f21cf0140ad/t/5eb2eddb92d7a7647a20f0e6/1588784603405/List+of+SCHs+FY+2020.pdf.
[7] Alliance for Rural Hospital Access. "What is an SCH?"  https://www.ruralhospitalcoalition.com/what-is-ansch.
[8] Alliance for Rural Hospital Access. "What is an SCH?"  https://www.ruralhospitalcoalition.com/what-is-an-sch. *See also,* Centers for Medicare & Medicaid Services. "Sole Community Hospital: Rural Health Fact Sheet Series." https://static1.squarespace.com/static/5c13fd4150a54f21cf0140ad/t/5c140b5f0e2e72d2f8928206/1544817505005/CMS_Fact_Sheet_--_SCH.pdf.
[9] Howard Head Sports Medicine. https://www.howardhead.org/.

5

CONFIDENTIAL

including manual therapy, dry needling, and aquatic therapy, sport psychology, telehealth, and total joint therapy.[10]

10.      Sports Rehab Consulting LLC ("SRC") is a physical therapy practice describing itself as "an elite level physical therapy provider."[11]  Its physical office is located in Denver, Colorado, but it also advertises home care, telehealth visits and concierge VIP/travel services.[12]  Indeed, SRC's Founder, Lindsay Winninger, testified that "I would actually view our service lines as pretty different than other physical therapy clinics in Vail, so I -- I didn't view us as a direct competitor to any of them."[13]   SRC does not accept public or private insurance but, rather, requires its patients to pay out-of-pocket for the services that SRC provides them.[14] SRC's total revenues in 2021 were approximately $600,000.[15]

11.      Lindsay Winninger founded SRC in 2014 after working for several years as a physical therapist at Howard Head and then as the head physical therapist for the U.S. Women's Ski Team.  She served as the Director of Rehabilitation for the Orlando Magic, an NBA team, prior to being promoted to the position of High Performance Director for the Magic in 2020.[16]

### B.  The Area

12.      Vail, Colorado is located in Eagle County about 100 miles west of Denver via Interstate I-70.[17]  It is one of about a dozen towns stretching from Silverthorne and Frisco to the East in Summit County through Vail and West to Glenwood Springs in Garfield County. Vail is approximately a 35-minute drive from Frisco and 70 minutes from Glenwood Springs. In addition to its 5,000 full time and 5,000 part time residents, Vail is a popular year-round vacation destination for people from all over the world.[18]  As a result, its health care providers serve patients from a substantially broader area than is customary: indeed, only about 60 percent of Vail Valley Medical Center's patients lived in Eagle County in 2015.[19]

13.      In addition to substantial inflow of tourists into Vail and the surrounding area, many individuals commute in and out of Eagle County for employment: according to 2018 US Census Bureau data, more

---

[10] Howard Head Sports Medicine. "Services." https://www.howardhead.org/services.
[11] Sports Rehab Consulting. "Who We Are." https://sportsrehabconsulting.com/about/.
[12] Sports Rehab Consulting. "Physical Therapy Services." https://sportsrehabconsulting.com/services/.
[13] Lindsay Winninger State Deposition, June 29, 2018. p. 89.
[14] Sports Rehab Consulting. "Physical Therapy Services." https://sportsrehabconsulting.com/services/.
[15] Income Statement: Sports Rehab Consulting 1 January 2021– 1 July, 2021. SRC_Fed0003408.pdf. (Data have been annualized using a straight-line calculation.)
[16] Sports Rehab Consulting. "Lindsay Winninger."  https://sportsrehabconsulting.com/about/lindsay-winninger/; NBA, "Orlando Magic Name Lindsay Winninger High Performance Director." https://www.nba.com/magic/orlando-magic-name-lindsay-winninger-high-performance-director-20200909
[17] Vail Mountain Lodging. "Driving to Vail." https://vailmountainlodging.com/getting-here/driving-to-vail/.
[18] Town of Vail. "Welcome to Vail!" https://www.vailgov.com/visiting/welcome-to-vail.
[19] VH_Fed_00000790.

CONFIDENTIAL

than 40 percent of employed Eagle County residents work outside the county, while 50 percent of individuals working in Eagle County commute in from outside the county.[20]  Moreover, while Dr. Schafer points to local newspaper reports on traffic tie ups and road closures in the area,[21] in fact, as I explain below, systematic data reveal that the Vail Pass is rarely closed more than briefly.

14.     Given the attractiveness of the Vail area as year-round outdoor recreation destination, it is not surprising that there is substantial demand in the area for physical therapy and other modalities designed to reduce pain and promote recovery from injury.  As a result, multiple physical therapy practices compete in the area.

### C.  The Colorado All Payor Claims Database

15.     Plaintiffs' expert, Dr. Schafer, relies heavily on the Colorado All Payor Claims Database ("CO-APCD") for her analyses of the relevant market and pricing of physical therapy services in the area. Since I discuss her analyses in detail in subsequent sections of my report, as well as presenting my own analyses using the same data set, it is useful initially to present an overview of its characteristics and sources.

16.     The CO-APCD is maintained by the Center for Improving Value in Health Care ("CIVHC"), which began collecting health insurance claims data from health insurance plans (payors) in 2012 and combining them with similar Medicare and Medicaid claims data.[22]  The data base has several important drawbacks.  First, according to CIVHC documentation, in 2020, the CO-APCD included information on approximately 65 percent of insured Colorado residents.  Notably, the data base does not include claims for approximately two thirds of those individuals who are enrolled in commercial health plans, and it includes only approximately one quarter of individuals with self-insured plans.[23]  Since Dr. Schafer focuses almost exclusively on the commercially insured in her analyses, the poor coverage of this segment is particularly noteworthy. Second, the CO-APCD does not contain information on individuals covered by federal insurance programs such as the Veterans Administration, TRICARE, federal employees, or the Indian Health Service.[24]  The data base also excludes individuals who are uninsured; in

---

[20] U.S. Census Bureau, Eagle County CO, OnTheMap Application and LEHD Origin-Destination Employment Statistics. https://onthemap.ces.census.gov/.

[21] Schafer Report, ¶¶76-78.

[22] CIVHC. "CO APCD Overview." https://www.civhc.org/get-data/co-apcd-info/. I did not obtain data on services provided to Medicaid patients as I understand they were not requested or evaluated by Plaintiffs' expert.

[23] Based on a 2016 U.S. Supreme Court decision, states cannot mandate that ERISA-based employers provide data to APCDs.  CIVHC estimates that the CO-APCD includes claims for only approximately one quarter of lives covered by ERISA-based plans.  *See,* CIVHC. "Commercial Data in the APCD." https://www.civhc.org/2021/09/13/commercial-data-in-the-co-apcd/.

[24] CIVHC. "Commercial Data in the APCD." https://www.civhc.org/2021/09/13/commercial-data-in-the-co-apcd/.

CONFIDENTIAL

Eagle County, approximately 17 percent of the population was uninsured in 2013-2017, a substantially
higher percentage than the state average of less than 10 percent.[25] Finally, the CO-APCD database does
not contain information on cash pay (self-pay) services. As I explain in more detail below, these
omissions from the CO-APCD render it unrepresentative of the health care services provided in Colorado,
in particular for services that are frequently paid for directly by patients, such as physical therapy or
acupuncture, which may face insurance coverage limitations, and treatment modalities that are mostly not
covered by insurance such as massage therapy. In addition to the CO-APCD's omission or poor coverage
of several key population segments, its composition has changed over the years as additional payors have
contributed data, making any sort of trend analysis potentially misleading.

## IV.    MARKET STRUCTURE

17.    Assessing the nature of competition facing a particular firm (or set of firms) often begins by
defining the market(s) in which it competes for customers.  Market definition has two dimensions –
product and geographic – which, in the antitrust context, are assessed from the perspective of customers.[26]
That is, the relevant questions concern what goods or services *customers* consider to be viable substitutes
for the good or service in question. The product dimension assesses what goods (or, as in this matter,
services) consumers consider to be substitutes.  The geographic dimension identifies the geographic area
within which consumers are willing to seek alternative providers of the product or service that they
demand.  Below, I discuss the factors that affect each dimension, as well as the evidence that is relevant
for defining the market, in order to demonstrate why Dr. Schafer's market definition analysis is deeply
flawed and provides no basis for accurate conclusions about market definition. As I describe below, Dr.
Schafer, mistakenly considers factors that affect supply rather than demand in her assessment of market
definition.

18.    Markets such as most health care services are considered by economists to be "differentiated."
That is, no two products or services in a differentiated market are viewed by consumers as identical.  That
does not imply, however, that the products or services do not compete or are not viewed by many
customers as reasonable substitutes.  When considering differentiated products or services, it is generally

---

[25] Vail Health. "Community Health Needs Assessment: Final Summary Report."  September 2019.  p. 23.
https://www.vailhealth.org/pdf/VailHealth/CHNA/2019_CHNA_Final_Report_2019_09.pdf
[26] The Horizontal Merger Guidelines promulgated by the federal antitrust enforcement agencies, the U.S.
Department of Justice and Federal Trade Commission, explain that "[m]arket definition focuses solely on
demand substitution factors, i.e., on customers' ability and willingness to substitute away from one product
to another in response to a price increase or a corresponding non-price change such as a reduction in
product quality or service. " United States Department of Justice and Federal Trade Commission.
"Horizontal Merger Guidelines." 2010.
https://www.justice.gov/sites/default/files/atr/legacy/2010/08/19/hmg-2010.pdf ("HMG") § 4.

CONFIDENTIAL

inappropriate to draw bright lines that distinguish clearly between services that are inside or outside of a defined market. Rather, different services provide different degrees of competitive pressure on each other depending on how many, and to what extent, customers view each as substitutes.[27]  As I discuss below, these principles of differentiation are important in considering the degree of competitive pressure that Vail Health (and Howard Head) face from different service providers.

19.     Once a market has been defined, the competitors that exist within the market can be identified.  In the context of a differentiated market such as this one, different competitors will place varying degrees of competitive pressure on each other, but all are relevant in assessing market behavior.

### A.  Market Definition: Product

20.     Dr. Schafer concludes, based on faulty and irrelevant analyses, that the market should be limited to physical therapy services.[28]  Below, I explain the problems with her analyses, but first I discuss several types of evidence that Dr. Schafer ignores that provide insight into how physical therapy patients (the relevant customers in this matter) might identify potential alternative services.

21.     In identifying the appropriate product market in which to evaluate the allegations of this case, it is necessary to consider why patients seek physical therapy services and what other services might serve the same goals.  Physical therapy is aimed "to ease pain and help you function, move, and live better."[29] Other services have similar goals and are likely viewed by at least some physical therapy patients as potential substitute modes of care. For example, chiropractic "can help reduce pain and correct the body's alignment and overall physical function,"[30] while "massage therapy is used to help manage a health condition or enhance wellness."[31]  Acupuncture has similar goals: "[a] key component of traditional Chinese medicine, acupuncture is most commonly used to treat pain. Increasingly, it is being used for overall wellness, including stress management."[32]  "Personal trainers assess their customers' bodily

---

[27] "In differentiated product industries, some products can be very close substitutes and compete strongly with each other, while other products are more distant substitutes and compete less strongly." U.S. Department of Justice and Federal Trade Commission, "Horizontal Merger Guidelines," 2010, § 6.1.  *See also,* for example, Dennis Carlton and Jeffrey Perloff. *Modern Industrial Organization*, Second Edition, 1994. Chapter 8.

[28] Schafer Report, ¶122.

[29] Susan Bernstein, WebMD. "What is Physical Therapy?" July 31, 2021. https://www.webmd.com/pain-management/what-is-physical-therapy. Similarly, Merriam-Webster defines physical therapy as "therapy for the preservation, enhancement, or restoration of movement and physical function impaired or threatened by disease, injury, or disability that utilizes therapeutic exercise, physical modalities (such as massage and electrotherapy), assistive devices, and patient education and training."  *See* https://www.merriam-webster.com/dictionary/physical%20therapy.

[30] Cleveland Clinic. "Chiropractic Adjustment." https://my.clevelandclinic.org/health/treatments/21033-chiropractic-adjustment.

[31] National Center for Complementary and Integrative Health (Department of Health and Human Services). "Massage Therapy: What You Need to Know." https://www.nccih.nih.gov/health/massage-therapy-what-you-need-to-know.

[32] Mayo Clinic. "Acupuncture." https://www.mayoclinic.org/tests-procedures/acupuncture/about/pac-20392763.

CONFIDENTIAL

strengths and weaknesses and create customized workout plans. They provide physical and mental guidance and monitor customers' progress on a regular basis…."[33] Primary care physicians (internal medicine, family practice and pediatric physicians) are also responsible for treating many patients who are suffering from pain or limitations to their functional ability.[34] "Physical medicine and rehabilitation (PM&R), also known as physical or rehabilitation medicine, aims to enhance and restore functional ability and quality of life to those with physical impairments or disabilities…; the goals of the physiatrist are to maximize patients' independence in activities of daily living and improve quality of life."[35]

22.    Finally, orthopedic surgeons address "[m]usculoskeletal conditions and pain [that] affect[s] people at any time and any age, keeping people of all ages from working or enjoying life….There are treatment options that help people lead happier and more productive lives."[36]  Therefore, they too could be viewed as substitutes to a patient with, for example, an arthritic hip, who may consider the full range of surgical and less invasive options.  However, as I discuss below, given the frequency of referrals from orthopedic surgery to physical therapy, particularly for patients typically treated in the Vail area, orthopedic surgery and physical therapy are likely viewed as complementary by some patients.

23.    Other types of qualitative evidence also indicate that some patients view other modalities of physical treatment as substitutes for physical therapy.  For example, based on an analysis of the CO-APCD data on which Dr. Schafer relies, patients who utilize physical therapists have many of the same diagnoses as patients receiving chiropractic, acupuncture and orthopedic surgery as the table below shows.  In particular, the top ten diagnoses for patients receiving physical therapy account for 48 percent of physical therapy claims, 55 percent of acupuncture claims, 49 percent of chiropractic claims and 9 percent of orthopedic surgery claims.[37] It is notable that of the top five diagnoses for patients receiving physical therapy treatments, four are also among the top five diagnoses for patients treated with

---

[33] Workable Better Hiring. "Personal Training Job Description." https://resources.workable.com/personal-trainer-job-description

[34] An Institute of Medicine monograph on chronic pain management notes the important role of "primary care, where practitioners may employ a variety of management strategies, including use of prescription drugs and suggestions for exercise, physical therapy, or weight loss…." Institute of Medicine (US) Committee on Advancing Pain Research, Care, and Education. "Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research." National Academies Press. 2011. https://www.ncbi.nlm.nih.gov/books/NBK92517/.  *See, also*, Graves Owen *et al*. "Evidence-based pain medicine for primary care physicians." Baylor University Medical Proceedings. January 2018. https://pubmed.ncbi.nlm.nih.gov/29686550/.

[35] American Academy of Physical Medicine and Rehabilitation. "What is Physical Medicine and Rehabilitation?" https://www.aapmr.org/about-physiatry/about-physical-medicine-rehabilitation.

[36] American Academy of Orthopedic Surgeons. "Orthopedic Surgeons: Restoring mobility and keeping our nation in motion." https://www7.aaos.org/member/directory/definition.htm.

[37] Calculations are based on ICD-10 codes reported in the principal diagnosis field of the CO-APCD data. Codes have been aggregated to the 4-digit level. Data are limited to commercial outpatient claims for 2016 to 2020 (prior to 2016 ICD-9 codes are more frequent in the data). Shares are calculated as the percentage of claims.

CONFIDENTIAL

acupuncture and two are among the top five common diagnoses for patients treated with chiropractic care and orthopedic surgery.

**Table 1: Top 10 ICD-10 Diagnosis Codes in CO-APCD for Patients Receiving Physical Therapy Treatment**

| ICD-10 Code | Description | Physical Therapy | | Accupuncture | | Chiropractic | | Orthopedic Surgery | |
|---|---|---|---|---|---|---|---|---|---|
| | | Rank | Share of Claims | Rank | Share of Claims | Rank | Share of Claims | Rank | Share of Claims |
| M545 | Low back pain | 1 | 10% | 1 | 23% | 4 | 8% | 18 | 1% |
| M2556 | Pain in knee | 2 | 9% | 5 | 3% | 43 | 0% | 4 | 3% |
| M2551 | Pain in shoulder | 3 | 8% | 4 | 4% | 30 | 0% | 5 | 2% |
| M542 | Cervicalgia | 4 | 7% | 2 | 20% | 3 | 9% | 15 | 1% |
| M2555 | Pain in hip | 5 | 5% | 7 | 2% | 28 | 0% | 8 | 2% |
| M2557 | Pain in ankle and joints of foot | 6 | 3% | 13 | 1% | 58 | 0% | 38 | 0% |
| M9901 | Segmental and somatic dysfunction of cervical region | 7 | 2% | 8 | 2% | 1 | 28% | 354 | 0% |
| M546 | Pain in thoracic spine | 8 | 1% | 9 | 1% | 7 | 3% | 105 | 0% |
| F840 | Autistic disorder | 9 | 1% | N/A | 0% | N/A | 0% | 609 | 0% |
| Z5189 | Encounter for other specified aftercare | 10 | 1% | 136 | 0% | 267 | 0% | 503 | 0% |
| **Total Top 10 Physical Therapy** | | | **48%** | | **55%** | | **49%** | | **9%** |

*Sources:*
[1] Dr. Schafer's Work Papers (CO-APCD)
[2] https://www.icd10data.com/ICD10CM/Codes

24.     Patients who are in pain or experiencing functional musculoskeletal difficulties may seek one or more of these alternative approaches.  In making their choices, they may take account of their insurance coverage, relative costs of different services, physician or other personal recommendations, and access. In Colorado, patients can access physical therapy services directly without a referral from a physician,[38] thereby enhancing its substitutability with other direct access disciplines such as primary care physicians and chiropractic.

25.     Dr. Schafer erroneously cites the different educational and licensing requirements to practice physical therapy, acupuncture, chiropractic, athletic training, fitness/personal training, massage therapy, family practice medicine and orthopedic surgery as evidence that these alternative modalities are not in the same product market.[39] But, as she acknowledges, these different requirements affect *supply*

---

[38] American Physical Therapy Association.  "Direct Access by State Map." February 2021. https://www.apta.org/advocacy/issues/direct-access-advocacy/direct-access-by-state
[39] Schafer Report, Tables 7a-7c and section V.A.1.a.1. Dr. Schafer does not even mention occupational therapists, except to note in various table footnotes that she excludes their services from her analyses, while acknowledging that Howard Head does provide occupational therapy services. *See* Schafer Report, ¶48. Occupational therapists treat injured, ill, or disabled patients through the therapeutic use of everyday activities. They help these

CONFIDENTIAL

*substitution* and might affect likelihood or ease of competitive entry.[40] They do not, however, necessarily affect how patients view the substitutability of these alternative modalities, which is the relevant question in identifying the product market. Dr. Schafer's comparison of training requirements is analogous to the production of different types of, say, mid-level sedans. While each manufacturer uses a different patented production process and could likely not replicate each other's models, this does not imply that customers don't consider a Honda Accord, Toyota Camry, and Ford Focus as potential alternatives in purchasing a new car. Both physical treatment modalities and mid-level sedans are differentiated products or services; while each provider differs somewhat from all others, that does not imply that purchasers consider them to be so different as not to be substitutable.

26.     Dr. Schafer also analyzes price and quantity trends in her assessment of the product market and concludes that "[p]rice trends for PT services and quantity trends in other musculoskeletal/orthopedic health care services such as acupuncture, chiropractic, and orthopedic surgery do not indicate that they are substitute[s] for PT."[41] However, as I explain below, Dr. Schafer's consideration of price and quantity trends is so highly flawed as to be meaningless.

27.     First, as I noted above, Dr. Schafer fails to take into consideration the fact that the set of payors submitting data to the APCD is incomplete, and has changed and grown over time, such that observed changes in quantity may reflect changes in the set of payors submitting claims and the number of lives that they enroll, rather than actual changes in the volume of services. According to CIVHC, as of 2019, the data covered only about 65 percent of the total insured population (including Medicare and Medicaid, which Dr. Schafer excludes from her analyses) and only 34 percent of the commercially insured population.[42] Among the commercially insured population, while CIVHC estimates that self-insured patients represent about half of all commercially insured lives in Colorado, only about one-quarter of those lives are included in the CO APCD data. In earlier years, it included an even lower proportion. Moreover, as Figure 1 below illustrates, as the number of payors submitting claims increased over time, so did the number of commercially insured lives included in the CO APCD.

---

patients develop, recover, improve, as well as maintain the skills needed for daily living and working. U.S. Bureau of Labor Statistics. "Occupational Outlook Handbook: Occupational Therapists."
https://www.bls.gov/ooh/healthcare/mobile/occupational-therapists.htm
[40] Schafer Report, ¶¶123-124.
[41] Schafer Report, ¶128.
[42] CIVHC. "Commercial Data in the CO APCD." https://www.civhc.org/2021/09/13/commercial-data-in-the-co-apcd/.

CONFIDENTIAL

**Figure 1: CO-APCD Commercially Insured Lives and Commercial Payors**



*Source*:
[1] Center for Improving Value in Healthcare, cihvc.org.

28.     The growth in the number of covered lives appears to track the unit volume of physical therapy services in Figure 3 of Dr. Schafer's report closely as shown in Figure 2 below.  In particular, while Dr. Schafer suggests that the very large increase in physical therapy volume in 2015 "is consistent with the introduction of physical therapy direct-access laws," she is incorrect in assuming that direct access to physical therapy only became possible in 2015.[43] The more likely explanation is that the growth in physical therapy volume shown in the APCD data between 2014 and 2015 reflects the large increase in covered lives included in the data that occurred then.

---

[43] Schafer Report, ¶129. It is unclear exactly when direct access to physical therapy was first permitted in Colorado, however, it was already allowed in 1998.  *See* Kelly Crout, Jennifer Hodgkins Tweedie and David Miller. "Physical Therapists' Opinions and Practices Regarding Direct Access." *Physical Therapy* 78: January 1998: 52-61, at 54.

13

CONFIDENTIAL

**Figure 2: CO-APCD Commercially Insured Lives and Physical Therapy Treatment Units**



*Sources*:
[1] Center for Improving Value in Healthcare, cihvc.org.
[2] Dr. Schafer's Work Papers.

29.     Second, Dr. Schafer's quantity and price measures aggregate across all CPT codes and commercial payors in the data, regardless of the CPT codes' units of measurement or the complexity of the services they represent.  As a result, her measures of quantities (units) and average prices are not comparable over time or across geographies or providers, since they do not account for changes and differences in the mix of services.  For example, Dr. Schafer treats as equivalent one unit of a timed CPT code, such as 97110 (therapeutic exercises, each 15 minutes) or 97140 (manual therapy, each 15 minutes), and one unit of an as untimed evaluation code, such as 97162 (physical therapy evaluation, moderate complexity) or modality, such as 97010 (hot or cold packs therapy), even though they may be paid very differently.  This approach is equivalent to considering one grape, one tangerine and one watermelon as three units of fruit.  The same holds true for her measures of average prices which she calculates by simply dividing total dollars across the variety of heterogeneous CPT codes by a count of their units.

30.     Differences in the complexity and costs of these different services are generally reflected in different prices for each.  Because Dr. Schafer averages over all CPT codes to calculate her price

14

CONFIDENTIAL

measure, she is not able to distinguish between changes in her measure of average price for each year (or differences in her measure across each provider) that are driven by changes in CPT mix versus actual changes in prices.  For example, if patients used more costly services in 2017 relative to 2016, it will appear that prices increased even if they remained the same for a particular CPT code.  Similarly, if one physical therapy practice provides more complex services than another, it will appear to have higher prices even though the two practices might have identical fee schedules.

31.     Because Dr. Schafer aggregates across all payors in the data, she also cannot distinguish between changes in her average price measure that are driven by changes in payor mix (since different payors negotiate different allowed amounts with providers) versus actual changes in prices.  Given the change in the set of payors submitting data to the CO-APCD over time, this is not a trivial concern.

