# Exhibit 1

Transcript of the Deposition Testimony of:

# Charles Crevling
July 22, 2021

Sports Rehab Consulting LLC

v.

Vail Clinic, Inc. d/b/a Vail Health

Civil No. 1:19-cv-02075-WJM-GPG



Mile High
Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil No. 1:19-CV-02075-WJM-GPG

_____

VIDEOCONFERENCE DEPOSITION OF CHARLES CREVLING
July 22, 2021

_____

SPORTS REHAB CONSULTING LLC, a Colorado limited
liability company, and LINDSAY WINNINGER, an
individual,

   Plaintiffs,

V.

VAIL CLINIC, INC. D/B/A VAIL HEALTH, a Colorado
nonprofit corporation,

   Defendant.

_____

       PURSUANT TO NOTICE, the videoconference
deposition of CHARLES CREVLING, called for examination
by the Plaintiffs herein, was taken with all parties
appearing via videoconference, commencing at
9:33 a.m., on Thursday, July 22, 2021, taken before
Jennifer Bajwa Melius, a Verbatim Stenographic
Reporter and Registered Professional Reporter.

**Mile High Court Reporting and Video, Inc. 303-202-0210**
**contact@milehighreporting.com**

Deposition of:  Charles Crevling - July 22, 2021
Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health

2

```
 1    APPEARANCES:
 2             SONYA BRAUNSCHWEIG, ESQ.
               5501 Irving Avenue South
 3             Minneapolis, Minnesota 55419
               612-819-2304
 4             sonya.braunschweig@gmail.com

 5                  and

 6             ALAN L. KILDOW, ESQ.
               15204 Wildwood Road
 7             Burnsville, MN 55306
               970-390-6675
 8             akildow@aol.com

 9                  For the Plaintiff Sports Rehab
                       Consulting and Lindsay Winninger
10

11             DANIEL A. RICHARDS, ESQ.
               Davis Graham & Stubbs LLP
12             1550 Seventeenth Street, Suite 500
               Denver, Colorado 80202
13             303-892-9400
               daniel.richards@dgslaw.com
14
                    For the Defendant Vail Clinic d/b/a
15                     Vail Health

16
               ERIN M. EISELEIN  ESQ.
17             Brownstein Hyatt Farber Schreck
               410 Seventeenth Street
18             Denver, Colorado 80202
               303-223-1251
19             eeiselein@bhfs.com

20                  For the Deponent

21

22

23

24

25
```

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

## 4

1  PROCEEDINGS
2  **THE STENOGRAPHER:** My name is Jenny
3  Melius. I'm a nationally certified stenographic
4  reporter. Today's date is July 22, 2021, and the time
5  is approximately 9:33 a.m.
6  This is the deposition of Charles
7  Crevling in the matter of Sports Rehab Consulting, LLC
8  and Lindsay Winninger versus Vail Clinic, Inc., venued
9  in the United States District Court for the District
10 of Colorado. The case number is
11 1:19-cv-02075-WJM-GPG.
12  At this time I will ask counsel to
13 identify themselves, state whom you represent, and
14 agree on the record that there is no objection to this
15 deposition officer administering a binding oath to the
16 witness remotely.
17  **MR. KILDOW:** My name is Alan Kildow,
18 spelled K-i-l-d-o-w. I am the attorney of -- one of
19 the attorneys of record for the plaintiffs in this
20 action, and I have no objection -- the plaintiffs have
21 no objection to your acting as the -- serving, I
22 should say, as the court reporter in this action.
23  **MR. RICHARDS:** Dan Richards,
24 R-i-c-h-a-r-d-s. I represent defendant Vail Health,
25 and we have no objection to the remote swearing of the

