# Exhibit 2

**NEW ISSUE**  
**BOOK-ENTRY ONLY**

**S&P Rating: A**  
**See "RATING"**

*In the opinion of Sherman & Howard L.L.C., Bond Counsel, under existing laws, regulations, rulings and judicial decisions and assuming the accuracy of certain representations and continuing compliance with certain covenants, interest on the Series 2015 Bonds is excludable from gross income for federal income tax purposes and is not a specific preference item for purposes of the federal alternative minimum tax. In the further opinion of Bond Counsel, the Series 2015 Bonds, the transfer thereof and the income therefrom, including any profit made on the sale thereof, is exempt from all taxation and assessments in the State of Colorado under existing laws of the State of Colorado. See "TAX MATTERS" herein.*

**$100,000,000**

**Vail Valley Medical Center**

**COLORADO HEALTH FACILITIES AUTHORITY**  
**HOSPITAL REVENUE BONDS**  
**(VAIL VALLEY MEDICAL CENTER PROJECT)**  
**SERIES 2015**

**Dated: Date of initial delivery**                 **Due: January 15, as shown on inside cover**

The Colorado Health Facilities Authority (the "Authority") will issue its Hospital Revenue Bonds (Vail Valley Medical Center Project) Series 2015 (the "Series 2015 Bonds") pursuant to the terms of the Bond Indenture of Trust dated as of October 1, 2015 (the "Bond Indenture"), between the Authority and UMB Bank, n.a., as bond trustee (the "Bond Trustee"). The Series 2015 Bonds will bear interest from their date of delivery at the rates set forth on the inside cover hereof, such interest being payable semiannually on January 15 and July 15, commencing January 15, 2016. The Series 2015 Bonds will be issued as fully registered bonds in denominations of $5,000 and any integral multiple thereof. All Series 2015 Bonds will be issued initially in book-entry form. Purchasers ("beneficial owners") will not receive certificates representing their beneficial interest in the Series 2015 Bonds. The Series 2015 Bonds will be registered in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), or such other name as may be requested by DTC. DTC will act as securities depository for the Series 2015 Bonds. DTC will be responsible for distributing each payment to the participating members of DTC, and such participating members of DTC will be responsible for distributing such payments to the beneficial owners of the Series 2015 Bonds, as more fully described herein.

**THE SERIES 2015 BONDS ARE SUBJECT TO OPTIONAL, MANDATORY SINKING FUND AND EXTRAORDINARY OPTIONAL REDEMPTION AND PURCHASE PRIOR TO MATURITY AS DESCRIBED HEREIN.**

**The Series 2015 Bonds and interest thereon are special, limited obligations of the Authority payable solely from and secured under the Bond Indenture only by a pledge of certain rights of the Authority (other than Unassigned Rights) under and pursuant to the Loan Agreement dated as of October 1, 2015 (the "Loan Agreement") between the Authority and Vail Clinic, Inc., doing business as Vail Valley Medical Center (the "Corporation"), a Colorado nonprofit corporation, from payments made by Members of the Obligated Group on Obligation No. 1 ("Obligation No. 1") and from moneys in certain funds described in the Bond Indenture and investment earnings thereon.** The obligation of the Corporation to make payments under the Loan Agreement will be evidenced and secured by Obligation No. 1, which will be issued by the Corporation as Obligated Group Representative under and pursuant to the terms of the Supplemental Master Trust Indenture for Obligation No. 1 dated as of October 1, 2015, which supplements the Master Trust Indenture dated as of October 1, 2015 (as supplemented and amended, the "Master Indenture") with UMB Bank, n.a., as master trustee (the "Master Trustee"), whereunder the Corporation and VVMC Diversified Services, doing business as VHS Physician Services ("Diversified Services"), as the current Members of the Obligated Group, will be obligated to make payments on Obligation No. 1 as provided in the Master Indenture. **The Series 2015 Bonds do not constitute an indebtedness, a debt or liability or a charge against the faith, credit or taxing power of the State of Colorado, its General Assembly or any of its political subdivisions or agencies other than the Authority to the extent provided in the Bond Indenture. The Authority is not authorized to levy or collect any taxes or assessments to pay the Series 2015 Bonds or for any other purpose. The Authority makes no representation or warranty as to the adequacy or sufficiency of the security for the Series 2015 Bonds.**

**The purchase of the Series 2015 Bonds involves certain risks and reference is hereby made to "BONDHOLDERS' RISKS" and "REGULATION OF THE HEALTH CARE INDUSTRY" for a discussion of some of those risks.**

The Series 2015 Bonds are offered when, as and if issued and delivered to the Underwriter subject to prior sale, withdrawal or modification of the offer without notice and to the approval of the legality of the Series 2015 Bonds by Sherman & Howard L.L.C., Denver, Colorado, Bond Counsel, and other conditions. Certain legal matters will be passed upon for the Authority by its general counsel, Ballard Spahr LLP, Denver, Colorado, for the Corporation by its counsel, Duane Morris LLP, Baltimore, Maryland, and for the Underwriter by Dorsey & Whitney LLP, Denver, Colorado. The Series 2015 Bonds are expected to be available for delivery through DTC on or about October 21, 2015.

This cover page contains certain information for quick reference only. It is not a complete summary of the terms of the Series 2015 Bonds. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.

**WELLS FARGO SECURITIES**

The date of this Official Statement is October 1, 2015

## MATURITY SCHEDULE

### $100,000,000
### COLORADO HEALTH FACILITIES AUTHORITY
### HOSPITAL REVENUE BONDS
### (VAIL VALLEY MEDICAL CENTER PROJECT)
### SERIES 2015

| Maturity (January 15) | Principal Amount | Interest Rate | Yield | CUSIP[1] |
|---|---|---|---|---|
| 2021 | $ 540,000 | 3.000% | 1.870% | 19648A4 B8 |
| 2022 | 620,000 | 4.000 | 2.150 | 19648A4 C6 |
| 2023 | 580,000 | 5.000 | 2.390 | 19648A4 D4 |
| 2024 | 610,000 | 5.000 | 2.560 | 19648A4 E2 |
| 2025 | 615,000 | 4.000 | 2.720 | 19648A4 F9 |
| 2026 | 3,030,000 | 5.000 | 2.840 | 19648A4 G7 |
| 2027 | 3,185,000 | 5.000 | 2.960* | 19648A4 H5 |
| 2028 | 3,350,000 | 5.000 | 3.060* | 19648A4 J1 |
| 2029 | 3,520,000 | 5.000 | 3.190* | 19648A4 K8 |
| 2030 | 3,675,000 | 3.500 | 3.550 | 19648A4 L6 |

$21,240,000 5.000% Term Bond due January 15, 2035, yield of 3.550%, CUSIP 9658A4 M4*

$59,035,000 4.000% Term Bond due January 15, 2045, yield of 4.120%, CUSIP 658A4 N2

---

\* Priced to optional redemption date of January 15, 2026.

[1] CUSIP is a registered trademark of the American Bankers Association. The CUSIP numbers are provided by Standard & Poor's, CUSIP Service Bureau, a Division of The McGraw-Hill Companies, Inc. These numbers are not intended to create a database and do not serve in any way as a substitution for the CUSIP Service. None of the Authority, the Corporation or the Underwriter takes any responsibility for the accuracy of CUSIP numbers, which are included solely for the convenience of owners of the Series 2015 Bonds.

No dealer, salesperson or any other person has been authorized to give any information or to make any representations, other than those contained in this Official Statement, in connection with the Series 2015 Bonds and, if given or made, such information or representations must not be relied upon as having been authorized by the Authority or the Corporation, or by Wells Fargo Bank, National Association, as underwriter (the "Underwriter"). This Official Statement does not constitute an offer to sell or a solicitation of an offer to buy in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation. This Official Statement is submitted in connection with the initial public offering of the Series 2015 Bonds. Neither the delivery of this Official Statement nor the sale of the Series 2015 Bonds implies that information herein is correct as of any time subsequent to the date hereof.

The information set forth herein has been obtained from the Authority (but only with respect to information concerning the Authority under the headings "THE AUTHORITY" and "LITIGATION—Authority"), the Corporation and other sources that are believed to be reliable, but the accuracy or completeness of such information is not guaranteed by, and should not be construed as a representation by, the Underwriter. The Underwriter has provided the following sentence for inclusion in this Official Statement. The Underwriter has reviewed the information in this Official Statement in accordance with, and as a part of, its responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriter does not guarantee the accuracy or completeness of such information.

Other than with respect to the information concerning the Bond Trustee and the Master Trustee under the caption "MISCELLANEOUS," neither the Bond Trustee nor the Master Trustee has reviewed nor participated in the preparation of this Official Statement, and neither the Bond Trustee nor the Master Trustee assumes any responsibility for the contents, accuracy, fairness or completeness of the information set forth in this Official Statement.

In connection with the offering of the Series 2015 Bonds, the Underwriter may over-allot or effect transactions that stabilize or maintain the market price of the Series 2015 Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.

THE SERIES 2015 BONDS HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE BOND INDENTURE HAS NOT BEEN QUALIFIED UNDER THE TRUST INDENTURE ACT OF 1939, AS AMENDED (THE "TRUST INDENTURE ACT"), IN RELIANCE ON SECTION 3(A)(2) OF THE SECURITIES ACT AND OTHER EXEMPTIONS CONTAINED IN THE TRUST INDENTURE ACT. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

References to web site addresses presented herein are for informational purposes only and may be in the form of a hyperlink solely for the reader's convenience. Unless specified otherwise, such web sites and the information or links contained therein are not incorporated into, and are not part of, this official statement for purposes of, and as that term is defined in, SEC Rule 15c2-12.

# TABLE OF CONTENTS

INTRODUCTORY STATEMENT ................................................................................................ 1

THE SERIES 2015 BONDS ..................................................................................................... 4

REDEMPTION OF SERIES 2015 BONDS ................................................................................... 5

BOOK-ENTRY SYSTEM .......................................................................................................... 8

SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2015 BONDS .................................. 11

SOURCES AND USES OF FUNDS ........................................................................................... 15

PLAN OF FINANCE ............................................................................................................... 15

DEBT SERVICE SCHEDULE ................................................................................................... 16

BONDHOLDERS' RISKS ........................................................................................................ 17

REGULATION OF THE HEALTH CARE INDUSTRY .................................................................. 34

THE AUTHORITY ................................................................................................................. 50

FINANCIAL ADVISOR ........................................................................................................... 51

UNDERWRITING .................................................................................................................. 51

RATING .............................................................................................................................. 52

TAX MATTERS .................................................................................................................... 52

FINANCIAL STATEMENTS ..................................................................................................... 54

CONTINUING DISCLOSURE UNDERTAKINGS ......................................................................... 55

LEGAL MATTERS ................................................................................................................ 56

LITIGATION ........................................................................................................................ 56

FORWARD-LOOKING STATEMENTS ...................................................................................... 57

MISCELLANEOUS ................................................................................................................ 57


Appendix A        Vail Valley Medical Center Obligated Group ................................................ A-1

Appendix B-1      Holding Company Consolidated Financial Statements as of and for the
                  fiscal years ended October 31, 2014 and 2013 ............................................... B-1

Appendix B-2      Obligated Group Interim Financial Statements as of and for the nine-
                  month periods ended July 31, 2015 and 2014 ................................................. B-2

Appendix C        Form of Bond Counsel Opinion ..................................................................... C-1

Appendix D        Summary of the Financing Documents ......................................................... D-1

Appendix E        Form of Continuing Disclosure Agreement ................................................... E-1

## OFFICIAL STATEMENT

**$100,000,000**
**COLORADO HEALTH FACILITIES AUTHORITY**
**HOSPITAL REVENUE BONDS**
**(VAIL VALLEY MEDICAL CENTER PROJECT)**
**SERIES 2015**

### INTRODUCTORY STATEMENT

THE FOLLOWING INTRODUCTORY STATEMENT IS SUBJECT IN ALL RESPECTS TO MORE COMPLETE INFORMATION CONTAINED IN THIS OFFICIAL STATEMENT. FOR THE DEFINITIONS OF CERTAIN CAPITALIZED TERMS USED IN THIS OFFICIAL STATEMENT AND NOT OTHERWISE DEFINED, SEE APPENDIX D.

The descriptions and summaries of various documents in this Official Statement do not purport to be comprehensive or definitive and reference is made to each document for the complete details of all terms and conditions. Copies of the Loan Agreement, the Bond Indenture, the Master Indenture and the Continuing Disclosure Agreement will be available for inspection at the principal office of the Bond Trustee. All statements herein are qualified in their entirety by reference to each document. The attached Appendices A through E are integral parts of this Official Statement and should be read in their entirety.

**Purpose of Official Statement**

This Official Statement, including the cover page and the Appendices, is furnished in connection with the issuance by the Colorado Health Facilities Authority (the "Authority") of $100,000,000 in aggregate principal amount of its Hospital Revenue Bonds (Vail Valley Medical Center Project) Series 2015 (the "Series 2015 Bonds").

**Members of the Obligated Group**

The Master Trust Indenture dated as of October 1, 2015 (the "Master Indenture") by and among Vail Clinic, Inc., doing business as Vail Valley Medical Center (the "Corporation"), VVMC Diversified Services, doing business as VHS Physician Services  ("Diversified Services"), and UMB Bank, n.a., as master trustee (the "Master Trustee"), establishes an Obligated Group. The Corporation and Diversified Services are the current Members of the Obligated Group. The Corporation is the Obligated Group Representative.

The Corporation owns and operates a 58 bed general acute care community hospital in Vail, Colorado (the "Hospital"), approximately 100 miles west of Denver. The Corporation also owns physician outpatient clinics, offices and treatment facilities in the nearby communities of Avon, Beaver Creek, Eagle, Edwards, Frisco, Gypsum and Silverthorne. Diversified Services provides outpatient services at offices located in the Medical Professional Building, the Hospital, the Edwards Campus and the Frisco Specialty Clinic. Both the Corporation and Diversified Services are wholly-owned subsidiaries of Vail Health Services (the "Holding Company"). Each of the Holding Company, the Corporation and Diversified Services is a Colorado nonprofit corporation exempt from federal income taxes under Section 501(c)(3) of the Code. A further description of the Holding Company, the Corporation and Diversified Services and their operations, facilities and service area is included in Appendix A.

**The Authority**

The Authority is authorized by the Colorado Health Facilities Authority Act, Article 25, Title 25 of the Colorado Revised Statutes, as amended (the "Act"), to issue the Series 2015 Bonds and to loan the proceeds thereof to the Corporation.  See "THE AUTHORITY" herein.

**THE SERIES 2015 BONDS AND INTEREST THEREON ARE SPECIAL, LIMITED OBLIGATIONS OF THE AUTHORITY PAYABLE SOLELY FROM AND SECURED UNDER THE BOND INDENTURE ONLY BY A PLEDGE OF CERTAIN RIGHTS OF THE AUTHORITY (OTHER THAN UNASSIGNED RIGHTS) UNDER AND PURSUANT TO THE LOAN AGREEMENT AND FROM PAYMENTS MADE BY MEMBERS OF THE OBLIGATED GROUP ON OBLIGATION NO. 1 AND FROM MONEYS IN CERTAIN FUNDS DESCRIBED IN THE BOND INDENTURE AND INVESTMENT EARNINGS THEREON.  THE SERIES 2015 BONDS DO NOT CONSTITUTE AN INDEBTEDNESS, A DEBT OR LIABILITY OR A CHARGE AGAINST THE FAITH, CREDIT OR TAXING POWER OF THE STATE OF COLORADO (THE "STATE"), ITS GENERAL ASSEMBLY OR ANY OF ITS POLITICAL SUBDIVISIONS OR AGENCIES OTHER THAN THE AUTHORITY TO THE EXTENT PROVIDED IN THE BOND INDENTURE.  THE AUTHORITY IS NOT AUTHORIZED TO LEVY OR COLLECT ANY TAXES OR ASSESSMENTS TO PAY THE SERIES 2015 BONDS OR FOR ANY OTHER PURPOSE.  THE AUTHORITY MAKES NO REPRESENTATION OR WARRANTY AS TO THE ADEQUACY OR SUFFICIENCY OF THE SECURITY FOR THE SERIES 2015 BONDS.**

**The Bond Indenture and the Loan Agreement**

The Series 2015 Bonds will be issued pursuant to a Bond Indenture of Trust dated as of October 1, 2015 (the "Bond Indenture") between the Authority and UMB Bank, n.a., as bond trustee (the "Bond Trustee").  The proceeds of the Series 2015 Bonds will be loaned by the Authority to the Corporation pursuant to a Loan Agreement dated as of October 1, 2015 (the "Loan Agreement") between the Authority and the Corporation.

**Purpose of the Series 2015 Bonds**

The proceeds of the Series 2015 Bonds will be loaned by the Authority to the Corporation pursuant to the Loan Agreement and used together with other available funds to (i) finance the expansion, construction, renovation, improvement and equipping of the Hospital and the construction of a new emergency helipad building adjacent to the Hospital pursuant to the Corporation's Master Facility Plan and (ii) pay the costs of issuing the Series 2015 Bonds.  See "SOURCES AND USES OF FUNDS" and "PLAN OF FINANCE" herein and "GENERAL—Master Facility Plan" in Appendix A.

**Security and Sources of Payment**

The Series 2015 Bonds and interest thereon are special, limited obligations of the Authority payable solely from and secured under the Bond Indenture only by a pledge of certain rights of the Authority (other than Unassigned Rights) under and pursuant to the Loan Agreement, from payments made by Members of the Obligated Group on Obligation No. 1 ("Obligation No. 1") and from moneys in certain funds described in the Bond Indenture and investment earnings thereon.  Payments under the Loan Agreement are required to be made in amounts sufficient to pay when due the principal of, premium, if any, and interest on the Series 2015 Bonds.  The obligation of the Corporation to make payments under the Loan Agreement will be evidenced and secured by Obligation No. 1, which will be issued by the Corporation as Obligated Group Representative under and pursuant to the terms of the Supplemental

Master Trust Indenture for Obligation No. 1 dated as of October 1, 2015, which supplements the Master Indenture.  See "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2015 BONDS" herein and Appendix D "THE MASTER INDENTURE."

Concurrently with the issuance of Obligation No. 1, the Corporation as Obligated Group Representative will issue Obligation No. 2 ("Obligation No. 2") securing the obligation of the Corporation to make payments with respect to the Authority's Refunding Revenue Note (Vail Valley Medical Center Project), Series 2012 (the "Series 2012 Notes"), presently outstanding in the aggregate principal amount of $15,117,204.  Obligation No. 2 will be issued under and pursuant to the terms of the Supplemental Master Trust Indenture for Obligation No. 2 dated as of October 1, 2015, which supplements the Master Indenture.  The Series 2012 Notes mature on January 15, 2025.

The Master Indenture creates in favor of the Master Trustee an irrevocable first Lien upon Gross Revenues, subject to Permitted Liens, of the Obligated Group to secure all Obligations (including Obligation No. 1 and Obligation No. 2) on a parity basis.  The Obligated Group may incur additional indebtedness, including additional Obligations under the Master Indenture, provided that the Obligated Group meets certain financial tests and other requirements prescribed by the Master Indenture.  See Appendix D "THE MASTER INDENTURE" generally and the subheading "Particular Covenants of the Corporation and Each Member—Limitations on Additional Indebtedness" thereunder and "THE SUPPLEMENTAL MASTER TRUST INDENTURES—Special Covenants."

The Members of the Obligated Group will be jointly and severally liable with respect to payments on all Obligations (including Obligation No. 1 and Obligation No. 2) as provided in the Master Indenture.  The Corporation and Diversified Services are the current Members of the Obligated Group.  Subject to certain conditions specified in the Master Indenture, other entities may become Members of the Obligated Group or, once Members, may withdraw from the Obligated Group.  For a more detailed discussion of entry into or withdrawal from the Obligated Group, see Appendix D "THE MASTER INDENTURE—Parties Becoming Members of the Obligated Group" and "—Withdrawal From Obligated Group."

**Continuing Information Concerning the Corporation**

The Corporation has agreed to supply specified financial information and notice of certain events as required by SEC Rule 15c2-12 under the Securities Exchange Act of 1934, as amended ("Rule 15c2-12").  See "CONTINUING DISCLOSURE UNDERTAKINGS" herein for a description of the Corporation's undertakings with respect to the Series 2015 Bonds.  Failure of the Corporation to provide such information may materially and adversely affect any secondary market trading in the Series 2015 Bonds.  See "BONDHOLDERS' RISKS—Lack of Secondary Market for the Series 2015 Bonds."

**Financial Statements**

Included in Appendix B-1 are the audited consolidated financial statements for the Holding Company as of and for the fiscal years ended October 31, 2014 and 2013, including supplementary consolidating schedules as of and for the fiscal year ended October 31, 2014 ("Holding Company Consolidated Financial Statements"), which financial statements were audited by BKD, LLP, Colorado Springs, Colorado, independent certified public accountants, whose report with respect thereto is also included in Appendix B-1.  Included in Appendix B-2 are the unaudited interim combined financial statements for the Obligated Group as of and for the nine-month periods ended July 31, 2015 and 2014 (the "Obligated Group Interim Financial Statements").  See "FINANCIAL STATEMENTS" herein and "GENERAL—Financial Statements" in Appendix A.

**Bondholders' Risks**

There are risks associated with the purchase of the Series 2015 Bonds. The attention of each prospective purchaser of the Series 2015 Bonds is directed to the discussions appearing in this Official Statement under captions "BONDHOLDERS' RISKS" and "REGULATION OF THE HEALTH CARE INDUSTRY."

**THE SERIES 2015 BONDS**

The following is a summary of certain provisions of the Series 2015 Bonds. Reference is made to the Series 2015 Bonds and to the Bond Indenture for a more detailed description of such provisions. The discussion herein is qualified by such reference. See Appendix D.

The Series 2015 Bonds will be dated the date of their initial delivery, will be issued in the aggregate principal amount and will bear interest and mature, subject to redemption and purchase as described below, on January 15 of the years and in the amounts set forth on the inside cover of this Official Statement. The Series 2015 Bonds will be issued in fully registered form and will initially be registered in the name of Cede & Co., as nominee for DTC, as securities depository for the Series 2015 Bonds (the "Securities Depository"). Purchases by beneficial owners of the Series 2015 Bonds ("beneficial owners") are to be made in book-entry only form in the denominations of $5,000 and integral multiples thereof (provided that no Series 2015 Bond may be issued in a denomination which exceeds the principal coming due on any maturity date and no individual Series 2015 Bond will be issued for more than one maturity). Interest on the Series 2015 Bonds is payable semiannually on January 15 and July 15 of each year (each an "Interest Payment Date"), commencing January 15, 2016. Interest on the Series 2015 Bonds will be computed on the basis of a 360-day year composed of 12 months of 30 days each until payment of principal has been made or provided for, payable on each Interest Payment Date, except that Series 2015 Bonds which are issued upon transfer, exchange or other replacement will bear interest from the most recent Interest Payment Date to which interest has been paid or duly provided for, or if no interest has been paid, from the date of the Series 2015 Bonds.

The principal of, premium, if any, and interest on the Series 2015 Bonds will be payable in any coin or currency of the United States of America which on the respective dates of payment thereof is legal tender for the payment of public and private debts. The principal of and premium, if any, on the Series 2015 Bonds will be payable by check or draft at maturity or upon earlier redemption to the Persons in whose names such Series 2015 Bonds are registered on the bond register maintained by the Bond Trustee at the maturity or redemption date thereof, upon the presentation and surrender of such Series 2015 Bonds at the designated corporate trust office of the Bond Trustee or of any Paying Agent named in the Bond Indenture. If the Series 2015 Bonds are not held by a Securities Depository, interest on the Series 2015 Bonds will be payable by check or draft mailed to the Owners of the Series 2015 Bonds as of the Record Date. With respect to Series 2015 Bonds which are held by a Securities Depository, or at the written request addressed to the Bond Trustee by any Owner of Series 2015 Bonds in the aggregate principal amount of at least $1,000,000, payment of interest will be made by electronic wire transfer in immediately available funds for credit to the account filed with the Bond Trustee no later than five Business Days before a payment date, but no later than the Record Date for the respective interest payment.

Except in the case of overdue interest, the Record Date for interest due on the Series 2015 Bonds will be the 1st day of the calendar month (whether or not a Business Day) immediately preceding each Interest Payment Date. Interest on any Series 2015 Bond that is due and payable but is not paid on the date due will cease to be payable to the Owner of such Series 2015 Bond on the relevant Record Date and will be payable to the Owner in whose name such Series 2015 Bond is registered at the close of business

4

on a Special Record Date for the payment of such overdue interest.  The Corporation is to notify the Bond Trustee in writing of the amount of overdue interest proposed to be paid on each Series 2015 Bond and the date of the proposed payment, upon which the Bond Trustee will  fix the Special Record Date for the payment of such overdue interest in accordance with the terms of the Bond Indenture.  The Bond Trustee will cause notice of the proposed payment of such overdue interest and the Special Record Date therefor to be mailed, first-class postage prepaid, to each Owner of a Series 2015 Bond entitled to such notice at the address of such Owner as it appears on the bond register not less than 10 days prior to such Special Record Date.

## REDEMPTION OF SERIES 2015 BONDS

**Optional Redemption**

Series 2015 Bonds maturing on and after January 15, 2027 are redeemable by the Authority, upon the direction of the Corporation Representative, on any date on or after January 15, 2026, in whole or in part, at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

**Extraordinary Optional Redemption**

The Series 2015 Bonds are subject to extraordinary optional redemption by the Authority, at the written direction of the Corporation Representative, in whole or in part, at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date on any date within one year of the occurrence of any of the following events:

(a)      The Property of the Corporation has been damaged or destroyed to such extent that, in the opinion of the Corporation Representative, (i) normal operations at the Corporation's facilities are prevented or are likely to be prevented for a period of four consecutive months or more, or (ii) the restoration of the Property is not economically feasible.

(b)      Title (including leasehold title, if any) to, or the temporary use of, all or substantially all of the Property of the Corporation has been taken under the exercise of the power of eminent domain by any governmental authority, or person, firm or corporation acting under governmental authority which, in the opinion of the Corporation Representative, is likely to result in normal operations at the Corporation's facilities being prevented for a period of four consecutive months or more.

(c)      As a result of any changes in the State Constitution or the Constitution of the United States of America or as a result of legislation or administrative action (whether state or federal) or by final decree, judgment or order of any court or administrative body (whether state or federal) entered after the contest thereof by the Corporation in good faith, the Loan Agreement has become void or unenforceable or impossible to perform in accordance with the intent and purposes of the parties, or has been declared to be unlawful, or unreasonable burdens or excessive liabilities have been imposed on the Authority or the Corporation, including without limitation federal, state or other ad valorem, property, income or other taxes not being imposed on the date of the Loan Agreement.

**Mandatory Sinking Fund Redemption**

The Series 2015 Bonds maturing on January 15, 2035 and January 15, 2045 are subject to mandatory sinking fund redemption by the Authority at a redemption price equal to 100% of the principal amount thereof plus accrued interest, if any, to the redemption date.

As and for a sinking fund for the redemption of Series 2015 Bonds maturing on January 15, 2035 there will be deposited under the Bond Indenture a sum which is sufficient to redeem (after credit as described below) the following principal amounts of such Series 2015 Bonds:

| January 15 of the Year | Principal Amount |
|---|---|
| 2031 | $3,835,000 |
| 2032 | 4,030,000 |
| 2033 | 4,235,000 |
| 2034 | 4,455,000 |
| 2035[*] | 4,685,000 |

[*]final maturity

As and for a sinking fund for the redemption of Series 2015 Bonds maturing on January 15, 2045 there will be deposited under the Bond Indenture a sum which is sufficient to redeem (after credit as described below) the following principal amounts of such Series 2015 Bonds:

| January 15 of the Year | Principal Amount |
|---|---|
| 2036 | $4,900,000 |
| 2037 | 5,100,000 |
| 2038 | 5,305,000 |
| 2039 | 5,525,000 |
| 2040 | 5,750,000 |
| 2041 | 5,985,000 |
| 2042 | 6,225,000 |
| 2043 | 6,480,000 |
| 2044 | 6,745,000 |
| 2045[*] | 7,020,000 |

[*]final maturity

The Bond Trustee shall, in each year in which Series 2015 Bonds are to be redeemed make timely selection of such Series 2015 Bonds or portions thereof to be so redeemed by lot in Authorized Denominations of principal amount and shall give notice thereof without further instructions from the Authority or the Corporation.

At the option of the Corporation, to be exercised on or before the 45th day next preceding each mandatory redemption date, the Corporation may: (i) deliver to the Bond Trustee for cancellation Series 2015 Bonds in the aggregate principal amount desired; (ii) furnish to the Bond Trustee funds, together with appropriate instructions, for the purpose of purchasing any of said Series 2015 Bonds from any Owner thereof in the open market at a price not in excess of 100% of the principal amount thereof,

whereupon the Bond Trustee is to expend such funds for such purposes to such extent as may be practical; or (iii) elect to receive a credit in respect to the mandatory redemption obligation described under this heading "Mandatory Sinking Fund Redemption" for any Series 2015 Bonds of the same maturity and interest rate which prior to such date have been redeemed (other than through the operation of such mandatory sinking fund redemption) and cancelled by the Bond Trustee and not theretofore applied as a credit against any mandatory sinking fund redemption obligation.  Each Series 2015 Bond so delivered or previously purchased or redeemed will be credited at 100% of the principal amount thereof on the obligation of the Authority to redeem Series 2015 Bonds of the same maturity and interest rate on the next mandatory redemption date applicable to Series 2015 Bonds of such maturity and interest rate that is at least 45 days after receipt by the Bond Trustee of such instructions from the Corporation, and any excess of such amount will be credited on future mandatory redemption obligations for Series 2015 Bonds of the same maturity and interest rate in chronological order or such other order as the Corporation may designate, and the principal amount of Series 2015 Bonds of the same maturity and interest rate to be redeemed on such future mandatory redemption dates by operation of the requirements of the Bond Indenture summarized under this heading will be reduced accordingly.

**Purchase of Series 2015 Bonds in Lieu of Redemption**

The Authority and, by their acceptance of the Series 2015 Bonds, the Owners of the Series 2015 Bonds irrevocably grant to the Corporation and any assigns of the Corporation with respect to this right, the option to purchase, at any time and from time to time, any Series 2015 Bond which is redeemable as described under "—Optional Redemption" above at a purchase price equal to the redemption price therefor.  To exercise such option, the Corporation is to give the Bond Trustee a written request exercising such option within the time period specified in the Bond Indenture as though such written request were a written request of the Authority for redemption, and the Bond Trustee will thereupon give the Owners of the Series 2015 Bonds to be purchased notice of such purchase in the manner specified in the Bond Indenture and summarized under the heading "—Notice of Redemption; Cessation of Interest" below as though such purchase were a redemption and the purchase of such Series 2015 Bonds will be mandatory and enforceable against the Owners of the Series 2015 Bonds.  On the date fixed for purchase pursuant to any exercise of such option, the Corporation is to pay the purchase price of the Series 2015 Bonds then being purchased to the Bond Trustee in immediately available funds, and the Bond Trustee will pay the same to the sellers of such Series 2015 Bonds against delivery thereof.  Following such purchase, the Bond Trustee is to cause such Series 2015 Bonds to be registered in the name of the Corporation or its nominee and is to deliver them to the Corporation or its nominee.  In the case of the purchase of less than all of the Series 2015 Bonds, the particular Series 2015 Bonds to be purchased are to be selected in accordance with the Bond Indenture and summarized under the heading "—Selection of Bonds to be Redeemed" below as though such purchase were a redemption.  No such purchase of the Series 2015 Bonds will operate to extinguish the indebtedness evidenced thereby.  Notwithstanding the foregoing, no such purchase is to be made unless the Corporation has delivered to the Bond Trustee and the Authority concurrently therewith an Opinion of Bond Counsel to the effect that such purchase will not result in the inclusion of interest on the Series 2015 Bonds in gross income for federal income tax purposes.

**Notice of Redemption; Cessation of Interest**

Unless waived by any Owner of Series 2015 Bonds to be redeemed, official notice of any such redemption is to be given by the Bond Trustee on behalf of the Authority by mailing a copy of an official redemption notice by registered, certified or first-class mail at least 30 days and not more than 60 days prior to the redemption date, to each Owner of the Series 2015 Bonds to be redeemed at the address shown on the bond register or at such other address as is furnished in writing by such Owner to the Bond Trustee.  Such notice may state, among other things, that the redemption of the Series 2015 Bonds may be

contingent or subject to such conditions as may be specified in the notice and that the redemption is subject to the deposit of sufficient funds by the Corporation on or prior to the redemption date. The failure of any Owner of Series 2015 Bonds to receive notice given as provided in the Bond Indenture and summarized under this heading, or any defect therein, will not affect the validity of any proceedings for the redemption of any Series 2015 Bonds for which proper notice has been given. Notice of redemption having been given as provided in the Bond Indenture and summarized above, the Series 2015 Bonds called for redemption will, on the redemption date, become due and payable at the redemption price therein specified and from and after such date (unless the Authority defaults in the payment of the redemption price or the notice of redemption is subject to the contingency described in the notice and the contingency has not been fulfilled) such Series 2015 Bonds will cease to bear interest.

**Selection of Bonds to be Redeemed**

Series 2015 Bonds may be redeemed only in Authorized Denominations or any integral multiple thereof. If less than all Series 2015 Bonds are to be redeemed by optional or extraordinary optional redemption, such Series 2015 Bonds will be redeemed from the maturity or maturities and from the interest rate or interest rates selected by the Corporation. If less than all Series 2015 Bonds of any maturity and interest rate are to be redeemed, the particular Series 2015 Bonds to be redeemed are to be selected by the Bond Trustee from the Series 2015 Bonds of such maturity and interest rate which have not previously been called for redemption, by such method as the Bond Trustee deems appropriate, in Authorized Denominations or any integral multiple thereof.

**Redemption Procedures Subject to Procedures of Book-Entry System**

So long as the book-entry system for the Series 2015 Bonds is in effect, the Bond Trustee is to provide all redemption notices described under this caption to DTC, and all procedures relating to redemption notices, selection of Series 2015 Bonds or portions thereof to be redeemed, and other redemption procedures are subject to applicable procedures of the book-entry system described below. Any failure by DTC, any successor Securities Depository, any Participant in a Securities Depository or book-entry system, or any other nominee to provide a redemption notice to the beneficial owner of a Series 2015 Bond will not affect the validity of the redemption of such Series 2015 Bond. See "BOOK-ENTRY SYSTEM."

## BOOK-ENTRY SYSTEM

DTC will initially act as Securities Depository for the Series 2015 Bonds. The Series 2015 Bonds will be issued as fully registered bonds registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2015 Bond will be issued for each maturity of the Series 2015 Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. **SO LONG AS THE SERIES 2015 BONDS ARE HELD BY DTC (OR A SUCCESSOR SECURITIES DEPOSITORY AS DESCRIBED BELOW), REFERENCES IN THE BOND INDENTURE AND IN THIS OFFICIAL STATEMENT TO THE REGISTERED OWNERS, BONDHOLDERS, HOLDERS OR OWNERS OF THE SERIES 2015 BONDS WILL MEAN THE NOMINEE OF SUCH SECURITIES DEPOSITORY AND WILL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2015 BONDS.**

So long as the Series 2015 Bonds are held by DTC, the Authority, the Corporation and the Bond Trustee will treat DTC (or its nominee) as the sole and exclusive Owner of the Series 2015 Bonds registered in its name for purposes of payment of the principal of, premium, if any, and interest on the Series 2015 Bonds, selecting Series 2015 Bonds and portions thereof to be redeemed, giving any notice

permitted or required to be given to registered Owners under the Bond Indenture (including any notice of redemption), registering the transfer of Series 2015 Bonds, obtaining any consent or other action to be taken by registered Owners and for all other purposes whatsoever and will not be affected by any notice to the contrary. **Neither the Authority, the Corporation nor the Bond Trustee will have any responsibility or obligation to any Direct Participant or Indirect Participant (each as defined below) or the persons for whom they act as nominees, nor to any beneficial owner of Series 2015 Bonds or any person having or claiming a beneficial owner's interest in any Series 2015 Bonds under or through DTC or any Direct Participant or Indirect Participant, nor to any other person not shown on the registration records of the Bond Trustee as being a registered Owner of the Series 2015 Bonds, with respect to any of the following: the accuracy of any records maintained by DTC or any Direct Participant or Indirect Participant; the payment by DTC or any Direct or Indirect Participant of any amount in respect of the principal of, premium, if any, or interest on the Series 2015 Bonds; any notice (including any notice of redemption) which is permitted or required to be given under the Bond Indenture; the selection by DTC or any Direct Participant or Indirect Participant of any person to receive payment in the event of a partial redemption or purchase in lieu of optional redemption of the Series 2015 Bonds; or any consent given or other action taken by DTC.**

As long as the DTC book-entry system is used for the Series 2015 Bonds, the Bond Trustee will give any notice of redemption or any other notices required to be given to registered Owners of Series 2015 Bonds only to DTC or its nominee. Any failure of DTC to advise any Direct Participant, of any Direct Participant to notify any Indirect Participant, or of any Direct Participant or Indirect Participant to notify any beneficial owner, of any such notice and its content or effect will not affect the validity of the redemption of the Series 2015 Bonds called for redemption or of any other action premised on such notice. Beneficial owners may desire to make arrangements with a Direct Participant or Indirect Participant so that all notices of redemption or other communications to DTC which affect such beneficial owners will be forwarded in writing by such Direct Participant or Indirect Participant.

The provisions described above are applicable with respect to DTC and with respect to any successor Securities Depository.

DTC may discontinue providing its services as Securities Depository with respect to the Series 2015 Bonds at any time by giving written notice to the Authority or the Bond Trustee. The Corporation or Director Participant and Indirect Participants accounting for not less than a majority of the outstanding principal of the Series 2015 Bonds also have the right under certain circumstances to discontinue use of the system of book-entry transfers through DTC (or a successor Securities Depository). In the event the book-entry system through DTC (or a successor Securities Depository) is discontinued, the Corporation, with the consent of the Bond Trustee, may designate another qualified Securities Depository or, if no qualified substitute Securities Depository can be found, the Bond Trustee will cause Series 2015 Bond certificates to be prepared and delivered to beneficial owners.

The following information about the book-entry only system applicable to the Series 2015 Bonds has been supplied by DTC. None of the Authority, the Corporation, the Bond Trustee or the Underwriter takes any responsibility for the accuracy or completeness thereof nor makes any representations, warranties or guarantees with respect thereto.

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934. DTC holds and provides asset servicing for securities that DTC's participants

("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a Standard & Poor's rating of AA+. The DTC Rules applicable to its Direct Participants and Indirect Participants are on file with the SEC. More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of Series 2015 Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2015 Bonds on DTC's records. The ownership interest of each beneficial owners is in turn to be recorded on the Direct Participant and Indirect Participants' records. Beneficial owners will not receive written confirmation from DTC of their purchase. Beneficial owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct Participant or Indirect Participant through which the beneficial owners entered into the transaction. Transfers of ownership interests in the Series 2015 Bonds are to be accomplished by entries made on the books of Direct Participant and Indirect Participants acting on behalf of beneficial owners. Beneficial owners will not receive certificates representing their ownership interests in Series 2015 Bonds, except as specifically provided in the Bond Indenture in the event that use of the book-entry system for the Series 2015 Bonds is discontinued.

To facilitate subsequent transfers, all Series 2015 Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Series 2015 Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual beneficial owners of the Series 2015 Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2015 Bonds are credited, which may or may not be the beneficial owners. The Direct Participant and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to beneficial owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial owners of Series 2015 Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2015 Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2015 Bond documents. For example, beneficial owners of Series 2015 Bonds may wish to ascertain that the nominee holding the Series 2015 Bonds for their benefit has agreed to obtain and transmit notices to beneficial owners.

Redemption notices shall be sent to DTC. If less than all of the Series 2015 Bonds of a single maturity are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such maturity to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to the Series 2015 Bonds unless authorized by a Direct Participant in accordance with DTC's procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts securities are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Payments on the Series 2015 Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Bond Trustee on payable date in accordance with their respective holdings shown on DTC's records. Payments by Direct Participants and Indirect Participants to beneficial owners of the Series 2015 Bonds will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Direct Participants and Indirect Participants and not of DTC (nor its nominee), the Bond Trustee, the Corporation or the Authority, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Bond Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the beneficial owners will be the responsibility of Direct Participant and Indirect Participants.

## SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2015 BONDS

**General**

The Series 2015 Bonds and the interest thereon are special, limited obligations of the Authority payable solely from and secured under the Bond Indenture only by a pledge of certain rights of the Authority (other than Unassigned Rights) under and pursuant to the Loan Agreement, from payments made by Members of the Obligated Group on Obligation No. 1 and from moneys in certain funds described in the Bond Indenture and investment earnings thereon. Payments under the Loan Agreement are required to be made in amounts sufficient to pay when due the principal of, premium, if any, and interest on the Series 2015 Bonds. *No reserve fund is being established for the Series 2015 Bonds and Obligation No. 1 under the Bond Indenture and the Master Indenture, respectively, and none of the Series 2015 Bonds and Obligation No. 1 are secured by any reserve fund.* The Authority has assigned its right, title and interest in the Loan Agreement (except for the Unassigned Rights consisting of the Authority's rights to indemnity, to payment of its fees and expenses, to receive notices and other documents and to perform certain discretionary acts) and Obligation No. 1 to the Bond Trustee. The obligation of the Corporation to make payments under the Loan Agreement will be evidenced and secured by Obligation No. 1, which will be issued by the Corporation as Obligated Group Representative under and pursuant to the terms of the Supplemental Master Trust Indenture for Obligation No. 1 dated as of October 1, 2015, which supplements the Master Indenture.

**The Series 2015 Bonds do not constitute an indebtedness, a debt or liability or a charge against the faith, credit or taxing power of the State, its General Assembly or any of its political subdivisions or agencies other than the Authority to the extent provided in the Bond Indenture. The Authority is not authorized to levy or collect any taxes or assessments to pay the Series 2015 Bonds or for any other purpose. The Authority makes no representation or warranty as to the adequacy or sufficiency of the security for the Series 2015 Bonds.**

The Act provides that the State pledges to, and agrees with, the holders of any obligations issued under the Act that it will not limit or alter the rights vested in the Authority by the Act until such

11

obligations, together with the interest thereon, are fully met and discharged, provided nothing in the Act precludes such limitation or alteration if and when adequate provision shall be made by law for the protection of the holders of such obligations.

**State of Colorado Not Liable on the Series 2015 Bonds**

The Series 2015 Bonds and the interest thereon do not constitute an indebtedness, a debt or a liability or a general charge against the credit or taxing power of the State, the General Assembly of the State, or of any county, city, city and county, town, school district or other subdivision of the State, or of any other political subdivision or body corporate and politic within the State other than the Authority (but only to the extent provided in the Bond Indenture) and neither the State, the General Assembly of the State, nor any county, city, city and county, town, school district or other subdivision of the State, except the Authority to the extent provided above, shall be liable thereon; nor do the Series 2015 Bonds constitute the giving, pledging or loaning of the faith and credit of the State, the General Assembly of the State, or any county, city, city and county, town, school district or other subdivision of the State or of any other political subdivision or body corporate and politic within the State but are payable solely from the funds provided therefor in the Bond Indenture.  The issuance of the Series 2015 Bonds does not, directly or indirectly or contingently, obligate the State or any subdivision of the State nor empower the Authority to levy or collect any form of taxes or assessments therefor or to create any indebtedness payable out of taxes or assessments or make any appropriation for their payment, and such appropriation or levy is prohibited.  Nothing in the Act shall be construed to authorize the Authority to create a debt of the State, within the meaning of the Constitution or statutes of the State or authorize the Authority to levy or collect taxes or assessments.  Neither the members of the Authority nor any person executing the Series 2015 Bonds shall be liable personally on the Series 2015 Bonds or be subject to any personal liability or accountability by reason of the issuance thereof.  The State shall not in any event be liable for the payment of the principal of, premium, if any, or interest on the Series 2015 Bonds or for the performance of any pledge, mortgage, obligation or agreement of any kind whatsoever by the Authority.  No breach of any such pledge, mortgage, obligation or agreement shall impose any pecuniary liability upon the State or any charge upon its general credit or against its taxing power.

**The Master Indenture**

*Joint and Several Obligations.*  Under the Master Indenture, the Obligated Group is authorized to issue or incur, pursuant to a Related Supplement, for itself and on behalf of the other Members of the Obligated Group, Obligations to evidence or secure Indebtedness.  All Members of the Obligated Group are jointly and severally liable with respect to the payments on Obligations as provided in the Master Indenture.  All Members of the Obligated Group are required to make payments on Obligation No. 1 in amounts sufficient to pay when due the principal of and premium, if any, and interest on the Series 2015 Bonds.  Obligation No. 1 and Obligation No. 2, together with any future Obligations, are secured on a parity basis under the Master Indenture by a pledge of Gross Revenues, subject in all cases to Permitted Liens.  See "—Pledge of Gross Revenues" below.

The Corporation and Diversified Services are the only current Members of the Obligated Group.  Subject to certain conditions specified in the Master Indenture, other entities may become Members of the Obligated Group or, once Members, may withdraw from the Obligated Group.  For a more detailed discussion of entry into or withdrawal from the Obligated Group, see Appendix D "THE MASTER INDENTURE—Parties Becoming Members of the Obligated Group" and "—Withdrawal From Obligated Group."

*Unsecured Debt.*  Except for the pledge of Gross Revenues described below (see "—Pledge of Gross Revenues"), Obligations issued under the Master Indenture are not secured by a lien on real or

personal property of the Members of the Obligated Group and cannot under the terms of the Master Indenture be secured by a mortgage on real or personal property unless such mortgage constitutes a Permitted Lien.

*Pledge of Gross Revenues.*  The Master Indenture creates in favor of the Master Trustee an irrevocable first Lien upon Gross Revenues, subject to Permitted Liens, of the Obligated Group to secure all Obligations on a parity basis.  "Gross Revenues" means all revenues, income, receipts and money received by or on behalf of the Members of the Obligated Group from all sources, excluding Excluded Property but including the following:

      (a)    gross revenues derived from the operation and possession of each Member's facilities;

      (b)    gifts, grants, bequests, donations and contributions of each Member, but excluding (i) any gifts, grants, bequests, donations, and contributions to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Obligations and (ii) funds of a Member of the Obligated Group derived therefrom which due to donor restrictions cannot legally be used to pay Obligations;

      (c)    proceeds derived from (i) condemnation proceeds, (ii) accounts receivable, (iii) securities and other investments, (iv) inventory and other tangible and intangible property, (v) medical reimbursement programs and agreements, (vi) insurance proceeds and (vii) contract rights and other rights and assets now or hereafter owned by each Member;

      (d)    Financial Products Payments or Financial Products Receipts;

      (e)    rentals received from the lease of office space; and

      (f)    amounts received from Designated Affiliates.

The pledge and security interest in the Gross Revenues is subject to certain limitations as to effectiveness and enforceability.  See "BONDHOLDERS' RISKS—Enforceability of Remedies, Bankruptcy, Limitations on Security Interests and Other Matters Relating to Security for the Series 2015 Bonds" below.  The security interest in the Gross Revenues may be perfected only in the rights to receive certain accounts receivable, but is prior to any other security interest (other than Permitted Liens).  Unless an event of default under the Master Indenture has occurred and is continuing, the Master Indenture does not limit the ability of the Members of the Obligated Group to apply Gross Revenues as received to pay operation and maintenance expenses or for any other lawful purpose.  In addition, accounts receivable of the Obligated Group which constitute Gross Revenues and are pledged as security under the Master Indenture may be sold if such sale is in accordance with the provisions of the Master Indenture.  Any lien in favor of the Master Trustee created under the Master Indenture on such accounts receivable would terminate and be immediately released upon any such sale with respect to any such accounts receivable so sold.  See "BONDHOLDERS' RISKS—Enforceability of Remedies, Bankruptcy, Limitations on Security Interests and Other Matters Relating to Security for the Series 2015 Bonds" below and "THE MASTER INDENTURE—Permitted Liens" and "—Limitations on Creation of Liens" in Appendix D.

Each Member of the Obligated Group agrees to perfect the grant of its security interest in the Gross Revenues to the extent, and only to the extent, that such security interest may be perfected by filing under the Uniform Commercial Code of the State of Colorado (the "UCC").  The Members are, therefore, not required to enter into any deposit account control agreements, which are required to perfect security interests in money and investments on deposit in deposit accounts under the UCC.  The security interest

of the Master Trustee may not be effective against third parties with perfected security interests. Even if perfected, the grant of a security interest in Gross Revenues may be subordinate to the interests and claims of others in several instances. Some examples of cases of subordination of prior interest and claims are (i) statutory liens, (ii) rights arising in favor of the United States of America or any agency thereof, (iii) present or future prohibitions against assignment, including collateral imposed or conferred by any state or federal court in the exercise of its equitable jurisdiction, (v) federal or state bankruptcy laws that may affect the enforceability of the Master Indenture or grant a security interest in Gross Revenues and (vi) liens on investments and investment accounts constituting Gross Revenues in favor of secured parties who have entered into control agreements with respect to such investments and investment accounts.

*Covenant Against Liens; Transfer of Assets.* Pursuant to the Master Indenture, each Member of the Obligated Group agrees that it will not create, assume or suffer to exist any Lien upon the Property of the Obligated Group; provided, however, that notwithstanding the foregoing provision, each Member may create, assume or suffer to exist Permitted Liens under the conditions set forth in the Master Indenture. The Master Indenture also contains restrictions on the ability of the Members of the Obligated Group to sell, lease, transfer or otherwise dispose of their respective assets. See "THE MASTER INDENTURE—Limitations on Creation of Liens" and "—Sale, Lease or Other Disposition of Property" in Appendix D.

*Additional Indebtedness.* The Obligated Group may incur Additional Indebtedness (including additional Obligations under the Master Indenture), provided that the Obligated Group meets certain financial tests and other requirements prescribed by the Master Indenture. See Appendix D "THE MASTER INDENTURE—Limitations on Indebtedness." Additional Obligations may be secured under the Master Indenture on a parity with Obligation No. 1, Obligation No. 2 and any other then outstanding Obligations with respect to the Gross Revenues.

## SOURCES AND USES OF FUNDS

The estimated sources and uses of funds in connection with the issuance of the Series 2015 Bonds are as follows:

Sources of Funds

| | |
|---|---|
| Principal amount of Series 2015 Bonds | $100,000,000.00 |
| Net Premium | 4,038,242.70 |
| Foundation capital campaign and cash reserves | 75,961,757.30 |
| Total | $180,000,000.00 |

Uses of Funds

| | |
|---|---|
| Costs of Implementation of Master Facility Plan | $179,078,758.79 |
| Bond issuance expenses including underwriting discount | 921,241.21 |
| Total | $180,000,000.00 |

## PLAN OF FINANCE

**The Series 2015 Bonds**

The proceeds of the Series 2015 Bonds will be loaned by the Authority to the Corporation pursuant to the Loan Agreement and used together with other available funds to (i) finance the expansion, construction, renovation, improvement and equipping of the Hospital and the construction of a new emergency helipad building adjacent to the Hospital, all in accordance with the Corporation's Master Facility Plan and (ii) pay the costs of issuing the Series 2015 Bonds. The Master Facility Plan will be implemented in two primary phases at an estimated cost of $180 million. See "SOURCES AND USES OF FUNDS" herein and "GENERAL—Master Facility Plan" in Appendix A for additional information. The Vail Health Services Foundation (the "Foundation"), is undertaking a five year capital campaign with a goal of $75 million for the costs of implementing the Master Facility Plan, with the remainder of the costs to be paid out of available reserves. To date, the Foundation has received $24 million in pledges.

**DEBT SERVICE SCHEDULE**

The following table sets forth, for each fiscal year ending October 31, the debt service requirements for the Series 2015 Bonds and other Outstanding Indebtedness.

| Fiscal Year Ending October 31 | Series 2015 Bonds Principal | Interest | Total | Other Outstanding Indebtedness[1] | Total Debt Service |
|---|---|---|---|---|---|
| 2015 | $         - | $         - | $         - | $ 1,458,508 | $ 1,458,508 |
| 2016 | - | 3,176,342 | 3,176,342 | 667,822 | 3,844,164 |
| 2017 | - | 4,331,375 | 4,331,375 | 667,822 | 4,999,197 |
| 2018 | - | 4,331,375 | 4,331,375 | 1,057,804 | 5,389,179 |
| 2019 | - | 4,331,375 | 4,331,375 | 2,296,871 | 6,628,246 |
| 2020 | - | 4,331,375 | 4,331,375 | 2,299,645 | 6,631,020 |
| 2021 | 540,000 | 4,323,275 | 4,863,275 | 2,300,966 | 7,164,241 |
| 2022 | 620,000 | 4,302,775 | 4,922,775 | 2,241,276 | 7,164,051 |
| 2023 | 580,000 | 4,275,875 | 4,855,875 | 2,303,253 | 7,159,128 |
| 2024 | 610,000 | 4,246,125 | 4,856,125 | 2,306,340 | 7,162,465 |
| 2025 | 615,000 | 4,218,575 | 4,833,575 | 2,325,633 | 7,159,208 |
| 2026 | 3,030,000 | 4,130,525 | 7,160,525 | - | 7,160,525 |
| 2027 | 3,185,000 | 3,975,150 | 7,160,150 | - | 7,160,150 |
| 2028 | 3,350,000 | 3,811,775 | 7,161,775 | - | 7,161,775 |
| 2029 | 3,520,000 | 3,640,025 | 7,160,025 | - | 7,160,025 |
| 2030 | 3,675,000 | 3,487,712 | 7,162,712 | - | 7,162,712 |
| 2031 | 3,835,000 | 3,327,525 | 7,162,525 | - | 7,162,525 |
| 2032 | 4,030,000 | 3,130,900 | 7,160,900 | - | 7,160,900 |
| 2033 | 4,235,000 | 2,924,275 | 7,159,275 | - | 7,159,275 |
| 2034 | 4,455,000 | 2,707,025 | 7,162,025 | - | 7,162,025 |
| 2035 | 4,685,000 | 2,478,525 | 7,163,525 | - | 7,163,525 |
| 2036 | 4,900,000 | 2,263,400 | 7,163,400 | - | 7,163,400 |
| 2037 | 5,100,000 | 2,063,400 | 7,163,400 | - | 7,163,400 |
| 2038 | 5,305,000 | 1,855,300 | 7,160,300 | - | 7,160,300 |
| 2039 | 5,525,000 | 1,638,700 | 7,163,700 | - | 7,163,700 |
| 2040 | 5,750,000 | 1,413,200 | 7,163,200 | - | 7,163,200 |
| 2041 | 5,985,000 | 1,178,500 | 7,163,500 | - | 7,163,500 |
| 2042 | 6,225,000 | 934,300 | 7,159,300 | - | 7,159,300 |
| 2043 | 6,480,000 | 680,200 | 7,160,200 | - | 7,160,200 |
| 2044 | 6,745,000 | 415,700 | 7,160,700 | - | 7,160,700 |
| 2045 | 7,020,000 | 140,400 | 7,160,400 | - | 7,160,400 |
| | $100,000,000 | $88,065,004 | $188,065,004 | $ 19,925,940 | $207,990,944 |

[1]   Represents debt service Series 2012 Notes, other notes payable and capital lease obligations and reflects the redemption of all outstanding Series 2004 Bonds on September 23, 2015.

# BONDHOLDERS' RISKS

The purchase and ownership of the Series 2015 Bonds involve investment risks that are discussed throughout this Official Statement.  Additionally, this "BONDHOLDERS' RISKS" section highlights certain general risks associated with hospital or health system operations as well as certain risks that are more specific to the individual Members of the Obligated Group, and should be read together with the section "REGULATION OF THE HEALTH CARE INDUSTRY" and with Appendix A, which includes detailed information concerning the Obligated Group.  The discussion under this "BONDHOLDERS' RISKS" section and the section "REGULATION OF THE HEALTH CARE INDUSTRY" is not, and is not intended to be, exhaustive, nor is the order of the discussion intended to reflect the relative importance of the risks described.  Prospective purchasers of the Series 2015 Bonds should make an independent evaluation of all the information presented in this Official Statement.

## General

The Series 2015 Bonds and interest thereon are special, limited obligations of the Authority payable solely from and secured under the Bond Indenture only by a pledge of certain rights of the Authority (other than Unassigned Rights) under and pursuant to the Loan Agreement, from payments made by Members of the Obligated Group on Obligation No. 1 and from moneys in certain funds described in the Bond Indenture and investment earnings thereon.  **No representation or assurance can be made that revenues will be realized by the Members of the Obligated Group in amounts necessary to make payments due under the Loan Agreement and on Obligation No. 1 or otherwise be sufficient to pay maturing principal of and interest on the Series 2015 Bonds.**

Federal health care reform legislation has changed and will continue to change many aspects of the operations and finances of health care providers, including the Members of the Obligated Group, and many of those changes are not yet fully understood and will be influenced by future legislative, regulatory and judicial action and interpretation.  See "—Legislative and Regulatory Changes; Health Care Reform" under this caption as well as the caption "REGULATION OF THE HEALTH CARE INDUSTRY."  A significant portion of the Obligated Group's revenue is derived from Medicare, Medicaid and other third-party payors.  The Members of the Obligated Group are subject to various regulatory requirements of federal, state and local government agencies and are affected by the policies, practices and standards of independent professional organizations, accrediting bodies and third-party reimbursement programs.  In addition, other conditions in the health care industry may affect the operations and economic viability of the Members of the Obligated Group.  Such conditions may include, among other things: difficulties in maintaining, increasing and collecting fees and charges; difficulties in maintaining an appropriate amount and quality of health services; recent and future changes in federal and state laws and regulations affecting payment for health services; changes in other third-party payment policies; the continued increase in managed care, including contracted insurance, and aggressive contracting by such payors; competition from other health care providers; technological advances and other changes in treatment modes; changes in demand for health services; and changes in the population or economic condition of the Obligated Group's service area.

The ability of the Members of the Obligated Group to generate sufficient revenue for payment of debt service on indebtedness (including Obligation No. 1 and the Series 2015 Bonds) is subject to, among other things:  utilization of inpatient and outpatient services; the capabilities of management of the Corporation; the confidence of physicians in management; the availability of physicians and trained support staff; the level of and restrictions on federal funding of Medicare, federal and state funding of Medicaid and other programs; imposition of government wage and price controls or other limits on expenses or revenue; government regulations and licensing requirements; inability to control expenses in

17

a period of inflation; and other future conditions and events that are unpredictable and cannot be quantified or determined at this time.

**Economic Conditions**

The economic recession that began in 2008 has had, and may continue to have, negative repercussions on the health care industry generally, including by  increasing pressure on the federal and state governments to control funding for Medicare and Medicaid (a significant source of the Obligated Group's revenue) and increasing pressure on payors generally (including the federal government with respect to Medicare and the federal and state governments with respect to Medicaid) to limit reimbursement rates and reduce utilization, particularly inpatient utilization.  Periodic market declines have adversely affected many hospitals with respect to their investment portfolios, including unrealized investment portfolio losses and reduced investment income.  See "INVESTMENTS" in Appendix A for a description of the Obligated Group's investment results for the past three fiscal years.  Market declines could also limit the Obligated Group's access to the credit markets and increase the Obligated Group's borrowing costs.

**Legislative and Regulatory Changes; Health Care Reform**

Over the past few years, health care reform at both the federal and state levels has been identified as a priority by political leaders and candidates, business leaders and public advocates.  In March 2010, federal health care reform efforts culminated in the enactment of H.R. 3590, the Patient Protection and Affordable Care Act, amended by H.R. 4872, the Health Care and Education Reconciliation Act of 2010 (collectively, the "Affordable Care Act").  The Affordable Care Act is designed to overhaul the U.S. health care system and regulate many aspects of and players in the health care arena, including individuals, employers and health insurers.  This legislation addresses almost all aspects of health care payment and delivery, and has and will continue to change how health care services are covered, delivered and reimbursed.  These changes may result in new payment models with risk of lower reimbursement from Medicare, utilization changes, increased government enforcement, and the necessity for health care providers to assess, and potentially alter, business strategies and practices.  Requirements for state health insurance exchanges to facilitate the purchase of health insurance could fundamentally alter the health insurance market and negatively impact health plans and providers by taking on a rate-setting role, thus potentially affecting the Obligated Group's revenue.  Federal deficit reduction efforts will likely curb federal Medicare and Medicaid spending further to the detriment of hospitals, physicians and other health care providers.

There have been many cases challenging various parts of the Affordable Care Act, including two U.S. Supreme Court cases:  (1) On June 28, 2012, the Supreme Court reviewed two provisions of the Affordable Care Act: the requirement that individuals maintain health insurance coverage, and Medicaid expansion.  The Supreme Court upheld the individual mandate to purchase insurance, but also ruled that the federal government could not compel states to comply with the Affordable Care Act's requirement to expand Medicaid by eliminating all federal funds a state receives for its existing Medicaid program.  (2) On June 25, 2015, the Supreme Court ruled to uphold the use of federal subsidies in federal insurance exchanges.  In addition to being challenged in lawsuits, certain political leaders have announced their intention to proceed with legislation to repeal or amend provisions of the Affordable Care Act.  At this time, it is not possible to predict the outcome of the many pending cases challenging various provisions of the Affordable Care Act, the legislative attempts to repeal or amend the Affordable Care Act, or other potential legislative efforts.

Some provisions of the Affordable Care Act took effect immediately, while others will be phased in over time, ranging from a few months following final approval to ten years.  Among other measures

18

aimed at expanding health insurance coverage, prohibitions against insurers denying coverage or imposing coverage exclusions on children with pre-existing conditions, provisions permitting young adults to obtain coverage under their parents' plans, and new restrictions on insurance policy coverage limits became effective in 2010.  In 2014, broad insurance coverage mandates became effective and health insurance exchanges became operational.  Health insurance providers participating in the health insurance exchanges are subject to regulation of benefit packages and review of premiums.  Purchasers of insurance on these exchanges meeting certain income limitations are eligible for tax credits.  Employer mandates and insurance requirements (including general prohibitions on pre-existing conditions exclusions and coverage limits) were originally set to begin in 2014, but were delayed until 2015.  Additionally, although Medicaid eligibility and services were to be expanded in 2014 and the federal government was to provide additional Medicaid funding, the Supreme Court ruled that states were not required to expand their Medicaid programs.  Thus, some states have expanded Medicaid (including Colorado), and others have not.

The Affordable Care Act also contains provisions aimed at reducing Medicare and Medicaid reimbursements to providers.  The Affordable Care Act aims to reduce projected growth of the Medicare program, including reducing Medicare Advantage payments and tying provider payments more closely to efficiency and quality outcomes.  See "REGULATION OF THE HEALTH CARE INDUSTRY— Medicare Reimbursement—Part A Reimbursement of Inpatient Services."  The Affordable Care Act also provides for new methods and increased resources to combat waste, fraud and abuse, as well as demonstration programs relating to alternative approaches for medical malpractice disputes.  Increased compliance and regulatory requirements, disclosure and transparency obligations, quality of care expectations and extraordinary enforcement provisions that could greatly increase potential legal exposure are all aspects of the Affordable Care Act that may increase operating expenses of the Obligated Group.

With expanded health insurance coverage under the Affordable Care Act, the Obligated Group expects to benefit from reduced charity care write-offs and bad debt expenses.  The Obligated Group may also benefit from the expansion of the Medicaid program and increased Medicaid reimbursement for services provided by employed physicians.  On the other hand, the Affordable Care Act may result in lower Medicare reimbursements and reduced Medicare and Medicaid disproportionate share hospital ("DSH") funding, and new reimbursement methodologies are expected to increase pressures for greater operational efficiency.  See "REGULATION OF THE HEALTH CARE INDUSTRY."  Also, since commercial and managed care insurers are expected to experience increased regulation and fees, negotiations with those insurers may become more difficult.  New excise taxes on medical equipment could result in increased costs to health care providers.

The Affordable Care Act contains many features from previous tax exemption reform proposals, including a set of sweeping changes applicable to hospitals exempt under Section 501(c)(3) of the Code. The Affordable Care Act: (a) imposes new eligibility requirements for 501(c)(3) hospitals, coupled with an excise tax for failures to meet certain of those requirements; (b) requires mandatory IRS review of the hospitals' entitlement to exemption; (c) sets forth new reporting requirements, including information related to community health needs assessments and audited financial statements; and (d) imposes further reporting requirements on the Secretary of the U.S. Department of the Treasury ("Treasury") regarding charity care levels, bad debt expenses, unreimbursed costs for services, and costs incurred for community benefit.  The Affordable Care Act does not, however, mandate specific levels of charity care for tax-exempt hospitals despite efforts to propose such a requirement.  See "—Internal Revenue Service Policy Regarding Maintenance of 501(c)(3) Tax Exemption" below under this caption for additional information.

Some regulations implementing provisions of the Affordable Care Act have not yet been promulgated or finalized, and as a result it is not possible to predict how the Members of the Obligated Group will be affected by all aspects of the Affordable Care Act.

Many states have also enacted or are considering health care reform measures. Both as a part of recent reform efforts and throughout the preceding decades, numerous legislative proposals have been introduced or proposed in the Colorado legislature (as well as the United States Congress) aimed at effecting major changes in health care policy and systems. The purpose of much of the statutory and regulatory activity has been to control health care costs, particularly costs paid under the Medicaid program. At present, a small portion of the Obligated Group's revenue is derived from the Medicaid program. See "REGULATION OF THE HEALTH CARE INDUSTRY—Medicaid Reimbursement."

It is not known which additional proposals may be proposed or adopted or, if adopted, what effect such proposals would have on the Obligated Group's operations or revenue. However, the recent increase in focus and interest on federal and state health care reform may increase the likelihood of further significant changes affecting the health care industry in the near future. There can be no assurance that recently enacted, currently proposed or future health care legislation, regulation or other changes in the administration or interpretation of governmental health care programs will not have an adverse effect on the Members of the Obligated Group. Reductions in funding levels of the Medicare program, changes in payment methods under the Medicare and Medicaid programs, reductions in state funding, or other legislative or regulatory changes could materially reduce the Obligated Group's revenue. See "REGULATION OF THE HEALTH CARE INDUSTRY" herein and "SOURCES OF REVENUE" in Appendix A.

**Third-Party Reimbursement**

Apart from reimbursement by the federal government under Medicare and the federal and state governments under Medicaid (including Medicaid health maintenance organizations), the state under its indigent care program, and the state government under workers' compensation fee schedules, a substantial portion of the Obligated Group's revenue is provided by private third-party payors (such as health maintenance organizations ("HMOs"), preferred provider organizations ("PPOs") and other commercial insurers. Generally, reimbursement received from large national HMOs and PPOs and commercial insurance companies that have specific contracts with the Obligated Group is lower than reimbursement received from smaller networks and commercial insurance companies which do not have contracts with the Obligated Group. Future contract negotiations between such third-party payors and the Obligated Group, and other efforts of these third-party payors and of employers to limit hospitalization and health-care costs, could adversely affect the level of utilization of the Obligated Group's services, or reimbursement to the Obligated Group, or both. In addition, it is possible that competitive pricing of plan premiums could cause an HMO or PPO or insurance carrier to operate at a loss and expose the Obligated Group to delays in payment or nonpayment of claims for services to plan participants or insured patients.

Changes in sources of revenue and case mix intensity may also adversely affect the Obligated Group's revenue. For example, if patients formerly covered by commercial insurance programs that pay full hospital and physician charges shift to high deductible health plans, health savings accounts ("HSAs"), HMOs, PPOs or other third-party payors such as contracted insurance that pay lower negotiated rates, the adjustments to determine net patient service revenue would increase, which (absent an offsetting decrease in operating expenses) would result in a decrease in operating income. In addition, if the average severity of illness or condition of patients covered by a capitated plan or contracted insurance with per diem charges or charges based on diagnosis were to increase after execution of the related plan contract, operating expenses could increase without an offsetting increase in operating

revenue.  The Obligated Group is not presently subject to capitation in any of its contracts with managed care plans.  Approximately 65% of the Obligated Group's gross patient service revenue for the fiscal year ended October 31, 2014 was derived from patients in managed care plans (other than Medicare and Medicaid managed care plans), including contracted insurance.  See "UTILIZATION" and "SOURCES OF REVENUE" in Appendix A.

It is expected that the provisions of the Affordable Care Act will cause major changes for third-party payors, but considerable uncertainty remains as to their impact.

**Growth of Alternative Delivery Systems**

In recent years, for various reasons, including changes in methods of payments for health care services, hospitals generally have experienced reductions or only small increases in the average length of stay for patients and a decline (or a relative decline compared to service area population growth) in hospital admissions.  Medicare, Medicaid and other purchasers of health care services continue to review their benefit plans in order to create incentives for cost containment.  Increases in deductibles and co-payments and increased offerings of HSAs for employer-provided insurance result in increased delays and difficulties in collecting hospital reimbursement.  Traditional health insurance programs, which pay for services on a fee-for-service basis, are giving way to health insurance programs being offered with economic incentives for employees and employers.  Certain private insurance companies contract with some hospitals on an "exclusive" or a "preferred" provider basis, and some insurers have introduced PPOs.  Under an exclusive provider plan, which includes most HMOs, private payors limit coverage to those services provided by selected hospitals.  With this contracting authority, private payors direct patients away from nonselected hospitals by denying coverage for services provided by them.

Increased sensitivity to the cost of health care has led to substantial growth among HMOs, PPOs and other alternative delivery systems.  The growth of alternative delivery systems can have negative impacts on hospitals in several ways.  A hospital generally will not be able to serve the patients of alternative delivery systems with which it does not contract, and a hospital is generally required to substantially reduce its charges to obtain a contract to serve alternative delivery system patients.  Also, the alternative delivery systems market is becoming increasingly competitive, and some of the alternative delivery systems may not survive.  A hospital that has a contract with an alternative delivery provider in poor financial condition may be responsible for providing care even though the alternative delivery system is unable to pay the hospital for the services.  Health care cost sensitivity has also caused more employers to provide all or part of their employee health insurance benefits through self-insurance mechanisms, and self-insured employers are increasingly using aggressive tactics and third-party administrators to shop for discounts.  Not all state laws, such as timely payment regulations, apply to the self-insured market, and self-insured employers are not always as financially stable as larger, state-regulated health plans.

Most PPOs, HMOs and contracted insurance providers generally pay hospitals on a discounted fee-for-service basis, or on a case rate or a fixed rate per day of care.  Discounts may result in payment at less than actual cost and the volume of patients directed to a hospital under an HMO or PPO contract or under a contracted insurance arrangement may vary significantly from projections.  Some HMOs are now offering or mandating a "capitation" payment method under which hospitals are paid a predetermined periodic rate for each enrollee in the HMO who is "assigned" to or otherwise directed to receive care at a particular hospital.  In a capitated payment system, the hospital assumes a financial risk for the cost and scope of care given to such HMO enrollees for the term of the contract.  The growth of PPOs, HMOs and alternative delivery systems may require the Obligated Group to substantially reduce its charges to service members of such plans, and any such reduction in charges could materially adversely affect the Obligated Group's revenues.

Pursuant to the Affordable Care Act, the Centers for Medicare and Medicaid Services ("CMS") within the United States Department of Health and Human Services ("HHS") is implementing voluntary pilot programs to gain experience with new models of health care delivery and payments. The Accountable Care Organization ("ACO") pilot program is intended to create shared savings incentives for Medicare providers to coordinate patient care across a range of settings. The program also emphasizes evidenced-based medicine protocols, patient engagement and reporting of quality measures. The "payment bundling" pilot program provides for the sharing of savings resulting from setting a single "bundled" Medicare payment for an "episode of care," in order to align incentives for providers across care settings. The Members of the Obligated Group did not participate in either of these pilot programs and is not aware of any participation by other providers in its service area. However, experiences under these pilot programs may be relevant to providers generally, since those experiences may affect the future course of more broadly applicable changes in health care delivery and payment mechanisms.

Failure to maintain contracts under alternative delivery systems could have the effect of reducing the market share and patient services revenues of the Obligated Group. Conversely, participation may result in lower net income if the Obligated Group is unable to adequately contain its costs.

Future contract negotiations between third-party payors within alternative delivery systems and the Obligated Group, and other efforts of these third-party payors and of employers to limit health care costs could adversely affect the level of utilization of the Obligated Group's services, or reimbursement to the Obligated Group, or both. In addition, it is possible that competitive pricing of plan premiums could cause an alternative delivery system to operate at a loss and expose the Obligated Group to delays in payment or nonpayment of claims for services to plan participants.

**Risks Associated with the Provision of Uncompensated Care**

Although the Obligated Group has and will continue to maximize payment or reimbursement for the care it provides, the Obligated Group recognizes its obligation to provide uncompensated care to the medically indigent. For the fiscal year ended October 31, 2014, the Obligated Group's uncompensated care costs were approximately $333,000. Obligations to provide uncompensated care can be derived from anti-dumping, emergency care, continuity of care and other laws that might apply to the Obligated Group. See "REGULATION OF THE HEALTH CARE INDUSTRY—Fraud and Abuse Laws and Regulations." See also "—Internal Revenue Service Policy Regarding Maintenance of 501(c)(3) Tax Exemption" below under this caption as to additional requirements and limitations for tax-exempt hospitals. Also, many tax-exempt hospitals have been and are subject to litigation attempting to establish obligations to provide uncompensated care based on the tax-exempt status of the hospital under federal or state law. Increased unemployment or other adverse economic conditions could increase the proportion of patients who are unable to pay all or any of the cost of their care. The expansions of health insurance coverage and Medicaid eligibility under the Affordable Care Act could eventually reduce the uncompensated care burden on the Obligated Group, but considerable uncertainty remains as to their impact. See "—Legislative and Regulatory Changes; Health Care Reform" above under this caption.

**Competitive Environment**

The Obligated Group could face increased competition in the future from other hospitals and from other forms of health care delivery, which could affect the Obligated Group's ability to attract patients, physicians or other staff. The development of HMOs and PPOs which do not use the Obligated Group's facilities or which are able to contract for lower-priced services could also result in decreased utilization of the Obligated Group's services; and the expansion of private insurance coverage and Medicaid eligibility under the Affordable Care Act could eventually make more choices available to certain categories of patients. Entry of additional providers of health care in the Obligated Group's

service area is not limited by any state requirement of need determination. Additionally, scientific and technological advances, new procedures, drugs and appliances, preventive medicine and outpatient health care delivery may reduce utilization and revenues of health care providers in the future or otherwise lead the way to new avenues of competition. See "SERVICE AREA—Competitive Environment" and "UTILIZATION" in Appendix A.

Mergers or joint ventures among hospitals in the Obligated Group's primary service area could result in consolidation of health care services. The Affordable Care Act (particularly the Accountable Care Organization model) could create incentives for vertical integration, incorporating a range of health care settings. The Obligated Group has entered into affiliations with other health care providers in order to enhance its ability to deliver high quality and cost-effective services. See "RELATED ORGANIZATIONS—Joint Ventures" in Appendix A. However, its ability to maintain a rate structure and preserve or increase its market share may be inhibited by the existence of other players in the market having a greater ability to provide services at reduced rates or to negotiate for increased shares of the market. The Obligated Group is not currently pursuing or considering any potential acquisition, merger or affiliation with other health systems or related entities.

Competition may, in the future, arise from new sources not currently anticipated or prevalent. While the effect of such actions is uncertain, it can be expected to increase competition in the health care field generally, and the revenues, as well as the expenses, of the Obligated Group could be adversely affected.

### Negative Rankings Based on Clinical Outcomes, Cost, Quality, Patient Satisfaction and Other Performance Measures

Health plans, Medicare, Medicaid, employers, trade groups and other purchasers of health services, private standard-setting organizations and accrediting agencies increasingly are using statistical and other measures in efforts to characterize, publicize, compare, rank and change the quality, safety and cost of health care services provided by hospitals and physicians. HHS has established the "Hospital Compare" website (http://www.hospitalcompare.hhs.gov/), which continues to expand as more emphasis is placed on the collection and utilization of health care data. Published rankings such as "score cards," tiered hospital networks with higher copayments and deductibles for nonemergent use of lower-ranked providers, "pay for performance" and other financial and non-financial incentive programs are being introduced to affect the reputation and revenue of hospitals and the members of their medical staffs and to influence the behavior of consumers and providers such as the Members of the Obligated Group. Measures of quality based on clinical outcomes of patient care, reduction in costs, patient satisfaction and investment in health information technology are becoming increasingly common. Measures of performance set by others that characterize a hospital negatively may adversely affect its reputation and financial condition.

The Affordable Care Act includes "value-based purchasing" provisions, including hospital performance scores, aimed at tying Medicare provider payments more closely to efficiency and quality outcomes. These provisions have increased the importance of hospital performance data, which is publicly available on the Hospital Compare website. See "REGULATION OF THE HEALTH CARE INDUSTRY—Medicare Reimbursement—Part A Reimbursement of Inpatient Services."

### Environmental Factors Affecting the Health Care Industry

Health care facilities and operations are subject to a wide variety of federal, state and local environmental and occupational and safety laws and regulations. Among the types of regulatory requirements faced by health care providers are: air and water quality control requirements; waste management requirements; specific regulatory requirements applicable to asbestos, polychlorinated

biphenyls and radioactive substances; requirements for providing notice to employees and members of the public about hazardous materials; and requirements for training employees in the proper handling and management of hazardous materials and wastes. In their role as owners and operators of properties or facilities, health care providers may be responsible for investigating and remedying hazardous substances located on or migrating from their property. Typical health care operations include, in various combinations, the handling, use, storage, transportation, disposal and discharge of infectious, toxic, radioactive, flammable and other hazardous materials, wastes, pollutants or contaminants. For this reason, health care operations are particularly susceptible to the practical, financial and legal risks associated with such environmental and safety laws and regulations, and noncompliance: may result in damage to individuals, property or the environment; may interrupt operations or increase their cost, or both; may trigger investigations, administrative proceedings, penalties or other government agency actions; and may result in legal liability, including damages, injunctions or fines, some or all of which may not be covered by insurance. There can be no assurance that the operations or financial condition of the Members of the Obligated Group will not be materially adversely affected by such environmental and safety risks. See "ENVIRONMENTAL MATTERS" in Appendix A.

At the present time, management of the Corporation is not aware of any pending or threatened claim, investigation or enforcement action regarding such environmental issues which, if determined adversely to the Members of the Obligated Group, would have a material adverse effect on the financial condition of the Obligated Group.

**Other Factors Generally Affecting the Obligated Group**

In the future, the following factors, among others, may affect the operations, facilities and financial performance of the Members of the Obligated Group to an extent that cannot be determined at this time:

- Medical and scientific advances, pressures for efficiency generated by recent health care reform measures, the development and requirement of the option for HMOs and PPOs in labor contracts, government and other health plans, preventive medicine, improved occupational health and safety, and improved outpatient care could result in decreased usage of inpatient hospital facilities. Also, as medical technology becomes more sophisticated and costly, the Members of the Obligated Group could encounter problems with availability, financing or operation of technology, which could adversely affect utilization. New discoveries may add greatly to costs of providing health care services with no or little offsetting increase in federal reimbursement and may also render obsolete certain of the health services provided by health care providers.

- Competition from other health care providers now or hereafter located in the service area of the Obligated Group could adversely affect its operations. See "SERVICE AREA—Competitive Environment" in Appendix A. Such competition includes physicians directly providing outpatient services.

- The Obligated Group could be adversely affected by general economic trends (including increases in unemployment) and by changes in the demographics of its service area. Difficulties in increasing charges and other fees, while at the same time maintaining scope and quality of health services, may affect the ability of the Obligated Group to maintain sufficient operating margins.

- In past years, the health care industry has suffered from a scarcity of nursing and other qualified health care personnel. A shortage of qualified professional personnel, including physicians and nurses, could limit operations and/or significantly increase payroll costs. The Obligated Group cannot control the prevailing wage rates in its service area, and any increase in

such rates will directly affect its costs of operations.  In addition to overall staffing shortages, there have been efforts in some states and federally to introduce legislation limiting a hospital's ability to require nurses to work overtime and to mandate minimum nurse-patient staff ratios. Such legislation, if enacted, could raise the Obligated Group's cost of doing business.  Finally, physician recruitment and retention is regulated by federal and state laws that may make it difficult for the Obligated Group to recruit and retain physicians.

•   The Obligated Group has been successful in recent years in maintaining the desired complement of physicians on its medical staff; however, no assurance can be given that such physician staffing will be continuously maintained in the future.  Changes in the number, composition or admitting practices of the medical staff could affect the Obligated Group's reputation or services and thus its operations and revenues.  Physicians who are denied medical staff membership or certain clinical privileges, or who have such membership or privileges curtailed, denied or revoked, often file legal actions against hospitals and medical staffs.  Such actions may include a wide variety of claims, some of which could result in substantial uninsured damages to a hospital.  In addition, failure of hospital management to adequately oversee the conduct of its medical staff may result in hospital liability to third parties.  See "MEDICAL STAFF" in Appendix A.

•   The Obligated Group may be adversely affected by the possible inability to obtain future governmental approvals to undertake projects which the Obligated Group deems necessary to remain competitive as to rates and charges and to maintain the quality and scope of care. Colorado statutes presently provide for Attorney General review of certain transactions, including the sale or other disposition of 50% or more of the assets of a nonprofit hospital such as the Obligated Group, to either a nonprofit or for-profit entity.  Although the Members of the Obligated Group are not now considering any sale transaction covered by these statutes (either as buyer or seller), such review procedures could interfere with plans in the future.

•   Professional liability and other actions alleging wrongful conduct and seeking punitive damages are often filed against health care providers.  The Obligated Group could be adversely affected by the unavailability or cost of malpractice and other insurance.  The cost of paying claims in excess of insurance coverage could directly adversely affect operating results.  In addition, the bankruptcy or insolvency of an insurance company which provides insurance coverage to the Obligated Group would cause the Obligated Group to be at risk for claims which would have been covered by such insurance without adequate liabilities having been recorded on the their balance sheets.  See "LITIGATION" and "INSURANCE" in Appendix A.  In addition to professional liability claims, litigation may also arise from the Obligated Group's corporate and business activities, employee-related matters, medical staff matters and denials of medical staff membership and privileges.  As with professional liability, many of these risks are covered by insurance, but some are not.  For example, some antitrust claims, business disputes and workers' compensation claims may not be covered by insurance or other sources and, in whole or in part, may be a liability of the Obligated Group if determined and settled adversely.  Claims for punitive damages may not be covered by insurance in certain circumstances.  Although the Obligated Group currently maintains actuarially determined self-insurance reserves and carries excess malpractice and general liability insurance which management considers adequate, management is unable to predict the future availability, cost or adequacy of such insurance.

•   Hospitals are major employers with a complex mix of professional, technical, clerical, housekeeping, maintenance and other types of workers.  Large employers bear a variety of risks flowing from employer-employee relationships as well as employee-patient interactions (for example, discrimination claims, tort actions and work-related injuries).  Some of these risks are not covered by insurance.  Tax-exempt hospitals and their employees are under the jurisdiction of

the National Labor Relations Board, which has adopted rules permitting collective bargaining units among a hospital's employees.  Also, the National Labor Relations Board has ruled that interns and residents can form unions.  There are presently no employees, interns or residents of the Members of the Obligated Group represented by a union.  Any future unionization of employees, interns or residents could cause an increase in costs of salaries and benefits. Moreover, work stoppages, slowdowns or lockouts could reduce, interrupt or otherwise adversely affect operations of the Obligated Group.

- The State of Colorado does not presently have a program for the regulation or review of the rates charged for hospital services furnished to private-paying patients.  If any such a program were established, or if wage or price controls were otherwise imposed with respect to the health care industry, such developments could have an adverse effect on the Obligated Group's revenue.

- An inflationary economy without corresponding increases in revenue could result from, among other factors:  increases in the salaries, wages and fringe benefits of employees; increases in costs associated with advances in medical technology or with inflation; or future legislation which would prevent or limit the ability of the Obligated Group to increase revenues. Inflation in health care costs may evoke action by legislatures, payers or consumers.  It is possible that legislative action at the state or national level may be taken with regard to the pricing of health care services.

- Major purchasers of health care services could take action to restrict hospital charges or charge increases.  As a result of increased public scrutiny, it is also possible that the pricing strategies of health care providers may be perceived negatively by consumers, and health care providers may be forced to reduce fees for their services.  Decreased utilization could result, and health care providers' revenues may be negatively impacted.  In addition, consumers and groups lobbying on behalf of consumers are increasing pressure for health plans, hospitals and other health care providers to be transparent and provide information about cost and quality of services that may affect future consumer choices about where to receive health care services.

- The Obligated Group could be adversely affected by changes in law or rulings imposing indigent care requirements as a condition of maintaining state or federal tax-exempt status, or by other efforts of taxing authorities to impose taxes related to the property or operations of tax-exempt organizations.  See "—Internal Revenue Service Policy Regarding Maintenance of 501(c)(3) Tax Exemption" below under this caption.

- Proposals to eliminate the tax-exempt status of interest on bonds issued to finance health facilities or to limit the use of such tax-exempt bonds could have an adverse effect on the Obligated Group.

- Substantial liabilities under federal and state antitrust laws and other trade regulations may arise in connection with a wide variety of activities, including joint ventures; merger, acquisition, and affiliation activities; payor contracting; certain pricing and salary setting activities; and relationships with physicians, including medical staff credentialing.  The application of antitrust laws to health care is evolving, and enforcement activity appears to be increasing.  At various times, health care providers may be subject to investigation by a governmental agency charged with the enforcement of antitrust laws, or may be subject to administrative or judicial action by a federal or state agency or a private party.  Antitrust violations may be subject to criminal and/or civil enforcement actions by government agencies as well as by private litigants.  Integration incentives under the Affordable Care Act may come into conflict with this increased antitrust enforcement pressure.

- No mortgage on any of the Obligated Group's properties or facilities has been granted and no title insurance obtained in connection with the issuance of the Series 2015 Bonds or Obligation No. 1. The Master Indenture provides that one or more Obligations may be secured by a lien on assets (which lien only secures specified Obligations and does not secure all Obligations) so long as the lien is a Permitted Lien.

- Natural disasters or acts of terrorism, including bioterrorism, could result in the Obligated Group's providing significant unreimbursed services, as well as causing property damage, employee injury and service interruptions.

- The revenues of Vail Valley Medical Center Foundation, Volunteer Corps of the Vail Valley Medical Center and Shaw Outreach Team (which are not Members of the Obligated Group) are primarily contributions, most of which are received in the form of pledges to pay specific amounts at future dates. The amount of contributions which can be secured by such entities or the Obligated Group in the future is strongly influenced by factors outside their control, such as changes in national economic climate and the economy of the Obligated Group's service area or changes in federal or state tax law affecting the tax benefits of such contributions. Also, death of a donor or changes in a donor's economic situation after a pledge is made can adversely affect collection.

- The Obligated Group has significant long-term investments, the income on which is an important source of revenue. Both the market value of those assets and the amount of investment income generated by such investments are subject to market fluctuations. See "INVESTMENTS" in Appendix A.

## Government Regulation and Approvals—Projects, Operations

The ability of the Obligated Group to complete planned projects, or to operate its facilities, may be adversely affected by legislative, regulatory, administrative or enforcement action at the local, state or national level with respect to a variety of matters, including zoning or land use controls, environmental policy and taxation. Delays in obtaining, or failure to obtain, governmental permits or approvals could prevent the Obligated Group from completing planned projects or from successfully operating facilities following completion, which could adversely affect the Obligated Group's ability to remain competitive (as to rates and charges or as to quality and scope of care). In recent years, the Colorado Department of Public Health and Environment has changed its licensing standards for health care facilities. These changes affect requirements for construction of facilities as well as hospital operations.

## Implementation of Master Facility Plan

No assurance can be given that the implementation of the Master Facility Plan will occur precisely in the manner presently anticipated. Construction projects are often subject to delay due to a variety of causes, including, without limitation, change orders, weather, labor disputes, availability of supplies, fire or other casualty losses and unanticipated construction difficulties. See "GENERAL—Master Facility Plan" in Appendix A for a discussion of estimated completion dates and cost estimates for implementation of the Master Facility Plan. In addition, implementation of the Master Facility Plan involves numerous challenges in relocating existing staff, equipment and operations during construction with a goal of minimizing disruption of ongoing patient care. Any such disruptions could have an adverse effect upon the financial condition of the Obligated Group.

The Corporation has entered into a guaranteed maximum price contract with GE Johnson Construction Company with respect to the first phase of the Master Facility Plan. Prior to commencement of the second phase, the Corporation expects to enter into a second guaranteed maximum

27

price contract with GE Johnson.  If cost overruns resulting from delays, change orders, or other causes are experienced, fixed prices may increase.

Proceeds of the Series 2015 Bonds will finance a portion of the cost of implementation of the Master Facility Plan.  The Corporation will require significant additional funds to complete construction (approximately $80 million).  The Foundation is undertaking a five year capital campaign with a goal of $75 million for the costs of implementing the Master Facility Plan, with the remainder of the costs to be paid out of available reserves.  Depending on the success of the Foundation's capital campaign, the Corporation could be required to expend significant additional funds.

**Other Contingent Liabilities**

The Obligated Group is subject to potentially significant contingent liabilities.  Funding requirements with respect to self-insurance reserves and employee pension plans are subject to actuarial calculations.  Also, final settlements and post-payment audits with respect to the Medicare and Medicaid programs can result in settlements in excess of amounts reserved by the Obligated Group.  See Note (2) in the audited financial statements for the fiscal years ended October 31, 2014 and 2013 included in Appendix B-1.

**Lack of Secondary Market for the Series 2015 Bonds**

The secondary market for the Series 2015 Bonds may be restricted or very limited at any given time, and there can be no assurance that the secondary market will provide owners of the Series 2015 Bonds with investment liquidity or will continue until final maturity of the Series 2015 Bonds.  The Underwriter plans to engage in secondary market trading of the Series 2015 Bonds (subject to applicable state securities laws).  However, the Underwriter is not obligated to engage in secondary market trading of the Series 2015 Bonds and cannot give assurances that there will be a continuing secondary market in the Series 2015 Bonds.  In addition, adverse developments with respect to the Obligated Group, its properties or operations may adversely affect bid and asked prices for the Series 2015 Bonds in any secondary market.  In some states, specific conditions must be met in order to qualify for an exemption from registration for secondary market sales.  Any rating on the Series 2015 Bonds will not address the market liquidity of the Series 2015 Bonds.

The Obligated Group has agreed to supply information as described under "CONTINUING DISCLOSURE UNDERTAKINGS."  Failure to provide such information, if required, may materially and adversely affect any secondary market trading on the Series 2015 Bonds.

**Certain Matters Relating to the Enforceability of the Master Indenture**

The accounts of the Members of the Obligated Group will be combined for financial reporting purposes and will be used in determining whether various covenants and tests contained in the Master Indenture (including tests relating to the incurrence of Additional Indebtedness) are met, notwithstanding uncertainties as to the enforceability of certain obligations of Members of the Obligated Group contained in the Master Indenture.  Such uncertainties bear on the availability of the assets of each Member of the Obligated Group for payment of debt service on the Obligations, including Obligation No. 1.  The joint and several obligations of the Members of the Obligated Group to make payments in respect of the Obligations (directly or indirectly) may be limited to the extent such payments (i) are requested with respect to any Obligation which is issued for a purpose which is not consistent with the governmental or charitable purposes of such Member, or which is issued for the benefit of any entity other than a government or a nonprofit corporation which is exempt from federal income taxes under Section 501(a) and 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), and which is not a

"private foundation" as defined in Section 509(a) of the Code; (ii) are required to be made from any moneys or assets which are donor restricted or which are subject to a direct or express trust which does not permit the use of such moneys or assets for such a payment; (iii) would result in the cessation or discontinuation of any material portion of the health care or related services previously provided by such Member (other than the Member which directly benefited from such Obligation); or (iv) are requested to be made pursuant to any loan violating applicable usury laws.  Due to the absence of clear legal precedent in this area, the extent to which the assets of the Members of the Obligated Group fall within the category referred to in clause (ii) above cannot now be determined.  The amount of such assets which fall within such category could be substantial.  The joint and several liability of the Members of the Obligated Group may be further limited by applicable principles of charitable trust law, applicable provisions relating to fraudulent conveyances and bankruptcy, provisions of state nonprofit corporation laws, state laws affecting the powers of governmental entities, and equitable principles, including the principles that such payments may be held to be against public policy.

A Member may not be required to make any payment on an Obligation, or portion thereof, the proceeds of which Obligations were not lent or otherwise disbursed to such Member, to the extent that such payment or use would render the Member insolvent, may be voided by a trustee in bankruptcy in the event of a bankruptcy of such Member, or may be voided by third-party creditors in an action brought pursuant to any applicable state fraudulent conveyance statutes.  Under the United States Bankruptcy Code, a trustee in bankruptcy and, under state fraudulent conveyance statutes, a creditor of a related guarantor, may avoid any obligation incurred by a related guarantor if, among other bases therefor (i) the guarantor has not received fair compensation or reasonably equivalent value in exchange for the guaranty, (ii) the guaranty renders the guarantor insolvent, as defined in the United States Bankruptcy Code or fraudulent conveyance statutes, or (iii) the guarantor is undercapitalized.

Application by courts of the tests of "insolvency," "reasonably equivalent value" and "fair consideration" has resulted in a conflicting body of case law.  It is possible that, in an action to force a Member of the Obligated Group to make a payment on an Obligation for which it was not the direct beneficiary, a court might not enforce such obligation to pay in the event it is determined that the Member against whom such payment is sought is analogous to a guarantor of the debt of the Member who directly benefited from the borrowing and that sufficient consideration for such Member's guaranty was not received or that the incurrence of such Obligation has rendered or will render such Member insolvent.

**Enforceability of Remedies, Bankruptcy, Limitations on Security Interests and Other Matters Relating to the Security for the Series 2015 Bonds**

No mortgage on any of the Obligated Group's properties or facilities has been granted in connection with the issuance of the Series 2015 Bonds or Obligation No. 1.

The Obligated Group's facilities are not comprised of general purpose buildings, and most of its facilities would not be suitable for industrial or commercial use.  Consequently, it could be difficult to find a lessee for the Obligated Group's facilities if it were necessary to proceed against the Obligated Group, whether pursuant to a judgment against the Obligated Group or otherwise.  Thus, upon any default and resulting subletting of the Obligated Group's facilities, the Master Trustee may not realize proceeds in an amount equal to the amount then due and payable with respect to the outstanding Obligations, including Obligation No. 1.  Leasing would also be constrained by the restriction on users of the Obligated Group's bond-financed facilities in order to maintain the tax-exempt interest on the Series 2015 Bonds and any other outstanding tax-exempt obligations.  See "—Covenants to Maintain Tax-Exempt Status of the Series 2015 Bonds".

The realization of any rights upon a default will depend upon the exercise of various remedies specified in the Loan Agreement, the Bond Indenture and the Master Indenture.  These remedies, in certain respects, may require judicial action which is often subject to discretion and delay.  Under existing law, certain of the remedies specified in the Loan Agreement, the Bond Indenture and the Master Indenture may not be readily available or may be limited (including limitations imposed by bankruptcy laws and other existing statutes, constitutional provisions and judicial decisions).  A court may decide not to order the specific performance of the covenants contained in these documents.

Obligation No. 1 is secured by a pledge of the Gross Revenues of Members of the Obligated Group, subject to Permitted Liens and, unless an event of default under the Master Indenture has occurred and is continuing, subject to the rights of the Members of the Obligated Group to use such revenue for operation and maintenance expenses and any other lawful purposes.  Additional Obligations may be secured under the Master Indenture on a parity with Obligation No. 1 and Obligation No. 2.  Such pledge is intended to be prior to any other security interest in, lien on or pledge of the Gross Revenues of the Members of the Obligated Group, except Permitted Liens.  However, the effectiveness of the pledge may be limited by a number of factors, including:  (i) the absence of an express assignment of payments due the Obligated Group under the Medicare or Medicaid programs or under the contracts between the Obligated Group and other third-party payors, and present or future prohibitions against assignment of certain accounts contained in state or federal statutes or regulations, including statutes which may affect assignment of Medicare and Medicaid payments; (ii) certain federal statutes and judicial decisions that have cast doubt upon the right of the Master Trustee or other creditors, in the event of a default, to collect and retain accounts receivable from Medicare, Medicaid and other governmental programs; (iii) statutory liens; (iv) rights arising in favor of the United States of America or any agency thereof; (v) constructive trusts, equitable liens or other rights impressed or conferred by any federal or state court in the exercise of its equitable jurisdiction; (vi) bankruptcy laws which would affect enforceability of the Master Indenture or the security interest in the Gross Revenues of any Member of the Obligated Group which are earned by the Member of the Obligated Group within prescribed periods preceding and after any institution of bankruptcy proceedings by or against such Member; (vii) rights of third parties in any revenue, including revenue converted to cash, not in the possession of the Bond Trustee or the Master Trustee; and (viii) the requirement that appropriate continuation statements be filed in accordance with the Colorado Uniform Commercial Code.  In addition, it may not be possible to perfect a security interest in any manner whatsoever in certain types of Gross Revenues (*e.g.*, gifts, donations, certain insurance proceeds, Medicare and Medicaid payments) before actual receipt by the Master Trustee.  Permitted Liens include a security interest in accounts receivable, subject to the limitations contained in the Master Indenture.  See "DEFINITIONS" in Appendix D.

In the event the Authority or Members of the Obligated Group were to become a debtor under Title 11 of the United States Code (the Federal Bankruptcy Code), or similar state-law provisions, payments on the Series 2015 Bonds or payments under the Loan Agreement or on Obligation No. 1 may be stayed or, under certain circumstances, subject to avoidance, and the interests of the Bond Trustee, the Master Trustee or other creditors in such payments may not extend to payments acquired after the commencement of such a bankruptcy case.  Furthermore, if the bankruptcy court concludes that the Bond Trustee, the Master Trustee or other creditors have "adequate protection," it may enter orders affecting the security of the Bond Trustee or the Master Trustee, including orders providing for the substitution, subordination and sale of security.  In addition, a reorganization plan may be adopted even though it has not been accepted by the Bond Trustee, the Master Trustee or other creditors, if the Bond Trustee, the Master Trustee or other creditors are provided with the benefit of its original lien or the "indubitable equivalent."  Thus, in the event of the bankruptcy of the Authority or Members of the Obligated Group, the amount realized by the Bond Trustee, the Master Trustee or other creditors may depend on the bankruptcy court's interpretation of "indubitable equivalent" and "adequate protection" under the then existing circumstances.  The bankruptcy court may also have the power to invalidate certain provisions of

the Bond Indenture, the Master Indenture or such other contracts that make bankruptcy and related proceedings by the Authority or Members of the Obligated Group an event of default thereunder.

There exists in some states statutory or common law authority for a court to terminate the existence of a nonprofit corporation or undertake supervision of its affairs on various grounds, including a finding that such corporation has insufficient assets to carry out its stated charitable purposes. Such court action may arise on the court's own motion or pursuant to a petition of the attorney general or other persons, pursuant to the common law and statutory power to enforce charitable trusts and to see to the application of their funds to their intended charitable uses.

All legal opinions with respect to the enforceability of the Bond Indenture, the Master Indenture, the Loan Agreement and other financing documents are expressly subject to a qualification that enforceability thereof may be limited by bankruptcy, reorganization, insolvency, fraudulent conveyance, moratorium or other similar laws affecting the rights of creditors generally, and by general principles of equity.

**Covenants to Maintain Tax-Exempt Status of the Series 2015 Bonds**

The tax-exempt status of the interest on the Series 2015 Bonds, as described under "TAX MATTERS," is based on continuing compliance by each Member of the Obligated Group and the Authority with certain covenants contained in the Bond Indenture, the Master Indenture, the Loan Agreement and the Tax Certificate and the reporting of certain information to the United States Treasury. These covenants relate generally to restrictions on the use of the facilities financed with proceeds of the Series 2015 Bonds, restrictions on leasing or selling such facilities to organizations other than tax-exempt organizations, continuation by each Member of the Obligated Group of its 501(c)(3) status, requirements regarding the timely and proper use of proceeds of the Series 2015 Bonds, arbitrage limitations and rebate of certain excess investment earnings, if any, to the federal government. Failure to comply with any of these covenants could cause interest on the Series 2015 Bonds to become subject to federal income taxation retroactive to the date of issuance of the Series 2015 Bonds. In such an event, the Bond Indenture does not provide for payment of any additional interest on the Series 2015 Bonds, redemption of the Series 2015 Bonds, or acceleration of the payment of debt service on the Series 2015 Bonds.

**Internal Revenue Service Policy Regarding Maintenance of 501(c)(3) Tax Exemption**

The tax-exempt status of interest on the Series 2015 Bonds depends upon maintenance by each Member of the Obligated Group of its status as organizations described in Section 501(c)(3) of the Code. Each Member of the Obligated Group has received a letter from the Internal Revenue Service (the "IRS") confirming such tax-exempt status. In order to maintain that status, each Member of the Obligated Group is required to comply with current and future IRS regulations and rulings governing tax-exempt health care facilities. Each Member of the Obligated Group has covenanted under the Master Indenture not to take any action which would result in the alteration or loss of its status as a tax-exempt organization, and the Corporation has covenanted under the Loan Agreement and the Tax Certificate not to perform any acts or enter into any agreements which would adversely affect such 501(c)(3) status.

In order to maintain its tax-exempt status under federal law, each Member of the Obligated Group must not be operated to any substantial degree for the benefit of private individuals and may not allow its earnings to inure to the benefit of any individuals having a personal or private interest therein. These proscriptions, in practice, regulate business dealings between hospitals and physicians. Tax-exempt hospitals generally are required to demonstrate that their business dealings with physicians benefit the community served by the hospital independently from any direct benefit received by the hospital itself.

The Members of the Obligated Group are not presently being challenged or investigated by the IRS with respect to these matters.

The IRS has reaffirmed, in the context of federal Medicare and Medicaid anti-kickback laws, the principle that violation of criminal statutes is inconsistent with continued recognition of an organization's tax-exempt status. Thus, the tax-exempt status of a nonprofit hospital could be subject to revocation if the entity were determined to have violated federal or state anti-kickback laws by providing illegal remuneration to physicians in exchange for the referral of Medicare or Medicaid patients or to have otherwise violated state or federal anti-kickback laws or laws restricting referrals. See "REGULATION OF THE HEALTH CARE INDUSTRY—Fraud and Abuse Laws and Regulations."

The IRS closely scrutinizes transactions between tax-exempt entities and for-profit entities. Although specific activities of tax-exempt entities have been the subject of interpretations by the IRS in the form of Private Letter Rulings, many activities have not been addressed in any official opinion, interpretation or policy of the IRS. Because each Member of the Obligated Group conducts significant and diverse activities involving private parties, there can be no assurance that certain of its transactions will not be challenged by the IRS. Additionally, the IRS reserves the right to and in fact occasionally does, alter or reverse its positions concerning tax-exemption issues, even concerning long-held positions upon which tax-exempt health care organizations have relied. This could adversely affect the tax-exempt status of the each Member of the Obligated Group.

Section 4958 of the Code imposes excise taxes on "excess benefit transactions" between "disqualified persons" and tax-exempt organizations. According to the legislative history and regulations associated with Section 4958, these excise taxes may be imposed by the IRS either in lieu of or in addition to revocation of exemption. These intermediate sanctions may be imposed in situations in which a "disqualified person" (such as an "insider") engages in "excess benefit transactions" such as (i) a transaction with a tax-exempt organization on other than a fair market value basis, (ii) receipt of unreasonable compensation from a tax-exempt organization, or (iii) receipt of payment in an arrangement that violates the prohibition against private inurement. A disqualified person who benefits from an excess benefit transaction will be subject to an excise tax equal to 25% of the amount of the excess benefit. Organizational managers who participate in the excess benefit transaction knowing it to be improper are subject to an excise tax equal to 10% of the amount of the excess benefit, subject to a maximum penalty of $20,000 per transaction. A second penalty, in the amount of 200% of the excess benefit, may be imposed on the disqualified person (but not upon the organizational manager) if the excess benefit is not corrected within a specified period of time. Fair market value and reasonable compensation for tax purposes typically reflect a range rather than a specific dollar amount, and the IRS does not rule in advance on whether a transaction results in more than fair market value payment or more than reasonable compensation to a disqualified person. Although it is not possible to predict what enforcement action, if any, the IRS might take related to potential excess benefit transactions, consistent with the legislative history of Section 4958, regulations issued by the IRS in March 2008 indicate that not all excess benefit transactions jeopardize exempt status. Rather, the IRS will consider all relevant facts and circumstances including: the size and scope of the organization's activities that further exempt purposes; the size, scope and frequency of any excess benefit transactions; whether the organization has implemented appropriate safeguards reasonably designed to prevent future excess benefit; and whether the organization has made good faith efforts to correct any excess benefit such as by obtaining repayment of the amount of any excess benefit.

Moreover, Section 4958 is potentially favorable to taxpayers because it provides the IRS with a punitive option short of revocation of exempt status to deal with incidents of private inurement. However, the standards for tax exemption have not been changed, including the requirement that no part of the net earnings of an exempt entity inure to the benefit of any private individual. Consequently,

although the IRS has only infrequently revoked the tax exemption of nonprofit health care corporations in the past, the risk of revocation remains and there can be no assurance that the IRS will not direct enforcement activities against the Obligated Group.

In certain cases, the IRS has imposed substantial monetary penalties and future charity care or public benefit obligations on tax-exempt hospitals in lieu of revoking their tax-exempt status, as well as requiring that certain transactions be altered, terminated or avoided in the future and/or requiring governance or management changes. These penalties and obligations are typically imposed on the tax-exempt hospital pursuant to a "closing agreement" with respect to the hospital's alleged violation of Section 501(c)(3) exemption requirements. Given the uncertainty regarding how tax-exemption requirements may be applied by the IRS, the Obligated Group could be at risk for incurring monetary and other liabilities. Like certain of the other business and legal risks described herein, these liabilities are possible from time to time and could be substantial, in some cases involving millions of dollars, and in extreme cases could be materially adverse.

The Affordable Care Act imposes certain additional requirements for tax-exempt hospitals such as the Corporation. One significant new requirement is that tax-exempt hospitals must perform a community health needs assessment every three years and develop an implementation strategy to meet the identified needs. Requirements relating to community health needs assessments became effective for taxable years beginning after March 23, 2012, while other requirements were effective for taxable years beginning after March 23, 2010. Any tax-exempt hospital that fails to satisfy the community health needs assessment requirement for any taxable year will be subject to an excise tax penalty of $50,000. Furthermore, the United States Secretary of the Treasury or that individual's delegate is to review the community benefit activities of each tax-exempt hospital at least every three years. Another major element of the Affordable Care Act relating to tax-exempt status of hospitals involves charges. A hospital must limit the amounts charged for emergency room or other medically necessary care provided to patients eligible for assistance under the hospital's financial assistance policy to no more than the amounts generally billed to patients who have insurance covering such care. In other words, hospitals cannot charge persons eligible for financial assistance higher rates than the amounts generally billed to patients who have insurance covering such care. The Affordable Care Act also requires that tax-exempt hospitals have a written financial assistance policy in place. Finally, the Affordable Care Act prohibits a hospital from engaging in extraordinary collection actions (which may include, among other things, a restriction on filing suit) before it has made reasonable efforts to determine whether the subject individual is eligible for financial assistance. Final regulations interpreting various portions of these new requirements were issued on December 29, 2014, to be effective for taxable years beginning after December 29, 2015.

The IRS Form 990 is used by certain exempt organizations, including organizations recognized under Section 501(c)(3) of the Code, to submit information required by the federal government to maintain tax-exemption. The Form 990 requires detailed public disclosure of compensation practices, corporate governance, loans to management and others, joint ventures and other types of transactions, political campaign activities and other areas the IRS deems to be compliance risk areas. For hospitals, the Form 990 also requires detailed community benefit information on Schedule H and establishes uniform standards for the reporting of charity care. Furthermore, Schedule K of the Form 990 requires detailed reporting information relating to tax exempt bonds, including compliance with the arbitrage rules and rules limiting private use of bond-financed facilities (which includes compliance with the safe harbor guidance in connection with management contracts and research contracts). The Form 990 allows for enhanced transparency as to the operations of tax-exempt organizations, which can result in enhanced enforcement from the IRS and other stakeholders, including state attorneys general, unions, plaintiff's class action attorneys, public watchdog groups and others.

The Treasury is required to review information about each tax-exempt hospital's community benefit activities at least once every three years, as well as to submit an annual report to Congress with information regarding the levels of charity care, bad debt expenses, unreimbursed costs of government programs, and costs incurred by tax-exempt hospitals for community benefit activities. The periodic reviews and reports to Congress regarding the community benefits provided by 501(c)(3) hospitals may increase the likelihood that Congress will require such hospitals to provide a minimum level of charity care in order to retain tax-exempt status and may increase IRS scrutiny of particular 501(c)(3) hospital organizations. Legislative bodies have considered legislation concerning the charity care standards that nonprofit, charitable health care providers must meet to maintain their federal income tax-exempt status under the Code and legislation mandating nonprofit, charitable hospitals to have an open-door policy toward Medicare and Medicaid patients as well as offer, in a non-discriminatory manner, qualified charity care and community benefits. The scope and effect of legislation, if any, which may be adopted at the federal or state levels with respect to charity care of nonprofit hospitals cannot be predicted. Any such legislation or similar legislation, if enacted, may have the effect of subjecting a portion of the income of the Obligated Group to federal or state income taxes or to other tax penalties and adversely affect the ability of the Obligated Group to generate revenues sufficient to meet its obligations and to pay the debt service on the Series 2015 Bonds.

The IRS has audit guidelines which implement a policy to scrutinize more closely the activities of tax-exempt hospitals to ensure that they satisfy the requirements for tax-exempt status. Given these audit guidelines and other related pronouncements by the IRS, it may be more difficult for hospitals to maintain their tax-exempt status. Hospitals or other health-care providers may be forced to forgo otherwise favorable opportunities for certain joint ventures, recruitment and other arrangements to maintain their tax-exempt status or to avoid other sanctions. Although management of the Corporation believes that the Obligated Group has properly complied with the tax laws and regulations, the Obligated Group could be audited by the IRS.

**Modifications to Master Indenture**

Certain amendments to the Master Indenture may be made with the consent of the Holders of not less than a majority of in aggregate principal amount of outstanding Obligations. Such amendments may adversely affect the security of the Bondholders, and such percentage may be composed wholly or partially of the Holders of additional Obligations (or, with respect to any credit-enhanced bonds and the related Obligations, such consent may be given by the respective credit enhancement provider). Also, the Master Indenture may be amended without the consent of any Holders in certain circumstances. See "THE MASTER INDENTURE—Supplements and Amendments—Supplements Not Requiring Consent of Holders" and "—Supplements Requiring Consent of Holders" in Appendix D.

## REGULATION OF THE HEALTH CARE INDUSTRY

**General Health Care Industry Factors**

The health care industry in general is subject to regulation by a number of governmental and private agencies, including those which administer the Medicare and Medicaid programs discussed below, and is affected by federal and state policies concerning the manner in which health care is provided, administered and financed. The health care industry is accordingly sensitive to frequent and substantial legislative and regulatory changes, including persistent federal and state efforts to control the growth of governmental spending on health care programs. In addition, Congress and other governmental agencies have focused on providing care to indigent and uninsured patients, prevention of "dumping" such patients on public hospitals in order to avoid the provision of non-reimbursed care, the unlawful payment of remuneration in exchange for referral of patients, physician self-referral, inaccurate billing, security and

privacy of health-related information, and other issues.  In recent years, federal and state governments have exerted sharply increased efforts and resources on enforcing laws and regulations against fraud, waste and abuse within government health care programs, and governmental enforcement is increasingly supplemented by lawsuits brought by private citizens, where permitted.  Health care providers that fail to comply with Medicare, Medicaid and commercial payor rules and guidelines are increasingly likely to receive onerous administrative, civil and even criminal penalties and may also be subject to exclusion from participation in Medicare, Medicaid and other federal programs.

During the fiscal year ended October 31, 2014, Medicare (including Medicare managed care) patients accounted for approximately 8% of the Obligated Group's net revenue, while Medicaid (including Medicaid managed care) patients accounted for approximately 2% of the Obligated Group's net revenue.  Reductions in Medicare or Medicaid funding levels or other changes designed to limit increases in Medicare or Medicaid costs could have a material negative effect on the Obligated Group's revenues.

In the years leading up to the Affordable Care Act, federal budget legislation included substantial funding cuts in Medicare and Medicaid payments, and diverse and complex mechanisms to limit the amount of money paid to health care providers under both the Medicare and Medicaid programs have been enacted.  Continued statutory and regulatory efforts to control health care costs, particularly costs paid under the Medicare and Medicaid programs (either generally or for particular classes of health care providers) can be expected.  The recent increase in focus and interest on federal and state health care reform may increase the likelihood of additional significant cost control measures being enacted in the near future.  See "BONDHOLDERS' RISKS—Legislative and Regulatory Changes; Health Care Reform."

Over the past several years, numerous and varied legislative and regulatory actions to reform the health care system have been proposed at both federal and state levels.  Such proposals have included establishment of a single-payor system, encouragement of voluntary efforts to expand health care coverage, stimulation of competition among health care providers, adoption or expansion of "patients' bills of rights" and similar programs, changes in licensure requirements, and other changes in methods of delivering, regulating and financing health care services.  The Affordable Care Act focuses on health insurance mandates; insurance exchanges and other measures to expand health care coverage and control health insurance premiums; modifications to methods and rates of payment to health care providers and other measures to control health care costs; use of electronic records and empirical research data to move toward "evidence-based medicine" protocols; new methods and increased enforcement resources to combat waste, fraud and abuse; and alternative approaches to medical malpractice disputes.

Implementation of the Affordable Care Act is scheduled to occur over a period of several years; it is possible that its provisions may be changed or superseded by intervening legislative action. Additional federal or state reform legislation or regulatory measures could be enacted in the future, and such legislative and regulatory action could adversely affect the operations and financial condition of health care providers by reducing government reimbursement or other income, imposing additional uncompensated operating costs, or restricting the provision of new or expanded health care services.  No assurance can be given that the operations and financial condition of the Obligated Group will not be materially adversely affected by ongoing or future legislative and regulatory changes.

**Budget Control Act and Sequestration**

The Budget Control Act of 2011 ("Budget Control Act') limits the federal government's discretionary spending caps at levels necessary to reduce expenditures by $917 billion during federal fiscal years 2012 through 2021.  Medicare, Medicaid Social Security and other entitlement programs are

not affected by the limit on discretionary spending caps (as they are considered "mandatory" spending). The Budget Control Act also created a Joint Select Committee on Deficit Reduction ("Committee"), which was tasked with making recommendations to further reduce the federal deficit by at least $1.2 trillion. After several months of negotiations, the Committee was unable to reach an agreement on spending reductions. As a result of this failure, and in exchange for raising the debt ceiling, the Budget Control Act set in place a protocol for mandatory spending cuts, known as sequestration (across the board cuts). In January 2013, these cuts were to be triggered in an amount necessary to achieve $1.2 trillion in savings over ten years. A wide range of spending is exempted from sequestration, including Medicaid, Social Security, Veteran's benefits and pensions, specified federal retirement funds, civil and military pay, child nutrition and other specified programs. Medicare is not exempted from sequestration; however, cuts to Medicare could not come at the cost of beneficiaries. Consequently, Medicare payments to providers were reduced as a result of these across the board spending reductions, limited to 2% of total program costs.

The American Taxpayer Relief Act of 2012 ("ATRA") postponed this scheduled sequestration until March 1, 2013. The Office of Management and Budget issued a report to Congress detailing the effects of this reduction to be a 2% Medicare spending reduction and CMS confirmed that the 2% reduction to Medicare providers and insurers was for services provided on or after April 1, 2013.

On December 26, 2013, President Obama signed into law a bipartisan and bicameral budget agreement known as the Bipartisan Budget Act of 2013 ("Bipartisan Budget Act"), which staved off further sequestration cuts, while keeping the current Medicare sequestration cuts in place. Therefore, the 2% reduction to Medicare providers and insurers has continued into 2015. The Bipartisan Budget Act also included a restructuring of Medicaid disproportionate share payments. See "— Disproportionate Share Payments" below under this caption. for information regarding the current status of disproportionate share payment reductions. The $85 billion agreement funds the federal government until fall 2015 and aims to eliminate some of the cuts imposed on the federal government by the sequestration.

It is possible that Congress will take action to eliminate some or all of the reductions in the future and any Congressional action could be made retroactive in order to eliminate some or all of the cuts even to the extent they were imposed. However, there is no certainty that Congress will take any action. Absent further Congressional action, these automatic spending cuts will become permanent. Because Congress may make changes to the budget in the future, it is impossible to predict the impact any spending cuts may have upon the Obligated Group. Similarly, it is impossible to predict whether any automatic reductions to Medicare may be triggered in lieu of other spending cuts that may be proposed by Congress. If and to the extent Medicare and/or Medicaid spending is reduced under either scenario, this may have a material adverse effect upon the financial condition of the Obligated Group, including a disproportionate impact on hospital providers.

**Licensing, Surveys, and Accreditation**

The Obligated Group is subject to regulation, certification, licensing, accreditation and policy changes by various federal and state government agencies (including agencies which administer the Medicare and Medicaid programs, and including agencies created by the National Health Planning and Resources Development Act), and by certain nongovernmental agencies such as The Joint Commission and other professional review organizations. Renewal and continuance of certain of these licenses, certifications and accreditations are based on inspections, surveys, audits, investigations or other reviews, some of which may require or include affirmative action or response by the Obligated Group. These activities generally are conducted in the normal course of business of health care facilities. No assurance can be given as to the effect on future operations of the Obligated Group of existing laws, regulations and standards for such certification, licensing or accreditation, or of any future changes in such laws,

regulations and standards.  Adverse actions relating to certification, licensure or accreditation could result in the loss of the ability of the Obligated Group to operate all or a portion of its facilities and could affect its ability to receive third-party reimbursement from various programs.  See "LICENSES, ACCREDITATIONS, CERTIFICATIONS AND MEMBERSHIPS" in Appendix A.

Management of the Corporation currently anticipates no difficulty renewing or continuing licenses, certifications or accreditations currently held by the Obligated Group.  Nevertheless, actions in any of these areas could result in the loss of utilization or revenues, or the ability to operate all or a portion of its operations and, consequently, could adversely affect the Obligated Group's ability to payments sufficient to pay principal, interest and premium, if any, due with respect to the debt service on the Series 2015 Bonds.

## Medicare Reimbursement

**Overview.**  The federal Social Security Act Amendments of 1965 established the Medicare program, which is designed to provide health care services primarily to the aged and disabled.  Medicare benefits are payable under Part A, which covers inpatient hospital services, skilled nursing care, and hospice services, certain home health services and certain other services, and Part B, which covers hospital outpatient services, physician and ambulatory services, durable medical equipment, certain home health services and certain other items and services.  Medicare Part A is funded through payroll taxes on employers, employees, and the self-employed.  Medicare Part B is a voluntary program, and only those eligible beneficiaries who pay the Part B premiums receive benefits.  Part C governs the Medicare Advantage program and provides for payment to Medicare Advantage plans from the Part A and Part B trust funds.  Part C requires that Medicare Advantage plans cover at least those items and services currently covered under Parts A and B, other than hospice care.  Additional benefits may be offered as part of a basic package or pursuant to an extra charge.  Part D provides Medicare prescription drug coverage.

Each Member of the Obligated Group is certified as a provider of Medicare services and the Obligated Group has historically received significant revenue from the Medicare program.  See "SOURCES OF REVENUE" in Appendix A.  Changes in the Medicare program are therefore likely to have a material effect on the Obligated Group.

**Conditions of Participation.**  Hospitals must comply with standards called "Conditions of Participation" in order to be eligible for Medicare (and Medicaid) reimbursement.  CMS is responsible for ensuring that hospitals meet these regulatory Conditions of Participation.  Failure to comply with the Conditions of Participation could have a materially adverse effect on the continued participation in the Medicare and Medicaid programs, and ultimately, the revenues of the Obligated Group.

**Part A Reimbursement of Inpatient Services.**  Hospitals are generally paid for inpatient services provided to Medicare beneficiaries based on established categories of treatments or conditions known as diagnosis related groups ("DRGs").  DRGs are a system of classifying inpatient hospital services based on a person's medical diagnosis, any secondary diagnoses, surgical procedures, age, sex and presence of any complications.  Payments are made to hospitals based on the DRG assignment for each patient's diagnosis.  Hospital reimbursement is set at specific rates established by Medicare for that particular patient's DRG, regardless of the actual costs incurred by the hospital for such treatment.  The actual cost of care, including capital costs, may be more or less than the DRG rate.  DRG rates are subject to adjustment by CMS and are subject to federal budget considerations.  There is no guarantee that DRG rates, as they change from time to time, will cover actual costs of providing services to Medicare patients.

CMS established a DRG classification system in its 2008 Inpatient Prospective Payment System Final Rule (the "2008 IPPS Rule"), which categorizes base DRGs by severity and weight. The 2008 IPPS Rule replaced the prior DRG codes with Medicare Severity DRG codes. CMS continues to revise the inpatient prospective payment system and annually publishes an interim rule for notice and comment prior to a final rule. While the update factor has typically been equal to the percentage increase in the market basket, from time to time Congress has set updates legislatively that are less than the market basket and has delayed scheduled payment updates. Such actions adversely affect the Obligated Group's revenues.

Payment rates are also affected by certain quality measures. For example, the Affordable Care Act creates a Hospital Value-Based Purchasing program, which links Medicare inpatient prospective payment system payments to performance on certain quality measures. The program is intended to shift from payments based on volume to payments based on performance. Under the Hospital Value-Based Purchasing Program, the 2015 Inpatient Prospective Payment System Final Rule (the "2015 IPPS Rule") increased the applicable percent reduction to 1.5% of the base operating DRG payment amounts to all participating hospitals. Also, the 2015 IPPS Rule included a payment rate update for general acute care hospitals that successfully participate in the Hospital Inpatient Quality Reporting Program and are meaningful users of EHR of 1.4%. Additionally, in fiscal year 2015, the maximum reduction in payments under the Hospital Readmissions Reduction program increased from 2 to 3 percent. There can be no assurance that future changes in classifications of patient hospitalizations or revisions to annual documentation and coding adjustments or other payment update measures implemented in future prospective payment regulations will not result in fluctuations or declines in revenue.

There will continue to be uncertainties associated with future determinations of reimbursement levels related to DRG classifications, quality incentives, and DSH adjustments (as well as reimbursement for outpatient services, as discussed below). In addition, the Medicare program is subject to judicial interpretations, administrative rulings, governmental funding restrictions and requirements for utilization review (such as second opinions for surgery and preadmission criteria). Such matters, as well as more general governmental budgetary concerns, may reduce payments made to the Obligated Group under the Medicare program, and future Medicare payment rates may not be sufficient to cover increases in the cost of providing services to Medicare patients.

**Part B Reimbursement of Outpatient Services**. Hospitals are generally paid for outpatient services provided to Medicare beneficiaries based on established categories of treatments or conditions known as ambulatory payment classifications ("APC"). The actual cost of care, including capital costs, may be more or less than the reimbursements. Some services, however, are paid under a fee schedule. There can be no assurance that reimbursement for outpatient services will be sufficient to cover costs for such services.

**Medicare Advantage Plans**. Part C of the Social Security Act gives most Medicare beneficiaries the option to obtain Medicare coverage either under the traditional Medicare program (Parts A and B as described above), or under a Medicare Advantage plan. A Medicare Advantage plan may be offered by a coordinated care plan (such as an HMO or PPO), a private fee-for-service plan ("PFFS"), a special needs plan, an HMO point-of-service plan, or a medical savings account ("MSA") plan. Each Medicare Advantage plan is required to provide at least the benefits offered under Medicare Parts A and B (other than hospice care) and certain additional benefits. A Medicare Advantage plan will receive a capitated monthly payment from HHS for each Medicare beneficiary who has elected coverage under the plan. The rates vary greatly by geographic area, and the variations do not necessarily correspond with variations in health care providers' costs to provide or arrange for care for Medicare Advantage members. Therefore, rate increases may not necessarily synchronize with increases in general medical inflation. It is difficult to forecast CMS capitation methodologies and rates and, thus, Medicare Advantage revenue

with certainty.  In general, health care providers such as the Members of the Obligated Group must contract with Medicare Advantage plans to treat Medicare Advantage enrollees at agreed upon rates, with the exception of PFFS plans which do not require a contract with the provider.

Medicare Advantage organizations have not to date been a significant source of the Obligated Group's revenue.  If Medicare Advantage plans develop further in the Obligated Group's service area in the future, no assurance can be given that the Obligated Group would be successful in entering into agreements with such plans, and failure to reach agreements with active Medicare Advantage plans could lead to a decline in utilization of the Obligated Group's services by Medicare beneficiaries.  Moreover, there can be no assurance that rates negotiated for the treatment of Medicare Advantage enrollees would be sufficient to cover the Obligated Group's cost of providing services to such patients.  The Affordable Care Act may result in significant reductions in Medicare Advantage payments.

**Hospital Capital Costs**.  Medicare payments for capital costs (*e.g.*, depreciation, interest, taxes and similar expenses for plant and equipment) are paid by Medicare exclusively on the basis of a standard federal rate (based upon average national costs of capital), subject to limited adjustments specific to each hospital.  There can be no assurance that future capital-related payments will be sufficient to cover the actual capital-related costs of the Obligated Group's facilities applicable to Medicare patient stays or will provide flexibility for hospitals to meet changing capital needs.

**Medicare Payment for Preventable Medical Errors**.  The Deficit Reduction Act of 2005 (the "DRA") required the Secretary of HHS to identify complicating conditions present as a secondary diagnosis that are high cost and/or high volume and reasonably preventable through application of evidence-based guidelines (collectively referred to as "hospital-acquired conditions").  The DRA further required hospitals to begin reporting on claims for discharges, beginning October 1, 2007, whether the selected hospital-acquired conditions were present on admission.  In the 2008 IPPS Rule, CMS included several conditions identified by the National Quality Forum as "never events" (*i.e.*, inexcusable outcomes in a health care setting).  Each year, additional conditions classified as hospital-acquired or never events can be added to the inpatient prospective payment system final rule.  All such conditions have negative payment implications when acquired during an inpatient stay.  Effective July 1, 2011, federal payments to states for Medicaid services related to hospital-acquired conditions were prohibited. As announced in the 2015 IPPS Rule, commencing in federal fiscal year 2015, Medicare payments to certain hospitals for hospital-acquired conditions such as infections were reduced by one percent.  The incidence of adverse events and their payment implications continues to be an area of focus for regulators.

**Physician Payments**.  Physicians may elect to "participate" or enroll in the Medicare program as a provider.  Medicare Part B provides reimbursement for physician services, including employed and provider-based physicians, based upon a national fee schedule called the Resource-Based Relative Value Scale ("RBRVS").  Under the RBRVS system, payments for services are determined by the "resource costs" necessary to provide such services.  Payments also are adjusted for geographical differences.  The costs have three components: physician work, practice expense and professional liability insurance. Payments are calculated by multiplying the combined costs of a service by a conversion factor.  The RBRVS system encourages a shift towards greater reimbursement for the provision of primary care, and a reduction of technology-based diagnostic procedures and surgical procedures.  This continued shift in payment emphasis may affect the relationship between the Members of the Obligated Group and its medical staff and may increase pressure on hospitals to enter into bundled or global payment models, risk-based delivery models, or increase demands by physicians for payment from hospitals. There is no guarantee that reimbursement under RBRVS will cover the Obligated Group's actual costs of providing physician services to Medicare beneficiaries.

**Medicaid Reimbursement**

**Overview**.  Medicaid (Title XIX of the federal Social Security Act) is a health insurance program for certain low-income and otherwise qualifying individuals.  Pursuant to federal guidelines, each state establishes its own eligibility standards; determines the type, amount, duration and scope of services; sets the payment rates for services; and administers its own programs.  Medicaid is funded by federal and state appropriations.  Federal funding is provided to each state for its Medicaid program in the form of matching payments in amounts equal to a percentage of such state's Medicaid expenditures, ranging from 50% to 100%, depending upon the use of the funds and the per capita income of the state's recipients.  These federal medical assistance percentages ("FMAPs") are recalculated for each federal fiscal year.  Receipt of federal funding is contingent on a state Medicaid program's compliance with federal standards regarding beneficiary eligibility, coverage, benefits, and use of FMAP payments.  A number of provisions of the Affordable Care Act impact FMAPs (*e.g.*, FMAPs of up to 100% for certain newly eligible individuals, increased FMAPs for disaster-affected states, primary care payment rate increases, specific preventative services and immunizations, and smoking cessation for pregnant women).  Hospital benefits are available under each participating state's Medicaid program, within prescribed limits, to persons meeting certain minimum income or other eligibility requirements, including children, the aged, the blind and/or the disabled.

Payments made to health care providers under the Medicaid program are subject to change as a result of federal or state legislative and administrative actions, including changes in the methods for calculating payments, the amount of payments that will be made for covered services and the types of services that will be covered under the program.  Because a portion of Medicaid's program costs are paid by the State, the absolute level of Medicaid revenue paid to the Obligated Group, as well as the timeliness of their receipt, may be partly dependent upon the financial condition of and budgetary factors facing the State, which may be adversely affected by factors beyond the State's control.  State budgets are not only affected by state economic conditions but also by a combination of Colorado constitutional provisions that limit taxes and revenues while mandating increases in public education spending which are not tied to revenue increases.  Consequently, Colorado's ability to appropriate additional funds for the Medicaid program, or to increase taxes to provide additional revenue for health care, is limited by the state Constitution and may be further restricted by initiated ballot proposals or by other changes in law or policy.

Changes referenced in this overview have occurred in the past and may be expected to occur in the future, particularly in response to federal and state budgetary constraints.  Any future reduction in the level of Medicaid spending by the federal government or as a result of cuts in state budgets is likely to have an adverse impact on the revenues of the Obligated Group derived from the Medicaid program.

**Colorado Medicaid (also known as the Colorado Medical Assistance Program)**.  In Colorado, the Medicaid program is administered by the Colorado Department of Health Care Policy and Financing.  While the Obligated Group's present revenue from Medicaid is small in relation to its overall patient service revenue, that could change in the future.  See "SOURCES OF REVENUE" in Appendix A.  Fiscal considerations in setting both federal and state budgets will directly affect the funds available to providers for payment of services rendered to Medicaid patients.  Since state payments to Medicaid providers are subject to state legislative appropriation, delays in appropriations and state budget deficits which may occur from time to time create a risk that payments for services to Medicaid patients will be withheld or delayed.

Colorado Medicaid inpatient hospital services are reimbursed on a prospective basis using a DRG method.  Claims with discharge dates on or after January 1, 2014, are reimbursed using the all-patient refined grouper.  Colorado Medicaid outpatient hospital services are a combination of cost reimbursement

and fee schedules. At least one proposal has been made to reform Colorado Medicaid outpatient hospital rates to utilize the enhanced ambulatory patient group methodology. Medicaid approved charges may be significantly less than a provider's normal charges, and participating providers must accept the Medicaid reimbursement level as payment in full. There can be no assurance that Medicaid revenue will cover expenses for Medicaid patients.

**State Children's Health Insurance Program**. The State Children's Health Insurance Program ("SCHIP") is a federally funded insurance program for children whose families earn too much money to be eligible for Medicaid, but yet cannot afford commercial health insurance. CMS administers the SCHIP, but each state creates its own program based upon minimum federal guidelines. Colorado provides SCHIP benefits to uninsured children through Child Health Plan Plus. While generally considered to be beneficial for both patients and providers by reducing the number of uninsured children, it is difficult to assess the fiscal impact of SCHIP on the payments to the Obligated Group. Moreover, each state must periodically submit its SCHIP plan to CMS for review to determine if it meets the federal requirements. If it does not meet the federal requirements, a state can lose federal funding for its program. Finally, the future of SCHIP funding and at what levels is uncertain. Therefore, a state's decision to elevate the eligibility requirements, thereby decreasing the number of children eligible for SCHIP, the loss of federal approval for a state's program, or the failure of the federal government to appropriate additional funds for SCHIP all could have an adverse impact on the financial condition of the Obligated Group.

## Disproportionate Share Hospital Payments

The federal Medicare and state Medicaid laws permit states to include a "disproportionate share" adjustment in payments to hospitals in order to compensate those hospitals that serve a disproportionate share of indigent patients with a supplemental payment.

Regarding Medicare DSH payments, pursuant to the Affordable Care Act, beginning in federal fiscal year 2014, hospitals receiving supplemental DSH payments from Medicare (*i.e.*, those hospitals that care for a disproportionate share of low-income Medicare beneficiaries) had their DSH payments reduced significantly.

Regarding Medicaid DSH payments, on September 18, 2013, CMS issued a final rule confirming its methodology, which accounted for statewide reductions in uninsured and uncompensated care, and reduced Medicaid DSH allotments to each state. Under this final rule, the federal share of Medicaid DSH payments was reduced by $500 million in fiscal year 2014, $600 million in fiscal year 2015, and additional amounts through 2020. However, the Bipartisan Budget Act also included cuts such as a restructuring of Medicaid DSH payments reductions by delaying the fiscal year 2014 DSH payment cuts until fiscal year 2016, but increasing the overall level of reductions and extending cuts through fiscal year 2023. On April 16, 2015, President Obama signed into law the Medicare Access and CHIP Reauthorization Act of 2015, which further modified the planned reductions in Medicaid DSH payments by delaying fiscal year 2017 cuts until fiscal year 2018, restructuring the overall level of reductions, and extending cuts through fiscal year 2025.

The Hospital is not currently a DSH hospital, however, the reductions in DSH payments could impact the Obligated Group in the future if the Hospital were to become a DSH hospital.

## Medicare and Medicaid Annual Cost Reporting and Audits

The Obligated Group's annual cost reports, which are required under the Medicare and Medicaid programs, are subject to audit which ultimately may result in retroactive adjustments to the amounts

determined to be due to or from the Obligated Group under these programs. Medicare and Medicaid regulations provide for withholding payment in certain circumstances if audits of cost reports determine that an overpayment of Medicare or Medicaid funds has been made. These audits often require several years to reach the final determination of amounts earned under each program based on cost. Providers also have rights of appeal. As of October 31, 2014, the Obligated Group has settled its Medicare and Medicaid cost reports through the 2012 filing year (with the exception in each case of the 2009 filing year). In addition to cost report audits, program integrity audits are conducted under the auspices of the state.

The Obligated Group is not aware of any situation whereby a material Medicare or Medicaid payment is presently being withheld from the Obligated Group and does not anticipate that substantial withholdings or audit adjustments not covered by existing reserves will be made in the future. However, if such withholdings or audit adjustments were to be assessed, such an occurrence could have a material adverse effect on the Obligated Group's financial position.

In addition to the cost report audits described above, Medicaid has implemented an audit program relating to overpayment of Medicaid claims in specified years. The Obligated Group may be required to repay certain claims, but does not expect such repayments to be material in amount. Under certain circumstances, payments may be determined to have been made as a consequence of improper claims subject to the federal False Claims Act ("FCA") or other federal or state statutes, which could subject the Obligated Group to civil or criminal sanctions. See discussion of the FCA under the caption "—Fraud and Abuse Laws and Regulations—Billing and Reimbursement Practices" below this caption.

**Recovery Audit Contractors**

Over the last several years, CMS has implemented and expanded a program for the use of recovery audit contractors ("RACs") to search for improper Medicare payments, and the Affordable Care Act has extended the use of RACs to the Medicaid program, Medicare Advantage and Medicare Part D. RACs are compensated in part on the basis of their collections, and the program has reportedly resulted in significant recoveries of overpayments. These programs tend to result in retroactively reduced payment and higher administration costs to hospitals. The Obligated Group cannot anticipate the amount or volume of its past claims that will be reviewed by the RACs or what the results of any such audits may be.

**Fraud and Abuse Laws and Regulations**

The Affordable Care Act provides new methods and increased resources to combat waste, fraud and abuse, and these provisions are intended to be a significant source of funding for implementation of health care reform. Significantly, the Affordable Care Act authorizes the Secretary of HHS to exclude a provider from participation in Medicare, Medicaid and other governmental programs, as well as suspend payments to a provider, pending an investigation of a credible allegation of fraud against a provider. Thus, providers may experience adverse financial consequences based on a mere allegation of violation of a federal fraud and abuse law, even if such allegation is unproven or is never proved.

The Affordable Care Act provides for additional program integrity measures aimed at fraud prevention and detection (*e.g.*, data integration, sharing and matching; also enhanced provider screening and enrollment requirements). The Affordable Care Act also creates incentives for providers to create more integrated and coordinated care platforms, and there may be some potential for tension between these incentives and certain types of fraud and abuse regulation.

Additionally, the following laws govern fraud and abuse.

**Anti-Kickback Laws**.  A federal law (known as the "Anti-Kickback Law") make it a criminal felony offense  to knowingly and willfully offer, pay, solicit or receive remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program, or in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program.  For the purposes of the Anti-Kickback Law, a "federal health care program" includes the Medicare and Medicaid programs, as well as any other health plan or program funded directly, in whole or in part, by the United States government.

The Anti-Kickback Law has been interpreted to cover any arrangement where one purpose of the remuneration was to obtain or pay money for the referral of services or to induce further referrals. The scope of prohibited payments in the Anti-Kickback Law is broad and has been broadly interpreted by courts in many jurisdictions.  Read literally, the statute places at risk many otherwise legitimate business arrangements, potentially subjecting such arrangements to lengthy, expensive investigations and prosecutions initiated by federal and state governmental officials.   In particular, the Office of the Inspector General of HHS has expressed concern that the acquisition of physician practices by entities in a position to receive referrals of business reimbursable by Medicare from such practices could violate the Anti-Kickback Law.   In addition, the Anti-Kickback Law covers certain economic arrangements involving hospitals, physicians and other health care providers, including joint ventures, space and equipment rentals, management and personal services contracts and physician employment contracts.

In addition to certain statutory exceptions to the Anti-Kickback Law, HHS has adopted regulations establishing certain payment practices and arrangements as "safe harbors" which are deemed not to violate the Anti-Kickback Law.   These safe harbors include, among other arrangements, specifically described arrangements covering investment interests, space and equipment rentals, personal services and management contracts, sales of physician practices, specialty services referral arrangements, warranties, discounts, arrangements with group purchasing organizations, waivers of beneficiary coinsurance and deductible amounts, joint ventures with respect to ambulatory surgery centers and payment of physician malpractice insurance premiums. The safe harbors are, however, narrow, and do not cover a wide range of economic relationships which many hospitals, physicians and other health care providers have historically considered to be legitimate business arrangements not prohibited by the Anti-Kickback Law.  Because the safe harbor regulations do not purport to describe comprehensively all lawful or unlawful economic arrangements or other relationships between health care providers and referral sources, it is uncertain whether hospitals and other health care providers that have these arrangements or relationships may need to alter them in order to ensure compliance with the Anti-Kickback Law.  While the failure to comply with a statutory exception or regulatory safe harbor does not mean that an arrangement is unlawful, such failure may increase the likelihood of a regulatory challenge or the potential for investigation.  To date, a limited number of final safe harbors have been established.

In addition to criminal penalties, violations of the Anti-Kickback Law can lead to civil monetary penalties and suspension or exclusion from participation in Medicare, Medicaid and other federal health care programs.  A person who violates the Anti-Kickback Law is subject to damages of up to three times the total amount of remuneration offered, paid, solicited or received.  The government may also exclude from federal health care programs any individual who has a direct or indirect ownership or control interest in a sanctioned entity and has acted in deliberate ignorance or is an officer or managing employee of the sanctioned entity, irrespective of whether the individual participated in the wrongdoing.  Exclusion from the Medicare or Medicaid programs would have a material adverse impact on the operations and financial condition of the Obligated Group.

The Affordable Care Act amended a number of provisions of the Anti-Kickback Law. One such amendment provides that an Anti-Kickback Law violation may be established without showing that an individual knew of the statute's proscriptions or acted with specific intent to violate the Anti-Kickback Law. The new standard expands criminal and civil fraud exposure for transactions and arrangements where there is no intent to violate the Anti-Kickback Law. The Affordable Care Act further amended the Anti-Kickback Law to explicitly provide that a violation of the statute constitutes a false or fraudulent claim under the FCA.

The Health Insurance Portability and Accountability Act of 1996 ("HIPAA") created a new program operated jointly by HHS and the United States Attorney General to coordinate federal, state and local law enforcement with respect to fraud and abuse, including the Anti-Kickback Law. HIPAA also provides for minimum periods of exclusion from a federal health care program for fraud related to the federal health care programs, provides for intermediate sanctions and expands the scope of civil monetary penalties.

Pursuant to the mandates of HIPAA, the DRA, and the HITECH Act, increased emphasis is being placed on federal investigations and prosecutions of Medicare and Medicaid "fraud and abuse" cases and increases in personnel investigating and prosecuting such cases have been reported, which will most likely result in a higher level of scrutiny of hospitals and health care providers, including the Obligated Group.

Colorado has adopted a provision similar to the Anti-Kickback Law but applicable specifically to the Colorado Medical Assistance Act. Additionally, Colorado statutes proscribe unearned rebates and the division of professional fees for certain health care providers.

Management of the Corporation believes that the Obligated Group has used its best effort to comply with the Anti-Kickback Law and similar state laws. However, because of the breadth of those laws and the narrowness of the safe harbor regulations, there can be no assurance that regulatory authorities will not take a contrary position or that the Obligated Group will not be found to have violated the Anti-Kickback Law or a similar state law.

At the present time, management of the Corporation is not aware of any pending or threatened claim, investigation or enforcement action regarding the Anti-Kickback Law or a similar state law, if determined adversely to the Obligated Group, would have a material adverse effect on the Obligated Group's financial condition.

**Billing and Reimbursement Practices**. Health care providers, including hospitals and physicians' clinics, are also subject to criminal, civil and exclusionary penalties for violating billing and reimbursement standards under state and federal law. In recent years, state and federal enforcement authorities have increased audit activities, investigating and prosecuting providers for submitting false claims to Medicare or Medicaid for services not rendered or for misrepresenting the level or necessity of services actually rendered in order to obtain a higher level of reimbursement. In addition, federal and state legislation has been considered or enacted providing for or expanding existing civil and criminal penalties against certain activities.

There are principally three federal statutes addressing the issue of "false claims." First, the FCA imposes civil liability (including substantial monetary penalties and damages) on any person or corporation that, among other activities: (1) knowingly presents or causes to be presented a false or fraudulent claim for payment to the United States government; (2) knowingly makes, uses, or causes to be made or used a false record or statement to obtain payment; or (3) engages in a conspiracy to defraud the federal government by getting a false or fraudulent claim allowed or paid. A showing of specific intent to

defraud the federal government is not required to establish the requisite knowledge. "Knowingly" is broadly defined to include not only actual knowledge but also deliberate ignorance or reckless disregard of the facts. This statute authorizes private persons to file qui tam actions on behalf of the United States. Because qui tam lawsuits are kept under seal while the federal government evaluates whether the United States will join the lawsuit, it is impossible to determine at this time whether any such actions are pending against the Obligated Group and no assurances can be made that such actions will not be filed in the future.

The Fraud and Enforcement and Recovery Act of 2009 ("FERA"), signed into law on May 20, 2009, expands exposure under the FCA for a wide range of business transactions involving federal government funds. Pursuant to FERA amendments, the FCA may impose liability for false claims with more remote connections to the federal government.

The Affordable Care Act further expanded the FCA by requiring a person who receives an overpayment to report and repay the overpayment within 60 days after the overpayment is identified or the date any corresponding cost report is due, whichever is later. The Affordable Care Act defines overpayments as "any funds that a person receives or retains under Medicare or Medicaid to which the person, after applicable reconciliation, is not entitled." Failure to repay any overpayment within the deadline could lead to liability under the FCA.

In addition to the FCA, the Civil Monetary Penalties Law authorizes the imposition of substantial civil money penalties against an entity that engages in certain activities including, but not limited to, (1) knowingly presenting or causing to be presented, a claim for services not provided as claimed or which is otherwise false or fraudulent in any way; (2) knowingly giving or causing to be given false or misleading information reasonably expected to influence the decision to discharge a patient; (3) offering or giving remuneration to any beneficiary of a federal health care program likely to influence the receipt of reimbursable items or services; (4) arranging for reimbursable services with an individual or entity which is excluded from participation from a federal health care program; (5) knowingly or willfully soliciting or receiving remuneration for a referral of a federal health care program beneficiary; or (6) knowingly making or causing to be made a false statement, omission or misrepresentation of material fact in any application, bid or contract to participate in a federal health care program. The Secretary of HHS, acting through the OIG, also has both mandatory and permissive authority to exclude individuals and entities from participation in federal health care programs pursuant to this statute. On October 3, 2014, the OIG published a proposed rule and request for comments that would amend certain rules under the Civil Monetary Penalties Law, but final regulations have not yet been published.

In addition, as added by HIPAA, the commission of either one of the prohibited practices listed below may lead to civil monetary penalties: (1) the practice or pattern of presenting a claim for an item or service on a reimbursement code that the person knows or should know will result in greater payment than appropriate (*i.e.,* upcoding) and (2) engaging in a practice of submitting claims for payment for medically unnecessary services. Violation of such prohibited practices could amount to civil monetary penalties of up to $10,000 for each item or service involved..

Finally, it is a criminal federal health care fraud offense to: (1) knowingly and willfully execute or attempt to execute any scheme to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations or promises any money or property owned or controlled by any health care benefit program. Penalties for a violation of this federal law may include fines and/or imprisonment.

The DRA provides financial incentives to states that pass similar false claims statutes or amend existing false claims statutes that track the FCA more closely with regard to penalties and rewards to qui

tam relators.  In 2010, the state legislature adopted the "Colorado Medicaid False Claims Act" authorizing civil actions by the state as well as private rights of action against a person submitting false Medicaid claims.

Additionally, CMS is reviewing health care providers that are receiving large proportions of their Medicare revenues from outlier payments.  Health care providers found to have obtained inappropriately high outlier payments will be subject to further investigation by CMS.  Management of the Corporation does not believe that any such review of the Obligated Group would result in a material adjustment.

These enforcement activities are aimed at a wide variety of health care related activities, many of which have not generally been perceived as "fraud."  In many areas, regulatory authorities have not provided clear guidance.  The FCA and similar laws may be violated merely by reason of inaccurate or incomplete reports, and ordinary course errors and omissions may result in liability.  Because the Obligated Group has structured its accounting and financial systems around complex billing code mechanisms imposed by the Medicare and Medicaid programs, the Obligated Group may not be able to comply expeditiously with future Medicare and Medicaid modifications, which could result in an adverse effect on operations.

**Restrictions on Referrals.**  A federal law (known as the "Stark Law") prohibits, subject to limited exceptions, a physician who has a financial relationship, or whose immediate family member has a financial relationship, with entities (including hospitals) providing "designated health services" from referring Medicare patients to these entities for the furnishing of "designated health services."  The Stark Law defines designated health services as including, among other categories, inpatient and outpatient hospital services.  The Stark Law also prohibits the entity receiving the referral from filing a claim or billing for the services arising out of the prohibited referral.  The prohibition applies regardless of the reasons for the financial relationship and the referral; no finding of intent to violate the Stark Law is required.  There are a number of exceptions for certain arrangements, such as employment arrangements, personal service and physician recruitment activities meeting specified criteria, which are not considered violative of these federal referral prohibitions.  Regulations which the Secretary of HHS has stated are indicative of HHS' position provide further clarification regarding the application of these federal laws; however, numerous ambiguities and questions of interpretation exist concerning application of referral restrictions to specific business arrangements.

Sanctions for violation of the Stark Law include denial of payment for the services provided in violation of the prohibition, refunds of amounts improperly collected, a civil penalty of up to $15,000 for each service arising out of the prohibited referral, exclusion from participation in the federal health care programs, and a civil penalty of up to $100,000 against parties that enter into a scheme to circumvent the Stark Law's prohibition.  Under an emerging legal theory, violations of the Stark Law may also serve as the basis for liability under the FCA.  The types of financial arrangements between a physician (or a physician's immediate family member) and an entity that trigger the self-referral prohibitions of the Stark Law are broad and include ownership and investment interests and compensation arrangements as well as certain disclosure obligations.

Regulations promulgated under the Stark Law are subject to frequent amendment.  Such amendments are likely to require the Obligated Group to amend or terminate certain arrangements with physicians to comply with new regulatory requirements.  Most recently, on July 8, 2015, CMS published the Calendar Year 2016 Physician Fee Schedule proposed rule that includes, among other changes, proposed updates to the Stark Law regulations.  The final rule has not yet been issued.

Although the Stark Law only applies to Medicare, a number of states (including Colorado) have passed similar statutes pursuant to which similar types of prohibitions are made applicable to all other

health plans or third-party payors. A Colorado statute provides that it is unlawful for provider (including a physician) participating in the medical assistance program to make a referral to an entity for designated health services (including inpatient and outpatient hospital services) if the provider or an immediate family member of the provider has a financial relationship with the entity. The term "financial relationship" is broadly defined to include most forms of direct and indirect remuneration or ownership. The Colorado statute also contains various exemptions from the self-referral prohibition.

In its Calendar Year 2016 Physician Fee Schedule Rule, CMS published a number of proposed changes to the Stark law which, if adopted, will likely reduce the number of Stark violations self-reported to CMS under the Stark law based on technical contracting errors. However, the Stark rules (even if the proposals are adopted), and other federal and state fraud and abuse laws, still create daunting legal challenges for providers. Comments on the proposed rule are due on September 8, 2015.

Although management of the Corporation believes that the arrangements of the Obligated Group with physicians do not violate the Stark Law or a similar state law, as currently interpreted, there can be no assurance that regulatory authorities will not take a contrary position or that the Obligated Group will not be found to have violated the Stark Law or a similar state law. Sanctions under the Stark Law or a similar state law could have a material adverse effect on the financial condition and results of operations of the Obligated Group, as would any significant penalties, demands for refunds or denials of payment.

**Anti-Dumping**. In 1986, in response to concerns regarding inappropriate hospital transfers of emergency patients based on the patient's inability to pay for the services provided, Congress enacted the Emergency Medical Treatment and Active Labor Act ("EMTALA") (sometimes referred to as the "anti-dumping law"). Generally, EMTALA requires that hospitals and other facilities with emergency departments provide "appropriate medical screening" to patients who come to the emergency department to determine if an emergency medical condition exists. If so, the hospital must stabilize the patient within the capabilities of the hospital and the patient cannot be transferred unless stabilization has occurred or the transfer is done pursuant to EMTALA requirements. In addition, a hospital which receives an inappropriate transfer must report that transfer to CMS. Failure to comply with EMTALA may result in a hospital's exclusion from the Medicare and/or Medicaid programs, lawsuits for damages, as well as imposition of civil monetary penalties. As such, failure of the Obligated Group to meet its responsibilities under EMTALA could adversely affect the financial condition of the Obligated Group

Management of the Corporation believes that the policies and procedures of the Obligated Group are in material compliance with EMTALA, but no assurance can be given that a violation of EMTALA will not be found. Any sanctions imposed as a result of an EMTALA violation could have a material adverse effect on the future operations or financial condition of the Obligated Group.

**Other Federal Legislation.** Extensive procedural and substantive changes to fraud and abuse and reimbursement related provisions of federal law have been enacted. In part, the changes provide funding and other incentives to encourage more vigorous enforcement of existing law. In addition, criminal and civil penalty provisions have been added, existing requirements and penalties have been extended to additional federal programs, and changes have been made to mandatory and permissive exclusion provisions. New criminal violations relating to "health care fraud" and "federal health care offense" have been defined. New civil monetary penalties have been added for actions such as patterns of incorrect coding or billing for unnecessary services, offering inducements to beneficiaries to obtain services from a particular provider, and for contracting with, or employing, an individual who is excluded from participation in a federal health care program. These legislative changes have and will continue to produce a very substantial number of proposed and final rules, advisory opinions and other notifications, all of which could have a material adverse effect on the Obligated Group's financial condition or results of operations.

**Compliance**

Management of the Corporation believes that the business relationships, billing and claims practices and other operations and activities of the Obligated Group materially comply with the terms of all applicable federal and state fraud and abuse laws and regulations  However, in light of the broad scope of these provisions, the narrowness of safe harbor regulations, and the scarcity of case law or other concrete guidance in interpreting them, there can be no assurance that the Obligated Group will not be challenged under the various fraud and abuse provisions in the future.  Such a challenge could materially adversely affect the financial condition of the Obligated Group.  The increasing pace of development of new laws and regulations increases the risk of failure to comply with applicable legal requirements as interpreted by federal and state agencies.   The Obligated Group maintains an ongoing compliance program.  New compliance program regulations may be promulgated in the future, and their effects are unknown.

**Electronic Transmission of Health Information;**
**Privacy and Security Regulations**

The American Recovery and Reinvestment Act of 2009 (the "Recovery Act")  was signed into law on February 17, 2009.  The Recovery Act includes certain provisions which are intended to provide financial relief to health care providers.  Title XIII of the Recovery Act, otherwise known as the Health Information Technology for Economic and Clinical Health Act (the "HITECH Act"), provides for an investment of almost $20 billion in public monies for the development of a nationwide health information technology ("HIT") infrastructure.  The HIT infrastructure is intended to improve health care quality, reduce health care costs and facilitate access to necessary information.  Among other things, the HITECH Act provides financial incentives (through the Medicare and Medicaid programs), as well as loans and grants to encourage practitioners and providers to engage in "meaningful use" of electronic health record ("EHR") technology.   Health care providers demonstrate their meaningful use of EHR technology by meeting objectives specified by CMS for using HIT and by reporting on specified clinical quality measures.   Medicare payments are significantly reduced for hospitals and physicians who have not satisfied the performance and reporting criteria for demonstrating meaningful use.   Additionally, the federal government began auditing hospitals' and providers' records related to their attestation of being "meaningful users" in order to obtain the incentive payments. A hospital or provider that fails the audit will have an opportunity to appeal. Ultimately, hospitals or providers that fail on appeal will have to repay any incentive payments they received through these programs.

The HITECH Act has also significantly increased fines and the scope of remedies for violations of HIPAA and breaches of the privacy and security of individuals' protected health information.  The HITECH Act requires notification to affected individuals, news media and HHS in the event certain breaches of unsecured protected health information.  Criminal penalties are enforceable against persons who obtain or disclose protected health information without authorization.  In addition, a state's attorney general can bring civil actions against a person on behalf of residents adversely affected by violations of either HIPAA or the HITECH Act.  The attorney general can either seek to enjoin further violations or obtain money damages on behalf of the residents harmed.  HHS has begun to perform periodic audits of health care providers and business associates to ensure that required policies under the HITECH Act are in place.   Individuals harmed by violations of HIPAA or the HITECH Act will be able to recover a percentage of monetary penalties or a monetary settlement based upon methods to be established by HHS for this private recovery.  The HITECH Act also increases penalties for violations of HIPAA.  Any violation of the HITECH Act is subject to HIPAA civil and criminal penalties.

The effect of the Recovery Act, including the HITECH Act, on the Obligated Group cannot be determined at this time.  The Obligated Group has received substantial HITECH Act incentive payments

to date and expects to receive certain additional incentive payments over the next few years.  However, there is no guarantee that the financial incentives for adopting qualified EHR systems will be sufficient to offset the Obligated Group's costs for development and implementation of such a system.

HIPAA addresses the confidentiality of individuals' health information and requires the establishment of distinct privacy and security protections for individually identifiable health information. HHS has promulgated privacy regulations under HIPAA that protect patient medical records and other personal health information maintained by health care providers, hospitals, health plans, health insurers and health care clearinghouses (the "Privacy Regulations").  Management of the Corporation believes that the Obligated Group is in substantial compliance with the Privacy Regulations.

Security regulations have also been promulgated under HIPAA (the "Security Regulations"). Additionally, HHS has promulgated regulations to standardize the electronic transfer of information pursuant to certain enumerated transactions (the "Code Set Transactions").  Management of the Corporation believes that the Obligated Group is in substantial compliance with the Security Regulations and the Code Set Transactions.  However, as national and worldwide security breaches show, no organization is immune from any number of intentional or unintentional attacks or breaches of information security.

Use and disclosure of certain broadly defined protected health information is prohibited unless expressly permitted under the provisions of HIPAA and related regulations or authorized by the patient. HIPAA's privacy and security provisions extend not only to patient medical records, but also to a wide variety of health care clinical and financial settings where patient privacy restrictions often impose new communication, operational, accounting and billing restrictions.  These restrictions add costs and create potentially unanticipated sources of legal liability.

On January 25, 2013, HHS issued comprehensive modifications to the existing HIPAA regulations to implement the requirements of the HITECH Act, commonly known as the "HIPAA Omnibus Rule."  The HIPAA Omnibus Rule became effective on March 26, 2013, and covered entities were required to be in compliance by September 23, 2013 (though certain requirements have a longer timeframe).  Key aspects of the HIPAA Omnibus Rule include, but are not limited to: (i) a new standard for what constitutes a breach of protected health information, (ii) establishing four levels of culpability with respect to civil monetary penalties assessed for HIPAA violations, (iii) direct liability of business associates for certain violations of HIPAA, (iv) modifications to the rules governing research, (v) stricter requirements regarding non-exempt marketing practices, (vi) modification and re-distribution of notices of privacy practices, and (vii) stricter requirements regarding the protection of genetic information.  While the effects of the HIPAA Omnibus Rule cannot be predicted at this time, the obligations imposed thereunder could have a material adverse effect on the financial condition of the Obligated Group.

The HITECH Act revises the civil monetary penalties associated with violations of HIPAA as well as provides state attorneys general with authority to enforce the HIPAA Privacy Regulations and Security Regulations.  The revised civil monetary penalty provisions establish a tiered system, ranging from a minimum of $100 per violation for an unknowing violation to $1,000 per violation for a violation due to reasonable cause, but not willful neglect.  For a violation due to willful neglect, the penalty is a minimum of $10,000 per violation if the violation was corrected within 30 days of the date the violator knew or should have known of the violation and a minimum of $50,000 if corrected after 30 days. Maximum penalties may reach $1,500,000 for identical violations.  The new levels of civil monetary penalties apply immediately for unknowing violations or violations due to reasonable cause.

Criminal penalties will be enforced against persons who obtain or disclose personal health information without authorization. Finally, while there is currently no private cause of action for violations of HIPAA or the HITECH Act, an individual may have a right to sue based on state law.

The Office for Civil Rights ("OCR") is the administrative office that is tasked with enforcing HIPAA. OCR has stated that it has now moved from education to enforcement in its implementation of the law. Recent settlements of HIPAA violations for breaches involving lost data have reached the millions of dollars. Any breach of HIPAA, regardless of intent or scope, may result in penalties or settlement amounts that are material to a covered health care provider.

**Coding Update**

The International Classification of Diseases ("ICD") is the international standard diagnostic classification used for health management purposes, clinical use and billing. HHS mandated a change from the ICD-9 coding standards currently used to ICD-10 standards to be effective October 1, 2015. The coding update changes are costly to health care providers and continue to require significant planning, training and updates to the software and systems of the Obligated Group at substantial cost.

## THE AUTHORITY

The Authority, created July 1, 1977, is an independent public body politic and corporate constituting a public instrumentality and a political subdivision of the State. The Authority is not an agency of State government and is not subject to administrative direction by any department, commission, board or agency of the State. The Authority was created by the Act, and its purpose is to provide financing for health facilities and to provide alternative methods by which health institutions in the State or their affiliates may finance health facilities located in the State and other states and refund or refinance outstanding indebtedness incurred for such health facilities.

The Act provides that the governing body of the Authority will be a Board of Directors consisting of seven members appointed for staggered, four-year terms by the Governor with the consent of the State Senate. Members must be Colorado residents, and no more than four members may be of the same political party.

The Authority has offered and plans to offer other obligations from time to time to finance other health care facilities. Such obligations have been and will be issued pursuant to and secured by instruments separate and apart from the Bond Indenture. Payments on these other obligations will be payable solely from revenue pledged under the separate instruments relating to such obligations and not from any revenue pledged under the Bond Indenture.

The Authority has not prepared or assisted in the preparation of this Official Statement, except the statements under this caption with respect to the Authority and the information with respect to the Authority under the caption "LITIGATION—Authority" and, except as aforesaid, the Authority is not responsible for any statements made in this Official Statement. Except for the execution and delivery of documents required to effect the issuance of the Series 2015 Bonds, the Authority has not otherwise assisted in the public offer, sale or distribution of the Series 2015 Bonds. Accordingly, except as aforesaid, the Authority disclaims responsibility for the disclosures set forth in this Official Statement or otherwise made in connection with the offer, sale and distribution of the Series 2015 Bonds.

## FINANCIAL ADVISOR

Ponder & Co. has served as financial advisor to the Authority. Ponder & Co. is not obligated to undertake, and has not undertaken, an independent verification or to assume responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement. Ponder & Co. is an independent advisory firm and is not engaged in the business of underwriting or distributing municipal securities or other public securities.

## UNDERWRITING

Under a bond purchase agreement (the "Bond Purchase Agreement") entered into among the Authority, the Corporation and the Underwriter, the Series 2015 Bonds are being purchased for reoffering by the Underwriter at an aggregate purchase price of $103,480,751.49 (representing the aggregate principal amount of the Series 2015 Bonds plus a net premium of $4,038,242.70 and less Underwriter's discount of $557,491.21). The obligation of the Underwriter to accept delivery of the Series 2015 Bonds is subject to various conditions contained in the Bond Purchase Agreement.

The Bond Purchase Agreement provides that the Underwriter will purchase all of the Series 2015 Bonds if any are purchased, and that the Corporation will indemnify the Underwriter and the Authority against losses, claims and liabilities arising out of any untrue statement of a material fact contained in this Official Statement or the omission herefrom of any material fact in connection with the transactions contemplated by this Official Statement, except to the extent limited by the provisions of the Bond Purchase Agreement. The initial offering prices or yields may be changed from time to time by the Underwriter.

Wells Fargo Securities is the trade name for certain securities-related capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Bank, National Association ("WFBNA"). WFBNA, the sole underwriter of the Series 2015 Bonds, has entered into an agreement (the "Distribution Agreement") with its affiliate, Wells Fargo Advisors, LLC ("WFA"), for the distribution of certain municipal securities offerings, including the Series 2015 Bonds. Pursuant to the Distribution Agreement, WFBNA will share a portion of its underwriting or remarketing agent compensation, as applicable, with respect to the Series 2015 Bonds with WFA. WFBNA also utilizes the distribution capabilities of its affiliate Wells Fargo Securities, LLC ("WFSLLC"), for the distribution of municipal securities offerings, including the Series 2015 Bonds. In connection with utilizing the distribution capabilities of WFSLLC, WFBNA pays a portion of WFSLLC's expenses based on its municipal securities transactions. WFBNA, WFSLLC, and WFA are each wholly-owned subsidiaries of Wells Fargo & Company.

John Vigil, a former Senior Business Banking Relationship Manager at WFBNA, is a member of the Board of Directors of the Colorado Health Facilities Authority. WFBNA conducts its municipal securities sales, trading and underwriting operations through the WFBNA Municipal Products Group and is the sole underwriter for the sale of the Series 2015 Bonds. WFBNA Business Banking is unrelated to the WFBNA Municipal Products Group. While employed by WFBNA, Mr. Vigil did not participate in any Board of Directors' discussions regarding the Series 2015 Bonds, was not involved in the selection of the underwriters of the Series 2015 Bonds, and did not participate in the Board of Directors' authorization of the Series 2015 Bonds. Mr. Vigil has no financial interest in any compensation that may be received by the WFBNA Municipal Products Group in connection with this Series 2015 Bonds transaction.

# RATING

The Series 2015 Bonds have received a rating of "A" from Standard & Poor's Ratings Services ("S&P"). The rating reflects only the views of S&P and an explanation of the significance of the rating may be obtained from S&P. There is no assurance that the rating will remain in effect for any given period of time or that the rating will not be revised downward, suspended or withdrawn entirely by S&P if, in the judgment of the rating agency, circumstances so warrant. Any such downward revision, suspension or withdrawal of a rating is likely to have an adverse effect on the market price or marketability of the Series 2015 Bonds.

A rating is not a recommendation to buy, sell or hold the Series 2015 Bonds and any rating should be evaluated independently. Neither the Corporation, the Authority nor the Underwriter has undertaken any responsibility either to bring to the attention of the owners of the Series 2015 Bonds any proposed change in, suspension or withdrawal of the rating of the Series 2015 Bonds or to oppose any such change, suspension or withdrawal other than as described under the heading "CONTINUING DISCLOSURE UNDERTAKINGS—Material Event Notices" below.

# TAX MATTERS

**General Matters**. In the opinion of Sherman & Howard L.L.C., Bond Counsel, under existing laws, regulations, rulings and judicial decisions, interest on the Series 2015 Bonds is excludable from gross income for federal income tax purposes and is not a specific preference item for purposes of the federal alternative minimum tax. The opinion described in the preceding sentence assumes the accuracy of certain representations and compliance by the Authority and the Corporation with covenants designed to satisfy the requirements of the Internal Revenue Code of 1986, as amended (the "Code"), that must be met subsequent to the issuance of the Series 2015 Bonds. Failure to comply with such covenants could cause interest on the Series 2015 Bonds to be included in gross income for federal income tax purposes retroactive to the date of issuance of the Series 2015 Bonds. The Authority and the Corporation have covenanted to comply with such requirements. Bond Counsel has expressed no opinion regarding other federal tax consequences arising with respect to the Series 2015 Bonds.

Notwithstanding Bond Counsel's opinion that interest on the Series 2015 Bonds is not a specific preference item for purposes of the federal alternative minimum tax, such interest will be included in adjusted current earnings of certain corporations, and such corporations are required to include in the calculation of alternative minimum taxable income 75% of the excess of such corporations' adjusted current earnings over their federal alternative minimum taxable income (determined without regard to such adjustment and prior to reduction for certain net operating losses).

The accrual or receipt of interest on the Series 2015 Bonds may otherwise affect the federal income tax liability of the owners of the Series 2015 Bonds. The extent of these other tax consequences will depend upon such owner's particular tax status and other items of income or deduction. Bond Counsel has expressed no opinion regarding any such consequences. Purchasers of the Series 2015 Bonds, particularly purchasers that are corporations (including S corporations and foreign corporations operating branches in the United States), property or casualty insurance companies, banks, thrifts or other financial institutions, certain recipients of social security or railroad retirement benefits, taxpayers otherwise entitled to claim the earned income credit, or taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, should consult their tax advisors as to the tax consequences of purchasing or owning the Series 2015 Bonds.

In the further opinion of Bond Counsel, the Series 2015 Bonds, the transfer thereof and the income therefrom, including any profit made on the sale thereof, is exempt from all taxation and

assessments in the State of Colorado under existing laws of the State of Colorado.  Bond Counsel has expressed no opinion regarding other tax consequences arising with respect to the Series 2015 Bonds under the laws of the State of Colorado or any other state or jurisdiction.

**Backup Withholding**. As a result of the enactment of the Tax Increase Prevention and Reconciliation Act of 2005, interest on tax-exempt obligations such as the Series 2015 Bonds is subject to information reporting in a manner similar to interest paid on taxable obligations.  Backup withholding may be imposed on payments made to any beneficial owner who fails to provide certain required information including an accurate taxpayer identification number to any person required to collect such information pursuant to Section 6049 of the Code.  The reporting requirement does not in and of itself affect or alter the excludability of interest on the Series 2015 Bonds from gross income for federal income tax purposes or any other federal tax consequence of purchasing, holding or selling tax-exempt obligations.

**Original Issue Discount**.  The Series 2015 Bonds that have an original yield above their respective interest rates, as shown on the inside cover of this Official Statement (collectively, the "Discount Bonds") are being sold at an original issue discount.  The difference between the initial public offering prices of such Discount Bonds and their stated amounts to be paid at maturity constitutes original issue discount treated in the same manner for federal income tax purposes as interest, as described above.

The amount of original issue discount that is treated as having accrued with respect to a Discount Bond is added to the cost basis of the owner of the Discount Bond in determining, for federal income tax purposes, gain or loss upon disposition of such Discount Bond (including its sale, redemption or payment at maturity).  Amounts received upon disposition of such Discount Bond that are attributable to accrued original issue discount will be treated as tax-exempt interest, rather than as taxable gain, for federal income tax purposes.

Original issue discount is treated as compounding semiannually, at a rate determined by reference to the yield to maturity of each individual Discount Bond, on days which are determined by reference to the maturity date of such Discount Bond.  The amount treated as original issue discount on such Discount Bond for a particular semiannual accrual period is equal to (a) the product of (i) the yield to maturity for such Discount Bond (determined by compounding at the close of each accrual period) and (ii) the amount that would have been the tax basis of such Discount Bond at the beginning of the particular accrual period if held by the original purchaser, (b) less the amount of any interest payable for such Discount Bond during the accrual period.  The tax basis for purposes of the preceding sentence is determined by adding to the initial public offering price on such Discount Bond the sum of the amounts that have been treated as original issue discount for such purposes during all prior periods.  If such Discount Bond is sold between semiannual compounding dates, original issue discount that would have been accrued for that semiannual compounding period for federal income tax purposes is to be apportioned in equal amounts among the days in such compounding period.

Owners of Discount Bonds should consult their tax advisors with respect to the determination and treatment of original issue discount accrued as of any date and with respect to the state and local tax consequences of owning a Discount Bond.  Subsequent purchasers of Discount Bonds that purchase such Discount Bonds for a price that is higher or lower than the "adjusted issue price" of such Discount Bonds at the time of purchase should consult their tax advisors as to the effect on the accrual of original issue discount.

**Original Issue Premium**. The Series 2015 Bonds that have an original yield below their respective interest rates, as shown on the inside cover of this Official Statement (collectively, the "Premium Bonds") are being sold at a premium.  An amount equal to the excess of the issue price of a

Premium Bond over its stated redemption price at maturity constitutes premium on such Premium Bond. A purchaser of a Premium Bond must amortize any premium over such Premium Bond's term using constant yield principles, based on the purchaser's yield to maturity (or, in the case of Premium Bonds callable prior to their maturity, generally by amortizing the premium to the call date, based on the purchaser's yield to the call date and giving effect to any call premium). As premium is amortized, the amount of the amortization offsets a corresponding amount of interest for the period and the purchaser's basis in such Premium Bond is reduced by a corresponding amount resulting in an increase in the gain (or decrease in the loss) to be recognized for federal income tax purposes upon a sale or disposition of such Premium Bond prior to its maturity. Even though the purchaser's basis may be reduced, no federal income tax deduction is allowed. Purchasers of the Premium Bonds should consult their tax advisors with respect to the determination and treatment of premium for federal income tax purposes and with respect to the state and local tax consequences of owning a Premium Bond.

**Changes in Federal and State Tax Law**. From time to time, there are legislative proposals in the Congress and in the states that, if enacted, could alter or amend the federal and state tax matters referred to under this heading "TAX MATTERS" or adversely affect the market value of the Series 2015 Bonds. It cannot be predicted whether or in what form any such proposal might be enacted or whether if enacted it would apply to bonds issued prior to enactment. In addition, regulatory actions are from time to time announced or proposed and litigation is threatened or commenced which, if implemented or concluded in a particular manner, could adversely affect the market value of the Series 2015 Bonds. It cannot be predicted whether any such regulatory action will be implemented, how any particular litigation or judicial action will be resolved, or whether the Series 2015 Bonds or the market value thereof would be impacted thereby. Purchasers of the Series 2015 Bonds should consult their tax advisors regarding any pending or proposed legislation, regulatory initiatives or litigation. The opinions expressed by Bond Counsel are based upon existing legislation and regulations as interpreted by relevant judicial and regulatory authorities as of the date of issuance and delivery of the Series 2015 Bonds and Bond Counsel has expressed no opinion as of any date subsequent thereto or with respect to any pending legislation, regulatory initiatives or litigation.

## FINANCIAL STATEMENTS

Included in Appendix B-1 are the audited consolidated financial statements for the Holding Company as of and for the fiscal years ended October 31, 2014 and 2013, including supplementary consolidating schedules as of and for the fiscal year ended October 31, 2014 ("Holding Company Consolidated Financial Statements"), which financial statements were audited by BKD, LLP, Colorado Springs, Colorado, independent certified public accountants, whose report with respect thereto is also included in Appendix B-1. Included in Appendix B-2 are the unaudited interim combined financial statements for the Obligated Group as of and for the nine-month periods ended July 31, 2015 and 2014 (the "Obligated Group Interim Financial Statements"). There are differences in the format of the Holding Company Consolidated Financial Statements and the format of the Obligated Group Interim Financial Statements which make them not directly comparable. The Holding Company Consolidated Financial Statements include information with respect to certain entities which are not members of the Obligated Group or otherwise liable with respect to the Series 2015 Bonds or Obligation No. 1. See "GENERAL—Financial Statements" in Appendix A. The Obligated Group's results for the nine month period ended July 31, 2015 are not necessarily indicative of the results of either the Holding Company or the Obligated Group that can be expected for the entire fiscal year.

## CONTINUING DISCLOSURE UNDERTAKINGS

The Corporation has agreed, pursuant to the Continuing Disclosure Agreement dated as of October 1, 2015 (the "Continuing Disclosure Agreement") between the Corporation and UMB Bank, n.a., as the initial dissemination agent (the "Dissemination Agent"), to provide certain information in accordance with the requirements of Rule 15c2-12 (the "Rule") promulgated by the SEC. See Appendix E. The Corporation has undertaken all responsibilities for continuing disclosure for itself and the other Members of the Obligated Group as described below. It has been determined that no information concerning the Authority is material to any decision to purchase, hold or sell the Series 2015 Bonds and the Authority will not provide any such information. Neither the Dissemination Agent nor the Authority shall have any liability or responsibility to the registered owners or beneficial owners of the Series 2015 Bonds or to any other person with respect to the accuracy or completeness of any continuing disclosure with respect to the Series 2015 Bonds.

**Annual Financial Information.** The Corporation has agreed that, beginning with respect to its fiscal year ending October 31, 2015, it will provide to the Dissemination Agent, annual financial information and operating data in substantially similar form and scope to the financial information and operating data contained in this Official Statement in Appendices A and B-1. This annual financial information will include (i) audited consolidated financial statements of the Holding Company and affiliates, including consolidating schedules showing the Members of the Obligated Group, substantially in the form set forth in Appendix B-1, audited combined financial statements of the Members of the Obligated Group, or separate audited financial statements of each Member of the Obligated Group and (ii) updated information contained in the charts under the captions "UTILIZATION," "LIQUIDITY," "SOURCES OF REVENUE" and "HISTORICAL AND PRO FORMA DEBT SERVICE COVERAGE" in Appendix A. This information will be provided to the Dissemination Agent for delivery to the Municipal Securities Rulemaking Board (the "MSRB") for filing on its Electronic Municipal Market Access ("EMMA") system, annually within 150 days after the end of the Corporation's fiscal year.

**Quarterly Financial Information.** Although not required by the Rule, the Corporation has also undertaken to provide an unaudited cumulative quarterly combined balance sheet and income statement of the Members of the Obligated Group substantially the form set forth in Appendix B-2, within 45 days after the end of each of the first three quarters of each fiscal year, to the Dissemination Agent for delivery to the MSRB.

**Material Event Notices.** In addition, the Corporation has agreed to provide notice of the occurrence of any of the following events with respect to the Series 2015 Bonds to the Dissemination Agent for prompt delivery to the MSRB: (1) principal and interest payment delinquencies; (2) non-payment related defaults (if material); (3) unscheduled reserve fund draws reflecting financial difficulties; (4) unscheduled draws on credit enhancements, if any, reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, issuance of material notices or determinations or other material events affecting tax exempt status; (7) modifications to rights of bondholders (if material); (8) bond calls (if material); (9) defeasances; (10) release, substitution, or sale of property securing repayment (if material); (11) rating changes; (12) tender offers; (13) bankruptcy, insolvency, receivership or similar events with respect to an obligated person; (14) consummation of, or entry into or termination of a definitive agreement with respect to, mergers, consolidations, acquisitions or asset sales with respect to an obligated person (if material); or (15) appointment of a successor or additional trustee or trustee name change (if material). As required by the Rule, the Corporation has agreed to provide notice of these events in a timely manner not in excess of ten business days after the occurrence of the event.

The Dissemination Agent also will provide notice in a timely manner to the MSRB if the Corporation has failed to materially comply with the Continuing Disclosure Agreement.

**Enforcement; Applicability.**  Registered owners and beneficial owners of the Series 2015 Bonds may enforce specific performance of the above-described Continuing Disclosure Agreement by any available judicial proceeding, and such action to compel performance is stated to be the sole remedy under the Continuing Disclosure Agreement.  Neither the Authority, the Bond Trustee nor the Dissemination Agent has any power or duty to enforce the Continuing Disclosure Agreement.  Failure to comply with the Continuing Disclosure Agreement does not constitute a default under the Master Indenture, the Bond Indenture or the Loan Agreement.

**Previous Compliance.**  During the previous five years, the Corporation has complied in all material respects with its continuing disclosure obligations under the Rule except as follows.  The Corporation entered into a Loan Agreement, dated as of September 1, 2001, which contains a continuing disclosure undertaking (the "2001 CDA") with respect to the Authority's Revenue Bonds (Vail Valley Medical Center Project), Series 2001 (the "Series 2001 Bonds") and entered into a Continuing Disclosure Agreement, dated as of December 1, 2004 (the "2004 CDA") with respect to the Authority's Refunding Revenue Bonds (Vail Valley Medical Center Project), Series 2004 (the "Series 2004 Bonds").  During each of the previous five years, the Corporation inadvertently omitted to file or filed late certain annual operating data required to be filed by the 2001 CDA and/or the 2004 CDA, as follows:  medical staff profile and top ten admitting physicians by specialty (fiscal years 2010 and 2011 were omitted); historical utilization data and sources of gross patient service revenue (fiscal year 2010 was filed one year late and fiscal year 2014 was omitted); and historical pro forma debt service coverage and historical liquidity levels (fiscal years 2010, 2011, 2012, 2013 and 2014 were omitted).  Additionally, the Corporation failed to file notices of upgrades of its underlying rating occurring in December 2010 and May 2014.  The Series 2001 Bonds are no longer outstanding and the remaining outstanding Series 2004 Bonds were redeemed on September 23, 2015.  As a result, the Corporation has determined not to file such omitted operating data.

## LEGAL MATTERS

Certain legal matters incidental to the authorization and issuance of the Series 2015 Bonds by the Authority are subject to the approval of Sherman & Howard L.L.C., Denver, Colorado, as Bond Counsel, whose approving opinion (the form of which is attached as Appendix C) will be delivered with the Series 2015 Bonds.  Certain legal matters will be passed upon for the Authority by its general counsel, Ballard Spahr LLP, Denver, Colorado, for the Corporation by its counsel, Duane Morris LLP, Baltimore, Maryland, and for the Underwriter by Dorsey & Whitney LLP, Denver, Colorado.

## LITIGATION

**Authority**

There is not now pending or, to the knowledge of the Authority, threatened, any litigation restraining or enjoining the issuance or delivery of the Series 2015 Bonds or questioning or affecting the validity of the Series 2015 Bonds or the proceedings or authority under which they are to be issued.  There is no litigation pending or, to the Authority's knowledge, threatened, which in any manner questions the right of the Authority to enter into the Loan Agreement or the Bond Indenture or to secure the Series 2015 Bonds in the manner provided in the Bond Indenture and the Act.

**The Obligated Group**

No litigation or proceedings are pending or, to the knowledge of any Member of the Obligated Group, threatened, against any Member of the Obligated Group, except (i) litigation, proceedings or claims involving professional liability claims or general liability claims in which the probable ultimate recoveries and the estimated costs and expenses of defense, in the opinion of the Members of the Obligated Group, based upon consultation with its insurers, will be entirely within applicable insurance policy limits, and (ii) litigation, proceedings, or other types of claims, which, if adversely determined, in the opinion of the Members of the Obligated Group, based upon consultation with applicable counsel, will not have a material adverse effect on the Corporation's operations or financial condition.

## FORWARD-LOOKING STATEMENTS

This Official Statement (including the information included in Appendix A) contains "forward-looking statements." When used in this Official Statement, the words "estimate," "intend," "expect," "plan," "budget" and similar expressions identify forward-looking statements. Any forward-looking statement is subject to uncertainty and risks that could cause actual results to differ, possibly materially, from those contemplated in such forward-looking statements.

## MISCELLANEOUS

The references herein to the Act, the Bond Indenture, the Master Indenture, the Loan Agreement, the Continuing Disclosure Agreement and other documents referred to in this Official Statement are brief summaries of certain provisions thereof and do not purport to be complete. For full and complete statements of such provisions, reference is made to the Act and such documents. Copies of the documents mentioned under this caption are on file at the offices of the Underwriter and, following delivery of the Series 2015 Bonds, will be on file at the office of the Bond Trustee.

The rights of the owners of the Series 2015 Bonds are fully set forth in the Bond Indenture, and neither any advertisement of the Series 2015 Bonds nor this Official Statement is to be construed as constituting an agreement with the purchasers of the Series 2015 Bonds. So far as any statements are made in this Official Statement involving matters of opinion, estimates or projections, whether or not expressly stated as such, they are not to be construed as representations of fact.

The attached Appendices A, B, C, D and E are integral parts of this Official Statement and must be read together with all of the foregoing statements.

The Authority has appointed UMB Bank, n.a., a national banking association organized under the laws of the United States, to serve as Bond Trustee under the Bond Indenture, and the Obligated Group has appointed UMB Bank, n.a., as Master Trustee under the Master Indenture. The Bond Trustee is to carry out those duties assigned to it under the Bond Indenture and the Master Trustee is to carry out those duties assigned to it under the Master Indenture. Neither the Bond Trustee nor the Master Trustee has evaluated the risks, benefits, or propriety of any investment in the Series 2015 Bonds, and neither the Bond Trustee nor the Master Trustee makes any representation regarding the value or condition of any assets or revenues pledged or assigned as security for the Series 2015 Bonds or the investment quality of the Series 2015 Bonds, about all of which neither the Bond Trustee nor the Master Trustee expresses any opinion, and which both the Bond Trustee and the Master Trustee expressly disclaim the expertise to evaluate.

The Corporation has approved the use of this Official Statement in connection with the offering of the Series 2015 Bonds.  Except as to the information relating to the Authority contained under the captions "THE AUTHORITY" and "LITIGATION—Authority," the Authority has not participated in the preparation of this Official Statement and has made no investigation of the facts contained herein and assumes no responsibility for the sufficiency, accuracy or completeness of this Official Statement.

VAIL CLINIC, INC.

By:  /s/Doris J. Kirchner
President and Chief Executive Officer

———————————————————

**Appendix A**

———————————————————

**VAIL VALLEY MEDICAL CENTER OBLIGATED GROUP**

The information contained herein and included as Appendix A to this Official Statement has been provided by Vail Clinic, Inc.

# TABLE OF CONTENTS

GENERAL ........................................................................................................................... 1

    Overview ..................................................................................................................... 1

    Mission and Strategic Vision ..................................................................................... 1

    Master Facility Plan ................................................................................................... 2

    Financial Statements .................................................................................................. 4

ORGANIZATION ............................................................................................................... 5

    Governance of Holding Company .............................................................................. 5

    Governance of Corporation and Diversified Services ............................................... 6

    Management ................................................................................................................ 6

    Conflicts of Interest Policy ........................................................................................ 8

    Employees .................................................................................................................. 8

RELATED ORGANIZATIONS ........................................................................................... 9

FACILITIES ...................................................................................................................... 11

SERVICES AND BED COMPLEMENT ........................................................................... 13

    Services .................................................................................................................... 13

    Obligated Group Specialty Services ........................................................................ 13

    Third Party Specialty Services ................................................................................. 14

    Other Affiliations ..................................................................................................... 15

    Bed Complement ...................................................................................................... 16

MEDICAL STAFF ............................................................................................................. 17

SERVICE AREA AND COMPETITION ........................................................................... 20

HISTORICAL FINANCIAL INFORMATION .................................................................. 22

    Utilization ................................................................................................................ 22

    Summary of Revenue and Expenses ........................................................................ 23

    Management's Discussion and Analysis of Recent Financial and Operational
    Performance ............................................................................................................. 24

    Liquidity .................................................................................................................. 26

    Historical and Pro Forma Debt Service Coverage ................................................... 27

    Source of Revenue ................................................................................................... 27

    Capitalization ........................................................................................................... 29

INVESTMENTS ................................................................................................................ 29

LITIGATION ..................................................................................................................... 30

INSURANCE ..................................................................................................................... 30

BENEFIT PLANS .............................................................................................................. 30

LICENSES AND ACCREDITATIONS .............................................................................. 31

ENVIRONMENTAL MATTERS ....................................................................................... 31

# GENERAL

**Overview**

Vail Clinic, Inc., doing business as Vail Valley Medical Center (the "Corporation"), owns and operates a 58 bed general acute care community hospital in Vail, Colorado (the "Hospital"), approximately 100 miles west of Denver.  The Corporation also owns physician outpatient clinics, offices and treatment facilities in the nearby communities of Avon, Beaver Creek, Eagle, Edwards, Frisco, Gypsum and Silverthorne.  The Corporation was incorporated in 1965 as a Texas nonprofit corporation around the time the Vail ski mountain was first opened, and was converted in 2009 to a Colorado nonprofit corporation.  The Corporation is exempt from federal income taxes under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended (the "Code").

VVMC Diversified Services, doing business as VHS Physician Services ("Diversified Services"), provides outpatient services at offices located in the Medical Professional Building, the Hospital, the Edwards Campus and the Frisco Specialty Clinic.  Diversified Services is a Colorado nonprofit corporation exempt from federal income taxes under Section 501(c)(3) of the Code.  See "SERVICES AND BED COMPLEMENT—Specialty Services" for further information.

Both the Corporation and Diversified Services are wholly-owned subsidiaries of Vail Health Services (the "Holding Company"), a Colorado non-profit corporation.  The Holding Company is organized and operated exclusively for the benefit of the Corporation, Diversified Services and their affiliates which are entities described in Section 501(c)(3) of the Code.  The Holding Company was established in 2009 as a non-member corporation with a self-perpetuating board of directors.  The only material assets of the Holding Company are its equity interests in its wholly-owned subsidiaries.  The Holding Company is the sole member of, and elects the board of directors of, the Corporation and Diversified Services.  The Holding Company and its wholly-owned subsidiaries are collectively referred to herein as the "Organization."  See "—Organizational Chart" below for a depiction of the corporate structure of the Organization.  **The Corporation and Diversified Services are the only Members of the Obligated Group.**

**Mission and Strategic Vision**

The mission of the Organization is to provide superior health services with compassion and exceptional outcomes, including world-renowned orthopedic, regional cancer and emergency services.

The Organization strives to offer the highest value services to Eagle County residents and visitors to the Vail Valley by focusing on quality and safety as a highest priority.  As a goal, the Organization seeks to be the provider of choice in orthopedics for patients locally, nationally and internationally, while providing leading edge procedures in all service lines.  Implementation of the Organization's strategic vision includes the following:

- building world class facilities for physicians, staff and patients;

- recruiting and retaining physicians who are leaders in their respective specialty and sub-specialty practice areas;

- providing training and education to staff to enhance and maintain their skills in order to best serve patients and continually improve outcomes;

- retaining local business through partnerships with health plans and employers;

A-1

• providing leading edge technology through targeted annual capital investment;

• controlling costs through physician partnerships, standardization and strategic affiliations with other providers;

• investing in research to advance the quality of healthcare services provided; and

• growing responsibly, adding services that meet community needs and maintaining the Organization's financial strength.

**Master Facility Plan**

In line with its strategic vision, the Holding Company's Board of Directors (the "Holding Company Board"), in consultation with its advisory team and the Corporation's executive team and medical staff, adopted a comprehensive Master Facility Plan for the Hospital and its other healthcare facilities located in Vail, Colorado (the "Vail Campus"). The Master Facility Plan is the result of two years of extensive research and review.

In the 50 years since the Hospital began serving the town of Vail, healthcare has become increasingly complex and the regional population and guest volume have grown substantially. The Organization has evolved with these trends, however, the Vail Campus is aging (with some buildings nearing 45 years of age) and the infrastructure requires modernization in order to meet the challenges of modern medicine and to ensure that the facilities provide the medical staff with the resources necessary to continue offering the highest quality health care. Implications of the aging facilities include: the basic mechanical and electrical systems are nearing the end of their useful lives; new services have historically been placed where room could be found, sometimes causing disjointed functional relationships between the types of services and patients' access to those services; and existing space is confined and not keeping pace with the state of the industry or with hospitals that have been recently built or renovated in Aspen, Frisco, Glenwood Springs, Steamboat Springs and other mountain communities. The Master Facility Plan addresses these operational, clinical and technical requirements and provides a framework for redevelopment of the Vail Campus. The Master Facility Plan also ensures that the Hospital remains in Vail, with a sustainable strategy to meet the long-term needs of the community.

The Master Facility Plan provides for expansions of the Vail Campus in two primary phases as described below. The Master Facility Plan increases square footage at the Vail Campus from 207,000 square feet to 290,000 square feet. Critical to the overall plan is the relocation of the main entrance for the Vail Campus from a heavily used pedestrian corridor in the town of Vail to South Frontage Road.

**Phase 1 – West Wing Expansion**. The west wing of the Hospital is a three-story building at which the Hospital's main surgery department, patient care unit, intensive care unit and a cardiac catheterization lab are located. Phase 1 of the Master Facility Plan includes the addition of a new fourth floor for the west wing which will provide new larger space for the Steadman Clinic (defined below) and the Steadman Philippon Research Institute, both of which currently reside in other areas of the Hospital. Smaller multi-level expansions are also planned at the south and west sides of the west wing. In addition, interior spaces throughout the west wing will be reconfigured to provide increased space, including a Howard Head Sports Medicine clinic and research facilities for Steadman Philippon Research Institute. Construction of Phase 1 improvements commenced in July 2015 and is expected to be completed in 2017 at an estimated cost of $56 million.

**Phase 2 – East/Central Wing Expansion and Emergency Helipad Building**. The east and central wings of the Hospital include the Hospital's emergency and imaging departments on the first two floors. Vail Valley Surgery Center, LLC ("Surgery Center') operates one of its multi-specialty ambulatory surgery centers on the third floor of the central wing of the Hospital in space it leases from the

Corporation. The Surgery Center's space includes among other things four orthopedic and general outpatient surgery rooms. Phase 2 of the Master Facility Plan includes demolishing the east wing and replacing it with a new 45,000 square foot three story-facility. The central wing will be remodeled in order to better integrate with the new east wing. The ground level of the combined space will include an enclosed loading/delivery facility and a central utility plant; the second story will be devoted to a new, larger emergency department, a new imaging department and existing inpatient units; and the third story will include space for Hospital admissions, Vail Summit Orthopaedics (an unaffiliated physician practice group) ("VSO") and Vail-Summit Orthopaedic Foundation (the "VSO Foundation") (both of which currently reside in the Medical Professional Building on the Vail Campus).

Located below the east wing will be a multi-level parking structure accessible from the reconfigured main entrance for the Vail Campus, which will provide the majority of on-site parking for the Vail Campus. The existing parking structure on the Vail Campus will be demolished. Phase 2 of the Master Facility Plan also includes the construction of a new four story 13,500 square foot building on the north side of the Vail Campus, which will include an emergency helipad and space for future service line expansions. Construction of the new east wing (including the parking structure) and improvements to the central wing are expected to commence in 2017, with completion scheduled for 2019. Construction of the new emergency helipad building is expected to commence in 2018, with completion scheduled for 2020. The estimated cost of the Phase 2 improvements is $124 million.

An essential consideration in the design and construction sequencing of the Master Facility Plan is preventing disruption of ongoing patient care. Phase 1 of the Master Facility Plan includes development of the west wing, which will create new space and allow for consolidation of a number of existing uses. This consolidation will free up existing space on the Vail Campus that can then accommodate existing uses currently located in the east wing during Phase 2 construction (uses that would otherwise be displaced during demolition and reconstruction of the east wing).

Proceeds of the Series 2015 Bonds will be used to pay a portion of the costs of the Master Facility Plan improvements. The Vail Health Services Foundation, doing business as Vail Valley Medical Center Foundation (the "Foundation"), is undertaking a capital campaign with a goal of $75 million in order to raise additional funds for the costs of implementing the Master Facility Plan, with the remainder of the costs to be paid out of available reserves. To date, the Foundation has received approximately $24 million in pledges.

The Corporation has engaged Heery International of Denver, Colorado, as architect, Project One Construction of Englewood, Colorado, as construction manager, and GE Johnson Construction Company of Colorado Springs, Colorado, as general contractor. Heery International is a national architectural firm with more than 40 years of experience designing healthcare facilities throughout the country. Project One has provided construction management services for 20 years on projects in Colorado and elsewhere in the United States, including managing the construction of health care facilities. GE Johnson Construction was founded in 1967 and has built numerous hospital facilities, medical office buildings and medical clinics both in Colorado and nationally. The Corporation has entered into a guaranteed maximum price contract with GE Johnson with respect to Phase 1 of the Master Facility Plan. Prior to commencement of Phase 2, the Corporation expects to enter into a second guaranteed maximum price contract with GE Johnson which covers the Phase 2 improvements.

**Financial Statements**

Included in Appendix B-1 to the Official Statement are the audited consolidated financial statements for the Holding Company as of and for the fiscal years ended October 31, 2014 and 2013, including supplementary consolidating schedules as of and for the fiscal year ended October 31, 2014 ("Holding Company Consolidated Financial Statements"), which financial statements were audited by BKD, LLP, Colorado Springs, Colorado, independent certified public accountants, whose report with respect thereto is also included in Appendix B-1.  Included in Appendix B-2 to the Official Statement are the unaudited interim combined financial statements for the Obligated Group as of and for the nine month periods ended July 31, 2015 and 2014 (the "Obligated Group Interim Financial Statements").  There are differences in the format of the Holding Company Consolidated Financial Statements and the format of the Obligated Group Interim Financial Statements which make them not directly comparable.  In addition, the Obligated Group's results for the nine month period ended July 31, 2015 are not necessarily indicative of the results of either the Holding Company or the Obligated Group that can be expected for the entire fiscal year.

The Holding Company Consolidated Financial Statements include (i) the consolidated financial position and results of operations for each of the Holding Company, the Corporation, Diversified Services, VHS Management Services, Inc. ("Management Services") and the Foundation, each of which is a wholly-owned subsidiary of the Holding Company, (ii) the consolidated financial position and results of operations for the Surgery Center, in which the Corporation has a 50.1% interest, and (iii) beneficial interests in each of Volunteer Corps of the Vail Valley Medical Center ("Volunteer Corps") and Shaw Outreach Team ("Shaw Outreach Team").  The Corporation is a beneficiary of assets held by Volunteer Corps and Shaw Outreach Team and as a result the net assets of each entity are included in the Holding Company Consolidated Financial Statements in accordance with generally accepted accounting principles.  The board of directors of each entity has sole control over its respective assets and therefore the net assets of each entity are not available to the Corporation unless and until transferred to the Corporation by such entity.  The Holding Company Consolidated Financial Statements also reflect income with respect to entities in which the Corporation has invested, accounted for using the equity method.  The book value of these investments reflected in the balance sheet of the Holding Company Consolidated Financial Statements was $7,552,436, $7,397,011 and $7,235,304 as of October 31, 2012, 2013 and 2014, respectively.  The Holding Company Consolidated Financial Statements include supplementary consolidating schedules for (i) the Holding Company, the Corporation and Management Services, (ii) the Foundation, (iii) the Surgery Center, and (iv) Diversified Services.

The Obligated Group Interim Financial Statements include a balance sheet and income statement which reflect the combined financial position and results of operations for the Corporation and Diversified Services.  The Obligated Group constitutes greater than 95% of the assets of the Holding Company.  Investments in the Surgery Center are recorded under the equity method.  In addition, the Obligated Group Interim Financial Statements do not reflect net assets released from restriction.  See "HISTORICAL FINANCIAL INFORMATION—Summary of Revenue and Expenses" and Appendix B hereto for further information.

**The Corporation and Diversified Services are the only Members of the Obligated Group; none of the Holding Company, Management Services, Surgery Center, the Foundation, Volunteer Corps, Shaw Outreach Team or the other entities in which the Corporation has invested are members of the Obligated Group or are obligated with respect to Obligation No. 1 under the Master Indenture or with respect to the Series 2015 Bonds.**  See "RELATED ORGANIZATIONS" for more information.  Except as specifically noted, the financial information and utilization data in this Appendix A is that of the Obligated Group and does not include these other entities.

## ORGANIZATION

### Governance of Holding Company

The business and affairs of the Holding Company are governed by the Holding Company Board, which has a self-perpetuating board of directors consisting of no less than five and no more than 17 directors.  The Chair of the Corporation's Board of Directors (the "Corporation Board"), the President of the Corporation, and the Chair of the Foundation's Board of Directors (the "Foundation Board") serve as ex-officio, voting members of the Holding Company Board.  The other directors are divided into three classes of nearly equal size serving staggered three year terms such that not more than one-third of director seats are open for election each year.  Elected directors may serve a maximum of three consecutive terms and may be removed at any time, with or without cause, by the affirmative vote of a majority of the other directors.  Vacancies are filled by the vote of a majority of the remaining directors.

The current members of the Holding Company Board are:

| Member | Position | Term Expires October 31 | Principal Occupation and Employer |
| --- | --- | --- | --- |
| Andy Arnold | Director | 2016 | Management Consultant |
| Mel Bergstein | Director | 2017 | Retired |
| Sam Bronfman | Director | 2017 | Managing Partner of Bacchus Capital Management |
| Ron Davis | Director | 2016 | Private Investor |
| Johannes Faessler | Director | 2017 | Hotelier (owner of Sonnenalp Hotel) |
| Reg Franciose, MD | Director | 2018 | Physician |
| Peter Frechette | Director | 2017 | Private Investor |
| Art Kelton | Director | ex-officio | Real Estate Executive and Chair of the Corporation Board |
| Doris Kirchner | Director | ex-officio | President and Chief Executive Officer of the Corporation |
| Marc Philippon, MD | Director | 2015 | Physician |
| Jay Precourt | Director | 2017 | Private Investor |
| Michael Shannon | Chair | 2017 | Co-Founder KSL Capital Partners |
| Richard Steadman, MD | Trustee | | Physician |
| Sally Veitch | Director | 2017 | Real Estate Investor |
| Dan Pennington | Director | ex-officio | Chair of the Foundation Board |

The bylaws of the Holding Company provide that the Holding Company will also have Trustees, as determined by the Holding Company Board.  Eligible to serve as Trustees are those persons who were formerly members of the Holding Company Board but who are ineligible for further service due to term limits.  The role of a Trustee is to provide advice and counsel to the Holding Company Board.  Trustees are not eligible to vote.

The bylaws of the Holding Company provide that the Holding Company Board may designate one or more action committees, each of which includes at least one director and may exercise all of the authority of the Holding Company Board except as prohibited by its bylaws or the Colorado Revised Nonprofit Corporation Act (the "Act").  Only directors of the Holding Company Board are permitted to be voting members of an action committee.  The bylaws of the Holding Company also provide that

Holding Company Board may form one or more advisory boards comprised of such members as the Holding Company Board may designate. If an advisory board has one or more voting members who are not then also directors of the Holding Company Board, that advisory board may not exercise any power or authority reserved to the Holding Company Board by the Act, its articles of incorporation or its bylaws. The Holding Company does not currently have any action committees or advisory boards.

### Governance of Corporation and Diversified Services

Each of the Corporation and Diversified Services has its own board of directors. The Corporation Board consists of no less than six and no greater than 15 directors. The Chair of the Holding Company Board and the President of the Corporation serve as ex-officio, voting members of the Corporation Board. The board of directors of Diversified Services (the "Diversified Services Board") consists of no less than three and no greater than eight members. The Chair of the Holding Company Board and the President of the Corporation serve as ex-officio, voting members of the Diversified Services Board. The elected directors (non ex-officio members) of the Corporation Board and the Diversified Services Board are elected by the Holding Company for three year terms and may serve a maximum of three consecutive terms. Elected directors may be removed at any time by the Holding Company, and vacancies are filled by the Holding Company.

The Holding Company has reserved for itself the exclusive right to approve material business matters and other transactions for each of the Corporation and Diversified Services, including but not limited to, the appointment and removal of the President of the Corporation, amending articles and bylaws, approving budgets, approving borrowings in excess of $1.0 million, causing dissolution, merger or consolidation and approving sales of assets in excess of $1.0 million.

### Management

The general charge and supervision of the business of the Organization is delegated to the Corporation's management staff headed by the President and Chief Executive Officer. The Holding Company, Diversified Services, Management Services and the Foundation do not have any management staff, executive officers or other employees. The Chief Financial Officer of the Corporation, Charlie Crevling, resigned from his position in July 2015 but is serving as a consultant for financial operations and assisting in the implementation of the proposed financing. A search for a new Chief Financial Officer has commenced. Biographical information of the Corporation's key management staff follows.

**Doris Kirchner, President and Chief Executive Officer**. Ms. Kirchner has more than 30 years of health care experience with an additional ten years of senior management experience in the private sector. She graduated from William Jewell College with a bachelor's of science in nursing and received a master's degree in health services administration from the University of Kansas. Ms. Kirchner has held various management positions in nursing administration and quality and risk management. She served as Chief Operating Officer for the Corporation from 1986-1994 and during that time, she led the recruitment team for Dr. Richard Steadman's relocation to Vail. In 1994, Ms. Kirchner left her position for a healthcare consulting role with Quorum Health Services in Nashville, Tennessee, where she worked with hospitals, physician groups and hospital boards of directors. In 1997, she joined KSL Recreation Corporation, a leader in the luxury sector of hospitality, as corporate vice president of human resources with oversight of 9,000 employees. Following her retirement from KSL, Ms. Kirchner returned to the Corporation in 2008 as the interim Chief Operating Officer and accepted the role of Chief Executive Officer in 2009. In addition to her duties with the Corporation, Ms. Kirchner serves on the Board of Directors for the Colorado Hospital Association.

**Sheila Sherman, Vice President of Patient Care Services**.   Ms. Sherman joined the Corporation as the director of patient care services in 2012 and was appointed to the role of Vice President of Patient Care Services in 2014.  She holds a master's degree as a clinical nurse specialist and is actively pursuing her doctorate of nursing practice degree and executive nurse leader board certification. Ms. Sherman is board certified as an advanced practice nurse and is also board certified in advanced diabetes management.  With over 20 years of acute care and leadership experience, Ms. Sherman has a passion for influencing staff to strive for excellence in patient care and team work.  Her varied clinical and leadership roles have included intensive care nurse, director of medical surgical and pediatrics/cardiopulmonary rehabilitation and clinical nurse specialist.  Ms. Sherman has also worked in the pharmaceutical industry as a clinical coach.

**Rick Smith, Chief Administrative Officer**.  Mr. Smith has served as Senior Vice President and Chief Administrative Officer of the Corporation since 2012.  He has 25 years of human resource and leadership experience with companies such as Vail Resorts, Gerry Baby Products, The Pillsbury Company, and Frito-Lay.  Mr. Smith holds an undergraduate degree in business administration from Regis University and a master's degree in labor and industrial relations from the University of Illinois. Prior to joining the Corporation, Mr. Smith was a partner with Pilot Advisors, where he worked with companies across the country, providing advice and service in improving culture, building cohesive leadership teams, and offering leadership training and executive coaching.

**Dr. Barry Hammaker, Chief Clinical Officer and Medical Director**.  Dr. Hammaker is an employee of Denver Health and Hospital Authority and, pursuant to an agreement with Denver Health, he has served as Medical Director and Chief Clinical Officer since 2010.  Dr. Hammaker received his medical degree from Georgetown University School of Medicine and completed his residency and internship in general surgery at William Beaumont Army Medical Center in El Paso, Texas.  He is board certified by the American Board of Surgery and is active in advanced laparoscopic surgery, thoracic surgery, surgical endoscopy and colon cancer screening.  Dr. Hammaker's tenure at the Hospital includes medical director, medical staff president and vice president, and operating room committee chairman.  Before arriving in Vail in 2006, Dr. Hammaker completed 16 years of active duty military service, including multiple tours in Iraq and Afghanistan from 2001 to 2005.

**Charlie Crevling, Financial Consultant**.  Mr. Crevling served as Senior Vice President of Finance and Chief Financial Officer of the Corporation from October 2008 to July 2015.  He has 25 years of healthcare finance experience at major medical centers, including Virginia Mason Medical Center, Mary-Hitchcock Memorial at Dartmouth, the University of Colorado Hospital, Exempla Healthcare, and Colorado's Lutheran Medical Center.  Mr. Crevling holds an undergraduate degree in accounting and finance from the University of Washington and a master's degree in healthcare administration from the University of Colorado.

**Kelly Staight, CPA, Controller**.  Ms. Staight joined the Corporation in 2006 and has served as the Controller since 2007.  She has over 20 years of accounting experience, including eight years as an auditor with the accounting firm Deloitte & Touche LLP.  Ms. Staight holds an undergraduate degree in economics from the University of California, Los Angeles.

**Dan Pennington, Foundation President**.  Mr. Pennington has served as President of the Foundation since November 2014.  He has 25 years of experience in philanthropy, nonprofit business and healthcare leadership.  Mr. Pennington was the senior development director at the Mayo Clinic for 10 years, where he was responsible for raising funds that averaged more than $320 million annually. He was also the assistant chair for development and lead planner for a capital campaign for Mayo that surpassed its $1.25 billion goal by $100 million. Prior to joining Mayo, Mr. Pennington was the principal and senior consultant with Pennington & Company Inc., providing fundraising and public relations consulting services to nonprofit organizations of all sizes across the United States. Most recently, he served as the

chief philanthropy officer at Via Christi Health, the largest provider in Kansas.  Mr. Pennington leads the Foundation's capital campaign to support the Master Facility Plan.  He received a bachelors of science in journalism from the University of Kansas and a master's in philanthropic studies from Indiana University. Mr. Pennington is also a chartered advisor in philanthropy through The American College.

## Conflicts of Interest Policy

The Corporation has a conflicts of interest policy to protect the interests of the Organization when contemplating entering into a transaction or arrangement that might benefit the private interest of a board member, officer, key employee, medical staff or other individual of the Organization.  The policy provides that disclosure of an actual or potential financial conflict of interest (directly or indirectly through business, investment or family) will be made to the Chief Executive Officer of the Corporation who will report such matter to the Corporation Board.  The Chief Executive Officer of the Corporation or the Corporation Board will determine whether a conflict exists and in the case of a conflict, whether the contemplated transaction may be authorized as just, fair and reasonable to the Organization, considering the welfare of the Organization and the advancement of its purpose.  Procedures for addressing a conflict include the exercise of due diligence by the Corporation Board or committee as to whether the Organization can obtain with reasonable efforts a more advantageous transaction or arrangement from a non-conflicted party and, if a more advantageous transaction or arrangement is not reasonably possible under the circumstances, the Corporation Board or committee will, prior to authorizing the transaction giving rise to a conflict, determine by majority vote of the disinterested directors that the transaction or arrangement is in the Organization's best interest, for its own benefit, and whether it is fair and reasonable.

## Employees

The number of full-time equivalent employees of the Corporation varies from the peak during ski season (e.g., 760 full-time equivalent employees during December 2014 compared to 732 during May 2015).  For the fiscal years ended October 31, 2012, 2013 and 2014, the Corporation employed an annual average of 627, 726 and 739 full-time equivalent employees, respectively.  Prior to fiscal year 2013, the Howard Head Sports Medicine clinics were staffed by outside contractors.  The Holding Company, Diversified Services, Management Services and the Foundation do not have any employees.

Management of the Corporation believes that relations with its employees are positive.  None of the employees are covered by a collective bargaining agreement.  Wages paid by the Corporation are considered competitive and management of the Corporation believes that employee turnover is at an acceptable level for a resort area.  The Corporation has undertaken specific efforts to recruit and retain nurses, including providing education support and graduate nursing programs at the Hospital.  Nurse vacancy rates are currently at 6%.

## RELATED ORGANIZATIONS

**Vail Valley Surgery Center, LLC**

Vail Valley Surgery Center, LLC (the "Surgery Center") is a Colorado limited liability company and a joint venture owned by the Corporation (50.1%), the Steadman Clinic, VSO and other physicians (49.9%). The Surgery Center operates multi-specialty ambulatory surgery centers within the Hospital and at the Edwards Campus in space it leases from the Corporation. The Surgery Center is consolidated for financial reporting purposes in the Holding Company Consolidated Financial Statements, however, with respect to the Obligated Group Interim Financial Statements, investments in the Surgery Center are recorded under the equity method. Pursuant to agreements between the Corporation and the Surgery Center, the Corporation provides non-physician personnel for the Surgery Center (85 full-time equivalent employees as of July 31, 2015) and also provides non-clinical management and administrative services to the Surgery Center. The Surgery Center does not employ any physicians.

**Eagle Health Care Center, Inc.**

Eagle Health Care Center, Inc. ("Eagle Health") is a Colorado nonprofit corporation and a joint venture owned by the Corporation (50%) and Valley View Hospital of Glenwood Springs (50%). Eagle Health owns a 35,000 square foot medical office building in Eagle, Colorado (the "Eagle Healthcare Center"). Eagle Health leases space in the building to the Corporation and Valley View for their respective physician clinics and provides onsite imaging services to the physician clinics. The Corporation subleases its space in the building to Colorado Mountain Medical (an unaffiliated physician practice group). The Corporation also provides management and administration services for Eagle Health pursuant to agreements between the parties. The Corporation's investment in Eagle Health is accounted for under the equity method.

**Foundation**

Vail Health Services Foundation, doing business as Vail Valley Medical Center Foundation (the "Foundation"), is a Colorado nonprofit corporation and a wholly-owned subsidiary of the Holding Company. The Foundation operates exclusively for the benefit of the Corporation, Diversified Services and any other nonprofit company affiliated with the Holding Company. The Foundation has been in existence for over 20 years and has generally focused its efforts on regular annual fundraising drives in support of research, services and equipment for the Hospital. In November 2014, the Foundation hired Dan Pennington as President. With a current staff of nine individuals (all of whom are employees of the Corporation) with over 63 years of combined non-profit fundraising experience, the Foundation is undertaking a capital campaign with a goal of $75 million in order to raise additional funds for the costs of implementing the Master Facility Plan. To date, the Foundation has received $24 million in pledges.

The Holding Company is the sole member of the Foundation and also elects the board of directors of the Foundation (the "Foundation Board"). The Foundation Board consists of the President and Chief Financial Officer of the Holding Company and any other individual appointed by the Holding Company, who may be removed at any time by the Holding Company. The Holding Company reserved for itself the exclusive right to establish policies relating to the distribution or other use of the Foundation's funds, including funded reserves, donated funds (restricted and unrestricted) and net operating surplus, and the exclusive right to approve material business matters and other transactions for the Foundation, including but not limited to, the appointment and removal of the President of the Foundation, amending articles and bylaws, approving budgets, approving borrowings in excess of $1.0 million, causing dissolution, merger or consolidation and approving sales of assets in excess of $1.0 million. The Foundation is exempt from federal income taxes under Section 501(c)(3) of the Code.

**Volunteer Corps and Shaw Outreach Team**

Volunteer Corps of the Vail Valley Medical Center ("Volunteer Corps") and the Shaw Outreach Team ("Shaw Outreach Team") are volunteer organizations formed exclusively for the benefit of the Corporation. Volunteer Corps was founded in 1979 and through its 200 members donates 10,000 service hours to the Hospital each year, providing assistance to patients, guests and staff. Volunteer Corps also engages in fundraising activities for the benefit of the Hospital. The Shaw Outreach Team was formed in 2004 and supports patients and programs of the Shaw Regional Cancer Center and undertakes fundraising efforts. The Shaw Outreach Team was responsible for raising the funds to plan, build and furnish Jack's Place (a lodge facility owned by the Corporation that provides overnight accommodations for patients of the Shaw Regional Cancer Center and their caregivers and families) and creating an endowment to support operating costs.

**VHS Management Services, Inc.**

VHS Management Services, Inc. ("Management Services") is Colorado for-profit corporation and a wholly-owned subsidiary of the Holding Company. Management Services was created to perform certain administrative tasks for the other subsidiaries of the Holding Company. Management Services does not have any material assets or any management staff, executive officers or other employees.

**The Corporation and Diversified Services are the only Members of the Obligated Group; none of the Holding Company, Management Services, Surgery Center, the Foundation, Volunteer Corps, Shaw Outreach Team or the other entities in which the Corporation has invested are members of the Obligated Group or are obligated with respect to Obligation No. 1 under the Master Indenture or with respect to the Series 2015 Bonds.**

**Organizational Chart**

The following chart shows the corporate structure for the Organization.



## FACILITIES

The original Vail Clinic (staffed by one physician) was incorporated in 1965 around the time the Vail ski mountain was first opened.  Since then, the original clinic has grown to a regional medical center with two campuses and multiple clinics throughout the Obligated Group's primary and secondary service areas.  Following are brief descriptions of the existing facilities.  See "GENERAL—Master Facility Plan" for a description of the planned improvements to the Vail Campus.

**Vail Campus**.  The Organization's main campus is centrally located in Vail on approximately 4.57 acres and includes the Hospital facility, a three-story 177,000 square foot building divided into west, central and east wings.  In addition to the 58 licensed acute care beds, the Hospital facility includes emergency facilities (a level III trauma center), a sports medicine clinic, a sports medicine research facility, four operating rooms, a Women's and Children's Center (which includes seven LDRP (labor, delivery, recovery, postpartum) rooms, plus four additional private rooms for antepartum, postpartum overflow, gynecological and pediatric patients, as well as a Level II nursery with seven bassinets (five staffed) and a dedicated operating room), outpatient facilities (including four additional outpatient surgery rooms utilized by the Surgery Center), a cardiac catheterization lab, physician offices, diagnostic imaging space and equipment, a pharmacy, laboratory and cafeteria.  The original Hospital was constructed in 1968, and a number of renovations and expansions have occurred over the years.

The Corporation leases space in the Hospital to the Surgery Center.  This space includes four orthopedic and general outpatient surgery rooms and a dedicated room for endoscopic procedures.  The Surgery Center is supported by an 18-bed preparation area and recovery suite, preadmission evaluation office and a private waiting room for surgery patients and families.  The Corporation also leases space in the Hospital to the Steadman Clinic and the Steadman Philippon Research Institute.  See "SERVICES AND BED COMPLEMENT—Specialty Practices" for a discussion of operations of these entities.

Adjacent to the Hospital is a 30,000 square foot three-story medical professional building (the "Medical Professional Building") purchased by the Corporation in 2004.  The Corporation uses space in the Medical Professional Building for human resource and information services and a Howard Head Sports Medicine clinic.  The Corporation leases space in the building to third parties, including Colorado Mountain Medical, VSO and VSO Foundation (both of which are moving to the east wing of the Hospital following completion of Phase 2 of the Master Plan), the Steadman Clinic and the Steadman Philippon Research Institute.  Also located on the Vail Campus is a three level parking structure.

**Edwards Campus**.  The Organization's satellite campus in Edwards, Colorado (15 miles from Vail) is a nine-acre site containing the Edwards Pavilion, the Shaw Regional Cancer Center, the Surgery Center (Edwards Campus) and Jack's Place.  All of these facilities are owned by the Corporation.

Edwards Pavilion is a 34,000 square foot three-story building and includes the Corporation's Vail Institute for Aesthetic and Reconstructive Surgery, human resources and medical records departments and a Howard Head Sports Medicine clinic.  The Corporation leases space in the Edwards Pavilion to Mountain Family Health (an unaffiliated physician clinic providing health care for the medically underserved).  The Edwards Pavilion was originally constructed in 1998 and updated in 2005.

Shaw Pavilion is a 66,000 square foot three-story facility and includes the Corporation's Shaw Regional Cancer Center, Sonnenalp Breast Center, diagnostic imaging facilities, a café, and a library and education resource center.  The Shaw Regional Cancer Center was designed to provide comprehensive cancer care (including early diagnosis, chemotherapy, radiation therapy and cancer education and prevention services) to regional residents.  See "SERVICES AND BED COMPLEMENT—Specialty Practices" for additional description of the operations of the Shaw Regional Cancer Center.  Also at the Shaw Pavilion are a multi-specialty physician clinic operated by Diversified Services and a retail

pharmacy.   The Corporation leases space in the Shaw Pavilion to Colorado Mountain Medical, the Steadman Clinic and other physician practice groups.  The Foundation's offices are also located in the Shaw Pavilion.  The Shaw Pavilion was originally constructed in 2001 and updated in 2006.

The Surgery Center (Edwards Campus) is a 19,000 square foot two-story building completed in 2012.   The Corporation leases this building to the Surgery Center.   See "SERVICES AND BED COMPLEMENT—Specialty Practices" for a discussion of operations of the Surgery Center.

Also on the Edwards Campus is Jack's Place, a 10,500 square foot lodge facility located immediately adjacent to the Shaw Regional Cancer Center.  Jack's Place provides day and overnight accommodations for patients and their caregivers or family members while receiving treatments at Shaw Regional Cancer Center.  Jack's Place includes 12 private guest rooms, living and dining rooms, and a kitchen.  Guests provide their own general housekeeping, laundry and meals.  Jack's Place was constructed in 2007.

**Avon Urgent Care Center**.  The Corporation leases space in Avon (10 miles from Vail) for use as an urgent care center (5,300 square feet), an occupational health clinic (1,600 square feet), a Howard Head Sports Medicine clinic and a Travelers Clinic.  The urgent care center includes a nine-bed treatment area, onsite x-ray and teleradiology capabilities, on-site lab services, occupational health services and wound, orthopedic and respiratory care.  Travelers Clinic provides world travelers with medical, health, safety and travel information, including immunizations, travel medication prescriptions, medical advice and documentation.

**Beaver Creek Medical Center**.  The Corporation owns a 4,600 square foot facility at the base of the Beaver Creek Ski Resort (the "Beaver Creek Medical Center") (10 miles from Vail).  Built in 1986, this facility offers emergency health care services to Beaver Creek resort guests and includes a 12-bed treatment area, two of which are critical care.  The Beaver Creek Medical Center is open seven days per week during the ski/snowboard season.  A Howard Head Sports Medicine clinic is also on the premises.

**Eagle Healthcare Center**.  Built in 2007, the Eagle Healthcare Center is a 35,000 square foot medical office building located on a 10-acre parcel in Eagle, Colorado (30 miles from Vail).  The Eagle Healthcare Center is owned by Eagle Health (in which the Corporation has a 50% interest).   See "RELATED ORGANIZATIONS" for more information about Eagle Health.  The Corporation leases space in the building (6,500 square feet), all of which it subleases to Colorado Mountain Medical.

**Frisco Specialty Clinic**.  The Corporation leases 3,900 square feet of space in Frisco (30 miles from Vail) for use as a multi-specialty physician clinic which is operated by Diversified Services.  Services provided in Frisco include internal medicine, cardiology and endocrinology.  In addition, the Shaw Regional Cancer Center offers 3D mammography, certified breast experts, breast radiologists, and oncology services at the Frisco facilities.

**Gypsum Urgent Care Center**.  The Corporation owns a 25,300 square foot medical office building in Gypsum (40 miles from Vail) which is used as an urgent care clinic, providing a range or urgent health care services for patients seven days per week on a walk-in basis.  The Gypsum facility also includes space for various administrative departments of the Corporation.

The Corporation leases additional space in Eagle, Frisco, Gypsum and Silverthorne (30 miles from Vail), for use as additional Howard Head Sports Medicine clinics.

## SERVICES AND BED COMPLEMENT

**Services**

Patient services offered by the Obligated Group include the following:

24-Hour Emergency Care (Level III Trauma)
Aesthetic and Reconstructive Surgery
Anesthesiology
Cardiology Institute
    Anticoagulation Clinic
    Cardiac Catheterization Lab
    Cardiac Rehabilitation
    Echocardiography—Adults and Pediatrics
    Electrocardiography—Adults and Pediatrics
    Holter Monitoring
    Stress Testing
Clinical Laboratory
    Blood Bank
    Chemistry
    Hematology
    Microbiology
    Urinalysis
Dermatology
Diabetic Education
Electroencephalography
Endocrinology
Family Medicine
Food and Nutrition
Gastroenterology
General Surgery
Hospice
Hospitalist Services
Intensive Care
Internal Medicine
Mental Health
Mountain Family Health Center
Obstetrics/Gynecology
    Labor & Delivery, Postpartum, Newborn
    Nursery—Level II Nursery
    Lactation Service

Occupational Health and Worksite Wellness
Oncology
    Breast Imaging
    Medical Oncology
    Radiation Oncology
Ophthalmology
Orthopedics
Ostomy and Incontinence
Otolaryngology
Pathology
    Cytology
    Histopathology
    Surgical Pathology
Pediatrics
Pharmacy
Radiology
    Bone Densitometry
    Computerized Tomography (CT)
    Magnetic Resonance Imaging (MRI)
    Mammography
    Positron Emission Tomography (PET)
    Nuclear Medicine
    Ultrasound
    X-Rays
Rehabilitation Care
    Arterial Blood Gases
    Pulmonary Function Testing
    Sleep Studies
Sports Medicine
Traveler's Clinic
Urgent Care
Urology
Wound Care

**Obligated Group Specialty Services**

**Diversified Services**.  Diversified Services provides outpatient services at offices located in the Medical Professional Building, the Hospital, the Edwards Campus and the Frisco Specialty Clinic.  The specialties within Diversified Services include cardiology, interventional cardiology, endocrinology, general surgery, trauma and wound care, internal medicine, and aesthetic and reconstructive surgery. Diversified Services providers perform all of their surgeries at the Hospital and the Surgery Center (both

A-13

at the Hospital and the Edwards Campus) and exclusively utilize the Corporation's ancillary services for their patient needs.  Diversified Services does not have any management staff, executive officers or other employees, but contracts with the Corporation for physician and non-physician personnel.

**Shaw Regional Cancer Center**.  Shaw Regional Cancer Center provides high-quality, compassionate cancer care.  Shaw Regional Cancer Center was specifically designed to provide a comforting, safe, healing environment accented by cascading waterfalls, healing gardens, soothing music, comfortable furnishings and the inspiring Rocky Mountains.  Shaw Regional Cancer Center is a premier cancer center for destination cancer care, local residents and second homeowners.  By combining the expertise of highly trained physicians and cancer specialists with advanced technology and the healing powers of nature, compassion, fitness and nutrition, Shaw Regional Cancer Center provides an innovative, holistic approach to cancer treatment.  Shaw Regional Cancer Center is recognized and accredited by some of the top cancer organizations in the country and has received awards for its efforts in cancer care.  In fiscal year 2014, Shaw Regional Cancer Center generated approximately $30 million of the Organization's gross revenue and served 1,083 patients.

**Howard Head Sports Medicine**.  Howard Head Sports Medicine helps athletes rebuild their body and spirit.  Working closely with the world's top orthopedic doctors and researchers, Howard Head's progressive sports medicine protocols work to broadly reshape physical therapy.  With eight Eagle and Summit County locations, Howard Head offers the following rehabilitative, preventative and non-surgical therapies:  aquatic therapy, dry needling, hand therapy, lymphedema therapy, occupational therapy, orthopedic rehabilitation, Pilates, sports rehabilitation, total joint therapy, vestibular rehabilitation and men's and women's health programs.  The clinics are owned and managed by the Corporation and all therapists at the clinics are employees of the Corporation.  In fiscal year 2014, Howard Head generated approximately $16 million of the Organization's gross revenue and accounted for 68,000 patient visits.

**Third Party Specialty Services**

**Vail Valley Surgery Center**.  The Surgery Center is a joint venture owned by the Corporation (50.1%), the Steadman Clinic, VSO and other physicians (49.9%).  The Surgery Center operates multi-specialty ambulatory surgery centers within the Hospital and at the Edwards Campus in a warm atmosphere, with individualized attention and the ability to return home the same day or stay up to 23 hours for observation.  Physicians performing surgeries at the Surgery Center practice in the areas of orthopedics, pain management, gastroenterology, general surgery, ophthalmology, otolaryngology, plastic surgery and podiatry.  During the fiscal years ended October 31, 2013 and 2014, 5,666 and 6,126 surgeries and other procedures were performed at the Surgery Center and during the nine month periods ended July 31, 2014 and 2015, 4,563 and 4,803 surgeries and other procedures were performed at the Surgery Center.  In fiscal year 2014, the Surgery Center generated approximately $74 million of the Organization's gross revenue.  The Surgery Center opened in the Hospital in 2002 and on the Edwards Campus in 2012 in space it leases from the Corporation.

**The Steadman Clinic**.  The Steadman Clinic is an independent world-renowned orthopedic clinic with its primary facilities located in the Hospital and on the Edwards Campus.  Specializing in knee, hip, shoulder, elbow, hand, spine, foot and ankle injuries, the clinic's experience and research have led to significant advances in the field of orthopedics and sports medicine.  The clinic treats patients from all walks of life, including recreational and professional athletes from all over the world.  The Steadman Clinic was founded by Dr. J. Richard Steadman (emeritus) and currently consists of 10 orthopedic surgeons (all active staff members).  The Steadman Clinic also trains on an annual basis "fellow" orthopedic surgeons who come from throughout the United States and internationally to pursue research and to perform surgeries.  There are presently seven fellow surgeons at the Steadman Clinic and there are more than 75 surgeons practicing throughout the United States and internationally who have completed

this fellowship program.  Since 1989, the Steadman Clinic has leased space in the Hospital, and it will relocate to new larger space in the Hospital following completion of Phase 1 of the Master Facility Plan pursuant to a new 10 year lease.  The Steadman Clinic also leases space in the Medical Professional Building and on the Edwards Campus.

**Steadman Philippon Research Institute**.  The Steadman Philippon Research Institute is the nonprofit research partner of the Steadman Clinic, with its primary facilities located in the Hospital.  The Institute is recognized worldwide for its research into the causes, prevention and treatment of orthopedic disorders.  Committed to solving the orthopedic problems that limit an individual's ability to maintain an active lifestyle, the Institute's primary areas of research and education include basic scientific studies, clinical research, biomedical engineering, imaging research and education and fellowship.  The Institute's team collects data and publishes clinic research results, making the Institute one of the most published organizations in sports medicine research and education.  In June 2015, Johnny Huard, PhD, joined the Institute as Chief Scientific Officer.  Dr. Huard is internationally recognized for his leading research in the field of stem cells and regenerative sports medicine.  The Institute is an affiliate of the University of Texas, serving as its primary partner for regenerative medicine research for orthopedic issues.  The Corporation and the Institute are parties to a research affiliation agreement pursuant to which they have agreed to collaborate on biomechanical research and the Corporation is also designated as a principal hospital affiliate of the Institute.  Under this agreement, the President and Chief Executive Officer of the Corporation serves as an ex-officio member of the Institute's board of directors.  The Corporation also contributes funds to the Institute in furtherance of research efforts.  The Institute leases space in the Hospital and will relocate to new larger space in the Hospital following completion of Phase 1 of the Master Facility Plan pursuant to a new 10 year lease.  The Institute also leases space in the Medical Professional Building.

**Vail-Summit Orthopaedics**.  VSO is an orthopedic surgery practice group with its primary facilities located on the Vail Campus.  Serving one of the most active populations in the country, VSO specializes in meeting the unique needs of the Obligated Group's service area, including amateur and professional athletes.  VSO's fully integrated approach to injury and repair and healthy recovery involves a customized treatment plan for each patient.  Specialists work with the patient to understand the nature of the injury, the patient's overall health and fitness and his or her particular recovery goals.  Options for treatment are discussed with the patient and may integrate a variety of modalities.  VSO presently consists of nine orthopedic surgeons (all active staff members).  In fiscal year 2014, VSO physicians performed approximately 25% of all orthopedic procedures performed at the Corporation's facilities.  In 2013, VSO physicians established the VSO Foundation which is dedicated to the study of orthopedic medicine.  The Corporation and the VSO Foundation are parties to a research affiliation agreement pursuant to which they have agreed to collaborate on research in the field of orthopedics, and the Corporation is also designated as a principal hospital affiliate of the VSO Foundation.  Both VSO and the VSO Foundation lease space in the Medical Professional Building and will relocate to new space in the Hospital following completion of Phase 2 of the Master Facility Plan pursuant to new eight year leases.

**Other Affiliations**

The Corporation has contracted with Denver Health and Hospital Authority ("Denver Health") (a level I trauma center) for the exclusive provision of trauma and critical care services at the Hospital.  This has significantly elevated the quality and consistency of available trauma and general surgery services at the Hospital.  The service is staffed by four full-time qualified trauma/general surgeons.  The service is available 24 hours a day, 365 days per year, and includes staffing a trauma and general surgery clinic for post-surgery evaluation and follow-up on trauma patients and other general surgical patients.  In addition, Denver Health provides the services of Dr. Barry Hammaker as Chief Clinical Officer and Chief Medical Officer of the Hospital.

The Corporation has engaged Vail Valley Emergency Physicians to provide exclusive emergency room coverage at the Hospital, Beaver Creek Medical Center, Avon Urgent Care and Gypsum Urgent Care.   The current agreement with Vail Valley Emergency Physicians automatically renews for successive two-year periods unless terminated in accordance with the terms of the agreement.

The Corporation has engaged Colorado Anesthesia Group, PLLC to provide exclusive anesthesia services at the Hospital facilities and any newly established Hospital facilities generally within the Obligated Group's primary or secondary service areas.  The current agreement with Colorado Anesthesia automatically renews for successive three-year periods unless unless terminated in accordance with the terms of the agreement.

The Corporation has engaged Diversified Radiology of Colorado, P.C. to provide exclusive radiology services (excluding radiation oncology) at the Hospital facilities and any newly established Hospital facilities generally within the Obligated Group's primary or secondary service areas.   The current agreement with Diversified Radiology automatically renews for successive three-year periods unless terminated in accordance with the terms of the agreement.

The Corporation maintains affiliations with additional research and healthcare organizations, including:

- University of Colorado Denver/Anschutz Medical Campus School of Medicine and University of Colorado Cancer Center, which permits Hospital patients to participate in the National Cancer Institute's clinical trials for the treatment of cancer.

- Yampa Valley Medical Center, a hospital in Steamboat Springs, Colorado, with which the Corporation collaborates on the care and treatment of oncology patients in the region to provide services not available in each location.

- Swedish Medical Center (Englewood, Colorado) with respect to stroke treatment.

- Aurora Medical Center (Aurora, Colorado) with respect to cardiology services.

- Aspen Valley Hospital (Aspen, Colorado) with respect to radiation oncology referrals.

- Presbyterian St. Luke's Medical Center (Denver, Colorado) with respect to high risk maternity and neo-natal care.

See "—Specialty Practices" for information regarding the Corporation's affiliations with the Steadman Clinic, the Steadman Philippon Research Institute, VSO and the VSO Foundation.

## Bed Complement

The Hospital's licensed bed complement and staffed bed complement as of July 31, 2015:

|  | Staffed | Licensed |
|---|---|---|
| Medicine/Surgery/Oncology | 46 | 46 |
| Obstetrics and Gynecology | 8 | 8 |
| Intensive Care/Medical ICU | 4 | 4 |
| Total | 58 | 58 |

**MEDICAL STAFF**

The Obligated Group's medical staff includes all licensed medical, osteopathic and podiatric physicians and dentists, who are privileged to attend patients in the Hospital.  The Obligated Group categorizes its medical staff as active, active community-based, associate, affiliate, administrative, physician fellow, and honorary.  Appointments to the medical staff are made by the Corporation Board based on input from its Credentials Committee and the Medical Executive Committee and are made for a period of no more than 24 calendar months.  Only active and associate members have admitting privileges at the Hospital.  In addition, active staff members are required to maintain a professional office within thirty minutes of the Hospital.

Active community-based members consist of those who do not desire to admit and treat inpatients but who have an ongoing outpatient practice in the community, and wish to be affiliated with the Hospital's outpatient services for utilization of the Hospital's outpatient facilities.  Affiliate staff members consist of those who do not meet the criteria for active, active community-based or associate members but who wish to maintain a professional, collegial affiliation with the Hospital.  Physician fellows consist of specialist physicians who are engaged in a formal specialized medical training and who are sponsored by one or more active staff members.  Administrative staff members consist of those clinicians who have full or part time positions as administrators or academics and who are unable to fulfill the clinical patient contact requirements for active or associate medical staff categories.  Honorary status is restricted to those individuals whom the medical staff wishes to honor.

As of July 31, 2015, the Obligated Group's employed medical staff consisted of 16 board certified physicians, as well as five mid-levels (physician assistants and nurse practitioners).

**Employed Medical Staff**
**(by specialty)**

| | Total Staff |
|---|---|
| Adult Hospitalists | 5 |
| Cardiology | 2 |
| Endocrinology | 2 |
| Internal Medicine | 2 |
| Medical Oncology | 1 |
| Pediatric Hospitalists | 2 |
| Radiation Oncology | 1 |
| Reconstructive/Cosmetic Surgery | 1 |
| Total | 16 |

As of July 31, 2015, the Corporation's medical staff consisted of 278 providers, including 122 active members, 146 associate members, and 10 affiliate members.  All of the Corporation's employed physicians are active staff members.  Because the Obligated Group has traditionally met its medical staffing needs from unsolicited applicants, it does not have a formal recruitment program.

The following chart provides a detailed description of the Corporation's medical staff:

**Medical Staff Profile**
**July 31, 2015**

| Specialty | Active | Associate | Affiliate | Total |
|---|---|---|---|---|
| | | Staff Status | | |
| Allergy and Immunology | — | — | 1 | 1 |
| Anesthesiology | 22 | 3 | — | 25 |
| Cardiology | 1 | 7 | — | 8 |
| Dentist | — | 1 | 1 | 2 |
| Dermatology | — | 3 | — | 3 |
| Emergency Medicine | 20 | 1 | — | 21 |
| Family Medicine | 15 | 1 | — | 16 |
| Gastroenterology | 1 | — | — | 1 |
| General Surgery | 4 | 2 | — | 6 |
| Infectious Disease | — | 2 | — | 2 |
| Internal Medicine | 12 | 11 | 4 | 27 |
| Maternal Fetal Medicine | — | 2 | — | 2 |
| Medical Oncology | 1 | 5 | — | 6 |
| Neurology | — | 10 | 1 | 11 |
| Obstetrics and Gynecology | 6 | 1 | 1 | 8 |
| Ophthalmology | — | 2 | — | 2 |
| Oral Maxillofacial Surgery | — | 1 | — | 1 |
| Orthopedic Surgery | 22 | 5 | — | 27 |
| Otolaryngology | 1 | 3 | — | 4 |
| Pain | 1 | — | — | 1 |
| Pathology | 2 | 1 | — | 3 |
| Pediatric Cardiology | — | 3 | — | 3 |
| Pediatrics | 5 | 4 | — | 9 |
| Physical Medicine-Rehabilitation | 1 | 2 | — | 3 |
| Plastic Surgery | 2 | 2 | 1 | 5 |
| Podiatric Medicine | 1 | — | — | 1 |
| Psychiatry | — | 1 | — | 1 |
| Public Health | — | 1 | — | 1 |
| Pulmonologist | — | 2 | — | 2 |
| Radiation Oncology | 1 | 3 | — | 4 |
| Radiology | 2 | 65 | — | 67 |
| Urology | 2 | 2 | 1 | 5 |
| Total/Average | 122 | 146 | 10 | 278 |

The following table sets forth the additions and departures for the admitting (active and associate) staff members for the four most recent fiscal years:

**Medical Staff Additions and Departures**
**(active and associate staff members)**

| | Year Ended October 31 | | | |
| --- | --- | --- | --- | --- |
| | 2011 | 2012 | 2013 | 2014 |
| Balance at Beginning of Year | 276 | 256 | 267 | 273 |
| Additions | 32 | 40 | 48 | 32 |
| Deletions | (52) | (29) | (42) | (37) |
| Balance at End of Year | 256 | 267 | 273 | 268 |
| Net increase: | -7% | 4% | 2% | -2% |

The top ten physicians by charges for the fiscal year ended October 31, 2014 are listed (by specialty) in the following table.

**Top Ten Physicians by Charges**
**(by specialty)**
**October 31, 2014**

| Specialty | % of Gross Revenue | Number of Encounters | % of Encounters |
| --- | --- | --- | --- |
| Orthopedics | 9.2% | 974 | 1.1% |
| Orthopedics | 5.2% | 1,633 | 1.8% |
| Orthopedics | 5.1% | 1,831 | 2.0% |
| Radiation Oncology | 5.0% | 851 | 0.9% |
| Medical Oncology | 4.2% | 1,598 | 1.8% |
| Orthopedics | 3.2% | 569 | 0.6% |
| General Surgery | 2.5% | 1,306 | 1.4% |
| General Surgery | 2.4% | 1,507 | 1.7% |
| Orthopedics | 2.4% | 590 | 0.6% |
| Orthopedics | 2.3% | 843 | 0.9% |
| Subtotal | 41.5% | 11,702 | 12.9% |
| Other Physicians | 58.5% | 79,172 | 87.1% |
| Total | 100.0% | 90,874 | 100.0% |

In fiscal year 2014, Steadman Clinic physicians represented five of the top ten physicians by charges, accounting for 25% of the Organization's gross revenue; Mountain Surgical Associates represented two of the top ten physicians by charges, accounting for approximately 5% of the Organization's gross revenue; and one VSO physician was in the top ten physicians by charges, accounting for approximately 2% of the Organization's gross revenue.

## SERVICE AREA AND COMPETITION

The Obligated Group's primary service area includes Eagle County, and its secondary service area (particularly for sports medicine, oncology and other specialty services) includes the counties of Summit, Lake, Routt and Garfield.  In addition, the Hospital draws a significant number of patients from outside the service area and outside the State of Colorado due to a large number of tourists visiting the area and patients traveling to Vail specifically for treatment by physicians in one of the area's specialty surgical practice groups.  The Corporation estimates that in fiscal year 2014, approximately 65% of the Obligated Group's patients (both inpatient and outpatient) were from the Obligated Group's primary service area, while 20.5% were from elsewhere in Colorado and 14.5% were from outside of Colorado.

### Population

The following table sets forth population estimates reported by the United States Bureau of the Census for the years 2000, 2010 and 2014 for the counties within the Obligated Group's primary and secondary service areas.

**Population**

| County | 2000 | 2010 | 2014 |
|---|---|---|---|
| Primary Service Area | | | |
| Eagle ...................................................................... | 41,659 | 52,197 | 52,921 |
| | | | |
| Secondary Service Area | | | |
| Summit.................................................................... | 23,548 | 27,994 | 29,404 |
| Lake ....................................................................... | 7,812 | 7,310 | 7,357 |
| Routt ...................................................................... | 19,960 | 23,509 | 23,865 |
| Garfield .................................................................. | 43,791 | 56,389 | 57,461 |
| Total secondary service area................................. | 95,111 | 115,202 | 118,087 |
| | | | |
| Combined primary and secondary service areas............... | 136,770 | 167,399 | 171,008 |

### Competitive Environment

The Hospital is the regional provider within its primary service area in terms of both inpatient and outpatient services.  The Obligated Group's primary competitors are Summit Medical Center in Frisco (30 miles from Vail), which is a Centura-owned 25 bed hospital, and Valley View Hospital in Glenwood Springs (60 miles from Vail), which is a 78 bed independent non-profit hospital.  There are also hospitals located in Aspen (100 miles from Vail), Steamboat Springs (95 miles from Vail) and Leadville (45 miles from Vail).  In 2013, Valley View Hospital added radiation oncology services.  There is a Centura-affiliated surgery center in Frisco, and Centura has announced plans to open a 24/7 emergency center and medical clinic space in Avon (10 miles from Vail) in July 2016.  Kaiser Permanente is currently constructing facilities in Frisco which will include primary care services and laboratory and routine medical imaging.  Kaiser has also announced plans to open new medical offices in Edwards in January 2016, which are expected to offer services similar to those at the Frisco facilities.

### Economy, Personal Income and Unemployment Rate

The largest employer in the Obligated Group's primary and secondary service areas is Vail Resorts, which owns and operates four major ski areas in Eagle and Summit Counties:  Vail, Beaver Creek, Breckenridge and Keystone.  The economy in the Obligated Group's primary service area is tourism based with increasing year-round tourism supplementing the traditional winter ski season.  The

primary service area has relatively high median household income (United States Census Bureau estimates for 2013 of $74,456 for Eagle County compared to $58,433 for Colorado and $53,046 nationally), while having a relatively low wage per job (U.S. Bureau of Economic Analysis data for 2013 indicates $42,541 for Eagle County compared to $51,537 for Colorado and $50,012 nationally).  The cost of living is relatively high in the primary service area, especially with respect to housing (United States Census Bureau 2013 estimates for median value of owner-occupied housing units were $453,300 in Eagle County compared to $236,200 in Colorado and $176,700 nationally), while unemployment is relatively low (U.S. Bureau of Labor Statistics show June 2015 unemployment rates of 3.8% for Eagle County compared to 4.3% for Colorado and 5.3% nationally).  This reflects the prominence of the service sector in the local economy as well as the significant number of part-time jobholders given the resort and recreation-oriented locale.

## HISTORICAL FINANCIAL INFORMATION

### Utilization

The table below presents selected statistical indicators of patient activity for the Corporation for the fiscal years ended October 31, 2012, 2013 and 2014 and the nine month periods ended July 31, 2014 and 2015.

|  | Fiscal Year Ended October 31 | | | Nine Month Period Ended July 31 | |
|---|---|---|---|---|---|
|  | 2012 | 2013 | 2014 | 2014 | 2015 |
| Admissions (excluding newborns) | 2,148 | 1,875 | 1,861 | 1,435 | 1,344 |
| Patient Days | 6,437 | 5,820 | 5,725 | 4,352 | 4,126 |
| Newborns (deliveries) | 524 | 442 | 503 | 361 | 338 |
| Average daily census | 17.6 | 15.9 | 15.7 | 15.9 | 15.1 |
| Average beds in service | 58 | 58 | 58 | 58 | 58 |
| Percent occupancy | 30% | 27% | 27% | 27% | 26% |
| Average length of stay (days) | 2.98 | 3.09 | 3.05 | 2.98 | 3.06 |
| Total Surgeries | 3,680 | 3,372 | 3,234 | 2,524 | 2,425 |
|     Inpatient Surgeries | 1,392 | 1,306 | 746 | 587 | 613 |
|     Outpatient Surgeries | 1,306 | 1,261 | 1,586 | 1,236 | 1,139 |
|     Surgical Observations | 982 | 805 | 902 | 701 | 673 |
| Surgery Center Total Procedures | 5,152 | 5,666 | 6,126 | 4,563 | 4,803 |
|     Surgery Cases | 3,280 | 3,684 | 3,561 | 2,722 | 2,691 |
|     Endoscopy Procedures | 751 | 752 | 796 | 593 | 570 |
|     Pain Procedures | 1,121 | 1,230 | 1,769 | 1,248 | 1,542 |
| Emergency room visits [1] | 13,566 | 13,554 | 13,657 | 11,589 | 12,282 |
| Laboratory tests | 125,763 | 118,219 | 122,326 | 91,405 | 91,391 |
| Radiology exams | 36,827 | 34,873 | 36,221 | 28,545 | 28,984 |
| Physical therapy [2] | 39,323 | 33,983 | 38,568 | 29,094 | 29,440 |
| Radiation oncology—daily treatments | 4,550 | 2,814 | 3,095 | 2,301 | 2,562 |
| Radiation oncology—courses of treatment | 179 | 111 | 120 | 91 | 103 |
| Medical oncology—courses of treatment | 104 | 84 | 92 | 68 | 68 |
| Other outpatient visits [3] | 118,986 | 83,379 | 89,122 | 67,372 | 66,858 |

[1]   Includes Beaver Creek Medical Center.

[2]   Consists of inpatient and outpatient physical therapy at the Vail location.

[3]   Includes cardiac rehabilitation, occupational medicine, occupational therapy, physical therapy (at off-site clinics), cardiopulmonary services and urgent care visits.

**Summary of Revenue and Expenses**

The following tables sets forth selected historical consolidated financial information for the Holding Company as of and for the fiscal years ended October 31, 2012, 2013 and 2014 and selected historical combined financial information for the Obligated Group as of and for the nine month periods ended July 31, 2014 and 2015.  The financial information for the fiscal years ended October 31, 2012, 2013 and 2014 has been derived from the Holding Company's Consolidated Financial Statements, which were audited by BKD, LLP, Colorado Springs, Colorado, independent certified public accountants.  The financial information for the nine month periods ended July 31, 2014 and 2015 has been derived from the Obligated Group Interim Financial Statements.  There are differences in the format of the Holding Company Consolidated Financial Statements and the format of the Obligated Group Interim Financial Statements which make them not directly comparable.  See "GENERAL—Financial Statements" for more information.  In addition, the Obligated Group's results for the nine month period ended July 31, 2015 are not necessarily indicative of the results of either the Holding Company or the Obligated Group that can be expected for the entire fiscal year.

### Summary of Revenue and Expenses
### Fiscal Year Ended October 31

|  | 2012 | 2013 | 2014 |
|---|---|---|---|
| Operating Revenue |  |  |  |
| Patient service revenue (net of contractual discounts and allowances) | $217,918,800 | $211,523,939 | $220,896,593 |
| Provision for uncollectible accounts | (18,611,292) | (14,617,996) | (14,851,026) |
| Net patient service revenue less provision for uncollectible accounts | 199,307,508 | 196,905,943 | 206,045,567 |
| Other operating revenue | 13,371,644 | 14,839,677 | 14,691,208 |
| Net assets released from restrictions used for operations | 851,600 | 355,275 | 372,500 |
| Total operating revenues | $213,530,752 | $212,100,895 | $221,109,275 |
| Operating Expenses |  |  |  |
| Salaries, wages and employee benefits | 61,772,241 | 73,072,495 | 76,902,644 |
| Supplies and other expenses | 56,156,816 | 63,398,598 | 61,370,266 |
| Purchased services | 33,553,719 | 21,653,624 | 23,018,762 |
| Depreciation and amortization | 13,956,520 | 15,182,205 | 14,552,073 |
| Interest | 1,794,262 | 1,025,112 | 781,181 |
| Total operating expenses | $167,233,558 | $174,332,034 | $176,624,926 |
| Operating Income | $ 46,297,194 | $ 37,768,861 | $ 44,484,349 |
| Other Net Nonoperating Income |  |  |  |
| Loss on defeasance of debt | (1,029,648) | — | — |
| Other income | 3,815,519 | 12,229,615 | 7,508,686 |
| Total other income (expense) | 2,785,871 | 12,229,615 | 7,508,686 |
| Excess of Revenue Over Expenses | $ 49,083,065 | $ 49,998,476 | $ 51,993,035 |
| Changes in Net Unrealized Gain (Loss) on Investments | 644,601 | 88,884 | (192,673) |
| Net Assets Released From Restrictions – Used for Purchase of Land, Buildings and Equipment | 858,072 | 530,217 | 256,153 |
| Distributions to and Other Changes in Noncontrolling Interest | (7,247,441) | (10,333,829) | (10,912,777) |
| Increase in Unrestricted Net Assets | $ 43,338,297 | $ 40,283,748 | $ 41,143,738 |

## Summary of Revenue and Expenses
## Unaudited Nine Month Period Ended July 31

|  | 2014 | 2015 |
|---|---|---|
| **Operating Revenue** | | |
| Patient service revenue (net of contractual discounts and allowances) | $131,510,493 | $129,194.409 |
| Provision for bad debt | (11,077,711) | (6,490,574) |
| Net patient service revenue less provision for bad debt | 120,432,782 | 122,703,834 |
| Other operating revenue | 14,814,868 | 14,710,588 |
| Total operating revenue | $135,247,651 | $137,414,423 |
| **Operating Expenses** | | |
| Salaries, wages and employee benefits | 50,998,789 | 54,688,004 |
| Purchased services | 14,286,827 | 15,325,022 |
| Supplies and other expenses | 38,272,400 | 39,419,212 |
| Interest and amortization | 571,486 | 564,228 |
| Depreciation | 10,161,775 | 9,978,636 |
| Total operating expenses | $114,291,276 | $119,975,101 |
| Hospital Operating Gain (Loss) | $ 20,956,375 | $ 17,439,321 |
| Gain (Loss) of Subsidiaries | 8,557,725 | 10,388,751 |
| Consolidated Operating Gain (Loss) | 29,514,100 | 27,828,072 |
| Nonoperating Income | 7,814,613 | 6,391,285 |
| Excess Revenues Over Expenses | $ 37,328,714 | $ 34,219,357 |
| Change in Investment – Unrealized Gain (Loss) | $  1,769,860 | $ (4,987,804) |

**Management's Discussion and Analysis of Recent Financial and Operational Performance**

Unless otherwise stated below, the following discussion of financial information and operating data reflects the Holding Company's financial information for the fiscal years ending October 31, 2012, 2013 and 2014, the Obligated Group's financial information for the nine-month periods ending July 31, 2014 and 2015, and the Corporation's utilization data.  See "—Summary of Revenue and Expenses" and "Utilization" above and also the financial statements included as Appendices B-1 and B-2 to the Official Statement.

**Operations.**  During the three fiscal years ended October 31, 2014, total surgeries decreased 12%. This reflects a decrease in inpatient surgeries (46%) as the Hospital shifts towards more outpatient services, consistent with the national trend, as well as a significant portion of outpatient surgeries being shifted to the Surgery Center (Edwards Campus), which opened in June 2012 as part of a strategic decision by the Corporation.  The decrease in inpatient surgeries was partially offset by an increase in outpatient surgeries (21%) during the same period.  Inpatient surgeries also declined in fiscal year 2014 due to the loss of a VSO spine surgeon who has recently been replaced.  Consistent with shifting practice patterns, Hospital admissions and patient days decreased 13% and 11%, respectively, during the three fiscal years ended October 31, 2014, while emergency room visits remained relatively flat during the same period.

During fiscal year 2013, other outpatient visits decreased approximately 30% from the prior year primarily as a result of a decrease in physical therapy visits (at off-site clinics). Prior to fiscal year 2013, the Howard Head Sports Medicine clinics were staffed by an outside contractor and the termination of this arrangement resulted in the outside provider competing for business. Howard Head has recaptured much of the lost business (both at the Hospital and at off-site clinics) and physical therapy services are growing. The decrease in other outpatient visits was also the result of a decrease in cardio pulmonary and respiratory therapy procedures due to the loss of a cardiologist in 2013 who was replaced in 2014 with two interventional cardiology practices. Radiation and medical oncology services also experienced a decline during the three year period ended October 31, 2014, which is primarily attributable to a competitor adding radiation oncology services at its facility in the Obligated Group's primary service area as of September 2013. The Corporation has undertaken efforts to recapture market share and oncology services are growing.

**Revenues and Expenses**. During the three fiscal years ended October 31, 2014, net patient service revenue minus provision for uncollectible accounts increased 3% ($199.3 million in 2012, $196.9 million in 2013 and $206.0 million in 2014). Net patient service revenue increased despite a decline in volumes, primarily as a result of a small price increase (2%), as well as a change in the mix of services provided (which included an increase in radiation oncology services from fiscal years 2013 to 2014, which is a high revenue per unit of service specialty). Outpatient revenues accounted for approximately two-thirds of the Organization's gross revenue. Other operating revenue increased approximately 10% from 2012 to 2014.

During the three fiscal years ended October 31, 2014, total operating expenses increased 6% ($167.2 million in 2012, $174.3 million in 2013 and $176.6 million in 2014), with salaries, wages and employee benefits increasing 25% during the same period. The Corporation added a net annual average of 112 full-time equivalent employees during this period primarily as a result of staffing Howard Head with employees instead of through an outside contractor.

**Income**. During the three fiscal years ended October 31, 2014, operating income decreased 4% ($46.3 million in 2012, $37.8 million in 2013 and $44.5 million in 2014). Other (non-operating) income, generally consisting of investments (reported at lower of cost or fair value), decreased 39% in fiscal year 2014 versus the prior year, representing weaker investment returns.

**Balance Sheet**. During the three fiscal years ended October 31, 2014, patient accounts receivable (net of allowance) increased 25% ($24.0 million in 2012, $26.6 million in 2013 and $30.1 million in 2014). Total liabilities decreased 24% ($61.1 million in 2012, $48.4 million in 2013 and $46.3 million in 2014), primarily as a result of the prepayment of indebtedness. The Obligated Group's unrestricted cash and investments increased from $142.4 million (383.3 days) at October 31, 2012 to $194.9 million (509.8 days) at October 31, 2014, primarily as a result of strong operations and conservative capital spending in anticipation of the implementation of the Master Facility Plan. See "—Liquidity."

**Nine Month Period Ended July 31, 2015.** Inpatient surgeries increased 4% during the nine month period ended July 31, 2015 compared to the same period in the prior year. Outpatient surgeries and surgical observations also decreased during the same period (8% and 4%, respectively). Admissions and patient days also declined 6% and 5%, respectively, while emergency room visits increased 6%. Howard Head continues to recapture lost business. Oncology services also increased during the same period after a decline in prior periods due to increased competition in the Obligated Group's primary service area.

Net patient service revenue (less provision for bad debt) increased slightly (2%) during the nine month period ended July 31, 2015 compared to the same period in the prior year primarily due to the addition of two interventional cardiology practices in February 2015 and better accounts receivable

management.   Provision for bad debt decreased over 40% during the same period following the Corporation's conversion to a new accounting system in 2012 and due to the expansion of Medicaid eligibility under the Affordable Care Act.  Outpatient revenues continue to be an increasing portion of the Organization's gross revenue, increasing 5.7% during the nine month period ended July 31, 2015 ($136.4 million) compared to the same period in the prior year ($129.8 million).  Total operating expenses increased 5% during the nine month period ended July 31, 2015 ($120.0 million) compared to the same period in the prior year ($114.3 million), driven primarily by a 7% increase in salary, wages and employee benefits.  Gain on subsidiaries increased during the same period by 21% primarily as a result of increasing profitability of the Surgery Center (both at the Hospital and on the Edwards Campus).  Income from the Surgery Center was $10.5 million for the nine month period ended July 31, 2015 compared to $8.5 million for the nine month period ended July 31, 2014.

**Liquidity**

The table below presents the Obligated Group's Days Cash on Hand (as defined in the Master Indenture) at October 31, 2012, 2013 and 2014 and the nine month periods ended July 31, 2014 and 2015.

**Days Cash on Hand**

|  | Fiscal Year Ended October 31 | | | Nine Months Ended July 31 | |
| --- | --- | --- | --- | --- | --- |
|  | 2012 | 2013 | 2014 | 2014 | 2015 |
| Cash and cash equivalents | $ 15,780,994 | $ 12,820,732 | $ 15,491,913 | $ 19,989,580 | $ 18,015,432 |
| Unrestricted investments | 126,595,640 | 149,818,039 | 179,397,986 | 171,478,685 | 199,257,834 |
| Unrestricted cash and investments | $142,376,634 | $162,638,771 | $194,889,899 | $191,468,265 | $217,273,266 |
| Total Operating Expense[1] | $148,897,306 | $152,672,677 | $152,965,605 | $114,291,276 | $119,975,101 |
| Less:  Depreciation | 13,323,635 | 14,093,065 | 13,435,395 | 10,161,775 | 9,978,636 |
| Subtotal | $135,573,671 | $138,579,612 | $139,530,210 | $104,129,501 | $109,996,465 |
| Average Daily Operating Expense [2] | $     371,435 | $     379,670 | $     382,275 | $     381,427 | $     402,917 |
| Days Cash on Hand[3] | 383.3 | 428.4 | 509.8 | 502.0 | 539.3 |

[1]   Does not include provision for uncollectible patient accounts.
[2]   Total operating expenses (less depreciation) divided by the number of days in year.
[3]   Unrestricted cash and investments divided by average daily operating expense.

**Historical and Pro Forma Debt Service Coverage**

The following table sets forth Income Available for Debt Service (as defined in the Master Indenture) and the extent to which actual debt service in each fiscal year and the Maximum Debt Service Requirement (as defined in the Master Indenture) were covered by such Income Available for Debt Service for the periods presented.  Information for the fiscal years ended October 31, 2012, 2013 and 2014 was derived from the Holding Company Consolidated Financial Statements and information for the nine month periods ended July 31, 2014 and 2015 was derived from the Obligated Group Interim Financial Statements.  See Appendix D to the Official Statement "THE MASTER INDENTURE— Limitations on Indebtedness" with respect to calculation of the Obligated Group's Debt Service Coverage Ratio.

| | Fiscal Year Ended October 31 | | | Nine Month Period Ended July 31 | |
| | 2012 | 2013 | 2014 | 2014 | 2015 |
|---|---|---|---|---|---|
| Excess revenue over expenses [1] | $41,835,624 | $39,664,647 | $41,080,258 | $37,328,714 | $34,219,357 |
| Plus: Depreciation and amortization | 13,956,520 | 15,182,205 | 14,552,073 | 10,161,775 | 9,978,636 |
| Plus: Interest expense | 1,794,262 | 1,025,112 | 781,181 | 571,486 | 564,228 |
| Plus: Loss on defeasance of debt | 1,029,648 | — | — | — | — |
| Income Available for Debt Service | $58,616,054 | $55,871,964 | $56,413,512 | $48,061,975 | $44,762,221 |
| Actual Debt Service | $ 9,360,395 | $10,561,528 | $ 5,501,863 | $4,044,783 | $2,530,761 |
| Actual Debt Service Coverage Ratio | 6.3x | 5.3x | 10.3x | 11.9x | 17.7x |
| Pro Forma Maximum Debt Service Requirement [2] | $ 7,164,241 | $ 7,164,241 | $ 7,164,241 | $ 7,164,241 | $ 7,164,241 |
| Pro Forma Debt Service Coverage Ratio [2] | 8.2x | 7.8x | 7.9x | 8.9x | 8.3x |

[1] Includes distributions to and other changes in noncontrolling interest.
[2] Reflects the redemption of all outstanding Series 2004 Bonds on September 23, 2015.  All amounts reflect maximum annual debt service requirements (including for the nine month periods ended July 31, 2014 and 2015).

**Source of Revenue**

The Obligated Group receives payment for its services from the federal government under the Medicare program, the federal government and the State of Colorado under the Medicaid program, commercial insurance carriers, individuals, HMO/PPO and other managed care entities.  For a further discussion of Medicare, Medicaid and other payors, see "BONDHOLDERS' RISKS" and "REGULATION OF THE HEALTH CARE INDUSTRY" in the Official Statement.

The table below presents the percentage breakdown of the Corporation's gross patient service revenues by primary source of payment for the fiscal years ended October 31, 2012, 2013 and 2014.

|  | Fiscal Year Ended October 31 | | |
| --- | --- | --- | --- |
|  | 2012 | 2013 | 2014 |
| HMO/PPO | 33% | 32% | 35% |
| Commercial and Workers Comp | 13% | 12% | 9% |
| Blue Cross/Blue Shield | 18% | 18% | 17% |
| Vail Resorts | 3% | 3% | 3% |
| Medicare | 21% | 23% | 23% |
| Medicaid | 5% | 4% | 7% |
| Private payors and others | 7% | 8% | 6% |

**HMOs, PPOs and Commercial**.  Health Maintenance Organizations (HMOs) and Preferred Provider Organizations (PPOs) generally pay hospitals for approved services to enrolled members on the basis of contractual arrangements that have been negotiated between the HMO or PPO and the particular hospital.  Such contracts generally provide for payments on a discounted or capitated basis which take into account savings and other benefits to the Corporation.  None of the Organization's contracts are based on capitated payments.  The Corporation presently has contracted insurance arrangements with over 19 managed care companies, including Blue Cross and Blue Shield.  In fiscal year 2014, five of these entities accounted for 73.9% of the Corporation's gross patient service revenue derived from all managed care contracts, the three largest of which accounted for 59.1% of such revenue.

**Workers' Compensation**.  Payments for health-care services rendered to patients covered by workers' compensation are based upon a methodology similar to Medicare which utilizes inpatient DRGs and fee schedules for outpatient services.

**Vail Resorts**.  The Corporation and Vail Resorts entered into a Provider Agreement for Occupational Health Program as of November 2001.  Under this Agreement, the Corporation provides occupational health services for employees of Vail Resorts which include workers compensation services and other occupational health services such as drug and alcohol testing, safety programs and vaccinations.

**Medicare and Medicaid**.  Medicare is a federally sponsored program that reimburses hospitals for services provided to Medicare recipients.  In general, Medicare recipients include patients over 65 years of age and certain other patients, including disabled persons and persons with end stage renal failure.  At present, the federal government pays for inpatient services based on Diagnostic Related Groupings (DRGs) plus a pass-through payment for capital-related costs.  Outpatient services are paid under different methodologies.  For most outpatient procedures payments are made under the Ambulatory Payment Classification and the remainder is on the basis of the reasonable cost of services provided or fee schedules.  Medicare payments are subject to review and audit by the Center for Medicare and Medicaid Services of the Department of Health and Human Services.  Medicaid is a jointly sponsored Federal and State program which reimburses hospitals for services provided to Medicaid recipients.  Medicaid recipients primarily include the indigent and disabled minors.  Reimbursement under the Medicaid program is determined on substantially the same basis as Medicare.  See "BONDHOLDERS' RISKS" in the Official Statement.

## Capitalization

The table below sets forth the long-term indebtedness and capitalization of the Obligated Group as of October 31, 2014, and "As Adjusted" to reflect the issuance of the Series 2015 Bonds.

| | October 31, 2014 | |
| --- | --- | --- |
| | Actual | As Adjusted |
| Series 2004 Bonds[1] | $ 5,350,000 | — |
| Series 2012 Notes | 15,117,204 | $ 15,117,204 |
| Series 2015 Bonds | — | 100,000,000 |
| Other Debt [2] | 795,471 | 795,471 |
| Total Long-Term Debt | 21,262,675 | 115,912,675 |
| Less: Current Maturities | (2,043,951) | (248,951) |
| Net Long-Term Debt | 19,218,724 | 115,663,724 |
| Total Unrestricted Net Assets | 310,838,705 | 310,838,705 |
| Total Capitalization | $330,057,429 | $426,502,429 |
| Net Long-Term Debt as a Percentage of Total Capitalization | 5.8% | 27.1% |

[1]   Reflects issuance of the Series 2015 Bonds and the redemption of all outstanding Series 2004 Bonds on September 23, 2015.
[2]   Represents notes payable and capital lease obligations.

## INVESTMENTS

The Corporation maintains an investment policy for the investment of its funds (the "Funds"). The policy is reviewed annually and is subject to change at the discretion of the Corporation Board. The purpose of the investment policy is to establish guidelines for the appropriate investment of the Funds by describing the appropriate risk posture for investments. The investment policy specifies the target asset allocation policies of the Corporation and establishes guidelines regarding the selection of investment managers, investment objectives, permissible securities to acquire, and the appropriate investment diversification of assets permitted. The investment policy also establishes the criteria for evaluating the performance of the Funds and defines the responsibilities for the Corporation's investment committee and other parties for the management of the assets of the Fund.

Pursuant to its investment policy, the Corporation Board currently chooses a low risk profile for investment of its operating fund, with a primary objective of preserving principal and avoiding liquidity risk. The Corporation Board currently chooses a moderate risk profile for its nonrestricted fund, which assumes a moderate level of volatility and risk of principal loss, with a primary objective of long-term growth of capital.

Investments are managed by Northern Trust. Recent audited asset allocations of the Organization may be found in Note 17 of the Holding Company Consolidated Financial Statements included in Appendix B-1.

## LITIGATION

At any given time, the Organization has a number of lawsuits pending against it alleging professional liability. The Organization employs and retains legal counsel to defend its interests in these professional liability suits. Given the Organization's professional liability insurance coverage and its excess commercial insurance coverage, it is the opinion of the management of the Corporation, based on consultation with legal counsel, if the pending professional liability suits were decided unfavorably to the Organization, there would be no material adverse effect on the financial condition of the Organization.

To the knowledge of the management of the Corporation, there are no other suits threatened against the Organization.

## INSURANCE

The Organization is insured for professional liability risks under the terms of a commercial general liability policy issued by Copic Insurance Co., which provides primary coverage on a claims-made basis in the amount of $1,000,000 per occurrence and $3,000,000 in the aggregate for professional liability coverage and $1,000,000 in the aggregate for general liability coverage. In addition, the Organization has obtained a liability umbrella policy with an aggregate annual limit of $10,000,000.

In addition to professional and general liability insurance, the Organization carries workers' compensation and employers' liability insurance, directors' and officers' liability insurance, general automobile liability insurance, coverage against loss of or damage to buildings and contents by fire and other casualties, business interruption insurance, cyber insurance, and certain other coverages.

## BENEFIT PLANS

The Corporation has a defined contribution retirement plan pursuant to Section 403(b) of the Code (the "Plan") covering all eligible employees (those completing one year of service to the Corporation). The Corporation makes matching contributions of up to 7.0% of an employee's base compensation following one year of service to the Corporation. Matching contributions vest on a six-year schedule for employees hired on or after January 1, 2004 and on a five-year vesting schedule for employees hired prior to January 1, 2004. The Corporation has a deferred compensation top hat plan for certain members of its administrative staff and physicians effective August 1, 2005. The top hat plan is a voluntary deferred compensation plan under Section 457(b) of the Code. The Corporation also has an executive retirement plan for its President and Chief Executive Officer of the Corporation effective August 1, 2005 and the current Chief Financial Officer effective March 1, 2011. This executive retirement plan is a defined benefit plan under Section 457(f) of the Code. As of October 31, 2014 and 2013, the Corporation recorded approximately $2.3 million and $2.2 million, respectively, in employee benefit plan expense.

The Corporation sponsors a health care for plan for employees. This plan is self-insured to the extent of the deductible amounts under the excess risk insurance policy of the Corporation. The Corporation's employee benefits program also includes dental and vision coverage, short-term and long-term disability, life insurance, tuition assistance, continuing education courses and paid time off program.

## LICENSES AND ACCREDITATIONS

The Corporation is fully accredited by the Joint Commission on Accreditation of Health Care Organizations and has a three-year overall accreditation granted in August 2015, which accreditation includes the Hospital, Edwards Pavilion, Shaw Pavilion, Avon Urgent Care Center, Beaver Creek Medical Center, Eagle Healthcare Center, Frisco Specialty Clinic, Gypsum Urgent Care Center and Howard Head Sports Medicine clinics. The Hospital is licensed by the Colorado Department of Public Health and Environment as an acute care hospital. The clinics in Avon, Beaver Creek, Eagle, Edwards, Frisco and Gypsum are all operated under the Corporation's hospital license. Management of the Corporation believes that the Organization is in material compliance with licensing requirements applicable to its operations.

## ENVIRONMENTAL MATTERS

The Organization is subject to numerous regulations with respect to environmental matters. See "BONDHOLDERS' RISKS—Environmental Matters" in this Official Statement. Certain environmental matters related to Organization's properties are discussed below.

Certain older facilities on the Vail Campus contain asbestos. In preparation for the renovation and/or reconstruction of the Vail Campus, the Organization in 2013 hired a third party inspector to prepare a Renovation Specific Asbestos Inspection. The report identified asbestos material in certain facilities on the Vail Campus which will be remediated as required by law in connection with the renovation and/or reconstruction of such facilities pursuant to the Master Facility Plan.

Although the Vail Campus includes an incinerator which complies with State standards, since 1994 the Organization has had its biomedical and hazardous wastes transported by third party contractors to offside locations where it is disposed of pursuant to regulatory standards.

(THIS PAGE INTENTIONALLY LEFT BLANK)

_____

**Appendix B-1**

_____


**HOLDING COMPANY CONSOLIDATED FINANCIAL STATEMENTS**

(THIS PAGE INTENTIONALLY LEFT BLANK)

# Vail Health Services

Independent Auditor's Report and Consolidated Financial Statements

October 31, 2014 and 2013

# Vail Health Services
## October 31, 2014 and 2013

## Contents

**Independent Auditor's Report on Consolidated
Financial Statements and Supplementary Information**....................................................1

**Consolidated Financial Statements**

Balance Sheets................................................................................................................ 3

Statements of Operations................................................................................................ 5

Statements of Changes in Net Assets ............................................................................ 6

Statements of Cash Flows .............................................................................................. 7

Notes to Financial Statements ....................................................................................... 9

**Supplementary Information**

Balance Sheet – 2014 Consolidating Information ......................................................... 36

Statement of Operations – 2014 Consolidating Information.......................................... 40

Statement of Changes in Net Assets – 2014 Consolidating Information ....................... 42



111 S. Tejon Street, Suite 800 // Colorado Springs, CO 80903-2286
719.471.4290 // fax 719.632.8087 // bkd.com

## Independent Auditor's Report on Consolidated Financial Statements and Supplementary Information

Board of Directors
Vail Health Services
Vail, Colorado

We have audited the accompanying consolidated financial statements of Vail Health Services (the Organization), which comprise the balance sheets as of October 31, 2014 and 2013, and the related statements of operations, changes in net assets and cash flows for the years then ended, and the related notes to the financial statements.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

### Auditor's Responsibility

Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.



Board of Directors
Vail Health Services

### *Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Organization as of October 31, 2014 and 2013 and the results of its operations, the changes in its net assets and its cash flows for the years then ended in accordance with accounting principles generally accepted in the United States of America.

### *Supplementary Information*

Our audits were conducted for the purpose of forming an opinion on the consolidated financial statements as a whole.  The consolidated balance sheets, statements of operations and changes in net assets information listed in the table of contents is presented for purposes of additional analysis and is not a required part of the consolidated financial statements.  Such information is the responsibility of management and was derived from and relates directly to the underlying accounting and other records used to prepare the consolidated financial statements.  The information has been subjected to the auditing procedures applied in the audit of the consolidated financial statements and certain additional procedures, including comparing and reconciling such information directly to the underlying accounting and other records used to prepare the consolidated financial statements or to the consolidated financial statements themselves, and other additional procedures in accordance with auditing standards generally accepted in the United States of America.  In our opinion, the information is fairly stated in all material respects in relation to the consolidated financial statements as a whole.

*BKD, LLP*

Colorado Springs, Colorado
February 25, 2015

2

# Vail Health Services

## Consolidated Balance Sheets
## October 31, 2014 and 2013

## Assets

|  | 2014 | 2013 |
|---|---|---|
| **Current Assets** |  |  |
| Cash and cash equivalents | $ 22,236,306 | $ 18,664,156 |
| Assets whose use is limited | 1,868,456 | 3,802,880 |
| Current portion of pledges receivable | 114,291 | 100,000 |
| Patient accounts receivable - net of allowance; |  |  |
| 2014 - $15,012,653 and 2013 - $11,727,859 | 30,099,587 | 26,611,070 |
| Inventories | 9,493,244 | 9,234,573 |
| Other current assets | 4,210,692 | 4,519,891 |
| Total current assets | 68,022,576 | 62,932,570 |
| **Investments and Assets Whose Use is Limited** | 188,560,753 | 155,949,211 |
| **Pledges Receivable, Less Current Portion** | 314,542 | 130,000 |
| **Land, Buildings and Equipment, Net** | 111,040,657 | 108,078,098 |
| **Investment in Eagle Health Care Center, Inc.** | 7,235,304 | 7,397,011 |
| **Beneficial Interests in Affiliated Organizations** | 233,869 | 298,266 |
| **Deferred Financing Cost, Net** | 267,303 | 298,617 |
| **Other Assets** | - | 389,000 |
| Total assets | $ 375,675,004 | $ 335,472,773 |

*See Notes to Consolidated Financial Statements*                                         3

# Vail Health Services

## Consolidated Balance Sheets (Continued)
### October 31, 2014 and 2013

## Liabilities and Net Assets

| | 2014 | 2013 |
|---|---|---|
| **Current Liabilities** | | |
| Accounts payable and accrued liabilities | $  20,315,989 | $  18,044,218 |
| Estimated third-party payor settlements | 3,935,199 | 3,592,889 |
| Current portion of long-term debt | 2,575,000 | 5,254,270 |
| Current portion of capital lease obligation | 248,951 | 241,844 |
| Total current liabilities | 27,075,139 | 27,133,221 |
| **Long-term Debt** | 18,702,095 | 20,507,823 |
| **Capital Lease Obligation** | 546,520 | 795,471 |
| Total liabilities | 46,323,754 | 48,436,515 |
| **Net Assets** | | |
| Unrestricted | | |
| Vail Health Services | 312,474,520 | 272,120,958 |
| Noncontrolling interest | 6,928,199 | 6,138,023 |
| Total unrestricted net assets | 319,402,719 | 278,258,981 |
| Temporarily restricted | 6,957,495 | 5,836,241 |
| Permanently restricted | 2,991,036 | 2,941,036 |
| Total net assets | 329,351,250 | 287,036,258 |
| Total liabilities and net assets | $ 375,675,004 | $ 335,472,773 |

# Vail Health Services
## Consolidated Statements of Operations
### Years Ended October 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **Operating Revenues** | | |
| Patient service revenue (net of contractual discounts and allowances) | $ 220,896,593 | $ 211,523,939 |
| Provision for uncollectible accounts | (14,851,026) | (14,617,996) |
| Net patient service revenue less provision for uncollectible accounts | 206,045,567 | 196,905,943 |
| Other operating revenue | 14,691,208 | 14,839,677 |
| Net assets released from restrictions used for operations | 372,500 | 355,275 |
| Total operating revenues | 221,109,275 | 212,100,895 |
| **Operating Expenses** | | |
| Salaries, wages and employee benefits | 76,902,644 | 73,072,495 |
| Supplies and other expenses | 61,370,266 | 63,398,598 |
| Purchased services | 23,018,762 | 21,653,624 |
| Depreciation and amortization | 14,552,073 | 15,182,205 |
| Interest | 781,181 | 1,025,112 |
| Total operating expenses | 176,624,926 | 174,332,034 |
| **Operating Income** | 44,484,349 | 37,768,861 |
| **Other Net Nonoperating Income** | 7,508,686 | 12,229,615 |
| **Excess of Revenues Over Expenses** | 51,993,035 | 49,998,476 |
| **Change in Net Unrealized Gain (Loss) on Investments** | (192,673) | 88,884 |
| **Net Assets Released From Restrictions - Used for Purchase of Land, Buildings and Equipment** | 256,153 | 530,217 |
| **Distributions to and Other Changes in Noncontrolling Interest** | (10,912,777) | (10,333,829) |
| **Increase in Unrestricted Net Assets** | $   41,143,738 | $   40,283,748 |

# Vail Health Services

## Consolidated Statements of Changes in Net Assets
### Years Ended October 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **Unrestricted Net Assets** | | |
| Excess of revenues over expenses | $ 51,993,035 | $ 49,998,476 |
| Change in net unrealized gain (loss) on investments | (192,673) | 88,884 |
| Net assets released from restrictions - used for | | |
| purchase of land, buildings and equipment | 256,153 | 530,217 |
| Distributions to and sale/purchase of noncontrolling interest | (10,912,777) | (10,333,829) |
| Increase in unrestricted net assets | 41,143,738 | 40,283,748 |
| **Temporarily Restricted Net Assets** | | |
| Contributions | 1,803,967 | 1,005,227 |
| Investment income and change in unrealized gain on investment | 10,337 | 218,740 |
| Change in beneficial interests in affiliated organizations | (64,397) | 115,201 |
| Net assets released from restriction | (628,653) | (885,492) |
| Increase in temporarily restricted net assets | 1,121,254 | 453,676 |
| **Permanently Restricted Net Assets** | | |
| Contributions | 50,000 | - |
| Increase in permanently restricted net assets | 50,000 | - |
| **Change in Net Assets** | 42,314,992 | 40,737,424 |
| **Net Assets, Beginning of Year** | 287,036,258 | 246,298,834 |
| **Net Assets, End of Year** | $ 329,351,250 | $ 287,036,258 |

# Vail Health Services
## Consolidated Statements of Cash Flows
### Years Ended October 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **Operating Activities** | | |
| Change in net assets | $ 42,314,992 | $ 40,737,424 |
| Change in net assets attributable | | |
| to the noncontrolling interest | (790,176) | 62,334 |
| | | |
| Change in net assets | 41,524,816 | 40,799,758 |
| Adjustments to reconcile change in net assets to | | |
| net cash provided by operating activities | | |
| Depreciation and amortization | 14,552,073 | 15,182,205 |
| Change in beneficial interest in affiliated organizations | 64,397 | (115,201) |
| Provision for uncollectible accounts | 14,851,026 | 14,617,996 |
| Noncontrolling interest | 11,702,953 | 10,271,495 |
| Loss on sale of land, buildings and equipment | 267,280 | 5,817 |
| Realized and unrealized gain on investments | (7,783,049) | (12,636,658) |
| Loss on investment in Eagle Health Care Center, Inc. | 161,707 | 155,425 |
| Permanently restricted contributions | (50,000) | - |
| Contributions of or for acquisition of property and equipment | (224,679) | (369,373) |
| Changes in current assets and liabilities | | |
| Patient accounts receivable | (18,339,543) | (17,230,950) |
| Inventories | (258,671) | (730,248) |
| Other assets and liabilities | 718,785 | (619,339) |
| Pledges receivable | (198,833) | 137,702 |
| Accounts payable and accrued liabilities | 1,404,200 | (4,566,388) |
| Estimated third-party payor settlements | 342,310 | 449,828 |
| | | |
| Net cash provided by operating activities | 58,734,772 | 45,352,069 |
| | | |
| **Investing Activities** | | |
| Purchase of land, buildings and equipment | (16,975,071) | (17,072,073) |
| Purchase of investments | (37,167,112) | (76,341,941) |
| Proceeds from sale of investments | 14,273,043 | 65,213,139 |
| Proceeds from sale of land, buildings and equipment | 60,730 | 109,343 |
| | | |
| Net cash used in investing activities | (39,808,410) | (28,091,532) |

*See Notes to Consolidated Financial Statements*                    7

# Vail Health Services

## Consolidated Statements of Cash Flows (Continued)
### Years Ended October 31, 2014 and 2013

|  | 2014 | 2013 |
|---|---|---|
| **Financing Activities** | | |
| Proceeds on issuance of debt | - | 190,000 |
| Principal payments on debt and capital lease obligation | (4,716,114) | (9,564,639) |
| Distributions to minority shareholders of subsidiary | (11,492,777) | (10,013,829) |
| Sale (purchase) of minority shareholder units of subsidiary | 580,000 | (320,000) |
| Proceeds from permanently restricted contributions | 50,000 | - |
| Proceeds from contributions of or for acquisition of property and equipment | 224,679 | 369,373 |
| Net cash used in financing activities | (15,354,212) | (19,339,095) |
| **Increase (Decrease) in Cash and Cash Equivalents** | 3,572,150 | (2,078,558) |
| **Cash and Cash Equivalents, Beginning of Year** | 18,664,156 | 20,742,714 |
| **Cash and Cash Equivalents, End of Year** | $  22,236,306 | $  18,664,156 |
| **Supplemental Cash Flow Information** | | |
| Interest paid | $  785,749 | $  996,889 |
| **Noncash Investing and Financing Activities** | | |
| Acquisition of property and equipment accrued for but unpaid | $  1,733,561 | $  865,990 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 1:    Nature of Operations and Summary of Significant Accounting Policies

### Nature of Operations

Vail Health Services was formed as a holding company, which is a Colorado nonprofit corporation. It was organized for the benefit of Vail Clinic, Inc. d/b/a Vail Valley Medical Center (the Hospital), VVMC Diversified Services d/b/a VHS Physician Services (Physician Services), and their affiliates.

The Hospital is an acute-care, general hospital and orthopedic referral center located in Vail, Colorado.  The Hospital also operates clinics in Avon, Beaver Creek, Eagle, Edwards, Frisco, Gypsum and Silverthorne, Colorado.

The primary mission of the Hospital is to provide health care and related services to the citizens of the local community and surrounding region through its acute-care and specialty-care facilities. Those activities, which are directly related to the furtherance of this purpose, are considered to be operating activities.

The Vail Valley Medical Center Foundation (the Foundation) was established to raise funds to benefit the Hospital, VVMC Diversified Services d/b/a VHS Physician Services and any other nonprofit corporation affiliated with Vail Health Services.  On September 1, 2010, the Foundation transferred all assets to the Hospital.  There was no activity in the Foundation during the year ended October 31, 2013.  On January 1, 2014 the Foundation was reactivated by the Vail Health Services Board of Directors and assets were transferred from the Hospital to the Foundation.

The Vail Valley Surgery Center, LLC (the Surgery Center) operates licensed ambulatory surgery centers within Vail Valley Medical Center and in Edwards, Colorado.  The ambulatory surgery center in Edwards, Colorado opened for services on June 1, 2012.  The Surgery Center also uses the trade names Vail Valley Surgery Center Vail and Vail Valley Surgery Center Edwards.  As of October 31, 2014 and 2013, the Hospital owns 50.1% and 51.8%, respectively, of the Surgery Center.

Physician Services operates outpatient clinics and provides practice management services for physicians and other licensed healthcare providers.  Physician Services is a Colorado nonprofit corporation.

VHS Management Services, Inc. (Management Services) performs certain administrative tasks for the other subsidiaries of Vail Health Services.

### Principles of Consolidation

The net assets and the results of operations of Vail Health Services, the Hospital, the Foundation, the Surgery Center, Physician Services, and Management Services (collectively, the Organization) are included in the consolidated financial statements.  All significant intercompany transactions have been eliminated.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Noncontrolling Interest

Noncontrolling interest represents the 49.9% and 48.2% interest in the Surgery Center that is not owned by the Hospital for the years October 31, 2014 and 2013, respectively.

For the years ended October 31, 2014 and 2013, changes in consolidated unrestricted net assets attributable to the controlling financial interest of the Organization and the noncontrolling interest are:

| | Total | Controlling Interest | Noncontrolling Interest |
|---|---|---|---|
| Balance, October 31, 2012 | $ 237,975,233 | $ 231,774,876 | $ 6,200,357 |
| Excess of revenues over expenses | 49,998,476 | 39,726,981 | 10,271,495 |
| Change in net unrealized gain on investments | 88,884 | 88,884 | - |
| Net assets released from restrictions - used for purchase of land, buildings and equipment | 530,217 | 530,217 | - |
| Distributions to and other changes in noncontrolling interest | (10,333,829) | - | (10,333,829) |
| Increase in unrestricted net assets | 40,283,748 | 40,346,082 | (62,334) |
| Balance, October 31, 2013 | 278,258,981 | 272,120,958 | 6,138,023 |
| Excess of revenues over expenses | 51,993,035 | 40,290,082 | 11,702,953 |
| Change in net unrealized gain (loss) on investments | (192,673) | (192,673) | - |
| Net assets released from restrictions - used for purchase of land, buildings and equipment | 256,153 | 256,153 | |
| Distributions to and other changes in noncontrolling interest | (10,912,777) | - | (10,912,777) |
| Increase in unrestricted net assets | 41,143,738 | 40,353,562 | 790,176 |
| Balance, October 31, 2014 | $ 319,402,719 | $ 312,474,520 | $ 6,928,199 |

The change in temporarily and permanently restricted net assets is attributable solely to the controlling interest.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### *Use of Estimates*

The preparation of financial statements in conformity with accounting principles generally accepted in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.  Actual results could differ from those estimates.

### *Cash Equivalents*

The Organization considers all liquid investments with original maturities of three months or less to be cash equivalents, excluding those limited as to use by Board designation or other arrangements under trust agreements.  At October 31, 2014 and 2013, cash equivalents consisted primarily of money market accounts.

At October 31, 2014, the Organization's cash accounts exceeded federal insured limits by approximately $23,286,000.

### *Investments and Investment Return*

Investments in equity securities having a readily determinable fair value and in all debt securities are carried at fair value.  The investment in Eagle Health Care Center, Inc. is reported on the equity method of accounting.  Investments in alternative investments, are valued at the lower of cost (or fair value at the time of donation, if acquired by contribution) or fair value.  Investment return includes dividend, interest and other investment income; unrealized gains and losses on investments carried at fair value; and realized gains and losses on other investments.  Investment return that is initially restricted by donor stipulation and for which the restriction will be satisfied in the same year is included in unrestricted net assets.  Investment returns are reflected in the statements of operations and changes in net assets as unrestricted, temporarily restricted or permanently restricted, based on the existence and nature of any donor or legally imposed restrictions.

### *Assets Limited as to Use*

Assets whose use is limited include assets held by trustees under bond indenture agreements, which can be used only for the purpose designated by such agreements.  Amounts required to meet current liabilities have been classified as current portion of assets whose use is limited in the accompanying balance sheets.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Patient Accounts Receivable

Accounts receivable are reduced by an allowance for doubtful accounts.  In evaluating the collectability of accounts receivable, the Organization analyzes its past history and identifies trends for each of its major payer sources of revenue to estimate the appropriate allowance for doubtful accounts and provision for bad debts.  Management regularly reviews data about these major payer sources of revenue in evaluating the sufficiency of the allowance for doubtful accounts.

For receivables associated with services provided to patients who have third-party coverage, the Organization analyzes contractually due amounts and provides an allowance for doubtful accounts and a provision for bad debts, if necessary (for example, for expected uncollectible deductibles and copayments on accounts for which the third-party payer has not yet paid, or for payers who are known to be having financial difficulties that make the realization of amounts due unlikely).

For receivables associated with self-pay patients (which includes both patients without insurance and patients with deductible and copayment balances due for which third-party coverage exists for part of the bill), the Organization records a significant provision for bad debts in the period of service on the basis of its past experience, which indicates that many patients are unable or unwilling to pay the portion of their bill for which they are financially responsible.  The difference between the standard rates (or the discounted rates if negotiated or provided by policy) and the amounts actually collected after all reasonable collection efforts have been exhausted is charged off against the allowance for doubtful accounts.

The Organization's allowance for doubtful accounts for self-pay patients was 75% and 71% of self-pay accounts receivable for the years ended October 31, 2014 and 2013, respectively.  In addition, the Organization's write-offs decreased approximately $3,105,000 from approximately $21,105,000 for the year ended October 31, 2013, to approximately $18,000,000 for the year ended October 31, 2014.  The decrease in write-offs resulted from accounts not being turned over to a third-party collection agency as quickly as in prior years.  Once sent to third-party collections, the typical time period was permitted for the collection.

### Inventories

Inventories are stated at the lower of cost, determined using the first-in, first-out method, or market.

### Land, Buildings and Equipment

Land, buildings and equipment are recorded at cost when purchased or at fair value when received by donation.  The provision for depreciation is calculated using the straight-line method, which allocates the cost of land improvements, buildings and equipment equally over their estimated useful lives.  The Organization uses depreciable lives recommended by the American Hospital Association.  Assets under capital lease obligations and leasehold improvements are depreciated over the shorter of the lease term or their respective estimated useful lives.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

Donations of property and equipment are reported at fair value as an increase in unrestricted net assets, unless use of the assets is restricted by the donor.  Monetary gifts that must be used to acquire property and equipment are reported as restricted support.  The expiration of such restriction is reported as an increase in unrestricted net assets when the donated asset is placed in service.

### Long-lived Asset Impairment

The Organization evaluates recoverability of the carrying value of long-lived assets whenever events or circumstances indicate the carrying amount may not be recoverable.  If a long-lived asset is determined to be impaired, the asset would be written down to fair value and an impairment loss recognized.  No asset impairment was recognized during the years ended October 31, 2014 and 2013.

### Deferred Financing Costs

Deferred debt issuance costs represent costs incurred in connection with the issuance of long-term debt.  These costs are being amortized using the effective interest method over the life of the related debt.

### Other Assets

Included in other assets is approximately $0 and $389,000 as of October 31, 2014 and 2013, respectively, in notes receivable from members of management and physicians.

### Temporarily and Permanently Restricted Net Assets

Temporarily restricted net assets are those whose use has been limited by donors to a specific time period or purpose.  Permanently restricted net assets have been restricted by donors to be maintained in perpetuity.

### Net Patient Service Revenue

The Organization has agreements with third-party payers that provide for payments to the Organization at amounts different from its established rates.  Payment arrangements include prospectively determined rates per discharge, reimbursed costs, discounted charges, and per diem payments.  Net patient service revenue is reported at the estimated net realizable amounts from patients, third-party payers, and others for services rendered, including estimated retroactive adjustments under reimbursement agreements with third-party payers.  Retroactive adjustments are accrued on an estimated basis in the period the related services are rendered and adjusted in future periods as final settlements are determined.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Charity Care

The Organization provides care to indigent patients under its charity care policy without charge or at amounts less than its established rates. Because the Organization does not pursue collection of amounts determined to qualify as charity care, these charges are not reported as net patient service revenue. The cost of charity care is estimated by applying the ratio of operating expenses to operating revenues. The Organization's direct and indirect costs for services furnished under its charity care policy aggregated approximately $333,000 and $691,000 in 2014 and 2013, respectively.

The Organization has received funding through the provider fee program during the years ended October 31, 2014 and 2013, as further described in Note 2 to assist with the cost of providing charity care.

### Contributions

Unconditional promises to give cash and other assets are accrued at estimated fair value at the date each promise is received. Gifts are available for unrestricted use, unless specifically restricted by the donor. Gifts are reported as either temporarily or permanently restricted support if they are received with donor stipulations that limit the use of the donated assets. When a donor restriction expires, that is, when a stipulated time restriction ends or purpose restriction is accomplished, temporarily restricted net assets are reclassified as unrestricted net assets and reported in the statement of operations as net assets released from restrictions. In-kind donations are recorded at fair value at the date of gift. In the absence of donor specification to restrict the income and gains on donated funds, such income and gains are reported as unrestricted income.

### Estimated Malpractice Costs

An annual estimated provision is accrued for the self-insured portion of medical malpractice claims and includes an estimate of the ultimate costs for both reported claims and claims incurred but not reported.

### Income Taxes

Vail Health Services, the Hospital, the Foundation and Physician Services are exempt from income taxes under Section 501(c)(3) of the Internal Revenue Code and a similar provision of state law. Accordingly, no provision for income taxes for these entities has been made in the accompanying consolidated financial statements. The Surgery Center has elected to have its income taxed as a partnership under provisions of the Internal Revenue Code. The Organization is subject to federal income tax on any unrelated business taxable income. The Organization files tax returns in the U.S. federal jurisdiction. With a few exceptions, the Organization is no longer subject to U.S. federal examinations by tax authorities for years before 2011.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Excess of Revenues Over Expenses

The statements of operations include the excess of revenues over expenses. Changes in unrestricted net assets which are excluded from the excess of revenues over expenses, consistent with industry practice, include unrealized gains and losses on investments, permanent transfers of assets to and from affiliates for other than goods and services, noncontrolling interest of consolidated entities and contributions of long-lived assets (including assets acquired using contributions restricted by donors for the purposes of acquiring such assets).

### Electronic Health Records Incentive Program

The Electronic Health Records Incentive Program, enacted as part of the *American Recovery and Reinvestment Act of 2009*, provides for one-time incentive payments under both the Medicare and Medicaid programs to eligible hospitals that demonstrate meaningful use of certified electronic health records technology (EHR). Payments under the Medicare program are generally made for up to four years based on a statutory formula. Payments under the Medicaid program are generally made for up to four years based upon a statutory formula, as determined by the state, which is approved by the Centers for Medicare and Medicaid Services. Payment under both programs are contingent on the hospital continuing to meet escalating meaningful use criteria and any other specific requirements that are applicable for the reporting period. The final amount for any payment year is determined based upon an audit by the fiscal intermediary. Events could occur that would cause the final amounts to differ materially from the initial payments under the program.

The Hospital recognizes revenue ratably over the reporting period starting at the point when management is reasonably assured it will meet all of the meaningful use objectives and any other specific grant requirements applicable for the reporting period.

The Hospital has recorded revenue of approximately $750,000 for the year ended October 31, 2014, which is included in other revenue within operating revenues in the statement of operations.

### Subsequent Events

Subsequent events have been evaluated through the date of the Independent Auditor's Report, which is the date the financial statements were available to be issued.

*15*

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 2:    Net Patient Service Revenue

The Organization recognizes patient service revenue associated with services provided to patients who have third-party payer coverage on the basis of contractual rates for the services rendered.  For uninsured patients that do not qualify for charity care, the Organization recognizes revenue on the basis of its standard rates for services provided.  On the basis of historical experience, a significant portion of the Organization's uninsured patients will be unable or unwilling to pay for the services provided.  Thus, the Organization records a significant provision for uncollectible accounts related to uninsured patients in the period the services are provided.  This provision for uncollectible accounts is presented on the statements of operations as a component of net patient service revenue.

The Organization has agreements with third-party payors that provide for payments to the Organization at amounts different from its established rates.  These payment arrangements include:

*Medicare*.  Revenue from the Medicare program accounted for approximately 8% and 10% of the Organization's net patient service revenue for the years ended October 31, 2014 and 2013, respectively.  Inpatient acute care and substantially all outpatient services rendered to Medicare program beneficiaries are paid at prospectively determined rates per discharge and per procedure.  These rates vary according to a patient classification system that is based on clinical, diagnostic and other factors.  Certain inpatient nonacute services, and medical education costs related to Medicare beneficiaries are paid based on a cost reimbursement methodology.  The Organization is reimbursed for certain services at tentative rates, with final settlement determined after submission of annual cost reports by the Organization and audits thereof by the Medicare fiscal intermediary.  The Organization's cost reports have been audited by the fiscal intermediary through October 31, 2012, with the exception of the year ended October 31, 2009.

*Medicaid*.  Revenue from the Medicaid program accounted for approximately 2% of the Organization's net patient revenue for both of the years ended October 31, 2014 and 2013.  Inpatient and outpatient services for cost reimbursable services rendered to Medicaid program beneficiaries are reimbursed under a cost reimbursement methodology for certain services and at prospectively determined rates for all other services.  These rates vary according to a patient classification system that is based on clinical, diagnostic and other factors.  The Organization is reimbursed for cost-reimbursable services at tentative rates, with final settlement determined after submission of annual cost reports by the Organization and audits thereof by the Medicaid fiscal intermediary.

Laws and regulations governing the Medicare and Medicaid programs are complex and subject to interpretation and change.  As a result, it is reasonably possible that recorded estimates will change materially in the near term.

The Organization has also entered into payment agreements with certain commercial insurance carriers, health maintenance organizations and preferred provider organizations.  The basis of payment to the Organization under these agreements includes prospectively determined rates per discharge, discounts from established charges, and prospectively determined daily rates.

*16*

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

The Colorado Healthcare Affordability Act, designated as House Bill 1293 (HB 1293), was passed during 2009 implementing a fee on hospitals to generate matching funds to the State of Colorado from federal sources.  Implementation of this act occurred during April of 2010 and had the following effect on the Organization's financial statements:

|  | 2014 | 2013 |
|---|---|---|
| Provider fee recovery revenue included in other operating revenue | $ 4,103,194 | $ 5,021,369 |
| Provider fee expense included in supplies and other expenses | (3,460,671) | (4,515,397) |
| Net effect of HB 1293 | $ 642,523 | $ 505,972 |

Patient service revenue, net of contractual allowances and discounts (but before the provision for uncollectible accounts), recognized in the years ended October 31, 2014 and 2013, was:

|  | 2014 | 2013 |
|---|---|---|
| Medicare | $ 18,054,724 | $ 17,884,551 |
| Medicaid | 3,655,369 | 3,190,623 |
| Other third-party payers | 185,773,759 | 172,015,826 |
| Self-pay | 13,412,741 | 18,432,939 |
| Total | $ 220,896,593 | $ 211,523,939 |

## Note 3:    Concentration of Credit Risk

The Organization grants credit without collateral to its patients, most of whom are insured under third-party payer agreements.  The composition of net receivables from patients and third-party payers was as follows as of October 31, 2014 and 2013:

|  | 2014 | 2013 |
|---|---|---|
| Commercial insurance carriers | 79% | 73% |
| Other third-party payors | 3% | 2% |
| Patients | 8% | 12% |
| Medicare | 10% | 13% |
| Total | 100% | 100% |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

**Note 4:   Investments and Investment Return**

Investments consist of the following as of October 31, 2014 and 2013:

|  | 2014 | 2013 |
|---|---|---|
| Investments and assets whose use is limited | $ 186,437,192 | $ 155,701,652 |
| Held by trustee under bond indenture agreements | 3,992,017 | 4,050,439 |
| Total | $ 190,429,209 | $ 159,752,091 |

Investments, by type, consist of the following as of October 31, 2014 and 2013:

|  | 2014 | | | 2013 | | |
|---|---|---|---|---|---|---|
|  | Cost | Carrying Value | Fair Value | Cost | Carrying Value | Fair Value |
| Cash and cash equivalents | $ 6,734,446 | $ 6,734,446 | $ 6,734,446 | $ 6,144,839 | $ 6,144,839 | $ 6,144,839 |
| Mutual funds |  |  |  |  |  |  |
| Fixed income | 21,182,077 | 21,139,416 | 21,139,416 | 19,900,967 | 20,227,905 | 20,227,905 |
| Equities | 9,477,704 | 10,757,173 | 10,757,173 | 9,037,633 | 9,610,347 | 9,610,347 |
| Real estate | 5,179,375 | 6,095,442 | 6,095,442 | 4,326,329 | 4,956,191 | 4,956,191 |
| Commodity | 17,261,314 | 15,491,260 | 15,491,260 | 14,182,109 | 13,374,044 | 13,374,044 |
| Other | 325,984 | 328,492 | 328,492 | - | - | - |
| Commercial paper | 2,379,827 | 2,379,827 | 2,379,827 | 2,379,827 | 2,379,827 | 2,379,827 |
| Alternative investments | 128,427,071 | 127,503,153 | 149,903,266 | 103,670,822 | 103,058,938 | 123,561,172 |
| Total | $ 190,967,798 | $ 190,429,209 | $ 212,829,322 | $ 159,642,526 | $ 159,752,091 | $ 180,254,325 |

Total investment return, including interest earned on cash equivalents and notes receivable, is comprised of the following:

|  | 2014 | 2013 |
|---|---|---|
| Interest and dividend income | $ 4,220,903 | $ 3,354,913 |
| Realized gains | 3,423,030 | 8,931,750 |
| Realized losses due to impairment of investments on other than trading securities | (4,829) | 276,728 |
| Total | $ 7,639,104 | $ 12,563,391 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

Total investment return is reflected in the statements of operations and changes in net assets as follows:

|  | 2014 | 2013 |
|---|---|---|
| Unrestricted net assets |  |  |
| Other nonoperating income | $ 7,821,440 | $ 12,255,767 |
| Unrestricted change in unrealized gains and (losses) | (192,673) | 88,884 |
| Temporarily restricted change in unrealized gains and (losses) | (81,435) | 187,844 |
| Temporarily restricted income | 91,772 | 30,896 |
| Total | $ 7,639,104 | $ 12,563,391 |

As indicated in Note 1, the Organization values alternative investments at the lower of cost or fair value. The fair value of alternative investments is derived from the net asset value per share or equivalent of the invested funds. At October 31, 2014 and 2013, alternative investments consist of investments in equity long/short hedge funds and investments in multi-strategy hedge funds as follows:

| | Carrying Value 2014 | Carrying Value 2013 | Redemption Frequency | Redemption Notice Period |
|---|---|---|---|---|
| Equity long/short hedge funds (A) | $ 68,343 | $ 201,596 | See (A) below | |
| Multistrategy hedge funds (B) | 44,384,199 | 34,614,880 | Daily to Monthly | 1-20 days |
| Multistrategy hedge funds (C) | 72,050,611 | 60,242,462 | Daily | 1-3 days |
| Multistrategy hedge funds (D) | 3,000,000 | 1,500,000 | Quarterly | 95 days |
| Multistrategy hedge funds (E) | 8,000,000 | 6,500,000 | Quarterly | 95 days |
| Total | $ 127,503,153 | $ 103,058,938 | | |

(A)   The equity long/short hedge funds seek to achieve positive investment returns in rising and falling markets with substantially less volatility than traditional equity and fixed income securities. Investments in this category cannot be redeemed because the investments are currently in a lock-up period and are expected to be liquidated and paid out over the next three years.

(B)   This category includes investments in hedge funds that pursue multiple strategies to diversify risks and reduce volatility. The funds' composite portfolio includes investments in U.S. and International large-cap, mid-cap and small-cap stocks.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

(C)  This category includes investments in hedge funds that pursue multiple strategies to diversify risks and reduce volatility.  The funds' composite portfolio includes investments in U.S. and International common stocks and private and public bonds.

(D)  This category includes investments in hedge funds that pursue multiple strategies to diversify risks and reduce volatility.  The funds' composite portfolio includes investments in long/short credit and equities and international commodities and currencies.

(E)  This category includes "Feeder Funds" that lead to a group of pooled investments that pursue alternative investment strategies to diversify risks and reduce volatility.  The funds' composite portfolio includes investments in U.S. and International Equities, fixed income securities, real estate, and commodities.

## Note 5:    Land, Buildings and Equipment

Land, buildings and equipment consist of the following as of October 31, 2014 and 2013:

|  | 2014 | 2013 |
|---|---|---|
| Land and improvements | $      8,242,349 | $      3,841,873 |
| Buildings and fixed equipment | 126,479,901 | 121,763,095 |
| Major moveable equipment | 95,171,615 | 90,604,025 |
| Building service equipment | 11,257,957 | 11,423,265 |
| Construction in progress and software under development | 6,279,387 | 3,231,753 |
|  | 247,431,209 | 230,864,011 |
| Less accumulated depreciation and amortization | (136,390,552) | (122,785,913) |
| Land, buildings and equipment, net | $ 111,040,657 | $ 108,078,098 |

## Note 6:    Beneficial Interests in Affiliated Organizations

During the year ended October 31, 2005, the Volunteer Corps of the Vail Valley Medical Center (the Volunteer Corps) and the Shaw Outreach Team (Shaw) were formed.  These organizations are separate legal entities with Boards of Directors separate from that of the Hospital.  Distribution of organization funds to the Hospital are directed by each organization's Board of Directors.  The Volunteer Corps and Shaw are operated exclusively for the benefit of the Hospital and therefore, are considered financially interrelated organizations of the Organization under generally accepted accounting principles.  Accordingly, the Organization recognizes its interest in the net assets of each organization on its balance sheet as beneficial interests in affiliated organizations.

# Vail Health Services
## Notes to Consolidated Financial Statements
### October 31, 2014 and 2013

As of October 31, 2014 and 2013, the Organization's beneficial interests in these affiliated organizations totaled $233,869 and $298,266, respectively.  During the year ended October 31, 2007, Shaw contributed a building (Jack's Place, a Cancer Caring House) and some permanently restricted funds, which combined, totaled approximately $4,200,000 to the Organization.  In connection with the conveyance, the Organization agreed to continue to operate the building as a Cancer Caring House and to maintain the restriction on the endowment funds for the purpose of supporting the Cancer Caring House.  As of October 31, 2014 and 2013, the net book value of the house included in temporarily restricted net assets was approximately $2,494,000 and $2,595,000, respectively.

## Note 7:    Debt

Debt consists of the following as of October 31, 2014 and 2013:

|  | 2014 | 2013 |
|---|---|---|
| Series 2012 revenue note (A) | $  15,117,204 | $  17,106,474 |
| Series 2004 revenue bonds (B) | 5,350,000 | 7,065,000 |
| Notes payable to bank - Surgery Center (C) | 780,000 | 1,550,000 |
|  | 21,247,204 | 25,721,474 |
| Plus premium on Series 2004 | 29,891 | 40,619 |
| Less current maturities | (2,575,000) | (5,254,270) |
| Long-term maturities | $  18,702,095 | $  20,507,823 |

(A)   In June 2012, the Organization entered into a loan agreement with the Colorado Health Facilities Authority, a $19,052,899 Refunding Revenue Note, Series 2012.  The proceeds of the note, along with $2,576,163 of cash provided by the Organization, were used to refund the Series 2001 revenue bonds and to pay certain expenses incurred in connection with the issuance of the note.  The 2012 note matures in varying installments through 2025, with fixed interest rates ranging from 2.64% to 4.58%.

(B)   In December 2004, the Organization issued Series 2004 refunding revenue bonds in the amount of $24,410,000.  The proceeds were used to refund the Series 1995A and 1996 bonds. The 2004 bonds contain a sinking fund and payment requirements such that the bonds will be paid in full in 2018, with interest ranging from 3% to 5%.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

(C)   In May 2012, the Surgery Center entered into a note payable with a bank in the amount of $1,500,000.  Interest is payable monthly with an annual interest rate of 2.74%.  The entire principal balance is due May 1, 2015.  The note is collateralized by the inventory, equipment and accounts receivable of the Surgery Center and contains various restrictive covenants.

In October 2013, the Surgery Center entered into an additional note payable with a bank in the amount of $190,000.  The Surgery Center paid the note in full during the year ended October 31, 2014.

The aggregate future minimum principal repayment requirements of the bonds and note payable for each of the next five fiscal years are as follows:

| | |
|---|---:|
| 2015 | $   2,575,000 |
| 2016 | 1,885,000 |
| 2017 | 465,000 |
| 2018 | 1,844,896 |
| 2019 | 1,938,003 |
| Thereafter | 12,539,305 |
| | $   21,247,204 |

The 2004 bonds maturing on or after January 15, 2017, are redeemable prior to maturity at par. The 2012 note is redeemable on or after July 15, 2017.

The Organization is required by the various bond indentures to maintain certain project and debt service reserve funds with the bond trustees.  These funds, stated at fair value, are included in assets whose use is limited in the accompanying balance sheets, and consist of the following as of October 31, 2014 and 2013:

| | 2014 | 2013 |
|---|---:|---:|
| Bond principal and interest funds | $   1,556,640 | $   1,560,190 |
| Bond reserve fund | 2,435,377 | 2,490,249 |
| Total | $   3,992,017 | $   4,050,439 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

**Note 8:  Capital Lease Obligation**

The Organization has entered into capital lease obligations for certain major medical equipment, payable in quarterly installments of principal and interest through 2018.

Future minimum lease payments under capital lease as of October 31, 2014 are as follows:

| | | |
|---|---|---:|
| 2015 | $ | 268,728 |
| 2016 | | 268,728 |
| 2017 | | 268,728 |
| 2018 | | 26,527 |
| Total future minimum payments | | 832,711 |
| Less interest | | (37,240) |
| Present value of future minimum lease payments | | 795,471 |
| Less current portion of capital lease obligation | | (248,951) |
| Capital lease obligation | $ | 546,520 |

Assets under capital lease are as follows as of October 31, 2014 and 2013:

| | 2014 | 2013 |
|---|---:|---:|
| Major moveable equipment | $ 1,545,171 | $ 1,545,171 |
| Less accumulated depreciation | (664,987) | (379,522) |
| Total | $ 880,184 | $ 1,165,649 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Note 9:    Operating Leases

The Organization leases certain commercial and residential properties and various equipment under long-term operating leases through 2019.  At October 31, 2014, future minimum annual rental commitments under noncancelable operating leases, principally for office space and equipment, are as follows:

| | | |
|---|---|---:|
| 2015 | $ | 2,773,326 |
| 2016 | | 1,815,328 |
| 2017 | | 1,591,704 |
| 2018 | | 1,176,741 |
| 2019 | | 512,493 |
| Total | $ | 7,869,592 |

Lease expense for the Organization for the years ended October 31, 2014 and 2013 was $3,675,135 and $3,809,905, respectively.

The Organization is the lessor of office space under operating leases expiring in various years through August 2022.  The buildings have a cost of $22,513,500 and accumulated depreciation of $10,663,587 as of October 31, 2014.

Minimum future rentals to be received on the office space leases as of October 31, 2014 are as follows:

| | | |
|---|---|---:|
| 2015 | $ | 1,913,448 |
| 2016 | | 1,157,061 |
| 2017 | | 770,791 |
| 2018 | | 601,899 |
| 2019 | | 392,316 |
| Thereafter | | 797,811 |
| Total | $ | 5,633,326 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 10:   Restricted Net Assets

Temporarily restricted net assets are available for the following purposes as of October 31, 2014 and 2013:

|  | 2014 | 2013 |
|---|---|---|
| Beneficial interests in affiliated organizations | $      233,869 | $      298,266 |
| Jack's Place, a Cancer Caring House | 2,494,439 | 2,595,398 |
| Capital expenditure projects | 1,766,369 | 1,177,939 |
| Other | 2,462,818 | 1,764,638 |
| Total | $   6,957,495 | $   5,836,241 |

Permanently restricted net assets totaled $2,991,036 and $2,941,036 for the years October 31, 2014 and 2013, respectively, and are restricted as endowment funds.  Interest thereon is available to be used to support operating expenses.

## Note 11:   Endowment

The Hospital's endowment consists of two individual funds established for a variety of purposes. The endowment includes only donor-restricted endowment funds.  As required by accounting principles generally accepted in the United States of America (GAAP), net assets associated with endowment funds, are classified and reported based on the existence or absence of donor-imposed restrictions.

The Hospital's governing body has interpreted the State of Colorado Prudent Management of Institutional Funds Act (SPMIFA) as requiring preservation of the fair value of the original gift as of the gift date of the donor-restricted endowment funds absent explicit donor stipulations to the contrary.  As a result of this interpretation, the Hospital classifies as permanently restricted net assets (a) the original value of gifts donated to the permanent endowment, (b) the original value of subsequent gifts to the permanent endowment and (c) accumulations to the permanent endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund.  The remaining portion of donor-restricted endowment funds is classified as temporarily restricted net assets until those amounts are appropriated for expenditure by the Hospital in a manner consistent with the standard of prudence prescribed by SPMIFA.  In accordance with SPMIFA, the Hospital considers the following factors in making a determination to appropriate or accumulate donor-restricted endowment funds:

1.   Duration and preservation of the fund
2.   Purposes of the Organization and the fund
3.   General economic conditions

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

4. Possible effect of inflation and deflation
5. Expected total return from investment income and appreciation or depreciation of investments
6. Other resources of the Organization
7. Investment policies of the Organization

Changes in endowment net assets for the years ended October 31, 2014 and 2013:

| | 2014 | | | |
|---|---|---|---|---|
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
| Endowment net assets, beginning of year | $ - | $ 566,823 | $ 2,941,036 | $ 3,507,859 |
| Investment return | | | | |
| Investment income | - | 91,772 | - | 91,772 |
| Net depreciation | - | (81,435) | - | (81,435) |
| Total investment return | - | 10,337 | - | 10,337 |
| Contributions | - | - | 50,000 | 50,000 |
| Appropriation of endowment assets for expenditure | - | (56,664) | - | (56,664) |
| Endowment net assets, end of year | $ - | $ 520,496 | $ 2,991,036 | $ 3,511,532 |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

| | 2013 | | | |
| | Unrestricted | Temporarily Restricted | Permanently Restricted | Total |
|---|---|---|---|---|
| Endowment net assets, beginning of year | $ - | $ 402,217 | $ 2,941,036 | $ 3,343,253 |
| Investment return | | | | |
| Investment income | - | 30,896 | - | 30,896 |
| Net appreciation | - | 187,844 | - | 187,844 |
| Total investment return | - | 218,740 | - | 218,740 |
| Contributions | - | - | - | - |
| Appropriation of endowment assets for expenditure | - | (54,134) | - | (54,134) |
| Endowment net assets, end of year | $ - | $ 566,823 | $ 2,941,036 | $ 3,507,859 |

The Hospital has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs and other items supported by its endowment while seeking to maintain the purchasing power of the endowment. Endowment assets include those assets of donor-restricted endowment funds the Hospital must hold in perpetuity or for donor-specified periods. Under the Hospital's policies, endowment assets are invested in a manner that is intended to produce results that exceed the spending policy while assuming a low level of investment risk.

To satisfy its long-term rate of return objectives, the Hospital relies on a total return strategy in which investment returns are achieved through both current yield (investment income such as dividends and interest) and capital appreciation (both realized and unrealized). The Hospital targets a diversified asset allocation that places emphasis on equity-based and fixed income security investments to achieve its long-term return objectives within prudent risk constraints.

The Hospital has adopted a policy effective beginning with the year ended October 31, 2010 (the spending policy) of appropriating for expenditure each year up to 3% of its endowment fund's average fair value over the prior 12 quarters through the year-end preceding the year in which expenditure is planned. In establishing this policy, the Hospital considered the long-term expected return on its endowment. This is consistent with the Hospital's objective to maintain the purchasing power of endowment assets held in perpetuity or for a specified term, as well as to provide additional real growth through new gifts and investment return.

The Hospital has a second endowment designated for Jack's Place, a Cancer Caring House operations. Pursuant to the endowment agreement, the spending policy appropriates income earned on the endowment for operational expenses of the Cancer Caring House.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 12:   Contingencies

### Litigation

The Organization is involved in litigation arising in the ordinary course of business.  In the opinion of management, after consultation with legal counsel, these matters are expected to be resolved without material adverse effect to the Organization's financial position.  Events could occur that would cause the estimate of ultimate loss to differ materially in the near term.

### Professional Liability Claims

The Organization purchases medical malpractice insurance under a claims-made policy.  Under such policy, only claims made and reported to the insurer during the policy term, regardless of when the incidents giving rise to the claims occurred, are covered.  The Organization also purchases excess umbrella liability coverage, which provides additional coverage above the basic policy limits up to the amount specified in the umbrella policy.

Based upon the Organization's claims experience, an accrual had been made for the Organization's estimated medical malpractice costs, including costs associated with litigating or settling claims, under its malpractice insurance policy, amounting to approximately $350,000 as of October 31, 2014 and 2013.  It is reasonably possible that this estimate could change materially in the near term.

## Note 13:   Transactions with Affiliates

### Eagle Health Care Center, Inc.

Eagle Health Care Center, Inc. was established to develop a medical center in Eagle, Colorado. The Organization provides management services to Eagle Health Care Center, Inc. and maintains an ownership percentage of 50%.  The investment is accounted for under the equity method. Revenue of Eagle Health Care Center, Inc. consists of rental payments and radiology fees paid by the two owners and expenses primarily consist of management fees paid to the Organization and other operating costs of the facility and radiology services.  The Organization entered into an agreement with Eagle Health Care Center, Inc. to lease space in the medical center.  The lease, as amended, calls for annual rental payments totaling approximately $249,000.  Losses of approximately $162,000 and $155,000 have been recorded in other income for the years ended October 31, 2014 and 2013, respectively.  The investment totaled $7,235,304 and $7,397,011 as of October 31, 2014 and 2013, respectively.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

Financial position and results of operations of the investee are summarized below:

|  | 2014 | 2013 |
|---|---|---|
| Current assets | $ 1,297,985 | $ 1,275,066 |
| Other long-term assets | 13,228,770 | 13,548,093 |
| Total assets | 14,526,755 | 14,823,159 |
| Current liabilities | 56,148 | 29,137 |
| Total liabilities | 56,148 | 29,137 |
| Net assets | $ 14,470,607 | $ 14,794,022 |
| Revenues | $ 478,142 | $ 473,342 |
| Net loss | $ (323,415) | $ (310,850) |

### The Tarnes

The Organization has a 20% ownership interest in an employee housing joint venture. The investment is accounted for under the equity method. The housing venture has total assets with a book value of approximately $5,886,397 and non-recourse debt of $10,410,000 as of October 31, 2014. The Organization's investment has been reduced to zero due to its share of the losses.

### Eagle County Emergency Services Hospital District

The Organization has a land lease with the Eagle County Emergency Services Hospital District (the District). Under this agreement, the Organization provides the land for the District's ambulance facility at a rental rate of $1 per annum over the 40-year term of the lease expiring December 31, 2023. The Organization has the right, at any time, to adjust the annual rent to 12% of the value of the leasehold improvements. At the end of the lease term, all leasehold improvements revert to the Organization.

### Other

As of October 31, 2014 and 2013, the Organization had notes receivable from members of management and physicians totaling $0 and $389,000, respectively. These notes receivable are secured in part by residential real estate in the Vail, Colorado area.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 14:   Employee Benefit Plans

The Organization established the Vail Valley Medical Center Retirement Plan (the Plan) which is a defined contribution plan for its employees pursuant to Section 403(b) of the Internal Revenue Code of 1986, as amended.  Eligible employees who have completed one year of service are eligible to participate in the matching contributions of the Plan.  The Plan provides for matching contributions of up to 7% of base compensation.  The Plan utilizes a 6-year graded vesting schedule for employees hired on or after January 1, 2004 and a 5-year graded vesting schedule for employees hired prior to January 1, 2004.

The Organization established a Deferred Compensation Top Hat Plan for certain members of the administrative staff effective August 1, 2005.  The Plan is a voluntary deferred compensation plan under Section 457(b) of the Internal Revenue Code.

The Organization established the Vail Valley Medical Center Executive Retirement Plan for the current President and Chief Executive Officer effective August 1, 2005 and the current Chief Financial Officer effective March 1, 2011.  The Plan is a funded deferred compensation plan under Section 457(b) and (f) of the Internal Revenue Code.

During the years ended October 31, 2014 and 2013, the Organization recorded approximately $2,262,000 and $2,214,000, respectively, in employee benefit plan expense.

## Note 15:   Functional Expenses

The Organization provides general health care services including inpatient, outpatient, emergency and home health services.  Expenses related to providing these services are as follows:

|  | 2014 | 2013 |
|---|---|---|
| Health care services | $ 131,649,267 | $ 129,438,439 |
| General and administrative | 44,068,088 | 43,049,089 |
| Fundraising | 907,571 | 1,844,506 |
| Total | $ 176,624,926 | $ 174,332,034 |

## Note 16:   Self-insured Health Care Plan

The Organization sponsors a health care plan for its employees.  This plan is self-insured to the extent of the deductible amounts under the excess risk insurance policy the Organization has obtained.  Accruals for unpaid claims amounted to approximately $1,141,000 and $929,000 at October 31, 2014 and 2013, respectively, and are included in the accompanying balance sheets in accrued liabilities.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

## Note 17:   Disclosures About Fair Value of Assets and Liabilities

Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date.  Fair value measurements must maximize the use of observable inputs and minimize the use of unobservable inputs.  There is a hierarchy of three levels of inputs that may be used to measure fair value:

**Level 1**   Quoted prices in active markets for identical assets or liabilities

**Level 2**   Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities

**Level 3**   Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities

### *Recurring Measurements*

The following table presents the fair value measurements of assets recognized in the accompanying statements of net assets measured at fair value on a recurring basis and the level within the fair value hierarchy in which the fair value measurements fall at October 31, 2014 and 2013:

| | | 2014 | | |
| --- | --- | --- | --- | --- |
| | | **Fair Value Measurements Using** | | |
| | **Fair Value** | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** |
| Fixed income funds | $ 21,139,416 | $    21,139,416 | $          - | $         - |
| Equity funds | 10,757,173 | 10,757,173 | - | - |
| Real estate funds | 6,095,442 | 6,095,442 | - | - |
| Commodity funds | 15,491,260 | 15,491,260 | - | - |
| Other funds | 328,492 | 328,492 | - | - |
| Commercial paper | 2,379,827 | - | 2,379,827 | - |

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

|  | | 2013 | | |
|---|---|---|---|---|
|  | | **Fair Value Measurements Using** | | |
|  | **Fair Value** | **Quoted Prices in Active Markets for Identical Assets (Level 1)** | **Significant Other Observable Inputs (Level 2)** | **Significant Unobservable Inputs (Level 3)** |
| Fixed income funds | $ 20,227,905 | $ 20,227,905 | $ - | $ - |
| Equity funds | 9,610,347 | 9,610,347 | - | - |
| Real estate funds | 4,956,191 | 4,956,191 | - | - |
| Commodity funds | 13,374,044 | 13,374,044 | - | - |
| Commercial paper | 2,379,827 | - | 2,379,827 | - |

Following is a description of the inputs and valuation methodologies used for assets and liabilities measured at fair value on a recurring basis and recognized in the accompanying consolidated balance sheets, as well as the general classification of such assets and liabilities pursuant to the valuation hierarchy. There have been no significant changes in the valuation techniques during the years ended October 31, 2014 and 2013.

### *Investments*

Where quoted market prices are available in an active market, securities are classified within Level 1 of the valuation hierarchy. Level 1 securities include fixed income funds, equity mutual funds, real estate funds and commodity funds. If quoted market prices are not available for investments carried at fair value, then fair values are estimated by using quoted prices of securities with similar characteristics or independent asset pricing services and pricing models, the inputs of which are market-based or independently sourced market parameters, including, but not limited to, yield curves, interest rates, volatilities, prepayments, defaults, cumulative loss projections and cash flows. Such securities are classified in Level 2 of the valuation hierarchy. Level 2 securities include commercial paper. In certain cases where Level 1 or Level 2 inputs are not available, securities are classified within Level 3 of the hierarchy. There are no Level 3 securities carried at fair value.

# Vail Health Services

## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### *Fair Value of Financial Instruments*

The following table presents estimated fair values of the Organization's financial instruments at October 31, 2014 and 2013.

| | 2014 | | 2013 | |
|---|---|---|---|---|
| | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Financial assets | | | | |
| Cash and cash equivalents | $22,236,306 | $22,236,306 | $18,664,156 | $18,664,156 |
| Fixed income funds | 21,139,416 | 21,139,416 | 20,227,905 | 20,227,905 |
| Equity funds | 10,757,173 | 10,757,173 | 9,610,347 | 9,610,347 |
| Real estate funds | 6,095,442 | 6,095,442 | 4,956,191 | 4,956,191 |
| Commodity funds | 15,491,260 | 15,491,260 | 13,374,044 | 13,374,044 |
| Commercial paper | 2,379,827 | 2,379,827 | 2,379,827 | 2,379,827 |
| Other | 328,492 | 328,492 | - | - |
| Pledges receivable | 428,833 | 428,833 | 230,000 | 230,000 |
| Notes receivable | - | - | 389,000 | 389,000 |
| Beneficial interests in affiliated organizations | 233,869 | 233,869 | 298,266 | 298,266 |
| Financial liabilities | | | | |
| Series 2004 Bonds | 5,350,000 | 5,405,653 | 7,065,000 | 7,210,123 |
| Series 2012 Note | 15,117,204 | 15,117,204 | 17,106,474 | 17,106,474 |
| Other debt obligations | 1,575,471 | 1,575,471 | 2,587,315 | 2,587,315 |

The following methods were used to estimate the fair value of all other financial instruments recognized in the accompanying consolidated balance sheets at amounts other than fair value.

### *Cash and Cash Equivalents*

The carrying amount approximates fair value.

### *Pledges, Notes Receivable and Beneficial Interests in Affiliated Organizations*

The carrying amount approximates fair value.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Alternative Investments Carried at the Lower of Cost or Fair Value

Alternative investments, which consist of various hedge funds, are carried at the lower of cost or fair value.  In previous years, an other than temporary impairment of fair value was recognized on certain alternative investments resulting in a carrying value which is below cost.  At October 31, 2014 and 2013 all alternative investments are carried at cost or adjusted cost basis due to previous impairment recognition.

### Notes Payable and Long-term Debt

Fair value is estimated based on the market activity for debt with similar terms and maturities.

## Note 18:   Significant Estimates and Concentrations

Accounting principles generally accepted in the United States of America require disclosure of certain significant estimates and current vulnerabilities due to certain concentrations.  Those matters include the following:

### Allowance for Net Patient Service Revenue Adjustments

Estimates of allowances for adjustments included in net patient service revenue are described in Notes 1, 2 and 3.

### Malpractice Claims

Estimates related to the accrual for medical malpractice claims are described in Notes 1 and 12.

### Orthopedic Physician Practices

The Organization is served by two orthopedic practices whose patients comprise approximately 52% of the Organization's gross patient revenue for the years ended October 31, 2014 and 2013.

# Vail Health Services
## Notes to Consolidated Financial Statements
## October 31, 2014 and 2013

### Note 19:   *Patient Protection and Affordable Care Act*

The *Patient Protection and Affordable Care Act* (PPACA) substantially reformed the United States health care system.  The legislation impacts multiple aspects of the health care system, including many provisions that change payments from Medicare, Medicaid and insurance companies.  The legislation requires the establishment of health insurance exchanges, which will provide individuals without employer-provided health care coverage the opportunity to purchase insurance.  It is anticipated that some employers, which have historically offered insurance to employees, will opt to have employees seek insurance coverage through the insurance exchanges.  It is possible the reimbursement rates paid by insurers participating in the insurance exchanges may be substantially different than rates paid under current health insurance products.  Another significant component of the PPACA is the expansion of the Medicaid program to a wide range of newly eligible individuals.  In anticipation of this expansion, payments under certain existing programs, such as Medicare disproportionate share, will be substantially decreased.  Each state's participation in an expanded Medicaid program is optional.  The state of Colorado has currently indicated it will participate in the Medicaid expansion program.

The PPACA is extremely complex and may be difficult for the federal government and each state to implement.  While the overall impact of the PPACA cannot currently be estimated, it is possible it will have a negative impact on the Hospital's net patient service revenue.  In addition, it is possible the Hospital will experience payment delays and other operational challenges during PPACA's implementation.

(THIS PAGE INTENTIONALLY LEFT BLANK)

**Supplementary Information**

# Vail Health Services

## Balance Sheet – Consolidating Information
## October 31, 2014

| Assets | | Vail Health Services, Management Services and Hospital | | Foundation | | Surgery Center |
|---|---|---|---|---|---|---|
| **Current Assets** | | | | | | |
| Cash and cash equivalents | $ | 15,350,286 | $ | 349,278 | $ | 6,392,475 |
| Assets whose use is limited | | 1,868,456 | | - | | - |
| Current portion of pledges receivable | | - | | 114,291 | | - |
| Patient accounts receivable, net of allowance | | 23,746,796 | | - | | 5,723,984 |
| Due from affiliate | | 2,961,665 | | - | | - |
| Inventories | | 7,374,483 | | - | | 2,118,761 |
| Other current assets | | 4,028,661 | | 4,942 | | 127,160 |
| Total current assets | | 55,330,347 | | 468,511 | | 14,362,380 |
| **Investments and Assets Whose Use is Limited** | | 181,521,547 | | 7,039,206 | | - |
| **Pledges Receivable, Less Current Portion** | | - | | 314,542 | | - |
| **Land, Buildings and Equipment, Net** | | 107,677,695 | | - | | 3,362,962 |
| **Investment in Foundation** | | 7,772,433 | | - | | - |
| **Investment in Surgery Center** | | 6,950,123 | | - | | - |
| **Investment in Physician Services** | | (1,816,339) | | - | | - |
| **Investment in Eagle Health Care Center, Inc.** | | 7,235,304 | | - | | - |
| **Beneficial Interests in Affiliated Organizations** | | 233,869 | | - | | - |
| **Deferred Financing Costs, Net** | | 267,303 | | - | | - |
| Total assets | $ | 365,172,282 | $ | 7,822,259 | $ | 17,725,342 |

# Vail Health Services

## Balance Sheet – Consolidating Information (Continued)
## October 31, 2014

| | Physician Services | Total Before Eliminations | Eliminations | Consolidated October 31, 2014 |
|---|---|---|---|---|
| | $ 144,267 | $ 22,236,306 | $ - | $ 22,236,306 |
| | - | 1,868,456 | - | 1,868,456 |
| | - | 114,291 | - | 114,291 |
| | 628,807 | 30,099,587 | - | 30,099,587 |
| | - | 2,961,665 | (2,961,665) | - |
| | - | 9,493,244 | - | 9,493,244 |
| | 49,929 | 4,210,692 | - | 4,210,692 |
| | 823,003 | 70,984,241 | (2,961,665) | 68,022,576 |
| | - | 188,560,753 | - | 188,560,753 |
| | - | 314,542 | - | 314,542 |
| | - | 111,040,657 | - | 111,040,657 |
| | - | 7,772,433 | (7,772,433) | - |
| | - | 6,950,123 | (6,950,123) | - |
| | - | (1,816,339) | 1,816,339 | - |
| | - | 7,235,304 | - | 7,235,304 |
| | - | 233,869 | - | 233,869 |
| | - | 267,303 | - | 267,303 |
| | $ 823,003 | $ 391,542,886 | $ (15,867,882) | $ 375,675,004 |

# Vail Health Services

## Balance Sheet – Consolidating Information (Continued)
## October 31, 2014

| Liabilities and Net Assets | Vail Health Services, Management Services and Hospital | | Foundation | | Surgery Center | |
|---|---|---|---|---|---|---|
| **Current Liabilities** | | | | | | |
| Accounts payable and accrued liabilities | $ | 17,539,240 | $ | 2,560 | $ | 1,734,067 |
| Due to affiliate | | - | | 47,266 | | 1,332,953 |
| Estimated third-party payor settlements | | 3,917,425 | | - | | - |
| Current portion of long-term debt | | 1,795,000 | | - | | 780,000 |
| Current portion of capital lease obligations | | 248,951 | | - | | - |
| Total current liabilities | | 23,500,616 | | 49,826 | | 3,847,020 |
| **Long-term Debt** | | 18,702,095 | | - | | - |
| **Capital Lease Obligations** | | 546,520 | | - | | - |
| Total liabilities | | 42,749,231 | | 49,826 | | 3,847,020 |
| **Net Assets** | | | | | | |
| Unrestricted | | | | | | |
| Vail Health Services | | 312,655,044 | | 1,004,756 | | 13,878,322 |
| Noncontrolling interest | | - | | - | | - |
| Total unrestricted net assets | | 312,655,044 | | 1,004,756 | | 13,878,322 |
| Temporarily restricted | | 6,776,971 | | 3,776,641 | | - |
| Permanently restricted | | 2,991,036 | | 2,991,036 | | - |
| Total net assets | | 322,423,051 | | 7,772,433 | | 13,878,322 |
| Total liabilities and net assets | $ | 365,172,282 | $ | 7,822,259 | $ | 17,725,342 |

# Vail Health Services

## Balance Sheet – Consolidating Information (Continued)
## October 31, 2014

| | Physician Services | Total Before Eliminations | Eliminations | Consolidated October 31, 2014 |
|---|---|---|---|---|
| | $ 1,040,122 | $ 20,315,989 | $ - | $ 20,315,989 |
| | 1,581,446 | 2,961,665 | (2,961,665) | - |
| | 17,774 | 3,935,199 | - | 3,935,199 |
| | - | 2,575,000 | - | 2,575,000 |
| | - | 248,951 | - | 248,951 |
| | 2,639,342 | 30,036,804 | (2,961,665) | 27,075,139 |
| | - | 18,702,095 | - | 18,702,095 |
| | - | 546,520 | - | 546,520 |
| | 2,639,342 | 49,285,419 | (2,961,665) | 46,323,754 |
| | (1,816,339) | 325,721,783 | (13,247,263) | 312,474,520 |
| | - | - | 6,928,199 | 6,928,199 |
| | (1,816,339) | 325,721,783 | (6,319,064) | 319,402,719 |
| | - | 10,553,612 | (3,596,117) | 6,957,495 |
| | - | 5,982,072 | (2,991,036) | 2,991,036 |
| | (1,816,339) | 342,257,467 | (12,906,217) | 329,351,250 |
| | $ 823,003 | $ 391,542,886 | $ (15,867,882) | $ 375,675,004 |

# Vail Health Services
## Statement of Operations – Consolidating Information
## Year Ended October 31, 2014

| | Vail Health Services, Management Services and Hospital | Foundation | Surgery Center |
|---|---|---|---|
| **Operating Revenues** | | | |
| Patient service revenue (net of contractual discounts and allowances) | $ 166,669,328 | $ - | $ 51,381,685 |
| Provision for uncollectible accounts | (14,119,023) | - | (337,480) |
| Net patient service revenue less provision for uncollectible accounts | 152,550,305 | - | 51,044,205 |
| Other operating revenue | 18,141,665 | 565,786 | - |
| Net assets released from restrictions used for operations | - | 372,500 | - |
| Total operating revenues | 170,691,970 | 938,286 | 51,044,205 |
| **Operating Expenses** | | | |
| Salaries, wages and employee benefits | 63,208,095 | - | 8,671,582 |
| Supplies and other expenses | 50,950,405 | 144,388 | 13,754,214 |
| Purchased services | 16,471,926 | 1,000 | 3,997,189 |
| Depreciation and amortization | 13,435,395 | - | 1,116,678 |
| Interest | 750,338 | - | 30,843 |
| Total operating expenses | 144,816,159 | 145,388 | 27,570,506 |
| **Operating Income (Loss)** | 25,875,811 | 792,898 | 23,473,699 |
| **Other Net Nonoperating Income (Expense)** | 19,406,648 | - | 14,638 |
| **Excess (Deficiency) of Revenues Over Expenses** | 45,282,459 | 792,898 | 23,488,337 |
| **Transfer of Net Assets From (To) Affiliate** | (4,656,664) | 56,664 | - |
| **Change in Net Unrealized Loss on Investments** | (192,673) | - | - |
| **Net Assets Released From Restrictions - Used for Purchase of Land, Buildings and Equipment** | 100,959 | 155,194 | - |
| **Distributions to and Other Changes in Noncontrolling Interest** | - | - | (22,330,000) |
| **Increase (Decrease) in Unrestricted Net Assets** | $ 40,534,081 | $ 1,004,756 | $ 1,158,337 |

# Vail Health Services

## Statement of Operations – Consolidating Information (Continued)
### Year Ended October 31, 2014

| | Physician Services | Total Before Eliminations | Eliminations | Consolidated October 31, 2014 |
|---|---|---|---|---|
| | $ 2,845,580 | $ 220,896,593 | $ - | $ 220,896,593 |
| | (394,523) | (14,851,026) | | (14,851,026) |
| | | | | |
| | 2,451,057 | 206,045,567 | - | 206,045,567 |
| | 82,771 | 18,790,222 | (4,099,014) | 14,691,208 |
| | - | 372,500 | - | 372,500 |
| | 2,533,828 | 225,208,289 | (4,099,014) | 221,109,275 |
| | | | | |
| | 5,022,967 | 76,902,644 | - | 76,902,644 |
| | 620,273 | 65,469,280 | (4,099,014) | 61,370,266 |
| | 2,548,647 | 23,018,762 | - | 23,018,762 |
| | - | 14,552,073 | - | 14,552,073 |
| | - | 781,181 | - | 781,181 |
| | 8,191,887 | 180,723,940 | (4,099,014) | 176,624,926 |
| | (5,658,059) | 44,484,349 | - | 44,484,349 |
| | 2,547 | 19,423,833 | (11,915,147) | 7,508,686 |
| | (5,655,512) | 63,908,182 | (11,915,147) | 51,993,035 |
| | 4,600,000 | - | - | - |
| | - | (192,673) | - | (192,673) |
| | - | 256,153 | - | 256,153 |
| | - | (22,330,000) | 11,417,223 | (10,912,777) |
| | $ (1,055,512) | $ 41,641,662 | $ (497,924) | $ 41,143,738 |

# Vail Health Services

## Statement of Changes in Net Assets – Consolidating Information
### Year Ended October 31, 2014

| | Vail Health Services, Management Services and Hospital | Foundation | Surgery Center |
|---|---|---|---|
| **Unrestricted Net Assets** | | | |
| Excess (deficiency) of revenues over expenses | $ 45,282,459 | $ 792,898 | $ 23,488,337 |
| Transfer of net assets from (to) affiliate | (4,656,664) | 56,664 | - |
| Change in net unrealized loss on investments | (192,673) | - | - |
| Net assets released from restrictions - used for purchase of land, buildings and equipment | 100,959 | 155,194 | - |
| Distributions to and sale/purchase of noncontrolling interest | - | - | (22,330,000) |
| Increase (decrease) in unrestricted net assets | 40,534,081 | 1,004,756 | 1,158,337 |
| **Temporarily Restricted Net Assets** | | | |
| Contributions | 1,106,086 | 754,549 | - |
| Transfer of net assets from (to) affiliate | - | 3,539,449 | - |
| Investment income and change in unrealized gain on investment | - | 10,337 | - |
| Change in beneficial interests in affiliated organizations | (64,397) | - | - |
| Net assets released from restriction | (100,959) | (527,694) | - |
| Increase in temporarily restricted net assets | 940,730 | 3,776,641 | - |
| **Permanently Restricted Net Assets** | | | |
| Contributions | 50,000 | - | - |
| Transfer of net assets from (to) affiliate | - | 2,991,036 | - |
| Increase in permanently restricted net assets | 50,000 | 2,991,036 | - |
| **Change in Net Assets** | 41,524,811 | 7,772,433 | 1,158,337 |
| **Net Assets, Beginning of Year** | 280,898,240 | - | 12,719,985 |
| **Net Assets, End of Year** | $ 322,423,051 | $ 7,772,433 | $ 13,878,322 |

# Vail Health Services

## Statement of Changes in Net Assets – Consolidating Information (Continued)
## Year Ended October 31, 2014

| Physician Services | Total Before Eliminations | Eliminations | Consolidated October 31, 2014 |
|---|---|---|---|
| $ (5,655,512) | $ 63,908,182 | $ (11,915,147) | $ 51,993,035 |
| 4,600,000 | - | - | - |
| - | (192,673) | - | (192,673) |
| - | 256,153 | - | 256,153 |
| - | (22,330,000) | 11,417,223 | (10,912,777) |
| (1,055,512) | 41,641,662 | (497,924) | 41,143,738 |
| - | 1,860,635 | (56,668) | 1,803,967 |
| - | 3,539,449 | (3,539,449) | - |
| - | 10,337 | - | 10,337 |
| - | (64,397) | - | (64,397) |
| - | (628,653) | - | (628,653) |
| - | 4,717,371 | (3,596,117) | 1,121,254 |
| - | 50,000 | - | 50,000 |
| - | 2,991,036 | (2,991,036) | - |
| - | 3,041,036 | (2,991,036) | 50,000 |
| (1,055,512) | 49,400,069 | (7,085,077) | 42,314,992 |
| (760,827) | 292,857,398 | (5,821,140) | 287,036,258 |
| $ (1,816,339) | $ 342,257,467 | $ (12,906,217) | $ 329,351,250 |

(THIS PAGE INTENTIONALLY LEFT BLANK)

_____

**Appendix B-2**

_____

**OBLIGATED GROUP INTERIM FINANCIAL STATEMENTS**

(THIS PAGE INTENTIONALLY LEFT BLANK)

Vail Valley Medical Center
Balance Sheet - Prior Year Comparison
As of July 31, 2015
Combined - Hospital and Diversified Services

|  | 7/31/2015 | 7/31/2014 |
|---|---|---|
| **ASSETS** | | |
| Current Assets | | |
| Cash and Short Term Investments | $18,015,432 | $19,989,580 |
| | | |
| Gross Accounts Receivable | 48,822,390 | 59,531,447 |
| Less:Allowance for Uncollectibles & Third Party Payors | (27,581,284) | (36,076,563) |
| | | |
| Net Accounts Receivable | 21,241,106 | 23,454,885 |
| | | |
| Inventories | 7,287,076 | 7,215,462 |
| Other Current Assets | 5,640,116 | 5,365,446 |
| | | |
| Total Current Assets | 52,183,730 | 56,025,373 |
| | | |
| Investments and Assets Whose Use is Limited | 202,853,439 | 174,916,113 |
| | | |
| Land, Buildings and Equipment, Net | 115,390,288 | 106,547,579 |
| | | |
| Other Assets | 25,318,992 | 22,377,818 |
| | | |
| TOTAL ASSETS | 395,746,449 | 359,866,884 |
| | | |
| **LIABILITIES AND NET ASSETS** | | |
| Current Liabilities | | |
| Accounts Payable and Accrued Liabilities | 19,561,330 | 14,710,462 |
| Estimated Third-Party Payor Settlements | 4,041,737 | 3,326,143 |
| Current Portion of Long-Term Debt and Capital Leases | 2,133,951 | 3,946,114 |
| | | |
| Total Current Liabilities | 25,737,018 | 21,982,719 |
| | | |
| Long Term Debt | 16,811,002 | 17,298,015 |
| | | |
| Capital Leases | 360,484 | 614,746 |
| | | |
| Total Liabilities | 42,908,503 | 39,895,479 |
| | | |
| Net Assets | | |
| Unrestricted | 313,105,289 | 271,418,059 |
| Temporarily Restricted | 7,510,068 | 6,513,736 |
| Permanently Restricted | 2,991,036 | 2,941,036 |
| Current Year Change in Unrealized Gain/(Loss) on Investments | (4,987,804) | 1,769,860 |
| Net Income (Loss) | 34,219,357 | 37,328,714 |
| | | |
| Total Net Assets | 352,837,946 | 319,971,404 |
| | | |
| TOTAL LIABILITIES AND NET ASSETS | 395,746,449 | 359,866,884 |

Vail Valley Medical Center
Income Statement - Comparison to Prior Year
For Periods Ending July 31, 2015
Combined - Hospital and Diversified Services

| | YTD | |
| --- | --- | --- |
| | Actual | Prior Year |
| OPERATING REVENUE | | |
| Patient Service Revenue (net of contractual discounts and allowances) | $129,194,409 | $131,510,493 |
| Provision for Bad Debt | (6,490,574) | (11,077,711) |
| NET PATIENT SERVICE REVENUE LESS PROVISION FOR BAD DEBT | 122,703,834 | 120,432,782 |
| OTHER OPERATING REVENUE | 14,710,588 | 14,814,868 |
| TOTAL OPERATING REVENUE | 137,414,423 | 135,247,651 |
| | | |
| OPERATING EXPENSES | | |
| Salaries, Wages and Employee Benefits | 54,688,004 | 50,998,789 |
| Purchased Services | 15,325,022 | 14,286,827 |
| Supplies and Other Expenses | 39,419,212 | 38,272,400 |
| Interest and Amortization | 564,228 | 571,486 |
| Depreciation | 9,978,636 | 10,161,775 |
| TOTAL OPERATING EXPENSES | 119,975,101 | 114,291,276 |
| | | |
| HOSPITAL OPERATING GAIN(LOSS) | 17,439,321 | 20,956,375 |
| Gain (Loss) of Subsidiaries | 10,388,751 | 8,557,725 |
| CONSOLIDATED OPERATING GAIN (LOSS) | 27,828,072 | 29,514,100 |
| NONOPERATING INCOME | 6,391,285 | 7,814,613 |
| EXCESS REVENUES OVER EXPENSES | 34,219,357 | 37,328,714 |
| Change in Investment - Unrealized Gain/(Loss) | (4,987,804) | 1,769,860 |

_____

**Appendix C**

_____


FORM OF BOND COUNSEL OPINION

(THIS PAGE INTENTIONALLY LEFT BLANK)

ATTORNEYS & COUNSELORS AT LAW

633 SEVENTEENTH STREET, SUITE 3000
DENVER, COLORADO 80202

TELEPHONE: (303) 297-2900
FAX: (303) 298-0940
WWW.SHERMANHOWARD.COM

October __, 2015

Colorado Health Facilities Authority
3033 East First Avenue, Suite 301
Denver, Colorado  80206

**$100,000,000**
**Colorado Health Facilities Authority**
**Hospital Revenue Bonds**
**(Vail Valley Medical Center Project)**
**Series 2015**

Ladies and Gentlemen:

We have acted as bond counsel to the Colorado Health Facilities Authority (the "Authority") in connection with the issuance of its Colorado Health Facilities Authority Hospital Revenue Bonds (Vail Valley Medical Center Project), Series 2015 in the aggregate principal amount of $100,000,000 (the "Series 2015 Bonds"), pursuant to a Bond Indenture of Trust, dated as of October 1, 2015 (the "Bond Indenture"), between the Authority and UMB Bank, n.a., as trustee (the "Bond Trustee").  In such capacity, we have examined the Authority's certified proceedings and such other documents and such law of the State of Colorado (the "State") and of the United States of America as we have deemed necessary to render this opinion letter. Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bond Indenture.

The proceeds of the Series 2015 Bonds will be used by the Authority to make a loan pursuant to a Loan Agreement dated as of October 1, 2015 (the "Loan Agreement"), between the Authority and Vail Clinic, Inc., doing business as Vail Valley Medical Center (the "Corporation") for the purpose of (i) financing the expansion, construction, renovation, improvement and equipping of Vail Valley Medical Center and its adjacent health care facilities and (ii) paying certain costs of issuing the Series 2015 Bonds.

The Series 2015 Bonds and the interest thereon are special, limited obligations of the Authority, payable solely out (i) of the revenues derived from the Loan Agreement, except to the extent otherwise provided in the Bond Indenture and the Loan Agreement, and (ii) payments under Obligation No. 1 issued to the Authority pursuant to the Master Trust Indenture, dated as of October 1, 2015 among the Corporation, on behalf of itself as a Member of the Obligated Group and as the Obligated Group Representative (as such terms are defined in such Master Indenture), VVMC Diversified Services, doing business as VHS Physician Services ("Diversified Services"), on behalf of itself as a Member of the Obligated Group and UMB

Colorado Health Facilities Authority
October __, 2015
Page 2

Bank, n.a., as master trustee, as supplemented by the Supplemental Master Trust Indenture for Obligation No. 1, dated as of October 1, 2015 (as so supplemented, the "Master Indenture").

Regarding questions of fact material to our opinions, we have relied upon the Authority's certified proceedings, representations and certifications of the Corporation, and other representations and certifications of public officials and others furnished to us, without undertaking to verify the same by independent investigation.

Based upon such examination, it is our opinion as bond counsel that:

1.     The Authority has been duly created and is an independent public body politic and corporate, validly organized and existing under the law of the State and has the authority to enter into the Loan Agreement and the Bond Indenture, to issue and sell the Series 2015 Bonds, and to loan the proceeds of the Series 2015 Bonds to the Corporation for the purposes described above.

2.     The Series 2015 Bonds have been duly authorized by the Authority, duly executed and delivered by authorized officers of the Authority, and assuming due authentication by the Bond Trustee, constitute valid and binding special, limited obligations of the Authority enforceable against the Authority in accordance with their terms, except as the enforceability thereof may be limited by insolvency, bankruptcy, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally or against municipal corporations such as the Authority from time to time in effect.

3.     The Loan Agreement and the Bond Indenture have been duly authorized by the Authority, duly executed and delivered by authorized officers of the Authority, and assuming due authorization, execution and delivery by the other respective parties thereto, constitute valid and binding obligations of the Authority enforceable against the Authority in accordance with their respective terms, except as the enforceability thereof may be limited by insolvency, bankruptcy, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally or against municipal corporations such as the Authority from time to time in effect.

4.     Interest on the Series 2015 Bonds is excluded from gross income under federal income tax laws pursuant to Section 103 of the Internal Revenue Code of 1986, as amended to the date hereof (the "Code"), and interest on the Series 2015 Bonds is excluded from alternative minimum taxable income as defined in Section 55(b)(2) of the Code except that such interest is required to be included in calculating the adjusted current earnings adjustment applicable to corporations for purposes of computing the alternative minimum taxable income of corporations.  The opinions expressed in this paragraph assume continuous compliance with the covenants and continued accuracy of the representations contained in the Authority's certified proceedings and in certain other documents and certain other certifications furnished to us.  In rendering the opinions stated in this paragraph, we are relying on the opinion of Duane Morris

Colorado Health Facilities Authority
October __, 2015
Page 3

LLP, counsel to the Corporation and Diversified Services, as to the status of the Corporation and Diversified Services as qualifying as exempt from federal income taxation under Section 501(c)(3) of the Code.

       5.     The Series 2015 Bonds, the transfer thereof and the income therefrom are exempt from all taxation and assessments in the State.

       The opinions expressed in this opinion letter are subject to the following:

       The obligations of the Authority pursuant to the Series 2015 Bonds, the Loan Agreement and the Bond Indenture are subject to the application of equitable principles and to the reasonable exercise in the future by the State and its governmental bodies of the police power inherent in the sovereignty of the State.

       In rendering the foregoing opinions, we are not passing upon the matters of (i) the corporate status of the Corporation, (ii) the power of the Corporation to execute and deliver the Loan Agreement, the Master Indenture or Obligation No. 1 or to perform its obligations thereunder, (iii) the validity or enforceability of the Loan Agreement, the Master Indenture or Obligation No. 1 against the Corporation, or (iv) the security afforded by the Master Indenture.

       In this opinion letter issued in our capacity as bond counsel, we are opining only upon those matters set forth herein, and we are not passing upon the accuracy, adequacy or completeness of the Official Statement, dated October __, 2015, relating to the Series 2015 Bonds or any other statements made in connection with any offer or sale of the Series 2015 Bonds or upon any federal or state tax consequences arising from the receipt or accrual of interest on or the ownership or disposition of the Series 2015 Bonds, except those specifically addressed herein.

       This opinion letter is issued as of the date hereof and we assume no obligation to revise or supplement this opinion letter to reflect any facts or circumstances that may hereafter come to our attention or any changes in law that may hereafter occur.

       Respectfully submitted,

(THIS PAGE INTENTIONALLY LEFT BLANK)

———————————————

**Appendix D**

———————————————

**SUMMARIES OF CERTAIN DEFINITIONS AND FINANCING DOCUMENTS**

(THIS PAGE INTENTIONALLY LEFT BLANK)

The following are summaries of certain provisions of the Master Indenture, supplemental master trust indentures relating to certain outstanding Obligations, the Bond Indenture and the Loan Agreement. These summaries do not purport to be complete or definitive and are qualified in their entireties by reference to the full terms of such documents.

THE MASTER INDENTURE

**General**

The Master Indenture authorizes the issuance of Obligations by the Obligated Group, which may be unsecured general obligations or, to the extent permitted by the Master Indenture, secured by a Lien on Property. An Obligation is stated in the Master Indenture to be a joint and several obligations of the Corporation and each other Member of the Obligated Group. The summary of the Master Indenture set forth under this heading "THE MASTER INDENTURE" and elsewhere in this Official Statement, including but not limited in the section of the Official Statement captioned "SECURITY AND SOURCES OF PAYMENT FOR THE SERIES 2015 BONDS," does not purport to be complete or definitive and is qualified in its entirety by reference to the full form of the Master Indenture, together with all supplements and amendments thereto.

**Definitions**

Certain capitalized words and phrases used under this heading "THE MASTER INDENTURE" and under the heading "THE SUPPLEMENTAL MASTER INDENTURES" have the meanings set forth under this subheading.

"*Additional Indebtedness*" means any Indebtedness (including all Obligations) incurred subsequent to the issuance of the Initial Obligations.

"*Affiliate*" means a corporation, partnership, joint venture, limited liability company, limited liability partnership, association, business trust or similar entity organized under the laws of the District of Columbia or any state of the United States of America which is directly or indirectly controlled by any Member of the Obligated Group or Designated Affiliate, by any other Affiliate or by any Person which controls any Member of the Obligated Group or Designated Affiliate or which controls any other Affiliate, except that the term "Affiliate" does not include any Member of the Obligated Group or Designated Affiliate. For purposes of this definition, control means the power to direct the management and policies of a Person through the ownership of not less than a majority of its voting securities or the right to designate or elect not less than a majority of the members of its board of directors or other governing board or body by law, contract or otherwise.

"*Aggregate Principal Amount*" means at any time of determination the outstanding aggregate principal amount of a security and, in the case of a discount or non-interest bearing security, its accreted value calculated in accordance with the documents authorizing such security or if not so defined, GAAP.

"*Audited Financial Statements*" means financial statements described in the definition of Financial Statements summarized below.

"*Authorized Representative*" means, with respect to the Corporation and each other Member of the Obligated Group and any Designated Affiliates, its respective chief executive officer or chief financial officer or any other individual or individuals designated as an Authorized Representative thereof by a current Authorized Representative in a writing filed with the Master Trustee and each Related Bond Trustee.

D-1

"*Balloon Long-Term Indebtedness*" means (a) Long-Term Indebtedness payments of 25% or more of the principal of which are due by reason of maturity, mandatory redemption or mandatory tender in a single twelve-month period, which portion of the principal is not required by the documents pursuant to which such Indebtedness is issued to be amortized by payment or redemption prior to such date, and (b) Qualified Commercial Paper.

"*Code*" means the Internal Revenue Code of 1986, as amended, and, when appropriate, any statutory predecessor or successor thereto, and all applicable regulations (whether proposed, temporary or final) thereunder and any applicable official rulings, announcements, notices, procedures and judicial determinations relating to the foregoing.

"*Commitment Indebtedness*" means an obligation or obligations of any Member of the Credit Group to repay amounts disbursed pursuant to a commitment from a Person to pay or refinance when due other Indebtedness of such Member or purchase when tendered for purchase by the holder thereof in accordance with the terms thereof (a) other Indebtedness of such Member of the Credit Group or (b) Indebtedness of a Person who is not a Member of the Credit Group which Indebtedness is guaranteed by a Guaranty of such Member or secured or payable from amounts paid on Indebtedness of such Member, which other Indebtedness was incurred in accordance with the provisions of the Master Indenture.

"*Completion Indebtedness*" means any Long-Term Indebtedness incurred by any Member of the Credit Group for the purpose of financing the completion of constructing or equipping facilities for which Indebtedness has theretofore been incurred in accordance with the provisions hereof, to the extent necessary to provide a completed and equipped facility of the type and scope contemplated at the time that such initial Indebtedness was originally incurred, and in accordance with the general plans and specifications for such facility as originally prepared in connection with the incurring of such initial Indebtedness with only such changes as have been made in conformance with the documents pursuant to which the original Indebtedness was incurred.

"*Consultant*" means a firm that is not, and no member, stockholder, director, officer or employee of which is, an officer, director, trustee or employee of any Member of the Credit Group or any Affiliate, and which is a professional management consultant or accounting firm having a favorable reputation and the skill and experience necessary to render the particular report required by the provisions of the Master Indenture in which such requirement appears and which is selected by the Obligated Group Representative.

"*Controlling Member*" means the Obligated Group Member designated by the Obligated Group Representative to establish and maintain control over a Designated Affiliate.

"*Corporation*" means Vail Clinic, Inc. d/b/a Vail Valley Medical Center, a Colorado nonprofit corporation, and its successors and assigns.  The Corporation is referred to in the Master Trust Indenture, the Bond Indenture and in the Loan Agreement, as the "Medical Center."

"*Credit Group*" means, collectively, the Corporation and the other Members of the Obligated Group and the Designated Affiliates.

"*Days Cash on Hand*" means as of any date of determination the quotient derived by dividing (a) the sum of the Credit Group's cash, cash equivalents and unrestricted investments available for operating purposes on such date of determination by (b) the average daily operating expenses (excluding depreciation and amortization) of the Credit Group for the previous 12 months.

"*Debt Service Coverage Ratio*" means for any period for which a calculation is made, the ratio determined by dividing the Income Available for Debt Service for such period by the Maximum Debt Service Requirement.

"*Debt Service Requirement*" means, for any period for which such determination is made, the aggregate of the payments required to be made in respect of principal (whether at maturity as a result of mandatory sinking fund redemption, mandatory prepayment or otherwise) and interest on Outstanding Long-Term Indebtedness of the Credit Group during such period, except that:

(a)     with respect to Balloon Long-Term Indebtedness the amount of debt service taken into account is to, at the option of the Obligated Group Representative, assume that such Indebtedness is to be amortized over a 30-year period, beginning on the date of such calculation, on a level debt service basis and at the rate of interest specified in such obligation (determined as of the time of calculation of the Debt Service Requirement and, if such obligation bears interest at a variable rate, calculated in the manner provided in the Master Indenture with respect to Variable Rate Indebtedness), except that if, as of the calculation date, the final maturity, mandatory redemption date or mandatory tender date for such Balloon Long-Term Indebtedness (other than Qualified Commercial Paper) is within 12 months and the Member of the Credit Group has not (i) obtained a firm commitment from a financial institution to retire such Balloon Long-Term Indebtedness, (ii) set aside or committed in an irrevocable reserve (which may be held by a Member of the Credit Group) in cash or other securities permitted as investments under the applicable Related Bond Indenture or other instrument securing such Balloon Long-Term Indebtedness in an amount sufficient to retire such Balloon Long-Term Indebtedness, or (iii) demonstrated that, as of the end of the most recent Fiscal Year or 12-month period for which Audited Financial Statements are available, the value of cash, cash equivalents and unrestricted investments available for operating purposes of the Credit Group as shown in the Audited Financial Statements for such Fiscal Year or 12-month period are equal to or greater than an amount equal to (A) the outstanding principal amount of such Balloon Long-Term Indebtedness, plus (B) 75 Days Cash on Hand, then the entire Outstanding amount of such Balloon Long-Term Indebtedness or, if a portion of the amount of principal payable on such maturity, mandatory redemption date or mandatory tender date has been set aside or committed in an irrevocable reserve described in (ii) above, the remaining amount required to retire such Long-Term Indebtedness, is to be included in the calculation of the Debt Service Requirement;

(b)     the interest on Variable Rate Indebtedness is to be calculated at a rate equal to an assumed fixed rate of interest equal to the average interest rate outstanding on such Indebtedness for the most recent 24-month period, except that if the Indebtedness has not been outstanding for 24 months, then the interest rate is to be the average rate for the most recent 12 months or the interest rate in effect on the date of calculation, whichever is higher, and except that if the debt has not been outstanding for a 12-month period, the assumed rate is to be (i) for tax-exempt debt the average of the interest rates set forth in the SIFMA Index on the first Business Day of each month for the most recent 24-month period and (ii) for taxable debt the average of the One-Month LIBOR interest rates determined on the first Business Day of each month for the most recent 24-month period;

(c)     with respect to any Guaranty the amount of principal and interest taken into account is to equal 20% of the principal and interest on the indebtedness guaranteed (calculated as if it were Indebtedness), unless a payment has been made by the guarantor pursuant to the Guaranty at any time during the immediately preceding 24 months, in which case the amount of principal and interest for such Guaranty taken into account is to equal 100% of the principal and

interest on the indebtedness guaranteed (calculated as if it were Indebtedness and in the manner provided above);

(d)    no debt service is to be included for any Commitment Indebtedness unless an unreimbursed draw has been made with respect to such Commitment Indebtedness or unless the Commitment Indebtedness is with respect to Balloon Long-Term Indebtedness the final maturity of which is due within 12 months and, in either event, debt service on Commitment Indebtedness will be computed in accordance with the terms and conditions of such Commitment Indebtedness and, if applicable, the other terms and conditions summarized in subsections (a) and (b) above;

(e)    with respect to Long-Term Indebtedness with respect to which a Financial Products Agreement has been entered into by a Member of the Credit Group, interest on such Long-Term Indebtedness is to be included in the determination of the Debt Service Requirement by including for any period an amount equal to the amount of interest payable on such Long-Term Indebtedness during such period at the rate or rates stated in such Long-Term Indebtedness plus any Financial Products Payments payable during such period minus any Financial Products Receipts receivable during such period, except that in no event may any calculation made pursuant to the Master Indenture as summarized in this subsection result in a number less than zero being included in the determination of the Debt Service Requirement and except that, if the actual interest rate on such Long-Term Indebtedness or the actual amount of Financial Products Payments or Financial Products Receipts cannot be determined for the period for which the Debt Service Requirement is being calculated, the amount of interest deemed payable during such period on such Long-Term Indebtedness is to be determined by applying the average interest rate per annum which was in effect (or, if such Long-Term Indebtedness was not Outstanding during such 18-month period, which would have been in effect) or the average Financial Products Payments which would have been paid, or the average Financial Products Receipts which would have been received, as the case may be, for any 12 consecutive calendar months specified in an Officer's Certificate during the 18 calendar months immediately preceding the date of calculation of the Debt Service Requirement; notwithstanding the foregoing, if the Financial Products Payments payable during such period are calculated at a fixed rate and the Financial Products Receipts during such period are calculated at a floating rate that bears a close correlation to the interest rate on such Long-Term Indebtedness, the amount of interest taken into account is to equal the Financial Products Payments for such period.

If the Indebtedness being calculated is with respect to a series of Related Bonds, portions of which may bear interest at types of rates and for periods of time different than those for other Related Bonds of that same series ("Modes"), each portion of the Indebtedness corresponding to a Mode then applicable to one or more Related Bonds is to be deemed separate Indebtedness for the purposes of this definition of Debt Service Requirement.

"*Designated Affiliate*" means any Person designated as a Designated Affiliate pursuant to the Master Indenture until such Person's status as such is terminated pursuant the Master Indenture.

"*Diversified Services*" means VVMC Diversified Services, d/b/a VHS Physician Services, a Colorado nonprofit corporation and its successors and assigns.

"*Event of Default*" means any one or more of those events set forth in the section of the Master Indenture summarized under the subheading "Events of Default" below.

"*Excluded Facilities*" means all land, improvements, equipment and other facilities (designated by the Obligated Group Representative in an Officer's Certificate delivered to the Master Trustee) at and

upon which no substantial health care or health care-related operations are then being conducted or are expected to be subsequently conducted by any Member of the Credit Group, except that (a) any Indebtedness incurred for or secured by such Excluded Facilities must be non-recourse against any Property other than Excluded Facilities and (b) any funds of a Member of the Credit Group (other than funds derived from Excluded Facilities) used to acquire or otherwise pay for any such Excluded Facilities or pay any expenses in connection with Excluded Facilities must satisfy the provisions of the Master Indenture summarized under the subheading "Sale, Lease or Other Disposition of Property" below with respect to disposition of Property.   A Member of the Obligated Group may provide an Officer's Certificate indicating that property previously designated as an Excluded Facility is no longer an Excluded Facility, except that if such Excluded Facility were no longer classified as such, the provisions of the Master Indenture summarized in paragraphs (a)(i) and (ii) under subheading "Limitations on Additional Indebtedness" (assuming for any time periods referred to in such sections such Excluded Property did not constitute Excluded Property) would be met for the incurrence of one dollar of additional Indebtedness.

"*Excluded Property*" means any Excluded Facility and all rents, revenues or other income derived directly or indirectly from any of the foregoing.

"*Financial Products Agreement*" means an interest rate swap, cap, collar, option, floor, forward or other hedging agreement, arrangement or security, however denominated, identified to the Master Trustee in an Officer's Certificate as having been entered into by a Member of the Credit Group with a Qualified Provider for the purpose of (a) reducing or otherwise managing the Member's risk of interest rate changes or (b) effectively converting the Member's interest rate exposure, in whole or in part, from a fixed rate exposure to a variable rate exposure, from a variable rate exposure to a fixed rate exposure, or from a variable rate exposure to a different variable rate exposure.

"*Financial Products Payments*" means payments periodically required to be paid to a counterparty by a Member of the Credit Group pursuant to a Financial Products Agreement.

"*Financial Products Receipts*" means amounts periodically required to be paid to a Member of the Credit Group by a counterparty pursuant to a Financial Products Agreement.

"*Financial Statements*" means the consolidated financial statements of the Holding Company and affiliates, including consolidating schedules showing the Members of the Obligated Group, substantially in the form set forth in Appendix B-1 to the attached Official Statement, combined financial statements of the Members of the Obligated Group, or separate financial statements of each Member of the Obligated Group, in each case prepared in accordance with GAAP and audited by a firm of independent accountants. The consolidating schedules of the Members of the Obligated Group may include therein the financial information of any non-Member the financial statements of which are consolidated with those of the Members of the Obligated Group and the assets of which represent less than 5% of Total Assets.

"*Fiscal Year*" means November 1 to October 31 or such other twelve-month period adopted as the Fiscal Year of the Credit Group as designated by the Obligated Group Representative.

"*GAAP*" means accounting principles generally accepted in the United States of America, consistently applied.

"*Holding Company*" means Vail Health Services and it successors and assigns.

"*Governing Body*" means, when used with respect to the Obligated Group Representative or any other Member of the Credit Group, its board of directors, board of trustees or other board or group of

individuals in which the powers of the Obligated Group Representative or the Member of the Credit Group are vested.

"*Government Obligations*" means (a) direct obligations of, or obligations the principal of and interest on which are guaranteed by, the United States of America, (b) evidences of a direct ownership in future interest or principal payments on obligations issued or guaranteed by the United States of America, which obligations are held in a custody account by a custodian satisfactory to the Master Trustee and any Related Bond Trustee pursuant to the terms of a custody agreement, (c) obligations issued or guaranteed by any agency, department or instrumentality of the United States of America if the obligations are rated in one of the two highest rating categories (without regard to material or similar modifiers) of a national rating agency or (d) obligations issued by any state of the United States of America or any political subdivision, public instrumentality or public authority of any state, which obligations are fully secured by and payable solely from noncallable obligations of the type described in (a), (b) or (c) above which are held in trust.

"*Gross Revenues*" means all revenues, income, receipts and money received by or on behalf of the Members of the Obligated Group from all sources, excluding Excluded Property but including the following:

(a)     gross revenues derived from the operation and possession of each Member's facilities;

(b)     gifts, grants, bequests, donations and contributions of each Member, but excluding (i) any gifts, grants, bequests, donations, and contributions to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of Obligations and (ii) funds of a Member of the Obligated Group derived therefrom which due to donor restrictions cannot legally be used to pay Obligations;

(c)     proceeds derived from (i) condemnation proceeds, (ii) accounts receivable, (iii) securities and other investments, (iv) inventory and other tangible and intangible property, (v) medical reimbursement programs and agreements, (vi) insurance proceeds and (vii) contract rights and other rights and assets on the date of the Master Indenture or thereafter owned by each Member;

(d)     Financial Products Payments or Financial Products Receipts;

(e)     rentals received from the lease of office space; and

(f)     amounts received from Designated Affiliates.

"*Guaranty*" means any obligation of any Member of the Credit Group guaranteeing in any manner, directly, indirectly or contingently, and whether by payment, advance, purchase, reserve or otherwise, any obligation of any other Person which obligation of such other Person would, if such obligation were the obligation of a Member of the Credit Group, constitute Indebtedness under the Master Indenture.

"*Holder*" means the registered owner of any Obligation issued in registered form.

"*Income Available for Debt Service*" means, unless the context provides otherwise, with respect to the Credit Group as to any period of time, net income, or excess of revenues over expenses (excluding

income from all Irrevocable Deposits) before depreciation, amortization, and interest expense, as determined in accordance with GAAP plus Limited Obligor Income for each Limited Obligor, except that no determination thereof may take into account:

      (a)    any revenue or expense of a Person that is not a Member of the Credit Group or any gain or loss resulting from either the early extinguishment or refinancing of Indebtedness or the sale, exchange or other disposition of capital assets not made in the ordinary course of business;

      (b)    gifts, grants, bequests, donations or contributions, to the extent specifically restricted by the donor to a particular purpose inconsistent with their use for the payment of principal of, redemption premium and interest on Indebtedness or the payment of operating expenses;

      (c)    the net proceeds of insurance (other than business interruption insurance) and condemnation awards;

      (d)    any unrealized gain or loss due to valuation of investments and Financial Products Agreements and any other similar instruments;

      (e)    extraordinary non-cash items;

      (f)    any realized loss on non-cash items due to other than the temporary impairment thereof; or

      (g)    any net income, or excess of revenues over expenses, or depreciation, amortization or interest expense or other expenses, related to or derived from Excluded Property.

"*Indebtedness*" means (a) all obligations for borrowed money incurred or assumed by Members of the Credit Group, (b) all installment sales, conditional sales and capital lease obligations of any Member of the Credit Group and (c) all Guaranties (other than any Guaranty by any Member of the Credit Group of Indebtedness of any other Member of the Credit Group), whether constituting Long-Term Indebtedness or Short-Term Indebtedness.  Indebtedness does not include (a) obligations of any Member of the Credit Group to any other Member of the Credit Group, (b) any Financial Products Agreement, (c) any non-recourse indebtedness incurred with respect to or secured by Excluded Property the liability for which indebtedness is effectively limited to such Excluded Property, and (d) obligations of any Member of the Credit Group for payments to donors under donated trusts or similar instruments, including without limitation, charitable gift annuities.

"*Industry Restrictions*" means federal, state or other applicable governmental laws or regulations affecting any Member of the Credit Group and their health care facilities or other facilities placing restrictions and limitations on the (a) rates, fees and charges to be fixed, charged or collected by any Member of the Credit Group or (b) the timing of the receipt of such revenues.

"*Initial Obligations*" means, collectively, all Obligations issued under the Master Indenture contemporaneously with the original execution and delivery of the Master Indenture.

"*Insurance Consultant*" means a Person or firm who is not, and no member, stockholder, director, officer or employee of which is, an officer, director, trustee or employee of a Member of the Credit Group or an Affiliate which is an actuary or other Person qualified to survey risks and to recommend insurance

D-7

coverage for hospitals, health-related facilities and services and organizations engaged in such operations and other facilities operated by Members of the Credit Group.

"*Irrevocable Deposit*" means the irrevocable deposit in trust of cash in an amount, or Government Obligations, or other securities permitted for such purpose pursuant to the terms of the documents governing the payment of or discharge of Indebtedness, the principal of and interest on which will be an amount, and under terms sufficient to pay all or a portion of the principal of, premium, if any, and interest on, as the same become due, of any such Indebtedness which would otherwise be considered Outstanding. The trustee of such deposit may be the Master Trustee, a Related Bond Trustee or any other trustee or escrow agent authorized to act in such capacity.

"*Lien*" means any mortgage, deed of trust or pledge of, security interest in or encumbrance on any Property of any Member of the Credit Group which secures any Indebtedness or any other obligation of any Member of the Credit Group or any other Person, other than an obligation to any Member of the Credit Group.

"*Limited Obligor*" means any Person, other than a Member of the Credit Group, on whose account any Member of the Credit Group has issued a Guaranty as consideration for such Person's execution and delivery to such Member of the Credit Group of a Pledged Note.

"*Limited Obligor Income*" means, with respect to each Limited Obligor, as to any period of time, the lesser of (a) the amount included in the Debt Service Requirement relating to any Guaranty by a Member of the Credit Group of any indebtedness of the Limited Obligor or (b) the Limited Obligor Income Available for Debt Service, except that if the amount included in the Debt Service Requirement for such period is at any time equal to 100% of the debt service on such indebtedness instead of 20% as provided in the definition of "Guaranty" summarized above, the Limited Obligor Income for such period is to be equal to zero.

"*Limited Obligor Income Available for Debt Service*" means, with respect to any Limited Obligor, as to any period of time, the Income Available for Debt Service, but calculated as to the Limited Obligor rather than the Members of the Credit Group.

"*Long-Term Indebtedness*" means all Indebtedness having a maturity longer than one year and Qualified Commercial Paper incurred or assumed by any Member of the Credit Group including: (a) money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, longer than one year; (b) leases that are required to be capitalized in accordance with GAAP having an original term, or renewable at the option of the lessee for a period from the date originally incurred, longer than one year; (c) installment sale or conditional sale contracts having an original term in excess of one year; and (d) Short-Term Indebtedness if Commitment Indebtedness exists to provide financing to retire such Short-Term Indebtedness and such Commitment Indebtedness provides for the repayment of principal on terms which would, if such commitment were implemented, constitute Long-Term Indebtedness.

"*Master Indenture*" means the Master Trust Indenture, expected to be dated as of the first day of the month in which the Bonds are originally issued, among the Corporation, Diversified Services and the Master Trustee, as supplemented and amended.

"*Master Trustee*" means UMB Bank, n.a., as successor master trustee, and its successor or successors and any other corporation or association which at any time may be substituted in its place pursuant to, and at the time serving as trustee under, the Master Indenture.

"*Maximum Debt Service Requirement*" means the highest Debt Service Requirement for any current or subsequent Fiscal Year.

"*Member*" means a Member of the Credit Group or a Member of the Obligated Group, as the context may require.

"*Member of the Credit Group*," or "*Credit Group Member*," means each Member of the Obligated Group and any other Person designated as a Designated Affiliate pursuant to the Master Indenture, but excluding any Designated Affiliate that has been terminated pursuant to the provisions of the Master Indenture.

"*Member of the Obligated Group*," or "*Obligated Group Member*," means the Obligated Group Representative and any other Person becoming a Member of the Obligated Group pursuant to the Master Indenture (as summarized under the subheading "Parties Becoming Members of the Obligated Group" below) but excluding any Member of the Obligated Group that has withdrawn from the Obligated Group pursuant to the Master Indenture (as summarized under the subheading "Withdrawal From the Obligated Group" below).  The Corporation and Diversified Services are initially the only Members of the Obligated Group.

"*Non-Recourse Indebtedness*" means any Indebtedness incurred to finance the acquisition of Property secured by a Lien on such Property, liability for which is effectively limited to the Property subject to such Lien with no recourse, directly or indirectly, to any other Property of the Credit Group.

"*Obligated Group*" means, collectively, the Members of the Obligated Group.

"*Obligated Group Representative*" means, initially, the Corporation and thereafter any Person as may be designated as Obligated Group Representative pursuant to written notice to the Master Trustee executed by all of the Members of the Obligated Group.

"*Obligation*" means any obligation of the Obligated Group issued under the Master Indenture, as a joint and several obligation of each Obligated Group Member, which may be in the form set forth in a Supplement, including but not limited to bonds, obligations, debentures, reimbursement agreements, loan agreements, guaranties, leases, Financial Products Agreements or other payment obligations.

"*Officer's Certificate*" means a certificate signed by the chairperson of the Governing Body of the Obligated Group Representative, or the president or chief executive officer, or the chief financial officer of the Obligated Group Representative.

"*One-Month LIBOR*" means the London interbank offered rate for United States dollar deposits for a one-month period, which rate appears on the display designated as Reuters Screen LIBOR01 Page (or such other page as may replace Reuters Screen LIBOR01 Page or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for United States dollar deposits), determined as of approximately 11:00 a.m., London time on the date of determination thereof (or, if not so reported, then as determined by a commercial or investment banking institution knowledgeable in municipal or corporate finance in a manner consistent with determining USD-LIBOR-BBA with a one month designated maturity as such terms are defined in the 2006 ISDA Definitions).

"*Opinion of Bond Counsel*" when used with reference to the Master Indenture means an opinion in writing signed by an attorney or firm of attorneys acceptable to the Master Trustee and the Obligated

Group Representative, and experienced in the field of municipal bonds whose opinions are generally accepted by purchasers of municipal bonds.

"*Opinion of Counsel*" means an opinion in writing signed by an attorney or firm of attorneys, including in-house counsel, acceptable to the Master Trustee, who may be counsel for any Member of the Credit Group or other counsel.

"*Outstanding*," when used with reference to Obligations and other Indebtedness means, as of any date of determination, all Obligations and Indebtedness theretofore issued or incurred and not paid and discharged other than: (a) Obligations theretofore canceled by the Master Trustee or delivered to the Master Trustee for cancellation; (b) Indebtedness deemed paid and no longer outstanding pursuant to the terms thereof, whether by payment, prepayment, defeasance or otherwise; (c) Obligations in lieu of which other Obligations have been authenticated and delivered or have been paid pursuant to the provisions of the Master Indenture regarding mutilated, destroyed, lost or stolen Obligations unless proof satisfactory to the Master Trustee has been received that any such Obligation is held by a bona fide purchaser; (d) Obligations owned by any Obligated Group Member as provided in the Master Indenture; and (e) Obligations or Indebtedness for which there has been made an Irrevocable Deposit, but only to the extent that payment of debt service on such Obligation or Indebtedness is payable from such Irrevocable Deposit, except that if two or more obligations which constitute Indebtedness represent the same underlying obligation (as when an Obligation secures an issue of Related Bonds and another Obligation secures current repayment obligations to a bank under Commitment Indebtedness) for purposes of the various financial covenants contained in the Master Indenture, but only for such purposes, only one of such obligations will be deemed Outstanding and the obligation so deemed to be Outstanding will be that one which produces the greater amount to be included in the Debt Service Requirement to be included in the calculation of such covenants.

"*Permitted Liens*" has the meaning summarized under the subheading "Limitations on Creation of Liens" below.

"*Person*" means any natural person, firm, association, corporation, partnership, joint stock company, a joint venture, trust, unincorporated organization or firm, or a government or any agency or political subdivision thereof or other public body.

"*Pledged Note*" means a promissory note executed by a Limited Obligor, as maker, in favor of a Member of the Credit Group, as payee, evidencing a sum certain liability of such maker to such payee, which is assigned by such payee to the Master Trustee.

"*Property*" means any and all rights, titles and interests in and to any and all assets whether real or personal, tangible or intangible and wherever situated (including without limitation the real property described in the Master Indenture unless the same constitutes Excluded Property), other than funds received as donations which are restricted by the donor to purposes inconsistent with payment of debt service on Obligations or operating expenses as determined in accordance with GAAP and other than Excluded Property.

"*Property, Plant and Equipment*" means all Property owned by the Members of the Credit Group which is property, plant and equipment under GAAP.

"*Qualified Commercial Paper*" means commercial paper issued, incurred or assumed by any Member of the Credit Group or issued as Related Bonds, which commercial paper is rated in either of the two highest rating categories of either Moody's Investors Service, Inc., Standard & Poor's Ratings Services or Fitch Ratings, or their respective successors, and which commercial paper is marketed by a

nationally recognized commercial paper dealer, and for which there is in place and effective a commercial paper dealer agreement with such a party.

"*Qualified Provider*" means any financial institution or insurance company that is a party to a Financial Products Agreement if the unsecured long-term debt obligations of such financial institution or insurance company (or of the parent or a subsidiary of such financial institution or insurance company if such parent or subsidiary guarantees the performance of such financial institution or insurance company under such Financial Products Agreement), or obligations secured or supported by a letter of credit, contract, guarantee, agreement, insurance policy or surety bond issued by such financial institution or insurance company (or such guarantor parent or subsidiary), are rated in one of the three highest rating categories (without regard to numerical or similar modifiers) of a national rating agency at the time of the execution and delivery of the Financial Products Agreement.

"*Related Bond Indenture*" means any indenture, bond resolution or other comparable instrument pursuant to which a series of Related Bonds is issued.

"*Related Bond Issuer*" means the issuer of any issue of Related Bonds.

"*Related Bond Trustee*" means the trustee and its successors in the trusts created under any Related Bond Indenture.

"*Related Bonds*" means the revenue bonds or other obligations issued or incurred by any state, territory or possession of the United States of America or any municipal corporation or political subdivision formed under the laws thereof or any constituted authority or agency or instrumentality of any of the foregoing empowered to issue obligations on behalf thereof ("governmental issuer"), pursuant to a Related Bond Indenture, the proceeds of which are loaned or otherwise made available to (a) a Member of the Obligated Group in consideration of the execution, authentication and delivery of an Obligation to or for the order of such governmental issuer, or (b) any Person other than a Member of the Obligated Group in consideration of the issuance to such governmental issuer (i) by such Person (including a Designated Affiliate) of any evidence of indebtedness or other obligation of such Person and (ii) by a Member of the Obligated Group of a Guaranty in respect of such indebtedness or other obligation, which Guaranty is represented by an Obligation.

"*Related Supplement*" means a Supplement executed in connection with Related Bonds. "Securities Act of 1933" means the Securities Act of 1933, as amended, or similar legislation subsequently enacted.

"*Short-Term Indebtedness*" means all Indebtedness having a maturity of one year or less (other than the current portion of Long-Term Indebtedness and other than Qualified Commercial Paper) incurred or assumed by one or more Members of the Credit Group, including (a) money borrowed for an original term, or renewable at the option of the borrower for a period from the date originally incurred, of one year or less, (b) leases that are required to be capitalized in accordance with GAAP having an original term, or renewable at the option of the lessee for a period from the date originally incurred, of one year or less, and (c) installment purchase or conditional sale contracts having an original term of one year or less.

"*SIFMA*" means the Securities Industry & Financial Markets Association (formerly the Bond Market Association).

"*SIFMA Index*" means, for the most recent date available, the level of the index which is issued weekly and which is compiled from the weekly interest rate resets of tax-exempt variable rate issues included in a database maintained by Municipal Market Data which meet specific criteria established

from time to time by SIFMA and issued on Wednesday of each week, or if any Wednesday is not a Business Day, the immediately preceding Business Day.  If the SIFMA Index is no longer published, then "SIFMA Index" means the S&P Weekly High Grade Index.  If the S&P Weekly High Grade Index is no longer published, then "SIFMA Index" means the prevailing rate determined by a commercial or investment banking institution knowledgeable in municipal finance for tax-exempt state and local government bonds meeting criteria determined in good faith by such institution to be comparable under the circumstances to the criteria used by SIFMA to determine the SIFMA Index immediately prior to the date on which SIFMA ceased publication of the SIFMA Index.

"*State*" means the State of Colorado.

"*Subordinated Indebtedness*" means any Indebtedness, other than Obligations, the payment of which is either unsecured or secured on a subordinate basis, but which is in any case specifically subordinated to the payment of principal and interest on Obligations and evidenced by a document which contains provisions substantially in the form set forth as an exhibit to the Master Indenture and for which the Obligated Group Representative has received an Opinion of Counsel to the effect that such Indebtedness constitutes Subordinated Indebtedness.

"*Supplement*" means an indenture supplemental to, and authorized and executed pursuant to the terms of, the Master Indenture.

"*Tax-Exempt Bonds*" means Related Bonds, the interest on which is excludable from gross income for federal income tax purposes.

"*Tax-Exempt Organization*" means a nonprofit organization, organized under the laws of the United States of America or any state thereof, that is an organization described in Section 501(c)(3) of the Code, is exempt from federal income taxes under Section 501(a) of the Code, or corresponding provisions of federal income tax laws from time to time in effect.

"*Tender Obligation*" means Long-Term Indebtedness of a Member of the Credit Group which by its terms may be required to be tendered for purchase, or which may be tendered for payment by and at the option of the holders thereof prior to the stated maturity thereof.

"*Total Assets*" means, at any point in time, all assets of the Credit Group, other than Excluded Property, as shown on the balance sheet in the most recent Audited Financial Statements available.

"*Transfer*" means any sale, gift, donation or any other act or occurrence the result of which is (a) to dispossess (including through leasing, as a lessor) any Person of any asset or interest therein or (b) to acquire or otherwise pay for Excluded Facilities or pay any expenses in connection with Excluded Facilities; including specifically in all cases, but without limitation, the forgiveness of any debt, except that the payment of bills or other accounts in the ordinary course of business (other than with respect to Excluded Facilities) is excluded from this definition.

"*Trust Indenture Act of 1939*" means the Trust Indenture Act of 1939, as amended, or similar legislation subsequently enacted.

"*Variable Rate Indebtedness*" means all or any portion of Indebtedness the interest rate on which has not been established at a fixed or constant rate to maturity.

**Amount of Indebtedness**

Each Member of the Obligated Group may incur Indebtedness by issuing Obligations under the Master Indenture (with the consent of the Obligated Group Representative and executed on behalf of the Obligated Group and each Member of the Obligated Group by the Obligated Group Representative) or by creating Indebtedness under any other document, in each case subject to the provisions and restrictions of the Master Indenture.  No Obligations issued under the Master Indenture may be secured on a basis senior to other Obligations, except that the provision of bond insurance, a letter or line of credit, standby bond purchase agreement or other similar instrument or obligation issued by a financial institution or the establishment of a debt service reserve fund or account for the benefit of the Holders of certain Obligations will not be considered as the providing of security on a senior basis for such Obligations. The principal amount of Indebtedness that may be created under the Master Indenture or under other documents is not limited, except as limited by the provisions of the Master Indenture, including the provisions of the paragraph describing "Limitations of Indebtedness" below, or of any Supplement.  Each Member of the Obligated Group is and will be jointly and severally liable for each and every Obligation. The Initial Obligations are issued simultaneously with the original execution and delivery of the Master Indenture.  Each Obligation will be issued pursuant to a Supplement.

**Appointment of Obligated Group Representative**

Each Member of the Credit Group, by becoming a Member of the Credit Group, irrevocably appoints the Obligated Group Representative as its agent and true and lawful attorney in fact and grants to the Obligated Group Representative on its behalf (a) full and exclusive power to execute Supplements on behalf of the Obligated Group and each Member of the Obligated Group authorizing the issuance of Obligations or series of Obligations, (b) full and exclusive power to execute Obligations for and on behalf of the Obligated Group and each Member of the Obligated Group, (c) full and exclusive power to execute Supplements on behalf of the Obligated Group and each Member of the Obligated Group pursuant to the Master Indenture, and (d) full power to prepare, or authorize the preparation of, any and all documents, certificates or disclosure materials reasonably and ordinarily prepared in connection with the issuance of Obligations under the Master Indenture or Related Bonds associated therewith, or to accomplish the purposes of the provisions of the Master Indenture summarized under the subheadings "Supplements Not Requiring Consent of Holders" and "Supplements Requiring Consent of Holders" below, and to execute and deliver such items to the appropriate parties in connection therewith.

**Security; Payment of Principal and Interest**

Each Member of the Credit Group represents and warrants in the Master Indenture that it has not pledged, mortgaged, encumbered or granted a security interest in any of its Property except for Permitted Liens, and covenants that it will not pledge, mortgage, encumber or grant a security interest in any of its Property except for Permitted Liens.

All Obligations issued pursuant to the Master Indenture will be joint and several general obligations of each Member of the Obligated Group equally and ratably secured by a pledge of the Gross Revenues as provided in the Master Indenture and summarized herein.

Each Member of the Obligated Group, respectively, pledges in the Master Indenture, and to the extent permitted by law grants a security interest to the Master Trustee in, all of its Gross Revenues and in any fund or account in which its Gross Revenues are deposited to secure the payment of Obligations under the Master Indenture and the performance by the Members of the Obligated Group of their other obligations under the Master Indenture.

D-13

Each Member of the Obligated Group jointly and severally covenants to promptly pay or cause to be paid the principal of, premium, if any, and interest on each Obligation issued pursuant to the Master Indenture at the place, on the dates and in the manner provided in the Master Indenture, any Supplement and in said Obligation according to the terms thereof whether at maturity, upon proceedings for redemption, by acceleration or otherwise.

**Insurance**

Each Member of the Credit Group agrees in the Master Indenture that it will maintain, or cause to be maintained, insurance (which may include reasonable deductibles) of such types and in such amounts as is customary for health care providers of similar size and character and in accordance with prevailing industry practice. Such insurance may be provided by one or more self-insurance programs, shared or pooled insurance programs or programs of captive insurance companies considered to be adequate by the Obligated Group Representative except that hazard or casualty risk on any real or personal property owned, leased or used by a Member of the Credit Group, including Property, Plant and Equipment of the Credit Group, may not be self-insured (except for reasonable deductibles). On or prior to January 1, 2017, and at least once every three years thereafter, the Obligated Group Representative is to employ an Insurance Consultant to prepare and file with the Master Trustee a report on the adequacy of the insurance maintained by the Obligated Group Representative and the other Members of the Credit Group.

**Limitations on Creation of Liens**

Each Member of the Obligated Group agrees in the Master Indenture, and the Controlling Member agrees in the Master Indenture that it will cause each Designated Affiliate, not to create or suffer to be created or permit the existence of any Lien upon Property now owned or hereafter acquired by it other than Permitted Liens. Permitted Liens may consist of the following:

(a) Liens arising by reason of good faith deposits with any Member of the Obligated Group or Designated Affiliate in connection with leases of real estate, bids or contracts (other than contracts for the payment of money), deposits by any Member of the Obligated Group or Designated Affiliate to secure public or statutory obligations, or to secure, or in lieu of surety, stay or appeal bonds, and deposits as security for the payment of taxes or assessments or other similar charges;

(b) Any Lien arising by reason of deposits with, or the giving of any form of security to, any governmental agency or any body created or approved by law or governmental regulation for any purpose at any time as required by law or governmental regulation as a condition to the transaction of any business or the exercise of any privilege or license, or to enable any Member of the Obligated Group or Designated Affiliate to maintain self-insurance (if permitted under the provision of the Master Indenture summarized under the subheading "Insurance" above or elsewhere in the Master Indenture) or to participate in any funds established to cover any insurance risks or in connection with workers' compensation, unemployment insurance, pension or profit sharing plans or other social security arrangements, or to share in the privileges or benefits required for companies participating in such arrangements;

(c) Any judgment lien or award against any Member of the Obligated Group or Designated Affiliate so long as such judgment is being contested in good faith and execution thereon is stayed or while the period for responsive pleading has not lapsed;

(d) (i) Rights reserved to or vested in any municipality or public authority by the terms of any right, power, franchise, grant, license, permit or provision of law affecting any

Property; (ii) any liens on any Property for taxes, assessments, levies, fees, water and sewer charges and other governmental and similar charges and any liens of mechanics, materialmen, laborers, suppliers or vendors for work or services performed or goods or materials furnished in connection with such Property, which are not due and payable or which are not delinquent, or the amount or validity of which, are being contested in accordance with the Master Indenture and execution thereon is stayed or, with respect to liens of mechanics, materialmen, laborers, suppliers or vendors which have been due for less than 90 days; (iii) easements, rights of way, servitudes, restrictions, oil, gas or other mineral reservations and other minor defects, encumbrances and irregularities in the title to any Property, Plant and Equipment which do not materially impair the use of such Property, Plant and Equipment; and (iv) statutory landlord's liens;

(e)     (i) Leases whereunder any Member of the Obligated Group or any Designated Affiliate is lessor which relate to Property, Plant and Equipment which is of a type that is customarily the subject of such leases, including without limitation office space for physicians and educational institutions, food service facilities, research and development facilities, parking facilities, barber shops, beauty shops, flower shops, gift shops, radiology, pathology or other hospital-based specialty services and pharmacy and similar departments; (ii) leases whereunder any Member of the Obligated Group or any Designated Affiliate is lessor entered into in accordance with the provisions of the Master Indenture summarized under the subheading "Sale, Lease or Other Disposition of Property" below; (iii) leases, licenses or similar rights to use Property whereunder any Member of the Obligated Group or any Designated Affiliate is lessor, lessee, licensor, licensee or the equivalent thereof existing as of the date of the Master Indenture and any renewals and extensions if payment is not yet due under the contract in question or if such Lien is being contested in accordance with the Master Indenture; and (iv) ground leases of unimproved real property;

(f)     Such minor defects and irregularities of title as normally exist with respect to Property similar in character to the Property involved and which do not materially adversely affect the value of, or materially impair, the Property affected thereby for the purpose for which it was acquired or is held by the owner thereof;

(g)     Any Lien on pledges, gifts or grants to be received in the future including any income derived from the investment thereof and Liens on or in Property given, bequeathed or devised by the owner thereof existing at the time of such gift, bequest or devise, so long as such Liens attach solely to the Property which is the subject of such gift, bequest or devise, and any Indebtedness secured by such Liens is not assumed by any Member of the Obligated Group or any Designated Affiliate;

(h)     Any Lien on inventory that does not exceed 25% of the book value thereof;

(i)     Any Lien created by the Master Indenture (including without limitation the liens on the Gross Revenues as set forth in the provision of the Master Indenture summarized under the subheading "Security; Payment of Principal and Interest" above) and any other Lien securing all Obligations on a parity basis;

(j)     Liens on Property due to rights of third-party payors for recoupment of amounts paid to any Member of the Obligated Group or any Designated Affiliate;

(k)     Any Lien existing for not more than 30 days after any Member of the Obligated Group or any Designated Affiliate have first received notice thereof;

(l)     Rights of the United States of America under Section 291, Title 42, United States Code and similar rights under other state and federal statutes;

(m)     Liens on moneys deposited by patients or others with any Member of the Obligated Group or any Designated Affiliate as security for or as prepayment for the cost of patient care or any rights of residents of life care or similar facilities to endowment or similar funds, any rights of students to fees or tuition, deposited by or on behalf of such patients, residents or students;

(n)     Any security interest in any depreciation reserve, debt service reserve, debt service or similar fund established pursuant to the terms of any Supplement, Related Bond Indenture or loan agreement in favor of the Master Trustee, the Related Bond Trustee, the Related Bond Issuer, the provider of any liquidity or credit support for such Related Bonds or the holder of the Indebtedness issued pursuant to such Supplement or Related Bond Indenture or any related Indebtedness;

(o)     Any Liens on Property of any Person existing at the date such Person becomes a Member of the Obligated Group pursuant to the provision of the Master Indenture summarized under the subheading "Parties Becoming Members of the Obligated Group" below or becomes a Designated Affiliate pursuant to the Master Indenture, or is merged into an Obligated Group Member or Designated Affiliate pursuant to the provision of the Master Indenture summarized under the subheading "Consolidation, Merger, Sale or Conveyance" below, except that such Lien will qualify as a Permitted Lien under the subsection of the Master Indenture summarized by this subheading only for as long as any Indebtedness secured by the Lien continues to exist without any increase, extension or renewal after the date upon which the Person became a Member of the Obligated Group or a Designated Affiliate or merges into an Obligated Group Member or Designated Affiliate and any such Person must provide a list of any such existing Liens to the Master Trustee on such date;

(p)     The rights of sellers under hospital or other facility acquisition agreements other than Liens securing the payment of the sale price or any reversion rights;

(q)     Any Lien arising by reason of any escrow established to pay debt service with respect to Obligations;

(r)     Any Lien in favor of a creditor or a trustee on the proceeds of Indebtedness and any earnings thereon prior to the application of such proceeds and such earnings;

(s)     Liens securing Non-Recourse Indebtedness incurred pursuant to the provision of the Master Indenture summarized in paragraph (e) under the subheading "Limitations on Additional Indebtedness" below;

(t)     Any Lien on any Related Bond or any evidence of Indebtedness incurred by or on behalf of any Member of the Credit Group which secures only Commitment Indebtedness;

(u)     Any Lien on particular accounts receivable if such Lien is given or made in connection with a sale, pledge, assignment or transfer of accounts receivable for the fair market

D-16

value thereof, except that any Lien with recourse may not exceed 35% of total accounts receivable;

(v)     Any Lien which is existing on the date of execution of the Master Indenture, except that no such Lien (or the amount of Indebtedness secured thereby) may be increased, extended, renewed or modified to apply to any Property of any Credit Group Member not subject to such Lien on such date unless such Lien as so increased, extended, renewed or modified otherwise qualifies as a Permitted Lien under the Master Indenture;

(w)     Any Lien securing Financial Products Agreements pursuant to the Master Indenture;

(x)     Liens on Property created in anticipation of the sale, assignment, transfer or other disposition of such Property (as permitted by the provision of the Master Indenture summarized under the subheading "Sale, Lease or Other Disposition of Property" below) and which are required or are conditions to such disposition, provided that the Obligated Group Representative provides an Officer's Certificate to the effect that such Lien will not adversely affect the Income Available for Debt Service of the Credit Group; and

(y)     Any other Lien on Property securing Indebtedness, except that the aggregate outstanding balance of Indebtedness secured by Liens pursuant to the subsection of the Master Indenture summarized under this subheading may not exceed the greater of (i) 10% of Total Assets of the Credit Group as shown in the Audited Financial Statements for the most recent Fiscal Year or 12-month period for which Audited Financial Statements are available and (ii) 20% of the total operating revenue of the Credit Group as shown in the Audited Financial Statements for the most recent Fiscal Year or 12-month period for which Audited Financial Statements are available.

**Limitations on Additional Indebtedness**

Except as specifically provided in the Master Indenture, each Member of the Obligated Group Member agrees that it will not incur any Additional Indebtedness, and the Controlling Member agrees that it will cause each Designated Affiliate not to incur Additional Indebtedness, unless (1) in connection with such Additional Indebtedness the Officer's Certificate described in the last paragraph under this subheading is provided and (2) such Additional Indebtedness consists of one or more of the following:

(a)     Long-Term Indebtedness may be incurred by any Member of the Credit Group if prior to incurrence of such Indebtedness:

(i)     an Officer's Certificate is filed with the Master Trustee demonstrating that for the most recent period of 12 full consecutive calendar months preceding the date of delivery of such Officer's Certificate for which Audited Financial Statements are available, the Debt Service Coverage Ratio, taking into account all Outstanding Long-Term Indebtedness and the Long-Term Indebtedness then to be incurred as if it had been incurred at the beginning of such period, is not less than 1.25; or

(ii)     an Officer's Certificate is filed with the Master Trustee demonstrating that: (A) for the most recent period of 12 full consecutive calendar months preceding the date of delivery of such Officer's Certificate for which Audited Financial Statements are available, the Debt Service Coverage Ratio, taking into account all Outstanding Long-Term Indebtedness, but not the Long-Term Indebtedness then to be incurred, is not less

than 1.25; and (B) the prospective Debt Service Coverage Ratio, taking the proposed Long-Term Indebtedness into account, for, (1) in the case of Long-Term Indebtedness (other than a Guaranty) to finance capital improvements, each of the two Fiscal Years next succeeding the date on which such capital improvements are expected to be placed in operation, or, (2) in the case of Long-Term Indebtedness not financing capital improvements or in the case of a Guaranty, each of the two Fiscal Years next succeeding the date on which the Indebtedness is to be incurred, is not less than 1.50, as shown in such Officer's Certificate for such periods, accompanied by a statement of the relevant assumptions upon which such prospective statements are based; or

(iii)      immediately after giving effect to any Long-Term Indebtedness incurred pursuant to the paragraph of the Master Indenture summarized by this paragraph (iii), the aggregate of Long-Term Indebtedness Outstanding under such paragraph does not exceed the greater of 20% of Total Assets of the Credit Group for the most recent period of 12 full consecutive calendar months for which Audited Financial Statements are available and, when the aggregate of Long-Term Indebtedness Outstanding under the paragraph of the Master Indenture summarized by this paragraph (iii) is combined with Short-Term Indebtedness incurred pursuant to the paragraph of the Master Indenture summarized by subsection (d) below, does not exceed in the aggregate 25% of the Total Assets of the Credit Group for the most recent period of 12 full consecutive calendar months for which Audited Financial Statements are available.

The Credit Group will be deemed to be in compliance with the test for the incurrence of Long-Term Indebtedness summarized in either paragraph (i) or (ii) above without attaining the Debt Service Coverage Ratio required by such paragraph if a Consultant files a report with the Master Trustee (A) stating that in his or her opinion the failure to generate sufficient Income Available for Debt Service to attain the required Debt Service Coverage Ratio is caused by compliance with Industry Restrictions or changes in public or private third-party reimbursement programs and the Credit Group has generated Income Available for Debt Service at the highest levels practicable and (B) reporting on prospective financial statements that demonstrate that the Debt Service Coverage Ratio was, for the tests summarized in paragraphs (i) and (ii)(A) above, and is projected to be, for the test summarized in paragraph (ii)(B) above, as the case may be, not less than 1.25.

(b)      Completion Indebtedness may be incurred by any Member of the Credit Group in in a principal amount not to exceed ten percent (10%) of the aggregate face amount of the original Indebtedness issued to finance the capital improvements for which the Completion Indebtedness is proposed to be issued provided there is filed with the Master Trustee (i) an Officer's Certificate stating that at the time the original Indebtedness for the capital improvements to be completed was incurred, such Member of the Credit Group had a reasonable belief that the proceeds of such Indebtedness together with other available moneys would be sufficient to complete such capital improvements, (ii) a certificate of an independent architect setting forth the amount reasonably expected to be required to complete the capital improvement for which the Indebtedness was incurred and an Officer's Certificate stating that the proceeds of the Completion Indebtedness and other moneys available therefor, including estimated investment earnings, will be sufficient to complete the capital improvement and (iii) an Officer's Certificate stating that the proceeds of the Completion Indebtedness proposed, together with any other available moneys, exceed the amount set forth in clause (ii) of this subsection.

(c)      Long-Term Indebtedness may be incurred by any Member of the Credit Group for the purpose of refunding any Outstanding Indebtedness if prior to the incurrence thereof there

is delivered to the Master Trustee an Officer's Certificate demonstrating that: (i) the Maximum Debt Service Requirement will not increase by more than 15% after the incurrence of such proposed refunding Long-Term Indebtedness and after giving effect to the disposition of the proceeds thereof; or (ii) the total Debt Service Requirement on the Indebtedness being refinanced will not increase by more than 15% after the incurrence of such proposed refunding Long-Term Indebtedness and after giving effect to the disposition of the proceeds thereof; or (iii) the requirements of the subsection of the Master Indenture summarized by subsection (a) above are met.

(d)     Short-Term Indebtedness may be incurred by any Member of the Credit Group if immediately after the incurrence of such Short-Term Indebtedness (i) the Outstanding principal amount of all such Short-Term Indebtedness does not exceed 15% of the Total Assets of the Credit Group for the most recent period of 12 full consecutive calendar months for which Audited Financial Statements are available or (ii) the aggregate principal amount of Short-Term Indebtedness Outstanding combined with the principal amount of Long-Term Indebtedness incurred pursuant to the subsection of the Master Indenture summarized by subsection (a)(iii) above Outstanding, does not exceed 25% of the Total Assets of the Credit Group for the most recent period of 12 full consecutive calendar months for which Financial Statements are available, except that the Credit Group is to be free from all Short-Term Indebtedness, except for an amount equal to not more than 3% of Total Assets, for a period of 20 consecutive calendar days in each Fiscal Year.

(e)     Non-Recourse Indebtedness, Subordinated Indebtedness and Commitment Indebtedness may be incurred without limitation.

For purposes of the section of the Master Indenture summarized under this subheading, the conversion of Indebtedness from Variable Rate Indebtedness to Indebtedness bearing a fixed interest rate or from one type of Variable Rate Indebtedness to another type of Variable Rate Indebtedness or from Indebtedness bearing a fixed interest rate to Variable Rate Indebtedness pursuant to the terms of the documents providing for the issuance of such Indebtedness will not be considered to be incurrence of Indebtedness.  No Additional Indebtedness will be deemed to arise when any funding occurs under any Commitment Indebtedness.

For the purposes of meeting the tests set forth in the subsections of the Master Indenture summarized by subsections (a) through (e) above, any Indebtedness that will no longer be Outstanding on the proposed issuance date of the Indebtedness then to be incurred will be excluded from the calculations required by such tests.

Indebtedness incurred pursuant to any one of the subsections of the Master Indenture summarized under this subheading may be reclassified as Indebtedness incurred pursuant to any other of such subsections if the tests set forth in the subsection to which such Indebtedness is to be reclassified are met at the time of such reclassification.

Concurrent with the issuance of any Additional Indebtedness, the Obligated Group Representative is to furnish the Master Trustee with an Officer's Certificate containing the following information, certifications and calculations (except that no such Officer's Certificate will be required for Indebtedness incurred pursuant to the paragraph summarized by paragraph (a)(iii) above):

(a)     identification of the Indebtedness to be incurred and the subsection of the section of the Master Indenture summarized under this subheading pursuant to which such Indebtedness is to be incurred; and

(b)      certifications demonstrating compliance with the provisions of such subsection and that no Event of Default then exists under the Master Indenture and that upon issuance of the Additional Indebtedness no Event of Default will exist under the Master Indenture and that no event will have occurred which with the passage of time or the giving of notice or both would become an Event of Default (except that such Officer's Certificate is not required to state that no Event of Default is then existing in connection with the issuance of Additional Indebtedness which is issued to refund any Indebtedness theretofore issued and then Outstanding if the Obligated Group Representative has delivered an Officer's Certificate accompanied by an Opinion of Counsel acceptable to the Master Trustee as to any conclusions of law supporting such Officer's Certificate that any existing Event of Default under the Master Indenture will be cured by such refunding).

## Income Available for Debt Service

Each Member of the Obligated Group agrees to manage its business, and each Controlling Member agrees to cause each Designated Affiliate to manage its business, such that the Debt Service Coverage Ratio of the Credit Group, calculated at the end of each Fiscal Year, will not be less than 1.25 for such Fiscal Year.

If for any Fiscal Year the Debt Service Coverage Ratio is not sufficient to satisfy the requirement summarized above, the Obligated Group Representative covenants to retain a Consultant to make recommendations to increase Income Available for Debt Service in the following Fiscal Year to satisfy subsection (a) or, if in the opinion of the Consultant the attainment of such level is impracticable, to the highest level attainable (provided, however, that a Consultant need not be hired for such purpose more frequently than once in any two-year period). The Obligated Group Representative agrees that within 10 days following receipt of such recommendations, a copy thereof will be transmitted to the Master Trustee and the Related Issuer. Each Obligated Group Member agrees, and the Controlling Member agrees to cause each Designated Affiliate, to accept any recommendations of the Consultant and will be obligated to implement such recommendations. So long as the provisions of the section of the Master Indenture summarized under this subheading are complied with, such section will be deemed to have been complied with even if the Debt Service Coverage Ratio for the following Fiscal Year is below the required level so long as the Debt Service Coverage Ratio of the Credit Group is sufficient to pay the debt service on all Indebtedness of the Credit Group for such Fiscal Year; but in no event may the Debt Service Coverage Ratio for any Fiscal Year be less than 1.00.

If a report of a Consultant is delivered to the Master Trustee and the Related Issuer, which report states that Industry Restrictions have been imposed which make it impossible for the Debt Service Coverage Ratio to satisfy the first paragraph of the section of the Master Indenture summarized under this subheading, then the required Debt Service Coverage Ratio will be temporarily reduced to the maximum coverage permitted by such Industry Restrictions during the duration of such Industry Restrictions but in no event less than an amount to pay the debt service on all Indebtedness of the Credit Group for such Fiscal Year.

## Sale, Lease or Other Disposition of Property

Each Member of the Obligated Group agrees in the Master Indenture, and the Controlling Member agrees that it will cause all Designated Affiliates, not to Transfer in any Fiscal Year any Property except for the following types of Transfers: (a) Transfers of Property to any Person, if such Transfer is made in the ordinary course of business; (b) Transfers of Property to any Person if such Property has, or within the next succeeding 24 months will, become inadequate, obsolete, worn out, unsuitable, unprofitable, undesirable or unnecessary and the sale, lease, removal or other disposition thereof will not

impair the structural soundness, efficiency or economic value of the remaining Property; (c) Transfers of Property to any Member of the Credit Group without limit; (d) Transfers of Property in an amount in any Fiscal Year not exceeding five percent of (i) the Total Assets of the Credit Group as shown in the Audited Financial Statements of the Credit Group for the preceding Fiscal Year or (ii) at the option of the Obligated Group Representative, the market value of the assets included within Total Assets of the Credit Group as reasonably determined in an Officer's Certificate; (e) Transfers of Property to any Person if such Property consists solely of assets that are specifically restricted by the donor or grantor to a particular purpose the result of which is that neither the Property nor the income nor any earnings thereon will ever be available to pay debt service on Indebtedness or operating expenses in connection with any Property and the sale, lease or other disposition thereof will not impair the economic value of the remaining Property; (f) Transfers of Property to any Person so long as the Member of the Credit Group proposing to make such Transfer receives as consideration for such Transfer cash, services or other property equal to the fair market value of the asset so transferred; (g) Transfers of Property to any Person if such Property is replaced with property of comparable value and utility, as determined in the reasonable opinion of such Member of the Credit Group; (h) Transfers of Property permitted to be Transferred by the Master Indenture; and (i) Transfers of Property to any Person, so long as prior to the Transfer there is delivered to the Master Trustee an Officer's Certificate demonstrating the Debt Service Coverage Ratio, adjusted to exclude the revenues and expenses derived from the transferred Property proposed to be disposed of, for the most recent Fiscal Year or period of 12 consecutive calendar months preceding the date of delivery of the Officer's Certificate for which Financial Statements are available, would be greater than it would have been in the absence of such Transfer or, if not greater, would not be less than 2.00.

**Consolidation, Merger, Sale or Conveyance**

Each Member of the Credit Group agrees, and the Controlling Member agrees that it will cause each Designated Affiliate, not to merge or consolidate with, or sell or convey all or substantially all of its Property, Plant and Equipment to any Person that is not a Member of the Credit Group unless: (i) At the time of such consolidation, merger, sale or conveyance (including without limitation the purchase of all or substantially all of the Property, Plant and Equipment of a Member of the Credit Group) such successor corporation is an entity organized under the laws of the District of Columbia or one of the states of the United States of America and becomes a Member of the Obligated Group in accordance with the Master Indenture or becomes a Designated Affiliate pursuant to the Master Indenture (except that if an Obligated Group Member and a Designated Affiliate merge, the surviving entity will remain an Obligated Group Member) and executes and delivers to the Master Trustee an appropriate instrument, satisfactory to the Master Trustee, containing the agreement of such successor corporation to assume, jointly and severally, the due and punctual payment of the principal of, premium, if any, and interest on all Obligations according to their tenor and the due and punctual performance and observance of all the covenants and conditions of the Master Indenture to be kept and performed by such Member; (ii) An Officer's Certificate is delivered to the Master Trustee demonstrating that no Member of the Credit Group, including such successor corporation, immediately after such merger, consolidation, sale or conveyance would be in default in the performance or observance of any covenant or condition of the Master Indenture and one of the tests summarized in paragraphs (a)(i) or (ii) of the subheading "Limitations on Additional Indebtedness" above would be met for the incurrence of one additional dollar of Long-Term Indebtedness, assuming such merger, consolidation, sale or conveyance actually occurred at the beginning of the most recent Fiscal Year or period of 12 full consecutive calendar months for which Audited Financial Statements are available; and (iii) If all amounts due or to become due on any Related Bond have not been fully paid to the holder thereof, there must be delivered to the Master Trustee and Related Issuer (A) an Opinion of Bond Counsel, in form and substance satisfactory to the Master Trustee, to the effect that the consummation of such merger, consolidation, sale or conveyance, whether or not contemplated on any date of the delivery of any Related Bonds, would not adversely affect the validity of such Related Bonds or result in the inclusion of interest payable on such Related Bonds that are Tax-

Exempt Bonds in gross income for purposes of federal income taxation or otherwise affect the tax status of such Related Bonds, (B) an Opinion of Counsel, in form and substance satisfactory to the Master Trustee and Related Issuer, to the effect that the consummation of such transaction (1) would not require the registration of the Related Bonds under the Securities Act of 1933 or any state securities law, or the Related Supplement under the Trust Indenture Act of 1939 or any state securities law, or if such registration is required, that all applicable registration and qualification provisions of said Acts have been complied with, and (2) will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status and (C) an Opinion of Counsel, in form and substance satisfactory to the Master Trustee, to the effect that the consummation of such merger, consolidation, sale or conveyance complies with all applicable federal and state laws and regulations.

Concurrent with such consolidation, merger, sale or conveyance, the Obligated Group Representative must furnish the Master Trustee with an Officer's Certificate of the Obligated Group Representative to the effect that no Event of Default then exists under the Master Indenture and that upon such consolidation, merger, sale or conveyance no Event of Default will exist under the Master Indenture and that no event will have occurred which with the passage of time or the giving of notice or both would become an Event of Default.

**Filing of Financial Statements, Certificate of No Default, Other Information**

Each Member of the Obligated Group agrees, and the Controlling Member agrees to cause any Designated Affiliate, to comply with the following covenants: (a) each Member of the Credit Group will keep adequate records and books of accounts, each separate from the other and from all other records and accounts, including books of records and accounts of all Property, Plant and Equipment, in which complete and correct entries will be made, in accordance with GAAP (such books at all times to be subject to the inspection by the Master Trustee and any Holder, or their representatives duly authorized in writing; except that the Master Trustee will not be obligated to inspect such books); (b) the Obligated Group Representative will cause Financial Statements to be prepared annually as soon as practicable; (c) within 30 days after receipt of the audit report mentioned below but in no event later than 180 days after the end of each fiscal reporting period for which the Financial Statements of the Credit Group are reported upon by independent certified public accountants (an "audit report"), it will file or cause to be filed with the Master Trustee and with each Holder who may have so requested in writing or on whose behalf the Master Trustee may have so requested a copy of the audited Financial Statements of the Credit Group as of the end of such fiscal reporting period accompanied by the opinion of the independent certified public accountants. Such audited Financial Statements are to be prepared in accordance with GAAP and are to include such statements necessary for a fair presentation of unrestricted fund financial position, results of operations and changes in unrestricted fund balance and cash flows as of the end of such fiscal reporting period; (d) within 30 days after receipt of the audit report mentioned above but in no event later than 180 days after the end of each Fiscal Year, it will file or cause to be filed with the Master Trustee and with each Holder who may have so requested in writing or on whose behalf the Master Trustee may have so requested, an Officer's Certificate stating the Debt Service Coverage Ratio for such fiscal reporting period and the ratio of Income Available for Debt Service to the Debt Service Requirement for such fiscal reporting period and stating whether, to the best knowledge of the signer, any Member of the Credit Group is in default in the performance of any covenant contained in the Master Indenture and, if so, specifying each such default of which the signer may have knowledge; (e) if an Event of Default has occurred and is continuing, it will (i) file with the Master Trustee such other financial statements and information concerning the operations and financial affairs of any Member of the Credit Group (or of any consolidated or combined group of companies, including the Obligated Group Representative and consolidated or combined Members of Obligated Group and including any other Member of the Credit Group) as the Master Trustee may from time to time reasonably request, excluding specifically donor records, patient records and personnel records and (ii) provide access to the facilities of

D-22

any Member of the Credit Group for the purpose of inspection by the Master Trustee during regular business hours or at such other times as the Master Trustee may reasonably request; and (f) within 30 days after its receipt thereof (if not filed earlier pursuant to some other provision of the Master Indenture), it will file or cause to be filed with the Master Trustee a copy of each report which any provision of the Master Indenture requires to be prepared by a Consultant or an Insurance Consultant.

**Parties Becoming Members of the Obligated Group**

Persons that are not Members of the Obligated Group may become Members of the Obligated Group if: (a) the Person that is becoming a Member of the Obligated Group executes and delivers to the Master Trustee an instrument (i) containing the agreement of such Person to become a Member of the Obligated Group under the Master Indenture and thereby become subject to compliance with all provisions of the Master Indenture pertaining to a Member of the Obligated Group, including the performance and observance of all covenants and obligations of a Member of the Obligated Group under the Master Indenture, and (ii) containing the unconditional agreement of such Person to jointly and severally make payments upon each Obligation at the times and in the amounts provided in each such Obligation; (b) each instrument executed and delivered to the Master Trustee in accordance paragraph (a) is to be accompanied by an Opinion of Counsel, addressed to and satisfactory to the Master Trustee, to the effect that such instrument has been duly authorized, executed and delivered by such Person and constitutes a valid and binding obligation enforceable in accordance with its terms, with such exceptions and limitations as are acceptable to the Master Trustee; (c) there must be filed with the Master Trustee an Officer's Certificate demonstrating that one of the conditions for the incurrence of one additional dollar of Long-Term Indebtedness summarized in the paragraphs (a)(i) or (ii) under the subheading "Limitations on Additional Indebtedness" above would be met, assuming such admission actually occurred at the beginning of the most recent Fiscal Year or period of 12 full consecutive calendar months for which Audited Financial Statements are available; (d) if all amounts due or to become due on any Related Bond have not been paid in full to the holders thereof, there must be delivered to the Master Trustee and Related Issuer (i) an Opinion of Bond Counsel, in form and substance satisfactory to the Master Trustee, to the effect that the consummation of such transaction would not adversely affect the validity of such Related Bonds or result in inclusion of interest payable on any such Related Bond that is a Tax-Exempt Bond in gross income for purposes of federal income taxation or otherwise affect the tax status of any such Related Bond and (ii) an Opinion of Counsel, in form and substance satisfactory to the Master Trustee and Related Issuer, to the effect that the consummation of such transaction (A) would not require the registration of the Related Bonds under the Securities Act of 1933 or any state securities law, or the Related Supplement under the Trust Indenture Act of 1939 or any state securities law, or if such registration is required, that all applicable registration and qualification provisions of said Acts have been complied with, and (B) will not adversely affect the status as a Tax-Exempt Organization of any Member which otherwise has such status; and (e) there must be delivered to the Master Trustee by the Person becoming a Member of the Obligated Group an irrevocable power of attorney authorizing the execution of Obligations by the Obligated Group Representative.

Concurrent with the addition of such Obligated Group Member, the Obligated Group Representative is to furnish the Master Trustee with an Officer's Certificate to the effect that no Event of Default then exists under the Master Indenture and that upon addition of such Obligated Group Member no Event of Default will exist under the Master Indenture and that no event will have occurred which with the passage of time or the giving of notice or both would become an Event of Default and acknowledging the addition of such Person as a Member of the Obligated Group which will be bound by all provisions of the Master Indenture.

**Withdrawal From the Obligated Group**

The Corporation may not withdraw from the Obligated Group.  No other Member of the Obligated Group may withdraw from the Obligated Group unless, prior to the taking of such action: (a) if all amounts due on any Related Bond have not been paid in full to the holders thereof, there must be delivered to the Master Trustee and the Related Issuer an Opinion of Bond Counsel, in form and substance satisfactory to the Master Trustee, to the effect that such Member's withdrawal from the Obligated Group would not result in the inclusion of interest payable on any such Related Bond that is a Tax-Exempt Bond in gross income for the purposes of federal income taxation or otherwise affect the tax status of any such Related Bond; (b) there is delivered to the Master Trustee an Officer's Certificate to the effect that one of the tests summarized in paragraphs (a)(i) or (ii) under the subheading "Limitations on Additional Indebtedness" above would be met for the incurrence of one additional dollar of Long-Term Indebtedness, assuming such withdrawal actually occurred at the beginning of the most recent Fiscal Year or period of 12 full consecutive calendar months for which Audited Financial Statements are available; and (c) there is delivered to the Master Trustee an Officer's Certificate of the Obligated Group Representative to the effect that immediately prior to and immediately after such withdrawal no Event of Default exists under the Master Indenture and no event will have occurred which with the passage of time or the giving of notice or both would become such an Event of Default.

Upon the withdrawal of any Member from the Obligated Group pursuant to the provisions of the Master Indenture summarized under this subheading, all liability of such Member of the Obligated Group with respect to all Obligations Outstanding under the Master Indenture will cease, and the Lien of the Master Indenture on any Property of such Member of the Obligated Group will be released.

**Financial Products Agreements**

Any Member of the Credit Group may enter into a Financial Products Agreement or Agreements, the payments on which may be secured by an Obligation on a parity with other Obligations issued under this Master Indenture, except as summarized below, and such Member may direct the Master Trustee to issue an Obligation or Obligations and enter into a Supplement with respect thereto in accordance with Master Indenture  The obligations of the Members of the Credit Group under any such Financial Products Agreement may be additionally secured by a pledge of collateral in the amounts and of the nature deemed necessary by such Member and identified to the Master Trustee in an Officer's Certificate.  Any Liens granted by the Member of the Credit Group to the provider of such Financial Products Agreement to secure the obligations of such Member thereunder are required to be Permitted Liens.  Notwithstanding any other provision of the Master Indenture no determination, settlement or similar payments required to be paid upon an early termination of a Financial Products Agreement or as a result of any event of default thereunder may be secured by a lien on Gross Revenues on a parity with the Obligations.

**Events of Default**

Event of Default, as used in the Master Indenture, means any of the following events:

(a)     the Members of the Obligated Group fail to make any payment of the principal of, premium, if any, or interest on any Obligations issued and Outstanding under the Master Indenture when and as the same become due and payable, whether at maturity, by proceedings for redemption, by acceleration or otherwise, in accordance with the terms thereof and of the Master Indenture;

(b)     any Member of the Credit Group fails duly to perform, observe or comply with any other covenant or agreement on its part under the Master Indenture for a period of 30 days after the date on which written notice of such failure, requesting the same to be remedied, has been given to the Obligated Group Representative by the Master Trustee, or to the Obligated Group Representative and the Master Trustee by the Holders of at least 50% in Aggregate Principal Amount of Obligations then Outstanding, except that if said failure is such that it cannot be corrected within 30 days after the receipt of such notice, it will not constitute an Event of Default if corrective action is instituted within such 30-day period and diligently pursued until the Event of Default is corrected;

(c)     any representation or warranty made by any Member in the Master Indenture or in any statement or certificate furnished to the Master Trustee or the purchaser of any Obligation in connection with the sale of any Obligation or furnished by any Member pursuant to the Master Indenture proves untrue in any material respect as of the date of the issuance or making thereof and is not corrected or brought into compliance within 30 days after written notice thereof to the Obligated Group Representative by the Master Trustee or the Holders of at least 50% in Aggregate Principal Amount of the Outstanding Obligations;

(d)     an "event of default" as defined in a Related Bond Indenture shall occur or upon a Related Bond;

(e)     any Member of the Credit Group (i) fails to make any required payment with respect to any Indebtedness for borrowed money the outstanding principal amount of which is in excess of 2% of Total Assets for the most recent Fiscal Year for which Financial Statements are available (other than Obligations issued and Outstanding under the Master Indenture and other than Non-Recourse Indebtedness), whether such Indebtedness exists on the date of the Master Indenture or thereafter is created, and any period of grace with respect thereto has expired, or (ii) an event of default as defined in any mortgage, indenture or instrument under which there may be issued, or by which there may be secured or evidenced, any Indebtedness the outstanding principal amount of which is in excess of 2% of Total Assets for the most recent Fiscal Year for which Financial Statements are available (other than Obligations issued and outstanding and Non-Recourse Indebtedness), whether such Indebtedness exists on the date of the Master Indenture or thereafter is created, occurs, which event of default is not waived by the holder of such mortgage, indenture or instrument, and as a result of such failure to pay or other event of default such Indebtedness has been accelerated, except that such default will not constitute an Event of Default within the meaning of the subsection of the Master Indenture summarized under this subheading if within 60 days, or within the time allowed for service of a responsive pleading if any proceeding to enforce payment of the Indebtedness is commenced, any Member of the Credit Group in good faith contests the obligation to pay or the existence of such Indebtedness;

(f)     the entry of a decree or order by a court having jurisdiction in the premises for relief against any Member of the Credit Group, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of such Member under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a receiver, liquidator, custodian, assignee or sequestrator (or other similar official) of such Member or of any substantial part of its Property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 90 consecutive days; and

(g)     the institution by any Member of the Credit Group of proceedings of an order for relief, or the consent by it to an order for relief against it, or the filing by it of a petition or answer

or consent seeking reorganization, arrangement, adjustment, compensation or relief under the United States Bankruptcy Code or any other similar applicable federal or state law, or the consent by it to the filing of any such petition or to the appointment of a receiver, liquidator, custodian, assignee, trustee or sequestrator (or other similar official) of such Member of the Credit Group or of any substantial part of its Property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due.

### Acceleration; Annulment of Acceleration

Upon the occurrence and during the continuation of an Event of Default under the Master Indenture, the Master Trustee may and, upon the written request of (a) the Holders of not less than 50% in Aggregate Principal Amount of Obligations Outstanding or (b) any Person properly exercising the right given to such Person under any Supplement to require acceleration of the Obligations issued pursuant to such Supplement, must, by notice to the Members of the Obligated Group declare all Obligations Outstanding immediately due and payable, whereupon such Obligations will become and be immediately due and payable, anything in the Obligations or in any other section of the Master Indenture to the contrary notwithstanding, except that if the terms of any Supplement give a Person the right to consent to acceleration of the Obligations issued pursuant to said Supplement, the Obligations issued pursuant to such Supplement may not be accelerated by the Master Trustee unless such consent is properly obtained pursuant to the terms of such Supplement. In the event Obligations are accelerated there will be due and payable on such Obligations an amount equal to the total principal amount of all such Obligations, plus all interest accrued thereon to the date of acceleration and, to the extent permitted by applicable law, which accrues to the date of payment.

At any time after the principal of the Obligations has been so declared to be due and payable and before the entry of final judgment or decree in any suit, action or proceeding instituted on account of such default, if (a) the Obligated Group has paid or caused to be paid or deposited with the Master Trustee moneys sufficient to pay all matured installments of interest and interest on installments of principal and interest and principal or redemption prices then due (other than the principal then due only because of such declaration) of all Obligations Outstanding, (b) the Obligated Group has paid or caused to be paid or deposited with the Master Trustee moneys sufficient to pay the charges, compensation, expenses, disbursements, advances, fees and liabilities of the Master Trustee, (c) all other amounts then payable by the Obligated Group under the Master Indenture have been paid or a sum sufficient to pay the same has been deposited with the Master Trustee, and (d) every Event of Default (other than a default in the payment of the principal of such Obligations then due only because of such declaration) has been remedied, then the Master Trustee may, and upon the written request of Holders of not less than a majority in Aggregate Principal Amount of the Obligations Outstanding must, annul such declaration and its consequences with respect to any Obligations or portions thereof not then due by their terms, except that no such annulment is to extend to Obligations issued pursuant to a Supplement which provides that no such declaration may be annulled by the Master Trustee unless consent of a particular Person is obtained without the consent of such Person. No such annulment will extend to or affect any subsequent Event of Default or impair any right consequent thereon.

### Additional Remedies and Enforcement of Remedies

Upon the occurrence and continuance of any Event of Default, the Master Trustee may, and upon the written request of the Holders of not less than 50% in Aggregate Principal Amount of the Obligations Outstanding, together with indemnification of the Master Trustee to its satisfaction therefor, must, proceed forthwith to protect and enforce its rights and the rights of the Holders under the Master Indenture by such suits, actions or proceedings as the Master Trustee, being advised by counsel, deems

expedient, but only to the extent permitted by law, including but not limited to: (a) enforcement of the right of the Holders to collect and enforce the payment of amounts due or becoming due under the Obligations; (b) suit upon all or any part of the Obligations; (c) civil action to require any Person holding moneys, documents or other property pledged to secure payment of amounts due or to become due on the Obligations to account as if it were the trustee of an express trust for the Holders; (d) civil action to enjoin any acts or things which may be unlawful or in violation of the rights of the Holders; (e) realize upon the security interest in the Gross Revenues and exercise all of the rights and remedies of a secured party under applicable state laws; (f) obtain specific performance, mandatory or prohibitory injunctive relief, or other equitable relief; and (g) enforcement of any other right of the Holders conferred by law or by the Master Indenture, except that such Holders will have no recourse under the Master Indenture to Excluded Property.

Regardless of the happening of an Event of Default, the Master Trustee, if requested in writing by the Holders of not less than 50% in Aggregate Principal Amount of the Obligations then Outstanding, must, upon being indemnified to its satisfaction therefor, institute and maintain such suits and proceedings as it may be advised are necessary or expedient (a) to prevent any impairment of the security under the Master Indenture by any acts which may be unlawful or in violation of the Master Indenture, or (b) to preserve or protect the interests of the Holders, so long as such request and the action to be taken by the Master Trustee are not in conflict with any applicable law or the provisions of the Master Indenture and, in the sole judgment of the Master Trustee, is not unduly prejudicial to the interests of the Holders not making such request.

**Application of Moneys After Default**

During the continuance of an Event of Default all moneys received by the Master Trustee pursuant to any right given or action taken pursuant to the Master Indenture (except for security given with respect to particular Obligations to the extent permitted in the Master Indenture, which security will only be applied to payment of debt service on such particular Obligations), after payment of (i) the costs and expenses of the proceedings resulting in the collection of such moneys and all fees, cost, liabilities, expenses and advances incurred or made by the Master Trustee with respect thereto and all other fees, costs, liabilities, advances and expenses of the Master Trustee under the Master Indenture (including any attorney fees, costs and expenses) and (ii) in the sole discretion of the Master Trustee, the payment of the expenses of operating the Property of any Members of the Obligated Group, are to be applied as follows:

(a) Unless the principal of all Outstanding Obligations has become or has been declared due and payable: *First*: to the payment to the Persons entitled thereto of all installments of interest then due on Obligations in the order of the maturity of such installments and, if the amount available is not sufficient to pay in full any installment or installments maturing on the same date, then to the payment thereof ratably, according to the amounts due thereon to the Persons entitled thereto, without any discrimination or preference; and *Second*: to the payment to the Persons entitled thereto of the unpaid principal installments of any Obligations which have become due, whether at maturity or by call for redemption, in the order of their due dates, and if the amounts available are not sufficient to pay in full all Outstanding Obligations due on any date, then to the payment thereof ratably, according to the amounts of principal installments due on such date, to the Persons entitled thereto, without any discrimination or preference.

(b) If the principal of all Outstanding Obligations has become or has been declared due and payable, to the payment of the principal and interest then due and unpaid upon Outstanding Obligations without preference or priority of principal over interest or of interest over principal, or of any installment of interest over any other installment of interest, or of any

Obligation over any other Obligation, ratably, according to the amounts due respectively for principal and interest, to the Persons entitled thereto without any discrimination or preference.

(c)      If the principal of all Outstanding Obligations has been declared due and payable, and if such declaration thereafter has been rescinded and annulled under the provisions of the Master Indenture, then, subject to the provisions of the Master Indenture summarized under this subheading in the event that the principal of all Outstanding Obligations later becomes due or is declared due and payable, the moneys will be applied in accordance with the provisions of the section of the Master Indenture summarized under this subheading.

Whenever moneys are to be applied by the Master Trustee pursuant to the provisions of the Master Indenture summarized under this subheading, such moneys are to be applied by it at such times, and from time to time, as the Master Trustee determines, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future.  Whenever the Master Trustee applies such moneys, it is to fix the date upon which such application is to be made, and upon such date interest on the amounts of principal to be paid on such dates will cease to accrue.  The Master Trustee is to give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and will not be required to make payment to the Holder of any unpaid Obligation until such Obligation is presented to the Master Trustee for appropriate endorsement of any partial payment or for cancellation if fully paid.

Whenever all Obligations and interest thereon have been paid under the provisions of the Master Indenture summarized under this subheading and all expenses and charges of the Master Trustee have been paid, any balance remaining will be paid to the Person entitled to receive the same; if no other Person is entitled thereto, then the balance will be paid to the Members of the Obligated Group, their respective successors, or as a court of competent jurisdiction may direct.

**Remedies Not Exclusive**

No remedy by the terms of the Master Indenture conferred upon or reserved to the Master Trustee or the Holders is intended to be exclusive of any other remedy, but each and every such remedy is to be cumulative and will be in addition to every other remedy given under the Master Indenture or existing at law or in equity or by statute on or after the date of the Master Indenture.

**Remedies Vested in the Master Trustee**

All rights of action (including the right to file proof of claims) under the Master Indenture or under any of the Obligations may be enforced by the Master Trustee without the possession of any of the Obligations or the production thereof in any trial or other proceedings relating thereto.  Any such suit or proceeding instituted by the Master Trustee may be brought in its name as the Master Trustee without the necessity of joining as plaintiffs or defendants any Holders.  Subject to the provisions of the section of the Master Indenture summarized under the subheading "Application of Moneys After Default" above, any recovery or judgment will be for the equal benefit of the Holders.

**Appointment of Receivers**

Upon the occurrence of an Event of Default, and upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Master Trustee and the Holders of Obligations under the Master Indenture, the Master Trustee will be entitled, as a matter of right, to the extent permitted under applicable law, to the appointment of a receiver or receivers of the rights and properties pledged under the Master Indenture and of the revenues, issues, payments and profits thereof, pending such proceedings, with such powers as the court making such appointment confers.

**Holders' Control of Proceedings**

If an Event of Default has occurred and is continuing, notwithstanding anything in the Master Indenture to the contrary, the Holders of not less than a majority in Aggregate Principal Amount of Obligations then Outstanding will have the right, at any time, by an instrument in writing executed and delivered to the Master Trustee and accompanied by indemnity satisfactory to the Master Trustee, to direct the method and place of conducting any proceeding to be taken in connection with the enforcement of the terms and conditions of the Master Indenture or for the appointment of a receiver or any other proceedings under the Master Indenture, so long as such direction is not in conflict with any applicable law or the provisions of the Master Indenture, and so long as the Master Trustee will have the right to decline to follow any such direction if the Master Trustee in good faith determines that the proceeding so directed would involve it in personal liability or would be unduly prejudicial to the interest of any Holders not joining in such direction.  Nothing in the section of the Master Indenture summarized under this subheading is to impair the right of the Master Trustee in its discretion to take any other action under the Master Indenture which it may deem proper and which is not inconsistent with such direction by Holders.

The foregoing notwithstanding, the Holders of a majority in Aggregate Principal Amount of the Obligations then Outstanding which are entitled to the exclusive benefit of certain security (to the extent provided in the Master Indenture) in addition to that intended to secure all or other Obligations will have the right, at any time, by an instrument or instruments in writing executed and delivered to the Master Trustee, to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of the Master Indenture, the Supplement or Supplements pursuant to which such Obligations were issued or so secured with respect to such separate security, except that such direction may not be otherwise than in accordance with the provisions of law and of the Master Indenture.

**Termination of Proceedings**

In case any proceeding taken by the Master Trustee on account of an Event of Default has been discontinued or abandoned for any reason or has been determined adversely to the Master Trustee or to the Holders, then the Members of the Credit Group, the Master Trustee and the Holders are to be restored to their former positions and rights under the Master Indenture, and all rights, remedies and powers of the Master Trustee and the Holders are to continue as if no such proceeding had been taken.

**Waiver of Events of Default**

No delay or omission of the Master Trustee or of any Holder to exercise any right or power accruing upon any Event of Default is to impair any such right or power or is to be construed to be a waiver of any such Event of Default or an acquiescence therein.  Every power and remedy given to the Master Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient by them.

The Master Trustee may waive any Event of Default which in its opinion has been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions of the Master Indenture or before the completion of the enforcement of any other remedy under the Master Indenture.

Notwithstanding anything contained in the Master Indenture to the contrary, the Master Trustee, upon the written request of the Holders of not less than a majority of the Aggregate Principal Amount of Obligations then Outstanding, is to waive any Event of Default under the Master Indenture and its consequences; provided, however, that, except under the circumstances set forth in the provisions of the Master Indenture summarized under the subheading "Acceleration; Annulment of Acceleration" above, a default in the payment of the principal of, premium, if any, or interest on any Obligation, when the same become due and payable by the terms thereof or upon call for redemption, may not be waived without the written consent of the Holders of all the Outstanding Obligations with respect to which such payment default exists.

In case of any waiver by the Master Trustee of an Event of Default under the Master Indenture, the Members of the Credit Group, the Master Trustee and the Holders are to be restored to their former positions and rights under the Master Indenture, respectively, but no such waiver is to extend to any subsequent or other Event of Default or impair any right consequent thereon.

**Notice of Default**

The Master Trustee, within 10 days after it has knowledge of the occurrence of an Event of Default, is to mail to each Related Issuer and all Holders as the names and addresses of such Holders appear upon the records of the Master Trustee, notice of such Event of Default known to the Master Trustee, unless such Event of Default has been cured before the giving of such notice; provided that, except in the case of default in the payment of the principal of or premium, if any, or interest on any of the Obligations and the Events of Default specified in subsections (f) and (g) of the section of the Master Indenture summarized under the subheading "Events of Default" above, the Master Trustee is to be protected in withholding such notice if and so long as the board of directors, the executive committee or a trust committee of directors of the Master Trustee in good faith determines that the withholding of such notice is in the interests of the Holders.

**Removal and Resignation of the Master Trustee**

The Master Trustee may resign or may be removed at any time by an instrument or instruments in writing signed by the Holders of not less than a majority of the Aggregate Principal Amount of Obligations then Outstanding or, if no Event of Default has occurred and is continuing, by an instrument in writing signed by the Obligated Group Representative. No such resignation or removal is to become effective unless and until a successor Master Trustee (or temporary successor trustee as provided below) has been appointed and has assumed the trusts created by the Master Indenture. Written notice of such resignation or removal is to be given to the Members of the Obligated Group and to each Holder at the address then reflected on the records of the Master Trustee and such resignation or removal is to take effect upon the appointment and qualification of a successor Master Trustee. A successor Master Trustee may be appointed at the direction of the Holders of not less than a majority in Aggregate Principal Amount of Obligations Outstanding or by the Obligated Group Representative if the Master Trustee was removed by the Obligated Group Representative. In the event a successor Master Trustee has not been appointed and qualified within 60 days of the date notice of resignation is given, the Master Trustee, any Member of the Obligated Group or any Holder may apply to any court of competent jurisdiction for the appointment of a temporary successor Master Trustee to act until such time as a successor is appointed as described.

**Supplements Not Requiring Consent of Holders**

The Obligated Group Representative, on behalf of the Credit Group and each Member of the Credit Group, and the Master Trustee may, without the consent of or notice to any of the Holders, enter into one or more Supplements for one or more of the following purposes: (a) to cure any ambiguity or formal defect or omission in the Master Indenture; (b) to correct or supplement any provision in the Master Indenture which may be inconsistent with any other provision in the Master Indenture, or to make any other provisions with respect to matters or questions arising under the Master Indenture and which will not materially and adversely affect the interests of the Holders; (c) to grant or confer ratably upon all of the Holders any additional rights, remedies, powers or authority that may lawfully be granted or conferred upon them, subject to provisions of the Master Indenture; (d) to qualify the Master Indenture under the Trust Indenture Act of 1939 or corresponding provisions of federal law from time to time in effect; (e) to create and provide for the issuance of Indebtedness as permitted under the Master Indenture; (f) to obligate a successor to any Member of the Obligated Group as provided in the Master Indenture; (g) to add a new Member or Designated Affiliate as provided in the Master Indenture; and (h) to make any other change in the Master Indenture that, in the opinion of the Obligated Group Representative and the Master Trustee, will not prejudice in any material respect the interests of the Holders of the Outstanding Obligations.

In addition, the Obligated Group Representative, when authorized by resolution or other action of equal formality by the Governing Body of the Obligated Group Representative, and the Master Trustee may, without the consent of or notice to any of the Holders, enter into one or more Supplements to modify, amend, change or remove any covenant, agreement, term or provision of the Master Indenture other than a modification of the types described above, except that written notice of the substance of such proposed Supplement is given by the Obligated Group Representative to each rating agency then maintaining a rating at the request of the Obligated Group Representative on any Obligations or Related Bonds and to the Master Trustee not less than 30 days prior to the date such Supplement is to take effect and the ratings, if any, on any Related Bonds or Obligations is not lowered or withdrawn by any such rating agency as a result of such proposed Supplement.

**Supplements Requiring Consent of Holders**

Other than Supplements referred to in the provisions of the Master Indenture summarized under the subheading "Supplements Not Requiring Consent of Holders" above, and subject to the terms and provisions and limitations contained in the Master Indenture and not otherwise, the Holders of not less than a majority in Aggregate Principal Amount of Obligations then Outstanding will have the right, from time to time, anything contained in the Master Indenture to the contrary notwithstanding, to consent to and approve the execution by the Obligated Group Representative, on behalf of the Credit Group and each Member of the Credit Group and the Master Trustee, of such Supplements as are deemed necessary and desirable for the purpose of modifying, altering, amending, adding to or rescinding, in any particular, any of the terms or provisions contained in the Master Indenture, except that nothing will permit or be construed as permitting a Supplement which would: (a) Effect a change in the times, amounts or currency of payment of the principal of, premium, if any, and interest on any Obligation or a reduction in the principal amount or redemption price of any Obligation or the rate of interest thereon, without the consent of the Holder of such Obligation; (b) Permit the preference or priority of any Obligation over any other Obligation except as expressly provided in the Master Indenture, without the consent of the Holders of all Obligations then Outstanding; or (c) Reduce the Aggregate Principal Amount of Obligations then Outstanding the consent of the Holders of which is required to authorize such Supplement without the consent of the Holders of all Obligations then Outstanding.

D-31

Any such consent will be binding upon the Holder giving such consent and upon any subsequent Holder of such Obligation and of any Obligation issued in exchange therefor (whether or not such subsequent Holder thereof has notice thereof), unless such consent is revoked in writing by the Holder of such Obligation giving such consent or by a subsequent Holder thereof by filing with the Master Trustee, prior to the execution by the Master Trustee of such Supplement, such revocation.  At any time after the Holders of the required Aggregate Principal Amount or number of Obligations have filed their consents to the Supplement, the Master Trustee is to make and file with the Obligated Group Representative a written statement to that effect.  Such written statement will be conclusive that such consents have been so filed.

If the Holders of the required Aggregate Principal Amount of the Obligations Outstanding have consented to and approved the execution of such Supplement as provided in the Master Indenture, no Holder will have any right to object to the execution thereof, or to object to any of the terms and provisions contained therein or the operation thereof, or in any manner to question the propriety of the execution thereof, or to enjoin or restrain the Master Trustee or any Member of the Obligated Group from executing the same or from taking any action pursuant to the provisions thereof.

### Satisfaction and Discharge of Master Indenture

If (a) the Obligated Group Representative delivers to the Master Trustee for cancellation all Obligations theretofore authenticated (other than any Obligations which have been mutilated, destroyed, lost or stolen and which have been replaced or paid as provided in the Supplement) and not theretofore canceled, or (b) all Obligations that have not become due and payable and have not been canceled or delivered to the Master Trustee for cancellation are deemed to have been paid and discharged pursuant to the terms of the Supplement under which such Obligations were issued, and if in all cases the Members of the Obligated Group also pay or cause to be paid all other sums payable under the Master Indenture by the Members of the Obligated Group or any thereof, then the Master Indenture will cease to be of further effect, and the Master Trustee, on demand of the Obligated Group Representative and at the cost and expense of the Members of the Obligated Group, will, upon written request of the Obligated Group Representative, and upon receipt by the Master Trustee of an Officer's Certificate and an Opinion of Counsel acceptable to the Master Trustee, each stating that in the opinion of the signers all conditions precedent to the satisfaction and discharge of the Master Indenture have been complied with, execute proper instruments acknowledging satisfaction of and discharging the Master Indenture.  Each Member of the Obligated Group, respectively, by the Master Indenture agrees to reimburse the Master Trustee for any costs or expenses theretofore and thereafter reasonably and properly incurred by the Master Trustee in connection with the Master Indenture or such Obligations.

## THE SUPPLEMENTAL MASTER TRUST INDENTURES

### General

Contemporaneously with the issuance of the Bonds by the Authority, the Corporation will enter into Supplement No. 1 and will issue Obligation No. 1 thereunder.  The Master Indenture has not heretofore been supplemented or amended, and no Obligations have heretofore been issued under the Master Indenture.  The following subheading therefore summarizes only Supplement No. 1.  Such summary and the summaries elsewhere in this Official Statement concerning Supplement No. 1 do not purport to be complete or definitive and are qualified in their entireties by reference to the full form of Supplement No. 1. Certain capitalized words and phrases used under this heading "THE SUPPLEMENTAL MASTER INDENTURES" have the meanings set forth under the headings "THE MASTER INDENTURE—Definitions" and "THE BOND INDENTURE—Definitions."

**Supplement No. 1**

Supplement No. 1 contains no special covenants of the Corporation in addition to the covenants contained in the Master Indenture.

Supplement No. 1 provides that Obligation No. 1 is an accelerable instrument for purposes of the provision of the Master Indenture summarized in the first paragraph under the subheading "THE MASTER INDENTURE—Acceleration; Annulment of Acceleration." Supplement No. 1 also provides that, upon occurrence of an Event of Default under the Master Indenture with respect to Obligation No. 1, the Holder of Obligation No. 1 will be entitled, by notice to the Master Trustee and the Obligated Group Representative, to require the Master Trustee to declare Obligation No. 1 immediately due and payable, subject to the provisions of the Master Indenture summarized under the subheading "THE MASTER INDENTURE—Acceleration; Annulment of Acceleration" and subject to Supplement No. 1. The Holder of Obligation No. 1 is also entitled to consent to any acceleration of Obligation No. 1, in accordance with the provisions of the Master Indenture referred to above, and, therefore, Obligation No. 1 may not be accelerated by the Master Trustee without the consent of the Holder thereof. The Authority is the Holder of Obligation No. 1. The Authority has assigned certain of its rights to the Bond Trustee pursuant to the Bond Indenture.

**BOND INDENTURE**

**General**

The Bond Indenture sets forth the terms of the Bonds, the nature and extent of the security, various rights of the owners of the Bonds, rights, duties and immunities of the Bond Trustee and the rights and obligations of the Authority. The summary of the Bond Indenture set forth under this heading "THE BOND INDENTURE" and elsewhere in this Official Statement does not purport to be complete or definitive and is qualified in its entirety by reference to the full form of the Bond Indenture.

**Definitions**

Certain capitalized words and phrases used under this heading "THE BOND INDENTURE" and the heading "THE LOAN AGREEMENT" below have the meanings set forth under this subheading. Capitalized words and phrases used under such headings but not defined under this subheading have the meanings set forth under the subheading "THE MASTER INDENTURE—Definitions."

"*Act*" means the Colorado Health Facilities Authority Act, constituting Article 25, Title 25 of Colorado Revised Statutes, as amended.

"*Annual Planning Service Fee*" means the annual fee required to be paid by the Corporation to the Authority pursuant to the Loan Agreement.

"*Authority*" means the Colorado Health Facilities Authority, an independent public body politic and corporate constituting a public instrumentality.

"*Authorized Denomination*" means $5,000 or any integral multiple thereof.

"*Bond*," "*Bonds*" or "*Series 2015 Bonds*" means the Colorado Health Facilities Authority Hospital Revenue Bonds (Vail Valley Medical Center Project), Series 2015, issued under the Bond Indenture.

D-33

"*Bond Indenture*" means the Bond Indenture of Trust, expected to be dated as of the first day of the month in which the Bonds are originally issued, between the Authority and the Bond Trustee, as supplemented and amended.

"*Bond Purchase Agreement*" means the Bond Purchase Agreement relating to the Bonds among the Authority, the Corporation and the Underwriter.

"*Bond Trustee*" means UMB Bank, n.a., and its successor or successors and any other corporation or association which at any time may be substituted in its place pursuant to and at the time serving as bond trustee under the Bond Indenture.

"*Business Day*" means a day other than (a) a Saturday, Sunday or legal holiday, (b) a day on which banks located in any city in which the designated corporate trust office or operations office of the Bond Trustee or any Paying Agent is located are required or authorized by law to remain closed or (c) a day on which the New York Stock Exchange or the Securities Depository is closed.

"*Cede & Co.*" means Cede & Co., as nominee of The Depository Trust Company, New York, New York.

"*Continuing Disclosure Agreement*" means the Continuing Disclosure Agreement relating to the Bonds between the Corporation and UMB Bank, n.a., as dissemination agent, as from time to time amended in accordance with the provisions thereof.

"*Corporation*" means Vail Clinic, Inc. d/b/a Vail Valley Medical Center, a Colorado nonprofit corporation, and its successors and assigns. The Corporation is referred to in the Master Indenture as the Medical Center.

"*Corporation Representative*" means the President or the Vice President of Finance of the Corporation and such other person or persons at the time designated to act on behalf of the Corporation in matters relating to the Bond Indenture and the Loan Agreement as evidenced by a written certificate furnished to the Authority and the Bond Trustee containing the specimen signature of such person or persons. Such certificate may designate an alternate or alternates each of whom is entitled to perform all duties of the Corporation Representative.

"*Costs of Issuance Fund*" means the fund by that name created by the Bond Indenture.

"*Debt Service Fund*" means the fund by that name created by the Bond Indenture.

"*Defeasance Obligations*" means: (a) cash (insured at all times by the Federal Deposit Insurance Corporation or otherwise collateralized with obligations described in paragraph (b) below); and (b) direct obligations of (including obligations issued or held in book-entry form) the Department of the Treasury of the United States of America or direct obligations of United States agency or instrumentality.

"*Interest Payment Date*" means each January 15 and July 15, commencing January 15, 2016, and the maturity date or the redemption date of any Bonds.

"*Loan*" means the loan of the proceeds of the Bonds made by the Authority to the Corporation pursuant to the Loan Agreement.

"*Loan Agreement*" means the Loan Agreement, expected to be dated as of the first day of the month in which the Bonds are originally issued, between the Authority and the Corporation, as supplemented and amended.

"*Loan Payments*" means the payments of principal of and interest on the Loan referred to in the Loan Agreement.

"*Obligation No.1*" means Obligation No. 1 issued by the Corporation under the Master Indenture, which secures the obligation of the Corporation to repay the Loan.

"*Officer's Certificate*" means a written certificate of the Corporation signed by the Corporation Representative, which certificate will be deemed to constitute a representation of, and will be binding upon, the Corporation with respect to matters set forth therein, and which certificate in each instance, including the scope, form, substance and other aspects thereof, is acceptable to the Bond Trustee.

"*Opinion of Bond Counsel*" when used with reference to the Bond Indenture or Loan Agreement means a written opinion of any legal counsel acceptable to the Corporation, the Authority and the Bond Trustee who must be nationally recognized as an expert in matters pertaining to the validity of obligations of governmental issuers and the exemption from federal income taxation of interest on such obligations.

"*Outstanding*" when used with reference to the Bonds means, as of any date of determination, all Bonds theretofore authenticated and delivered under the Bond Indenture, except: (a) Bonds theretofore cancelled by the Bond Trustee or delivered to the Bond Trustee for cancellation as provided in the Bond Indenture; (b) Bonds for whose payment or redemption money or Defeasance Obligations in the necessary amount has been irrevocably deposited with the Bond Trustee or any Paying Agent in trust for the Owners of such Bonds as provided in the Bond Indenture, except that, if such Bonds are to be redeemed, notice of such redemption has been duly given pursuant to the Bond Indenture or provision therefor satisfactory to the Bond Trustee has been made; (c) Bonds in exchange for or in lieu of which other Bonds have been authenticated and delivered under the Bond Indenture; and (d) Bonds alleged to have been destroyed, lost or stolen which have been paid as provided in the Bond Indenture.

"*Owner*" or "*Owners*" means the registered owner or owners or beneficial owner or owners, as the context may require, of one or more Bonds.

"*Paying Agent*" means the Bond Trustee and any other commercial bank or trust institution organized under the laws of any state of the United States of America or any national banking association designated pursuant to the Bond Indenture or any Supplemental Bond Indenture as paying agent for any Bonds at which the principal of, redemption premium, if any, and interest on such Bonds will be payable.

"*Permitted Investments*" means, if and to the extent the same are at the time legal for investment of funds held under the Bond Indenture, any of the following:

      (a)    direct obligations of the United States, including obligations the principal and interest of which are unconditionally guaranteed by the full faith and credit of the United States, and trust receipts evidencing a direct ownership interest in such obligations;

      (b)    direct obligations of any United States government agency or instrumentality;

      (c)    obligations issued by any state of the United States of America, or any political subdivision thereof, rated at the time of purchase (without incorporating refinements or graduation of rating category by numerical qualification or otherwise) by at least two nationally

recognized rating agencies in one of the three highest rating categories, and obligations fully secured by and payable solely from an escrow fund held by a trustee consisting of cash or obligations described in paragraph (a) above;

(d)     debt obligations of any United States corporation or trust, which obligations are rated at the time of purchase by at least two nationally recognized rating agencies in one of the three highest rating categories (without incorporating refinements or graduation of rating category by numerical qualification or otherwise), or (2) commercial paper of the same rated at the time of purchase by at least two nationally recognized rating agencies in the highest rating category (without incorporating refinements or gradation of rating category by numerical modifier or otherwise);

(e)     certificates of deposit or time deposits of any bank, trust company or savings and loan which deposits are fully insured by a federally sponsored deposit insurance program;

(f)     bankers acceptances of any bank which bank or its parent holding company's debt conforms to the rating requirements of paragraph (d) above;

(g)     repurchase agreements, entered in conformance with prevailing industry standard guidelines, of obligations listed in paragraph (a) or (b) above, delivered versus payment to the Bond Trustee and continuously collateralized at 102% or greater, with counterparties having debt rated in conformance with the rating requirements of paragraph (d) above;

(h)     investment agreements of any corporation which agreements or the corporation's long term debt is rated by at least two nationally recognized rating agencies in one of the three highest rating categories; and

(i)     shares of a money market fund or commingled trust which fund's or trust's investments are restricted to these Permitted Investments, including any such fund or trust which is a proprietary fund or trust of the Bond Trustee or any of its affiliates.

"*Project*" means the financing of the expansion, construction, renovation, improvement and equipping of certain of the Corporation's health care facilities or the reimbursement to the Corporation for expenditures therefor made prior to the issuance of the Bonds, and financing the costs of issuing the Bonds all as further generally described in Appendix A the front part of this Official Statement.

"*Project Fund*" means the Project Fund created by the Bond Indenture.

"*Rating Agency*" means S&P, if the Bonds are rated by S&P at the time and any other nationally recognized securities rating service requested by the Corporation to maintain a rating on the Bonds.

"*Rebate Fund*" means the Rebate Fund created by the Bond Indenture.

"*Record Date*" means the Regular Record Date unless a Special Record Date is applicable under the Bond Indenture.

"*Regular Record Date*" means the January 1 and July 1 (whether or not a Business Day) immediately prior to each Interest Payment Date.

"*S&P*" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, and its successors and assigns, and, if such firm is dissolved or liquidated or no longer performs the

functions of a securities rating service, S&P will be deemed to refer to any other nationally recognized securities rating service designated by the Corporation, with notice to the Authority and Bond Trustee.

"*Securities Depository*" means, initially, The Depository Trust Company, New York, New York, and its successors and assigns.

"*Special Record Date*" means the Special Record Date as established and as defined in the Bond Indenture.

"*Supplement No. 1*" means the Supplemental Master Trust Indenture for Obligation No. 1, expected to be dated as of the first date of the month in which the Bonds are originally issued, between the Corporation and the Master Trustee, as supplemented and amended.

"*Supplemental Bond Indenture*" means any indenture supplemental or amendatory to the Bond Indenture entered into by the Authority and the Bond Trustee pursuant to the provisions of the Bond Indenture.

"*Supplemental Loan Agreement*" means any agreement supplemental or amendatory to the Loan Agreement entered into by the Authority and the Corporation pursuant to provisions of the Loan Agreement.

"*Tax Certificate*" means the Federal Tax Certificate, dated the date the Bonds are originally issued, certified by the Corporation, as from time to time amended in accordance with the provisions thereof.

"*Trust Estate*" means the Trust Estate described in the Granting Clauses of the Bond Indenture.

"*Unassigned Rights*" means (a) the Authority's rights under the Loan Agreement, (b) the Authority's rights to receive notices and other documents contemplated by the Loan Agreement and (c) the Authority's rights to perform certain discretionary acts contemplated by the Loan Agreement.

"*Underwriter*" means Wells Fargo Bank, National Association.

**Funds and Accounts**

The Bond Indenture establishes certain funds and accounts in the custody of the Bond Trustee, and in the name of the Authority, including the funds summarized below.

*Costs of Issuance Fund*.  The moneys in the Costs of Issuance Fund will be disbursed by the Bond Trustee from time to time, upon receipt of written disbursement requests of the Corporation in substantially the form required by the Bond Indenture and signed by the Corporation Representative, in amounts equal to the amount of costs of issuance certified in such written requests.  At such time as the Bond Trustee is furnished with an Officer's Certificate stating that all costs of issuance have been paid, and in any case not later than six months from the date on which the Bonds are originally issued, the Bond Trustee will transfer any moneys remaining in the Costs of Issuance Fund to the Debt Service Fund.

*Debt Service Fund*.  The Bond Trustee is to deposit and credit to the Debt Service Fund, as and when received, the following: (a) the amounts, if any, required to be deposited therein under the Bond Indenture, and all Loan Payments made by the Corporation pursuant to the Loan Agreement; (b) interest earnings and other income on Permitted Investments required to be deposited in the Debt Service Fund

pursuant to the Bond Indenture; and (c) all other moneys received by the Bond Trustee under and pursuant to any of the provisions of the Bond Indenture, the Loan Agreement, the Master Indenture or Obligation No. 1, when accompanied by directions from the person depositing such moneys that such moneys are to be paid into the Debt Service Fund.

The moneys in the Debt Service Fund will be held in trust and, except as otherwise provided in the Bond Indenture, will be expended solely as follows: (i) to pay interest on the Bonds as the same becomes due; (ii) to pay principal of the Bonds as the same mature or become due and upon mandatory sinking fund redemption thereof; and (iii) to pay principal of and redemption premium, if any, on the Bonds as the same become due upon redemption prior to maturity. The Bond Trustee is authorized and directed to withdraw sufficient funds from the Debt Service Fund to pay principal of, redemption premium, if any, and interest on the Bonds as the same become due and payable at maturity or upon redemption and to make said funds so withdrawn available to the Bond Trustee and any Paying Agent for the purpose of paying said principal, redemption premium, if any, and interest. After payment in full of the principal of, redemption premium, if any, and interest on the Bonds (or after provision has been made for the payment thereof as provided in the Bond Indenture), all rebatable arbitrage to the United States of America and the fees, charges and expenses of the Bond Trustee, any Paying Agents and the Authority, and any other amounts required to be paid under the Bond Indenture and the Loan Agreement, all amounts remaining in the Debt Service Fund are to be paid to the Corporation upon the expiration or sooner termination of the Loan Agreement.

*Project Fund*. Moneys in the Project Fund will be disbursed by the Bond Trustee to the Corporation from time to time, upon receipt of written disbursement requests of the Corporation in substantially the form required by the Bond Indenture and signed by the Corporation Representative. The Master Indenture provides that the Bond Trustee may conclusively rely as to the completeness and accuracy of all statements in such request if the request is signed by an authorized Corporation representative, and the Bond Trustee is not required to make any independent investigation in connection therewith. The Bond Trustee shall retain such requests and disbursements so long as the Bonds are outstanding. Upon completion of the Project as certified by the Corporation, any remaining moneys in the Project Fund will be transferred, at the direction of the Corporation, to the Debt Service Fund to pay interest on the Bonds, to pay principal of the Bonds or to redeem the Bonds pursuant to the optional redemption provisions of the Bond Indenture.

*Rebate Fund*. The Bond Indenture creates and establishes with the Bond Trustee for the benefit of the United States of America a Rebate Fund in the name of the Authority which is to be expended in accordance with the provisions thereof and the Tax Certificate. The Corporation is responsible for making all such deposits to the Rebate Fund as required in the Tax Certificate and the Loan Agreement. The Bond Trustee will invest the Rebate Fund at the written direction of a duly authorized officer of the Corporation pursuant to the Tax Certificate and will deposit income from said investments immediately upon receipt thereof in the Rebate Fund, all as set forth in the Tax Certificate. For purposes of determining rebate calculations on every fifth anniversary of the Bond Year as defined in the Tax Certificate or on any other date on which any other calculations may be required with respect thereto pursuant to the Tax Certificate, the Corporation will employ, at its own expense, a firm with recognized expertise in the area of rebate calculation and will promptly notify the Authority of such selection. The Bond Trustee will be entitled to rely on the calculations required to be made pursuant to the Bond Indenture and will not be responsible for any loss or damage resulting from any action taken or omitted to be taken in reliance upon such calculations.

## Investment of Moneys

Moneys held as part of the Costs of Issuance Fund, the Project Fund, the Debt Service Fund and the Rebate Fund will be invested by the Bond Trustee at the written direction of a Corporation Representative in Permitted Investments (a) with respect to the Costs of Issuance Fund and the Project Fund maturing in the amounts and at the times necessary to provide funds to make the payments to which such moneys are applicable as estimated in a certificate of a Corporation Representative filed with the Bond Trustee and, (b) with respect to the Debt Service Fund and the Rebate Fund, maturing in the amounts and at the times necessary to provide funds to make the payments to which such moneys are applicable as determined by the Bond Trustee. All such Permitted Investments purchased will mature or be redeemable or otherwise subject to a put on a date or dates prior to the time when the moneys so invested will be required for expenditure. The Bond Trustee will sell and reduce to cash a sufficient portion of such investments whenever the cash balance in a fund is insufficient for the purposes of such fund. The Bond Trustee may make any and all investments permitted by the provisions of the Bond Indenture through its or its affiliates' own trust or bond departments, as principal or agent and may charge ordinary and customary fees for such trades, including cash sweep accounts fees. The Bond Trustee will, subject to the other provisions of the section of the Bond Indenture summarized under this subheading, invest moneys held as part of the funds under the Bond Indenture in those Permitted Investments as directed by the Corporation, or if no such direction is received, then in money market funds. The Bond Trustee will determine the value of all investments, if any, in the Debt Service Fund, Cost of Issuance Fund, Project Fund and Rebate Fund at least semiannually, and such value will be equal to the lower of cost or fair market value of such investments as reasonably determined by the Bond Trustee.

## Events of Default and Remedies

The Bond Indenture provides that the term "event of default" means any one of the following events (whatever the reason for such event and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of any interest on any Bond when such interest becomes due and payable;

(b)     default in the payment of the principal of, or premium, if any, on, any Bond when the same becomes due and payable (whether at maturity, upon proceedings for redemption, by acceleration or otherwise);

(c)     default in the performance, or breach, of any covenant or agreement of the Authority in the Bond Indenture (other than a default in or breach of a covenant or agreement which is specifically dealt with elsewhere in this paragraph), and continuance of such default or breach for a period of 30 days after the Bond Trustee has given to the Authority and the Corporation (or the Owners of at least 25% in principal amount of the Bonds Outstanding have given to the Authority, the Corporation and the Bond Trustee) a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such 30-day period, but can reasonably be expected to be fully remedied, such default will not constitute an event of default if the Authority immediately upon receipt of such notice commences the curing of such default and thereafter prosecutes and completes the same with due diligence and dispatch; or

(d)     any event of default under the Loan Agreement or the Master Indenture occurs and is continuing and has not been waived.

**Acceleration of Maturity; Rescission and Annulment**

If an event of default occurs and is continuing, the Bond Trustee may, and will if requested by the Owners of not less than 25% in principal amount of the Bonds Outstanding, by written notice to the Authority and the Corporation declare the principal of all Bonds Outstanding and the interest accrued thereon to be due and payable, and upon any such declaration such principal and interest will become immediately due and payable.  At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on any Bonds has been obtained by the Bond Trustee as provided in the Bond Indenture, the Owners of a majority in principal amount of the Bonds Outstanding may, by written notice to the Authority, the Corporation and the Bond Trustee, rescind and annul such declaration and its consequences if:

> (a)    there is deposited with the Bond Trustee a sum sufficient to pay: (i) all overdue installments of interest on all Bonds; (ii) the principal of, and premium, if any, on, any Bonds which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Bonds; (iii) interest upon overdue installments of interest at the rate or rates prescribed therefor in the Bonds; and (iv) all sums paid or advanced by the Bond Trustee under the Bond Indenture and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel; and

> (b)    all events of default, other than the nonpayment of the principal of the Bonds which have become due solely by such declaration of acceleration, have been cured or have been waived as provided in the Bond Indenture.

No such rescission and annulment will affect any subsequent default or impair any right consequent thereon.

**Exercise of Remedies by the Bond Trustee**

Upon the occurrence and continuance of any event of default under the Bond Indenture, unless the same is waived as provided in the Bond Indenture, the Bond Trustee will have the following rights and remedies, in addition to any other rights and remedies provided under the Bond Indenture or by law:

*Right To Bring Suit, Etc.*  The Bond Trustee may pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Bonds Outstanding, including interest on overdue principal, and premium, if any, and on overdue installments of interest, and any other sums due under the Bond Indenture, to realize on or to foreclose any of its interests or liens under the Bond Indenture or with respect to the Loan Agreement and Obligation No. 1, to enforce and compel the performance of the duties and obligations of the Authority as set forth in the Bond Indenture and to enforce or preserve any other rights or interests of the Bond Trustee under the Bond Indenture with respect to any of the Trust Estate or otherwise existing at law or in equity.

*Exercise of Remedies at Direction of Owners.*  If requested in writing to do so by the Owners of not less than 25% in principal amount of Bonds Outstanding, and if indemnified as provided in the Bond Indenture, the Bond Trustee will be obligated to exercise such one or more of the rights and remedies conferred by the Bond Indenture as the Bond Trustee will deem most expedient in the interests of the Owners.

*Appointment of Receiver.*  Upon the filing of a suit or other commencement of judicial proceedings to enforce the rights of the Bond Trustee and of the Owners under the Bond Indenture, the

Bond Trustee will be entitled, as a matter of right, to the appointment of a receiver or receivers of the Trust Estate, pending such proceedings, with such powers as the court making such appointment will confer.

*Suits To Protect the Trust Estate.* The Bond Trustee will have power to institute and to maintain such proceedings as it may deem expedient to prevent any impairment of the Trust Estate by any acts which may be unlawful or in violation of the Bond Indenture and to protect its interests and the interests of the Owners in the Trust Estate, including power to institute and maintain proceedings to restrain the enforcement of or compliance with any governmental enactment, rule or order that may be unconstitutional or otherwise invalid, if the enforcement of or compliance with such enactment, rule or order would impair the security under the Bond Indenture or be prejudicial to the interests of the Owners or the Bond Trustee, or to intervene (subject to the approval of a court of competent jurisdiction) on behalf of the Owners in any judicial proceeding to which the Authority or the Corporation is a party and which in the judgment of the Bond Trustee has a substantial bearing on the interests of the Owners.

*Enforcement Without Possession of Bonds.* All rights of action under the Bond Indenture or any of the Bonds may be enforced and prosecuted by the Bond Trustee without the possession of any of the Bonds or the production thereof in any suit or other proceeding relating thereto, and any such suit or proceeding instituted by the Bond Trustee is to be brought in its own name as trustee of an express trust. Any recovery of judgment will, after provision for the payment of the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel, and subject to the provisions of the Bond Indenture, be for the equal and ratable benefit of the Owners of the Bonds in respect of which such judgment has been recovered.

*Restoration of Positions.* If the Bond Trustee or any Owner has instituted any proceeding to enforce any right or remedy under the Bond Indenture by suit, foreclosure, the appointment of a receiver, or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee or to such Owner, then and in every case the Authority, the Bond Trustee and the Owners will, subject to any determination in such proceeding, be restored to their former positions and rights under the Bond Indenture, and thereafter all rights and remedies of the Bond Trustee and the Owners will continue as though no such proceeding had been instituted.

## Limitation on Suits by Owners

No Owner of any Bond will have any right to institute any proceeding, judicial or otherwise, under or with respect to the Bond Indenture, or for the appointment of a receiver or trustee or for any other remedy under the Bond Indenture, unless:

     (a)    such Owner has previously given written notice to the Bond Trustee of a continuing event of default;

     (b)    the Owners of not less than 25% in principal amount of the Bonds Outstanding have made written request to the Bond Trustee to institute proceedings in respect of such event of default in its own name as Bond Trustee under the Bond Indenture;

     (c)    such Owner or Owners have offered to the Bond Trustee indemnity as provided in the Bond Indenture against the fees, costs, expenses and liabilities to be incurred in compliance with such request;

     (d)    the Bond Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)    no direction inconsistent with such written request has been given to the Bond Trustee during such 60-day period by the Owners of a majority in principal amount of the Outstanding Bonds; it being understood and intended in the Bond Indenture that no one or more Owners of the Bonds will have any right in any manner whatever by virtue of, or by availing of, any provision of the Bond Indenture to affect, disturb or prejudice the lien of the Bond Indenture or the rights of any other Owners of the Bonds, or to obtain or to seek to obtain priority or preference over any other Owners or to enforce any right under the Bond Indenture, except in the manner provided in the Bond Indenture as summarized herein and for the equal and ratable benefit of all Outstanding Bonds.  Notwithstanding the foregoing or any other provision in the Bond Indenture, however, the Owner of any Bond will have the right which is absolute and unconditional to receive payment of the principal of, and premium, if any, and interest on such Bond on the respective stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date) and nothing contained in the Bond Indenture will affect or impair the right of any owner to institute suit for the enforcement of any such payment.

**Control of Proceedings by Owners**

Subject to the right of the Bond Trustee to receive indemnity as provided in the Bond Indenture, the Owners of a majority in principal amount of the Bonds Outstanding have the right, during the continuance of an event of default:

(a)    to require the Bond Trustee to proceed to enforce the Bond Indenture, either by judicial proceedings for the enforcement of the payment of the Bonds and the foreclosure of the Bond Indenture, or otherwise; and

(b)    to direct the time, method and place of conducting any proceeding for any remedy available to the Bond Trustee, or exercising any trust or power conferred upon the Bond Trustee under the Bond Indenture, except that: (i) such direction may not be in conflict with any rule of law or the Bond Indenture; (ii) the Bond Trustee may take any other action deemed proper by the Bond Trustee which is not inconsistent with such direction; and (iii) the Bond Trustee does not determine that the action so directed would be unjustly prejudicial to the Owners not taking part in such direction.

**Application of Moneys Collected**

Any moneys collected by the Bond Trustee pursuant to the provisions of the Bond Indenture describing events of default and remedies therefor (after the deductions for payment of fees, costs and expenses of proceedings resulting in the collection of such moneys) together with any other sums then held by the Bond Trustee as part of the Trust Estate, will be applied in the following order, at the date or dates fixed by the Bond Trustee and, in case of the distribution of such money on account of principal, or premium, if any, or interest, upon presentation of the Bonds and the notation thereon of the payment if only partially paid and upon surrender thereof if fully paid:

FIRST, to the payment of all undeducted amounts due the Bond Trustee under certain compensation and reimbursement provisions of the Bond Indenture relating to the Bond Trustee;

SECOND, to the payment of the whole amount then due and unpaid upon the Outstanding Bonds for principal, and premium, if any, and interest, in respect of which or for the benefit of which such money has been collected, with interest (to the extent that such interest has been collected by the Bond Trustee or a sum sufficient therefor has been so collected and payment thereof is legally enforceable at the respective rate or rates prescribed therefor in the

Bonds) on overdue principal, and premium, if any, and on overdue installments of interest; and in case such proceeds are insufficient to pay in full the whole amount so due and unpaid upon such Bonds, then to the payment of such principal and interest, without any preference or priority, ratably according to the aggregate amount so due;

THIRD, to the payment of the Authority's fees and expenses; and

FOURTH, to the payment of the remainder, if any, to the Corporation or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

Whenever moneys are to be applied by the Bond Trustee pursuant to the provisions of the Bond Indenture summarized under this heading, such moneys will be applied by it at such times, and from time to time, as the Bond Trustee determines, having due regard for the amount of such moneys available for application and the likelihood of additional moneys becoming available for such application in the future. Whenever the Bond Trustee will apply such moneys, it will fix the date (which will be an Interest Payment Date unless it deems another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date will cease to accrue. The Bond Trustee will give such notice as it may deem appropriate of the deposit with it of any such moneys and of the fixing of any such date, and will not be required to make payment to the Owner of any unpaid Bond until such Bond is presented to the Bond Trustee for appropriate endorsement or for cancellation if fully paid.

## Supplemental Bond Indentures

Without the consent of the Owners of any Bonds, the Authority and the Bond Trustee may from time to time enter into one or more Supplemental Bond Indentures for any of the following purposes:

(a)     to correct or amplify the description of any property at any time subject to the lien of the Bond Indenture, or better to assure, convey and confirm unto the Bond Trustee any property subject or required to be subjected to the lien of the Bond Indenture, or to subject to the lien of the Bond Indenture additional property;

(b)     to evidence the appointment of a separate trustee or co-trustee or the succession of a new trustee under the Bond Indenture;

(c)     to add to the covenants of the Authority or to the rights, powers and remedies of the Bond Trustee for the benefit of the Owners of all Bonds or to surrender any right or power conferred in the Bond Indenture upon the Authority;

(d)     to cure any ambiguity, to correct or supplement any provision in the Bond Indenture which may be inconsistent with any other provision in the Bond Indenture or to make any other change, with respect to matters or questions arising under the Bond Indenture, which will not be inconsistent with the provisions of the Bond Indenture, provided such action will not materially adversely affect the interests of the Owners of the Bonds;

(e)     to modify, eliminate or add to the provisions of the Bond Indenture to such extent as necessary to effect the qualification of the Bond Indenture under the Trust Indenture Act of 1939, as amended, or the registration of the Bonds under the Securities Act of 1933, as amended, or under any similar federal statute hereafter enacted, or to permit the qualification of the Bonds for sale under the securities laws of the United States of America or any state of the United States of America; or

D-43

(f)   to make any other change in the Bond Indenture that, in the opinion of the Bond Trustee, will not prejudice in any material respect the interests of the Owners of the Outstanding Bonds.

With the prior written consent of the Owners of not less than a majority in principal amount of the Bonds then Outstanding affected by such Supplemental Bond Indenture, the Authority and the Bond Trustee may enter into one or more Supplemental Bond Indentures for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Bond Indenture or of modifying in any manner the rights of the owners of the Bonds under the Bond Indenture, except that no such Supplemental Bond Indenture will, without the consent of the owner of each Outstanding Bond affected thereby:

(a)   change the stated maturity of the principal of, or any installment of interest on, any Bond, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, any Bond, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

(b)   reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose Owners is required for any such Supplemental Bond Indenture, or the consent of whose Owners is required for any waiver provided for in the Bond Indenture of compliance with certain provisions of the Bond Indenture or certain defaults under the Bond Indenture and their consequences;

(c)   modify the obligation of the Authority to make payment on or provide funds for the payment of any Bond;

(d)   modify or alter the provisions of the proviso to the definition of the term "Outstanding;"

(e)   modify any of the provisions of the Bond Indenture describing the amendment of Supplemental Bond Indentures without consent of Owners of the Bonds or provisions set forth in the Bond Indenture describing waiver of past defaults, except to increase any percentage provided thereby or to provide that certain other provisions of the Bond Indenture cannot be modified or waived without the consent of the Owner of each Bond affected thereby; or

(f)   permit the creation of any lien ranking prior to or on a parity with the lien of the Bond Indenture with respect to any of the Trust Estate or terminate the lien of the Bond Indenture on any property at any time subject to the Bond Indenture or deprive the Owner of any Bond of the security afforded by the lien of the Bond Indenture.

The Bond Trustee may in its discretion determine whether or not any Bonds would be affected by any Supplemental Bond Indenture and any such determination will be conclusive upon the Owners of all Bonds, whether theretofore or thereafter authenticated and delivered under the Bond Indenture.  The Bond Trustee will not be liable for any such determination made in good faith.

So long as the Corporation is not in default under the Loan Agreement, a Supplemental Bond Indenture under the provisions of the Bond Indenture describing Supplemental Bond Indentures which affects any rights of the Corporation will not become effective unless and until the Corporation consents in writing to the execution and delivery of such Supplemental Bond Indenture.

**Payment, Discharge and Defeasance of Bonds**

Bonds will be deemed to be paid and discharged and no longer Outstanding under the Bond Indenture and will cease to be entitled to any lien, benefit or security of the Bond Indenture if the Authority pays or provides for the payment of such Bonds in any one or more of the following ways:

(a)     by paying or causing to be paid the principal of, including redemption premium, if any, and interest on such Bonds, as and when the same become due and payable;

(b)     by delivering such Bonds to the Bond Trustee for cancellation; or

(c)     by depositing in trust with the Bond Trustee moneys and/or Defeasance Obligations in an amount, together with the income or increment to accrue thereon, without consideration of any reinvestment thereof, sufficient to pay or redeem (when redeemable) and discharge the indebtedness on such Bonds at or before their respective maturity or redemption dates (including the payment of the principal of, premium, if any, and interest payable on such Bonds to the maturity or redemption date thereof); provided that, if any such Bonds are to be redeemed prior to the maturity thereof, proper notice of redemption of such Bonds will have been previously given in accordance with the requirements of the Bond Indenture, or in the event said Bonds are not by their terms subject to redemption within the next succeeding 45 days or are not to be redeemed within the next succeeding 45 days, the Corporation will have given the Bond Trustee, on behalf of the Authority, in form satisfactory to the Bond Trustee, irrevocable instructions to notify, as soon as practicable, the Owners in in accordance with the requirements of the Bond Indenture, that a deposit has been made with the Bond Trustee and that said Bonds are deemed to have been paid in accordance with the requirements of the Bond Indenture and stating the maturity or redemption rate upon which moneys are to be available for the payment of the principal of and the applicable redemption premium, if any, on said Bonds, plus interest thereon to the due date thereof; provided further that, such notice must state the impact of the defeasance on any bond redemption rights of the Corporation.

The Bonds may be defeased in advance of their maturity or redemption dates only with cash or Defeasance Obligations pursuant to the section of the Bond Indenture summarized in paragraph (c) above, subject to receipt by the Bond Trustee of (i) a verification report prepared by independent certified public accountants, or other verification agent, satisfactory to the Bond Trustee, (ii) an escrow agreement and (iii) an Opinion of Bond Counsel addressed and delivered to the Bond Trustee and the Authority to the effect that the payment of the principal of and redemption premium, if any, and interest on all of the Bonds to be defeased have been provided for in the manner set forth in the Bond Indenture and to the effect that so providing for the payment of any Bonds will not cause the interest on the Bonds to be included in gross income for federal income tax purposes, notwithstanding the satisfaction and discharge of the Bond Indenture.

The foregoing notwithstanding, the liability of the Authority in respect of such Bonds will continue, but the Owners thereof will thereafter be entitled to payment only out of the moneys and Defeasance Obligations deposited with the Bond Trustee as summarized above.  Moneys and Defeasance Obligations so deposited with the Bond Trustee pursuant to the Bond Indenture will not be a part of the Trust Estate but will constitute a separate trust fund for the benefit of the Persons entitled thereto.  Such moneys and Defeasance Obligations will be applied by the Bond Trustee to the payment (either directly or through any Paying Agent, as the Bond Trustee may determine) to the Persons entitled thereto, of the principal, and premium, if any, and interest for whose payment such moneys and Defeasance Obligations have been deposited with the Bond Trustee.

**The Bond Trustee**

Except during the continuance of an event of default under the Bond Indenture, the Bond Trustee will undertake to perform such duties and only such duties as are specifically set forth in the Bond Indenture.   At the time of an event of default under the Bond Indenture and during the continuation thereof, the Bond Trustee will exercise such of the rights and powers vested in it by the Bond Indenture, and will use the same degree of care and skill in its exercise, as a prudent person would exercise under the circumstances.

The Bond Indenture provides that the Bond Trustee will be entitled to act upon opinions of counsel as specified in the Bond Indenture and will not be responsible for any loss or damage resulting from reliance thereon in good faith.  In addition, the Bond Indenture provides that the Bond Trustee will be entitled to rely on certain other instruments and it will not be liable for any action taken or omitted to be taken by it in good faith and reasonably believed by it to be within the discretion or power conferred upon it in the Bond Indenture.

**THE LOAN AGREEMENT**

**General**

The Loan Agreement provides for the Loan from the Authority to the Corporation of the proceeds of the Bonds.  The Corporation will be obligated to repay the Loan by making Loan Payments of principal and interest to the Bond Trustee for the account of the Authority and for deposit in the Debt Service Fund created under the Bond Indenture.  The summary of the Loan Agreement set forth under this heading "THE LOAN AGREEMENT" and elsewhere in this Official Statement does not purport to be complete or definitive and is qualified in its entirety by reference to the full form of the Loan Agreement.

**Definitions**

Certain capitalized words and phrases used under this heading "THE LOAN AGREEMENT" have the meanings set forth under the headings "THE MASTER INDENTURE—Definitions" and "THE BOND INDENTURE—Definitions."

**Loan Payments and Other Amounts Payable**

The Corporation is required to deposit moneys directly with or to the account of the Bond Trustee as repayment of the Loan until the principal of, premium, if any, and interest on the Bonds have been paid or provision for the payment thereof has been made in accordance with the Bond Indenture, as follows: (a) into the Debt Service Fund not less than five days preceding each Interest Payment Date on the Bonds, an amount which is not less than the interest to become due on such Interest Payment Date, except that the Corporation may be entitled to certain credits on such payments as permitted under the Loan Agreement; (b) into the Debt Service Fund not less than five days preceding each principal payment date on the Bonds an amount which is not less than the next installment of principal due on the Bonds on such principal payment date, except that the Corporation may be entitled to certain credits on such payments as permitted under the Loan Agreement; and (c) into the Debt Service Fund on or before the date required or permitted by the Loan Agreement or the Bond Indenture for the redemption of the Bonds, the amount intended or required to redeem the Bonds then Outstanding if the Corporation exercises its right to redeem the Bonds under any provision of the Bond Indenture or if any Bonds are required to be redeemed under any provision of the Bond Indenture.

Notwithstanding any schedule of payments upon the Loan set forth in the Loan Agreement or in Obligation No. 1, the Corporation will make payments upon the Loan and will be liable therefor at the times and in the amounts (including interest, principal and redemption premium, if any) equal to the amounts to be paid as interest, principal and redemption premium, if any, whether at maturity or by optional or mandatory sinking fund redemption upon all Bonds from time to time Outstanding under the Bond Indenture.

Unpaid Loan Payments will bear interest at the applicable rate of interest on the Bonds.  Any interest charged and collected on an unpaid Loan Payment will be deposited to the credit of the Debt Service Fund and applied to pay interest on overdue amounts in accordance with the Bond Indenture.

**Credits on Loan Payments**

Notwithstanding any provision contained in the Loan Agreement or in the Bond Indenture to the contrary, the Corporation is to receive credit for payment on the Loan, in addition to any credits resulting from payment or prepayment from other sources, as follows:

(a)     any moneys deposited by the Bond Trustee or the Corporation in the Debt Service Fund as interest will be credited against the obligation of the Corporation to pay interest on the Loan as the same becomes due;

(b)     any moneys deposited by the Bond Trustee or the Corporation in the Debt Service Fund as principal will be credited against the obligation of the Corporation to pay the principal of the Loan as the same becomes due;

(c)     the investment income accruing to the Debt Service Fund and the amount of any moneys transferred by the Bond Trustee from any other fund held under the Bond Indenture and deposited in the Debt Service Fund as interest or principal will be credited against the obligation of the Corporation to pay interest or principal, as the case may be, on the Loan as the same become due;

(d)     on installments of principal and interest in an amount equal to the principal amount of the Bonds for the payment at maturity or redemption of which sufficient amounts (as determined pursuant to the Bond Indenture) in cash or Defeasance Obligations are on deposit as provided in the Bond Indenture to the extent such amounts have not previously been credited against such payments, and the interest on such Bonds from and after the date fixed for payment at maturity or redemption thereof (which credits will be made against the installments of principal and interest which would have been used, but for such call for redemption, to pay principal of and interest on such Bonds when due);

(e)     on installments of principal and interest in an amount equal to the principal amount of the Bonds acquired by the Corporation and surrendered to the Bond Trustee for cancellation or purchased by the Bond Trustee on behalf of the Corporation and canceled, and the interest on such Bonds from and after the date interest thereon has been paid prior to cancellation (which credits will be made against the installments of principal and interest which would have been used, but for such cancellation, to pay principal of and interest on such Bonds when due); and

(f)     on installments of principal and interest in an amount equal to payments made under Obligation No. 1 which have been received by the Bond Trustee.

**Additional Payments**

The Corporation will make the following additional payments to the following Persons:

*Authority Fees.*  The Corporation has heretofore paid the Authority an initial planning service fee.  The Corporation will agree in the Loan Agreement to pay to the Authority an Annual Planning Service Fee in accordance with the agreement between the Corporation and the Authority, as the same may be amended from time to time, plus any amounts required to reimburse the Authority for any out-of-pocket fees and expenses, including fees and disbursements of attorneys incurred by the Authority as a result of its performance of any act required or contemplated by the provisions of the Loan Agreement, the Bond Indenture or any other document in connection therewith.  The sum of such payments and the initial planning service fee will at all times be in an amount which does not cause the Corporation to violate the provisions of the Loan Agreement.

*Bond Trustee, Agent and Professional Fees.*  The Corporation will pay to the Bond Trustee and any Paying Agent, registrars, counsel, accountants, rebate analysts, and other Persons when due, all reasonable fees, charges and expenses of such Persons for services rendered under the Bond Indenture, the Loan Agreement, the Master Indenture, Obligation No. 1 or any other document related thereto and expenses incurred in the performance of such services thereunder for which such Persons are entitled to payment or reimbursement, including expenses of compliance with the provisions of the Tax Certificate, and such obligations of the Corporation described in this paragraph will survive discharge and termination of the Loan Agreement.

*Advances by Bond Trustee.*  The Corporation will pay to the Bond Trustee the amount of all advances of funds made by the Bond Trustee under the provisions of the Loan Agreement or the Bond Indenture, with interest thereon at the prime rate announced from time to time by the Bond Trustee.

*Arbitrage Rebate Payments.*  The Corporation will pay to the Bond Trustee all amounts to be deposited to the Rebate Fund, as and when the same become due as determined pursuant to the Bond Indenture, to the extent there are no other amounts available to make such deposits, and the Bond Trustee will apply such funds in compliance with the Bond Indenture.

*Costs of Enforcement.*  In the event the Corporation defaults under any of the provisions of the Loan Agreement and the Bond Trustee and/or the Authority employ attorneys or incur other expenses for the collection of required payments or the enforcement of performance or observance of any obligation or agreement on the part of the Corporation contained in the Loan Agreement, the Corporation on demand therefor is to pay to the Bond Trustee and/or the Authority, as applicable, the reasonable fees of such attorneys and such other expenses so incurred by the Bond Trustee and/or the Authority.  The Corporation also will pay, and will indemnify the Authority and the Bond Trustee from and against, all fees, costs, expenses and charges, including reasonable counsel fees, incurred for the collection of payments due or for the enforcement or performance or observance of any covenant or agreement of the Corporation under the Loan Agreement, Obligation No. 1, the Bond Indenture, the Tax Certificate or any other document related to the foregoing.

*Taxes and Assessments.*  The Corporation will pay all taxes and assessments with respect to its property; provided, however, that the Corporation will have the right to protest any such taxes or assessments and will have the right to withhold payment of any such taxes or assessments pending disposition of any such protest or contest unless such withholding, protest, or contest would materially adversely affect the rights or interests of the Authority or the Bond Trustee.

*Removal or Substitution of Bond Trustee.*  The Corporation agrees to pay all costs and expenses which may be incurred in connection with any removal or substitution of the Bond Trustee and the appointment of any successor trustee.

*Other Amounts Payable.*  The Corporation will pay to the Person or Persons entitled thereto, any other amounts which the Corporation has agreed to pay under the Loan Agreement or which the Corporation is required to pay under the Bond Indenture.

## Corporate Existence and Tax-Exempt Status

Except as otherwise expressly provided in the Loan Agreement or the Master Indenture, the Corporation has agreed to (a) preserve and keep in full force and effect its corporate or other separate legal existence, (b) remain qualified to do business and conduct its affairs in each jurisdiction where ownership of its property or the conduct of its business or affairs requires such qualification, (c) maintain its status as a Tax-Exempt Organization and (d) preserve and keep its status as a "health institution" within the meaning of the Act.

## Assignment by the Corporation

The Corporation will not assign the Loan Agreement, as a whole or in part, without the prior written consent of the Authority and the Bond Trustee, unless such assignment is pursuant to a merger, consolidation or transfer of the Corporation's property substantially as an entirety permitted under the Master Indenture and the Loan Agreement, or unless the following conditions are met:

    (a)    No assignment will relieve the Corporation from primary liability for any of its obligations under the Loan Agreement, and in the event of any such assignment, the Corporation will continue to remain primarily liable for payment of the amounts specified in the Loan Agreement and the performance and observance of the other agreements to be performed and observed by the Corporation under the Loan Agreement to the same extent as though no assignment had been made.

    (b)    The assignee will assume the obligations of the Corporation under the Loan Agreement to the extent of the interest assigned.

    (c)    If there remains unpaid any Bond which bears interest that is not includable in gross income under the Code, the Bond Trustee and the Authority have received (i) an Opinion of Bond Counsel, in form and substance satisfactory to the Bond Trustee and the Authority, to the effect that under then existing law the consummation of such assignment, whether or not contemplated on any date of the delivery of such Bond, would not cause the interest payable on such Bond to become includable in gross income for federal income tax purposes and (ii) an Opinion of Counsel that such merger or assignment complies with applicable law.

    (d)    The Corporation will, within 30 days after the delivery thereof, furnish or cause to be furnished to the Bond Trustee and the Authority a true and complete copy of each assignment and assumption of obligations.

## Maintenance and Insurance

The Corporation will be obligated to maintain its Property, including the Project, in good repair and working order.  During the term of the Loan Agreement, the Corporation must also cause its health

care facilities, including the Project, to be insured against loss to the extent provided in the Master Indenture.  See "THE MASTER INDENTURE—*Insurance*" herein.

**Casualty Loss and Condemnation**

Upon casualty loss or condemnation of the Corporation's health care facilities, all buildings, improvements and equipment acquired in the repair, rebuilding or restoration of the Corporation's health care facilities pursuant to the provisions of the Bond Indenture will be deemed a part of the Corporation's health care facilities and will be available for use and occupancy by any Member of the Obligated Group without payment of any payments under the Loan Agreement other than the Loan Repayments and other payments specifically required to be made as described under "—Loan Payments and Other Amounts Payable" and "—Additional Payments" herein.  See also "THE MASTER INDENTURE—*Insurance*" herein.

**Events of Default**

The following are certain of the "events of default" under the Loan Agreement:

(a)     default in the payment of any interest on the Loan or Obligation No. 1 when such interest becomes due and payable;

(b)     default in the payment of the principal of, or premium, if any, on the Loan or Obligation No. 1 when the same becomes due and payable (whether at maturity, upon proceedings for redemption, by acceleration or otherwise);

(c)     default in the performance, or breach, of any covenant or agreement of the Corporation in the Loan Agreement (other than a covenant or agreement a default in the performance or breach of which is specifically dealt with elsewhere in the section of the Loan Agreement summarized under this subheading), and continuance of such default or breach for a period of 30 days after the Bond Trustee or the Authority has given to the Corporation (or the Owners of at least 25% in principal amount of the Bonds Outstanding have given to the Bond Trustee and the Corporation) a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such 30-day period, but can reasonably be expected to be fully remedied, such default will not constitute an event of default if the Corporation immediately upon receipt of such notice commences the curing of such default and thereafter prosecutes and completes the same with due diligence and dispatch;

(d)     any representation or warranty made by the Corporation in the Loan Agreement or in any written statement or certificate furnished to the Authority or the Bond Trustee or the purchaser of any Bond in connection with the sale of any Bond or furnished by the Corporation pursuant to the Loan Agreement proves untrue in any material respect as of the date of the issuance or making thereof and is not corrected or brought into compliance within 30 days after the Bond Trustee or the Authority has given to the Corporation (or the Owners of at least 25% in principal amount of the Bonds Outstanding have given to the Bond Trustee and the Corporation) a written notice specifying such default or breach and requiring it to be remedied; provided, that if such default cannot be fully remedied within such 30-day period, but can reasonably be expected to be fully remedied, such default will not constitute an event of default if the Corporation immediately upon receipt of such notice commences the curing of such default and thereafter prosecutes and completes the same with due diligence and dispatch;

(e)      the entry of a decree or order by a court having jurisdiction in the premises for relief in respect of the Corporation, or adjudging the Corporation a bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, adjustment or composition of or in respect of the Corporation under the United States Bankruptcy Code or any other applicable federal or state law, or appointing a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of or for the Corporation or any substantial part of its property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order remains unstayed and in effect for a period of 60 consecutive days;

(f)      the commencement by the Corporation of a voluntary case, or the institution by it of proceedings to be adjudicated a bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, arrangement or relief under the United States Bankruptcy Code or any other applicable federal or state law, or the consent or acquiescence by it to the filing of any such petition or the appointment or or taking possession by a custodian, receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of the Corporation or any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability or its failure to pay its debts generally as they become due, or the taking of corporate action by the Corporation in furtherance of any such action; or

(g)      the occurrence and continuance of any "event of default" specified in the Bond Indenture or in the Master Indenture that has not been properly cured or waived.

The foregoing provisions of subsections (c) and (d) of the section of the Loan Agreement summarized above are subject to the following limitations: If by reason of *force majeure* the Corporation is unable in whole or in part to carry out its agreements contained in the Loan Agreement, other than the obligations on the part of the Corporation contained in certain payment provisions in the Loan Agreement, in certain tax and arbitrage covenant provisions of the Loan Agreement and in certain insurance provisions in the Loan Agreement, the Corporation will not be deemed in default during the continuance of such inability.  The term "force majeure" means, without limitation, the following: acts of God; strikes, lockouts or other industrial disturbances; acts of public enemies; orders of any kind of the government of the United States of America or of the State or any of their departments, agencies, or officials, or any civil or military authority, including, without limitation, orders, rules or regulations of any such entities having jurisdiction over the rates and fees charged by the Corporation for its facilities and services; insurrections; riots; epidemics; landslides; lightning; earthquake; fire; hurricane; tornadoes; storms; floods; washouts; droughts; arrests; restraint of government and people; civil disturbances; explosions, breakage or accident to machinery, transmission pipes or canals, partial or entire failure of utilities; or any other cause or event not reasonably within the control of the Corporation.   The Corporation agrees, however, if possible, to remedy with all reasonable dispatch the cause or causes preventing it from carrying out its agreements; provided, that the settlement of strikes, lockouts and other industrial disturbances will be entirely within the discretion of the Corporation, and the Corporation will not be required to make settlement of strikes, lockouts or other industrial disturbances by acceding to the demands of the opposing party or parties when such course is in the judgment of the Corporation unfavorable to the Corporation.

**Remedies on Default**

***Acceleration of Maturity; Rescission and Annulment.***  If an event of default under the Loan Agreement occurs and is continuing, the Bond Trustee, as assignee of the Authority, may and will if requested by the Owners of not less than 25% in principal amount of the Bonds Outstanding by written notice to the Authority and the Corporation, declare the principal of the Loan and the interest accrued

thereon to be due and payable, and upon any such declaration such principal and interest will become immediately due and payable.

At any time after such a declaration of acceleration has been made, but before any judgment or decree for payment of money due on the Loan has been obtained by the Bond Trustee as provided in the Loan Agreement, the Bond Trustee may, by written notice to the Corporation, rescind and annul such declaration and its consequences if: (a) there is deposited with the Bond Trustee a sum sufficient to pay: (i) all overdue installments of interest on the Loan; (ii) the principal of, and premium, if any, on the Loan which has become due otherwise than by such declaration of acceleration and interest thereon at the rate prescribed therefor in the Bond Indenture; (iii) interest upon overdue installments of interest at the rate prescribed therefor in the Loan Agreement; and (iv) all sums paid or advanced by the Bond Trustee under the Bond Indenture and the reasonable compensation, expenses, disbursements and advances of the Bond Trustee, its agents and counsel; and (b) all events of default, other than the nonpayment of the principal of the Loan which has become due solely by such declaration of acceleration, have been cured or have been waived as provided in the Loan Agreement.  No such rescission and annulment will affect any subsequent default or impair any right consequent thereon.

***Exercise of Remedies by the Bond Trustee.***  Upon the occurrence and continuance of any event of default under the Loan Agreement, unless the same is waived as provided in the Loan Agreement, the Bond Trustee, as assignee of the Authority, will have the following rights and remedies, in addition to any other rights and remedies provided under the Loan Agreement or by law:

Right To Bring Suit, Etc.  The Bond Trustee, as assignee of the Authority, may pursue any available remedy at law or in equity by suit, action, mandamus or other proceeding to enforce the payment of the principal of, premium, if any, and interest on the Loan, including interest on overdue principal and premium, if any, and on overdue installments of interest, and any other sums due under the Loan Agreement, to realize on or to foreclose any of its interests or liens under the Loan Agreement, to enforce and compel the performance of the duties and obligations of the Corporation as set forth in the Loan Agreement and to enforce or preserve any other rights or interests of the Bond Trustee, as assignee of the Authority, under the Loan Agreement or otherwise existing at law or in equity.

Exercise of Remedies at Direction of Owners.   If requested in writing to do so by the Owners of not less than 25% in principal amount of Bonds Outstanding and if indemnified as provided in the Bond Indenture, the Bond Trustee, as assignee of the Authority, will be obligated to exercise such one or more of the rights and remedies conferred by the Loan Agreement as the Bond Trustee deems most expedient in the interests of the Owners of the Bonds.

Restoration of Positions.  If the Bond Trustee, as assignee of the Authority, has instituted any proceeding to enforce any right or remedy under the Loan Agreement by suit, foreclosure or otherwise, and such proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Bond Trustee, then and in every case the Corporation and the Bond Trustee, as assignee of the Authority, will, subject to any determination in such proceeding, be restored to their former positions and rights under the Loan Agreement, and thereafter all rights and remedies of the Bond Trustee will continue as though no such proceeding had been instituted.

Whenever any event of default has occurred and is continuing which results from the failure of the Corporation to pay to or perform for the Authority any payment covenant, agreement or warranty not assigned to the Bond Trustee, the Authority may (but need not) proceed directly against the Corporation and may take any action at law or in equity which it may deem necessary or desirable to collect or enforce such payment or performance in default.

**Amendments, Changes and Modifications**

Without the consent of the Owners of any Bonds, the Authority and the Corporation may from time to time enter into one or more Supplemental Loan Agreements, in form satisfactory to the Bond Trustee, for any of the following purposes:

(a)     to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the Loan, as set forth in the Loan Agreement, additional conditions, limitations and restrictions thereafter to be observed;

(b)     to evidence the succession of another corporation to the Corporation (in accordance with the Master Indenture) and the assumption by any such successor of the covenants of the Corporation contained in the Loan Agreement;

(c)     to add to the covenants of the Corporation or to the rights, powers and remedies of the Bond Trustee for the benefit of the Owners of all of the Bonds or to surrender any right or power conferred in the Loan Agreement upon the Corporation;

(d)     to cure any ambiguity, to correct or supplement any provision in the Loan Agreement which may be inconsistent with any other provision in the Loan Agreement or to make any other provisions, with respect to matters or questions arising under the Loan Agreement, which will not be inconsistent with the provisions of the Loan Agreement, so long as such action does not adversely affect the interests of the Owners of the Outstanding Bonds;

(e)     to amend or supplement any provision relating to the Unassigned Rights, so long as such action does not adversely affect the interests of the Owners of the Outstanding Bonds; or

(f)     to make any other change in the Loan Agreement that, in the opinion of the Corporation and the Bond Trustee, will not prejudice in any material respect the interests of the Owners of the Outstanding Bonds.

In addition to entering into Supplemental Loan Agreements as described in the previous paragraph, with the consent of the Owners of not less than a majority in principal amount of the Bonds then Outstanding affected by such Supplemental Loan Agreement, the Authority and the Corporation may enter into Supplemental Loan Agreements, in form satisfactory to the Bond Trustee, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Loan Agreement or of modifying in any manner the rights of the Bond Trustee and the Owners of the Bonds under the Loan Agreement, except that no such Supplemental Loan Agreement will, without the consent of the Owner of each Outstanding Bond affected thereby:

(a)     change the stated maturity of the principal of, or any installment of interest on, the Loan, or reduce the principal amount thereof or the interest thereon or any premium payable upon the redemption thereof, or change any place of payment where, or the coin or currency in which, the Loan, or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the redemption date);

(b)     reduce the percentage in principal amount of the Outstanding Bonds, the consent of whose Owners is required for any such Supplemental Loan Agreement, or the consent of whose Owners is required for any waiver provided for in the Loan Agreement of compliance with

D-53

certain provisions of the Loan Agreement or certain defaults under the Loan Agreement and their consequences; or

(c)      modify any of the provisions described in this paragraph, except to increase any percentage provided thereby or to provide that certain other provisions of the Loan Agreement cannot be modified or waived without the consent of the Owner of each Bond affected thereby.

The Bond Trustee may in its discretion determine whether or not any Bonds would be affected by any Supplemental Loan Agreement and any such determination will be conclusive upon the Owners of all Bonds, whether theretofore or thereafter authenticated and delivered under the Bond Indenture.  The Bond Trustee will not be liable for any such determination made in good faith.  It will not be necessary for the required percentage of Owners of the Bonds to approve the particular form of any proposed Supplemental Loan Agreement, but it will be sufficient if such act approves the substance thereof.

_____

**Appendix E**

_____


**FORM OF CONTINUING DISCLOSURE AGREEMENT**

(THIS PAGE INTENTIONALLY LEFT BLANK)

## CONTINUING DISCLOSURE AGREEMENT

This Continuing Disclosure Agreement dated as of October 1, 2015, between Vail Clinic, Inc., doing business as Vail Valley Medical Center (the "Corporation") and UMB Bank, n.a. (the "Dissemination Agent").  UMB Bank, n.a. is also the current bond trustee (the "Bond Trustee") under the Bond Indenture of Trust dated as of October 1, 2015 (the "Bond Indenture") between the Bond Trustee and the Colorado Health Facilities Authority (the "Authority").

RECITALS

1.	The Authority is issuing its Colorado Health Facilities Authority Hospital Revenue Bonds (Vail Valley Obligated Group Project), Series 2015 (the "Series 2015 Bonds") pursuant to the Bond Indenture.

2.	As of the date hereof, the Corporation and VVMC Diversified Services, doing business as VHS Physician Services ("Diversified Services"), are the sole members of the Obligated Group (defined below).

3.	In order to allow the underwriter of the Series 2015 Bonds to comply with Rule 15c2-12 promulgated by the Securities and Exchange Commission (the "SEC") under the Securities Exchange Act of 1934, as amended (17 CFR Part 240, § 240.15c2-12) (the "Rule"), the Obligated Group is required to make certain continuing disclosure undertakings for the benefit of the bondowners and beneficial owners of the Series 2015 Bonds.

4.	The Dissemination Agent is hereby appointed as Dissemination Agent hereunder with respect to the Series 2015 Bonds.

5.	This Agreement is intended to satisfy the requirements of the Rule.

Now, therefore, the parties hereto agree as follows:

Section 1. Definitions.  Capitalized terms used herein but not defined herein shall have the meanings given to them in the Bond Indenture and in the Master Trust Indenture dated as of October 1, 2015 among the Corporation, Diversified Services and UMB Bank, n.a., as Master Trustee (as supplemented by the Supplemental Master Indenture for Obligation No. 1 dated as of October 1, 2015, the "Master Indenture").  In addition, the following terms shall have the following meanings:

(a)	"Annual Financial Information" means the annual financial information, which shall be based on financial statements prepared in accordance with generally accepted accounting principles as in effect from time to time ("GAAP"), and operating data of the type set forth in Appendix A and Appendix B-1 to the Official Statement, which Annual Financial Information shall consist of (i) the Audited Financial Statements and (ii) an update of certain information contained in Appendix A to the Official Statement and identified in Exhibit A hereto.

(b)	"Audited Financial Statements" means the audited consolidated financial statements of the Holding Company and affiliates, including consolidating schedules showing the Members of the Obligated Group, substantially in the form set forth in Appendix B-1 to the Official Statement, combined financial statements of the Members of the Obligated Group, or separate financial statements of each Member of the Obligated Group, in each case prepared in accordance with GAAP and audited by a firm of independent accountants.

E-1

(c)    "Holding Company" means Vail Health Services or any successor or assign of which the Corporation is a direct or indirect wholly-owned subsidiary.

(d)    "Material Event" means any of the following events with respect to the Series 2015 Bonds:

(i)    Principal and interest payment delinquencies;

(ii)    Non-payment related defaults, if material;

(iii)    Unscheduled draws on debt service reserves reflecting financial difficulties;

(iv)    Unscheduled draws on credit enhancements reflecting financial difficulties;

(v)    Substitution of credit or liquidity providers, or their failure to perform;

(vi)    Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2015 Bonds, or other material events affecting the tax status of the Series 2015 Bonds;

(vii)    Modifications to rights of bondowners, if material;

(viii)    Bond calls, if material, and tender offers;

(ix)    Defeasances;

(x)    Release, substitution, or sale of property securing repayment of the Series 2015 Bonds, if material;

(xi)    Rating changes;

(xii)    Bankruptcy, insolvency, receivership or similar event of an Obligated Person;

(xiii)    The consummation of a merger, consolidation, or acquisition involving an Obligated Person or the sale of all or substantially all of the assets of an Obligated Person, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

(xiv)    Appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e)    "Material Event Notice" means written or electronic notice of a Material Event.

(f)    "MSRB" means the Municipal Securities Rulemaking Board or any other entity designated or authorized by the SEC to receive reports pursuant to the Rule.  Until otherwise designated by the MSRB or the SEC, filings with the MSRB are to be made through the Electronic Municipal Market Access ("EMMA") website of the MSRB currently located at http//emma.msrb.org/.

(g)    "<u>Obligated Group</u>" has the meaning given to such term in the Master Indenture.

(h)    "<u>Obligated Person</u>" means any Person who is either generally or through an enterprise, fund, or account of such Person committed by contract or other arrangement to support all or part of the Series 2015 Bonds (other than providers of municipal bond insurance, letters of credit, or other liquidity facilities).

(i)    "<u>Official Statement</u>" means the Official Statement dated October 1, 2015, delivered in connection with the original issue and sale of the Series 2015 Bonds.

(j)    "<u>Person</u>" means any individual, partnership, corporation, trust, or unincorporated organization, and any government or agency or political subdivision thereof.

(k)    "<u>Quarterly Financial Statements</u>" means the unaudited cumulative quarterly balance sheet and income statement of the Members of the Obligated Group substantially in the form set forth in Appendix B-2 to the Official Statement, in each case prepared in accordance with GAAP.

Section 2.    <u>Continuing Disclosure Undertaking</u>.

(a)    The Corporation, as the Obligated Group Representative (as defined in the Master Indenture), will provide the following information on behalf of the Obligated Group:

(1)    Annual Financial Information,

(2)    Quarterly Financial Information, and

(3)    Material Event Notices.

(b)    The Corporation shall while any Series 2015 Bonds are Outstanding provide Annual Financial Information to the Dissemination Agent within 150 days after the end of the Corporation's fiscal year and Quarterly Financial Information within 45 days after the end of each of the first three fiscal quarters of each fiscal year (each, a "Submission Date"), beginning with respect to the Corporation's fiscal year ending October 31, 2015 and fiscal quarter ending January 31, 2016.  The Dissemination Agent shall while any Series 2015 Bonds are Outstanding provide to the MSRB such Annual Financial Information and Quarterly Financial Information on or before the tenth day after the Dissemination Agent receives such Annual Financial Information or Quarterly Financial Information (the "Report Date").  The Corporation shall include with each submission of Annual Financial Information to the Dissemination Agent a written representation addressed to the Dissemination Agent to the effect that such submission is the Annual Financial Information required by this Agreement, and that such submission complies with the applicable requirements of this Agreement.  As to the Annual Financial Information and Quarterly Financial Information required by this Agreement, it shall be sufficient if the Corporation provides to the Dissemination Agent, and the Dissemination Agent provides to the MSRB, such Annual Financial Information or Quarterly Financial Information by specific reference to documents available to the public on the MSRB's website or filed with the SEC.

(c)    If a Material Event occurs while any Series 2015 Bonds are Outstanding, the Corporation shall provide a Material Event Notice to the Dissemination Agent in a timely manner not in excess of ten business days after the occurrence of the event, and the Dissemination Agent shall promptly provide such Material Event Notice to the MSRB.  Each Material Event Notice shall be so captioned and shall prominently state the date, title and CUSIP numbers of the Series 2015 Bonds.

(d)     With respect to information provided to the MSRB, the Dissemination Agent shall comply with all applicable MSRB requirements as to information format, methods of information transmission and identifying information.

(e)     The Dissemination Agent shall promptly advise the Corporation whenever, in the course of performing its duties as Dissemination Agent or as Bond Trustee, it identifies an occurrence which would require the Corporation to provide a Material Event Notice pursuant to subsection (c) above; provided that the failure to advise the Corporation of such occurrence shall not constitute a breach by the Dissemination Agent or Bond Trustee of any of its duties and responsibilities hereunder or under the Bond Indenture.

(f)     The Dissemination Agent shall, while any Series 2015 Bonds are Outstanding, without further direction or instruction from the Corporation, provide to the MSRB in a timely manner notice of any failure by the Dissemination Agent to provide Annual Financial Information or Quarterly Financial Information to the MSRB on or before the Report Date (whether caused by failure of the Corporation to provide information to the Dissemination Agent by the Submission Date or for any other reason).  For the purposes of determining whether information received from the Corporation is Annual Financial Information or Quarterly Financial Information, the Dissemination Agent shall be entitled to conclusively rely on the Corporation's written representation made pursuant to subsection (b) hereof.

(g)     If the Corporation provides to the Dissemination Agent information relating to the Corporation or the Series 2015 Bonds, which information is not designated as a Material Event Notice, and directs the Dissemination Agent to provide such information to the MSRB, the Dissemination Agent shall provide such information in a timely manner to the MSRB.

(h)     Unless otherwise required by law and subject to technical and economic feasibility, the Corporation and the Dissemination Agent shall employ such methods of information transmission as shall be reasonably requested or recommended by the designated recipients of the Corporation's information.

(i)     The continuing obligation hereunder of the Corporation to provide Annual Financial Information, Quarterly Financial Information and Material Event Notices and the Dissemination Agent's obligations under this Agreement shall terminate immediately once the Series 2015 Bonds are no longer Outstanding.  The Corporation's obligations under this Agreement shall also terminate once the Corporation is no longer an "obligated person" within the meaning of the Rule.  This Agreement, or any provision hereof, shall be null and void in the event that the Corporation delivers to the Dissemination Agent an opinion of nationally recognized bond counsel to the effect that those portions of the Rule which require the undertaking contained in this Agreement, or any such provision, are invalid, have been repealed retroactively or otherwise do not apply to the Series 2015 Bonds; provided that the Dissemination Agent shall have provided notice of such delivery and the cancellation of the undertaking contained in this Agreement to the MSRB.  This Agreement may be amended to the extent required or permitted by the Rule, or in connection with a change in the identity, nature or status of the Members of the Obligated Group or the types of businesses conducted by the Obligated Group; provided that any such amendment either (i) does not materially impair the interest of the bondowners or beneficial owners of the Series 2015 Bonds, in the determination of the Bond Trustee (which may be based on an opinion of counsel); or (ii) is approved by the owners of a majority in aggregate principal amount of the Series 2015 Bonds.  The Dissemination Agent shall provide notice of any such amendment to the MSRB.

(j)     Any failure by the Corporation to perform in accordance with this Agreement shall not constitute an "Event of Default" under the Bond Indenture or the Master Indenture, and the rights and remedies provided by the Bond Indenture and the Master Indenture upon the occurrence of an

"Event of Default" shall not apply to any such failure.  Neither the Dissemination Agent nor Bond Trustee shall have any power or duty to enforce this Agreement.  The bondowners and the beneficial owners of the Series 2015 Bonds may enforce specific performance of the obligations contained in this Agreement by any judicial proceedings available, and such action to compel performance shall be the sole remedy under this Agreement in the event of any failure of the Corporation to comply with this Agreement.

(k)     The Dissemination Agent shall not have any obligation to examine or review the Annual Financial Information or Quarterly Financial Information and neither shall it have a duty to verify the accuracy or completeness of the Annual Financial Information or Quarterly Financial Information.

Section 3.  <u>Future Members of Obligated Group</u>.  The Corporation is executing this Agreement as Obligated Group Representative as well as on its own behalf.  The Corporation hereby agrees that Annual Financial Information, Quarterly Financial Information and Material Event Notices shall be provided with respect to future Members of the Obligated Group, if any, and their respective operations.

Section 4.  <u>Termination Provisions</u>.  Either the Dissemination Agent or the Corporation may terminate this Agreement upon thirty days notice to the other party; provided, however, that upon such termination the Corporation shall either (i) enter into a new Continuing Disclosure Agreement (with substantially similar terms to this Agreement except to the extent that such changes which would be permitted pursuant to the amendment provisions hereof) with a different dissemination agent (which may be but is not required to be a successor trustee under the Bond Indenture), or (ii) undertake to provide continuing disclosure itself, in accordance with the Rule, without the assistance of a dissemination agent.  Any such undertaking that the Corporation shall provide continuing disclosure itself shall be evidenced by a Continuing Disclosure Certificate which shall replace this Agreement and which shall comply with the Rule.

Section 5.  <u>Fees of Dissemination Agent</u>.  As compensation for its services under this Agreement, the Dissemination Agent shall be compensated or reimbursed by the Corporation for its reasonable fees and expenses in performing the services specified under this Agreement.

IN WITNESS WHEREOF, the Corporation and the Dissemination Agent have caused this Agreement to be executed in their respective names, all as of the date first above written.

VAIL CLINIC, INC., on behalf of itself and as Obligated Group Representative

By: _____
    President and Chief Executive Officer

UMB BANK, n.a.

By: _____
    Vice President

**EXHIBIT A**

**ANNUAL FINANCIAL INFORMATION
TABLES TO BE UPDATED**

(Page numbers refer to Appendix A to Official Statement dated October 1, 2015)

Utilization ............................................................................................................................... A-22
Liquidity.................................................................................................................................. A-26
Historical and Pro Forma Debt Service Coverage ................................................................. A-27
Sources of Revenue................................................................................................................. A-28

(THIS PAGE INTENTIONALLY LEFT BLANK)