# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-02075-WJM-GPG

SPORTS REHAB CONSULTING, LLC, and
LINDSAY WINNINGER,

Plaintiffs,

v.

VAIL CLINIC, INC., d/b/a Vail Health,

Defendant.

---

## SPECIAL MASTER'S REPORT AND RECOMMENDATION REGARDING MOTION TO COMPEL #5

---

This matter has been referred to the Special Master by Magistrate Judge Gallagher for a Report and Recommendation regarding Plaintiffs' ("SRC" or "SRC and Winninger") Motion to Compel #5 (D. 195). The Special Master has considered the Defendant's ("Vail Health") response (D. 213), and the Plaintiffs' reply (D. 226). The transcript of the parties' October 21, 2021 oral argument on that motion was also reviewed, along with the parties' Joint Discovery Dispute Chart e-mailed to me on August 8, 2022.[1] Of particular importance to the analysis here is Vail Health's September 10, 2021 privilege log (D. 195-4) and an Amended Privilege Log dated November 2, 2021. (D. 396-1).

The matters raised in Motion to Compel #5 focus on Vail Health's responses to document production requests propounded by SRC and Winninger. As to the documents discussed here, Vail Health contends that those documents are immune from discovery due to the attorney-client privilege.[2] Vail Health has produced a privilege log identifying each document for which it

---

[1]     A copy of that chart is attached to the Special Master's Report and Recommendation Regarding Motion to Compel #2 (D. 381) and is not separately reproduced here.

[2]     Vail Health's privilege log identifies items #6-19 that are being withheld on relevance grounds, rather than on any claims of privilege. Relevance objections are not properly interposed via a privilege log and the Special Master's prior rulings have addressed issues relating to relevance. Vail Health also identifies items #21-24 as being subject not only to the attorney-client privilege, but also to "WP" – presumably the attorney work product privilege.

claims privilege.  SRC and Winninger challenge the appropriateness of Vail Health's invocation of privilege and the parties have briefed their positions on the issues in dispute.  Vail Health has produced the challenged documents pursuant to the Order of the Special Master for *in camera* review.  In August 2022, pursuant to an email request from the Special Master, the parties produced a Joint Discovery Dispute Chart addressing this motion.  Rather than narrowing or clarifying the parties' dispute, the chart presented a series of rhetorical questions that reflected some of the legal arguments raised in the parties' briefing.

Before turning to the merits of the parties' arguments, the Special Master is compelled to remind the parties of the obligations imposed by the Protective Order (D. 76) previously issued in this case on October 21, 2020.  Specifically, that Order directs that material that is identified by the producing party as "Confidential" (or bearing other similar designations) may only be used by the receiving party for purposes related to this case and may only be disseminated to a limited pool of recipients.  Although the burden is on Vail Health, as the producing party, to make the appropriate designations contemplated by the Protective Order, it is very likely that many of the documents addressed in this Report will warrant such designations and, accordingly, activate corresponding limitations on the uses that the Plaintiffs may make of them.

## A.  General Legal Principles

The purpose of the attorney-client privilege is to "encourage full and frank communication between attorneys and their clients" and "the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation."  *Upjohn Co v. U.S.*, 449 U.S. 383, 389 (1981).  The privilege is bilateral, existing "to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice."  *Id.* at 390.

In *Upjohn*, the dispute concerned the privileged status of survey questionnaires that the corporation's counsel had issued to managers and employees as part of an investigation into whether company representatives had paid bribes to foreign government officials.  The purpose of the investigation was to obtain facts that would allow counsel to provide the company with legal advice concerning the company's liability.  *Id.* at 394.  The government subpoenaed the employees' survey responses, and the company refused.  The Court of Appeals found the survey results to not be privileged because the information came from low-level employees, and it held that the attorney-client privilege runs only to he ranks of corporate managers and officers who actually controlled the company.  In reversing, *Upjohn* established the proposition that communications from mid- and low-level employees to counsel are within the privilege, just as much as communications from the corporation's officers and controlling management.

To be a protected communication, the party asserting privilege must show: (i) a communication, (ii) made between privileged persons (that is, the attorney, the client, and "any of their agents that help facilitate attorney-client communications or the legal representation"; (iii) in confidence; and (iv) for the purpose of requesting (by the client) or providing (by the

---

Neither side made any arguments regarding the applicability of the work product privilege, and thus, the Special Master makes no findings as to that issue.

attorney) legal advice to the client. *In re Teleglobe Comm's. Corp.*, 493 F.3d 345, 349 (3d Cir. 2007). The mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege. *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010). Rather, the party invoking the privilege must demonstrate that the substance of the communication "relate[s] to legal advice or strategy sought by the client." *Id.*

The Special Master emphasizes that the burden of proof is on the party claiming privilege in a document – here, Vail Health. Moreover, the scope of privilege is narrowly construed, and if Vail health fails to demonstrate all the facts necessary to permit the conclusion that a document is privileged, the court defaults to the conclusion that the document is <u>not</u> privileged and must be disclosed. *See Burke v. Regalado*, 935 F.3d 960, 1023 (10th Cir. 2019). More importantly, the party claiming privilege is required to demonstrate its applicability "as to specific questions or documents, not by making a blanket claim." *In re Grand Jury Proceedings*, 616 F.3d 1172, 1183 (10th Cir. 2010).

### B. Substantive Issues Presented In Briefing

The Plaintiffs' motion identifies four general issues[3] upon which they dispute Vail Health's claims of privilege: (1) whether business valuations performed by independent appraisers at the direction of a corporate attorney for the purpose of evaluating legal issues arising from a possible joint venture are privileged; (2) whether the privilege was waived by Vail Health when it made ostensibly-privileged communications using "business e-mail accounts" (rather than "Vail Health's e-mail system. personal emails, or through a Board portal") and in a particular situation where Board Chair Michael Shannon "included his outside assistant – who is not employed by Vail Health – on purported privileged communications"; (3) whether Vail Health, by "intentionally producing some documents to or from the appraisers about the joint venture, waived privilege related to the same subject matter"; and (4) whether privileged documents that Vail Health produced to third parties lost their privilege as a result. The Special Master addresses these four issues in detail.

### 1. Business valuations

According to the Plaintiffs, approximately 70 entries[4] on Vail Health's privilege log concern documents relating to business valuations conducted as part of Vail Health's

---

[3]     SRC and Winninger raise additional arguments concerning the sufficiency of the contents of Vail Health's privilege log. Those issues will be addressed, inferentially if not explicitly, in the course of the discussion below. The Plaintiffs also challenge the timeliness of Vail Health's privilege log. The Special Master finds that, in the context of this complex and heavily-adversarial litigation, Vail Health's production of the privilege log was not so late as to warrant a broad-scale sanction of blanket waiver as the Plaintiffs request.

[4]     As the movants, SRC and Winninger must identify the specific documents they seek to compel. Thus, the Special Master's review and findings herein are limited to the specific item

consideration of possible joint ventures with Steadman, VSO, and various other entities providing physical therapy services.

