**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 19-cv-2075-WJM-SBP

SPORTS REHAB CONSULTING LLC, a Colorado limited liability company, and
LINDSAY WINNINGER, an individual,

      Plaintiffs,

v.

VAIL CLINIC, INC., a Colorado nonprofit corporation, d/b/a Vail Health,

      Defendant.

_____

**ORDER GRANTING VAIL HEALTH'S SUMMARY JUDGMENT MOTION**
_____

      This is an antitrust case in which Plaintiffs Sports Rehab Consulting LLC ("Sports Rehab") and Lindsay Winninger (jointly, "Plaintiffs") contend that Defendant Vail Clinic, Inc. ("Vail Health") violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the physical therapy ("PT") market in the Vail Valley region, which Plaintiffs define as encompassing "Eagle County with the exception of Basalt," between 2012 and 2020.  Vail Health now moves for summary judgment ("Motion") on Plaintiffs' two antitrust claims, arguing that Plaintiffs have failed to present evidence demonstrating monopoly power, exclusionary conduct, or antitrust standing.  (ECF No. 528.)

      The Court agrees that Plaintiffs have failed to identify actionable exclusionary conduct perpetrated by Vail Health.  This is largely because Plaintiffs ignore or otherwise fail to develop substantive responses to Vail Health's specific and detailed

1

summary judgment arguments.  (ECF No. 543.)  And the exclusionary conduct Plaintiffs

do identify is devoid of record support.  As a result, Plaintiffs cannot satisfy the elements

of their monopolization and attempted monopolization claims, nor establish antitrust

standing.

For these reasons, the Motion is granted in its entirety.

## I.     MATERIAL, UNDISPUTED FACTS[1]

Vail Health is a nonprofit community health system that offers PT services at

several clinic locations throughout Eagle County and Summit County, Colorado.  (ECF

No. 528 at 4–5.)  Starting in 2008, Plaintiff Winninger worked as a physical therapist for

Howard Head Sports Medicine ("Howard Head" or "HH"),[2] a clinic run by Vail Health.

(ECF No. 543 at 5.)  David Cimino worked as a physical therapist for Howard Head from

2012 until the end of 2015.  (ECF No. 528 at 7.)  As a condition of his employment,

Cimino signed an offer letter containing a "Non-Solicitation" provision, which stated that,

"[d]uring the term of [his] employment and for a period of one year thereafter," he could

not "hire, offer to hire (or participate in the hiring or offer to hire of) any officer, or

---

[1] This factual background is derived from the parties' briefs on the Motion and documents
submitted in support thereof.  These facts are undisputed unless attributed to a party or source.
All citations to docketed materials are to the page number in the CM/ECF header, which
sometimes differs from a document's internal pagination.

[2] Plaintiffs explain "Howard Head" to be a trade name.  (ECF No. 543 at 6, 10.)  Vail Health
states that "Howard Head Sports Medicine is the name for Vail Health's PT services
department."  (ECF No. 528 at 4 n.1.)

The Court observes, in addition, that Vail Valley Medical Center ("VVMC") appears to be a trade
name of Vail Health.  (ECF No. 543-10 at 2.)  Hence, references to HH and VVMC throughout
this Order should generally be understood to refer to Vail Health.

employee of the Medical Center or directly, or indirectly, solicit, divert or take away . . . any business the Medical Center has enjoyed." (ECF No. 528-4 at 3.)

 In 2012, Winninger left Howard Head to become the head physical therapist for the United States women's ski team. (ECF No. 543 at 13.) When she left, Winninger copied documents from Howard Head's shared network drive onto an external storage device, which included statutorily protected health information ("PHI") for hundreds of patients. (ECF No. 528 at 8.) She later founded Plaintiff Sports Rehab in the spring of 2014 and opened a PT clinic in Vail, Colorado in December 2015. (ECF No. 543 at 6.)

Winninger hired Cimino to work as a physical therapist at Sports Rehab's Vail location. (ECF No. 528 at 7.) Cimino had also copied documents from Howard Head's shared network drive, which included patients' PHI, after he left that employment. (*Id.*) Pursuant to its obligations under the Health Insurance Portability and Accountability Act, Vail Health reported these incidents of PHI breaches to affected patients, news agencies, competitors in the PT industry (as discussed in greater detail below), and several government entities, including the Department of Health and Human Services' Office of Civil Rights, the Vail Police Department, and the Eagle County District Attorney's Office. (*Id.*) These incidents were also[3] reported to the Colorado Department of Regulatory Agencies. (*Id.*)

Vail Health has business relationships with The Steadman Clinic ("TSC"), the Steadman Philippon Research Institute ("SPRI"), and Vail Summit Orthopedics ("VSO"). (*Id.*) TSC and VSO are "private orthopedic surgery physician practice[s] with" locations

---

[3] The parties dispute whether Vail Health or some other anonymous source reported the incident to the Colorado Department of Regulatory Agencies. (ECF No. 528 at 7; ECF No. 543 at 7.)

in the Vail Valley.  (*Id.*; ECF No. 543 at 21.)  SPRI is a "nonprofit foundation" that has a

"symbiotic relationship" with TSC: SPRI conducts research, which "benefits [TSC] by

retaining and expanding the doctors' practices."  (*Id.* at 4, 5.)

Vail Health's business relationships with TSC, SPRI, and VSO are the primary

subject of this summary judgment dispute.  TSC "leases clinical space in the Vail Health

Hospital, which contains restrictions of [TSC's] use of the leased space, including a

prohibition on rendering PT services in that space."  (ECF No. 528 at 5.)  Vail Health's

relationships with TSC and VSO are lucrative.  Vail Health "earns revenue from

orthopedic surgeries performed on Vail Health patients by [TSC] and VSO in Vail Health

facilities and from PT services performed on Vail Health patients referred by physicians

affiliated with [TSC] and VSO . . . ."  (ECF No. 549 at 6.)  In fiscal year 2015, "Vail

Health's contribution margin for the orthopedic service line . . . was over $65 million, far

surpassing any other hospital service line."  (ECF No. 543 at 11.)  During that same

year, TSC and VSO generated 54% and 15% in orthopedic referrals to Vail Health,

respectively, which constituted "$16 million in revenues."  (*Id.*)

At some point, however, Vail Health officials began hearing rumors "in the

executive ranks" that TSC was "going to leave [Vail Health] and do their own thing."