32.     Dr. Schafer attempts to formalize her product market analysis by estimating own and cross-price elasticities for physical therapy and related treatments.  Price elasticity of demand describes the responsiveness of demand for a product to changes in price.  Own-price elasticity describes the responsiveness of demand for a product to changes in its own price, and cross-price elasticity describes the responsiveness of demand for a product to changes in the price of a related product.  If products A and B are considered by consumers to be substitutes, then we expect that if the price of B increases, we will see demand for A increase as consumers substitute away from B and toward A.  For example, if the price of blue pens increases but the price of black pens stays the same, we expect to see the demand for black pens to increase (*i.e.*, we expect a positive cross-price elasticity).

33.     Dr. Schafer uses a reduced-form regression analysis to estimate own and cross-price elasticities for physical therapy, chiropractic, acupuncture, and orthopedic surgery.[44]  In addition to the issues noted above related to the unit and price measurements, her regression approach is fraught with methodological problems and cannot be relied upon for evidence of a product market definition.

34.     Dr. Schafer uses ordinary least squares ("OLS") regressions to estimate the relationship between the log of quantity (measured in total units across all CPT codes) of physical therapy (and separately for the quantity of acupuncture, chiropractic and orthopedic surgery) and the log of prices of physical therapy, chiropractic, acupuncture, and orthopedic surgery, where prices are unit-weighted averages of the allowed amounts across all CPT codes and payors for each treatment modality. Her data are aggregated to the level of a geographic area (Vail Valley, Summit County, Front Range Urban Area, and Other

---

[44] In a reduced-form regression analysis, the dependent variable (here quantity demanded) is expressed as a function of the exogenous (independent) variables of interest (here prices) and other explanatory variables.  The model estimates the relationship between the independent variables and the dependent variable (here, the relationship between quantity demanded and price).

CONFIDENTIAL

Colorado) and Place of Service (either hospital-based or free-standing office, identified by the Type of Bill and Place of Service fields).[45]  Her regression includes controls for the "prices" (as she calculates them) of physical therapy and the potential substitute services she identifies (acupuncture, chiropractic, and orthopedic surgery).  The only other controls that Dr. Schafer includes are indicator variables that specify the year, geography, and place of service ("fixed effects") of each observation.  These fixed effects control for differences in the average quantity of physical therapy across years, differences in average quantity of physical therapy across geographies, and differences in average quantity across different places of service.

35.     Dr. Schafer mistakenly assumes that the coefficient estimates from her model represent own and cross-price elasticities of demand.  She concludes that, because she observes that the coefficients on her measure of the price of physical therapy are negative, or not statistically significant in her models estimating the determinants of the quantity of acupuncture, chiropractic and surgery, "the regression analysis is further confirmation that acupuncture, chiropractic and orthopedic surgery are not substitutes for PT."[46]  Dr. Schafer's conclusions are fatally flawed for the following reasons:

a.  Dr. Schafer's measure of quantity demanded is meaningless since it reflects changes in commercial payors submitting data to the CO-APCD over time and not actual changes in quantity, and aggregates across CPT codes with different units of measure and complexity.[47]

b.  Dr. Schafer's measure of price is meaningless since it averages across CPT codes with different units of measure and complexity, as well as averaging across payors.  As a result, her price measure cannot distinguish actual price differences across time and geographies from differences caused by differences in CPT and payor mixes.[48]

c.  Even putting aside these issues with her quantity and price measures, the coefficient on price in her model cannot be interpreted as the change in quantity demanded *caused by* a change in price.  This is because the observed prices and quantities are equilibrium prices and quantities determined by the intersection of supply and demand at a single observed point.  But to measure the effect of a change in price on the quantity that the customer demands it is necessary to map out movement along an entire demand curve.  Because Dr. Schafer fails to control for any factors

---

[45] Schafer Report, ¶140.
[46] Schafer Report, ¶144.
[47] See my discussion at ¶29 for more detail.
[48] See my discussion at ¶30 for more detail.

CONFIDENTIAL

that affect demand and vary over time and across geographies her model suffers from simultaneity bias.[49]

d.   The issues with Dr. Schafer's data and regression specification are reflected in her nonsensical results.  For example, Dr. Schafer estimates a positive and statistically significant own-price elasticity for chiropractic treatments, suggesting that a 1 percent increase in the price of chiropractic treatment increases demand for chiropractic treatment by 1.7 percent.  Similarly, she estimates that a 1 percent increase in the price of orthopedic surgery increases demand by 1.1 percent.  Dr. Schafer offers no explanation for these findings. And, while Dr. Schafer estimates a significantly positive effect of chiropractic prices on acupuncture quantity demanded (implying that they are substitutes), the reverse does not hold:  the effect of acupuncture prices on chiropractic quantity is negative, albeit insignificant.[50]

36.     As another example of Dr. Schafer's faulty analysis, she finds that the number of physical therapist providers that appear in the APCD data that billed commercial payors statewide declines substantially between 2015 and 2020 (from 4046 to 3199, a more than 20 percent decline).[51]  This pattern makes no sense and is inconsistent with Dr. Schafer's previous observation about an increase in demand. It can be perhaps partially explained by her inexplicable limitation of this analysis to physical therapist providers to those with commercial billings.[52] It is also not clear why she uses 2020 in her comparison, since this year was substantially impacted by COVID-19. When I correct her analysis, even using the incomplete APCD data, I find that the number of physical therapist providers *increased* by 20 percent in Colorado from 5,175 in 2015 to 6,227 in 2019, and by 29 percent in Vail, from 14 providers in 2015 to 18 in 2019.

---

[49] "It is well known that simultaneity and endogeneity are potentially important issues in any demand estimation. Prices are determined in the equilibrium of the market and depend on all the exogenous variables affecting demand and supply. Therefore, we expect prices to be correlated with the error terms in the demand equations. Correlation between regressors and the error term implies that the OLS method is an inconsistent estimator of the parameters in demand equation." (Victor Aguirregabiria. *Empirical Industrial Organization: Models, Methods, and Applications.* June 2021. http://aguirregabiria.net/wpapers/book_dynamic_io.pdf).  *See* also Stephen Berry and Philip Haile. "Foundations of Demand Estimation." In (eds) Ho, Hortaçsu, Lizzeri. *Handbook of Industrial Organization.* Chapter 1. p 4 ("A primary challenge in demand estimation is the endogeneity of prices; i.e., statistical dependence between prices and unobservables that also affect demand.")
[50] Schafer Report, Table 8.
[51] Schafer Report, ¶25.  Dr. Schafer identifies individual providers based on a count of unique billing NPIs (so for example, Vail Health counts as a single provider).  In instances where a billing NPI is missing, she uses the service provider NPI.
[52] While in assessing price competition, it can be appropriate to limit the analysis to services for which prices are actually subject to negotiation – namely those for commercially insured patients – but that logic does not apply to quantifying supply.

CONFIDENTIAL

## B. Market Definition: Geographic

37.     As is the case for product markets, geographic markets are properly defined by focusing on the choices that customers would make.  That is, geographic market definition considers whether a sufficient number of customers in a putative area are willing to travel outside the area to obtain services as to make a price increase within the area unprofitable.  If so, the geographic market must be expanded.[53]

38.     Dr. Schafer acknowledges that a substantial number of patients treated in Vail and in the broader Vail Valley, which she defines as a "50+ mile stretch through the Colorado Mountains…[that includes] Gypsum, Eagle, Wolcott, Edwards, Avon, Eagle-Vail, Beaver Creek, Minturn, Red Cliff and Vail,"[54] reside outside the area.[55]  This area does not even encompass all of Eagle County.  Moreover, it excludes sizeable towns that are proximate to the area, including Glenwood Springs to the West and Breckenridge, Frisco, Dillon, and Silverthorne to the East.  As I discussed above in ¶13, commuting pattern data indicate that a large portion of area residents travel both in and out of Eagle County for work.

39.     Dr. Schafer defends her narrow delineation of the market as no broader than the Vail Valley based on the "geographic terrain" of the area, which, according to her, includes "mountains, a steep mountain pass, and dangerous canyons."[56]  She goes on to report various anecdotes of severe traffic backups.  She also notes some Vail Health documents that describe Eagle County as its "service area" as well as strategic planning documents that define it as Eagle and Summit Counties. In the latter case, she acknowledges that a provider's description of its service area "is not necessarily a geographic market for antitrust purposes."[57]  I agree with her, but do not understand why she is apparently willing to accept Vail Health documents that identify a smaller service area as valid evidence of a narrower market while rejecting its strategic documents that describe a broader area.

40.     Moreover, her reliance on anecdotal evidence of traffic backups, rather than seeking systematic overall data that can be analyzed to determine probabilities of delay, is faulty.  Analysis of systematic traffic data reveals that Vail Pass has been closed eastbound 0.4 percent of the time and westbound 0.3 percent of the time between 2019 and 2021, *i.e.*, less than one half of one percent of the time, between 6 am and 8 pm.[58]

---

[53] Horizontal Merger Guidelines §4.2.
[54] Schafer Report, ¶65.
[55] Schafer Report, ¶148.  As Dr. Schafer notes, only 56.7% of Vail Health patients resided in the Vail Valley in 2018, while in 2020, more than one third (36.3%) of its revenue derived from patients residing outside the valley.
[56] Schafer Report, ¶151.
[57] Schafer Report, ¶158.
[58] Drive Colorado. "Is Vail Pass Open." https://isvailpassopen.com/closure-history.

CONFIDENTIAL

41.     Dr. Schafer has also erred in drawing a bright line boundary around her putative geographic market, rather than recognizing that different physical therapy customers who live within her defined market or who are visiting the area are based in different locations within it.  In many cases, these patients may be closer to competing physical therapy providers who are outside her defined market than they are to other providers that are within it. For example, patients who live in Vail are only 30 minutes from Frisco (outside her defined geographic market), while they are 32 minutes from Eagle.  Similarly, patients living in Gypsum are 37 minutes from Vail and only 31 minutes from Glenwood Springs (also outside her proposed market).[59]

42.     The Vail area attracts patients from all over the United States and even internationally to its world-renowned orthopedic center at Vail Health.  According to a 2015 Vail Health analysis, only about one third of its orthopedic patients originated from Eagle and Summit Counties (28 percent from Eagle and six percent from Summit County).  Almost 30 percent resided outside of Colorado in the U.S., while two percent were international.[60] Similarly, 35 percent of Howard Head's physical therapy patients originated in Eagle and Summit counties, with 40 percent arriving in Vail from outside of Colorado.[61] While some of these patients likely are injured while in Vail rather than deliberately choosing to travel to Vail to receive health care services, many do choose the orthopedic and physical therapy services there.[62] These patients could choose alternative locations that are closer to home, or concierge providers that would travel to their preferred destinations. Patients would be more likely to do so if Vail Health prices were anticompetitively high and/or its quality low.  Indeed, Vail Health has noted that "[t]here are factors that encourage [injured tourists] to go back home…"[63] for orthopedic care, and it cites "PT options back home (for destination patients)" as competition.[64]

43.     My own analysis of the residence locations of Howard Head's Vail Clinic patients confirms these travel patterns, with patients from outside of Colorado accounting for approximately 37 percent of patient visits and patients from outside of Eagle County accounting for 54 percent of patient visits.[65] Even

---

[59] Drive times are based on the distance between Vail Health's Vail, Frisco and Eagle locations and GMA Physical Therapy's Glenwood Springs physical therapy location.  Drive times are calculated using the average with and without traffic and to/from the locations.

[60] VVMC Strategic Planning: 2016. VH_Fed_00000772-866 at 791.

[61] VVMC Strategic Planning: 2016. VH_Fed_00000772-866  at 792.

[62] "Athletes from around the world rely on the expertise of The Steadman Clinic and Vail-Summit Orthopaedics as well as the scientific breakthroughs at Steadman Philippon Research Institute and Vail-Summit Orthopaedic Foundation." Vail Health. "Orthopaedics." https://www.vailhealth.org/services/orthopaedics.

[63] VVMC Strategic Planning 2016, VH_Fed_00000772-866 at 857.

[64] VVMC Strategic Planning 2016, VH_Fed_00000772-866 at 833.

[65] Calculated using Vail Health patient-level data (VH_Fed_00006965 AEO PHI.xlsx and VH_Fed_00006966 AEO PHI.xlsx) for January 1, 2014 to September 22, 2021. These data include private-payer outpatient physical therapy procedures.

CONFIDENTIAL

focusing just on patients who live in Colorado, the service area from which Howard Head draws 90 percent of its Colorado patients extends east through Denver; west past Rifle (101 minutes from Vail) as the map below shows.  It is also worth noting that the non-compete clause in a proposed, but never finalized, joint venture between Vail Health, The Steadman Clinic ("Steadman"), and Vail Summit Orthopaedics ("VSO") encompassed the "Counties of Eagle, Garfield, Lake, Pitkin, Routt and Summit, Colorado,"[66] suggesting that Vail Health considered this multi-county region to be relevant for competitive purposes.

---

[66] Letter of Intent Vail Valley Medical Center to The Steadman Clinic, December 3, 2015. VAIL_00003560-3568 at 3567; Term Sheet – Howard Head Sports Medicine Joint Venture: Vail-Summit Orthopedic Foundation. VSO_Fed001-006 at 001 (Nico Brown Federal Deposition Exhibit 43).

CONFIDENTIAL

**Figure 3: Howard Head Vail Service Area[67]**



44.     Dr. Schafer also ignores the nature of Plaintiffs' practice that has allegedly been competitively harmed and is the subject of this litigation.  As I noted earlier, SRC advertises its concierge physical

---

[67] Dr. Schafer includes the following ZIP codes in her definition of the Vail Valley: codes 81657, 81649, 81620, 81632, 81645, 81631,81637 (Schafer Report footnote 95 and Dr. Schafer's Work Papers). To calculate the 75 percent and 90 percent draw areas, patient locations (from VH_Fed_00006965 AEO PHI.xlsx; VH_Fed_00006966 AEO PHI.xlsx for patient visits included in the data in the last 2 years) and the Howard Head Vail facility are geocoded to obtain the latitude and longitude at the ZIP Code and address level, respectively. The Here API (*see* https://developer.here.com/) is then used to calculate the drive time both to and from the facility, and an average of the two directions is taken. The 75th and 90th percentile drive times represent the driving times such that 75 percent and 90 percent of patient visits respectively had driving times less than or equal to this value (*i.e.,* for 75 percent of patient visits, the patient's driving time was 53 minutes or less, and for 90 percent of patient visits, the patient's driving time was 109 minutes or less).

CONFIDENTIAL

therapy services and that physical therapists provide services in their patients' homes.[68]  Their Amended Complaint notes that SRC therapists treat patients "at any location requested by the patient."[69]  Indeed, Lindsey Winninger, founder and owner of SRC, travels worldwide to treat her patients, many of whom are star athletes.[70]  Given this business model, the relevant question in defining the geographic market is not how far patients are willing to travel, but rather how far physical therapists will travel to treat patients.

45.    Dr. Schafer analyzes prices for physical therapy in Vail and other geographic regions in her assessment of market definition.  In Figure 11, she compares prices of Howard Head[71] in Vail with Howard Head outside of Vail and with prices of other providers in Vail and other cities.  Based on this price comparison she concludes that "Vail Health's prices in the town of Vail are far higher than its prices for services provided outside of Vail."[72]  Her statement appears to imply that Howard Head is able to charge higher rates in Vail because Vail is a separate geographic market from the surrounding area.  Apart from the issues in Dr. Schafer's measure of prices that I have discussed, her comparison of Howard Head's prices in Vail and outside of Vail is completely ill-founded.  She is actually comparing Howard Head's prices across all its locations in Eagle and Summit Counties with the prices of a different provider in Edwards that Dr. Schafer has mistakenly identified as Howard Head.  That is, Dr. Schafer makes a mistake in her classification of Howard Head and includes observations for Vail Integrative Medical Group as part of Howard Head.[73]  The CO-APCD data do not distinguish the different Howard Head locations as Dr. Schafer acknowledges.[74]  Moreover, Howard Head uses a single fee schedule across all its locations.[75]

---

[68] According to a source relied upon by Dr. Schafer (cited in Schafer Report, footnote 31), concierge physical therapy practice is "often more profitable than a traditional setup. By eliminating insurance companies from the mix, concierge physical therapy rates can be whatever the markets support. Compared to a traditional cash-based practice model, a subscription-based model also offers a more reliable income stream." Meredith Castin. WebPT. "What is Concierge Physical Therapy & Why is it Trending?" January 30, 2019.  https://www.webpt.com/blog/what-is-concierge-pt-and-why-is-it-getting-so-popular/.

[69] Amended Complaint, ¶16.

[70] Lindsey Vonn. *Rise: My Story*. Dey St., An Imprint of William Morrow. 2022. Prologue, p. 2. "I'm in Are, Sweden for the FIS Alpine World Ski Championships….I make the drive [to the downhill race site] with my trainer, Alex Bunt, my physical therapist, Lindsay Winninger…." *See, also*, Winninger LinkedIn Profile describing Sports Rehab Consulting:  "Travel physical therapy and consulting services at a location that is convenient for the athlete." (VAIL_00003956); Lindsay Winninger State Deposition March 11, 2020, p. 168, "Well, travel services are part of our business." And Lindsay Winninger Federal Deposition October 7, 2021, p. 66: "We have provided travel services since the inception of SRC."

[71] Dr. Schafer uses "Vail Health" to refer to Howard Head.

[72] Schafer Report, ¶165.

[73] Dr. Schafer appears to classify observations with the billing provider NPI of 1851449920 as part of Vail Health, however these observations relate to a different provider:  Centers for Medicare & Medicaid Services. "NPPES NPI Registry." https://npiregistry.cms.hhs.gov/registry/provider-view/1851449920

[74] Schafer Report, ¶107.

[75] Howard Head chargemasters provide a single fee for each service rather than differentiating across locations. *See, e.g.*, VH_Fed_00000246, VH_Fed_00000247, VH_Fed_00000248, VH_Fed_00000249

CONFIDENTIAL

46.      Dr. Schafer performs a similarly flawed calculation of own and cross price elasticities in her attempt to define a geographic market as she did in the context of product market. Dr. Schafer uses ordinary least squares ("OLS") regressions to estimate the relationship between the log of quantity (measured in total units across all CPT codes) of physical therapy in the Vail Valley (and separately in Glenwood Springs, Summit County, Front Range Urban Area, and Other Colorado), and the log of prices for each geographic area, where prices are weighted averages of the allowed amounts across all CPT codes for each geography. Her data are limited to claims for commercial payors, and aggregated to the level of a geographic area, year, and place of service (either hospital-based or free-standing office, identified by the Type of Bill and Place of Service fields).  Her regressions include controls for the prices of physical therapy in each geography.  The only other controls that Dr. Schafer includes are variables indicating the year and place of service ("fixed effects").[76]  These fixed effects control for differences in the average quantity of physical therapy in a geography across years, and differences in average quantity of physical therapy in a geography across different places of service.

47.      Dr. Schafer interprets the coefficient estimates from her model as own and cross-price elasticities of demand.  She concludes that, because she observes negative or statistically insignificant coefficients on the prices of other geographies in the Vail regression and vice-versa, "patients did not substitute outwards to other geographic areas for PT."[77] Dr. Schafer's conclusions are fatally flawed for the same reasons I discussed with respect to her product market analysis.[78]

48.      The issues with Dr. Schafer's data and regression specification are reflected in her nonsensical results.  For example, Dr. Schafer estimates a very large negative and statistically significant own-price elasticity for Vail Valley suggesting that a 1 percent increase in the price of physical therapy in the Vail Valley decreases demand for physical therapy by 5.7 percent.  This extremely high own-price elasticity suggests that Vail is not a geographic market, since it implies that for every 1 percent price increase by providers practicing in Vail, they would lose almost 6 percent of their business to competitors outside of Vail.  She also estimates large negative and statistically significant own-price elasticities for Summit County, suggesting this is also not a geographic market. Dr. Schafer's explanation that "this may occur because the geographic model is limited to PT services and so does not account for the influence of

---

[76] The regression results reported in Table 9 of Dr. Schafer's report do not accurately reflect the controls in her model as she fails to report the coefficient on the Other Colorado price in her model, and mistakenly indicates that she has included year-season fixed effects.

[77] Schafer Report, ¶174.

[78] See my discussion at ¶35 for more detail.

CONFIDENTIAL

complementary products,"[79] indicates that she recognizes her model is mis-specified and therefore unreliable.

49.     Dr. Schafer also estimates large negative cross-price elasticities in several of her regressions.  For example, she finds that a 1 percent *increase* in price in the Front Range geography is associated with a 3.2 percent *decrease* in quantity demanded in Glenwood Springs, suggesting, nonsensically, that patients substitute away from Glenwood Springs physical therapy providers when they become less expensive relative to providers in a different geographic region.  Similarly, she finds that a 1 percent *increase* in price in Glenwood Springs is associated with a 1.7 percent *decrease* in quantity demanded in the Front Range region and a 1.3 percent *decrease* in the quantity demanded in "Other Colorado."   Dr. Schafer offers no explanation for these incongruous findings, which likely result from the myriad data measurement and specification errors in her estimation.

50.     Dr. Schafer also argues that the fact that Vail Health invested $60 million to build a new facility in Summit County shortly after completing a major expansion of its primary facility in Vail is evidence that Vail Health perceives Eagle and Summit counties to be separate geographic markets.[80]  This is incorrect.  She is misinterpreting Vail Health's strategy to compete more effectively by offering convenient options to potential patients and their physicians as evidence that patients won't travel.  The fact that a hospital offers treatment options at multiple locations does not imply that patients will not travel, but rather that convenience is a valued dimension of service that many hospitals offer to facilitate access.  Moreover, while Vail Health had only recently completed the expansion of its main campus, demand has been increasing and that growth is expected to continue. Given this increasing need for capacity, it is not surprising, nor does it provide insight on the limits of the geographic market in which it competes, that Vail Health chose to expand into Dillon.  In addition, the new Dillon facility in Summit County provides a variety of services beyond physical therapy, including primary care, behavioral health, urgent care, oncology and surgery.[81]  For some of these services, such as primary and urgent care, convenience may be more critical.

### C.  Competitors to Vail Health/Howard Head

51.     Even ignoring all of the arguments that I presented above and limiting the analysis to physical therapy practices in the Vail Valley area as defined by Plaintiffs and Dr. Schafer, Howard Head faces multiple competitors.  Within Eagle County, these include, at least:

---

[79] Schafer Report, ¶174.
[80] Schafer Report, ¶¶170-171.
[81] Vail Health. "Dillon Health Center debuts new health services for Summit County."  November 15, 2021.
https://www.vailhealth.org/news/dillon-health-center-debuts-new-health-services-for-summit-county

CONFIDENTIAL

- Axis Sports Medicine[82]
  - Six locations and 21 physical therapists, including three locations and nine physical therapists in Eagle County (at Eagle, Edwards, and Avon)
  - Treatment modalities include Sports & Orthopedic Rehabilitation, Total Joint Therapy, Trigger Point Dry Needling, Vestibular Therapy, Neurological Rehabilitation, Aquatic Therapy, Pilates, Women's Health, Lymphedema Therapy, Concussion Management, Golf Assessment, Running Assessment, and Functional Movement Screening
- Vail Integrative Medical Group[83]
  - Three locations and three physical therapists in Eagle County (at West Vail, Edwards, and Eagle).
  - The practice also includes chiropractors and massage therapists.
  - Treatment modalities include Physical Therapy, Hyperbaric Oxygen Therapy, Chiropractic, Massage Therapy, Active Release Technique, Trigger Point Dry Needling (TDN), Graston Technique, Active Release Technique, Kinesio Taping Method (KTM), Functional Movement Screen (FMS), Normatec, and Vax-D Spinal Decompression.
- Valley View[84]
  - Four locations and 24 physical therapists including two locations and six physical therapists in Eagle County (in Eagle and Basalt[85])
  - The practice also includes occupational and speech therapists.
  - Treatment modalities include Physical Therapy, Occupational Therapy, Speech Therapy, Inpatient Rehabilitation Services, Pediatric Rehabilitation Services, Cardiopulmonary Rehabilitation, Hand Therapy, Pelvic Floor Therapy, Wound Care, and High School Athletic Training Services
- Altius[86]
  - One location in Avon with three physical therapists.