## 5

1  witness or conducting the deposition remotely.
2  **MS. EISELEIN:** And this is Erin
3  Eiselein, E-i-s-e-l-e-i-n. I'm the attorney for the
4  witness, Charles Crevling, and we also have no
5  objection to the remote swearing in of Mr. Crevling.
6  CHARLES CREVLING,
7  having been first duly sworn, was examined and
8  testified as follows:
9  EXAMINATION
10 BY MR. KILDOW:
11  Q. Mr. Crevling, my name, as I have
12 announced, is Alan Kildow. I represent the plaintiffs
13 in this action, Sports Rehab Development -- or
14 Consulting and Lindsay Winninger.
15  I'm going to ask you questions today. I
16 will do my best to ask questions which are short and
17 succinct and hopefully easy to understand. I will do
18 my best to wait to ask a second question until you
19 have answered the question that was just posed.
20 Correspondingly, I would ask you to wait until I've
21 finished the question before you begin to answer.
22  We are doing something that is
23 technologically now somewhat common but until recently
24 was relatively unique, which is taking a deposition by
25 video -- by Zoom. And as Jenny has pointed out,

## 6

1  sometimes there's just a little bit of a lag between
2  the time you stop speaking and the other hear -- the
3  other person hears that. And so we have to be even
4  more vigilant than we really usually are in waiting
5  for the question to be completed and waiting for the
6  answer to be completed because, as expert as Jenny is,
7  it's hard to take down what's being said when two
8  people are talking over each other. Is that fair
9  enough?
10  A. Fair enough.
11  Q. Okay. You live in Glenwood Springs; is
12 that correct?
13  A. Correct.
14  Q. And could you state your address again
15 for the record?
16  A. 345 Woodruff Road, Glenwood Springs,
17 81601.
18  Q. Okay. Is there anyone else that lives
19 there with you?
20  A. My wife.
21  Q. What's her name?
22  A. Karen.
23  Q. Okay. Are you represented by counsel
24 today?
25  A. I am.

## 7

1  Q. And that is Erin; is that correct?
2  A. That is correct.
3  Q. Is -- are you represented by anybody
4  else such as Mr. Richards?
5  A. I am not.
6  Q. Okay. Now, because you live in Glenwood
7  Springs, I can't be absolutely certain that I'm going
8  to be able to subpoena you for trial. I think I can,
9  but I can't be absolutely certain. And so today's
10 deposition plaintiffs intend to be a trial deposition
11 insofar as we will take this deposition as though you
12 are testifying in a court of law in Denver and there
13 was a judge and a jury there, okay?
14  A. Yeah.
15  **MR. KILDOW:** And I will try to ask the
16 questions in a way that is -- that are
17 non-objectionable, but if Mr. Richards housed an
18 objection, not just to form but a trial objection, he
19 should state that objection on the record so that I
20 can add the foundation or rephrase the question in a
21 manner that is not objectionable.
22  Is that acceptable to everybody?
23  **MR. RICHARDS:** Mr. Kildow, I think we'll
24 proceed consistent with the Federal Rules of Civil
25 Procedure, and my objections will be consistent with

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

76

1  Q. Mr. Crevling, what do you mean about
2  "across service lines"?
3  A. So orthopedics would be a service line,
4  cardiology would be a service line, cancer is a
5  service line, internal med is a service line.
6  Q. Was there ever a reporting or any
7  financial document prepared for the Howard Head Sports
8  Medicine physical therapy operation after November 1,
9  2012, relating to the contribution margin, if any,
10 that had contributed to Vail Health?
11     MR. RICHARDS: Objection to form.
12 A. I can't --
13     MR. RICHARDS: Foundation.
14 A. I can't say that there was or was not.
15 Q. (By Mr. Kildow) Who would know that?
16 A. I'm not sure it would -- who would be
17 able to say, "Yeah, we created that." It would have
18 come from finance. So, you know, would we have looked
19 at physical therapy? Probably so.
20 Q. I can't --
21 A. We did that on a regular basis with
22 services across the organization. But physical
23 therapy is downstream. It's not as much of a feeder
24 as an internal medicine. It gets fed more than feeds.
25 Q. With respect to the format of billed