Vail Health argues that documents related to this issue fall into four general categories: (i) specific attorney-client communications; (ii) client-to-client communications, in which non-attorney employees or officials of Vail Health "discuss legal advice provided or are discussing information for the purpose of obtaining legal advice"; (iii) "attorney-client-appraiser" communications, in which "valuations were undertaken on the advice of counsel and were then provided to counsel for the purposes of obtaining legal advice regarding regulatory risks"; and (iv) "appraiser-client" communications in which the appraisers are communicating with Vail Health's non-attorney employees for the purpose of facilitating the appraisal.

### A. Attorney-client communications

In theory, communications between a client and their counsel would present the most straightforward case for application of the attorney-client privilege. But privilege does not attach simply because an attorney is involved in the communication. *In re Grand Jury Proceedings*, 616 F.3d at1182. Particularly in corporate settings, attorneys may be involved in a range of communications addressing business matters, strategic planning, budgeting, and other matters that do not necessarily call upon the attorney to render legal advice. These communications would not be privileged even though an attorney may have been a participant in such discussions. On the other hand, where some degree of factfinding is necessary to collect the information that an attorney requires in order to provide legal advice, the attorney's communications to the client directing that factfinding and communications back to the attorney detailing the results of that factfinding may be privileged.[5] *In re Allen*, 106 F.3d 582, 602-03 (4th Cir. 1997).

The Special Master again emphasizes that the burden is on Vail Health to demonstrate that each and every communication for which it claims privilege in this category involves a discussion with an attorney *that relates to the giving of legal advice*. Those showings must be

---

numbers recited in the Motion to Compel. For purposes of this section of the discussion, those item numbers are listed in D. 195 at n. 42, n. 53, n. 56, and n. 59.

[5]    It is important to note that the attorney-client privilege protects communications, not facts. *Upjohn*, 449 U.S. at 395-96. For example, if Vail Health's attorney asked for a third-party's appraisal of a contemplated joint venture, and the appraiser ultimately deemed the venture to have a fair market value of, say, $6.5 million, communications between Vail Health officials and Vail Health's attorneys reporting the appraiser's valuation (*e.g.* an email stating "the appraiser has told us that the FMV of the venture is $6.5 million. How does this affect us?") might be privileged, as those communications are made to the attorney in the course of Vail Health requesting legal advice. But the fact of the appraiser's valuation ("the FMV of the venture is $6.5 million") cannot be privileged. If the Plaintiffs sought to depose the appraiser or a Vail Health official and inquire "what did the appraiser determine the fair market value of the venture to be?," Vail Health could not object to that question as intruding on the attorney-client privilege, as the question seeks facts, not communications.

specific in nature as to each document, as Vail Health cannot simply rely on categorical arguments or general allegations about what the document contains. *Id.* at 1183, *see also WildEarth Guardians v. U.S. Forest Serv.*, 713 F.Supp.2d 1243, 1266 (D.Colo. 2010).

The Special Master finds that, as a general matter, Vail Health's presentation with regard to the items the Plaintiffs seek to compel is insufficiently specific to establish its claims of attorney-client privilege. To illustrate this point, the Special Master turns to a document that is already part of the record, one which Vail Health inadvertently disclosed and now seeks to claw back on privilege grounds.[6] Docket #196-5 is a six-part e-mail string from November 11, 2016, Chronologically, those parts are identified in Vail Health's privilege log as items #373, 379, 380, 381, 382, and 372. We will return to other portions of that document in the ensuing subsections of the discussion, but for purposes of this subsection of the analysis – that is, the analysis of communications between Vail Health officials and Vail Health's counsel – only one portion of the e-mail string, item #382, falls into that category.

Item #382 is Nicholas Brown's email to Doris Kirchner and Ted Sirotta (all three individuals being Vail Health executives), with Matthew Jones, Vail Health's counsel, as a cc:'d recipient. The document reads, "Doris and Ted, after spending some time reviewing, here are some thoughts," after which Mr. Brown provides a series of bullet points addressing certain financial figures. He concludes with "I have attached[7] both 10 year projections [ ], Haverford workpapers, and HTA draft workpapers for both the MSO visit rate and MSO Ownership. Happy to discuss further and walk through this analysis. Thanks again for your support during this process." Vail Health's privilege log describes item #382 as "Email conveying information for the purposes of seeking legal advice regarding proposed joint venture, with attached analysis prepared at the direction of legal counsel." Nothing in Vail Health's briefing, in Mr. Brown's affidavit, or any other portion of the record discusses item #382 in particular, and thus, the privilege log's Description of the document is the entirety of Vail Health's argument regarding the privileged status of this particular document.

The Special Master finds that the brief description in the privilege log fails to carry Vail Health's burden of proof to show that the communication in item #382 is attorney-client privileged. To reiterate, a communication is privileged if it is: (i) between an attorney and a client, (ii) for the purpose of requesting or supplying legal advice; and (iii) kept confidential. It is self-evident that the document satisfies the first element – that Mr. Jones, a Vail Health attorney, is a recipient on the communication and sender and other recipients are all officials of Vail Health. But the remaining two elements are not apparent from the face of the document itself. Mr. Jones is copied on the document, but Mr. Brown's purpose in involving Mr. Jones in the discussion is not clear. Mr. Brown does not address any questions to Mr. Jones, nor indicate

---

[6]    Using a document that is already in the record facilitates the further review of the Special Master's findings by the Magistrate and District Judges without requiring additional production of numerous extra-record documents submitted by Vail Health for the Special Master's *in camera* review.

[7]    No attachments are included in the version of the document filed with the court.

that the information being supplied was requested by Mr. Jones, nor is the information Mr. Brown conveys information whose very nature makes clear that it is provided for purposes of legal advice (as opposed to, say, business or finance purposes).  Nor is there any evidence in the record that the information being conveyed by Mr. Brown is confidential and intended to be kept so.  Certainly, nothing on the face of the document establishes the contention in the privilege log that Mr. Brown is "seeking legal advice" from Mr. Jones through this communication.

Giving full consideration to Vail Health's position, the Special Master broadens out the analysis somewhat and reflects on item #382 in a more general context, informed by: (i) the remainder of the email string in which it is found, (ii) Mr. Brown's affidavit, and (iii) Vail Health's over-all arguments in its response brief.  As Vail Health's brief recites generally, and Mr. Brown's affidavit discusses in slightly greater detail, Vail Health requested legal opinions from Mr. Jones as to whether joint ventures that Vail Health was contemplating with other physical therapy providers would comply with anti-kickback statutes and other legal and regulatory restrictions applicable to such ventures.  As Vail Health explained in another discovery filing in this case, "transactions between a hospital and physicians [ ] must generally occur at fair market value" in order to satisfy these legal and regulatory burdens, making it necessary for Vail Health's attorneys to determine the fair market value (sometimes "FMV") of the proposed venture.  *See* D. 176 at 8.  The email string in which item #382 is found involves a third-party appraiser retained by Vail Health reporting some conclusions about the FMV of the proposed venture and Vail Health executives discussing the appraiser's conclusions among themselves and with Mr. Jones.