(ECF No. 542-22 at 8.)  In September 2015, Vail Health also learned that Winninger and

TSC's managing partner, Marc Philippon, were "working" "on opening a small [PT] clinic

in the Four Seasons."  (ECF No. 543-29 at 2.)  Vail Health believed that Winninger

"ha[d] the relationship with [Philippon] to pull this off" and that the attraction of their

partnership was based on "the idea" that Philippon's "higher profile [sic] patients do not

have to mix with regular patients within our clinic."  (*Id.*)

4

These rumors prompted Vail Health to shore up its relationships with TSC and

SPRI.  In the fall of 2015, Vail Health and TSC began negotiating "a package strategic

alignment," or as TSC's chief executive officer ("CEO"), Dan Drawbaugh, put it, "a ten-

year reset."  (ECF No. 543-27 at 2.)  In December 2015, Vail Health, TSC, and SPRI

struck an agreement titled "the 10-year partnership," which Vail Health valued at $173

million in a presentation.  (ECF No. 542-20 at 42.)  $73,700,000 of this amount

constituted the direct value TSC and SPRI would receive from Vail Health, whereas the

remaining $100 million constituted the potential joint fundraising value TSC and SPRI

would receive over the course of the partnership.  (*Id.* at 41, 42.)  The presentation also

included a slide that stated: "Competition is Coming—Get Ready—No Status Quo."  (*Id.*

at 7.)

    This arrangement was consummated via five written agreements: a Research

Affiliation Agreement, a SPRI lease, a TSC lease, a letter of intent ("LOI"), and

"proposed amendments to the [Vail Health operating agreement]."  (ECF Nos. 543-30 at

4, 543-1 at 12, 549 at 5.)  On December 7, 2015, Vail Health's CEO, Doris Kirchner,

circulated an e-mail announcing "that tonight the SPRI Board unanimously approved the

Agreements between [Vail Health] and SPRI, Lease, and Research Affiliation

Agreement."  (ECF No. 543-22 at 2.)  She continued: "This brings to close years of work

by many of you.  We are solid with our partnership for the next 16 years.  Please join

me in sharing my excitement to the new partnership!"  (*Id.*)

    The LOI, dated December 3, 2015 and "ratified" by Vail Health's Finance

Committee, stated its intent was "to summarize the principal terms of a proposed

arrangement between" Vail Health, TSC, "and certain other physicians and/or physician

groups, for the provision of physical therapy and rehabilitation services."  (ECF No. 543-

10 at 2; ECF No. 549 at 5.)  The LOI contained 11 provisions, three of which are

particularly pertinent to this case.  The first provision, titled "Definitive Agreement,"

stated as follows:

> The Parties *wish to commence negotiating definitive written
> agreements providing for the Potential Transaction* (the
> 'Definitive Agreements').  The execution of any such
> Definitive Agreements will be subject to approval of the
> Potential Transaction by each Party's governing board.  It is
> proposed that the Definitive Agreements include the terms
> set forth on Exhibit A attached hereto, as such terms may be
> modified by mutual written agreement and incorporated into
> the Definitive Agreements.

(*Id.* (emphasis added).)  The sixth provision, titled "Entire Agreement," stated, as

pertinent here, as follows:

> The provisions of Sections 2 through II of this letter of intent
> (the "Binding Provisions") constitute legally binding and
> enforceable agreements of the Parties.  *The Parties
> understand and agree that the remaining provisions of this
> letter of intent (Section 1 and Exhibit A) do not constitute and
> will not give rise to any legally binding obligation on the part
> of either of the Parties.  Except for the Binding Provisions, a
> binding commitment with respect to the Potential
> Transaction will result only from the execution of the
> Definitive Agreements, subject to the conditions expressed
> therein.*

(*Id.* at 3 (emphasis added).)  The ninth provision, titled "Termination," stated that the LOI

"shall commence on the date this letter of intent is executed and delivered" and "shall

continue until the first to occur of (i) the execution and delivery of the Definitive

Agreements by all parties thereto, or (ii) January 31, 2016."  (*Id.* at 4.)

Finally, Exhibit A, appended to the LOI, included various terms and conditions

setting forth the intent of Vail Health, TSC, and "certain other physicians or physician

6

groups (or their holding companies) as determined by VVMC" to form a new Colorado

LLC named "Vail Valley Physical Therapy & Rehabilitation Services, LLC."  (*Id.* at 6.)

The purpose of creating this LLC was "to own and operate the physical therapy and

rehabilitation business that is currently owned and operated solely by VVMC under the

name 'Howard Head Sports Medicine' . . . ."  (*Id.*)  As relevant here, Exhibit A laid out

the purchase options available to the members of the agreement, their voting powers,

and a "Non-Compete" clause, which provided as follows:

> Each of the Members and their respective affiliates will agree
> not to compete with the Company while they remain
> Members of the Company and for one (I) year thereafter,
> within the Counties of Eagle, Garfield, Lake, Pitkin, Routt
> and Summit, Colorado (the 'Non-Compete Territory');
> provided that the one-year tail on the non-compete will not
> apply to TSC in the event of an exercise of VVMC's 'call'
> right.

(*Id.* at 7–10.)

But the members of the LOI did not execute a definitive agreement by January

31, 2016; instead, they renewed the LOI several times, including up to September 2016.

(*See* ECF No. 543-1 at 16 ¶ 87 (Plaintiffs confirming that the last letter of intent "expired

in September 2016").)  Despite these renewals, and central to the Court's resolution of

the present dispute, the members of the LOI in the end never executed definitive

agreements creating a new Colorado LLC, nor did they ever otherwise bind themselves

to the noncompete provision contemplated in Section 1 and Exhibit A of the LOI.  (*Id.*)

Vail Health's response to Plaintiffs entering the PT market was not limited to

shoring up its relationships with TSC and SPRI—Vail Health set its eyes on Plaintiffs as

well.  In January 2016, Vail Health's counsel sent cease and desist letters to Plaintiffs

and Cimino.  (ECF Nos. 542-35, 542-36.)  The letters accused Cimino of breaching the

non-solicitation provision of his Howard Head employment contract by, among other

conduct, taking "confidential, proprietary and copyrighted information belonging to" Vail

Health.  (*See, e.g.*, ECF No. 542-35 at 4.)  And as alluded earlier, in March 2016,

Kirchner "informed Steadman doctors, including Dr. Philippon, that Cimino had taken

copyrighted protocols and was working for Sports Rehab."  (*See, e.g.*, ECF No. 543-35

at 2.)