---

[82] Axis Sports Medicine, https://axissportsmedicine.com/team/avon; https://axissportsmedicine.com/team/breckenridge; https://axissportsmedicine.com/team/eagle/; https://axissportsmedicine.com/team/edwards/; https://axissportsmedicine.com/team/frisco/; https://axissportsmedicine.com/team/silverthorne/; https://axissportsmedicine.com/patients/physical-therapy-treatment/.
[83] Vail Integrative Medical Group, https://vailmed.com/staff.php; https://vailmed.com/findus.php; https://vailmed.com/services.php.
[84] Valley View Rehabilitation Services, https://www.vvh.org/our-services/rehab-services/; https://www.vvh.org/our-services/rehab-services/physical-therapy/.
[85] Basalt spans Eagle and Pitkin counties.
[86] Altius, https://altiuspt.com/, https://altiuspt.com/aboutus.

CONFIDENTIAL

- o   Offers preventative care, treatment of orthopedic and neurological injuries and performance coaching
- Competitive Edge[87]
  - o   One location in Eagle with one physical therapist
  - o   Offers Acute Injury Care, Joint Replacement and Other Post-op Rehabilitation, Back and Neck Care, and Sport-Specific Athlete Training
- Joint Worx[88]
  - o   Two locations and six physical therapists in Eagle County (in Avon and Edwards)
  - o   The practice also employs massage therapists
  - o   Offers Manual and Manipulative Treatment, Pre- and Post-Surgical Rehabilitation, Spinal Rehabilitation, Massage Therapy, Blood Flow Restricted Therapy, Sports Injury Rehabilitation, Women's and Men's Health Therapy and Vestibular Rehabilitation
- Movement PT[89]
  - o   One location with two physical therapists in Edwards
  - o   Treatment services include Injury Prevention, Golf Performance Enhancement, Restorative Pilates, Treatment of Spinal Injuries and Pain, Orthopedics and Sports Injuries, Pre- and Post-Surgical Rehabilitation, Treatment of Headaches, Migraines, TMJ/TMD and Orofacial Pain. Neurological and Orthopedic Pediatric Disorders, Chronic Pain Dizziness, Vertigo and Balance Disorders including BPPV, Auto Accidents and Whiplash, and Workers Compensation
- Vail PT[90]
  - o   One location in West Vail with three physical therapists
  - o   Offers treatment of conditions including Ankle/Foot Injuries, including sprains and heel pain, Achilles Tendinopathy, Arthritis, Back Injuries/Pain, Balance/Dizziness/Concussion Symptoms, Chronic Pain, Dislocations and Fracture Rehabilitation, Elbow Pain, Golf Injuries, Headaches, including Cervicogenic (whiplash associated disorders), Hip Pain: Osteoarthritis, labral tears, Impingement, Joint Contractures, Knee Osteoarthritis (OA), Neck Injuries/Pain, Neck and Arm Pain (Cervical Radiculopathy), Nerve Injuries and Repairs, Pre and Post-Surgical Treatment, Pregnancy Associated Back and Pelvic Pain,

---

[87] Competitive Edge,  https://competitiveedge-pt.com/services/, https://competitiveedge-pt.com/about-us/.
[88] Joint Worx Physical Therapy, https://jointworx.com/services/, https://jointworx.com/about/staff/.
[89] Movement Physical Therapy, https://www.movementvail.com/services/, https://www.movementvail.com/our-people/.
[90] Vail Physical Therapy, https://vailphysicaltherapy.com/services/, https://vailphysicaltherapy.com/location/, https://vailphysicaltherapy.com/about-us/.

CONFIDENTIAL

Regional Sympathetic Disorder, Sacroiliac Pain/Dysfunction, Sports Injuries, Sprains, Tendon and Ligament Repairs, Tendonitis, TMJ Disorder, Trigger Point Dry Needling, Throwing Injuries, Total Joint Replacement, and Vertigo

52. There are several additional physical therapy practices immediately to the east in Summit County as well as to the west in Garfield County, such as Avalanche (with three locations and 11 physical therapists in Summit County),[91] Glenwood Medical Associates (with two locations and three physical therapists in Garfield County),[92] Panorama Summit (with one location and one physical therapist in Summit County),[93] and Breckenridge Physical Therapy (with one location and three physical therapists in Summit County).[94] In addition, Concierge Physical Therapy of the Rockies has one physical therapist located in Garfield County and offers physical therapy services at the patient location for "clients from Aspen to Glenwood Springs, Colorado and may travel further along the I-70 Corridor upon request."[95]

---

[91] Avalanche Physical Therapy, https://avalanchetherapy.com/locations/; https://avalanchetherapy.com/meet-avalanche/.
[92] Glenwood Medical Associates, https://www.glenwoodmedical.com/services/physical-therapy/.
[93] Panorama Summit Orthopedics, https://www.summitorthopanorama.com/services-2/physical-therapy/.
[94] Breckenridge Physical Therapy, https://breckenridgephysicaltherapy.com/our-team/; https://breckenridgephysicaltherapy.com/contact/.
[95] Concierge Physical Therapy of the Rockies, https://www.conciergeptoftherockies.com/conciergeptlocationcontactinformation.

CONFIDENTIAL

**Figure 4: Physical Therapy Competitors in the Vail Area[96]**



---

[96] Map does not reflect precise competitor locations within each town.

28

CONFIDENTIAL

## V.   ECONOMIC ANALYSIS

### A.  Summary of Plaintiffs' and Dr. Schafer's Antitrust Allegations Regarding the Competitive Effect of Howard Head's Alleged Behavior

53.     Plaintiffs and their expert, Dr. Schafer, make numerous erroneous allegations regarding Howard Head's behavior and its effect on competition among providers of physical therapy services in the area in question.  In this section, I outline Plaintiffs' allegations and then in the next sections I discuss why they are unfounded from an economic perspective.

54.     Plaintiffs have alleged that Howard Head has market power that it has used to erect various barriers to entry against potential competitors, including SRC's Vail operation.  They claim that Howard Head has used several tactics to implement this "foreclosure" of competition.

55.     First, they claim that Howard Head has "locked up" the supply of physical therapists by using non-compete and/or non-solicitation agreements that prevent its employed physical therapists from leaving to join competitors.[97]  Relatedly, Plaintiffs argue that Howard Head's non-solicitation clauses prohibit any physical therapist who does leave Howard Head's employment from soliciting any patients to the therapist's new practice.[98]  These agreements, the Amended Complaint alleges, "have the additional chilling effect [on] other physical therapy providers from hiring Vail Health physical therapists…."[99] Dr. Schafer estimates that Howard Head provides 47 percent of physical therapy units.[100]

56.     Second, Plaintiffs assert that Howard Head benefits from its superior location in Vail, housed in a medical office building attached to Vail Health Hospital that also contains Steadman, one of the major orthopedic practices in Vail.[101]  This, allegedly, provides them with cost and other advantages.  Relatedly, plaintiffs argue that Howard Head benefits from its Vail Health affiliation through better access to information about post-surgical patients who require physical therapy.[102]

57.     Third, plaintiffs also claim that the importance of establishing and maintaining contracts with health insurance companies (payors) represents a barrier to entry.  They claim that the process is costly

---

[97] Amended Complaint, ¶¶53-54.
[98] Amended Complaint, ¶¶77-93.
[99] Amended Complaint, ¶89.
[100] Schafer Report, Table 11. (As I explain below, Dr. Schafer's classification of "Vail Health – Other" is incorrect.)
[101] Amended Complaint, ¶¶55, 59.
[102] Amended Complaint, ¶58.

CONFIDENTIAL

and time consuming and that Howard Head does not have to incur this expense due to its ability to access Vail Health's payor contracting efforts.[103]

58.     Fourth, Plaintiffs further allege that Howard Head has reduced competition by manipulating local orthopedic surgery practices not to refer to anyone except Howard Head.  In particular, plaintiffs assert that Howard Head prevented the competitive success of SRC.  Plaintiffs outline several tactics that Howard Head supposedly deployed.

59.     Plaintiffs claim that Vail Health attempted to implement joint ventures with the two leading orthopedic surgery practices in the Vail area, The Steadman Clinic and Vail-Summit Orthopaedics, that, had they been consummated, would have resulted in Vail Health "locking in" the major stream of referrals to Howard Head.[104]  While acknowledging that these attempted joint venture agreements were never completed, Plaintiffs contend that Vail Health accomplished the same objective by instead entering into a long-term lease with Steadman that provided Steadman with office and clinical space within the medical office building that is attached to Vail Health Hospital. Under the terms of this lease for this space, Steadman agreed not to establish a competing physical therapy practice in the leased space, which is owned by Vail Health.[105]

60.     Plaintiffs also allege that Vail Health prevented the successful entry of SRC by "sham use of governmental processes" to spread false information about SRC's Vail employee, David Cimino. Plaintiffs also allege that Vail Health falsely accused Ms. Winninger of taking of patient health information.[106]  In addition, as described in the Amended Complaint, Vail Health supposedly used this information to "destroy" Lindsay Winninger's reputation, by defaming her with Steadman physicians.[107]

61.     In the next sections, I address each of these allegations and explain why all are unfounded and unsupported by economic evidence.  I also discuss why all the econometric analyses that Dr. Schafer presents rely on faulty methodology, which combined with the incompleteness of the data that I have already described, render her conclusions incorrect and misleading.  Correcting her errors, I find that if anything, Howard Head's rates decreased during the relevant time period relative to appropriate comparators.

---

[103] Amended Complaint, ¶57.
[104] Amended Complaint, ¶61-67.
[105] Amended Complaint, ¶75-76.
[106] Amended Complaint, Section heading, p. 34 and ¶¶119-150.
[107] Amended Complaint, ¶¶151-158.

CONFIDENTIAL

**B.  Howard Head's Rates are Consistent with Those of Other Colorado Hospital-Based Providers**

62.      Plaintiffs contend that "Vail Health has raised prices to physical therapy consumers above what would otherwise be a competitive market equilibrium price."[108]  Similarly, Dr. Schafer concludes that "Vail Health has been able to sustain supra-competitive prices in the Vail physical therapy market since at least 2012."[109]  These assertions are incorrect.

63.      Even if it were the case, contrary to the existing evidence, that Vail Health attempted to charge supra-competitive prices to payors for the physical therapy services provided by Howard Head, it is unlikely that it would have been able to achieve and sustain such price levels.  Payors are sophisticated negotiators with meaningful bargaining ability that would have pushed back against price demands that they felt were too high.  In 2019, 45 percent of Howard Head's net revenues stemmed from patients insured by Anthem (BCBS), Cigna and United – three of the four largest national commercial insurers.[110]  Indeed, had Howard Head attempted to assert market power, such action would have helped Howard Head's competitors to gain share, as payors steered volume to them instead of to Howard Head.

64.      From the patient's perspective, Howard Head's out of pocket requirements are likely substantially lower than those demanded by SRC. SRC does not participate in any health insurance plan's network;[111] nor does it assist its patients in collecting from their health plans.[112]  As a result, SRC patients are required to bear 100 percent of the fees they are charged by SRC, which range from $120-$180 for an initial consultation and $90 for follow-up visits.[113]  In contrast, patient payment responsibilities for physical therapy services at Howard Head for patients with commercial insurance average $17.[114]

65.      Plaintiffs also ignore that, as a hospital-based practice, Howard Head is entitled to bill for the higher facility costs of being associated with a hospital.  This does not constitute any evidence of market power.  Medicare and many private payors acknowledge the higher costs of hospital-based operations and

---

[108] Amended Complaint, ¶232.
[109] Schafer Report ¶15d.
[110] VH_Fed_00006607.xlsx. The five largest health insurers also include Aetna and Humana, but Humana is primarily focused on Medicare. Becker's Healthcare. "Becker's ASC Review." https://www.beckersasc.com/asc-coding-billing-and-collections/5-largest-health-insurance-companies-by-membership.html.
[111] SRC Price List (*see* Sports Rehab Consulting. "Physical Therapy Services." https://sportsrehabconsulting.com/services/.
[112] Lindsay Winninger Federal Deposition, October 7, 2021, p. 85.
[113] SRC Price List (*see* Sports Rehab Consulting. "Physical Therapy Services." https://sportsrehabconsulting.com/services/.
[114] Calculations based on CO-APCD data, on which Dr. Schafer relies, for commercially insured patients for 2012 to 2020.  Outliers in the top one percent of patient out of pocket amounts within CPT and year are dropped.

CONFIDENTIAL

accordingly willingly pay higher amounts. A substantial literature explains why hospital costs are higher than those of free-standing facilities.  They must be open and staffed 24-7, operate an emergency department, and accept all customers, many of whom are older and present with more complex needs.[115] As I noted earlier, CMS has also designated Vail Health Hospital as a Sole Community Provider recognizing that it provides important access to a wide variety of health care services in a rural area that might otherwise be underserved.

66.     Dr. Schafer herself notes that rates paid for hospital-based physical therapy services are generally substantially higher than office-based services across Colorado.  Table 1 of her report depicts her calculations that hospital-based physical therapy providers received an average of $83 per unit, while office and clinic physical therapy averaged $33 per unit.[116]  Dr. Schafer subsequently also remarks that within the area, Howard Head's pricing is most similar to that in Glenwood Springs, where Valley View Hospital is located.[117] Similarly, Plaintiff Lindsay Winninger acknowledges that hospitals are typically paid more for physical therapy services.[118]

67.     As I show in my analysis in Figure 5, (based on the CO-APCD data on which Dr. Schafer relies) when I compare the rates paid to Howard Head with those paid to other hospital-based physical therapy providers[119] throughout the state of Colorado for the top five CPT codes based on volume, I find that Howard Head's rates are consistent with those of other rural hospitals in the state.

---

[115] American Hospital Association. "Fact Sheet: Site Neutral Payment Provisions." September 2019. https://www.aha.org/system/files/media/file/2019/09/fact-sheet-site-neutral-0919.pdf; KNG Health Consulting Inc. "Comparison of Hospital Outpatient Departments and Independent Physician Offices." April 2021. https://www.aha.org/system/files/media/file/2021/04/KNG-Health-AHA-HOPD-and-IPO-Comparison-FULL-COHORT.pdf  Barbara Wynn, Peter Hussey and Teague Ruder. "Policy Options for Addressing Medicare Payment Differentials Across Ambulatory Settings," RAND Health. 2011. pp. 17 and 24. http://www.rand.org/content/dam/rand/pubs/technical_reports/2011/RAND_TR979.pdf
[116] Schafer Report, ¶26. While her descriptive analysis is flawed in not accounting for year or service mix, when I correct her calculations by looking at prices within CPT codes and year, I confirm her finding that allowed amounts per unit are substantially higher for hospital-based physical therapy providers.
[117] Schafer Report, ¶168.
[118] Lindsay Winninger Federal Deposition, October 7, 2021, pp. 68-69.
[119] The "Average Other Rural Hospitals" excludes Critical Access Hospitals (CAH) because their cost-based reimbursement from Medicare may affect their payments from private payors as well.  The patterns are qualitatively identical when I include Critical Access Hospitals. The list of CAH and other rural hospitals in Colorado was obtained from Colorado Hospital Association. "Find a Hospital." https://cha.com/colorado-hospitals/find-a-hospital/.

CONFIDENTIAL

**Figure 5: Comparison of Physical Therapy Rates for Common Physical Therapy CPT Codes: Howard Head and Other Rural Hospitals in Colorado**





CONFIDENTIAL

68.     Dr. Schafer also recognizes that Vail Health would lose money if it only billed for physical therapy services at the rates typically paid to freestanding practices in the area.[120]  While she does not cite a source for this conclusion, it appears that she relies on an internal Vail Health analysis that demonstrates that moving from hospital-based billing to professional billing would reduce its margin (across all payors) from a positive 19 percent to a negative 21 percent.[121] Given the higher costs of hospital-based practices that I discussed above, this is not surprising.

69.     In fact, according to the analysis relied upon by Dr. Schafer, Howard Head currently (at existing rates) loses money on the 39 percent of its patients who are insured by Medicare, Medicaid, Workers Compensation or self-pay.[122]  This pattern is consistent across hospitals both in Colorado, where Medicare paid on average 67 percent of costs while Medicaid (Health First Colorado) paid 83 percent of costs in 2020,[123] and nationwide, where Medicare margins averaged -8.7 percent in 2019.[124]  Ms. Winninger similarly noted that "Medicaid and Medicare are two of the worst reimbursing contracts.  They also require the most paperwork."[125]  However, Dr. Schafer's price comparisons focus only on commercial patients whose care is typically reimbursed at substantially higher rates.

70.     Howard Head also offers a broad range of physical therapy subspecialties including, for example, brain and balance care, pediatric services, pelvic health, hand therapy, and speech therapy.[126] Not surprisingly, the other groups in the area generally provide narrower scope of subspecialty therapies. Providing this broad range of services can be costly.  It requires employing the variety of physical therapists who possess the requisite subspecialty training, who are often in short supply and more senior in their careers, and thus compensated at higher levels.  Moreover, demand for subspecialized services may be less consistent than for more basic physical therapy services leading to lower average utilization of specialized therapists.

---

[120] Schafer Report, ¶194.
[121] VH_Fed_00006607.xlsx.  I calculate contribution margin as (payment amount – direct cost)/payment amount.
[122] VH_Fed_00006607.xlsx.
[123] Colorado Healthcare Affordability and Sustainability Enterprise. Annual Report, January 15, 2022, https://hcpf.colorado.gov/sites/hcpf/files/2022%20CHASE%20Annual%20Report%20with%20CLs.pdf. Table 7, p. 23
[124] MedPAC. March 2021 Report to Congress: Medicare Payment Policy, Chapter 3. .  Figure 3.8, p. 76.
[125] Lindsay Winninger Federal Deposition, October 7, 2021, p. 78.
[126] Howard Head Sports Medicine. "Services." https://www.howardhead.org/services. Dr. Schafer also notes the broad range of specialties that Howard Head provides (Schafer Report, ¶48).

CONFIDENTIAL

### C.  Dr. Schafer's Assessment of Howard Head Pricing and Margins is so Full of Errors that it is Meaningless

#### i.  Dr. Schafer's Price Regressions Suffer from Methodological Flaws and are Based on an Incorrect Model

71.     Dr. Schafer's attempt to compare Howard Head's pricing with that of other Vail Valley providers is fraught with theoretical, methodological, and execution errors.  In this section I describe the errors that she makes and then provide an alternative, corrected approach.  I find that her conclusions that Howard Head's prices were inflated due to its exercise of market power are incorrect.

72.     I first note that Dr. Schafer appears to assume that any observed price difference between Howard Head and other physical therapy providers implies that Howard Head has market power and has exercised it.  But she is mistakenly applying the "small but significant and non-transitory increase in price (SSNIP)" standard of five percent articulated by the FTC and DOJ in their Horizontal Merger Guidelines in the context of market definition to an analysis of Howard Head's alleged market power.[127]  The SSNIP test is used to assess whether a hypothetical monopolist in a putative market could profitably raise price or whether the market definition needs to be broadened, not to assess differences in price levels across differentiated firms.  There are a variety of reasons why different firms price at different levels (or why their prices increase at different rates.)  As I have discussed, health care services are highly differentiated, varying at least in terms of quality, complexity, and cost to provide, and this differentiation can be expected to result in different prices.  Assuming they should all be the same is akin to expecting that a luxury Mercedes should be priced equivalently to a compact Honda.   Regardless, as I demonstrate below, Dr. Schafer's comparisons of Howard Head's prices with those of other area physical therapists are seriously flawed, and when I correct her errors, I find that at most Howard Head's prices are equivalent to those of its competitors and possibly lower than those of other rural hospitals in Colorado.

73.     Dr. Schafer first presents a descriptive analysis comparing the trends in Howard Head's prices with trends in those of other Vail Valley physical therapy providers.  This analysis contains all the errors that I previously highlighted relating to inappropriate averaging of different services with different complexity and inappropriate identification of Vail Health.[128]  In addition, as I have also previously explained, she appears to associate Howard Head's use, as a hospital-based provider, of facility billing with an exercise of market power rather than a regulatorily accepted approach that acknowledges the higher costs of hospital-based services.  Using her own flawed methodology, Dr. Schafer herself

---

[127] Schafer Report, ¶¶195, 205.
[128] See ¶¶29-31 and ¶45 of my report.

CONFIDENTIAL

demonstrates (in her Table 1) that Howard Head's billing levels are consistent with those of other hospital-based providers in Colorado. As a result, it is impossible to draw any conclusions from her trend analysis, presented in her Figure 15.

74.     Dr. Schafer then introduces, without explanation, a comparison of an "early conduct period" and a "later conduct period." She defines the early conduct period as spanning January 2012 – March 2017 and the later conduct period encompassing April 2017 – 2020. Plaintiffs allege that Howard Head has possessed market power for the entire time period that Dr. Schafer analyzes, that is, since at least the time that Vail Health assumed its operation from ProAxis and "locked up" its physical therapists with non-compete agreements in 2012. They also claim that it exercised this power against Lindsay Winninger beginning in 2015 when she set up an SRC office in Vail. There is no distinction made anywhere in Plaintiffs' allegations, nor does Dr. Schafer provide any rationale for making one, between the "early" and "later" conduct periods that she defines.

75.     Dr. Schafer appears to make this distinction so that she can employ the often-used econometric "difference-in-difference" or "DID" technique. When employed correctly, this approach compares changes in a variable of interest, such as a properly measured price charged by a party that is of interest (say, an alleged competitor that has gained market power) with changes in the same variable for a "control group" that is similar in all respects to the party of interest *except for* the event or behavior that is at issue. Properly executed, such a DID analysis isolates the effect of the action that is being assessed, say the gain of market power by a particular competitor.

76.     However, that is not what Dr. Schafer has done in her comparison of "early" and "later" conduct periods. First, her control group is comprised of other physical therapy providers in the same Vail Valley area in which Howard Head allegedly competes. As a result, to the extent that Plaintiffs and Dr. Schafer are correct in their allegations, all these competitors would be subject to the market conditions imposed by Howard Head. In order to isolate the effect of the alleged conduct, the control group must be unaffected by the alleged conduct, and it must face sufficiently similar supply and demand conditions such that prices at Howard Head would be expected to change in the same way as prices in the control group (after controlling for observable factors), but-for the alleged conduct.[129] Dr. Schafer's control group does not satisfy either of these two conditions.

77.     Second, in a properly executed DID analysis, changes are measured from a time period that precedes the conduct in question to one that reflects the conduct. Dr. Schafer instead assumes that both

[129] *See* American Bar Association. *Proving Antitrust Damages*, Third Edition. 2017. pp. 178-179.

CONFIDENTIAL

her pre and post periods reflect Howard Head's exercise of its market power.  As a result, absent all the other flaws of her methodology, she is at best measuring whether Howard Head exercised more market power after March 2017 than it did before (relative to other physical therapy providers in the Vail Valley.) But she provides absolutely no justification to distinguish between her early and later conduct periods; neither she nor Plaintiffs cite any event or market disturbance that occurred in March 2017.  Given the economic framework that Dr. Schafer and Plaintiffs present, the conclusions that Dr. Schafer draws from her comparison of conduct periods are completely inappropriate.[130]

78.     Even if one were to accept the legitimacy of Dr. Schafer's use of a DID framework to measure Howard Head's supposed exercise of market power, Dr. Schafer's implementation of this analysis is deeply flawed.   First, she misidentifies Vail Health.[131] Second, she does not control for the varying service and payor mix of different providers in different years.   Third, she leaves in unusually high and low-dollar value observations (outliers) that can have an undue effect on her results.  Fourth, she uses a control group that does not provide a valid comparison: she limits her analysis to other physical therapy providers in the Vail Valley (as she defines it, discussed earlier).  Since these providers are direct competitors to Vail Health, their pricing is likely impacted by that of Howard Head.