---

77

1  versus collected, who within Vail Health, if you know,
2  determined the pricing or the amount that would be
3  billed to an entity beginning December -- or excuse
4  me -- November 1, 2012, to the end of your tenure
5  there?
6      MR. RICHARDS: Objection to form.
7      MS. EISELEIN: Objection. Form.
8  A. It would have been finance working with
9  the department directors. They would determine what
10 the charges were.
11 Q. (By Mr. Kildow) Who within finance
12 would have worked with Nicholas Brown and Luke
13 O'Brien?
14 A. It would have --
15     MS. EISELEIN: Objection. Form.
16     MR. RICHARDS: Same.
17 A. It would have been myself or -- and/or a
18 financial analyst.
19 Q. (By Mr. Kildow) And who, again, would
20 the financial analyst be? If you know.
21 A. During that time, it would have been --
22 probably would have been Tim Wise.
23 Q. Wise, W-i-s-e?
24 A. Yeah.
25 Q. Do you know where Mr. Wise is now?

---

78

1  A. Yeah. He works for me here.
2  Q. In Glenwood?
3  A. Yeah.
4  Q. Okay. Were there any documents --
5  financial documents, accounting documents, price
6  analyses -- that were generated when you went through
7  that pricing process?
8      MR. RICHARDS: Objection to form.
9      MS. EISELEIN: Same objection.
10 A. You know, the analysis, a lot of them
11 were printed and discussed, but there's no formal
12 document. There's no formal income statement, so
13 there wouldn't have been -- I can't say that anything
14 would have been kept, if that's where you're going.
15 Q. (By Mr. Kildow) Now, did you file those
16 and maintain them over the long run?
17 A. No.
18     MR. RICHARDS: Objection to form.
19 A. No. So, you know, they're -- again,
20 they're not legal documents or anything like that, so
21 there was lots of analysis done but no formal
22 recordkeeping of that analysis.
23 Q. (By Mr. Kildow) Tell me the analysis
24 that would have been conducted.
25 A. I think --

---

79

1      MS. EISELEIN: Objection. Form.
2      MR. RICHARDS: Objection to form.
3  A. I think I already have. So, you know,
4  if you were looking at a service line, again, it would
5  be billed and collections and looking at direct costs
6  and does that add or subtract from the entity's
7  financial health.
8  Q. (By Mr. Kildow) Was there a margin that
9  you were trying to achieve in billing for the physical
10 therapy group while you were there?
11     MR. RICHARDS: Objection to form.
12 A. There was never a margin set for
13 physical therapy, to the best of my knowledge. So
14 there's an overall budget and, of course, there was
15 a -- you know, a budgeted income for the organization
16 as a whole. But the reality is, you know, the surgery
17 drives, not physical therapy.
18 Q. (By Mr. Kildow) Because they're taking
19 from the surgery side from Steadman or VSO or somebody
20 like that?
21 A. Right. They're getting referrals from
22 surgery. It's -- you know, in any hospital, the OR is
23 going to be the economic engine.
24 Q. Were the budgets formally submitted up
25 the chain on an annual basis?

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

108

1    MS. EISELEIN: Objection. Mr. Kildow,
2  you skipped a line.
3    MR. KILDOW: Which line did I skip?
4    MS. EISELEIN: I believe the one that
5  starts with "this arrangement resulted in."
6    MR. RICHARDS: Yeah.
7    A. So I can see the document, Alan.
8    Q. (By Mr. Kildow) Okay.
9    A. Well, if --
10   Q. The physical therapy group they're
11  referring to is the RPC-Vail Proaxis group that left,
12  right?
13   MR. RICHARDS: Objection to form.
14   A. I believe they are referring to Axis
15  that formed from --
16   Q. (By Mr. Kildow) Yeah.
17   A. Yes.
18   Q. Some of the physical therapists that
19  worked for -- or worked for Proaxis RPC-Vail went over
20  with Steve Stalzer to form or be part of Axis, right?
21   A. That's correct.
22   Q. I'm sure you knew Steve Stalzer during
23  the time you were working there.
24   A. I did.
25   Q. Yeah. When visits dipped, did Vail