But even assuming that: (i) Vail Health had demonstrated that Mr. Jones specifically requested that Mr. Brown procure a valuation opinion as part of factfinding attendant to Mr. Jones giving legal advice to Vail Health, and (ii) the valuation being discussed in item #382 is the information Mr. Jones requested, the showing regarding item #382 is still insufficient.  Vail Health has not demonstrated that the topics being discussed by Mr. Brown in item #382 are topics that are necessary to Mr. Jones' legal analysis, as opposed to strategic business or finance matters arising out of the valuation.  It is possible that the specific data points Mr. Brown highlights in item #382 are critical to Mr. Jones' legal analysis of anti-kickback issues.  It is also possible that Mr. Brown is primarily talking to other Vail Health executives about the business implications of the valuation opinion and that Mr. Jones is included only as a convenient or incidental recipient of that business discussion.  The Special Master re-emphasizes that Vail Health has the burden of proof to show that the communication is legal in nature, and any uncertainty as to what Mr. Brown's purposes are in this correspondence works to Vail Health's detriment.  Thus, the conclusion remains that Vail Health has not carried its burden of proof to show that the communication is privileged.

The Plaintiffs calculate that there are 238 entries on Vail Health's privilege log that involve communications by or to an attorney, but Vail Health has not offered a separate analysis justifying its claim of privilege for each of those 238 documents.  Vail Health's brief identifies only 16 specific documents it alleges fall into the subcategory of attorney-client communications, and as to those 16 documents, it makes only a categorical argument that those documents are privileged because "[t]hey are communications from a client to an attorney seeking legal advice."  (D. 213 at 8).  For the same reasons above, the Special Master finds that

the conclusory assertion that documents are "seeking legal advice" does not suffice to carry Vail Health's burden of proof. Although there may be rare instances where a document, on its face, clearly contains an obvious request for or delivery of legal advice, in most cases, the documents in question require considerable interpretation, explanation, and additional context before their significance becomes clear. It is Vail Health's burden, not the Special Master's, to locate and present this contextual information and show how it demonstrates that the communication is indeed one relating to legal advice, but Vail Health's abbreviated and conclusory briefing regarding the pertinent documents fails to do so. Certainly, the Special Master will not marshal the evidence or create arguments on Vail Health's behalf. Instead, it suffices to find that Vail Health has not carried its burden of proving that the identified documents are privileged and it must therefore Disclose each of the items sought by the Plaintiffs, *see* n. 4, except as noted below.[8]

Once again, to be fully comprehensive, the Special Master notes that Vail Health's brief offers some additional argument as to only two specific documents, items #252 and #376. *See* D. 213 at 8-9. Another attorney-client document, item #172, is discussed later in Vail Health's brief. In addition, the affidavit of Nicholas Brown, D. 213-3, offers brief explanations of Vail Health's position regarding certain additional documents. Of those, the only one involving direct communications with counsel is item #293. *Id.*, ¶ 6. To give Vail Health the full benefit of its briefing, the Special Master will address these documents individually.

Item #252 (discussed in D. 213 at 9) is an email string between Mr. Brown and Mr. Jones with Ms. Kirchner and Mr. Shannon copied as recipients, with certain draft PowerPoint presentations attached. According to Vail Health's response brief, this document "is an email . . . seeking legal input on a draft presentation." Vail Health's privilege log describes this document as an "email seeking legal advice." The Special Master finds that the document on its face does not clearly indicate that Mr. Brown is seeking advice. The only potential evidence of such a request is Mr. Brown using the term "legalese" at one point. A related communication (item #251) references a mutually-agreeable presentation, which in the full context is neither legal advice nor material subject to attorney-client privilege. Thus, the Special Master finds that Vail Health has not carried its burden to show that item #252 is privileged. Disclose.

Item #376 (discussed in D. 213 at 9) is an email from Mr. Brown to Mr. Jones. Vail Health's brief describes it as "seeking legal advice on the Stark Law after an internal discussion about a valuation." The privilege log describes the document as an "email conveying information for use in obtaining legal advice regarding joint venture." (The log also indicates that the "attached valuations [were] prepared at the direction of legal counsel.") The first message in the email references draft exhibits that are attached and summary conclusions from Nicolas Newsad, a third-party appraiser, regarding "puts and calls." The second message is from Mr. Brown to Mr. Jones expressing "concerns" about language in the presentation materials. Neither document is, on its face, purporting to seek legal advice, and there is no meaningful evidence showing that Mr. Jones requested

---

[8]   To the extent a given item included an attachment, the attachment shall be disclosed as well.

that information for the purpose of rendering legal advice.  As such, Vail Health has not carried its burden of showing that the documents are privileged.  Disclose.

Item #172 (discussed in D. 213 at 12) is an email string apparently initiated by Mr. Brown, and includes Mr. Jones and a second Vail Health attorney, Mr. Auten, as recipients.  Vail Health's brief describes this document as "a meeting request from Vail Health to discuss concerns about safe harbor regulations and Stark Law issues."  In this instance, the Special Master is satisfied that, on its face, the document is between Vail Health officials and Vail Health's counsel, that the purpose of the communication is to request legal advice from Mr. Jones and Mr. Auten, and by all appearances, the communication has otherwise been kept confidential.  The Special Master finds that item #172 is protected from disclosure by the attorney-client privilege.  Not Disclose.

Item #293 (discussed in Mr. Brown's affidavit, ¶ 6) contains two emails from Mr. Brown to Mr. Jones and other Vail Health officials.  Its contents clearly involve Mr. Brown requesting Mr. Jones' legal advice on an alternative potential joint venture with VSO. The Special Master is satisfied that the document is protected by attorney-client privilege. Not Disclose.

### B. Client-to-client communications

Next, Vail Health describes certain documents on the privilege log as reflecting "client-client communications," in which non-attorney officials of Vail Health confer with one another to "discuss legal advice provided or are discussing information for the purpose of obtaining legal advice."

As *Upjohn* discusses, "it will frequently be employees beyond the control group [of] officers and agents . . . who will possess the information needed by the corporation's lawyers" and that "it is only natural that [middle- and lower-level employees] would have the relevant information needed by corporate counsel if he is adequately to advise the client" in certain situations.  449 U.S. at 391.   The attorney-client privilege must therefore accommodate the channels by which information germane to legal advice flows up from rank-and-file employees to the corporate attorney's office and by which legal advice flows back down.  As *Williams v. Sprint/United Mgmt. Co.*, 2006 WL 266599 (D.Ks. Feb. 1, 2006), explains, "[i]n preparation for, or in the midst of, consultations with an attorney, employees of the client will often consult one another to ensure that the attorney's advice is based on full knowledge of all relevant facts," and those consultations are as deserving of privilege as the communications directly involving the attorney.  Consequently, it is appropriate to conclude that employee-to-employee communications that pass otherwise privileged legal communications up or down the chain of command would retain that privileged status, as well as communications among employees that are for the purpose of collecting all relevant information to present to the attorney for evaluation and advice.

But that is not to say that all employee-to-employee discussions that touch upon matters of legal advice are necessarily privileged.  Once again, the privilege is intended to protect the confidentiality of a request for and delivery of a legal opinion and foster uninhibited

communication between attorneys and clients. Discussions among employees as to how to react to a legal opinion that has been given do not implicate the same concerns. Thus, a communication among non-attorney employees that informs others of the attorney's advice would probably be privileged, but a communication that discusses how employees should address that advice (*e.g.* "the attorney has advised that we cannot do X, what should we do instead?") would not be privileged.