But these efforts were not enough to stop TSC, SPRI, or Plaintiffs from

independently participating in the PT market.  In September 2016, shortly after the final

LOI expired, Drawbaugh sent Kirchner the following e-mail:

> Doris, I have not requested a meeting however did ask
> Steve Boocheraver to get us a go/no go decision on JV'ing
> Howard Head.  *TSC has been approached by Price
> Waterhouse who is representing a PE firm with interest in
> pursuing joint business opportunities with TSC.  PT/Rehab is
> one of the identified opportunities.*  Marc [Philippon] and I
> have wanted to ensure [Vail Health] has every opportunity to
> partner with us on PT.  [W]e are now 9–10 months in this
> discussion.  It is time for both organizations to progress on
> this decision asap.  *I do not want you to be caught off guard
> would we decide to explore/pursue an in-house approach
> with PT.*

(ECF No. 543-38 at 3 (emphases added).)  Kirchner described this e-mail as "[q]uite

concerning," adding that, "[o]bviously, there will be many issues for [Vail Health] if TSC

pursues the independent route."  (*Id.*)  Another Vail Health official agreed that the e-mail

was "[v]ery concerning" but reassured Kirchner that "two of the three offices where

[TSC] currently operate are [Vail Health] owned and have non-compete clauses within

the leases."  (*Id.* at 2.)

8

Around this same time, Drawbaugh informed Kirchner that TSC and SPRI "had entered into two consulting agreements with Winninger" in August 2016. (ECF No. 543-1 at 17.) In December 2016, Kirchner learned that TSC "does not want to pursue the" joint venture contemplated in the LOI. (ECF No. 543-43 at 2.) In response to this news, a Vail Health official "suggest[ed] we put non competes into our HH employees." (*Id.*) Kirchner concurred, explaining that she "would like us to look at placing non-compete clauses in all of our HH staff's employments asap. The potential is extremely high that TSC will try to partner with Lindsey Winninger [sic] in a private physician therapy venture. We do not want to lose any of our HH staff." (ECF No. 543-44.)

At the end of December 2016, Vail Health's chairman of the board, Michael Shannon, showed Philippon a copy of a draft complaint alleging various state law claims against Plaintiffs based on Winninger's taking of patient files that included PHI. (ECF No. 543 at 19.) Philippon "took the fact of a criminal or civil complaint seriously." (ECF No. 549 at 11.) A few days later, Kirchner informed another Vail Health official that Shannon "spoke with Marc Philippon on Saturday. Marc appears to be on Board with the HH MSO[4] [*i.e.*, the joint venture] and is not interested in setting up a competitive therapy situation to HH." (ECF No. 543-49 at 3 (explanatory brackets added).) But soon thereafter, Kirchner informed other Vail Health officials that she had learned that "SPRI is going to not play with the HH MSO . . . ." (ECF No. 543-51 at 2.)

In January 2017, Vail Health's counsel sent Plaintiffs a copy of the draft complaint. (ECF No. 542-14.) Upon learning that Plaintiffs had received the draft

---

[4] "MSO" stands for "managed services organization." (ECF No. 543 at 4.) it is simply another term to describe the joint venture Vail Health, TSC, and SPRI had contemplated creating.

complaint, Kirchner said, "Here we go……………."  (ECF No. 543-53 at 2.)  Around that

same time, Kirchner showed Drawbaugh the draft complaint.  (ECF No. 543-1 at 19.)

TSC then put "on hold" its consulting agreements with Plaintiffs "until things . . .

hopefully cleared with the issues with [Winninger] and Vail Health."  (ECF No. 530-2 at

15.)  Nevertheless, in May 2017, Plaintiffs signed amended consulting agreements with

SPRI.  (ECF No. 530-4 at 3.)  TSC continued to refer patients to Plaintiffs throughout

2017 and 2018.  (ECF No. 543 at 6; ECF No. 530-1 at 28.)  By 2019, several

companies began providing PT services in Vail Valley, including "Axis Sports Medicine,

Altius Physical Therapy, Joint Worx, Navig8, Concierge Physical Therapy Colorado,

Thrive PT, Competitive Edge Physical Therapy, Vail Integrative Medicine Clinic,

Movement Physical Therapy, Vail Sports Medicine Physical Therapy, and Vail Health."

(ECF No. 528 at 11; ECF No. 543 at 9.)

In April 2017, Plaintiffs sued Vail Health in state court, asserting 24 defamation

claims and three tortious interference claims.  (ECF No. 528 at 8.)  "The gist of

[Plaintiffs'] claims was that Vail Health . . . had defamed Winninger and Sports Rehab

by suggesting that Winninger stole Vail Health's PHI and implicating her in Cimino's

alleged theft of PHI, thereby affecting her ability to obtain referrals and causing financial

and reputational harm to Sports Rehab."  (ECF No. 627 at 6.)  Vail Health countersued

for conversion, breach of contract, breach of the duty of loyalty, tortious interference,

misappropriation of trade secrets, civil theft, and conspiracy.  (*Id.* at 9.)

The state trial court granted summary judgment in Vail Health's favor on all of

Plaintiffs' affirmative claims, reasoning that the statements concerning Winninger's

misappropriation of PHI were substantially true and therefore not defamatory.

10

*Winninger v. Kirchner*, 2021 WL 11087739 (Colo. Dist. Ct. Eagle Cnty., Nov. 4, 2021).
(*Id.* at 7.)  This summary judgment ruling left remaining only Vail Health's
counterclaims,[5] which proceeded to a jury trial in February 2024.  (*Id.* at 8.)  The jury
found in Plaintiffs' favor on all counterclaims.[6]  (*Id.*)  "It found that, although Cimino took
Vail Health's documents, Winninger did not misappropriate any of the information; that
Winninger had interfered with Cimino's performance of his contract, but Vail Health did
not sustain any damages; and that Winninger took documents owned by Vail Health,
but she did not 'exercise unauthorized dominion or ownership over these documents
when she took the[m].'"  (*Id.*)  In August 2025, the Colorado Court of Appeals affirmed
both the trial court's summary judgment in favor of Vail Health[7] and the jury's verdict in
favor of Plaintiffs.  *Winninger v. Vail Clinic, Inc.*, 2025 WL 2416959, at *1 (Colo. App.
Aug. 21, 2025).