79.     In addition to all the flaws in Dr. Schafer's implementation described in the previous paragraph, her interpretation of the Vail Health indicator variable in the DID regressions is incorrect. She states that the coefficient of 0.32 in her Table 14a implies "PT prices 37.7 percent higher than other Vail Valley providers across the early and later conduct periods."[132]  However, since the regression includes provider fixed effects, the 37.7 percent is not relative to *all other* Vail Valley providers, as Dr. Schafer states. Instead, the difference is related specifically to provider "Aaron C. Castonguay," which is assigned automatically by Stata, the statistical software program that Dr. Schafer uses, as the base group because the software uses the first observation in alphabetical order. The estimated value of the coefficient associated with the Vail Health indicator changes magnitude and sign for different choices of the base provider. An alternative way to interpret the Vail Health indicator coefficient that avoids the base group

---

[130] *See for example* American Bar Association. *Proving Antitrust Damages*, Third Edition. 2017.  pp. 270-271. ("More so than in price-fixing cases, exclusionary conduct cases often present difficulties in identifying an appropriate unaffected period. For example, in a case where the exclusionary conduct artificially maintained the pre-existing status quo, the before period (*i.e.*, the status quo) may not provide an appropriate basis for modeling the affected period absent the exclusionary conduct.")

[131] Dr. Schafer appears to classify observations with the billing provider NPI of 1851449920 as part of Vail Health, however these observations relate to a different provider:  Centers for Medicare & Medicaid Services, "NPPES NPI Registry." https://npiregistry.cms.hhs.gov/registry/provider-view/1851449920. Dr. Schafer also includes other observations with either a non-Vail Health billing or service provider NPI for which it is unclear whether pricing is set by Vail Health.

[132] Schafer Report, ¶213.

CONFIDENTIAL

choice issues is to compare the estimated fixed effect for Vail Health (0.32) with those of other providers. The histogram in Figure 6 shows that the Vail Health fixed effect (represented by the red dashed line) is not an outlier as Dr. Schafer suggests, but rather falls near the middle of the distribution of provider fixed effects.

**Figure 6: Distribution of Provider Fixed Effects in Schafer's Regression 14a**



Sources:
[1] CO-APCD
[2] Dr. Schafer's Work Papers

80.    In Table 2, I present a set of regressions that address the errors described above.[133]  Column (1) replicates Dr. Schafer's regression from Table 14a.  Next, Column (2) shows Dr. Schafer's regression

---

[133] I use clustered standard errors by CPT code in all regressions except in the replication of Dr. Schafer's Table 14a regression in column (1) of Table 2 (since she did not use them). This choice does not have any impact on the magnitude of the coefficients that I estimate but rather affects only the computation of standard errors used for testing standard levels of statistical significance, *i.e.*, whether each coefficient is statistically different from zero.  Use of clustered standard errors controls for the commonly observed error correlation within groups of observations for particular CPTs. As pointed out by Cameron and Miller, "Failure to control for within-cluster error correlation can lead to very misleadingly small standard errors, and consequent misleadingly narrow confidence intervals, large t-statistics and low p-values. It is not unusual to have applications where standard errors that control for within-cluster correlation are several times larger than default standard errors that ignore such correlation." Colin Cameron and Douglas L. Miller.  "A Practitioner's Guide to Cluster-Robust Inference." *Journal of Human Resources,* Vol 50 no. 2. Spring 2015, (317-372). p. 318.

correcting her non-inclusion of CPT fixed effects.[134] This first correction results in a 21 percent reduction in the DID effect (Vail Health x Conduct Period) relative to what Dr. Schafer estimates. Column (3) shows the same specification as (2) but also corrects the definition of Vail Health in the data.[135] The estimated DID effect is now 67 percent lower than Dr. Schafer's original estimate (from 27 percent in Dr. Schafer's incorrect specification, to 8.8 percent in the estimates presented in Column (3)). Column (4) displays the results after removing outliers that can produce distorted estimates.[136] The estimates after removing the outliers are 70 percent lower than what Dr. Schafer's originally estimated. In Column (5) I remove observations from 2020, which is a potentially misleading year because of the effect that COVID had on all health care delivery. Even though Dr. Schafer includes an indicator variable for the COVID period in her model, this variable cannot adequately capture a possible change in the DID effect, which is the core of the analysis. After removing observations from 2020, the estimated DID effect is 78 percent smaller than what Dr. Schafer originally estimated (from 27 percent to 5.8 percent).

81.     In Columns (6) and (7) I present the results of a sensitivity check on Dr. Schafer's arbitrary "later conduct period." Since Plaintiffs allege that "Vail Health's exclusionary behavior did not begin until [Winninger] returned to the Vail Valley to open a competing physical therapy clinic in the autumn of 2015,"[137] I use September 2015 and January 2016 as alternative dates for the start of the "later conduct period" in place of Dr. Schafer's arbitrarily chosen April 2017. Column (6) shows that when I use September 2015 (and also make all the other corrections), I find that the estimated DID effect is only 1.6

---

[134] I am unable to correct for Dr. Schafer's failure to account for differences in payor mix across providers since she does not appear to have requested the Payer_Cd field in the CO-APCD data from CIVHC. If this field becomes available to me, I may revise my analysis.

[135] Specifically, from Dr. Schafer's definition I categorize claims with billing provider NPI of 1851449920 as part of the control group, and I exclude from the data observations with missing service provider NPI for which it is unclear without additional information whether pricing is set by Vail Health. In at least some cases, the services billed under physical therapy codes (and associated allowed amounts) may also include other services included in a care bundle. The Revenue_Cd field in the CO-APCD data may be informative regarding what the allowed amounts in such cases represent, however I understand this field was not requested by Dr. Schafer. If I am able to access the Revenue_Cd field, I may revise my treatment of these observations. In many of the cases that have a Vail Health billing provider NPI 1992812333 but a different service provider NPI, they appear to be other provider types (e.g. orthopedic surgeons and primary care providers). Since it is not clear how prices are determined for these observations, I have also run my analysis removing them and my conclusions are unchanged.

[136] See National Research Council. *Reference Manual on Scientific Evidence*, Third Edition. Washington, DC: The National Academies Press. 2011. pp. 345-346. I removed observations with allowed amount per unit below the 1st percentile or above the 99th percentile values of allowed per unit within CPT code and year. For instance, the sample used in Dr. Schafer's regression Table 14a includes more than 500 observations with average allowed amount per unit above $1,000, with the maximum average allowed amount per unit in her regression sample of $35,386.25. Dr. Schafer's regression also includes more than 1,700 observations with average allowed amount below $3.00. Moreover, while Dr. Schafer claims in Note (3) from Table 14a that the regression "Includes private-payers outpatient claim lines with allowed amounts greater than or equal to $1", there are 27 observations with average allowed amount per unit below $1, including average allowed amount per unit as low as $0.32.

[137] Amended Complaint, ¶41.

CONFIDENTIAL

percent, and is not statistically significantly different from zero, and Column (7) shows that the effect is 2.1 percent (and also not statistically significant) when I use January 2016 as the "conduct" date.[138]

### Table 2: Effect of Corrections on Dr. Schafer's Flawed Price Regression

| | Dr. Schafer's Vail Health Classification | | Vail Health Defined by Billing Provider NPI 1992812333 | | | | |
|---|---|---|---|---|---|---|---|
| | Alleged Conduct Start Date: April 1, 2017 | | Alleged Conduct Start Date: April 1, 2017 | | | Alternative Conduct Dates | |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| | Same Model as Dr. Schafer's Table 14a | Same as (1) + CPT FE | Same as (1) + CPT FE | Same as (3) + remove outliers by CPT/year | Same as (4) + remove observations from year 2020 | Same as (5) + alternative conduct date: September 1, 2015 | Same as (5) + alternative conduct date: January 1, 2016 |
| Vail Health x Conduct Period | 0.239*** | 0.194*** | 0.0844** | 0.0769** | 0.0568** | 0.0162 | 0.0208 |
| | (0.00512) | (0.0271) | (0.0358) | (0.0356) | (0.0239) | (0.0247) | (0.0262) |
| Vail Health | 0.320*** | 0.398* | 0.628*** | 0.568*** | 0.603*** | 0.680*** | 0.676*** |
| | (0.0312) | (0.197) | (0.110) | (0.0937) | (0.0500) | (0.0615) | (0.0605) |
| Conduct | -0.0776*** | -0.0550*** | -0.0225 | -0.0389** | -0.0322* | -0.0352* | -0.148*** |
| | (0.00835) | (0.0167) | (0.0204) | (0.0155) | (0.0162) | (0.0179) | (0.0268) |
| Vail Valley Market Share | 0.565*** | 0.496** | 0.362** | 0.432*** | 0.395*** | 0.288*** | 0.296*** |
| | (0.0412) | (0.233) | (0.145) | (0.114) | (0.0850) | (0.0754) | (0.0710) |
| Covid Period | -0.0751*** | -0.0786*** | -0.0574*** | -0.0505*** | | | |
| | (0.00755) | (0.0131) | (0.0178) | (0.0177) | | | |
| Constant | 3.352*** | 4.223*** | 4.221*** | 4.235*** | 4.229*** | 4.233*** | 4.231*** |
| | (0.0151) | (0.0758) | (0.0511) | (0.0432) | (0.0438) | (0.0438) | (0.0456) |
| Observations | 292,308 | 292,308 | 278,038 | 269,346 | 237,827 | 237,827 | 237,827 |
| CPT FE | No | Yes | Yes | Yes | Yes | Yes | Yes |
| Provider FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| DID Effect | 27.0% | 21.4% | 8.8% | 8.0% | 5.8% | 1.6% | 2.1% |
| Adjusted R-Squared | 0.245 | 0.387 | 0.420 | 0.491 | 0.487 | 0.487 | 0.487 |
| Standard Errors | Robust | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) |

**Notes:**
[1] Standard errors in parentheses
[2] *** p<0.01, ** p<0.05, * p<0.1
[3] "DID Effect" is computed by exp(coefficient)-1, where coefficient refers to the coefficient of Vail Health x Conduct Period

**Sources:**
[1] CIVHC CO-APCD
[2] Dr. Schafer's Work Papers

82.     Another problem with Dr. Schafer's specification is her inclusion of a share measure. Specifically, she includes the provider's share of total commercial revenue from physical therapy services in the Vail Valley in the previous quarter (as reported in the CO-APCD data) as one of the explanatory variables in the DID regression presented in her Table 14a. She explains the purpose of this variable as "a measure of each PT provider's pricing power derived from its size."[139] Regressions of price on quantities or concentration measures, such as share, are well known in the economics literature to be problematic,

---

[138] Given that the documents do not provide precise information about the beginning of the alleged conduct, in addition to the dates presented in columns (6) and (7), I tested a version excluding 3 months before and after each date and 6 months before and after each date. The purpose of these additional sensitivity checks is to remove a possible transition period and estimate the DID effect base on cleaner control and treatment periods. The results of these additional checks are similar to what I show in columns (6) and (7).

[139] Schafer Report, ¶210.

CONFIDENTIAL

because price and quantity are not independently determined.[140] This simultaneity issue introduces bias in Dr. Schafer's regression, adding yet another concern to the reliability of her analysis. While she uses lagged shares, commercial payors' prices are usually set for at least one and often several years and, so, automatically generate correlation across the different periods. [141]

83.     Her share measure is also likely affected by various factors that have nothing to do with pricing power.  For one, her measure of share is based on the CO-APCD data, which as I previously discussed includes only 34 percent of commercially insured lives.  In addition, Dr. Schafer does not control for the effect of variation in payor mix across providers or time. Nor do I have the ability to do so since the CO-APCD data that I received (which matched those requested by Dr. Schafer) do not include information on commercial payor mix.  In addition, the revenue shares that she estimates are strongly affected by prices, and since providers that bill for facility charges receive higher payments, their revenue shares are inflated in ways that have nothing to do with market power.[142]

84.     I next address the issue of a mis-specified control group.  Dr. Schafer's regressions are restricted to providers in the Vail Valley and include a heterogeneous set of providers as the control group. As I discussed above in ¶¶75-76, the econometric methodology used by Dr. Schafer requires the control group to be comparable to Howard Head, and unaffected by the alleged conduct. Her control group fails on both these criteria. Instead of using other physical therapy groups in her defined geographic area of the Vail Valley, I perform her DID analysis of Howard Head against a control group of other rural hospitals in Colorado that are not critical access hospitals.[143]  In these regressions, I do not include a measure of each provider's share because of the simultaneity problem that I explained above.

---

[140] For example, Miller *et al*. (2021) explain: "A famous example of simultaneity involves price and quantity, which are simultaneously determined in the classic economic model of supply and demand." Nathan Miller *et al*. "On The Misuse of Regressions of Price on the HHI in Merger Review." November 22, 2021. *Available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3974267.

[141] The fact that Dr. Schafer uses a lagged measure of shares does not eliminate the simultaneity issue when prices (which affect the revenue share measure) and the share measure itself are correlated over time, so the lagged and current measures are related. Bellemare *et al*. demonstrate that "lag identification is almost never a solution to endogeneity problems in observational data," and that rather than allowing for the identification of causal relationships, lag identification "merely moves the channel through which" endogeneity biases estimates of causal effects. Marc F. Bellemare, Takaaki Masaki, Thomas B. Pepinsky. "Lagged Explanatory Variables and the Estimation of Causal Effects." *The Journal of Politics* 79, July 2017: 949-963 at 949.

[142] In practice the share variable has little effect on Dr. Schafer's estimated DID effect.  When I test the effect of omitting the share variable in Dr. Schafer's regression, the DID effect of 27% from Dr. Schafer's incorrectly specified regressions presented in Table 14a becomes 25.8%.

[143] Critical Access hospitals are rural hospitals that have 25 or fewer acute care inpatient beds, are more than 35 miles from another hospital location, maintain an average length of stay of 96 hours or less for

CONFIDENTIAL

85.        These results are presented in Table 3. All regressions in this table use the same definition of Howard Head as I use for the analysis presented in Table 2, that is Howard Head is defined by billing provider NPI 199281233 with the same adjustments as above. The sequence of regressions in Table 3 is similar to those presented in Table 2. First, I use the same model as Dr. Schafer (*i.e.*, omitting CPT fixed effects). Next, I include CPT fixed effects. In the third column I present the results after removing outliers and in the fourth column I show the estimates after dropping the observations from 2020. All of these DID regressions estimated using rural hospitals in Colorado as the control group show a negative and significant DID effect, contradicting Dr. Schafer's claim that during the period between March 2017 and December 2020 Vail Health raised prices, much less by 27%.  In Columns (5) and (6) of Table 3, I implement my sensitivity test of Dr. Schafer's "later conduct period" and find I find no effect of the "conduct."[144]

---

acute care patients and provide 24/7 emergency services.  Qualifying hospitals receive cost plus reimbursement from Medicare for inpatient and outpatient services. "The CAH designation is designed to reduce the financial vulnerability of rural hospitals and improve access to healthcare by keeping essential services in rural communities." Rural Health Information Hub. "Critical Access Hospitals." https://www.ruralhealthinfo.org/topics/critical-access-hospitals. *See, also,* Centers for Medicaid & Medicare Services. "Critical Access Hospitals" https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs.

[144] I removed Critical Access Hospitals from the set of Colorado rural hospitals that form my control group for this analysis because their cost-based reimbursement from Medicare may affect their payments from private payors as well.  However, I also assessed whether this choice affected my results by including them.  The results were qualitatively identical when they are included, *i.e.*, the sign and significance and approximate magnitude of all the Vail Health x Conduct period coefficients remained unchanged.

CONFIDENTIAL

**Table 3: DID Regressions on Rural Hospitals in Colorado**

**Vail Health Defined Based on Billing Provider NPI 1992812333**

| VARIABLES | Alleged Conduct Start Date: April 1, 2017 | | | | Alternative Conduct Dates | |
| --- | --- | --- | --- | --- | --- | --- |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| | Same Model as Dr. Schafer's Table 14a | Same as (1) + CPT FE | Same as (2) + remove outliers by CPT/year | Same as (3) + remove observations from year 2020 | Same as (4) + alternative conduct date: September 1, 2015 | Same as (4) + alternative conduct date: January 1, 2016 |
| Vail Health x Conduct Period | -0.155*** | -0.136*** | -0.134*** | -0.0815*** | 0.0159 | -0.0223 |
| | (0.0449) | (0.0306) | (0.0324) | (0.0219) | (0.0214) | (0.0220) |
| Vail Health | -0.241* | -0.0460 | -0.0547 | -0.0436 | -0.0914 | -0.0658 |
| | (0.128) | (0.0822) | (0.0672) | (0.0683) | (0.0736) | (0.0710) |
| Conduct | 0.0185 | 0.00427 | 0.0104 | -0.0164 | -0.0410* | 0.154*** |
| | (0.0191) | (0.0174) | (0.0202) | (0.0178) | (0.0219) | (0.0328) |
| Covid Period | -0.114*** | -0.136*** | -0.110*** | | | |
| | (0.0179) | (0.0128) | (0.0111) | | | |
| Constant | 4.554*** | 5.188*** | 5.175*** | 5.203*** | 5.229*** | 5.215*** |
| | (0.103) | (0.0773) | (0.0566) | (0.0742) | (0.0782) | (0.0764) |
| Observations | 256,512 | 256,512 | 250,469 | 221,219 | 221,219 | 221,219 |
| CPT FE | No | Yes | Yes | Yes | Yes | Yes |
| Hospital County FE | Yes | Yes | Yes | Yes | Yes | Yes |
| Year FE | Yes | Yes | Yes | Yes | Yes | Yes |
| DID Effect | -14.4% | -12.7% | -12.5% | -7.8% | 1.6% | -2.2% |
| Adjusted R-Squared | 0.080 | 0.167 | 0.187 | 0.183 | 0.183 | 0.183 |
| Standard Errors | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) | Clustered (CPT) |

**Notes:**
[1] Standard errors in parentheses
[2] *** p<0.01, ** p<0.05, * p<0.1
[3] I remove the cases where the hospital x county combination has fewer than 100 observations
[4] "DID Effect" is computed by exp(coefficient)-1, where coefficient refers to the coefficient of Vail Health x Conduct Period

**Sources:**
[1] CIVHC CO-APCD
[2] Dr. Schafer's Work Papers
[3] https://cha.com/colorado-hospitals/find-a-hospital/

## ii.  Dr. Schafer's Assessment of Margins is Inappropriate

86.      Dr. Schafer also misleadingly and meaninglessly compares the margins of Vail Health's Howard Head physical therapy practice with the *aggregate* margins for hospitals in general.[145]   Hospitals are comprised of many service units with substantially varying degrees of profitability.[146]   As a result, the only appropriate comparisons would be between Howard Head and other hospital-based physical therapy practices, or by comparing aggregate Vail Health margins to the hospital-wide averages that she cites.

---

[145] Schafer Report, ¶226.
[146] *See* Guy David *et al*., "Do Hospitals Cross-Subsidize?" *Journal of Health Economics, Vol.* 37. 2014: 198-218 and numerous other references cited therein. For example, elective procedures (both inpatient and outpatient) tend to be relatively more profitable. *See* Matthew J. Best, Edward G. McFarland, Gerard F. Anderson, Uma Srikumaran, "The likely economic impact of fewer elective surgical procedures on US hospitals during the COVID-19 pandemic." *Surgery.* 2020: 962-967, at 964.  "When comparing elective procedures to nonelective procedures, elective procedures had lower cost and higher net income than nonelective procures."

CONFIDENTIAL

Making the latter comparison, I find that Vail Health's financial condition is considerably worse than the average hospital. Dr. Schafer notes that nationally the median hospital operating margin was 2.4 percent, while that of Colorado hospitals was 2.6 percent in 2019.  In contrast, Vail Health's operating margin in 2019 was a negative 6 percent.[147]  Forty-two percent of its total patient days were reimbursed by government payors (Medicare and Medicaid.)[148]

### D.  Howard Head has not prevented competitive entry through its employment of a substantial number of local physical therapists

87.     Dr. Schafer mistakenly assumes that the mere fact that Howard Head employs a substantial portion of all physical therapists practicing in the Vail area necessarily provides Howard Head with the ability to foreclose competitor entry or expansion in the area, and that it has done so.  Rather, Howard Head's success may be evidence of its superior ability to compete in the "market" for physical therapists.

88.     Dr. Schafer appears to adopt Plaintiffs' ill-founded implicit assumption that the market for physical therapists is local.  There are several factors that demonstrate that this assumption is false.  First, it is evident that the majority of physical therapists practicing in the Vail Valley, both at Howard Head and at its competitors, have relocated to the area after training and, in some cases, practicing elsewhere. For example, among the physical therapists at competing physical therapy practices I have identified in Eagle County, more than 70 percent earned their physical therapy degrees outside of Colorado or relocated from outside of Colorado.[149]  The same pattern holds for physical therapists employed at Howard Head clinics in Eagle County, with over 70 percent of the physical therapists having trained or relocated from outside of Colorado.[150]  Moreover, as Brad Schoenthaler, managing partner of SRC has acknowledged, the Denver office of SRC considers physical therapist candidates from outside of Colorado,[151] posting ads with the American Physical Therapy Association that run nationally.[152]  Plaintiff,

---

[147] American Hospital Directory.  "Vail Health Financial Indicators."
https://www.ahd.com/indicators.php?hcfa_id=c66f3f1be21530bbcd34cef3e542e706&ek=0acee91deeabcb9f0a31a9437f33a13f
[148] American Hospital Directory. "Vail Health Profile."
https://www.ahd.com/profile.php?hcfa_id=c66f3f1be21530bbcd34cef3e542e706&ek=0acee91deeabcb9f0a31a9437f33a13f
[149] Competing physical therapy practices in Eagle County include Axis Sports Medicine, Vail Integrative Medical Group, Valley View PT, Altius, Competitive Edge PT, Joint Worx, Movement PT and Vail PT.  I reviewed information from the physical therapist biographies on these competitor websites as well as LinkedIn  pages where available.
[150] Based on my review of physical therapist biographies https://www.howardhead.org/staff and LinkedIn accounts where available.
[151] Brad Schoenthaler Federal Deposition July 8, 2021, pp.67-75.
[152] SRC_FED_000120. (Exhibit 8 to Schoenthaler Federal Deposition, July 8, 2021). A recent review of the APTA website indicated 1126 job postings for physical therapists nationwide.  American Physical Therapy Association. "APTA Career Center." https://jobs.apta.org  (accessed February 25, 2022).

CONFIDENTIAL

Lindsay Winninger, herself, trained in St. Louis, Missouri before relocating to practice in Colorado; she now practices with the Orlando Magic in Florida.[153]  Mr. Schoenthaler trained at the University of Kansas.

89.     Recruitment from other states to Colorado is facilitated by the fact that Colorado is one of 25 states that honors the interstate physical therapy compact, which simplifies cross-state licensure of physical therapists to simplify their mobility.[154] Therefore, even if it were the case, contrary to evidence, that Howard Head prevented its employed physical therapists from leaving to practice with local competitors, it is apparent that competitors of Howard Head are not limited to recruit from the stock of existing physical therapists already practicing in the local area.