---

109

1  Health lower the price that it was charging, the fees
2  it was charging, for physical therapy?
3    MR. RICHARDS: Objection to form.
4  Foundation.
5    A. No. I don't remember ever doing that.
6    MR. KILDOW: Okay. You can drop that,
7  Sonya.
8    Q. (By Mr. Kildow) As the CFO, you're
9  probably aware of the fact that a significant number
10  of the referrals that were made to physical therapists
11  at Vail Health were made by Steadman physical
12  therapy -- orthopedics surgeons, right?
13   MR. RICHARDS: Objection to form.
14   MS. EISELEIN: Objection. Form.
15  Foundation.
16   A. Yes.
17   Q. (By Mr. Kildow) Was there ever any
18  analysis done that you're aware of as to determine
19  what percentage of the physical therapy business came
20  from Steadman referrals?
21   A. I don't recall doing that analysis or
22  seeing that analysis. It would probably be --
23  probably parallel to the number of surgeries by group.
24   Q. Okay. Were you involved in any way in
25  any negotiations related to renewal or reading,

---

110

1  writing the Steadman lease at the property of 181 West
2  Meadow Drive?
3    A. Yeah.
4    Q. What was your involvement?
5    A. The involvement would have simply been
6  looking at fair market values in space.
7    Q. Were there -- do you recall the number
8  of square feet that Steadman had at the time?
9    A. No, I don't, Alan.
10   Q. Okay. Who was -- were you negotiating
11  with people at Steadman or not?
12   A. Well, I certainly would have had
13  conversations probably with whoever was their CEO at
14  that time, and so would probably Doris have had those
15  conversations. Perhaps we might have had a
16  conversation together, so. . .
17   Q. All right. Do you recall the person
18  they were dealing with, the COO at the time, was Kelly
19  Adair?
20   A. Kelly was involved in a lot of
21  discussions. He may have been there too. He wasn't
22  the CEO, though, of Steadman.
23   Q. Right. He was a COO, and Dan Drawbaugh
24  was the CEO?
25   A. Yeah.

---

111

1    Q. You sound enthusiastic about that.
2    Did you deal directly with Dan Drawbaugh
3  sometimes?
4    A. Dan was -- I did not have much contact
5  with Dan.
6    Q. When did the discussions -- usually in
7  commercial real estate when somebody's lease is up,
8  they don't start two months before the lease is --
9  ends its term. It begins sometime before. Do you
10  recall when discussions began about what was going to
11  happen with the Steadman lease and -- et cetera.
12   MR. RICHARDS: Objection to form.
13  Foundation.
14   A. I'd be totally guessing, Alan. No.
15   Q. (By Mr. Kildow) It was during the time
16  that you were the CFO though?
17   A. We renewed the Steadman lease on the old
18  clinic before all the construction happened while I
19  was there.
20   Q. So if we put that together, it was --
21  probably preceded January 1, 2010 -- or excuse me --
22  2015?
23   A. Yeah, I would say so. Yeah.
24   Q. Did you ever talk with a guy named Steve
25  Boochever?

---

**Deposition of: Charles Crevling - July 22, 2021**
**Sports Rehab Consulting LLC v. Vail Clinic, Inc. d/b/a Vail Health**

---

**112**

1  A. I'm sorry, Alan. I didn't hear you.
2  Q. Did you ever have any conversations
3  about the Steadman lease with a fellow by the name of
4  Steve Boochever?
5  A. I don't remember Steve Boochever at all.
6  Q. Okay. Did there ever come a time when
7  there were discussions, however sincere or insincere,
8  about Steadman leaving the space at the Vail Health
9  building at 181 West Meadow Drive?
10  MR. RICHARDS: Objection to form.
11  A. There were always rumors that they were
12  going to leave and do their own thing. That's, you
13  know, not unusual with a surgical group especially.
14  Q. (By Mr. Kildow) Why do you select the
15  demographic group of surgeons?
16  A. Because if you look around, you know,
17  the state, the country, the -- you know, oftentimes,
18  groups leave and the surgeons control ambulatory
19  surgery centers. And that's what you've seen across
20  the Denver metro and the state.
21  Q. For the record, thinking that this might
22  be something that a jury will hear, could you describe
23  your understanding of what an ambulatory service --
24  surgery center is?
25  A. Well, it's pretty much contained in the