It is appropriate for us to again revisit the November 11, 2016 email chain in D. 196-5 to illustrate these principles. Four of the e-mails in this string consist of Vail Health officials – Ms. Kirchner, Mr. Brown, and Mr. Sirotta – communicating solely amongst themselves, without including Mr. Jones or any other attorney. In the first email, item #379 in the privilege log, Mr. Brown appears to be forwarding a third-party appraiser's message on to Ms. Kirchner and Mr. Sirotta. Mr. Brown's message consists entirely of "FMV for MSO JV Model. I am reviewing." In the next message, item #380, Ms. Kirchner responds to Mr. Brown with the question "How does this compare with the previous valuation?" In the third message, item #381, Mr. Brown responds to Ms. Kirchner "Still reviewing. It is a different approach so I need to dig into it . . ." and he makes certain brief observations about the appraiser's findings. Finally, after Mr. Brown's email to Ms. Kirchner, Mr. Sirotta, and Mr. Jones discussed above, Mr. Sirotta writes to Mr. Brown, item #372, offering "my comments/questions" and lists several bullet points relating to certain financial matters tied to the appraiser's findings. For each of these items, Vail Health's privilege log describes them as being "email discussing information conveyed for the purposes of seeking legal advice regarding proposed joint venture."

As with the prior discussion, neither Vail Health's briefing nor Mr. Brown's affidavit offers any additional context or further discussion about the circumstances of items #372 and #379-82, and thus, the privilege log provides the entirety of Vail Health's argument that these documents are privileged. The terse, conclusory explanation in the privilege log is insufficient to carry Vail Health's burden of showing that the documents involve the confidential discussion of information for purposes of giving or receiving legal advice. On their face, nothing in the documents gives the slightest indication that they are discussing legal advice delivered by Mr. Jones or any other attorney, much less that the author of the communication is requesting that the recipient gather more information that will be provided to the attorney. For example, Ms. Kirchner asking Mr. Brown how the appraiser's opinion compares to a different appraiser's opinion does not appear to be a question that Ms. Kirchner is asking in order to collect information that she will then present to an attorney as part of a request for legal advice. Mr. Brown is not an attorney and his assessment of how one appraisal opinion compares to another cannot possibly provide legal advice to Ms. Kirchner. She is simply asking Mr. Brown to summarize facts for her. Her purpose for requesting that summary is entirely unclear, and the Special Master will not arbitrarily assume that that purpose is legal in nature, rather than being financial or strategic or otherwise.

Likewise, Mr. Brown's response – "still reviewing . . . I need to dig into it" also does not appear to be any sort of discussion of any legal advice or opinion. Mr. Brown highlights some differences between the two valuation opinions, but nothing in the record would permit the

finding that the differences identified by Mr. Brown to Ms. Kirchner relate to legal advice.[9] Assuming, for example, that Mr. Jones previously advised all of the officials that a particular variable must fall within a given range (say, it must exceed $75,000) in order for Vail Health being legally able to complete the joint venture, Mr. Brown and Ms. Kirchner discussing whether that variable falls into the permitted range is not attorney-client privileged communication. Rather, it is two laypeople discussing how to react to the advice their counsel gave, in light of facts they have obtained. The most likely conclusion that the Special Master reaches from reviewing these messages is that the officials involved are discussing concerns that are significant to the business decisions that Vail Health might make regarding the joint venture. Because it is Vail Health's obligation to demonstrate that each communication involves co-workers communicating information to each other for the purpose of obtaining legal advice, and Vail Health has not shown any facts that warrant that conclusion, the Special Master finds that Vail Health has not carried its burden of showing that these documents are subject to privilege.

Again, the same finding is warranted as to all client-client documents that Vail Health claims as privileged, but which are supported only by brief, conclusory descriptions in the privilege log or brief, rather than by specific factual development in Vail Health's brief or Mr. Brown's affidavit. Vail Health's brief identifies 20 specific items that it contends are privileged "because they discuss legal advice provided or are discussing information for the purpose of obtaining legal advice," but Vail Healh offers no further explanation or context of how each document reflects those characteristics. Categorical arguments fail to establish the necessary elements of privilege for each requested document, and without specific explanation of how the contents and context of each document justifies a finding of privilege, the Special Master will not make Vail Health's arguments for it. Thus, the Special Master directs all of the documents in this category that the Plaintiffs have sought must be be Disclosed.

Three documents receive slightly more discussion in Vail Health's brief and the Special Master addresses them individually.

Items #440 and 441 are specifically discussed by Vail Heath in D. 213 at 9 and Mr. Brown's affidavit at ¶12-13. Vail Health's brief describes these communications as "providing a copy of the latest draft valuation for their review so that Vail Health could approach its attorneys with further questions about regulatory compliance." Mr. Brown's affidavit similarly states that "members of Vail Health's leadership would discuss the contents of fair market value analyses along with the advice provided by [attorneys] so

---

[9]    At best, Vail Health would have to argue that Mr. Brown's comments to other non-lawyers reflects his understanding and his explanations of Mr. Jones' legal advice. Cases like *Upjohn* and *Williams* seem to acknowledge that communications of attorney advice among co-workers can be protected by privilege, but the purposes of shielding attorney-client communications from discovery quickly get strained when non-attorneys attempt to offer their own interpretations of legal advice to others. Much like in the children's game of "Telephone," the attorney's original advice can quickly become contaminated with miscommunications and misinterpretations as it passes among non-attorney employees, to the point where the purpose of the attorney-client privilege – fostering candid communications – becomes lost.

that we could determine what further [legal] advice we needed to make a decision." Item #440 consists of an email from Mr. Brown to Mr. Sirotta, attaching an appraiser's FMV report, and advising Mr. Sirotta to contact Mr. Brown "if you need further revisions or clarifications."

Item #441 is from Mr. Brown to other non-attorney Vail Health officials, forwarding the appraiser's report and noting that Mr. Brown looks forward to discussing it and bringing printed copies "for our meeting." Once again, the privilege log describes these communications as being "for the purposes of seeking legal advice" (or that the underlying appraisal report being discussed was "prepared at the direction of legal counsel"), but the face of the documents do not demonstrate this fact. None of the senders or recipients were attorneys, and there is no evidence whatsoever of any legal counsel advice being discussed. The attorney-client privilege is not so flexible that it shields general business discussions among corporate officials simply because those officials might eventually seek legal advice regarding whatever business strategy the officials ultimately decide to pursue. Particularly where the communications are solely among non-attorneys, the reasoning of *Upjohn* and similar cases will stretch only enough to cover those communications that are proximately related to a request for legal advice. If, for example, the items in question entailed Mr. Brown canvassing his fellow officials for questions to be presented to Vail Health's attorneys, the Special Master might be persuaded that those communications might be privileged. But here, Mr. Brown is simply attaching items for the recipients' review, in anticipation of future discussions. The connection between those communications, the subsequent discussions, and any request for legal advice that might eventually result thereafter is too attenuated to warrant a finding of privilege. Disclose.