Plaintiffs initiated this antitrust action in July 2019, asserting two claims under
Section 2 of the Sherman Act: monopolization and attempted monopolization.  (ECF No.
26 at 70–76.)  They submit that Vail Health monopolized or attempted to monopolize the

---

[5] Some of Vail Health's original counterclaims were also dismissed as a result of a Colorado
Supreme Court decision and the state trial court's subsequent application of that decision.
*Winninger v. Kirchner*, 488 P.3d 1091, 1093 (Colo. 2021).  This procedural history, however, is
not material to the Court's analysis, so the Court does not mention it beyond this footnote.

[6] Plaintiffs' surreply and Vail Health's response thereto pertain to whether the jury's verdict has
preclusive effect with respect to Vail Health's arguments regarding its petitioning, litigation, and
related statements.  (ECF No. 604, 609.)  The Court need not resolve this issue, however,
because Plaintiffs ignore Vail Health's arguments that the *Noerr-Pennington* doctrine
extinguishes liability and that such statements can have only a *de minimis* effect on competition.
In any event, to the extent issue preclusion cuts one way or another on the defamation issue, it
would likely cut in favor of Vail Health, as the Colorado Court of Appeals affirmed the state
court's summary judgment in Vail Health's favor.

[7] The Colorado Court of Appeals left undisturbed the substance of the state trial court's
summary judgment ruling but vacated its costs award as to certain Vail Health officials.

PT market in the Vail Valley between 2012 and 2020.  (ECF No. 543 at 21, 22.)  Vail

Health now moves for summary judgment on both claims.  (ECF No. 528.)

## II.    APPLICABLE LAW

Summary judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  *Coomer v. Lindell*, 2024 WL 3989524, at *2 (D. Colo. Aug. 29, 2024) (quoting

Fed. R. Civ. P. 56(a)).  "A dispute is genuine if there is sufficient evidence so that a

rational trier of fact could resolve the issue either way.  A fact is material if under the

substantive law it is essential to the proper disposition of the claim."  *Id.* (quoting *Crowe*

*v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (quotations omitted).  "It

is the movant's burden to demonstrate that no genuine dispute of material fact exists for

trial, whereas the nonmovant must set forth specific facts establishing a genuine issue

for trial."  *Id.* (citing *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  "At

all times, the Court will 'view the factual record and draw all reasonable inferences

therefrom most favorably to the nonmovant.'"  *Id.* (quoting *Zia Shadows, L.L.C. v. City of*

*Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016) (quotation omitted).

Notwithstanding the principle that courts must resolve factual ambiguities against

the moving party, thus favoring the right to a trial, *Houston v. Nat'l Gen. Ins. Co.*, 817

F.2d 83, 85 (10th Cir. 1987), the Tenth Circuit has observed that "[s]ummary judgment

is of particular importance in the area of antitrust law, because it helps to avoid wasteful

trials and prevent lengthy litigation that may have a chilling effect on pro-competitive

market forces."  *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. &*

*Antitrust Litig.*, 44 F.4th 959, 980 (10th Cir. 2022) (quoting *MLB Props., Inc. v. Salvino,*

*Inc.*, 542 F.3d 290, 309 (2d Cir. 2008)).

"Section 2 of the Sherman Act makes it illegal to 'monopolize' any part of the trade or commerce among the several states." *Id.* (quoting 15 U.S.C. § 2). A monopolization claim has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 981 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). "The second element is often called the 'exclusionary conduct' element. To survive summary judgment, the plaintiff must present a triable issue of both (1) monopoly power and (2) exclusionary conduct." *Id.*

An attempted monopolization claim has three similar elements: "'(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power,' with the third element requiring 'consider[ation] [of] the relevant market and the defendant's ability to lessen or destroy competition in that market.'" *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1192 (10th Cir. 2009) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). Hence, as to both monopolization and attempted monopolization claims, Plaintiffs must "plead both power in a relevant market and anticompetitive conduct." *Id.*

More fundamentally, "[i]n order to bring a private antitrust claim, the party must have antitrust standing, which consists of 'antitrust injury' and a plausible connection between that injury and the alleged violation of the antitrust laws." *Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *3 (D. Utah May 17, 2018) (citing *Tal v. Hogan*,

13

453 F.3d 1244, 1253 (10th Cir. 2006)).  "Thus, Plaintiffs must show (1) an antitrust injury

and (2) a causal connection between the defendant's antitrust violation and their alleged

antitrust injury."  *Compliance Mktg., Inc. v. Drugtest, Inc.*, 2010 WL 1416823, at *4 (D.

Colo. Apr. 7, 2010).  "An antitrust injury is 'an injury of the type the antitrust laws were

designed to prevent and that flows from that which makes defendants' acts unlawful.'"

*Id.* (quoting *Abraham v. Intermountain Healthcare, Inc.*, 461 F.3d 1249, 1267 (10th Cir.

2006)).

### III.    ANALYSIS[8]

Vail Health contends that Plaintiffs' monopolization and attempted

monopolization claims fail because they cannot show antitrust injury; "actionable

anticompetitive conduct"; "sufficient facts to show monopoly power"; or "specific intent to

monopolize the market."  (ECF No. 528 at 12–13.)  Vail Health organizes the conduct

on which Plaintiffs base their antitrust claims into four groups: (1) "Vail Health's

litigation, petitioning, and related statements," which all stem from Plaintiffs' taking of

patients' PHI (*id.* at 19); (2) the unconsummated definitive agreement Vail Health, TSC,

and SPRI considered but did not ultimately execute via the LOIs (*id.* at 23–24); (3) the

non-solicitation provisions included in its physical therapists' employment contracts (*id.*

at 24); and (4) Vail Health's lease with TSC, which restricted TSC from performing PT

---

[8] Plaintiffs' fact section occupies about two thirds of their 32-page response, partly because Vail
Health's fact section omits important facts, but also because it is replete with legal arguments.
(ECF No. 543 at 1–20.)  "The Court does not consider legal arguments included in the parties'
statements of facts."  *Kansas Masonic Found., Inc. v. Auto-Owners Ins. Co.*, 2025 WL 1100045,
at *2 (D. Kan. Apr. 14, 2025); *see also Ysasi v. Brown*, 3 F. Supp. 3d 1088, 1104 n.15 (D.N.M.
2014) ("Legal arguments should not be set forth in a party's asserted fact section during
summary judgment.").  The Court instead considers only arguments raised in the analysis
section of Plaintiffs' brief (*i.e.*, ECF No. 543 at 20–30).

services in the leased property (*id.* at 24–25).