90.     Recognizing that recruitment of physical therapists occurs nationally, Howard Head employs a miniscule fraction of the total supply of available physical therapists.  Nationally, there were approximately 220,870 physical therapists employed in the United States.[155] Even if the "market" for recruiting physical therapists were limited to the state of Colorado, there were 5,130 employed physical therapists in the state in 2020.[156]  Moreover, projections by the American Physical Therapy Association indicate that the supply of physical therapists nationally is growing faster than demand for them.[157] In 2020 there were 11,331 graduates from physical therapist programs in the U.S., up 10% over the number in 2017.[158]

91.     Plaintiffs (and Dr. Schafer) also stress the high cost of living in Vail as a barrier to recruitment of new physical therapists.  While Vail does have a high cost of living, it is also an attractive place to live given its access to world-class skiing, hiking trails, and the amenities of a resort town. It is not surprising that housing prices are relatively high in an attractive location. In addition, while home prices in Vail are

---

[153] Lindsay Winninger profile posted on Sports Rehab Consulting website. https://sportsrehabconsulting.com/about/lindsay-winninger/
[154] PT-Compact. https://ptcompact.org/ptc-states
[155] U.S. Bureau of Labor Statistics. "Occupational Employment and Wage Statistics. 29-1123 Physical Therapists." May 2020. https://www.bls.gov/oes/current/oes291123.htm.   The American Physical Therapy Association, considering self-employed and employed physical therapists, reports that there were 313,000 physical therapists nationally and 5,100 in Colorado. American Physical Therapy Association. "APTA Physical Therapy Workforce Analysis." 2020. pp. 4-5. https://www.apta.org/contentassets/5997bfa5c8504df789fe4f1c01a717eb/apta-workforce-analysis-2020.pdf
[156] U.S. Bureau of Labor Statistics. "Occupational Employment and Wage Statistics. 29-1123 Physical Therapists." May 2020. https://www.bls.gov/oes/current/oes291123.htm.
[157] American Physical Therapy Association. "APTA Physical Therapy Workforce Analysis." 2020. p. 10. https://www.apta.org/contentassets/5997bfa5c8504df789fe4f1c01a717eb/apta-workforce-analysis-2020.pdf
[158] American Physical Therapy Association. "Commission on Accreditation in Physical Therapy Education. Aggregate Program Data: 2020 Physical Therapist Education Programs Fact Sheet." 2020. p. 10. https://www.capteonline.org/globalassets/capte-docs/aggregate-data/2020-2021-aggregate-pt-program-and-salary-data.pdf.

CONFIDENTIAL

high, there are affordable options available for local residents.  For example, renters make up approximately 50% of households in Vail,[159] and rent for a two-bedroom apartment is approximately $2100 per month.[160]  Vail also has 729 deed-restricted housing units available for sale or rent for local employees.[161]  Vail Valley's Economic Development website notes that "real estate in Vail and Beaver Creek can be quite expensive, but many surrounding communities such as Gypsum, Eagle, Minturn and others offer significantly more affordable options, all within an easy 35-minute travel corridor."[162]  The same source Dr. Schafer cites as listing a median home sale price of $2 million in Vail in October 2021 indicates that median listing prices in Eagle County as a whole were less than half of that amount.[163]  In addition, annual income for physical therapists is higher than the average across other occupations.  For example, while the annual wage income for the Northwest Colorado non-metropolitan area (which includes Vail) was $53,840 in 2020, the average for physical therapists in the area was approximately 50 percent greater, $83,450.[164]

92.     Moreover, the high cost of housing and commercial real estate is an issue that Howard Head also faces, as Dr. Schafer notes, citing various Vail Health documents.[165]  As she apparently recognizes, Howard Head does not have an advantage with respect to housing costs relative to its competitors in attracting physical therapists to practice in Vail.  And, while Plaintiffs and Dr. Schafer cite the lack of affordable and favorable commercial locations at which competing physical therapy groups can practice,[166] these statements are belied by the number of existing physical therapy locations in Vail and the surrounding area, discussed in Section IV.C above.

---

[159] U.S. Census Bureau, American Community Survey. "Narrative Profile 2015-2019, Vail Town, Colorado" https://www.census.gov/acs/www/data/data-tables-and-tools/narrative-profiles/2019/report.php?geotype=place&state=08&place=80040.
[160] Best Places. "Vail, Colorado." https://www.bestplaces.net/cost_of_living/city/colorado/vail.
[161] Town of Vail. "Housing in the Town of Vail." https://www.vailgov.com/government/departments/housing.
[162] Vail Valley Economic Development, "Thinking of moving to the Vail Valley?" https://vailvalleymeansbusiness.com/life/housing-real-estate-cost-living/.  In addition, Colorado Mountain College recently announced that it was constructing 150 affordable housing units spread across Glenwood Springs, Edwards, Dillon, and Breckenridge as well as in Steamboat Springs. Shannon Marvel, "CMC announces $40M affordable housing project sited at four campus locations."  *Vail Daily,* June 22, 2021. https://www.vaildaily.com/news/cmc-announces-41-million-affordable-housing-project-sited-at-four-campus-locations/.
[163] Realtor.com. "Eagle County, CO Real Estate Market." https://www.realtor.com/realestateandhomes-search/Eagle-County_CO/overview. The median listing price in January 2022 was $929K in Eagle County, and the median listing price per square foot was $543.
[164] U.S. Bureau of Labor Statistics. "Occupational and Wage Statistics." https://www.bls.gov/oes/current/oes_0800003.htm.
[165] Schafer Report, ¶27.
[166] Schafer Report, ¶¶71-72; Amended Complaint, ¶3.

CONFIDENTIAL

**E.   Proximity to Vail Hospital or The Steadman Clinic is not critical to
successful operation of a physical therapy practice**

93.      Plaintiffs allege that Howard Head's proximity to Vail Hospital is a barrier to entry facing other
providers of physical therapy services since Howard Head "enjoys the resource of its hospital facility in
the heart of Vail that is contiguous or very close to Steadman…."[167] Dr. Schafer similarly stresses the
importance of the referrals that Howard Head receives from Steadman and VSO, noting an internal
analysis that showed that 51 and 57 percent of  Howard Head's referrals in 2014 and 2015, respectively,
stemmed from the two orthopedic practices.[168] Her own analysis of the APCD data, however, indicated a
substantially lower referral figure to Howard Head post orthopedic surgery:  she found referrals to 666
providers, including 27 in the Vail Valley, with only 38 percent going to Howard Head over the entire
2012-2020 time-period.[169] These figures are inconsistent with Howard Head locking up the orthopedic
surgery referral market.[170] They also indicate that many patients leave the Vail Valley, likely to return
home, to complete their post-operative physical therapy.[171]

94.      Moreover, a substantial number of physical therapy patients in the Vail area are not post-surgical.
The internal Howard Head analysis cited by Dr. Schafer also reveals that Howard Head received 3,277
and 2,893 referrals from other sources in 2014 and 2015, respectively.[172]  Therefore, even if it were the
case, hypothetically, that Howard Head had locked up referrals from the orthopedic practices, there were
still thousands of other referrals annually that remained competitive.

95.      With respect to VSO, its failure to refer numerous post-surgical patients to local physical
therapists has nothing to do with any conduct of Howard Head.  Rather, in 2018 VSO acquired Avalanche
Physical Therapy in order "to expand its continuum of care to include personalized physical therapy and
sports rehabilitation, while lowering overall costs and improving efficiencies."[173] This captive physical
therapy practice likely reduces referrals to Howard Head as well as other competing physical therapy
practices.

---

[167] Amended Complaint, ¶55.
[168] Schafer Report, ¶84.
[169] Schafer Report, ¶85.
[170] Amended Complaint, ¶5.
[171] The relevance of Table 5 in Dr. Schafer's report is also unclear.  It appears to show that Vail Health and its
orthopedic surgery practices earn substantial and increasing revenues over the time period she analyzes, a pattern
that is not in dispute as local demand for orthopedic services has increased along with the general popularity of the
Vail area.
[172] VH_Fed00002009.
[173] Lauren Glendenning. "Comprehensive concussion treatment is world class in Summit County." *Vail Daily.*
December 25, 2020. https://www.vaildaily.com/news/comprehensive-concussion-treatment-is-world-class-in-
summit-county-sponsored/.  *See, also*, Schafer Report, ¶63.

CONFIDENTIAL

96.    Dr. Schafer also describes patient preferences for providers that offer "an integrated service" as a barrier to entry.[174] To the extent that hospital proximity, and the continuity of care that integrated providers and services offer, affect the choices that some Vail Health patients make, this implies that these patients value proximity and integration and perceive them as dimensions of service quality. Similarly, to the extent that orthopedic surgeons, and, perhaps, other providers associated with Vail Health, prefer Howard Head because they find that it facilitates care coordination, through, for example, integrated medical records, these preferences likely benefit patients.

97.    Research indicates that patients benefit when they receive care in an integrated setting, both through enhanced quality and reduced cost.[175] Indeed, the American Academy of Orthopedic Surgeons recommends integration of physical therapy into orthopedic practice, noting studies that indicate that it may "lead patients to choose more cost-effective nonsurgical options" as well as enhancing patient safety and patient-centered treatment.[176]   More generally, in recent years, both public and private payors have increased their efforts to encourage care integration.  CMS established its Center for Medicare & Medicaid Innovation ("CMMI") that encourages models of "[a]ccountable care [that] [*reduce*] *fragmentation in patient care and cost* by giving providers the incentives and tools to deliver high-quality, coordinated, team-based care" (emphasis added).[177]

98.    There is nothing anticompetitive about competing successfully on quality dimensions and thereby gaining customers.  Indeed, to prevent such integration could reduce consumer welfare by eliminating patients' preferred options.  Dr. Schafer quotes Howard Head as acknowledging that it has won share from competitors,[178] but there is nothing inappropriate about competing effectively to win additional customers by offering them an option that they prefer.

### F.  Howard Head's reporting of theft of its patient records is not anticompetitive

99.    Plaintiffs take 125 paragraphs of their Amended Complaint (¶102 - ¶226), and approximately one half of its pages, to describe Vail Health's identification of and communication regarding the theft of

---

[174] Schafer Report, ¶188.
[175] For a review of some of the research, see, Wenke Hwang, *et al.* "Effects of Integrated Delivery System on Cost and Quality." *The American Journal of Managed Care* 19 (2013): e175-e184. https://cdn.sanity.io/files/0vv8moc6/ajmc/1b61b45452536221a262ea24ddfc7f2e4f5d5ffd.pdf/AJMC_13may_Hwang_e175to184.pdf
[176] American Academy of Orthopedic Surgeons. "Position Statement: Physician Owned Physical Therapy Services." 2004. p. 2.  https://www.aaos.org/contentassets/1cd7f41417ec4dd4b5c4c48532183b96/1166-physician-owned-physical-therapy-services.pdf
[177] Centers for Medicare & Medicaid Innovation. "Strategic Direction." https://innovation.cms.gov/strategic-direction.
[178] Schafer Report, ¶198, citing a consultant analysis.

CONFIDENTIAL

confidential patient data by David Cimino, who left Howard Head to joint SRC. Plaintiffs claim that Vail Health "fabricate[d] evidence….and made false and misleading statements" (¶121), that its actions amounted to "torching" of Ms. Winninger and SRC (¶151) designed to "destroy Winninger" (¶162), and that Vail Health engaged in "sham petitioning of…multiple governmental entities." (¶226)

100.    While I am not drawing any legal conclusions with respect to the validity of these claims, I understand that they have been dismissed in a parallel action brought by plaintiffs in State Court.[179] Below, I do comment, as a health economist, on the importance of protecting confidential patient information. I also discuss the legitimate business incentives that Howard Head and Vail Health had to ensure confidentiality of their patient records as well as the reasons that Steadman should have taken the information on the reported breach seriously.

101.    According to one survey, two thirds of the public are concerned about the privacy of their own health information.[180] Another study found a range of 54 to 59 percent, depending on health status, expressed concern.[181] Patients must rely on their providers' ability to maintain the confidentiality of their personal medical records. As a result, it is not surprising that physicians are also concerned about the confidentiality of the medical records that they maintain on their patients.[182] First, providers are concerned that patients who doubt that their providers are able to assure privacy of their records are more likely to withhold important personal health information,[183] which can have implications on the quality of care that they are able to deliver. Second, providers are concerned about their reputations both among their customers (patients and referring physicians) and generally in the medical community.[184]

102.    Therefore, it is not surprising that, beyond any legal requirements, Vail Health had legitimate motivations to protect its own brand reputation by ensuring that interested parties were aware of the data breach and to stop it. And, it is similarly to be expected that physicians at Steadman would have concerns about maintaining their consulting arrangement with Lindsay Winninger and their referrals to her practice

---

[179] Order Granting Defendants' Motion for Summary Judgment, *Winninger, et al. v. Kirchner, et al.*, Case No. 17CV30102 (Nov. 4, 2021).
[180] Lake Research Partners. "Consumers and Health Information Technology: A National Survey." April 2010. https://www.chcf.org/publication/consumers-and-health-information-technology-a-national-survey/
[181] Deborah Beranek Lafky and Thomas A. Horan, "Personal Health Records: Consumer attitudes toward privacy and security of their personal health information." *Health Informatics Journal* 17. 2011: 63-71 at 66.
[182] Ismail Keshta and Ammar Odeh. "Security and privacy of electronic health records: Concerns and challenges." *Egyption Informatics Journal,* 22. 2021: 177-183 at 178-179.
[183] Matthew DePuccio *et al.* "Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic." *Journal of General Internal Medicine* 35. 2020: 3122-3125 at 3122.
[184] See, Kelly Adair State Deposition, September 12, 2018, p. 186 acknowledging concern felt by Steadman physicians regarding the data breach. Marc Philippon State Deposition, September 27, 2018, pp. 40, 71-73.

until the issue was resolved.[185] Both Vail Health and Steadman had made substantial investments to grow the reputation and success of their businesses, and as a result, any threat to their reputations raised the risk that they would forfeit the returns on those investments.

103.     In addition to taking confidential patient records, I also understand that Mr. Cimino took Howard Head "binders" that contained proprietary and confidential training materials.[186]  As I discuss below, businesses make investments to develop proprietary protocols.  Absent any protection of these documents, firms would have less incentive to invest in their development, which could lead to lower quality patient care.

### G.   Howard Head has a right to impose non-solicitation agreements in its employment arrangements

104.     Plaintiffs argue that the one-year non-solicitation agreements contained in Vail Health's employment agreements have harmed competition by "chilling" Howard Head's competitors' willingness to hire physical therapists employed by Howard Head.  As I explained earlier, recruitment of physical therapists occurs on a nationwide basis, so that even if this allegation were true, it does not prevent competing Vail area physical therapy practices from hiring physical therapists to practice with them.

105.     Moreover, economic theory explains that firms are reluctant to make beneficial but costly investments if they will be unable to internalize profits generated from the investment.  Non-solicitation or non-compete arrangements are justified when they enable employers to make investments they would not otherwise make in the absence of such provisions.  They mitigate the potential for employers not to earn the return that governed their initial investment decision by discouraging workers from leaving their employer before the employer can recoup the costs of its investment.

106.     Such investments include the costs of developing customer relationships by building a favorable reputation that results in referrals from physicians as well as attracting patients directly.  Non-solicitation provisions mitigate employers' concerns that employees will depart and take the employer's "book" of business with them.[187]  Investments can also encompass employee training and the sharing of confidential

---

[185] Marc Phillipon State Deposition, September 27, 2018, pp. 38-41.

[186] Nico Brown State Deposition, July 19, 2018. p. 67;  Vail Health's Eighth Supplemental Response to Plaintiffs' Interrogatory No. 1, Filed in Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, June 29th, 2020. pp. 7-8.

[187] One study of non-compete agreements suggests that protecting customer relationships is the primary explanation for them within primary care physician practices where approximately 45 percent of physicians are covered by non-competes.  Kurt Lavetti, Carol Simon and William White. "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians." *The Journal of Human Resources*, Vol. 55 No. 3. Summer 2020: 1025-1067.

CONFIDENTIAL

information, such as practice protocols, with employees.  Employers understandably want to avoid making costly investments in employees only to have the employee leave them for a competitor.[188]

107.    Non-solicitation agreements or even non-compete agreements are relatively common in firms that rely upon highly skilled and trained labor.  For example, the 2014 National Noncompete Survey Project found that 18% of workers were bound by a non-compete agreement in 2014, and that non-compete agreements were more prevalent in technical and high-skill industries and occupations.[189]  Another study of primary care physicians found that 45 percent of primary care physicians in group practices were bound by non-compete agreements.[190]  Vail Health's provisions are not unusual in this regard, and employees are aware that they are entering into such arrangements when they accept new jobs.

108.    Moreover, Howard Head physical therapists, including Lindsay Winninger, apparently had non-solicit or non-compete arrangements when they were employed by ProAxis prior to 2012 when Vail Health assumed the operation of the practice.[191]  Indeed, Ms. Winninger testified that she didn't "think it's abnormal for companies to have noncompetes."[192]

109.    Indeed, SRC itself utilizes non-compete agreements.  For example, when David Cimino left Howard Head and joined SRC in 2015, SRC required that he agree to a non-compete agreement with the following provisions.  "The undersigned Employee hereby agrees not to directly or indirectly compete with the Company on local, national or international platform.  During the period of employment and for a period of 365 days following termination or separation of employment and notwithstanding the cause or reason for termination."[193] The Employee Handbook for SRC contains similar language.[194]  The

---

[188] John McAdams. "Non-Compete Agreements: A Review of the Literature." December 31, 2019, p. 8 (available at https://ssrn.com/abstract=3513639).

[189] Evan Starr, J.J. Prescott and Norman Bishara, "Noncompetes in the U.S. Labor Force." *Journal of Law and Economics*. October 2020. *Available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2625714.

[190] This study is based on a 2007 survey of primary care physicians in California, Texas, Illinois, Georgia, and Pennsylvania. *See* Kurt Lavetti, Carol Simon and William White. "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians." *The Journal of Human Resources*, Vol. 55 No. 3. Summer 2020: 1025-1067.

[191] In response to a question about whether she had a non-compete when she was employed by ProAxis, Lindsey Winninger testified "I don't recall if it was a noncompete or a non-solicitation, but I do recall signing something in exchange for an increase in – in salary."  Lindsay Winninger State Deposition, June 29, 2018, p. 129.

[192] Lindsay Winninger State Deposition, June 29, 2018, p. 129-130.

[193] Non-Compete Agreement, Sports Rehab Consulting, LLC (SRC000697, Exhibit 39 to Lindsay Winninger State Deposition, June 29, 2018.)  While I understand that Plaintiffs claim that they do not possess a signed version of Mr. Cimino's agreement, comparable terms with other SRC contractors were signed. *See, for example*, SRC_FED0000036 and SRC_FED0000041.

[194] Employee Handbook: Sports Rehab Consulting, LLC. SRC000742-754 at 749 (part of Exhibit 40 to Lindsay Winninger State Deposition, June 29, 2018.) While Mr. Cimino's version in the record to this case is unsigned, a signed version by employee Purvi Desai is contained in SRC_FED_0001425.

CONFIDENTIAL

agreements that Howard Head employees sign are, in fact, less onerous.  They are limited to attempting to hire Vail Health Employees or soliciting its patients for one year.  They have no reference to any "national or international platform."  Moreover, they make clear that the non-solicit provision "shall not be construed to require Employee to violate any law forbidding anti-competitive practices or any law regarding anti-trust."[195]

### H.  Proposed Joint Venture Between Steadman and Vail Health Does Not Pose Competitive Concerns

110.    Plaintiffs make much of a contemplated, but never consummated, joint venture between Vail Health and the two local orthopedic surgery groups, Steadman and VSO.  Since no joint venture was consummated between Vail Health and either group, it is not possible that a joint venture facilitated any anticompetitive behavior by Vail Health or Howard Head.

111.    Moreover, even if the parties had entered into a joint venture, there are many procompetitive benefits that can be achieved through joint ventures. As public and private payors increasingly move toward value-based payment approaches that focus on entire episodes of care, rather than on particular services, providers are motivated to determine how to deliver patient care as cost effectively as possible. Therefore, it makes sense to align the interests of the different providers involved. For example, in 2015 CMS initiated a still-ongoing bundled payment program for joint replacement surgeries that included the surgery itself as well as all the services provided for 90 days post-discharge, intended to reflect the entire recovery period.[196]  As part of this program, approximately 375 participating providers nationwide receive a single payment for all the services that each joint replacement patient receives. As a result, providers have a strong incentive to align the interests of, for example, the surgeons, hospital, skilled nursing facility, and physical therapists that provide the care included in the episode to ensure that it is delivered cost-effectively.  Joint ventures can help to align these interests through the profit and loss sharing that is part of the joint venture.

112.    Joint ventures can also facilitate important investments that can improve patient care, again by aligning interests and mitigating the risk of not being able to realize a return on the costly investments if one party decides to leave the arrangement. Thus, it is not surprising that the first bullet of Vail Health's Aligned Vision for Future Success stated that "VVMC is investing heavily in hospital updates and

---

[195] VH_FED_00000965-967 at 966; VH_Fed_00000971-973 at 972; VH_Fed_00000990-991 at 991.
[196] Centers for Medicare & Medicaid Services. "Comprehensive Care for Joint Replacement (CJR) Model Provider and Technical Fact Sheet for Performance Years 6-8." https://innovation.cms.gov/files/fact-sheet/cjr-providerfs-finalrule.pdf. *See, also*, Centers for Medicare & Medicaid Services. "Comprehensive Care for Joint Replacement Model." https://innovation.cms.gov/innovation-models/cjr.

CONFIDENTIAL

research," and had plans to "expand research focus to improve entire continuum of patient experience."[197] The same presentation noted the move toward "value-based payment models" and pressure for providers to take on risk.[198] Vail Health's interest in pursuing joint ventures with the orthopedic practices is entirely consistent with these motivations.

113.     The federal antitrust authorities have similarly recognized the potential benefits of collaborations between existing or potential competitors.  Their jointly issued guidelines for competitor collaborations note that "[t]he Agencies recognize that consumers may benefit from competitor collaborations in a variety of ways. For example, a competitor collaboration may enable participants to offer goods or services that are cheaper, more valuable to consumers, or brought to market faster than would be possible absent the collaboration. A collaboration may allow its participants to better use existing assets or may provide incentives for them to make output-enhancing investments that would not occur absent the collaboration."[199]

114.     In addition, the economics literature explains how joint ventures can benefit consumers.  For example: "There is widespread agreement that collaborative activities can generate significant private benefits for the parents that correspond to genuine social benefits as well. These benefits include: (1) the sharing of risks associated with investments that serve uncertain demand or involve uncertain technology; (2) synergies arising when venturers share complementary skills or assets; and (3) the attainment of economies of scale and scope in production, procurement, or logistics. The economic theory of organization and control affirms that realizing such benefits may require closer long-term relationships than arms-length market transactions and short-term contracts can provide."[200]

115.     Regardless, Vail Health did not enter into any physical therapy joint venture with Steadman or VSO. As a result, even if this were a case of "attempted monopolization" as Plaintiffs allege, which the evidence indicates it was not, there can be no effect from a failed move.  Dr. Schafer argues that, despite the failed joint venture, Howard Head achieved the same aims through a "alternative, three-pronged, strategy" consisting of financial donations, facility investments and non-compete arrangements.[201]  But this argument also fails.

---

[197] VH_Fed_00006738-754 at 745. (Nico Brown Federal Deposition exhibit 45).
[198] VH_Fed_00006738-754 at 749. (Nico Brown Federal Deposition exhibit 45).
[199] U.S. Department of Justice and Federal Trade Commission, "Antitrust Guidelines for Collaborations among Competitors." April 2000. p. 6. https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf
[200] Carl Shapiro and Robert Willig. "On the Antitrust Treatment of Production Joint Ventures." *Journal of Economic Perspectives* 4. Summer 1990: 113-130 at p. 114.
[201] Schafer Report, ¶239.

116.     Dr. Schafer cites as support for her assertion regarding "facility investments" the bond document prepared to generate funding for a major hospital renovation and expansion in both Vail and in Dillon (Summit County). She references the fact that both orthopedic groups will be utilizing the new space. However, raising $100 million in bond funding merely to stem potential competition in physical therapy from the two leading local orthopedic practices would be an irrationally costly approach.  A much more logical explanation is that Vail Health recognized that its existing facilities could not accommodate the evident growth in demand for its services, and in particular the orthopedic surgery offering for which it is world-renowned.  Moreover, the new facility in Summit County in Dillon, which opened last year, addressed VSO's loss of privileges at the Centura Hospital in Frisco, when Centura brought in a competing orthopedic practice to operate there.[202]  Vail Health's new Dillon facility allows it to compete more effectively with Centura for orthopedic, physical therapy and other patients.