---

**113**

1  name. So ambulatory means outpatient as compared to
2  inpatient surgery. And they can be, you know, owned
3  by the hospitals themselves or owned by physicians
4  with equity interest, or they can be a combination of,
5  which they often are. And that's what Vail Valley
6  Surgery Center was.
7  Q. But when the Vail Valley Surgical --
8  Ambulatory Surgical Center was established, Vail
9  Valley maintained -- what? -- 51-plus percent of the
10  ownership of that center; is that right?
11  A. It was approximately 51/49. Again,
12  not --
13  Q. In some of these ambulatory surgery
14  centers, did the docs own 100 percent of the centers?
15  A. Some --
16  MS. EISELEIN: Objection to form.
17  Foundation.
18  A. Some market surgery centers are owned
19  100 percent by physicians. But now, as you probably
20  know, there's several very large ambulatory surgery
21  companies that own a large percentage across the
22  country.
23  Q. (By Mr. Kildow) Is that hurting
24  hospitals?
25  MR. RICHARDS: Objection to form.

---

**114**

1  Foundation.
2  A. Well, it's competition that didn't exist
3  before, right? So. . .
4  Q. (By Mr. Kildow) Yeah. When you
5  heard -- said you heard rumors about the possibility
6  that Steadman might leave the space at 181 West Meadow
7  Drive, did you hear it -- can you tell -- do you
8  recall where you heard it from?
9  A. I can't tell you for sure, but I know it
10  was a rumor that was repeated by -- in the executive
11  ranks.
12  Q. In the executive ranks of who? Vail
13  Health?
14  A. Yeah.
15  Q. Would Doris Kirchner have been one of
16  those people who mentioned it?
17  A. Yes. She certainly could have been.
18  Q. What about Mike Shannon?
19  A. Well, Mike was a board member, but he
20  also could have, you know, brought that to the table.
21  Q. Yeah. If Steadman had said, We're going
22  to terminate or let our lapse -- our lease lapse at
23  the 181 West Meadow Drive and we're going to go down
24  to Eagle or Edwards or someplace like that and we're
25  going to build our own building and our own surgery

---

**115**

1  center, if that happened, what kind of an impact would
2  have it had on Vail Health?
3  MS. EISELEIN: Objection. Form.
4  MR. RICHARDS: Objection to form. Calls
5  for speculation.
6  A. It would have -- if they were able to do
7  that and if they were able to recontract the rates
8  that brought business there, it would have a material
9  negative effect on Vail Valley --
10  Q. (By Mr. Kildow) Okay.
11  A. -- Medical Center.
12  Q. Were there discussions about the impact
13  of Steadman moving out and moving down valley among
14  members of the Vail Health management?
15  A. Yeah. I remember --
16  MR. RICHARDS: Objection to form.
17  Foundation.
18  A. I do remember discussions about the
19  Steadman group saying that they wanted their own
20  business or might move into another facility. There
21  were -- that was not unusual in my tenure at Vail.
22  Q. (By Mr. Kildow) And during the time
23  that you were the CFO of Vail Health, were there any
24  discussions about if Steadman left that they might
25  form their own physical therapy group?

---

```
 1                    REPORTER'S CERTIFICATE

 2

 3              I, Jennifer Bajwa Melius, Verbatim

 4   Stenographic Reporter and Registered Professional

 5   Reporter, do hereby certify that prior to the

 6   commencement of the examination of CHARLES CREVLING,

 7   said witness was remotely sworn via videoconference to

 8   testify to the truth in relation to the matters in

 9   controversy between the parties hereto; that identity

10   of the witness was verified via satisfactory evidence

11   per the Rules; that said examination was taken in

12   machine shorthand by me and was thereafter reduced to

13   typewritten form; and that the foregoing is a true and

14   accurate transcript of the questions asked, testimony

15   given, and proceedings had.

16              I further certify that I am not related

17   to any party herein, nor their counsel, and have no

18   interest in the result of this litigation.

19              IN WITNESS WHEREOF, I have affixed my

20   signature this 3rd day of August, 2021.

21

22

23   _____
     Jennifer Bajwa Melius
24   Registered Professional Reporter

25
```