Item #544 (discussed in Mr. Brown's affidavit, ¶ 15) is a 2019 email from Mr. Brown to Will Cook, Vail Health's then-new CEO, attaching several documents identified as "Financial Forecasts and Valuations" for the proposed joint ventures dating back to 2015-2017. According to Mr. Brown's affidavit, these historical documents were "previously generated at the direction of counsel," and were provided to Mr. Cook "so that he could understand the history of the prior regulatory issues we had faced when considering past joint venture opportunities." It is sensible to conclude that attorney-client privileged communications do not become stale. That is, if a communication was privileged when it is first made, it may retain that status over the passage of time and providing the old communication to a new employee to advise the employee of what the attorney has previously instructed would still fall within the purposes of the privilege. Thus, Vail Health must demonstrate that the materials Mr. Brown communicated to Mr. Cook were properly the subject of privilege at the time they were made. It has not done so. Although Mr. Brown's affidavit describes them as documents that had been "generated at the direction of counsel," not all documents that an attorney generates (much less directs

others to generate[10]) are necessarily generated for the purpose of providing legal advice.[11] Here, item #544 involves Mr. Brown sharing "forecasts and valuations" with Mr. Cook. Even assuming that a corporate attorney previously directed someone to prepare those forecasts or valuations, nothing in the record indicates that those forecasts and valuations were necessarily cloaked in privilege. Thus, Vail Health has not carried its burden of showing that item #544 is itself privileged. In any event, these documents would seem to simply be <u>facts</u> that are not protected by privilege. Disclose.

### C. Attorney-appraiser-client communications and appraiser-client communications

The final two categories of communications discussed by Vail Health are those in which third-party appraisers are involved. Vail Health describes two categories of documents as being those in which Mr. Jones or another attorney has asked Vail Health to obtain valuation opinions for the contemplated joint venture, for the purpose of providing legal advice as to the application of anti-kickback statutes and the like, and Vail Health has retained a third-party appraiser to provide that opinion. The documents in these categories involve communications between Vail Health officials and the third-party appraisers, with or without Vail Health's attorneys being included in those communications.

The inclusion of third parties in allegedly-privileged communications raises complex questions touching on the "confidentiality" element of the attorney-client privilege. In the influential case of *U.S. v. Kovel*, 296 F.2d 918 (2d Cir. 1961), the court discussed "under what circumstances, if any, the attorney-client privilege may include a communication to a nonlawyer by the lawyer's client." *Kovel* involved a subpoena issued to an accountant who had performed services for a client at the request of the client's attorney. When the accountant was subpoenaed as part of a criminal investigation into the client's activities, he claimed that his communications with the client and the client's attorney were privileged. In assessing that claim of privilege, the court gave the example of an attorney requiring the assistance of an interpreter to communicate with a client who spoke a foreign language and concluded that the interpreter's involvement in facilitating the communication would not vitiate the appropriateness of the privilege (even where the attorney instructed the interpreter to interview the client directly and summarize the client's statements for the lawyer's subsequent review). Extrapolating that analogy to the case at hand,

---

[10]     As the subsequent subsection explains, when an attorney requests information from third parties, even for the purpose of the attorney ultimately giving legal advice, privilege questions become even thornier.

[11]      For example, a manager might consult the corporate attorney about an instance of workplace misconduct, and the attorney might advise the manager to write up an incident report and place it in the employee's personnel file. The advice from the attorney to the manager ("write up an incident report...") might be privileged. But the incident report that the attorney directs to be prepared is not privileged if it is not thereafter provided to the attorney for further evaluation and advice. *See e.g. In re Advanced Pain Centers Poplar Bluff v. Ware*, 11 F.Supp.3d 967, 974-75 (E.D.Mo. 2014).

*Kovel* differentiated between two possible situations.  In one, the accountant was retained to "interpret" complex accounting concepts in order to facilitate the client's consultation with a lawyer, essentially "translating" the client's accounting information to terms the attorney could understand.  In that circumstance, the privilege would encompass communications with the accountant.  But where the accountant is retained "not [for] legal advice but only for accounting service, or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." 296 F.2d at 922.

*Lluberes v. Uncommon Productions, LLC*, 663 F.3d 6 (1st Cir. 2011), illustrates the *Kovel* principle.  The subjects of a documentary film sued the producers of the film, claiming that the film defamed them.  The producers had consulted an attorney about preemptively obtaining insurance against claims of this type, and the attorney had advised the producers that he would require a third-party fact-checker's report on the contents of the script before he could procure insurance.  The producers retained a fact-checker, and ultimately provided the fact-checker's report to the attorney (who, presumably, used it to obtain the insurance).  During discovery in the defamation case, the plaintiffs sought to obtain the fact-checking report, but the defendants resisted, claiming the report was covered by the attorney-client privilege.  Acknowledging the general rule of *Kovel* that the privilege can be extended "when a third party helps the lawyer give legal advice," the court found that the fact-checking report was not subject to privilege:

> The filmmakers . . . argue that [the fact-checker] was "necessary, or at least highly useful" because [the attorney] required her report in order to analyze and assess the legal risks associated with the film. That may be true (though a point we do not resolve here), but it is not sufficient. The key, it seems to us, involves considering the source and nature of the information contained in the documents. If the communication contains only client confidences made in pursuit of legal advice—or legal advice based on such client confidences—that communication, if intended to remain confidential, should be covered by the privilege, regardless of whether it came from the client, his attorney, or an agent of either one.  If, however, the transmitted information consists largely of facts acquired from non-client sources, those facts are not privileged.

663 F.3d at 24-25.  The court also noted that the fact-checker's job was to canvass outside sources to produce the report, and the parties' intention was that the report would ultimately be produced to third-parties (insurers).  Therefore, it concluded the report was not privileged.

A second illustration of *Kovel* focuses the inquiry even more sharply.  In *U.S. v. Ackert*, Goldman Sachs approached Paramount Pictures about an investment opportunity.  Paramount asked its in-house attorney, Meyers, to advise it regarding the tax implications of the investment. Meyers contacted Ackert, an investment banker, to "discuss various aspects of the Goldman Sachs proposal . . . and its potential tax consequences so that he could advise his client, Paramount."  In conjunction with a tax investigation, the government later subpoenaed Ackert to

testify about those discussions and Paramount objected to Ackert testifying, claiming attorney-client privilege.  Paramount argued that *Kovel* covered the situation, but the court disagreed:

> We assume [ ] that Meyers interviewed Ackert in order to gain information and to better advise his client Paramount. That, however, is insufficient to give rise to the privilege. [T]he privilege protects communications between a client and an attorney, not communications that prove important to an attorney's legal advice to a client.  [A] communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client.

> We also reject Paramount's argument based on *Kovel*.  That decision recognized that the inclusion of a third party in attorney-client communications does not destroy the privilege if the purpose of the third party's participation is to improve the comprehension of the communications between attorney and client. That principle, however, has no application to this case. Meyers was not relying on Ackert to translate or interpret information given to Meyers by his client. Rather, Meyers sought out Ackert for information Paramount did not have about the proposed transaction and its tax consequences. Because Ackert's role was not as a translator or interpreter of client communications, the principle of *Kovel* does not shield his discussions with Meyers.

169 F.3d at 139.

These cases clarify the tenets derived from *Kovel* and its progeny.  First, the mere fact that an attorney believes that the assistance of a third party would be helpful or necessary to the attorney providing legal advice to the client does <u>not</u> operate to shield the communications with the third party in privilege.  *Ackert, supra.*  ("communication between an attorney and a third party does not become shielded by the attorney-client privilege solely because the communication proves important to the attorney's ability to represent the client").  If the third-party consultants are engaged (by counsel or the client) to simply translate information already possessed by the client into a form that is more readily digestible by the attorney, the third party's communications with the attorney and client will fall within the scope of attorney-client privilege.  But communications involving consultants who are engaged to synthesize the client's own information with additional information not already known to the client and consultants who are asked to give their own independent opinions or ply their own particular brand of expertise on matters that bear on the matters the attorney is considering will not fall within the scope of privilege.