Vail Health's arguments in support of its contention that none of this conduct can support Plaintiffs' monopolization and attempted monopolization claims are detailed and specific. As to the first group, Vail Health argues that its petitions to government agencies and its related statements to the public and competitors "are immune from antitrust liability under the *Noerr-Pennington* doctrine." *See Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 894 (10th Cir. 2011) ("The *Noerr-Pennington* doctrine stems from federal antitrust law and exempts from antitrust liability 'the conduct of private individuals in seeking anticompetitive action from the government.'") (citation omitted); *see also Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1369 (5th Cir. 1983) ("It would be anomalous to hold that, while the litigation was in good faith, the publicity and warnings preceding it were not."). (*Id.* at 19, 20.)

Separately on this point, Vail Health argues that Plaintiffs cannot "overcome [the] rebuttable presumption that statements about a competitor have a *de minimis* effect on competition." (*Id.* at 22.) In particular, Vail Health stresses that Plaintiffs cannot show that its allegedly disparaging statements were "clearly false," given that the state trial court found (and the Colorado Court of Appeals affirmed) that Plaintiffs' defamation claims—which were largely based on the same allegedly disparaging statements at issue here—were substantially true. *See Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 762 F.3d 1114, 1127 (10th Cir. 2014) (observing that the "stringent trade-disparagement test" "presumes that trade disparagement bears only a *de minimis* effect on competition," assuming certain factors are not met, including that the disparagement was "clearly false"). (*Id.* at 22.)

15

As to the second group, Vail Health argues that "Plaintiffs cannot show that the consideration and negotiation of an unconsummated joint venture constituted anticompetitive behavior."  *See Springfield Terminal Ry. Co. v. Canadian Pac. Ltd.*, 133 F.3d 103, 105 (1st Cir. 1997) ("We must dismiss the several allegations of conduct that resulted in no action"); *see also Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F.Supp.3d 1156, 1172 (D. Or. 2021) (rejecting claims premised on an unaccepted agreement containing a non-compete clause).  (*Id.* at 23–24.)

As to the third group, Vail Health argues that its non-solicitation provisions "have many legitimate business justifications," which necessarily defeats Plaintiffs' Section 2 claims, because such claims only scrutinize conduct that "has little or no value beyond the capacity to protect the monopolist's market power."  (*Id.* at 24 (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013).)  Vail Health cites Tenth Circuit caselaw providing that "many jurisdictions hold that businesses possess a legitimate interest in protecting the special training of employees, trade secrets, confidential business information, loss of clients, good will, reputation, seeing that contracts with clients continue, and referral sources."  (*Id.* (quoting *Retiree, Inc. v. Anspach*, 660 F. App'x. 582, 587 (10th Cir. 2016) (cleaned up).)  Vail Health maintains that its non-solicitation agreements bear these same non-predatory hallmarks.  (*Id.*)

And as to the fourth group, Vail Health argues that its leases with TSC are not anticompetitive because they do "not restrict [TSC's] ability to compete with Vail Health outside the leased property, including anywhere else in Eagle County."  *See JetAway Aviation, LLC v. Bd. of Cnty. Comm'rs of Cnty. of Montrose, Colo.*, 754 F.3d 824, 863 (10th Cir. 2014) (Tymkovich, J., concurring) ("The Airport has no antitrust duty to open

16

its premises up to concessionaire competition.").  (*Id.* at 24–25 (citing *Novell, Inc.*, 731

F.3d at 1074 ("Even a monopolist generally has no duty to share . . . physical property

with a rival.").)

Vail Health's decision to organize its Motion in this way makes sense because it

generally tracks with how *Plaintiffs* ordered their theories of liability in the amended

complaint.  (ECF No. 26 at 18–27.)  It is also consistent with Tenth Circuit caselaw,

which recognizes that "[r]eal-world monopolists may engage in allegedly exclusionary

conduct which does not fit within a single paradigm, instead exhibiting characteristics of

several common forms of alleged misconduct."  *In re EpiPen*, 44 F.4th at 982.  As such,

the Circuit has instructed courts to "disaggregate the exclusionary conduct into its

component parts before applying the relevant law."  *Id.*; *see also id.* ("For the sake of

accuracy, precision, and analytical clarity, we must evaluate Mylan's allegedly

exclusionary conduct separately.").

Despite all this, Plaintiffs do not structure their response to the Motion in a cogent

manner; rather, they primarily focus on a new theory of liability[9] that finds no basis in the

amended complaint: That Vail Health engaged in exclusionary conduct by "commit[ing]

$173 million in financial benefits to [TSC] and its nonprofit research affiliate, SPRI, in

---

[9] Vail Health suggests that the Court should not consider this new theory because it is not
mentioned in the amended complaint.  (ECF No. 549 at 10.)  But the theory is discussed in the
Final Pretrial Order.  *See Elephant Butte Irrigation Dist. v. U.S. Dep't of Interior*, 538 F.3d 1299,
1302 (10th Cir.2008) ("[T]he pretrial order is treated as superseding the pleadings and
establishing the issues to be considered at trial."). (ECF No. 583.)  So while the Court is most
unimpressed by Plaintiffs' last-minute pivot, it will nonetheless address whether this new theory
supports their antitrust claims.  *See A.B., by Ybarra v. City of Woodland Park*, 174 F. Supp. 3d
1238, 1246 (D. Colo. 2016) ("Although the Final Pretrial Order was entered after the Motion for
Summary Judgment was filed, the Court finds this does not necessitate a different result.").

exchange for an agreement not to compete in the physical therapy (relevant market)

and relevant geographic market of Vail Valley."  (ECF No. 543 at 21.)