117.     Vail Health's "donations" were not payments to Steadman and VSO but rather donations to nonprofit research organizations affiliated with Steadman and VSO.[203] Rather than being the bribes not to compete in physical therapy that Dr. Schafer speculated these contributions to be, they served to advance the pathbreaking research, participation in clinical trials and fellowship programs that both research organizations have engaged in.[204] These contributions thereby enhance the reputation of Vail Health as a high quality and innovative orthopedic hub.  In other words, these were further investments by Vail Health to improve patient outcomes, enhance its reputation and make it more competitive to patients and physicians.

118.     Finally, Vail Health's non-compete agreement is tied to Steadman's lease of space in Vail Health. It is limited to restrict Steadman's use of that space to compete with Howard Head, but it does not preclude Steadman from establishing physical therapy services at other locations.[205]  That Vail Health does not want the space that it owns, and whose construction it has financed, to be used to compete with Vail Health should not be surprising or deemed an attempt at monopolization.  Indeed, it is typical that health systems prohibit such competition under their own roofs. "In the case of medical office buildings associated with hospitals or health systems, these buildings are usually restricted on the use that can be made of any leased space that would compete or interfere with the hospital's mission or procedures….

[202] Luke O'Brien Federal Deposition Transcript, October 9, 2021. pp.121-123.
[203] See, VH_Fed_00004543-4593 at 4555: "SPRI is well-funded with…$30.1 million in committed funding from Vail Health for the next seven years."  See, also, Vail Health. "Giving Back." https://www.vailhealth.org/about/giving-back, noting that Vail Health donated of $18 million to various initiatives, including SPRI and the Vail-Summit Orthopaedic Foundation, in 2019 alone.
[204] See, Steadman Philippon Research Institute. https://www.sprivail.org/ and Vail-Summit Orthopaedic Foundation. https://www.vsoresearch.com/.
[205] First Amendment to Office Lease, [The Steadman Clinic, Professional LLC] VAIL_00002043-2066 at 2050.

CONFIDENTIAL

Quite reasonably, hospitals do not want to allow space that they own or lease, and that they do or can control, to be utilized for uses that compete with hospital procedures. Such use restrictions and exclusivity provisions are common in the healthcare arena…."[206]

## VI. EVEN IF SRC HAD DIFFICULTY ENTERING VAIL, THIS DOES NOT IMPLY ANY HARM TO COMPETITION

119. The U.S. Department of Justice explains that "[c]ompetition produces injuries; an enterprising firm may negatively affect rivals' profits or drive them out of business. But competition also benefits consumers by spurring price reductions, better quality, and innovation. Accordingly, mere harm to competitors is not a basis for antitrust liability. 'The purpose of the [Sherman] Act,' the Supreme Court instructs, 'is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.' [Spectrum Sports] Thus, preserving the rough-and-tumble of the marketplace ultimately 'promotes the consumer interests that the Sherman Act aims to foster.' [Copperweld]"[207]

120. While Plaintiffs and their expert attempt to argue that competition for physical therapy services in the Vail Valley has been harmed through the actions of Vail Health, as I have explained in this report, those allegations are unfounded. There is no credible evidence that supply has been restricted or that prices are above competitive levels, which are the requisite pieces of evidence to demonstrate a harm to competition and consumers rather than merely harm to competitors.[208]

121. Plaintiffs (and their expert, Dr. Schafer) ignore the myriad reasons why Lindsay Winninger's attempt to expand her Sports Rehab Consulting physical therapy practice from Denver to Vail failed. These include, at least, the lack of contracts with insurance plans and the focus on a high-cost, high-touch concierge business model for which there is limited demand.

122. First, Ms. Winninger and her business manager, Brad Schoenthaler, readily acknowledge that they made a choice not to undergo the cost and hassle of establishing contracts with either private or government insurers, and they acknowledge that their self-pay model enabled them to collect higher

---

[206] Brooks R Smith, "Health Care Leases: Use Restrictions and Religious Directives." *Bradley*, June 2015. https://www.bradley.com/insights/publications/2015/06/part-4-healthcare-leases-use-restrictions-and-re__

[207] U.S. Department of Justice, "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 1 – An Overview." Citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993) and Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 (1984). https://www.justice.gov/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-1#N_56_

[208] *See, for example*, Thomas Krattenmaker, Robert Lande and Steven Salop. "Monopoly Power and Market Power in Antitrust Law." *Georgetown Law Journal,* 76. 1987. p. 241. *Available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1140761, p. 5.

CONFIDENTIAL

rates.[209]  They made this decision despite the fact that the vast majority of Colorado residents (as well as those from other states) possess such insurance.[210]  In 2020, 91 percent of the U.S. population, and 90 percent of Colorado residents, were insured.[211]   Moreover, the vast majority of physical therapists, even those in small practices, do accept insurance payments: only 2.3 percent of total U.S. physical therapy revenues derived from cash pay, and this figure includes not just those patients utilizing cash-based practices such as SRC but also those who are uninsured or who have exhausted their insurance benefit coverage of physical therapy.[212] As a result, it is not surprising that SRC could not generate much patient interest: even in Denver their operations have only grown from $432,000 to approximately $600,000 in annual revenues between 2015 and 2021.[213]

123.    Second, SRC marketed itself as a concierge physical therapy practice that was willing to travel anywhere to visit patients.  SRC's website describes the practice as "an elite level physical therapy provider."[214]  While it offers traditional in-office physical therapy services it also offers services that "are performed remotely, on site at the location required by you [the patient] to fit your needs," as well as with an approach "that allows for our staff to be with you the full day. Our physios are available to travel to you regardless of your location (nationally or internationally)…."[215]  While this may be an appealing model to some, by its very "elite" nature, demand for this level of service will be limited to the relatively few patients who can afford and are willing to pay for it.

---

[209] "It was going to be easier to get started that way and make an appropriate amount of money for our visits….The rates which we charge are higher than what we had anticipated being able to get with insurance right off the bat." Lindsay Winninger Federal Deposition Transcript, October 7, 2021, pp. 47, 67. "One, with our size, it doesn't make sense to go through the hassle of creating contracts with insurance companies and having to hire billing specialists and quality assurance, and there's – we're too small of an operation at the moment to take insurance. It's more efficient to do it on a self-pay basis."  Brad Schoenthaler Federal Deposition, July 8, 2021, p. 49.

[210] Dr. Schafer describes the well-known "two stage model" of provider competition in which providers first compete on the basis of price to be included in payor networks and then for patients who are covered by the payor on the basis of quality and service.  (Schafer Report ¶138).  In describing this model, she appears to neglect its inapplicability to SRC's cash-based practice model that does not engage in the first stage.

[211] Kaiser Family Foundation. "Health Insurance Coverage of the Total Population." 2020. (Data from the Current Population Survey). https://www.kff.org/other/state-indicator/health-insurance-coverage-of-the-total-population-cps/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

[212] David Lo and Nicholas Janiga. "2020 Outlook: Physical Therapy Clinics & Centers."  FMVantage Point, HealthCare Appraisers. 2020.  Figure 2.  https://healthcareappraisers.com/2020-outlook-physical-therapy-clinics-centers/.

[213] Sports Rehab Consulting, Profit and Loss: January – December 2015. P&L Pltf_SRC00002.pdf. Income Statement: Sports Rehab Consulting 1 January – 1 July, 2021. Income Statement January-July 2021. SRC_Fed0003408.pdf. (2021 data have been annualized using a straight line calculation.)

[214] Sports Rehab Consulting. "Who We Are."  https://sportsrehabconsulting.com/about/.

[215] Sports Rehab Consulting. "Physical Therapy Services."  https://sportsrehabconsulting.com/services/.  Mr. Schoenthaler also acknowledged that SRC's "original business plan/model" contemplated that its "physical therapist, for the right fees, will travel really anywhere to treat someone." Schoenthaler Federal Deposition, July 8, 2021, p 65, and Lindsay Winninger explained that travel services is "one of our service lines." Lindsay Winninger Federal Deposition, October 7 2021, p. 66.

CONFIDENTIAL

124.     Dr. Schafer also makes statements that belie Plaintiffs' arguments that Ms. Winninger was anticompetitively precluded from establishing her practice in Vail. For example, she explains that Colorado's enactment of a law allowing direct access to physical therapy services without a physician referral, was associated with an increase in the demand for physical therapy services as access was facilitated.[216]  Dr. Schafer is incorrect in stating that direct access was introduced in 2015 as it, in fact, had been in effect for many years before then.[217]  However, were she correct, this greater ease in (and reduced expense, by being able to bypass a physician visit, of) obtaining physical therapy services, should have facilitated the entry of new physical therapy providers, such as Ms. Winninger, into the Vail area (and elsewhere in the state).

125.     Second, Dr. Schafer correctly notes that prior to 2012, when Vail Health took over the operation of Howard Head, "RPC-Vail was the exclusive operator providing PT services…."[218] That is, Vail Health did not transform Howard Head into the exclusive physical therapy practice of Vail Health; all that happened in 2012 is that Vail Health took over the *management* of Howard Head. Since the practice's inception in 1986, Vail Health had owned Howard Head, and handled its billing.[219]  In 2012, Vail Health merely chose not to renew the management agreement it had with the outside company (ProAxis) that had managed the Howard Head operations on behalf of Vail Health.  Vail Health made this change because it "believed it could provide a higher quality of physical therapy care to patients and better value to patients and payers by managing those services directly, rather than indirectly through a managed service organization such as RPC-Vail."[220]

126.     Dr. Schafer falsely suggests that Howard Head was begun through acquisition rather than organic growth, noting that "[i]t was advantageous for Vail Health that RPC-Vail created a successful physical therapy practice which Vail Health took over on November 1, 2012."[221] Even if the 2012 transaction had

---

[216] Schafer Report, ¶129. (As I explain elsewhere in this report, in fact the marked increase that Dr. Schafer notes in 2015 is more likely attributable to increasing numbers of payors submitting data to the APCD database from year to year.)

[217] It is unclear exactly when direct access to physical therapy was first permitted in Colorado, however, it was already allowed in 1998.  *See* Kelly Crout, Jennifer Hodgkins Tweedie and David Miller. "Physical Therapists' Opinions and Practices Regarding Direct Access."  *Physical Therapy* 78: January 1998: 52-61, at 54.

[218] Schafer Report, ¶230.

[219] "Vail hospital to take over Howard Head." *Vail Daily*. July 28, 2012. https://www.vaildaily.com/news/vail-hospital-to-take-over-howard-head/

[220] Vail Health's Objections and Responses to Plaintiffs' First Set of Interrogatories and Second Requests for Production of Documents, Interrogatory Number 4, Filed in Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado Civil Action No. 1:19-cv-02075-WJB-GPG, April 30, 2021.

[221] Schafer Report, ¶17.

CONFIDENTIAL

been an acquisition, there is nothing inherently anticompetitive about acquiring a successful business, particularly when it is one with which you do not compete.[222]

127.    Moreover, this change in management actually led to the establishment of a new competing physical therapy practice.[223] Axis Sports Medicine was formed by 17 physical therapists who chose to set up their own independent practice instead of employment with Vail Health.[224]  As a result, the 2012 shift in the operation of Howard Head created new competition, replacing one competitor with two, rather than diminishing it.

## VII.    CONCLUSION

128.    As I have explained in my report, none of Plaintiffs' allegations that Vail Health engaged in an anticompetitive exercise of market power that prevented what would have been an otherwise successful new entrant (SRC) are valid.  Moreover, the analyses performed by their expert, Dr. Schafer, are so flawed as to be meaningless.  I reserve the right to supplement my opinions should additional information become available.

Monica G. Noether, Ph.D.
February 28, 2022

---

[222] In fact, the question of when to "make" (*i.e.*, build from scratch), which Dr. Schafer falsely implies is generally more beneficial to consumers, and when to buy (acquire or manage internally) has a longstanding economic discourse, initiated by Ronald Coase in 1937 ("The Nature of the Firm." *Economica*.1937: 386-405) that describes the different conditions under which each strategy maximizes the efficiency of operations.  Generally, when transaction costs of contracting are high, either because there are too many contingencies to anticipate or articulate in writing a contract, or because monitoring and enforcement of the contract are difficult, then internal organization (managing and/or owning) is more likely to be optimal. Such situations are most likely to result, all else constant, when products are specialized, market conditions are changing, and information is imperfect  (*See*, Jean Tirole, *The Theory of  Industrial Organization* (1988): 21-34 or Dennis Carlton & Jeffrey Perloff, *Modern Industrial Organization* (1994): 17-24 for summaries of this literature.) It is not surprising that Vail Health felt that internal management of its physical therapy operations would allow it to provide superior quality and value.
[223] "Physical Therapists start new group." *Vail Daily.* November 8, 2012. https://www.vaildaily.com/news/physical-therapists-start-new-group/.
[224] Schafer Report, ¶53.

# Appendix A



## Monica G. Noether
Vice President

PhD, Economics
University of Chicago
Booth School of Business

MA, Economics
George Washington University

MBA, Finance and Economics
University of Chicago
Booth School of Business

BA, Photography
Wesleyan University

Dr. Noether specializes in antitrust analysis and other competitive issues related to the health care industry for law firms, professional associations, government agencies, and other clients. She has analyzed dozens of hospital, health plan, provider and medical supplier mergers as well as competitive disputes between different players in the health care sector. She is also expert in public and private sector provider reimbursement policies. She has provided expert testimony in antitrust and reimbursement litigation, analyzing class certification, merits, and damages questions. While she is best known for her work in the health care industry, she also has broad general expertise in all aspects of antitrust analyses. She has also worked on matters involving insurance, pharmaceuticals, software, retailing, wholesale, distribution, music, soft drinks, and energy.

Dr. Noether has also served in several senior leadership positions at CRA, including as Chief Operating Officer from 2009 to 2012. Prior to joining CRA 25 years ago, Dr. Noether served as a managing vice president at Abt Associates, where she specialized in federal reimbursement policy of health care providers and in antitrust issues. She also spent several years at the Federal Trade Commission as a deputy assistant director in the Bureau of Economics and Commissioner Advisor.

## Professional experience

### Antitrust

*Antitrust litigation*. Dr. Noether has provided economic analysis to various cases involving allegations of attempted monopolization, supracompetitive pricing and monopsonistic purchasing, exclusive dealing, foreclosure, boycotts, or tying for a variety of healthcare services.  Cases have involved physicians and other professional providers, hospitals, ambulatory facilities, health plans, pharmaceutical products, medical devices and clinical laboratories across a variety of health care segments such as radiology, anesthesia, cardiology, children's services, dental services, women's health, dialysis, and trauma, among others. Dr. Noether has also assessed similar economic issues in a variety of other industries: retailing, wholesale distribution, software, and chemicals. She has provided deposition and trial testimony in a variety of these matters on class certification, liability, and damages questions.

*Health plan mergers*. Dr. Noether has assessed the likely competitive effects of several health plan consolidations including Aetna's purchase of Prudential; United's acquisitions of Oxford, PacifiCare, and Sierra; Humana's of CHA; Anthem's of WellPoint, Kaiser Permanente's of Group Health Cooperative, and WellCare's of Meridian. She has prepared white papers for and made presentations to federal and/or state antitrust authorities as well as providing expert testimony to state departments of insurance in some of these matters. Issues have included definition of the appropriate product and geographic markets for antitrust analysis, assessment of the likelihood and sufficiency of entry or expansion by competitors, and the potential for the exercise of monopsony power over providers. She is familiar with the variety of databases useful to these efforts.

*Hospital mergers*. Dr. Noether has analyzed the economic effects of dozens of proposed hospital mergers all over the country, including issues related to market definition, nature of existing competition, ownership structure, scale and scope requirements for hospitals to engage in meaningful risk bearing and delivery of population health, and importance of network development to payment reform initiatives. She has testified in federal district court and/or been deposed in a variety of hospital merger cases in federal district court, including the Federal Trade Commission's challenges of the consummated merger between Evanston Northwestern Healthcare and Highland Park Hospital and the proposed acquisition of Rockford Health System by the OSF Healthcare System (on behalf of the hospitals).

*Vertical transactions*. Dr. Noether has assessed a variety of vertical transactions between health plans and hospitals, hospitals and physicians, and health care providers and suppliers, as well as antitrust allegations in vertical markets.  Such matters typically involve evaluations of whether a vertical transaction would make some sort of anticompetitive foreclosure or "raising rivals' costs" behavior profitable.  They also involve an assessment of the cost savings and quality benefits that such arrangements provide.

*Other mergers*. Dr. Noether has evaluated the effects of mergers proposed in a variety of industries, including clinical laboratories, dialysis services and equipment, pharmaceuticals, medical devices, physician services, private duty nursing services, disability insurance, soft drinks, supermarkets, energy, chemicals, recorded music, and building materials. Each of these analyses has required assessment of market definition, entry conditions, and the impact of unique industry conditions on competition among market participants. In some cases, Dr. Noether has presented her analyses to state or federal antitrust agencies.

*Policy issues*. Dr. Noether has provided research and analysis on a number of important policy issues in health care.  She has developed and evaluated models of bundled payment for health care services, designed physician payment methodologies, assessed the effects of various innovative payment mechanisms and evaluated the potential benefits of hospital mergers.  She estimated the costs of proposed legislation that would have allowed physicians the right to negotiate collectively with health plans, and the results of her analysis were widely disseminated to federal and state legislators. She has also been involved in various Certificate of Need proceedings in which she has provided expert testimony on issues relating to competitive impact.

## Other litigation

*Class certification.* Dr. Noether has addressed the economic questions that relate to the issues of predominance and typicality in class certification matters and has provided expert testimony on these questions. Her analysis has focused on whether common interests and methods of assessing harm pertain to all members of putative classes as well as whether, from an economic perspective, the named class members can adequately represent the interests of the class.

*Damages.* Dr. Noether has constructed and estimated models of the "but for world" that are well-founded in industry and market specifics to assess potential damages or consumer harm that might have accrued from alleged illegal activity. Cases have involved allegations of attempted monopolization and exclusion, underpayment of health care providers, denials of claims, collusion, breach of contract, and delayed entry of generic pharmaceuticals, among others. Dr. Noether has also assisted clients in preparing for mediation or arbitration discussions relating to similar issues.

*Regulatory issues.* Dr. Noether has assessed the economic issues arising from various forms of health care regulation, including fair market value provisions of the fraud and abuse laws, Orphan Drug Act, and Certificate of Need statutes. Analysis has focused on the regulations' effects on the economic incentives and behavior induced by the regulation as well as on their likely impact on market competition. She has provided testimony in a number of these matters.

*Provider payment.* Dr. Noether has analyzed the economic issues and, in some cases, testified in various matters relating to hospital and physician reimbursement by private and public payers. These have included issues related to out-of-network and reasonable and customary reimbursements, measurement of the fair market value of medical director services to dialysis facilities, appropriate payment by Medicaid risk plans, benchmarking of competitive rates, reimbursement of salaried teaching physicians, and Boren Amendment mandates that rates support efficiently operated hospitals. Dr. Noether also worked with the Health Care Financing Administration (now Centers for Medicare & Medicaid Services) as well as various medical specialty organizations, including the American Medical Association in the design of Medicare's physician payment system.

*Managed care contracting.* Dr. Noether has evaluated the effect of various payment policies and regulations on how the Medicare and Medicaid programs compensate managed care organizations for insuring their members and the related impacts of these policies on the payments that managed care organizations must make to providers. Such policies include the Centers for Medicare & Medicaid Services' (CMS) implementation of government budget sequestration and its approach to determining the payments it makes to Medicare Advantage plans.

Charles River Associates

## Physician studies

*Medicare physician fee schedule analyses*. Dr. Noether was active in all aspects of the congressionally mandated reform of Medicare's physician payment system to reflect a "resource-based relative value" approach. For the Health Care Financing Administration (now CMS), she directed the design of the data collection strategy for measuring physician practice expenses, which relied on national survey data as well as information obtained from clinical panels. She also conducted a variety of studies and data collection efforts on behalf of medical specialties (including cardiothoracic, vascular, orthopedic, otolaryngologic, and general surgeons; gastroenterologists, radiologists, pathologists, and nuclear medicine physicians) to assess the effects of the proposed reforms of practice expense reimbursement as well as of the work and malpractice components of the Medicare Physician Fee Schedule. In other fee-schedule-related work, Dr. Noether also assisted in the development of the methodology used to update and reevaluate the work component of the fee schedule, evaluated the effects of volume performance standards, and assessed the visit patterns associated with global surgical fees.

*Forecast of staffing requirements in various specialties*. Dr. Noether assessed current utilization of anesthesiology, nephrology, oral, and maxillofacial surgery, critical care staffing in different settings, and projected requirements in future years based on anticipated demographic and technological changes and the influence of health care reform. She compared projected requirements and supply to estimate training needs.

*Development of bundled surgical episode payment options*. Dr. Noether developed design and implementation options for lump-sum prospective payment of all services associated with a surgical episode. She analyzed particular procedures (cataract extraction, cardiac surgery) to determine options for episode definition, risk stratification, payment mechanisms, and other design and implementation features.

## Hospital studies

*Assessment of the benefits of hospital mergers*. Dr. Noether, and her colleague, Sean May, evaluated the benefits that can result from hospital mergers in terms of cost reductions and quality improvements for the American Hospital Association.  Using a two-pronged approach that involved structured interviews with the executives of 20 major hospital systems as well as an econometric analysis of the universe of hospital mergers that occurred in the US between 2009 and 2014, the authors found that mergers can benefit patients through the achievement of scale and of clinical standardization, as well as other improvements.

*Development of estimates of effect of new technologies on hospital costs*. Dr. Noether developed the annual estimate of the scientific and technological advance allowance presented by the Prospective Payment Assessment Commission (now MedPAC) to Congress as part of its recommendation regarding payment updates for hospitals and dialysis facilities. The project involved collecting cost and diffusion data on cost-increasing, quality-enhancing technologies.

*Analysis of factors contributing to growth in outpatient surgery*. Dr. Noether evaluated factors that explain switch from inpatient to outpatient setting for five outpatient surgical and diagnostic procedures. Changes in technology, reimbursement, and clinical risk were assessed through literature review and structured interviews with clinicians and medical device manufacturers.

*Hospital prospective payment system evaluations*. Dr. Noether conducted various economic analyses of the effects of federal and state prospective reimbursement programs on utilization, quality, and cost of hospital services as well as on medical education provided by hospitals. She also designed and evaluated a prospective ambulatory reimbursement system.

## Previous professional experience

| | |
|---|---|
| 1987–1996 | *Managing Vice President* and *Area Manager of Economic Consulting to Healthcare Organizations*, *Senior Economist*, Abt Associates Inc. |

Dr. Noether developed a new practice of health economics consulting to private clients on policy issues. She also directed a variety of publicly funded research initiatives.

| | |
|---|---|
| 1983–1987 | *Deputy Assistant Director*, *Staff Economist*, Antitrust Division, Bureau of Economics, Federal Trade Commission |

Dr. Noether analyzed economic consequences of various actions subject to antitrust scrutiny, including mergers in various industries, price fixing, group boycotts, and other horizontal restraints. She was particularly active in investigations of competitive practices of various members of the health care industry. She served as lead economist on the Commission's investigation of various acquisitions in the soft drink industry; she also supervised and worked on investigations of mergers in the oil, polyester, recorded music, and supermarket industries. In addition, she supervised several staff economists.