Applying *Kovel* to this case**,** it is not enough for Vail Health to demonstrate that its attorneys needed or wanted valuation information in order to provide legal advice as to the legality of the joint ventures Vail Health was considering.  Nor is it sufficient to demonstrate that

the attorney specifically requested that Vail Health obtain the appraisal information.  For *Kovel* to be applicable, Vail Health must show that the third-party appraisers did nothing more than "translate" financial information that Vail Health already had into a form that Vail Health's attorneys understood, thus allowing the attorneys to provide legal analysis.  To the extent the appraisers collected external information or brought their own independent expertise to bear, they ceased being "translators" of Vail Health's own data.  As in *Kovel*, they were retained "not [for] legal advice but only for [their particular] service" – in this case, appraising.  296 F.2d at 922.  As such, those communications fall outside the scope of Vail Health's attorney-client privilege.

With that rule in mind, we can return to the November 11, 2016 email string in D. 196-5.  The first communication in that string, identified in the privilege log as item #373, is an email from Mr. Newsad, a third-party appraiser.  The recipients of Mr. Newsad's e-mail are Mr. Brown and Mr. Jones.  Mr. Newsad's email reads "Nico, Matt: Attached you will find our draft exhibits.[12]  Here is a summary of the draft conclusions," followed by several bullet points identifying various financial highlights of Mr. Newsad's FMV calculations.  The Description of item #373 on Vail Health's privilege log identifies it as an "Email conveying information for the purposes of seeking legal advice regarding proposed [sic, probably "joint venture"], with attached documentation and valuation prepared at the direction of legal counsel."

Counsel is clearly knowledgeable about using particular language and phrases in their argument, but the Special Master must find sufficient evidence to support it. Nothing in Vail Health's response brief discusses item #373, nor does Mr. Brown's affidavit, and thus, the privilege log's Description is the entirety of Vail Health's showing as to the privileged status of this document.  Vail Health's description does not suffice to establish the necessary elements of attorney-client privilege, particularly in the *Kovel* context.  The Special Master will assume *arguendo* that Vail Health retained Mr. Newsad and his firm upon Mr. Jones' instructions in order to facilitate Mr. Jones providing a legal opinion about the contemplated joint venture. However, Vail Health has not demonstrated that Mr. Newsad's appraisal activities were in the nature of merely "translating" Vail Health's own information into a form Mr. Jones could understand.  The more likely inference to be drawn is that Mr. Newsad brought particular expertise relating to business valuations to the table and that he drew not only upon Vail Health's own information, but upon external information and his own knowledge in order to provide Vail Health with a valuation estimate of the joint venture.  Because Mr. Newsad was not merely an agent facilitating communication between Vail Health and Mr. Jones (and other attorneys), his presence in the communications at issue operates to vitiate the confidentiality necessary for attorney-client privilege to exist. The Special Master finds Vail Health has not shown that any communications in which Mr. Newsad – or any third-party appraiser – was involved would fall within the scope of privilege.

Vail Health's brief lists a number of items in the privilege log that it contends fall into these two categories of communications, but it offers no particularized analysis or identification of the pertinent facts applicable to most of those items.  For the same reasons discussed above,

---

[12]     No attachments are included in the version of the document filed with the court.

Vail Health's failure to supply the necessary predicate facts to demonstrate that most of the communications within this category fall on the privileged side of the *Kovel* analysis. Vail Health's brief or Mr. Brown's affidavit make passing discussion about five specific items that the Special Master will address:

> Item #116 and 117 (discussed in D. 213 at 11): Item #116 is an email from Mr. Newsad which transmitted revised documents as to MSO rates and other financial alternative analyses. Vail Health's brief describes it as "a draft valuation, which was prepared to enable counsel to assess regulatory implications." For the reasons stated above, Vail Health has not demonstrated that any communications or work product produced by Mr. Newsad satisfies the *Kovel* analysis and enjoys a privilege. Thus, item #116 must be produced. Thereafter, Mr. Newsad's report "was internally circulated to other Vail health employees, along with a discussion of a call [Mr.] Brown had with Vail Health attorneys about regulatory concerns." That communication is item #117, an email from Mr. Brown forwarding #116 to Mr. Jones and Mr. Sirotta. It references the financial pros and cons of the most recent study. However, the is no indication in the email requesting any legal advice from Mr. Jones regarding the FMV analysis and 10-year projection. Vail Health has failed to carry its burden to establish an attorney-client privilege for these materials and they shall be Disclosed.

> Item #435 and 438 (discussed in D. 213 at 10-11): Item #435 was an email initiated by Kirk Rebane of Haverford Capital to Ms. Kirchner and copied to Mr. Auten (another Vail Health attorney) and Mr. Jones. Vail Health's brief explains that it is "an email from an appraisal firm . . . at the request of Vail Health's attorneys." The privilege log describes this document as an "email providing documents at the request of counsel and seeking information to provide to counsel." The privilege log's Description is inconsistent with the body of the email, but in any event, Vail Health has made no showing whatsoever as to how Mr. Rebane's involvement in the discussion satisfies the *Kovel* analysis. As discussed above, merely asserting that Vail Health's attorneys consulted third parties in the course of providing legal advice does not suffice to render those communications privileged. Vail Health has failed to meet its burden to substantiate that this communication was for the purpose of providing information to and obtaining legal advice from Vail Health's counsel or that it was kept confidential. Accordingly, Vail Health shall Disclose this document.

> Item # 438 is merely an email from Mr. Newsad, sent to Mr. Brown, and copied to Mr. Jones, accompanying the 41-page draft FMV report along with an invoice. It offers revisions or clarification if needed and a finalized report upon payment in full. The Description in the privilege log accurately represents it was provided to Mr. Jones for review, but nothing in the document itself or anything else in the record supports Vail Health's assertion that it is communicated for the purpose of "providing legal advice regarding valuation." In any event, under *Kovel,* communications involving Mr. Newsad do not appear to be eligible for treatment as attorney-client privileged. Vail Health has not met its burden to support the attorney-client privilege for this document and must be Disclosed.

Finally, item #62 (discussed in D. 213 at 12, labeling it as VH_FED_00004020, contending redacted portion is privileged) is a two-part email from Ms. Kirchner to Mr. Brown, Mr. Jones, and Mr. Sirotta, relating to a meeting between Vail Health and VSO representatives regarding the possible joint venture.[13] Vail Health's brief describes this document as "seeking legal advice regarding potential regulatory implications concerning the unredacted portion of the document." The privilege log claims it to be an "Email responding to legal advice regarding VSO communications." Although the Special Master reads the document as requesting, not responding to, legal advice, it is unquestionably within the attorney-client privilege and need not be Disclosed.