This sloppy briefing not only saddles the Court[10] with the unenviable task of

trying to decipher why Plaintiffs believe Defendants' summary judgment arguments are

afield—it has substantive consequences as well.  Specifically, Plaintiffs ignore or fail to

develop responses to most of Vail Health's arguments, seemingly as a result of their

jumbled briefing structure.  For instance, Plaintiffs fail to meaningfully address Vail

Health's arguments that

- the *Noerr-Pennington* doctrine forecloses a finding of liability based on its

  reports to the public, competitors, and government entities that Winninger

  took patients' PHI.  (*Id.*)  The term "*Noerr-Pennington*" and the word

  "immunity" are totally absent from Plaintiffs' response.[11]  (*See generally*

  ECF No. 543.)

- Vail Health's petitions and related statements are not actionable because

  statements about competitors generally only have a *de minimis* effect on

  competition.  (*See generally id.*)

---

[10] The Court apparently isn't alone in its frustration with the quality of Plaintiffs' briefing.  The
state trial court presiding over the parties' state law claims "continued a trial setting conference
because its consideration of the summary judgment motion was taking longer than 'even the
most complex cases due to the length of' Winninger and Sports Rehab's response to Vail
Health's summary judgment motion (Response), *the Response's poor organization*, and the
length of the SAC."  (ECF No. 627-1 at 11–12 (emphasis added).)

[11] Plaintiffs argue, in a single paragraph, that "Vail Health filed fraudulent claims in the state
court action that have cost Plaintiffs hundreds of thousands of dollar in costs and eventually will
cost untold dollars in attorneys/fees."  (ECF No. 543 at 27.)  By this, however, the Court does
not construe Plaintiffs to specifically challenge Vail Health's *Noerr-Pennington* doctrine
argument.

- Vail Health's leases with TSC are not actionable because "Vail Health had
  no obligation to continue leasing its property to a competitor."  (ECF No.
  549 at 14.)  Plaintiffs only briefly mention[12] the non-compete provision in
  the argument section of their response, stating in conclusory fashion that
  "[t]he intent to exclude competition is clear from the language of the [TSC]
  lease."  (ECF No. 543 at 21.)

- Vail Health's employment contracts containing non-solicitation provisions
  "have many legitimate business justifications," thereby defeating Plaintiffs'
  Section 2 claims, because such claims only scrutinize conduct that "has
  little or no value beyond the capacity to protect the monopolist's market
  power."  (ECF No. 528 at 24.)  Plaintiffs' argument section in their
  response makes *zero* mention of the non-solicitation provision.  (ECF No.
  543 at 20–30.)

- the joint venture contemplated in the LOIs was never consummated.  On
  the contrary, Plaintiffs acknowledge that "[t]he LOI was renewed multiple
  times and expired on September 1, 2016."  (ECF No. 543 at 4.)

By ignoring or failing to develop meaningful rejoinders to these arguments,

Plaintiffs have waived and/or abandoned them.  *See Bella Monte Owners Ass'n, Inc. v.*

*Vial Fotheringham, LLP*, 2021 WL 5961566, at *7 (D. Utah Dec. 16, 2021) ("Bella Monte

had notice of this argument in VF's motion, but it failed to respond in its opposition.  If a

---

[12] Plaintiffs later say in their response that "[t]he payments must be considered in concurrence
with the horizontal territorial non-compete in the lease and [TSC's] decision to decline to enter
the physical therapy market."  (*Id.* at 25.)  But this is yet another conclusory statement.  It is not
a substantive rejoinder to Vail Health's argument that its leases were not predatory or otherwise
anticompetitive.

party fails to make an argument in opposition to a motion for summary judgment, that argument is waived."); *see also Smith v. Liberty Mut. Fire Ins. Co.*, 495 F. Supp. 3d 1019, 1028 (D.N.M. 2020) ("Mr. Smith fails to respond to the Individual Defendants' argument regarding whether they owed him an individual duty of care, nor did he include any evidence or argument regarding negligence in his response brief. Accordingly, the Court finds that he has waived this claim."); *Shelter Gen. Ins. Co. v. Goodyear Tire & Rubber Co.*, 2023 WL 2648014, at *5 (D. Colo. Mar. 27, 2023) ("When a party fails to address the arguments that its opponent puts forth in a motion for summary judgment, that party's claim is usually deemed abandoned."); *Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (upholding district court's conclusion that plaintiff "abandoned his equal protection claim by failing to address it in his response to defendants' motion for summary judgment").

These omissions are particularly problematic with respect to Plaintiffs' admitted obligation to identify the exclusionary conduct allegedly perpetrated by Vail Health—a necessary element of both their monopolization and attempted monopolization claims. (*See* ECF No. 543 at 24 (Plaintiffs acknowledging that Tenth Circuit caselaw "compels identification of the alleged anticompetitive conduct at issue").)  As to exclusionary conduct, Plaintiffs' provide the following argument:

> [TSC] was about to enter the physical therapy market in the Vail Valley as a competitor of Vail Health's HH physical therapy clinic.  To foreclose what would have been substantial, even debilitating competition, Vail Health committed $173 million in financial benefits to [TSC] through its non-profit research affiliate SPRI in exchange for an agreement not to engage in competition in the physical therapy (product) market or relevant geographic market of Vail Valley.  This agreement constitutes a territorial limitation

20

> (and product allocation) between a competitor (Vail Health)
> and a nascent competitor ([TSC]), both at the same
> horizontal level of competition in the physical therapy
> market.  This agreement is a 'naked restraint of trade with no
> purpose except stifling competition.'  [TSC] was and is a
> large, superbly funded orthopedic surgery group that
> provided about 60% of the billable physical therapy units of
> care to HH, so at the very least has the 'potential for genuine
> adverse effects on competition' and 'a dangerous probability
> of achieving monopoly power.'

(ECF No. 453 at 24–25 (footnotes omitted).)