As part-time economic consultant to Commissioner Azcuenaga, Dr. Noether advised the Commissioner on specific cases before the Commission and on general economic theory. She also advised the Commissioner on acquisitions in chemical, natural gas, and other industries.

| | |
|---|---|
| 1979 | *Research Associate*, Office of Domestic Policy Coordination, US Department of Commerce |

Dr. Noether prepared briefings to the Secretary on various policy issues.

| | |
|---|---|
| 1974–1978 | *Administrative Positions*, American Association of Psychiatric Services for Children and the American Psychiatric Association |

Dr. Noether was responsible for federal lobbying activities as well as management of Associations' finances, meetings, and newsletter editing.

## Papers, publications, and presentations

## Publications and reports

"Economic Tools for Analyzing Vertical Mergers in Healthcare." With Josh Lustig, Sean May and Ben Stearns. *CPI Antitrust Chronicle*, May 2020.

"Comments on Changes in Quality of Care after Hospital Mergers and Acquisitions (Nancy D. Beaulieu, et al., New England Journal of Medicine 382(1), January 2020)."  With Sean May and Ben Stearns. Study of behalf of the American Hospital Association, February 2020.

"Hospital Merger Benefits: Views from Hospital Leaders and Econometric Analysis – An Update." With Sean May and Ben Stearns.  Study done on behalf of American Hospital Association, September 2019.

"Re: Federal Trade Commission Hearing on Competition and Consumer Protection in the 21st Century – Project Number P181201 – Comments from the American Hospital Association on Defects in the Models Used for Evaluating Hospital Transactions." With Sean May. White paper on behalf of the American Hospital Association, December 2018.

"Hospital Merger Benefits:  Views from Hospital System Leaders and Econometric Analysis."  With Sean May.  Study done on behalf of American Hospital Association, January, 2017.

"St. Luke's-Saltzer:  Where Does the Ninth Circuit Decision Leave Quality-Enhancing Network Integration in Allegedly Concentrated Markets?"  *CPI Antitrust Chronicle,* April 2015.

"Unresolved Questions Relating to Market Definition in Hospital Mergers."  With Sean May. *Antitrust Bulletin* 59, Fall 2014.

"The St. Luke's-Saltzer Case:  Can Antitrust and Health Care Reform Policies Converge?" *CPI Antitrust Chronicle,* April 2014.

"Comment on "A Retrospective Study of Two Hospital Mergers in Chicago." With Gregory Adams. *International Journal of the Economics of Business*, February 2011.

"Economic Issues Relating to the Evanston Merger Remedy Order." *Global Competition Policy*, May 27, 2008.

"Antitrust Issues Raised in the DOJ's Investigation of the Anthem-WellPoint and United-Oxford Mergers." *Health Lawyers News,* Vol. 9, Number 2, February 2005, co-author.

"The Economics of Exclusive Contracts Between Hospitals and Managed Care Organizations." *Antitrust Review 4*, Early Spring 2002. Publication of American Health Lawyers Association.

"Antitrust Waivers for Physicians: Costs and Consequences." Report for Health Insurance Association of America, June 1999, updated March 2000. Several state level analyses have also been published.

"Economic Issues in Hospital Merger Policy." *Antitrust* 13, Spring 1999.

"Economic Issues in the Antitrust Assessment of Hospital Competition: Overview." *International Journal of the Economics of Business*, July 1998. Special issue on hospital antitrust policy edited by Monica Noether.

"A Critical Evaluation of the Cross-Specialty Linkage Procedure in the RBRVS." With M. Glickman. *Medical Care*, 1997.

"Compression in Magnitude Estimation: A Chronic Deficiency in Measuring Physicians' Work for Setting Medicare Physician Payment." With others. Working Paper.

"Estimating Increases in Outpatient Dialysis Costs Resulting from Scientific and Technological Advancement." With others. *Advances in Renal Replacement Theory* 2, No. 2, April 1995, 127–142.

"Using Claims Data to Select Primary Care Physicians for a Managed Care Network." With others. *Managed Care Quarterly*, Autumn 1994, and *Physician Profiling and Risk Adjustment*, Norbert Goldfield and Peter Boland (eds.), Aspen Publishers, 1996.

"The RBRVS in Vascular Surgery." With N. Hertzer, MD. *Journal of Vascular Surgery*, October 1993.

"Physician Payment Reform: Comments from Economic Practitioners." With W. Marder. *Journal of Medical Practice Management,* Winter 1992.

"Measurement of the Total Physician Work of Surgical Procedures for Development of a Resource-Based Relative Value Scale." With G. Miller, MD, and G. Rainer, MD. June 1992.

"Using Functional Status to Identify Appropriate Cataract Surgeries." With O. Schein, MD, and L. Olinger. June 1992.

"Results from the Cardiothoracic and Vascular Surgery Work Survey by Abt Associates Inc." *The Annals of Thoracic Surgery*, August 1991.

"Changes in Hospital Competition during the Early 1980s." Working Paper, April 1991.

"Frequency and Costs of Diagnostic Imaging in Office Practice: A Comparison of Self-Referring and Radiologist-Referring Physicians." With others. *New England Journal of Medicine*, December 6, 1990.

"Readmissions and Transfers: The Effect of PPS." Report to the Health Care Financing Administration, November 1988.

"Competition Among Hospitals." *Journal of Health Economics*, September 1988.

"The Magnitude and Effect of Changes Between 1982 and 1985 in Hospital Patient Severity and Utilization, Measured Using MEDISGRPS Data." Report to the Health Care Financing Administration, September 1988.

"How Profitable is a Medical Career?" *Journal of Medical Practice Management*, Summer 1988.

"Competition Among Hospitals." FTC report, May 1987.

"The Effect of Government Policy Changes on the Supply of Physicians: Expansion of a Competitive Fringe." *Journal of Law and Economics*, October 1986.

"The Growing Supply of Physicians: Has the Market Become More Competitive?" *Journal of Labor Economics*, October, 1986.

## Presentations

"Antitrust Collaborations in Light of COVID." Moderator of Podcast sponsored by American Health Lawyers Association. April 13, 2020.

"Benefits of Hospital Mergers: Results from Interviews and Econometrics."  2019 Academy of Management Annual Meeting, Corporate Strategy In Healthcare Workshop. August 10, 2019.

"Women on Boards." Member of Panel, CRA CLE Seminar, San Francisco, June 12, 2019.

"The Effect of the Changing Healthcare Political and Regulatory Environment on Physician Practices." Presentation to the Physician Executive Council of the Healthcare Financial Management Association, June 26, 2017.

"The Long and Winding Road: An Update on the FTC's Latest Hospital Merger Cases." Webinar (with Douglas Ross and Kevin Hahm) sponsored by the American Health Lawyers Association Antitrust Practice Group, January 17, 2017.

"Regulating Competition in Health Care: Commentary." Presentation at the ABA Section of Antitrust Law Reconciling Competition and Consumer Protection in Health Care Symposium, September 20, 2016.

"What Can Economic Research Say about Merger Policy?" Presentation at the 2016 Antitrust in Healthcare Conference sponsored by the ABA Health Law Section, Section of Antitrust Law and the American Health Lawyers Association, May 12, 2016.

Panelist in the "Summation Roundtable: Antitrust Perspectives on Evolving Provider and Payment Models" for Examining Health Care Competition: FTC-DOJ Workshop, February 25, 2015.

"Trust Us, It's Complicated: Antitrust Issues Facing Healthcare in the Affordable Care Act Environment." Presentation to the Los Angeles County Bar Association, May 1, 2014.

"Hospital Mergers: Winning and Losing Arguments." CRA Healthcare Seminar, January 23, 2013.

"Health Plan Most Favored Nations Provisions with Providers in Metropolitan Areas: Economic Issues." Brownbag/Webinar sponsored by American Bar Association and DC Bar Association, March 1, 2012.

"Physician Practice Mergers: The Key Antitrust Issues." Webinar sponsored by the American Health Lawyers Association, June 6, 2011.

"Economic Analysis of Monopsony Concerns in Health Plan Mergers." Presentation at 2010 Antitrust in Healthcare Conference—Arlington, VA, American Bar Association Health Law Section, ABA Section of Antitrust Law, American Health Lawyers Association, May 25, 2010.

"The Use of Direct Evidence of Competitive Effects" Presentation at Joint Department of Justice—Federal Trade Commission Public Workshops on Revisions to the Horizontal Merger Guidelines, Chicago, IL, December 10, 2009.

"Highmark-IBC Merger Challenge—An Economist's Perspective." American Bar Association Section of Antitrust Law, Teleconference on Insurance Mergers, March 2, 2009.

"Health Care Antitrust Enforcement in the New Administration—An Economist's Perspective." Boston Bar Association, Boston, MA, February 10, 2009.

"Recent Hospital Merger Enforcement Actions: The Case of *FTC v. Evanston Northwestern Healthcare*." American Enterprise Institute Conference on Old and New Forms of Hospital Competition, Washington, DC, November 21, 2008.

"Economic Analysis in Hospital and Health Insurance Mergers." American Health Lawyers Association Annual Meeting, San Francisco, CA, June 30, 2008.

"Merger Remedy Policy: Application to the Evanston Case," ABA Spring Antitrust Meeting, Washington, DC, March, 2008.

"Hospital Turf Wars." American Health Lawyers Association Teleconference, February 13, 2007.

"Health Plan Power and Practice." American Bar Association/American Health Lawyers Association Health Law Conference, Washington, DC, May 12, 2005.

"Review of FTC/DOJ Health Competition Report." American Bar Association Annual Antitrust Meeting, Washington, DC, March 30, 2005.

"Physician Product and Geographic Market Definition." Federal Trade Commission—Department of Justice Joint Hearings on Health Care and Competition Law and Policy, Washington, DC, September 24, 2003.

"Economic Analysis of Market Power." Health Antitrust Conference jointly sponsored by the American Bar Association and American Health Lawyers Association, Washington, DC, May 16, 2003.

"Health Insurance and Providers: Countervailing Market Power." Federal Trade Commission—Department of Justice Joint Hearings on Health Care, Washington, DC, May 7, 2003.

"Experts in Antitrust Litigation." American Bar Association Annual Meeting, Washington, DC, August 11, 2002.

"Exclusive Contracting—Benefit or Evil to Competition?" American Health Lawyers Association Annual Meeting, Antitrust Practice Group, July 1, 2002.

"Use of Economic Experts in Merger Evaluations." American Bar Association Antitrust Section Conference, New York, NY, June 13, 2002.

"Merger Simulation Techniques." Boston Bar Association, March 8, 2002.

"What is a Cost-to-Serve Model? How Can It Help?" Periodical and Book Association of America, New York, NY, December 6, 2001.

"How Can an Economist Help in an Antitrust Case?" Ohio State Bar Association Antitrust Institute, Columbus, OH, November 2, 2001.

"Antitrust Issues in Health Care Restructuring." Practicing Law Institute Program on Health Care Restructuring, New York, NY, April 26, 2001.

"Looking Beyond Managed Care: What's Next?" Health Industry Group Purchasing Association Annual Meeting, Orlando, FL, October 24, 2001.

"Economic Issues in Antitrust Policy Regarding Health Care Mergers." Practicing Law Institute Program on Health Care Mergers and Acquisitions, New York, NY, April 15, 1999.

"Economic Input to Strategies in Merger Litigation." American Bar Association, Section of Antitrust Law, Spring Meeting, Washington, DC, April 14, 1999.

"Issues in Hospital Merger Policy." Dallas Bar Association, Health Section, March 17, 1999.

"Antitrust Considerations in Mergers and Acquisitions." Tax Executive Institute, Needham, MA, January 22, 1999.

Charles River Associates

"Recent Policy Developments in Hospital Mergers." CRA International Conference on Economists' Perspectives on Antitrust, Boston, MA, April 30, 1998.

"Hospital Merger Policy." New York State Bar Association, January 29, 1998.

"Determining Geographic Markets: Principles and Applications." CRA International Conference on Economists' Perspectives on Antitrust Today, Boston, MA, April 24, 1997.

Participation in Robert Wood Johnson working conference on "Defining Competition in Health Care Markets," Reston, VA, November 14–15, 1996.

"A Health Policy Perspective on Market Definition." CRA International Conference on Current Topics in Merger and Antitrust Enforcement, Washington, DC, October 31, 1996.

"New Ways to Think About Market Definition in Health Care as Markets Evolve." American Bar Association Health Antitrust Conference, New Orleans, LA, October 25, 1996.

"Defining Markets for Healthcare Networks." New York City Bar Association, May 20, 1996.

"Reform of Medicare Physician Payment for Practice Expenses." Harvard University course on Coping with the Healthcare Revolution, May 14, 1996.

"Pricing Your Plan's Services." Presented at Physician Sponsored Managed Care Plans conference, Chicago, IL, October 16, 1995.

Briefings to 130 medical specialty societies on Reform of the Physician Practice Expense Reimbursement, June 13 and August 18, 1995.

"Pricing of Bundled Episodes of Care." Presented at Activity Based Costing Conference, Boston, MA, July 12, 1995.

"Medicare Practice Expense Reform." Presented to American Association of Thoracic Surgeons, April 22, 1995.

"Antitrust and Evolving Health Care Markets." Opening remarks and moderator of day-long symposium sponsored by Chicago Bar Association, March 1995.

"Costing of Bundled Service Packages." Massachusetts Health Financial Management Association, March 1995.

"Economic Analysis of Physician Joint Ventures." National Association of Attorneys' General Meeting, September 1994.

"Market Definition in a Hospital Physician Privileges Case." American Bar Association Antitrust Meeting, April 1994.

"Hospital Merger Analysis." Loyola University School of Law, December 1993.

"Resource-Based Approaches to Physician Practice Expense Payment." American College of Surgeons Coalition Meeting, November 1993.

"Issues in RBRVS Refinement." Massachusetts Health Information Management Association Meeting, September 1992.

"Abt Restudy of Vascular Surgery Work Values." Midwestern Vascular Surgery Society Meeting, September 1992.

"Changes in Hospital Competition during the Early 1980s." Annual Health Economics Symposium, May 1991.

"The Effects of RBRVS on Physician Payment—Lessons for Other Payors." Workmen's Compensation Research Institute Annual Meeting, February 1991.

"Results from the Restudy of Work in Cardiothoracic and Vascular Surgery." Society of Thoracic Surgeons (STS) Interim Meeting, September 1990.

"A Method to Identify Inappropriate Cataract Surgeries." International Society of Technology Assessment in Health Care, June 1992; American Medical Review Research Center (AMRRC), August 1990.

"Constructing and Analyzing Episodes of Care Using Claims Data." AMRRC, November 1989.

"Competition among Hospitals." Western Economic Association, July 1986; American Economic Association, December 1986; Association for Health Services Research, June 1987.

"The Magnitude and Effect of Changes in Patient Severity and Hospital Utilization Measured Using MEDISGRPS Data." MediQual's 4th National Symposium, April 1988.

"Readmissions and Transfers: The Effects of PPS." Eastern Economic Association, March 1989; Harvard School of Public Health, April 1989; AMRRC, November 1989.

## Memberships

- American Economic Association

- Association for Health Services Research

- American Bar Association

- American Health Lawyers Association, Former Vice Chair, Antitrust Practice Group, 2001–2008

## Board affiliations

- Boston Medical Center:

  - Chair, Boston University Medical Group Board, 2017–Present

  - Member, Captive Insurance Company Board, 2020–Present

  - Member, Health System Board, 2019-Present

  - Member, Trust Advisory Board, 2015–Present

- Dana Farber Cancer Institute Susan F. Smith Center for Women's Cancers Visiting Committee, 2015-Present

- Lahey Health Behavioral Services, 2009–2015

- Social Venture Partners – Boston, 2020-Present

- The Boston Club, 2010–2013

- Wesleyan University President's Advisory Council, 2013–2017

## Referee

- *American Economic Review*

- *Antitrust Law Journal*

- *Health Affairs*

- *Health Services Research*

- *International Journal of the Economics of Business*

- *Journal of the American Medical Association*

- *Journal of Political Economy*

- *Journal of Law and Economics*

- *Journal of Labor Economics*

- *Journal of Health Economics*

- *Journal of Industrial Economics*

- *Medical Care*

- *National Science Foundation*

- *RAND Journal of Economics*

## Honors

- Charles E. Merrill Fellowship, 1978–1980

- US Department of Health, Education, and Welfare Fellowship, 1979–1980

- University of Chicago Fellowship, 1980–1983

- H. B. Earhart Fellowship, 1981–1983

- Dean's Honor List, University of Chicago Booth School of Business

## Deposition and trial testimony

*Blue Cross Blue Shield of Florida, Inc. and Health Options, Inc. vs. DaVita, Inc.,* US District Court Middle District of Florida, Jacksonville Division; December 17, 2021, Deposition Testimony.

*Bardy Diagnostics, Inc. v. Hill-Rom, Inc,* Court of Chancery of the State of Delaware. C.A. No. 2021-0175-JRS. April 23, 2019, Deposition Testimony; May 7, 2021, Trial Testimony.

*Commonwealth of Virginia Informal Fact Finding Conference,* Review of COPN Application VA-8426, June 27, 2019, Hearing Testimony on Behalf of Bon Secours St. Francis Medical Center.

*In re Anthem-Cigna Merger Litigation,* Court of Chancery of the State of Delaware. Consolidated C.A. No. 2017-0114-JTL. January 16, 2019, Deposition Testimony; March 8, 2019, Trial Testimony.

*Stephanie Allen, Mark Allen and Absolute Life Wellness Center, Inc. vs United Services Automobile Association; USAA Casualty Insurance Company, USAA General Indemnity Company; Garrison Property and Casualty Insurance Company; and USAA County Mutual Insurance.* District Court of Travis County, Texas, 345th Judicial District.  Case No. D-1-GN-17-000155. June 19, 2018, Deposition Testimony.

*Steward Health Care System LLC, et al. v. Blue Cross & Blue Shield of Rhode Island,* U.S. District Court for the District of Rhode Island. Case No. 13-4058. June 1, 2017, Deposition Testimony.

*Highmark Inc. and Keystone Health Plan West, Inc. v. UPMC,* American Arbitration Association, Claim No. 01-15-0002-9164. August 17, 2015, Deposition Testimony and September 2-3, 2015, Hearing Testimony.

*California Dental Association v. Delta Dental of California,* Superior Court of the State of California, City and County of San Francisco, Case No.: CGC-14-538849. August 12, 2015, Deposition Testimony.

*HCA Holdings, Inc. v. UnitedHealthcare Insurance Company,* American Arbitration Association (Los Angeles) Case No. 72-20-1400-0104, December 12, 2014, Hearing Testimony.

*My Spine PS v. USAA Casualty Insurance Company, and USAA General Indemnity Company,* Superior Court for the State of Washington in and for the County of King, No. 12-2-32635-5 SEA, October 21, 2014, Deposition Testimony.

*John Doe, Robert Doe, Mark Roe, Jane Smith, David Smith, Gaudenzia Inc. and Gaudenzia Erie, Inc. v. Capital Blue Cross, Capital Hospital Service, Inc., Capital Advantage Insurance Company Keystone Health Plan Central, Magellan Health Services, Inc., and Magellan Behavioral Health, Inc.,* Court of Common Pleas of Philadelphia County, November 28, 2012, Hearing testimony re class certification and liability.

*FTC v. OSF Healthcare System and Rockford Health System*, No. 3:11 cv 50344, January 20, 2012 and March 23, 2012, Deposition testimony.

*Darlery Franco et al. v. Connecticut General Life Insurance Co, Cigna Corp and Cigna Health Corp.,* Civil No. 07-6039, June 23, 2010: Deposition testimony re: class certification and December 15, 2010: Deposition testimony re: Liability.

Charles River Associates

In re *Neurontin Antitrust Litigation*, US District Court for the District of New Jersey, MDL No. 1479, Master File No. 02-1390, October 7, 2010, Deposition testimony.

In re *Evanston Northwestern Healthcare*, No. 07 C 4446. Class Certification Hearing, February 23, 2010, Hearing testimony.

New Jersey and Connecticut Departments of Insurance Hearings regarding proposed acquisition of Health Net Incorporated's Northeast Division by UnitedHealth Group Incorporated, November 12, 2009 and November 23, 2009, Hearing testimony.

Pennsylvania Department of Insurance Hearing regarding proposed merger of Highmark, Inc. and Independence Blue Cross, Pittsburgh, PA, July 8, 2008, Hearing testimony.

Review of Certificate of Public Need Application VA-7374, Commonwealth of Virginia, Department of Health, 2006, Hearing testimony.

Review of Certificate of Public Need Application FL-9822, State of Florida Division of Administrative Hearings, 2006, Deposition and Hearing testimony.

Kentucky Department of Insurance Hearing regarding Review of Form A Filing on Humana's Acquisition of CHA Health, April 2006, Hearing testimony.

Colorado Department of Insurance Hearing regarding Review of Form A Filing on UnitedHealthcare's Acquisition of PacifiCare, November 2005, Hearing testimony.

In the matter of *Evanston Northwestern Healthcare Corporation*, before the Federal Trade Commission, Docket 9315, 2005, Deposition and Trial testimony.

New Jersey Department of Insurance Hearing regarding Review of Form A Filing regarding the Acquisition of Oxford Health Plans by UnitedHealth Group. 2004, Hearing testimony.

Connecticut Department of Insurance Hearing regarding Review of Form A Filing regarding the Acquisition of Oxford Health Plans by UnitedHealth Group. 2004, Hearing testimony.

Review of Certificate of Public Need Application VA-6886 Commonwealth of Virginia, Department of Health. 2004, Hearing testimony.

Review of Certificate of Public Need Application VA-6859 Commonwealth of Virginia, Department of Health. 2003, Hearing testimony.

*Rocky Mountain Medical Center, Inc. v. Northern Utah Healthcare Corporation, HCA, Inc., and Ogden Regional Medical Center*, Third Judicial District Court of Salt Lake County, State of Utah, Civil No. 000906627. 2003, Deposition testimony.

*EasCare, LLC v. Cape Cod Healthcare, and Cape Cod Medical Enterprises, Inc.*, US District Court for the District of Massachusetts, Civil Action No. 02-11460-RWZ. 2003, Deposition testimony.

*Boca Raton Community Hospital v. Agency for the Health Care Administration and various hospitals*, State of Florida Division of Administrative Hearings. 2003, Deposition and Hearing testimony.

Combined Review of Competing Certificate of Public Need Applications: VA-6714, VA-6728, VA-6729, VA-6731, Commonwealth of Virginia, Department of Health. 2002, Hearing testimony.

Charles River Associates

---

Certificate of Public Need Request Number VA-6361, submitted by Bons Secours–Richmond Health System in Accordance with a Decision of the Virginia Court of Appeals, Commonwealth of Virginia, Department of Health. 2002, Hearing testimony.

*Women's Clinic, Inc., et al. v. St. John's Health System, Inc., et al.*, US District Court Western District of Missouri, Southern Division, Case No. 01- 32-45- CV – S. 2002, Deposition testimony.

*Grand Valley Health Plan, Inc., Priority Health, Inc., and Care Choices HMO, v. Gambro Health Care, Inc.*, US District Court in the Western District of Michigan, Southern Division, Case No. 1:00–CV–873. 2002, Deposition testimony.

*Boca Raton Community Hospital (and various other hospitals) v. Agency for the Health Care Administration*, State of Florida Division of Administrative Hearings. 2001-2002, Deposition and Hearing testimony.

*State of Maine* v. *Bridgton Hospital et al.*, State of Maine Superior Court Civil Action, Docket No. 00-548. 2000, Deposition testimony.

State of South Carolina Department of Insurance, Proposed Acquisition of Colonial Life & Accident Insurance Company by Provident Companies. 1999, Hearing testimony.

State of Maine Bureau of Insurance, Proposed Acquisition of UNUM Life Insurance Company of America by Provident Companies. 1999, Hearing testimony.

*Christopher Allen, MD, Bryan Donohue, MD and John Cave, MD* v. *The Washington Hospital, Telford Thomas, John Frazier, MD and Neil Hart, MD*, US District Court for the Western District of Pennsylvania, C-96-1950. 1999, Deposition testimony.