## 2. Use of outside email accounts/outside assistants

The Plaintiffs argue that there are 180 emails[14] "sent by or received from Vail Health Board members" that are not privileged because they were sent or received not through "Vail Health's email system, personal emails, or through a Board portal," but rather were sent or received by the board members through those members' "business email accounts" at other entities (apparently where those board members are also employed). Docket #196-1 serves as an example of the Plaintiffs' argument: it is a November 3, 2015 email from Mr. Jones to four Vail Health board members. Three of the four board members are addressed via email accounts that clearly belong to non-Vail Health organizations: kslcapital.com, thekeltongroup.com, and vailresorts.com. The Plaintiffs argue that communications that are sent through third parties' email servers fail to preserve the confidentiality that is essential in order for those communications to be attorney-client privileged.

One of the most widely-cited case on this point is *In re Asia Global Crossing, Ltd.*, 322 B.R. 247, 256 (S.D.N.Y. Bankr. 2005). There, employees used their employer-provided email accounts to communicate with the employees' private attorneys. When developments brought the employees and employer into an adversarial posture, the employer sought to produce those emails, and the employees claimed the documents were protected by the employees' claims of attorney-client privilege. The employer responded that the employees' use of the employer's email system (possibly in violation of the employer's policies regarding use of company assets for personal business) operated to waive any confidentiality that otherwise attached to the communications. The court began by observing the prevailing sentiment that just because a communication was "sent by e-mail or because persons necessary for the delivery or facilitation of the e-mail may have access to its content . . . does not, without more, destroy the privilege." *Id.* at 256.

---

[13]     This document would appear to fall within the analytical category of attorney-client communications, rather than client-appraiser communications. Nevertheless, Vail Health's brief discussed it in the context of the latter category and the Special Master addresses it in that context.

[14]     The Plaintiffs' motion identifies several of the challenged items at footnote 14 and 15 of D. 195. The Special Master limits its analysis and ruling to those documents specifically identified by the Plaintiffs in those footnotes.

Examining the competing interests of the employer and employee in this situation, *Asia Global* then considered whether the employees had an objectively-reasonable expectation of privacy in their communications over the employer's email system.  It posited four factors that courts should examine in evaluating whether the sender of an email has an objectively reasonable expectation that the communication will be kept private: (i) whether the corporation maintains policies banning use of corporate email for personal purposes; (ii) whether the company monitors the employees' use of email; (iii) whether third parties have a right of access to the emails; and (iv) whether the corporation notified the employee of the company's monitoring policies.  *Id.* at 257.  The court in *Asia Global* ultimately concluded that the employer did not have monitoring policies in place, and therefore, the employees had a reasonable expectation of privacy in their communications with their private counsel through the employer's email system. *See also U.S. v. Hamilton*, 701 F.3d 404 (4th Cir. 2012) (finding marital communications privilege waived where spouse used business email account to communicate privileged information to other spouse).

Although *Asia Global*'s factual context is not precisely applicable to the situation presented here, courts facing scenarios more similar to this one have nevertheless applied the *Asia Global* factors.  In *In re High-Tech Employee Antitrust Litigation*, 2013 WL 772668 (N.D.Ca. Feb. 28, 2013), Campbell was an executive with Intuit, but also served as a advisor to Google and was involved in attorney-client communications between Google's attorneys and Google executives.  Campbell received those communications at his Intuit email account and Google's adversaries in the litigation argued that the sending of Google's attorney-client privileged communications to Campbell's Intuit email account operated to waive that privilege. Finding that the *Asia Global* framework could apply in that situation, the court proceeded to inquire whether Campbell had an objective basis to believe that emails sent by Google to his Intuit account would remain private or whether Intuit could be expected to monitor them. Ultimately, the court found that although Intuit advised against the use of the corporate email system for personal use, it did not strictly prohibit it and there was no evidence that Intuit did indeed monitor Campbell's emails.  The court found that Campbell's use of his Intuit account to receive Google communications did not compromise Google's privilege in those communications.

The Special Master is compelled to observe that the Plaintiffs' initial motion did not cite to *Asia Global* or discuss the pertinent factors.  Instead, the Plaintiffs relied solely on a different case, *L-3 Communications, Inc. v. Jaxon Engineering & Maint. Co.*, 2014 WL 3732943 (D.Colo. July 29, 2014), that is both factually and legally inapposite to the situation presented here.  The first time the Plaintiffs addressed *Asia Global* or other cases applying its analysis was in their reply brief.  As a result, Vail Health's response brief does not address the *Asia Global* factors on either legal or factual grounds.  Vail Health defended the board members' use of outside email accounts by arguing that the attorney-client privilege belongs to Vail Health as an entity and that individual board members are not able to waive that privilege on Vail Health's behalf.[15]  To the

---

[15]     Google raised a similar argument in *In re High-Tech Employee.  Id.* at *5 ("Google contends that the *Asia Global* factors do not apply because the privilege is Google's, not Campbell's [and] the court should only consider whether Google reasonably believed that

extent that the burden of proof rests on Vail Health to establish the applicability of the *Asia Global* factors, it has not done so.

Nevertheless, the Special Master finds that the Plaintiffs' failure to specifically identify *Asia Global* as the controlling law in their initial motion operates to waive any argument that Vail Health did not satisfy the *Asia Global* inquiry. It is axiomatic that a party who fails to raise an issue in their initial moving papers waives that issue and cannot assert that issue for the first time in a reply brief. *U.S. v. Cortez*, 965 F.3d 827, 833 n. 4 (10th Cir. 2020). The reasons for such a rule are apparent: a party cannot "lie in wait," reserving their strongest arguments for a reply brief after the respondent has already been heard, allowing the movant to have the last word unchallenged. *See Hetronic Intl., Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016 , 1045 n. 9 (10th Cir. 2021). Both the conferral requirements of Local Rule 7.1(a) and the motion-response-reply format of Local Rule 7.1(c) are premised on the idea that the moving party will present their best arguments initially, thereby allowing the respondent a fair opportunity to examine the movant's precedent, facts, and reasoning and respond appropriately.

Plaintiffs' motion does specifically indicate that the issue it was raising was that "a party can waive privilege by using business emails to transmit confidential and privileged communications," but they did so in an extremely abbreviated manner and their citation only to the inapposite *L-3* case in support of that argument amounted to a failure to adequately develop an argument based on *Asia Global* instead. *See e.g. Murrell v. Shalala*, 43 F.3d 1388, 1389 n. 2 (10th Cir. 1994) (briefly mentioning argument is not sufficient, and "some effort at developed argumentation" is necessary to properly present an issue). By failing to give Vail Health adequate notice that they were invoking the *Asia Global* analysis and challenging whether the owners of the kslcapital.com, thekeltongroup.com, and vailresorts.com domains maintained, communicated, and exercised their ability to review emails sent through their system, the Plaintiffs deprived Vail Health of an adequate opportunity to marshal and present evidence on that point. Therefore, it is appropriate to treat the Plaintiffs as having waived that argument. Accordingly, the Plaintiffs' request to compel production of these documents is denied. Not Disclosed.

The Plaintiffs also make a specific argument that Vail Health Board Chair Michael Shannon waived the confidentiality of items #244, 245, 248, 322, 324, and 325 by copying his outside Executive Assistant, Christie Faires, on those communications. It is undisputed that Ms. Faires is not an employee of Vail Health.