The problem with Plaintiffs' theory that Vail Health paid TSC and SPRI $173 million in exchange for a commitment not to compete, however, is that it is conclusory and enjoys no evidentiary support.  Indeed, the documents signed by Vail Health, TSC, and SPRI pursuant to their "ten-year reset" did *not* purport to bind them to a noncompete agreement, nor did it have such a real-world effect.  The LOI, "ratified" by Vail Health's Finance Committee pursuant to the reset, is the only document that even spoke to such an agreement.  It expressly stated that "[t]he Parties *wish to commence negotiating definitive written agreements* providing for the Potential Transaction (the 'Definitive Agreements').  (ECF No. 543-10 at 2 (emphasis added).)  The LOI then went on to clarify that *"*[t]he Parties understand and agree that the remaining provisions of this letter of intent (Section 1 and Exhibit A) *do not constitute and will not give rise to any legally binding obligation on the part of either of the Parties*."  (*Id.* at 3 (emphasis added).)  The LOI continued: "Except for the Binding Provisions, a binding commitment with respect to the Potential Transaction *will result only from the execution of the Definitive Agreements*, subject to the conditions expressed therein."  (*Id.* (emphasis added).)

21

Hence, the LOI itself confirmed that its legal effect was limited to merely stating

the members' "wish" to begin "negotiating" a potential future agreement to form a new

Colorado LLC and to not compete with one another.  It did not purport to bind the

parties to a current noncompete provision.  Notably, the parties *agree that the LOI never*

*led to the execution of a definitive agreement containing noncompete provisions*.[13]

Plaintiffs concede that the final LOI expired in September 2016.  (ECF No. 543-1 at 16 ¶

87.)

Lest there be any doubt about the real-world consequences of the LOI, Vail

Health, TSC, and SPRI's conduct following the execution of the "ten-year reset"

unambiguously demonstrates its precatory nature.  Shortly after the final LOI expired in

September 2016, TSC informed Vail Health that it had "been approached" by another

competitor in the PT industry "with interest in pursuing joint business opportunities with

TSC.  PT/Rehab is one of the identified opportunities."  (ECF No. 543-38 at 3.)  TSC

then warned Vail Health that it was considering pursuing this opportunity with the

competitor: "I do not want you to be caught off guard would we decide to explore/pursue

an in-house approach with PT."  (*Id.*)  That is, TSC was clearly under the impression

that it had the freedom to contract with other competitors in the PT industry,

---

[13] As mentioned in the Court's material fact section, Kirchner at some point announced that
Philippon "appears to be on Board with the HH MSO [*i.e.*, the joint venture] and is not interested
in setting up a competitive therapy situation to HH."  (ECF No. 543-49 at 3 (explanatory brackets
added).)  But the Court does not understand, based on the parties briefing, that TSC and SPRI
actually ever executed noncompete agreements with Vail Health.  Indeed, soon after receiving
this news, Kirchner informed other Vail Health officials that she had learned that "SPRI is going
to not play with the HH MSO . . . ."  (ECF No. 543-51 at 2.)  And in any event, Plaintiffs do not
argue that this momentary period of ostensible agreement constituted actionable exclusionary
conduct.  Rather, Plaintiffs' theory of exclusionary conduct hinges almost solely on the
execution of the "ten-year reset" partnership.

notwithstanding the fact that Vail Health had recently thrown over a hundred million

dollars its way via the "ten-year reset."  Moreover, Vail Health plainly seemed to share

this understanding: Kirchner described the possibility of TSC contracting with another

PT provider as being "[q]uite concerning," adding that, "[o]bviously, there will be many

issues for [Vail Health] *if TSC pursues the independent route*."  (*Id.* (emphasis added).)

Another Vail Health official agreed that the e-mail was "[v]ery concerning."  (*Id.* at 2.)

The possibility that TSC and SPRI would collaborate with PT providers other than

Vail Health became a reality soon enough.  In August 2016, TSC and SPRI signed

consulting agreements with Plaintiffs, whereby the former referred its orthopedic surgery

patients to the latter.  (ECF No. 543-1 at 17.)  Vail Health was troubled by this

collaboration, even speculating that "[t]he potential is extremely high that TSC will try to

partner with Lindsey Winneger [sic] in a private physician therapy venture."  (ECF No.

543-44.)  And although TSC and SPRI put these consulting agreements on hold in

January 2017, this undisputedly had nothing to do with the "ten-year reset."  The record

reveals that TSC and SPRI paused the consulting agreements only after learning that

Vail Health showed Philippon a draft complaint alleging various state law claims against

Plaintiffs based on Winninger's taking of patient files that included PHI.  (ECF No. 543

at 19.)

Even Plaintiffs concede that the pause was unrelated to the $173 million

partnership.  In their words, TSC "put the agreements on hold *because of Vail Health's

allegations against Winninger.*  [TSC] told her she had to clear her name before it would

proceed with agreements."  (ECF No. 543 at 6 (emphasis added).)  At any rate, the

pause was short-lived.  In May 2017—only a few months after the pause commenced in

23

January 2017—Plaintiffs signed amended consulting agreements with SPRI. (ECF No. 530-4 at 3.) TSC then undisputedly continued to refer patients to Plaintiffs throughout 2017 and 2018 pursuant to these amended consulting agreements. (ECF No. 543 at 6; ECF No. 530-1 at 28.)

From all this, the Court finds that the uncontroverted evidence establishes that Vail Health did *not* pay TSC and SPRI $173 million in exchange for an agreement not to compete in the PT market, as Plaintiffs repeatedly assert. (*See, e.g.*, ECF No. 543 at 21 (asserting that the grant was "in exchange for an agreement not to compete" and describing the grant as a "contractual restriction"); *id.* at 26 (asserting that TSC "agreed to refrain from competing against Vail Health"); *id.* at 28 (asserting that Vail Health violated the Sherman Act "by illegally paying [TSC] millions to stay out of the market").)

Consequently, the Court concludes the "ten-year reset"—on which Plaintiffs almost exclusively rely in support of their antitrust claims—does not constitute actionable exclusionary conduct, and therefore as a matter of law cannot sustain Plaintiffs' monopolization and attempted monopolization claims.[14]  *See New Mexico Oncology & Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, 54 F.Supp.3d 1189, 1206 (D.N.M. 2014) ("To bring a monopolization or monopolization claim, Plaintiff must allege both (1) the possession of monopoly or monopsony power and (2) the maintenance of that power through exclusionary conduct.").