*Temple University Hospital* v. *Healthcare Management Alternatives, Inc.*, Court of Common Pleas of Philadelphia County. 1999, Trial testimony.

*Cleveland Clinic* v. *Agency for Health Care Administration and Naples Community Hospital.* 1998, Deposition testimony.

State of Missouri Department of Insurance, Proposed Acquisition of Group Health Plan, Inc., Healthcare USA of Missouri LLC, Principal Health Care of Kansas City, Inc., and Principal Health Care of St. Louis, Inc. by Coventry Health Care, Inc. 1998, Hearing testimony.

*The Regents of the University of California* v. *Genentech, Inc.*, US District Court, Northern District of California, C 90-2232. 1998, Deposition testimony.

*Methodist Hospitals of Dallas* v. *Physician Reliance Network, Inc. and Texas Oncology, P.A.*, District Court of Dallas County, 96-01253. 1998, Deposition testimony.

*Iowa Eye, PC and John Puk, MD, PC* v. *Richard Noyes et al.*, US District Court, Northern District of Iowa, C 95-0288. 1997, Deposition testimony.

*Sisters of Providence Health System, Inc.* v. *Holyoke-Chicopee Health Resources, Inc.*, Commonwealth of Massachusetts, Superior Court, C-95-1051. 1997, Deposition testimony.

State of New Hampshire Department of Insurance, Proposed Acquisition of Matthew Thornton Health Plan by Blue Cross Blue Shield of New Hampshire. 1997, Hearing testimony.

Charles River Associates

Commonwealth of Massachusetts Division of Insurance, Proposed Acquisition of Control of Paul Revere Companies by Provident Companies, Docket No. F-97-1. 1997, Hearing testimony.

State of New Hampshire Department of Insurance, Proposed Acquisition of Matthew Thornton Health Plan by Harvard Community Health Plan. 1995, Deposition and Hearing testimony.

*Ralph Read, MD* v. *Medical X-ray Center, et al.*, US District Court, District of South Dakota, C-92-4095. 1994–1995, Deposition and Trial testimony.

*US* v. *Mercy Health Services and Finley Tri-States Health Group Inc.*, US District Court for the Northern District of Iowa, C-94-1023. 1994, Deposition and Trial testimony.

*Mary Imogene Bassett Hospital* v. *Donna Shalala and Empire Blue Cross/Blue Shield*, US District Court Northern District of New York, 86-CV-1287. 1994, Trial testimony before Magistrate.

*Federal Trade Commission* v. *Columbia Hospital Corporation*, Defendant, Adventist Health System/Sunbelt Health Care Corporation, Defendant-Intervenor, US District Court, Middle District of Florida, 93-30-Civ-Ftm-23D. 1993, Deposition and Trial testimony.

*Federal Trade Commission* v. *University Health and St. Joseph Hospital*, US District Court, Southern District of Georgia, CVI-91-052. 1991, Trial testimony.

# Appendix B

# Appendix B

# List of Materials Relied Upon

## Documents Filed with the Court

Expert Report of Leslie E. Schafer, Ph.D., Filed in Sports Rehab Consulting, LLC and Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, January 10, 2022.

Order Granting Defendants' Motion for Summary Judgment, Winninger, et al. v. Kirchner, et al., District Court, Eagle County, State of Colorado, Case No. 17CV30102, Nov. 4, 2021.

Sports Rehab Consulting, LLC and Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. Plaintiffs' Amended Complaint and Jury Demand. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, September 27, 2019.

Vail Health's Objections and Responses to Plaintiffs' First Set of Interrogatories and Second Requests for Production of Documents, Filed in Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, April 30, 2021.

Vail Health's Eighth Supplemental Response to Plaintiffs' Interrogatory No. 1, Filed in Lindsay Winninger v. Vail Clinic, Inc., d/b/a Vail Health. U.S. District Court of Colorado, Civil Action No. 1:19-cv-02075-WJB-GPG, June 29th, 2020.

## Depositions

Brad Schoenthaler Federal Deposition July 8, 2021.

Kelly Adair State Deposition, September 12, 2018.

Lindsay Winninger State Deposition, June 29, 2018.

Lindsay Winninger State Deposition March 11, 2020.

Lindsay Winninger Federal Deposition, October 7, 2021.

Luke O'Brien Federal Deposition, October 9, 2021.

Marc Phillipon State Deposition, September 27, 2018.

Nico Brown State Deposition, July 19, 2018.

Nico Brown Federal Deposition, October 19, 2021

## Bates Stamped Documents

Pltf_SRC00002

SRC_FED_000120

SRC_FED_0001425

SRC_FED0000036

SRC_FED0000041

SRC_Fed0003408

SRC000697

SRC000742-754

VAIL_00002043-2066

VAIL_00003560-3568

VAIL_00003956

VH_Fed_00000246

VH_Fed_00000247

VH_Fed_00000248

VH_Fed_00000249

VH_Fed_00000772-866

VH_Fed_00000790

VH_FED_00000965-967

VH_Fed_00000990-991

VH_Fed_00006607

VH_Fed_00006738-754

VH_Fed_00006965

VH_Fed_00006966

VH_Fed00002009

VSO_Fed001-006

VH_Fed_00000971-973

VH_Fed_00004543-4593

## Journal Articles and Books

American Bar Association. *Proving Antitrust Damages*. Third Edition. 2017.

Barbara Wynn, Peter Hussey and Teague Ruder. "Policy Options for Addressing Medicare Payment Differentials Across Ambulatory Settings." RAND Health. 2011. http://www.rand.org/content/dam/rand/pubs/technical_reports/2011/RAND_TR979.pdf

Carl Shapiro and Robert Willig. "On the Antitrust Treatment of Production Joint Ventures." *Journal of Economic Perspectives,* Vol. 4. No. 3. Summer 1990: 113-130

Colin Cameron and Douglas L. Miller.  "A Practitioner's Guide to Cluster-Robust Inference." *Journal of Human Resources,* Vol 50 No. 2. Spring 2015, (317-372).

Deborah Beranek Lafky and Thomas A. Horan, "Personal Health Records: Consumer attitudes toward privacy and security of their personal health information." *Health Informatics Journal,* Vol. 17. 2011: 63-71.

Dennis Carlton and Jeffrey Perloff. *Modern Industrial Organization,* Second Edition. 1994.

Evan Starr, J.J. Prescott and Norman Bishara, "Noncompetes in the U.S. Labor Force." *Journal of Law and Economics*. October 2020. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2625714

Graves Owen et al. "Evidence-based pain medicine for primary care physicians." *Baylor University Medical Proceedings, Vol. 31.* January 2018: 37-47. https://pubmed.ncbi.nlm.nih.gov/29686550/.

Guy David *et al*., "Do Hospitals Cross-Subsidize?" *Journal of Health Economics,*37. 2014: 198-218.

Institute of Medicine (US) Committee on Advancing Pain Research, Care, and Education. "Relieving Pain in America: A Blueprint for Transforming Prevention, Care, Education, and Research." National Academies Press. 2011. https://www.ncbi.nlm.nih.gov/books/NBK92517/

Ismail Keshta and Ammar Odeh. "Security and privacy of electronic health records: Concerns and challenges." *Egyption Informatics Journal*, 22. 2021: 177-183.

Jean Tirole. *The Theory of Industrial Organization*. 1988.

John McAdams. "Non-Compete Agreements: A Review of the Literature." December 31, 2019. *Available at:* https://ssrn.com/abstract=3513639.

Kelly Crout, Jennifer Hodgkins Tweedie and David Miller. "Physical Therapists' Opinions and Practices Regarding Direct Access." *Physical Therapy,* Vol. 78: January 1998: 52-61.

Kurt Lavetti, Carol Simon and William White. "The Impacts of Restricting Mobility of Skilled Service Workers: Evidence from Physicians." *The Journal of Human Resources,* Vol. 55 No. 3. Summer 2020: 1025-1067.

Marc F. Bellemare, Takaaki Masaki, Thomas B. Pepinsky. "Lagged Explanatory Variables and the Estimation of Causal Effects." *The Journal of Politics* 7, Vol. 9. July 2017.

Matthew DePuccio et al. "Patients' Perceptions About Medical Record Privacy and Security: Implications for Withholding of Information During the COVID-19 Pandemic." *Journal of General Internal Medicine,* Vol. 35. 2020: 3122-3125.

Matthew J. Best, Edward G. McFarland, Gerard F. Anderson, Uma Srikumaran, "The likely economic impact of fewer elective surgical procedures on US hospitals during the COVID-19 pandemic." *Surgery.* 2020: 962-967.

Nathan Miller et al. "On The Misuse of Regressions of Price on the HHI in Merger Review." November 22, 2021. *Available at:* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3974267.

National Research Council. *Reference Manual on Scientific Evidence,* Third Edition. Washington, DC: The National Academies Press. 2011.

Ronald Coase. "The Nature of the Firm." *Economica,* 1937: 386-405.

Stephen Berry and Philip Haile. "Foundations of Demand Estimation." In (eds) Ho, Hortaçsu, Lizzeri. *Handbook of Industrial Organization.* 2021.

Thomas Krattenmaker, Robert Lande and Steven Salop. "Monopoly Power and Market Power in Antitrust Law." *Georgetown Law Journal.* 76. 1987. p. 241.

Victor Aguirregabiria. *Empirical Industrial Organization: Models, Methods, and Applications.*  June 2021. http://aguirregabiria.net/wpapers/book_dynamic_io.pdf.

Wenke Hwang, et al. "Effects of Integrated Delivery System on Cost and Quality." *The American Journal of Managed Care* Vol. 19 (2013): e175-e184.

**Data Sources**

CIVHC CO-APCD data.

Dr. Schafer's Work Papers.

**Other Public Sources**

Alliance for Rural Hospital Access. "List of SCHs by State." https://static1.squarespace.com/static/5c13fd4150a54f21cf0140ad/t/5eb2eddb92d7a7647a20f0e6/1588784603405/List+of+SCHs+FY+2020.pdf

Alliance for Rural Hospital Access. "What is an SCH?"  https://www.ruralhospitalcoalition.com/what-is-an-sch

Altius. "Who We Are." https://altiuspt.com/aboutus

Altius. https://altiuspt.com/

American Academy of Orthopedic Surgeons. "Orthopedic Surgeons: Restoring mobility and keeping our nation in motion." https://www7.aaos.org/member/directory/definition.htm

American Academy of Orthopedic Surgeons. "Position Statement: Physician Owned Physical Therapy Services." 2004. https://www.aaos.org/contentassets/1cd7f41417ec4dd4b5c4c48532183b96/1166-physician-owned-physical-therapy-services.pdf

American Academy of Physical Medicine and Rehabilitation. "What is Physical Medicine and Rehabilitation?" https://www.aapmr.org/about-physiatry/about-physical-medicine-rehabilitation

American Hospital Association. "Fact Sheet: Site Neutral Payment Provisions." September 2019. https://www.aha.org/system/files/media/file/2019/09/fact-sheet-site-neutral-0919.pdf

American Hospital Directory. "Vail Health Financial Indicators." https://www.ahd.com/indicators.php?hcfa_id=c66f3f1be21530bbcd34cef3e542e706&ek=0acee91deeabcb9f0a31a9437f33a13f

American Hospital Directory. "Vail Health Profile." https://www.ahd.com/profile.php?hcfa_id=c66f3f1be21530bbcd34cef3e542e706&ek=0acee91deeabcb9f0a31a9437f33a13f

American Physical Therapy Association.  "Direct Access by State Map." February 2021. https://www.apta.org/advocacy/issues/direct-access-advocacy/direct-access-by-state

American Physical Therapy Association. "APTA Career Center." https://jobs.apta.org/

American Physical Therapy Association. "APTA Physical Therapy Workforce Analysis." 2020. https://www.apta.org/contentassets/5997bfa5c8504df789fe4f1c01a717eb/apta-workforce-analysis-2020.pdf

American Physical Therapy Association. "Commission on Accreditation in Physical Therapy Education.  Aggregate Program Data: 2020 Physical Therapist Education Programs Fact Sheet." 2020. https://www.capteonline.org/globalassets/capte-docs/aggregate-data/2020-2021-aggregate-pt-program-and-salary-data.pdf

Avalanche Physical Therapy. "Locations." https://avalanchetherapy.com/locations/

Avalanche Physical Therapy. "Meet Avalanche Physical Therapy." https://avalanchetherapy.com/meet-avalanche/

Axis Sports Medicine. "Avon." https://axissportsmedicine.com/team/avon

B-4

Axis Sports Medicine. "Breckenridge." https://axissportsmedicine.com/team/breckenridge

Axis Sports Medicine. "Eagle." https://axissportsmedicine.com/team/eagle/

Axis Sports Medicine. "Edwards." https://axissportsmedicine.com/team/edwards/

Axis Sports Medicine. "Frisco." https://axissportsmedicine.com/team/frisco/

Axis Sports Medicine. "Physical Therapy Treatment." https://axissportsmedicine.com/patients/physical-therapy-treatment/

Axis Sports Medicine. "Silverthorne." https://axissportsmedicine.com/team/silverthorne/

Becker's Healthcare. "Becker's ASC Review." https://www.beckersasc.com/asc-coding-billing-and-collections/5-largest-health-insurance-companies-by-membership.html

Best Places. "Vail, Colorado." https://www.bestplaces.net/cost_of_living/city/colorado/vail

Breckenridge Physical Therapy. "Contact." https://breckenridgephysicaltherapy.com/contact/

Breckenridge Physical Therapy. "Our Team." https://breckenridgephysicaltherapy.com/our-team/

Brooks R Smith, "Health Care Leases: Use Restrictions and Religious Directives." Bradley, June 2015. https://www.bradley.com/insights/publications/2015/06/part-4-healthcare-leases-use-restrictions-and-re__

Centers for Medicaid & Medicare Services. "Critical Access Hospitals" https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/CAHs

Centers for Medicare & Medicaid Innovation. "Strategic Direction." https://innovation.cms.gov/strategic-direction

Centers for Medicare & Medicaid Services. "Sole Community Hospital: Rural Health Fact Sheet Series."https://static1.squarespace.com/static/5c13fd4150a54f21cf0140ad/t/5c140b5f0e2e72d2f8928206/1544817505005/CMS_Fact_Sheet_--_SCH.pdf

Centers for Medicare & Medicaid Services. "Comprehensive Care for Joint Replacement (CJR) Model Provider and Technical Fact Sheet for Performance Years 6-8." https://innovation.cms.gov/files/fact-sheet/cjr-providerfs-finalrule.pdf

Centers for Medicare & Medicaid Services. "Comprehensive Care for Joint Replacement Model." https://innovation.cms.gov/innovation-models/cjr

Centers for Medicare & Medicaid Services. "Conditions for Coverage (CfCs) & Conditions of Participation (CoPs)." https://www.cms.gov/Regulations-and-Guidance/Legislation/CFCsAndCoPs

Centers for Medicare & Medicaid Services. "NPPES NPI Registry." https://npiregistry.cms.hhs.gov/registry/provider-view/1851449920

CIVHC. "CO APCD Overview." https://www.civhc.org/get-data/co-apcd-info/

CIVHC. "Commercial Data in the APCD." https://www.civhc.org/2021/09/13/commercial-data-in-the-co-apcd/

Cleveland Clinic. "Chiropractic Adjustment." https://my.clevelandclinic.org/health/treatments/21033-chiropractic-adjustment

Colorado Healthcare Affordability and Sustainability Enterprise. Annual Report, January 15, 2022, https://hcpf.colorado.gov/sites/hcpf/files/2022%20CHASE%20Annual%20Report%20with%20CLs.pdf

Colorado Hospital Association. "Find a Hospital." https://cha.com/colorado-hospitals/find-a-hospital/

Competitive Edge. "About Us." https://competitiveedge-pt.com/about-us/

Competitive Edge. "Services." https://competitiveedge-pt.com/services/

Concierge Physical Therapy of the Rockies. "Connect." https://www.conciergeptoftherockies.com/conciergeptlocationcontactinformation

David Lo and Nicholas Janiga. "2020 Outlook: Physical Therapy Clinics & Centers." FMVantage Point, HealthCare Appraisers. 2020. Figure 2. https://healthcareappraisers.com/2020-outlook-physical-therapy-clinics-centers/

Drive Colorado. "Is Vail Pass Open." https://isvailpassopen.com/closure-history

Glenwood Medical Associates. "Physical Therapy." https://www.glenwoodmedical.com/services/physical-therapy/

Here API. https://developer.here.com/

Howard Head Sports Medicine. "Meet the Team." https://www.howardhead.org/staff

Howard Head Sports Medicine. "Services." https://www.howardhead.org/services

Howard Head Sports Medicine. https://www.howardhead.org/

ICD10Data.com. www.icd10data.com

Joint Worx Physical Therapy. "Services." https://jointworx.com/services/

Joint Worx Physical Therapy. "Staff." https://jointworx.com/about/staff/

Kaiser Family Foundation. "Health Insurance Coverage of the Total Population." 2020. (Data from the Current Population Survey). https://www.kff.org/other/state-indicator/health-insurance-coverage-of-the-total-population-cps/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D

KNG Health Consulting Inc. "Comparison of Hospital Outpatient Departments and Independent Physician Offices." April 2021. https://www.aha.org/system/files/media/file/2021/04/KNG-Health-AHA-HOPD-and-IPO-Comparison-FULL-COHORT.pdf

Lake Research Partners. "Consumers and Health Information Technology: A National Survey." April 2010. https://www.chcf.org/publication/consumers-and-health-information-technology-a-national-survey/

Lauren Glendenning. "Comprehensive concussion treatment is world class in Summit County." Vail Daily. December 25, 2020. https://www.vaildaily.com/news/comprehensive-concussion-treatment-is-world-class-in-summit-county-sponsored/

Lindsey Vonn. "Rise: My Story." Dey St., An Imprint of William Morrow. 2022.

LinkedIn, linkedin.com

Mayo Clinic. "Acupuncture." https://www.mayoclinic.org/tests-procedures/acupuncture/about/pac-20392763

MedPAC. March 2021 Report to Congress: Medicare Payment Policy, Chapter 3. https://www.medpac.gov/wp-content/uploads/2021/10/mar21_medpac_report_ch3_sec.pdf

Meredith Castin. WebPT. "What is Concierge Physical Therapy & Why is it Trending?" January 30, 2019. https://www.webpt.com/blog/what-is-concierge-pt-and-why-is-it-getting-so-popular/

Merriam-Webster Dictionary. "Physical Therapy." https://www.merriam-webster.com/dictionary/physical%20therapy

Movement Physical Therapy. "Our People." https://www.movementvail.com/our-people/

Movement Physical Therapy. "Our Services." https://www.movementvail.com/services/

National Center for Complementary and Integrative Health (Department of Health and Human Services). "Massage Therapy: What You Need to Know." https://www.nccih.nih.gov/health/massage-therapy-what-you-need-to-know

NBA. "Orlando Magic Name Lindsay Winninger High Performance Director." https://www.nba.com/magic/orlando-magic-name-lindsay-winninger-high-performance-director-20200909

Panorama Summit Orthopedics. "Panorama Summit Physical Therapy." https://www.summitorthopanorama.com/services-2/physical-therapy/

"Physical Therapists start new group." Vail Daily. November 8, 2012. https://www.vaildaily.com/news/physical-therapists-start-new-group/

PT Compact. https://ptcompact.org/ptc-states

Realtor.com. "Eagle County, CO Real Estate Market." https://www.realtor.com/realestateandhomes-search/Eagle-County_CO/overview

Rural Health Information Hub. "Critical Access Hospitals." https://www.ruralhealthinfo.org/topics/critical-access-hospitals

Shannon Marvel. "CMC announces $40M affordable housing project sited at four campus locations." Vail Daily, June 22, 2021. https://www.vaildaily.com/news/cmc-announces-41-million-affordable-housing-project-sited-at-four-campus-locations/

Sports Rehab Consulting. "Lindsay Winninger." https://sportsrehabconsulting.com/about/lindsay-winninger/

Sports Rehab Consulting. "Physical Therapy Services." https://sportsrehabconsulting.com/services/

Sports Rehab Consulting. "Who We Are." https://sportsrehabconsulting.com/about/

Steadman Philippon Research Institute. https://www.sprivail.org/

Susan Bernstein, WebMD. "What is Physical Therapy?" July 31, 2021. https://www.webmd.com/pain-management/what-is-physical-therapy

Town of Vail. "Housing in the Town of Vail." https://www.vailgov.com/government/departments/housing

Town of Vail. "Welcome to Vail!" https://www.vailgov.com/visiting/welcome-to-vail

U.S. Bureau of Labor Statistics. "Occupational Employment and Wage Statistics. 29-1123 Physical Therapists." May 2020. https://www.bls.gov/oes/current/oes291123.htm

U.S. Bureau of Labor Statistics. "Occupational and Wage Statistics." https://www.bls.gov/oes/current/oes_0800003.htm

U.S. Bureau of Labor Statistics. "Occupational Outlook Handbook: Occupational Therapists." https://www.bls.gov/ooh/healthcare/mobile/occupational-therapists.htm

U.S. Census Bureau, American Community Survey. "Narrative Profile 2015-2019, Vail Town, Colorado" https://www.census.gov/acs/www/data/data-tables-and-tools/narrative-profiles/2019/report.php?geotype=place&state=0&place=80040

U.S. Census Bureau. Eagle County CO, OnTheMap Application and LEHD Origin-Destination Employment Statistics. https://onthemap.ces.census.gov/

U.S. Department of Justice and Federal Trade Commission. "Antitrust Guidelines for Collaborations among Competitors." April 2000. https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf

U.S. Department of Justice and Federal Trade Commission. "Horizontal Merger Guidelines," 2010. https://www.justice.gov/atr/file/810276/download

U.S. Department of Justice. "Competition and Monopoly: Single-Firm Conduct Under Section 2 of the Sherman Act: Chapter 1 – An Overview." https://www.justice.gov/atr/competition-and-monopoly-single-firm-conduct-under-section-2-sherman-act-chapter-1#N_56_

Vail Health. "About." https://www.vailhealth.org/about

Vail Health. "Community Health Needs Assessment: Final Summary Report." September 2019. https://www.vailhealth.org/pdf/VailHealth/CHNA/2019_CHNA_Final_Report_2019_09.pdf

Vail Health. "Dillon Health Center debuts new health services for Summit County." November 15, 2021. https://www.vailhealth.org/news/dillon-health-center-debuts-new-health-services-for-summit-county

Vail Health. "Giving Back." https://www.vailhealth.org/about/giving-back

Vail Health. "Insurance." https://www.vailhealth.org/patients-and-visitors/insurance

Vail Health. "Orthopaedics." https://www.vailhealth.org/services/orthopaedics

"Vail hospital to take over Howard Head." Vail Daily. July 28, 2012. https://www.vaildaily.com/news/vail-hospital-to-take-over-howard-head/

Vail Integrative Medical Group. "Find Us." https://vailmed.com/findus.php

Vail Integrative Medical Group. "Team." https://vailmed.com/staff.php

Vail Integrative Medical Group. "Treatments." https://vailmed.com/services.php

Vail Mountain Lodging. "Driving to Vail." https://vailmountainlodging.com/getting-here/driving-to-vail/

Vail Physical Therapy. "Location." https://vailphysicaltherapy.com/location/

Vail Physical Therapy. "Services." https://vailphysicaltherapy.com/services/

Vail Physical Therapy. "About Us." https://vailphysicaltherapy.com/about-us/

Vail Valley Economic Development. "Thinking of moving to the Vail Valley?" https://vailvalleymeansbusiness.com/life/housing-real-estate-cost-living/

Vail-Summit Orthopaedic Foundation. https://www.vsoresearch.com/

Valley View Rehabilitation Services. "Physical Therapy." https://www.vvh.org/our-services/rehab-services/physical-therapy/

Valley View Rehabilitation Services. "Rehabilitation Services." https://www.vvh.org/our-services/rehab-services/

Workable Better Hiring. "Personal Training Job Description." https://resources.workable.com/personal-trainer-job-description