---

Campbell was maintaining the confidentiality of the communications"). The court found that argument to be unpersuasive. *Id.* at *6 ("Campbell may not be able on his own to waive Google's privilege but it does not make sense that if Campbell speaks on Google's behalf, Google does not share the knowledge that Campbell possesses regarding the policy of the [Intuit] email system he employed"). The Special Master would reject Vail Health's arguments on the same ground – Vail Health's counsel and its directors were all aware that the outside directors were receiving privileged communications using outside email accounts, and are presumed to have consented to that conduct and any potential waiver of privilege that might result from it.

*Kovel* explains that "few lawyers could now practice without the existence of secretaries, file clerks, telephone operators, messengers, clerks not yet admitted to the bar, and aides of other sorts.  The assistance of these agents being indispensable to his work and the communications of the client being often necessarily committed to them by the attorney or the client himself, the privilege must include all the persons who act as the attorney's agents."  296 F.2d at 912.  This constitutes a well-settled conclusion that the privilege encompasses communications that may pass through "all the persons who act as the attorney's agents."  *Louisiana Muni. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 311 (D.N.J. 2008), *quoting* 8 Wigmore on Evidence, § 2301.  The question of whether that same doctrine applies to the client's side of the equation is not as clear.  Much of today's business is conducted with the assistance of an array of secretaries, assistants, and agents of various types as well, and it might be sensible to conclude that *Kovel*'s rule extends to clients who share the privileged communications with their own assistants and agents. *See e.g. Abbott Laboratories v. Airco, Inc.*, 1985 WL 3596 (N.D.Il. Nov. 4, 1985) ("A recognized exception to the rule that the communication must be directly between the client and attorney is for ministerial agents of the attorney . . . or of the client who facilitate transmission of the communication") (emphasis added).  Such a rule nevertheless has limits – a client is not free to designate every conceivable person under the sun as their "ministerial agent."  Some factual showing by the party claiming privilege is necessary to demonstrate how the alleged agent relates to the client's business operations and how that agent's receipt of the communication was necessary to facilitate the client's processing of the privileged communication.

It is at this point that Vail Health fails to validate why Mr. Shannon believed it was necessary to include Ms. Faires on privileged Vail Health communications.  Vail Health does not offer any factual development on this situation at all except to describe Ms. Faires as Mr. Shannon's "administrative assistant."  It would come as no surprise if Vail Health itself employed an assistant for Mr. Shannon, but Ms. Faires is not such a Vail Health employee.  It appears that Mr. Shannon may wear several hats, providing services to several different businesses, and may have separate administrative assistants assigned to him by each entity.  Conceivably, there could be situations in which it might be appropriate for Mr. Shannon to press his assistant from endeavor A into service to address a situation with endeavor B without compromising endeavor A's confidentiality.[16]  Such situations are sufficiently unusual that it is not enough for Vail Health to merely state that Ms. Faires is Mr. Shannon's assistant.  Once again, as the party with the burden of establishing that it maintained the confidentiality of communications purported to be privileged, Vail Health has the burden of coming forward with a detailed factual explanation for why Mr. Shannon is disclosing Vail Health's privileged information to a non-Vail Health

---

[16]     For example, assume Mr. Shannon provides services to both Vail Health and to the separate Acme Corporation.  Assume also that Acme employs an assistant, Assistant A, to aid Mr. Shannon in performing Acme duties, and that Vail Health similarly employs Assistant V to assist Mr. Shannon with his duties for Vail Health.  If there was a situation in which Assistant V was away from work on leave, Mr. Shannon had an urgent need to address Vail Health matters, and Assistant A had sufficient familiarity with the operations of Vail Health and manifested some understanding of the need to maintain the confidences of any Vail Health information the assistant obtained, it might be appropriate to deem Assistant A as temporarily acting as an agent of Vail Health during that limited period.

assistant.  *See Burke v. Regalado*, 935 F.3d 960, 1023 (10th Cir. 2019).  Vail Health's failure to do so warrants a conclusion that items ## 244, 245, 248, 322, 324, and 325 lost any privilege they might have had.  Disclose.

### 3.  <u>Producing some documents as waiver of privilege to all</u>

The Plaintiffs argue that "by intentionally producing some documents to or from the appraisers about the joint venture, Vail Health waived privilege as to the same subject matter." Plaintiffs' argument on this point is completely undeveloped: they do not cite authority for this proposition, point to the particular documents in the record that they contend illustrate the situation (both as to the selective production and as to Vail Health's intent), or explain how Vail Health's production places the Plaintiffs at a disadvantage.  The Plaintiffs' reply brief does not elaborate on this argument.

When one party selectively discloses otherwise privileged communications in order to obtain an advantage over another, "courts broaden the waiver as necessary to eliminate the advantage."  If selective disclosure does not create an unfair advantage, courts "typically limit the waiver to the communications actually disclosed."  *In re Teleglobe Comm's. Corp.,* 493 F.3d 345, 361 (3d Cir. 2007).  The Plaintiffs' argument on this point is insufficiently developed and the Special Master cannot reasonably conclude that Vail Health has selectively disclosed documents in order to obtain some unfair advantage.  Denied and Not Disclose.

### 4.  <u>Documents intended to be provided to third party</u>

Plaintiffs' motion makes two arguments that seem to be limited to "term sheets" that were prepared in conjunction with anticipated joint ventures with Steadman and VSO.  Vail Health's response is that it has produced all documents it has located that were actually shared with third parties, but that it has claimed privilege as to one particular document (apparently a term sheet for a contemplated joint venture with Steadman) that was drafted but never shared outside of Vail Health.  The Plaintiffs' reply brief does not further address this issue.

It is not clear whether there remains a dispute to be addressed on this point.  To the extent there is, Vail Health's response appears to assert that the only documents in question are items #567 and 568 on the privilege log.  The Special Master's review of the preceding Item #566 clearly reflects communications requesting legal advice from Mr. Jones and Mr. Auten. Neither of items #567 nor #568 were included in the materials submitted to the Special Master for in camera review. As to item #568, Vail Health's brief describes the document as a "draft" of the term sheet that Vail Health discussed with its attorneys but did not produce to any third party. Item #568 is described in the privilege log as an email from Mr. Brown to Mr. Jones "seeking legal advice regarding VSO term sheet" and attaching the term sheet in question.  The Special Master is satisfied that, in the absence of additional argument, Vail Health has carried its burden of showing that item #568 is privileged.  It may be that, once finalized, the term sheet was intended to ultimately be provided to VSO or another third party and then would lose its privileged status.  But where Vail Health had discussions with its counsel about <u>drafts</u> of that term sheet, discussing what items to include or exclude or how to present certain terms in the

final version that would be shared with VSO, those discussions and the drafts themselves would clearly be privileged.  Not Disclosed.

Accordingly, the Special Master recommends that the Plaintiffs' Motion to Compel #5 be Granted in part and Denied in part as set forth herein.

### C. **Attorney fees**

The Plaintiffs request an award of attorney fees under Fed. R. Civ. P. 37(a)(5).  Because the motion is granted in part and denied in part, the Special Master declines to attempt to apportion attorney fees under Rule 37(a)(5)(c).

### D. **Objections to this Report and Recommendation**:  Adopting the requirements of Fed. R. Civ. P. 72(a), the Special Master directs that any party may file Objections to the Magistrate Judge within 14 days of the date of this Report.

Dated this 21st day of October 2022.

*W. Terry Ruckriegle*

*Special Master*

*Box 3305*

*Breckenridge, CO 80424*

*970-390-9865 phone*