---

[14] Perhaps realizing that the "ten-year reset" agreement did not include an agreement not to compete, Plaintiffs at times argue that the reset created an "irresistible incentive" not to compete. (ECF No. 543 at 26.)  But Plaintiffs cite no caselaw for the proposition that conduct which creates merely an "incentive" not to compete constitutes exclusionary conduct under the Sherman Act.  And in any event, any incentive not to compete was in fact quite "resistible."  As discussed, TSC twice contracted with Plaintiffs via the consulting agreements after Vail Health paid it millions of dollars.

24

This lack of evidence showing exclusionary conduct leads the Court to further conclude that Plaintiffs have failed to demonstrate antitrust standing.  Recall that a plaintiff has antitrust standing only if they can "show (1) an antitrust injury and (2) a causal connection between the defendant's antitrust violation and their alleged antitrust injury."  *Compliance Mktg., Inc.*, 2010 WL 1416823, at *4.  "An antitrust injury is 'an injury of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'"  *Id.* (citation omitted).

Plaintiffs cannot show that the antitrust laws were designed to prevent Vail Health from simply executing a $173 million dollar partnership with TSC and SPRI in Vail Valley's PT market.  For the reasons discussed, this partnership did not injure Plaintiffs because it did not foreclose them from pursuing their PT business in Vail. Plaintiffs were successfully able to partner with TSC and SPRI on two occasions less than a year after that partnership was executed.  *See Edwards Vacuum, LLC v. Hoffman Instrumentation Supply, Inc.*, 556 F.Supp.3d 1156, 1172 (D. Or. 2021) ("[I]t is difficult to see how an unaccepted offer . . . can cause antitrust injury to [the defendant].");  *see also Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1254 (10th Cir. 2003) ("A violation of the Act without resultant injury to the [plaintiff] is insufficient to confer standing, [plaintiff] must show the antitrust injury resulted directly from [the defendant's] violation of antitrust law.") (citation omitted); *World of Sleep, Inc. v. Stearns & Foster Co.*, 525 F.2d 40, 43 (10th Cir. 1975) ("It is well established that an essential element for recovery under antitrust laws is that the claimant be injured or damaged, and a violation of the Act without resultant injury is not

25

enough.").

And by 2019, nearly a dozen other companies providing PT services had commenced operations in the Vail Valley market.  (ECF No. 528 at 11.)  Thus, Plaintiffs can in no way establish that competition was injured by the $173 million dollar partnership either.  *See Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *4 (S.D.N.Y. Mar. 20, 2015) ("Even assuming, *arguendo*, that Defendant's conduct may result in price increases, Plaintiff would still have failed plausibly to allege 'an adverse effect on competition market-wide . . . .'"); *see also In re Baseball Bat Antitrust Litig.*, 75 F.Supp.2d 1189, 1198 (D. Kan. 1999) (discerning no antitrust injury where a competitor was excluded, but other competitors remained).

In reaching this conclusion, the Court acknowledges the significant evidence demonstrating Vail Health's intent to strengthen its position in the PT market at the expense of Plaintiffs.  The evidence shows that Vail Health noticed when Plaintiffs arrived on the PT scene and began to assiduously monitor their relationships with TSC and SPRI thereafter.  Vail Health was concerned that Plaintiffs were going to pursue a joint venture with TSC and SPRI and believed that Winninger "ha[d] the relationship with [Philippon] to pull this off" because Philippon's "higher profile [sic] patients do not have to mix with regular patients within our clinic."  (ECF No. 543-29 at 2.)  And as soon as Plaintiffs partnered with TSC and SPRI, Vail Health began to distribute copies of its draft complaint against Plaintiffs to competitors, presumably to damage their reputation.

The Tenth Circuit has recognized that such "intent evidence is relevant in antitrust analysis."  *In re EpiPen*, 44 F.4th at 990–91.  But such evidence is relevant only insofar as there is an "inference of *exclusionary effect*."  *Id.* at 991 (emphasis added).  Without

26

evidence of such exclusionary effect, "intent cannot save the plaintiff's case." *Id.*; *see
also Novell, Inc.*, 731 F.3d at 1078 (Gorsuch, J.) ("Were intent to harm a competitor
alone the marker of antitrust liability, the law would risk retarding consumer welfare by
deterring vigorous competition—and wind up punishing only the guileless who haven't
figured out not to write such things down.")

To recap, the Court finds that Plaintiffs have not shown evidence of exclusionary
conduct or effect in this case.  The evidence shows that Vail Health reported
Winninger's taking of patients' PHI to the public, media, and competitors, and it
threatened to pursue litigation in an effort to undermine her reputation.  But Plaintiffs do
not respond to Vail Health's *Noerr-Pennington* defense or argument that statements
about competitors generally only have a *de minimus* effect on competition.  The
evidence shows that Vail Health used noncompete provisions in its leases with TSC.
But Plaintiffs do not respond to Vail Health's argument that its leases are not actionable
because it had no obligation to lease its property to a competitor.  The evidence shows
that Vail Health required its physical therapists to sign non-solicitation agreements.  But
Plaintiffs do not respond to Vail Health's argument that those agreements are not
actionable because they have other legitimate, non-predatory business justifications.

And the evidence shows that Vail Health paid TSC and SPRI millions of dollars
and "ratified" a LOI with precatory language about forming a new Colorado LLC and
abstaining from competing with one another.  But the LOI never materialized into an
agreement establishing such an LLC, or one which bound its members not to compete.
Very much to the contrary, TSC and SPRI were free to compete with Vail Health in the
PT market within Vail Valley, which they ultimately did by signing two consulting

agreement with Plaintiffs thereafter.

Plaintiffs have therefore failed to show exclusionary conduct[15] supporting their monopolization and attempted monopolization claims.  It follows that they have failed to demonstrate antitrust standing as well.

## IV.    CONCLUSION

For all these reasons,

1.  The Motion (ECF No. 528) is GRANTED;

2.  All remaining pending motions are DENIED AS MOOT;

3.  Final Judgment shall enter against Plaintiffs and in favor of Vail Health;

4.  Vail Health shall have its costs upon its compliance with Local Rule 54.1; and

5.  The Clerk shall terminate this action.


Dated this 10th day of September, 2025.

BY THE COURT:

William J. Martínez
Senior United States District Judge

---

[15] The Court resolves the Motion without addressing Vail Health's arguments that Plaintiffs failed to show monopoly power and define a geographic market.  (ECF No. 528 at 26 n.5.)